# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

WASHINGTON AREA BICYCLIST
ASSOCIATION, INC.,

      *Plaintiff*,

v.

DOUGLAS BURGUM, in his official capacity
as SECRETARY OF THE INTERIOR;

DEPARTMENT OF THE INTERIOR;

JESSICA BOWRON, in her official capacity as
ACTING DIRECTOR, NATIONAL PARK
SERVICE;

NATIONAL PARK SERVICE;

SEAN DUFFY, in his official capacity as
SECRETARY OF TRANSPORTATION;

DEPARTMENT OF TRANSPORTATION;

SEAN MCMASTER, in his official capacity as
ADMINISTRATOR, FEDERAL HIGHWAY
ADMINISTRATION;

FEDERAL HIGHWAY ADMINISTRATION,

      *Defendants*.

Case No. 1:26-cv-00988-ABJ

## PLAINTIFF'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR A PRELIMINARY INJUNCTION

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ..................................................................................................iii

INTRODUCTION ........................................................................................................... 1

BACKGROUND ............................................................................................................. 4

    A.    WABA and Bike Lanes on the National Mall. ........................................ 4

    B.    The National Park Service Installs Protected Bike Lanes After a
Meaningful Public Consultation Process. ............................................... 6

    C.    Safety Along 15th Street Dramatically Improves After Bike Lane
Installation.............................................................................................. 8

    D.    WABA Members Use and Rely on the Bike Lanes.................................. 9

    E.    The Federal Government Plans in Secret to Remove the Bike Lanes. ................. 11

    F.    The Federal Government Decides That It Will Remove the 15th Street and
Tidal Basin Bike Lanes on March 23, Until Forced to Delay by This
Litigation................................................................................................ 12

LEGAL STANDARD...................................................................................................... 14

ARGUMENT ................................................................................................................... 14

I.    WABA Is Likely to Succeed on the Merits of Its Claims that the Lane Removal
Project Violates the Administrative Procedure Act............................................ 14

    A.    WABA Is Likely to Prevail on Its Claim that Defendants' Failure to
Submit Plans for the Lane Removal Project to the National Capital
Planning Commission is Unlawful. ....................................................... 15

    B.    Defendants' Abrupt Bike Lane Removal Project is Arbitrary and
Capricious. .............................................................................................. 17

        1.    Defendants' Sudden and Unexplained Change is Arbitrary and
Capricious. ...................................................................................... 18

        2.    Defendants' Failure to Consider Safety and Traffic Data is
Arbitrary and Capricious................................................................. 22

        3.    Defendants' Failure to Consider Serious Reliance Interests is
Arbitrary and Capricious................................................................. 24

C.  Defendants Have Unlawfully Ignored Their Procedural Obligations Under the National Environmental Policy Act. ............................................................... 26

D.  Defendants' Lane Removal Project Does Not Comply with the Park Service Organic Act's Mandate. ........................................................................... 31

II.  WABA's Members Will Suffer Irreparable Harm Without a Preliminary Injunction. ....................................................................................................................... 34

III.  The Balance of Equities and Public Interest Weigh in Favor of Preliminary Relief. ........ 40

IV.  The Court Should Not Require a Bond, Or, Alternatively, Should Require Only a Nominal Bond. ................................................................................................................. 41

CONCLUSION ................................................................................................................................. 42

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Advocs. for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.*,
  429 F.3d 1136 (D.C. Cir. 2005)......................................................................................22

*Affirmed Energy, LLC v. FERC*,
  166 F.4th 1070 (D.C. Cir. 2026)......................................................................................18

*Al-Joudi v. Bush*,
  406 F. Supp. 3d 13 (D.D.C. 2005)....................................................................................34

*Am. Ass'n of Pol. Consultants v. U.S. Small Bus. Admin.*,
  613 F. Supp. 3d 360 (D.D.C. 2020), *aff'd*, 810 F. App'x 8 (D.C. Cir. 2020).........................34

*Am. Oversight v. Hegseth*,
  788 F. Supp. 3d 14 (D.D.C. 2025)....................................................................................41

*Am. Wild Horse Pres. Campaign v. Perdue*,
  873 F.3d 914 (D.C. Cir. 2017)........................................................................................18

*\*Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*,
  462 U.S. 87 (1983)................................................................................................27, 31

*Banks v. Booth*,
  459 F. Supp. 3d 143 (D.D.C. 2020)..................................................................................37

*Baystate Franklin Med. Ctr. v. Azar*,
  950 F.3d 84 (D.C. Cir. 2020)..........................................................................................22

*Bicycle Trails Council of Marin v. Babbitt*,
  82 F.3d 1445 (9th Cir. 1996), *as amended* (June 17, 1996) .......................................................32

*Bldg. Trades Unions v. Dep't of Def.*,
  783 F. Supp. 3d 290 (D.D.C. 2025)..................................................................................42

*Brady Campaign to Prevent Gun Violence v. Salazar*,
  612 F. Supp. 2d 1 (D.D.C. 2009)...............................................................................22, 29

*Childers v. United States*,
  40 F.3d 973 (9th Cir. 1994), *as amended* (Jan. 17, 1995) .......................................................33

*Cmty. Oncology All. v. Becerra*,
  No. 23-cv-2168, 2023 WL 9692027 (D.D.C. Dec. 21, 2023) ................................................34

*Cnty. of Berks v. Otis Elevator Co.*,
  No. 15-cv-4862, 2015 WL 5585732 (E.D. Pa. Sept. 23, 2015)........................................35, 39

*Comm. of 100 on Fed. City v. Foxx*,
  87 F. Supp. 3d 191 (D.D.C. 2015).....................................................................................39

*Coronel v. Decker*,
  449 F. Supp. 3d 274 (S.D.N.Y. 2020)...........................................................................37, 38

*Costa v. Bazron*,
  456 F. Supp. 3d 126 (D.D.C. 2020).....................................................................................34

*CSL Plasma Inc. v. U. S. Customs & Border Prot.*,
  628 F. Supp. 3d 243 (D.D.C. 2022)..................................................................................2, 25

*Ctr. for Auto Safety v. Dole*,
  582 F. Supp. 1444 (D.D.C. 1984).......................................................................................40

*Daingerfield Island Protective Soc. v. Babbitt*,
  40 F.3d 442 (D.C. Cir. 1994).............................................................................................32

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
  591 U.S. 1 (2020)...............................................................................................3, 18, 25

*District of Columbia v. U.S. Dep't of Agric.*,
  444 F. Supp. 3d 1 (D.D.C. 2020).........................................................................................14

*Drs. for Am. v. Off. of Pers. Mgmt.*,
  766 F. Supp. 3d 39 (D.D.C. 2025).......................................................................................14

*El Puente v. U.S. Army Corps of Eng'rs*,
  100 F.4th 236 (D.C. Cir. 2024)...........................................................................................31

*Encino Motorcars, LLC v. Navarro*,
  579 U.S. 211 (2016).............................................................................................................2

*Esteras v. United States*,
  606 U.S. 185 (2025)...........................................................................................................28

*FCC v. Fox Television Stations, Inc.*,
  556 U.S. 502 (2009)....................................................................................................20, 22

*Fed. Prescription Serv., Inc. v. Am. Pharm. Ass'n*,
  636 F.2d 755 (D.C. Cir. 1980)...........................................................................................41

*Franklin v. Massachusetts*,
  505 U.S. 788 (1992)...........................................................................................................15

*Friends of the Ompompanoosuc v. FERC*,
    968 F.2d 1549 (2d Cir. 1992)..................................................................................30

\**Friends of the Vietnam Veterans Mem'l v. Kennedy*,
    116 F.3d 495 (D.C. Cir. 1997) ......................................................................6, 32, 33

*Gorbach v. Reno*,
    219 F.3d 1087 (9th Cir. 2000) ...............................................................................28

*Jud. Watch, Inc. v. Nat'l Energy Pol'y Dev. Grp.*,
    219 F. Supp. 2d 20 (D.D.C. 2002) .........................................................................14

*L.G.M.L. v. Noem*,
    800 F. Supp. 3d 100 (D.D.C. 2025) ........................................................................42

*League of Women Voters of United States v. Newby*,
    838 F.3d 1 (D.C. Cir. 2016)....................................................................................40

*Lemon v. Geren*,
    514 F.3d 1312 (D.C. Cir. 2008)..............................................................................16

*Mashpee Wampanoag Tribe v. Bernhardt*,
    No. 18-cv-2242, 2020 WL 3034854 (D.D.C. June 5, 2020)..............................40, 41

*Media Matters for Am. v. Paxton*,
    138 F.4th 563 (D.C. Cir. 2025)...............................................................................40

*MediNatura, Inc. v. FDA*,
    998 F.3d 931 (D.C. Cir. 2021).................................................................................25

*Mooreforce, Inc. v. U.S. Dep't of Transp.*,
    243 F. Supp. 2d 425 (M.D.N.C. 2003) ....................................................................38

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983)..................................................................................................18

*Mullins v. City of New York*,
    626 F.3d 47 (2d Cir. 2010)......................................................................................34

*N.S. v. Hughes*,
    335 F.R.D. 337 (D.D.C. 2020).................................................................................40

*NAACP Erie Unit 2262 v. Fed. Highway Admin.*,
    648 F. Supp. 3d 576 (W.D. Pa. 2022)......................................................................30

*Nat. Res. Def. Council v. U.S. Nuclear Regul. Comm'n*,
    879 F.3d 1202 (D.C. Cir. 2018)...............................................................................30

*Nat'l Ass'n of Farmworkers Orgs. v. Marshall*,
    628 F.2d 604 (D.C. Cir. 1980) ...................................................................................35

*Nat'l Council of Nonprofits v. OMB*,
    763 F. Supp. 3d 36 (D.D.C. 2025) ..............................................................................22

*PPL Wallingford Energy LLC v. FERC*,
    419 F.3d 1194 (D.C. Cir. 2005) ..................................................................................33

*Protect Key W., Inc. v. Cheney*,
    795 F. Supp. 1552 (S.D. Fla. 1992) .............................................................................38

*Pub. Citizen, Inc. v. FAA*,
    988 F.2d 186 (D.C. Cir. 1993) ....................................................................................18

*Pub. Citizen v. Fed. Motor Carrier Safety Admin.*,
    374 F.3d 1209 (D.C. Cir. 2004) ...................................................................................2

*Rocky Mountain Peace & Just. Ctr. v. U.S. Fish & Wildlife Serv.*,
    40 F.4th 1133 (10th Cir. 2022) ...................................................................................29

*S. Dakota v. Frazier*,
    No. 4:20-cv-03018, 2020 WL 6262103 (D.S.D. Oct. 23, 2020) ................................38

*S. E. Pa. Transp. Auth. v. Int'l Ass'n of Machinists & Aerospace Workers*,
    708 F. Supp. 659 (E.D. Pa. 1989), *aff'd*, 882 F.2d 778 (3d Cir. 1989) ......................38

*Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*,
    605 U.S. 168 (2025) ................................................................................................2, 26

*Shawnee Tribe v. Mnuchin*,
    984 F.3d 94 (D.C. Cir. 2021) ......................................................................................40

*Sierra Club v. Mainella*,
    459 F. Supp. 2d 76 (D.D.C. 2006) ..............................................................................33

*Smiley v. Citibank (S.D.), N.A.*,
    517 U.S. 735 (1996) ....................................................................................................20

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
    540 F.Supp.3d 45 (D.D.C. 2021) ................................................................................34

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
    No. 16-cv-1534, 2021 WL 2036662 (D.D.C. May 21, 2021) ......................................34

*Stellar IT Sols., Inc. v. U.S. Citizenship & Immigr. Serv.*,
    No. 18-cv-2015, 2018 WL 6047413 (D.D.C. Nov. 19, 2018) ......................................40

*Taylor v. Trump*,
No. 25-cv-3742, 2026 WL 396844 (D.D.C. Feb. 11, 2026) .....................................................41

*Terbush v. United States*,
516 F.3d 1125 (9th Cir. 2008) ..................................................................................................33

*Thakker v. Doll*,
451 F. Supp. 3d 358 (M.D. Pa. 2020) .......................................................................................35

*U.S. Army Corps of Eng'rs v. Hawkes Co.*,
578 U.S. 590 (2016) ..................................................................................................................15

*United States v. City of Berkeley*,
735 F. Supp. 937 (E.D. Mo. 1990) ............................................................................................35

*W. Va. Rivers Coal., Inc. v. Chemours Co. FC, LLC*,
793 F. Supp. 3d 790 (S.D.W. Va. 2025) ...................................................................................35

*\*WildEarth Guardians v. Jewell*,
738 F.3d 298 (D.C. Cir. 2013) ..............................................................................................3, 27

*Wilderness Soc'y v. U.S. Dep't of Interior*,
No. 22-cv-1871, 2024 WL 3443754 (D.D.C. July 16, 2024) ...................................................31

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008) ......................................................................................................................14

**Statutes**

5 U.S.C. § 552b(b) ...........................................................................................................................17

5 U.S.C. § 705 ............................................................................................................................14, 42

5 U.S.C. § 706(2) .............................................................................................................................17

5 U.S.C. § 706(2)(A) .....................................................................................................................2, 14

16 U.S.C. § 1 ....................................................................................................................................32

40 U.S.C. § 8702(2) .........................................................................................................................15

40 U.S.C. § 8711(a) .........................................................................................................................17

40 U.S.C. § 8722(a) .........................................................................................................................15

40 U.S.C. § 8722(b)(1) ......................................................................................................2, 15, 16, 17

40 U.S.C. § 8722(b)(2)(A) ...............................................................................................................17

40 U.S.C. § 8722(b)(2)(B) ..................................................................................................17

42 U.S.C. § 4331(b)(3) .......................................................................................................29

42 U.S.C. § 4332(2)(C)(i) ...................................................................................................27

42 U.S.C. § 4332(2)(F) .......................................................................................................27

42 U.S.C. § 4336e(1) .......................................................................................................3, 27

54 U.S.C. § 100101 .............................................................................................................32

54 U.S.C. § 100101(a) .......................................................................................................3, 6

## Regulations and Other Administrative Materials

23 C.F.R. § 771.117(a)....................................................................................................27, 29

23 C.F.R. § 771.117(b)(2)....................................................................................................30

23 C.F.R. § 771.117(c)(3) ...................................................................................................28

23 C.F.R. § 771.117(c)(26) .................................................................................................28

43 C.F.R. § 46.205 ..............................................................................................................27

43 C.F.R. § 46.215(a)........................................................................................................3, 29

90 Fed. Reg. 24,644 (June 11, 2025) ..................................................................................28

Exec. Order No. 14252 § 4(a), 90 Fed. Reg. 14,559 (Apr. 3, 2025).............................................15

## Other Authorities

Fed. R. Civ. P. 65(c) ...........................................................................................................41

Dep't of the Interior, *NEPA Handbook*, Appendix 2, NPS, § 12.6(13),
   https://perma.cc/4BWK-P7DV ........................................................................................28

Dist. Dep't of Transp., *2024 Performance Oversight Questions, Part II*,
   https://perma.cc/X2EF-BQWC ......................................................................................8, 39

Dist. Dep't of Transp., *A Plan of Action* (2015), https://perma.cc/93GX-WW3F .........................35

Dist. Dep't of Trans., *Bicycle Facility Evaluation* (2012), https://perma.cc/7XKH-
   6L55 .................................................................................................................................24

Fed. Highway Admin., *Categorical Exclusion – 15th St Cycle Track Removal and
   Road Repaving* (Feb. 27, 2026), https://perma.cc/5RDV-DXQL...........................................12

Fed. Highway Admin., *Proven Safety Countermeasures: Bicycle Lanes* (last visited Mar. 22, 2026), https://perma.cc/KH6L-FCJJ..........................................23

Letter from Rep. Donald S. Beyer Jr. et al. to Jessica Bowron, Acting Dir., Nat'l Parks Serv. (Mar. 20, 2026), https://perma.cc/2LCB-3YF6 .......................................13, 16, 26

Letter from Meghan Hottel-Cox, General Counsel and Chief FOIA Officer, Nat'l Capital Planning Comm'n (Apr. 14, 2025), https://perma.cc/A4J8-TG5N ............................17

MoveDC, *Bicycles* (last visited Mar. 21, 2026), https://perma.cc/RN7B-AH4W .........................36

Nat'l Capital Planning Comm'n, *The Comprehensive Plan for the National Capital: Federal Elements – Transportation Element* (2020), https://perma.cc/Z9WV-CK3V ...................................................................................16

Nat'l Highway Traffic Safety Admin., *Countermeasures That Work* (11th ed. 2023), https://perma.cc/8Q95-V6TH ....................................................................36

Nat'l Park Serv., *15th Street Cycle Track Removal and Road Repaving* (last visited Mar. 25, 2026), https://perma.cc/3U4K-N7ZV .............................................12

Nat'l Park Serv., *National Mall Plan: Summary* (2010), https://perma.cc/6RCU-LMTJ ...............................................................................6, 7, 21

Nat'l Park Serv., *Paved Trails Study* (2016), https://perma.cc/B6AP-Q7AZ ...............................21

Nat'l Park Serv., *Improving Roads and Multi-Use Trails Around the National Mall* (last updated Aug. 31, 2021), https://perma.cc/J6PU-GJF9...........................................20

Nat'l Park Serv., *NEPA Handbook* § 2.1 (2015), https://perma.cc/J8FX-FQJ5 ...........................31

Nat'l Park Serv., *New Bike Lane Coming to National Mall* (Oct. 7, 2021), https://perma.cc/JYN2-YGUM ...............................................................................36

Nat'l Park Serv., *The Mall* (last updated Dec. 22, 2025), https://perma.cc/NK5F-HV8C ...............................................................................................................33

Nat'l Park Serv., *Categorical Exclusion – 15th St Cycle Track Removal and Road Repaving* (Feb. 20, 2026), https://perma.cc/XF93-BFCP.........................................12

National Mall NPS (@NationalMallNPS), X (Mar. 25, 2026, at 07:50 PM), https://perma.cc/DM8K-GFMP ...............................................................................26

National Cherry Blossom Festival Dates, https://perma.cc/FPA9-VEK4 ....................................19

Randi Hildreth, *DC Mayor Bowser Opposes Removal of 15th Street Bike Lanes*, WUSA9 (Mar. 21, 2026), https://perma.cc/WN7Q-T32C....................................13, 19, 24, 30

Vision Zero D.C., *Bicycle Safety* (last visited Mar. 21, 2026),
    https://perma.cc/34N8-GM46 ...................................................................................................36

**INTRODUCTION**

The federal government is poised to destroy, as early as April 23, protected bike lanes that run through the National Mall.  Indeed, the only reason the lanes continue to exist today is because of the pendency of this lawsuit, which has already twice caused the government to delay demolition and attempt to provide some public reason for its planned actions.  The lanes, which follow 15th Street, NW, for most of their route, connect central Washington, D.C. with Virginia and provide safe access for residents and tourists alike to Washington's iconic monuments.  The National Park Service ("NPS") constructed the lanes fewer than five years ago, in cooperation with the District Department of Transportation ("DDOT").  The original construction of these lanes occurred only after NPS satisfied its assessment and public consultation obligations under the National Capital Planning Act ("NCPA"), National Environmental Policy Act ("NEPA"), and other federal statutes.

The process was a success.  After construction of the lanes finished, safety along the part of 15th Street that comprises the majority of the planned removal action improved dramatically: Roadway crashes plummeted by 46% and bicycle injury crashes by 91%.  Members of Plaintiff, the Washington Area Bicyclist Association, Inc. ("WABA"), benefit from that safety daily.  They bike to work, to home, and more, all relying on the bike lanes' direct route, and the protection from danger the lanes provide.  But the Department of the Interior, through NPS, and in partnership with the Federal Highway Administration ("FHWA"), seeks to undo these protections.

NPS and FHWA have provided no meaningful public justification for the planned action, nor any opportunity for public involvement, remaining silent on their plans until the pendency of this litigation.  Acting in haste and, until now, in secret, the agencies intend to tear out the successful, carefully planned bike lanes in the midst of Spring, one of the Mall's busiest times. This will erase the bike lanes' marked safety benefits, sever a crucial transportation link between

Virginia and D.C., and diminish the quality of life for residents of the District of Columbia and visitors alike.

This removal project is illegal, for four reasons. *First*, the NCPA instructs that "*before* preparing construction plans" federal agencies "*shall* advise and consult with the [National Capital Planning] Commission as the agency prepares plans and programs . . . that affect the plan and development of the National Capital." 40 U.S.C. § 8722(b)(1) (emphasis added). NPS recognized this obligation when it constructed the lanes, and sought and obtained the Commission's approval before moving forward. This time, though, it has not satisfied these consultation requirements.

*Second*, the Administrative Procedure Act ("APA") demands that agency actions be "reasonable and reasonably explained," rather than arbitrary and capricious. *Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, 605 U.S. 168, 180 (2025); 5 U.S.C. § 706(2)(A). The lane removal is arbitrary and capricious three times over. To start, "where the agency has failed to provide even [a] minimal level of analysis, its action is arbitrary and capricious and so cannot carry the force of law." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016). That is true here because NPS and FHWA have charged ahead without providing any meaningful explanation or analysis to the public. The only justifications are found in press statements and two curt NEPA documents that became public only because of this lawsuit. Moreover, an agency decision "normally is arbitrary and capricious if it 'entirely failed to consider an important aspect of the problem' before it." *Pub. Citizen v. Fed. Motor Carrier Safety Admin.*, 374 F.3d 1209, 1216 (D.C. Cir. 2004) (citation modified). The scant documentation available confirms that NPS and FHWA ignored the proven safety record of these protected bike lanes. Finally, agencies "must be especially 'cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account.'" *CSL Plasma Inc. v. U.S. Customs & Border Prot.*, 628 F. Supp.

3d 243, 259 (D.D.C. 2022) (quoting *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020)).  The bike lanes are part of the fabric of many WABA members' lives—and of D.C. bicyclists and visitors.  The lanes help bicyclists save money through traveling by bike, and help determine where they go to shop, socialize, and work.  NPS's and FHWA's thin paper trail— to the extent it says anything at all—indicates that the agencies considered none of that.

*Third*, under NEPA, NPS and FHWA must "consider and report on the environmental effect of their proposed actions."  *WildEarth Guardians v. Jewell*, 738 F.3d 298, 302 (D.C. Cir. 2013).  NEPA recognizes that federal agencies need not provide detailed environmental assessments for an action that an agency "has determined normally does not significantly affect the quality of the human environment," 42 U.S.C. § 4336e(1), but instead may rely upon adopted "categorical exclusions."  NPS and FHWA extend this concept beyond its lawful bounds to actions that have real and harmful consequences that NEPA was designed to analyze.

NPS and FHWA claim an exclusion for routine highway "modernization" applies here. But the exclusion's plain text does not cover bike lane removal, and Interior's own regulations provide that actions with "significant impacts on public health or safety" (like this) are not appropriate for such cursory treatment.  43 C.F.R. § 46.215(a); *see id.* § 46.205(c).  The federal government's attempt to paper over its NEPA obligations is therefore insufficient.

*Fourth*, the lane removal ignores NPS's obligations under the Park Service Organic Act. That statute, NPS's basic charter, applies to the National Mall and commands that NPS "provide for the enjoyment of the scenery, natural and historic objects, and wild life in such manner and by such means as will leave them unimpaired for the enjoyment of future generations."  54 U.S.C. § 100101(a).  That command includes concern for safety and conservation, and courts have agreed

3

that motorized vehicles are often inconsistent with park values.  But here too, NPS is plowing ahead with lane removal, no matter the consequences for the National Mall.

Urgent action of the Court is required.  For WABA's members, and bicyclists throughout D.C., the stakes are high.  The protected lanes drastically reduced accident rates, and removing the lanes—the reason for the improved safety—sends bicyclists back to step one.  If the lanes are removed, a crash is a statistical inevitability; indeed, even more likely now during the busy Spring tourist and event season.  These harms will begin the day NPS and FHWA remove the lanes.  This Court's prompt intervention is necessary to avert imminent danger and ensure that the agencies properly consider their plans before acting.

In contrast, the government will face no harm if this Court temporarily pushes the "pause" button on the lane removal while it evaluates whether the government has complied with the law based on the full administrative record.  There is no urgent need—indeed, no need at all—to remove these bike lanes.  The government's shifting rationale for this action belies its claim that removal must occur by a date certain.  For the same reasons, the public interest favors issuance of a preliminary injunction.  Accordingly, this Court should enter a preliminary injunction halting removal of these bike lanes, pending an opportunity to consider a motion for summary judgment.[1]

## BACKGROUND

### A.    WABA and Bike Lanes on the National Mall.

WABA is a nonprofit organization dedicated to making streets safer and improving cycling across the D.C. region.  Declaration of Elizabeth Kiker ("Kiker Decl.") ¶ 3, attached as Exhibit

---

[1] If the Court is unable to rule on the motion for a preliminary injunction before April 23, 2026, WABA respectfully requests that the Court enter a temporary restraining order to preserve the status quo until the resolution of the motion.

A.[2]  Founded in 1972, WABA has about 5,000 members and nearly 23,000 regional advocacy supporters. *Id.*

The installation of protected bikeways is central to ensuring the safety of cyclists, including WABA's members.  Without dedicated lanes, separate from cars, bicyclists face dramatically higher risks of injury and death. *See id.* ¶ 18.  Protected bike lanes separate bikers from faster, heavier cars; prevent cars from swerving into bikers; and keep pedestrians at a safer distance from moving traffic. *See id.* ¶ 13.  Dedicated lanes also help transform biking into a practical means of transportation. *See id.* ¶ 17.

For WABA and its members, travel along 15th Street, NW, its safety, and its role in the regional bike network have long been a focus. *See id.* ¶ 7.  WABA has been calling for a safe connection along 15th Street since at least 2013.[3]  *Id.*  This is because 15th Street is a high-volume corridor, and links the D.C. region's northern and southern bicycle networks:

---

[2] Citations to attachments to Exhibit A use each attachment's internal pagination.

[3] Between Constitution Avenue and Maine Avenue, SW, 15th Street at times becomes Raoul Wallenberg Place, SW.  Kiker Decl., Att. 2, at 32.  When this document refers to "15th Street," it includes Raoul Wallenberg Place, SW.

*Id.*, Att. 2, at 16. To help close this missing link, WABA coordinated with NPS and DDOT staff, and the community, to develop bicycle lanes along 15th Street. *Id.* ¶ 7.

**B.    The National Park Service Installs Protected Bike Lanes After a Meaningful Public Consultation Process.**

Congress has charged NPS, an agency housed in the Department of the Interior, with managing the National Park System's units "in such manner and by such means as will leave them unimpaired for the enjoyment of future generations." 54 U.S.C. § 100101(a). One of those park units is the National Mall, located in the heart of Washington, D.C. *See Friends of the Vietnam Veterans Mem'l v. Kennedy*, 116 F.3d 495, 496 (D.C. Cir. 1997). The Mall "is a uniquely symbolic space in the heart of our nation's capital," housing "the enduring symbols of our country," including "monuments, memorials, statues, and other commemorative works." Nat'l Park Serv., *National Mall Plan: Summary* 6 (2010).[4]

---

[4] https://perma.cc/6RCU-LMTJ

While much of the Mall is designed for pedestrian traffic and serves as a public park for the Nation, the Mall is also crisscrossed by streets and paths that are essential for traversing Washington, D.C. NPS has authority over those cross streets, sharing a role in managing the streets of D.C. with DDOT. Kiker Decl., Att. 2, at 18. That shared role includes 15th Street (shown in teal on the map below), and connected segments of Ohio Drive, SW and East Basin Drive, SW (shown in dashed red, and referred to in this memorandum as the "Tidal Basin" lanes):



*Id.* For years, NPS and DDOT worked cooperatively to manage 15th Street and the Tidal Basin segment in keeping with NPS's goal to "[i]mprove circulation and amenities for pedestrians, bicyclists, and other visitors" to the Mall. Nat'l Park Serv., *National Mall Plan: Summary* 10 (2010).[5]

The process for installing the 15th Street bike lanes began in October 2020. Kiker Decl. ¶ 10. In the following months, a traffic analysis was conducted, crash data was reviewed, and a

---

[5] https://perma.cc/6RCU-LMTJ

conceptual design was created. *Id.* DDOT held two public meetings, and continued to meet with stakeholders during the first half of 2021. *Id.* Throughout the process, NPS honored its obligations under multiple federal statutes. NPS assessed the project under NEPA and concluded that it did not significantly affect the environment, relying on a categorical exclusion. *Id.*, Att. 3, at 1–3. NPS also evaluated the project's potential effects on historic resources under the National Historic Preservation Act. *Id.*, Att. 3, at 4–8. After this, NPS submitted the project, along with its NEPA and historic assessment documents, to the National Capital Planning Commission, as required by the NCPA. *Id.*, Att. 4. The Commission, on the recommendation of its staff and considering NPS's and DDOT's extensive public consultation, approved the project at a public meeting, noting its support for the project's goal of improving safety for all road users. *See id.* at 4; *id.*, Att. 5.

DDOT completed construction of the 15th Street bike lanes in Fall 2021. *Id.* ¶ 13. The goals of the project were to "[c]reate a safe right-of-way for people, regardless of walking, biking, or driving"; "[i]mprove function of the street and intersections to make them easier to use and understand"; and "[b]alance travel delay with right-of-way capacity and access for everyone who uses the street." *Id.*, Att. 6, at 4. The Tidal Basin segment was completed in FY 2023. Dist. Dep't of Transp., *2024 Performance Oversight Questions, Part II*, at 101 (listing the "East Basin Dr SW" segment from "Maine Ave (N)" to the "14th Street Bridge Path" as having been "installed in FY23").[6]

C.      **Safety Along 15th Street Dramatically Improves After Bike Lane Installation.**

After the installation of the bike lane, in 2026, DDOT conducted a data-driven evaluation of the 15th Street corridor and produced a report to provide a snapshot of roadway conditions before and after the installation of the bike lane. Kiker Decl., Att. 6. DDOT analyzed verified

---

[6] https://perma.cc/X2EF-BQWC

crash reports provided by the Metropolitan Police Department, a large dataset of vehicular speeds and travel times, bus speeds, and travel time provided by the Washington Metropolitan Area Transit Authority, and turning movement counts, which are collected at every signalized intersection on a regular basis. *Id.*, Att. 7, at 1–3.

DDOT's evaluation showed that the 15th Street bike lane reduced all roadway crashes by 46% and bicycle injury crashes by 91%. *Id.*, Att. 6 at 4. The evaluation also showed that the protected lanes resulted in a 3% increase in bicycle traffic along the corridor. *Id.*, Att. 6, at 4. Finally, the report showed that speeds increased by 17%, and peak hour northbound travel time decreased by thirty-six seconds, while southbound travel time decreased by forty seconds. *Id.* This demonstrates that the bike lanes did not have an adverse impact on traffic flow, likely because motorists no longer had to worry about coming into proximity with bicycles.

**D.    WABA Members Use and Rely on the Bike Lanes.**

Many WABA members benefit from the 15th Street and Tidal Basin lanes and rely on their safety in their everyday lives. Allison Foster lives in Arlington, Virginia, but regularly travels to D.C. for work. Declaration of Allison Foster ("Foster Decl.") ¶¶ 2, 4, attached as Exhibit B. The lanes help her "navigate a very busy area of the city with greater separation from vehicle traffic." *Id.* ¶¶ 4, 7. That makes biking "safer and more feasible." *Id.* ¶ 5. But without the lanes, she "will be forced to find alternate routes." *Id.* ¶ 6.

WABA member Nicholas Johnson "use[s] the 15th Street bicycle lanes nearly every day," and "regularly use[s]" the Tidal Basin lanes. Declaration of Nicholas Johnson ("Johnson Decl.") ¶¶ 4, 11, attached as Exhibit C. He uses the 15th Street lane for his commute from his "home in Southwest D.C. to his office near DuPont Circle." *Id.* The lane's "[p]hysical separation from cars and buses . . . makes it much safer to ride bicycles on 15th Street." *Id.* ¶ 7. Removing the lanes, therefore, "threaten[s]" his "safety," and would force him "to rely more on other forms of

transportation such as cars, which will contribute to traffic congestion." *Id.* ¶ 10. Removing the Tidal Basin lanes also "would make traveling to D.C. more dangerous" for him. *Id.* ¶ 11.

WABA member David Wacker is an airline pilot who "regularly commute[s]" by bike between his home in D.C. and his job at Ronald Reagan International Airport. Declaration of David Wacker ("Wacker Decl.") ¶¶ 1, 3–4, attached as Exhibit D. The 15th Street and Tidal Basin lanes "fundamentally transformed" his commute because now he no longer has to "choose between riding on crowded sidewalks, creating frequent and unsafe conflicts with pedestrians, . . . [and] riding in traffic alongside motor vehicles, where [he] was routinely subjected to aggressive and unsafe driver behavior." *Id.* ¶ 5. So, the Removal Project "would significantly degrade the safety and reliability of [his] commute." *Id.* ¶ 9.

There are many more such WABA members. Steven Bouchard lives in Alexandria and "regularly travel[s] to and from Washington, DC." Declaration of Steven R. Bouchard ("Bouchard Decl.") ¶¶ 3–4, attached as Exhibit E. He uses the 15th Street and Tidal Basin bike lanes because they are "the quickest route" and because of their "safety." *Id.* ¶ 5. With the lanes, "drivers clearly see where cyclists will be traveling, and the bollards prevent early turning." *Id.* ¶ 8. David Alpert often uses the 15th Street and Tidal Basin lanes to get from his home in D.C. to Arlington. Declaration of David Alpert ("Alpert Decl.") ¶ 4, attached as Exhibit F. For him, the lanes are "a safe and practical route" that save him money by reducing his need for driving. *Id.* ¶¶ 5–6. Ashwin Jagannathan is in the same boat. The lanes are one of his "most frequently used routes," and they keep him safe because "having physical separation from cars . . . takes the human error out of the equation and actively prevents crashes from happening." Declaration of Ashwin Jagannathan ("Jagannathan Decl.") ¶¶ 5–6, attached as Exhibit G. Hundreds of WABA's members, like these, will continue to use the 15th Street and Tidal Basin lanes—if they continue to exist after April 23.

10

*See, e.g.*, Foster Decl. ¶ 6; Johnson Decl. ¶ 10; Bouchard Decl. ¶ 13; Jagannathan Decl. ¶ 9; Kiker Decl. ¶ 16 ("I estimate that 900 of our members travel on 15th Street bike lanes every day."). And if they do not exist, many will still use this crucial route—except now exposed to new and imminent dangers. *See, e.g.*, Bouchard Decl. ¶ 13; Alpert Decl. ¶ 11; Wacker Decl. ¶ 9.

### E.      The Federal Government Plans in Secret to Remove the Bike Lanes.

The federal government plans to soon erase the segment of the 15th Street bike lanes that runs through the National Mall, as well as the Tidal Basin lanes. This rapidly unfolding effort is referred to as the "Removal Project" in this memorandum. Beginning in February, members of WABA heard from contacts in Interior and DDOT that the federal government was considering removing the 15th Street bike lanes. Kiker Decl. ¶ 22. Concerned that this change would put bicyclists' safety at risk and damage the regional bike network, and unable to find any public indication that this work was planned, WABA sent a letter to NPS on March 13, 2026. *Id.*, Att. 8. The letter expressed concerns about any bike lane removal in this area and urged NPS to comply with its legal obligations. *See id.*, Att. 8, at 3–6. WABA never received any response. *Id.* ¶ 22. Then, on March 19, signs announcing imminent road closures and detours appeared on and around the part of 15th Street that crosses the National Mall. *Id.* ¶ 23. Contacts in DDOT informally conveyed that NPS would move forward with removing bike lanes from the section of 15th Street that crosses the National Mall on Monday, March 23. *Id.* ¶ 24.

While WABA and the public scrambled for information, the government had already settled on a plan. In documents dated to late February, but publicly released only on March 25, NPS and FHWA described the Removal Project's precise scope, and presented a reason for not analyzing its environmental impacts. NPS prepared a National Historic Preservation Act assessment document, as well as a NEPA "Categorical Exclusion Documentation Form." *See* Nat'l Park Serv., *Categorical Exclusion – 15th St Cycle Track Removal and Road Repaving* (Feb.

20, 2026) ("NPS CE Form").[7]  FHWA prepared its own "NEPA Categorical Exclusion Form." Fed. Highway Admin., *Categorical Exclusion – 15th St Cycle Track Removal and Road Repaving* (Feb. 27, 2026) ("FHWA CE Form").[8]  The documents provided detailed street-segment information and explained that the 15th Street and Tidal Basin bike lanes would be entirely removed.  NPS CE Form at 1; FHWA CE Form at 1.

The agencies' purported justification for this precipitous action took up just a few sentences.  According to NPS and FHWA, the Removal Project was appropriate because it "supports implementation of Executive Order 14252, 'Making the District of Columbia Safe and Beautiful,'" and "[w]ith the upcoming National Cherry Blossom Festival and preparations underway for Americas 250th anniversary, ensuring safe access for residents, commuters, visitors, and emergency services is a shared priority."  NPS CE Form at 1, 7; FHWA CE Form at 1–2. WABA and the public only learned of these documents after the government posted them online in response to the Court's March 25 scheduling conference.  *See* Nat'l Park Serv., *15th Street Cycle Track Removal and Road Repaving* (last visited Mar. 25, 2026).[9]

**F.      The Federal Government Decides That It Will Remove the 15th Street and Tidal Basin Bike Lanes on March 23, Until Forced to Delay by This Litigation.**

The government effectively confirmed its intentions on Friday, March 20, 2026.  In a statement provided to press outlets, NPS said (quoting its then-secret NEPA document) that "[w]ith the upcoming National Cherry Blossom Festival and preparations underway for America's 250th anniversary, ensuring safe access for residents, commuters, visitors, and emergency services is a shared priority."  *Id.*, Att. 9, at 2; *id.*, Att. 10, at 2.  The agency added that "[t]hese nationally

---

[7] Attached as Exhibit H.  The historical assessment document is dated February 20, 2026.  *Id.* at 1.  The NEPA form has no date, but is signed with a date of February 23, 2026.  *Id.* at 11.

[8] Attached as Exhibit I.

[9] https://perma.cc/3U4K-N7ZV

significant events draw substantial visitation and require coordinated infrastructure planning to support mobility, security, and a positive experience for all." *Id.*, Att. 9, at 2; *id.*, Att. 10, at 2. A statement from FHWA's parent agency, the Department of Transportation ("DOT"), to a local news station said that "[a]s part of the President's initiative to revitalize Washington, D.C., we are collaborating with the Department of the Interior to restore common sense into city planning." Randi Hildreth, *DC Mayor Bowser Opposes Removal of 15th Street Bike Lanes*, WUSA9 (Mar. 21, 2026).[10] The statement claimed that the "bike lanes on 15th St have dramatically reduced roadway capacity," and cited a need to "improve[] traffic flow." *Id.*

Prompted by reports like these, nine members of Congress wrote to NPS on March 20, urging NPS to "immediately reverse course and stop the removal of the bike lane." Letter from Rep. Donald S. Beyer Jr. et al. to Jessica Bowron, Acting Dir., Nat'l Park Serv. (Mar. 20, 2026).[11] Washington, D.C. Mayor Muriel Bowser also called for the retention of the bike lanes and criticized NPS for increasing "conflicts between pedestrians, cyclists, and vehicles, especially at one of the busiest times of the year." Kiker Decl., Att. 9, at 3. News outlets then reported that lane removal was scheduled for Monday, March 23. *See id.*, Att. 9, at 1; *id.*, Att. 10, at 1.

Then the government changed course—only because of this lawsuit. On the afternoon of March 22, after WABA's counsel informed the government of the pendency of this litigation, the Department of Justice assured WABA that no work would be done on the bike lanes until March 30, at the earliest. *Id.* ¶ 29. But even as the government delivered this temporary reprieve, it revealed for the first time that the Tidal Basin protected bicycle lanes were also slated for removal. *Id.* ¶ 30. This was the first time that WABA learned that the planned removal extended beyond

---

[10] https://perma.cc/WN7Q-T32C

[11] https://perma.cc/2LCB-3YF6

the scope of the 15th Street lanes.  *Id.*  Next, on the afternoon of March 23, shortly after WABA

filed its complaint, the government delayed the Removal Project again, and represented to this

Court that no work would begin in connection with the 15th Street and Tidal Basin lanes "until, at

the earliest, April 23, 2026."  Joint Status Report & Proposed Schedule, at 1–2, Dkt. No. 7.

**LEGAL STANDARD**

To obtain a preliminary injunction, WABA must establish that it "is likely to succeed on

the merits," that it "is likely to suffer irreparable harm in the absence of preliminary relief, that the

balance of equities tips in [its] favor, and that an injunction is in the public interest."  *Winter v.

Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  Separately, the APA empowers a "reviewing

court" to "issue all necessary and appropriate process . . . to preserve status or rights pending

conclusion of the review" of "an agency action."  5 U.S.C. § 705.  The factors governing a stay

under § 705 are the same as those that govern the issuance of a preliminary injunction.  *District of

Columbia v. U.S. Dep't of Agric.*, 444 F. Supp. 3d 1, 15 (D.D.C. 2020).

**ARGUMENT**

**I.      WABA Is Likely to Succeed on the Merits of Its Claims that the Lane Removal Project
         Violates the Administrative Procedure Act.**

Under the APA, a reviewing court must set aside agency action that is "arbitrary,

capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

Defendants' secretive, abrupt decision to remove bike lanes from 15th Street and the Tidal Basin

is inconsistent with applicable law and is arbitrary and capricious.  WABA is therefore likely to

prevail in showing that it is entitled to relief under the APA.[12]

---

[12] Defendants' decision to remove the 15th Street and Tidal Basin bike lanes is a reviewable final
agency action.  Here, the decision to remove a portion of the District's critical infrastructure "is
certainly a 'form of agency power' or 'action' that the APA reaches."  *Drs. for Am. v. Off. of Pers.
Mgmt.*, 766 F. Supp. 3d 39, 50 (D.D.C. 2025) (quoting *Jud. Watch, Inc. v. Nat'l Energy Pol'y Dev.*
(continued…)

14

A.    **WABA Is Likely to Prevail on Its Claim that Defendants' Failure to Submit Plans for the Lane Removal Project to the National Capital Planning Commission is Unlawful.**

NPS is required by statute to submit plans for D.C.-area projects to the National Capital Planning Commission for review and consultation.  The NCPA mandates that federal agencies "shall cooperate and correlate their efforts by using the . . . Commission as the central planning agency for federal activities in the National Capital region."  40 U.S.C. § 8722(a).  Executive Order 14252, cited in NPS and FHWA's NEPA documents, *see* NPS CE Form at 1, 7; FHWA CE Form at 1, also recognizes the Commission's role, and directs agencies (including Interior and DOT) to "consult[]" with the Commission in developing "a program to beautify and make safe and prosperous the District of Columbia."  Exec. Order No. 14252 § 4(a), 90 Fed. Reg. 14,559, 14,560 (Apr. 3, 2025).

Congress's mandate to give effect to those ideals is comprehensive.  Any federal agency, "*before* preparing construction plans the agency originates for proposed developments and projects," "*shall* advise and consult with the Commission as the agency prepares plans and programs in preliminary and successive stages that affect the plan and development of the National Capital."[13]  40 U.S.C. § 8722(b)(1) (emphasis added).  The Commission, in turn, must provide the

---

*Grp.*, 219 F. Supp. 2d 20, 38 (D.D.C. 2002)).  Based on public reporting, the recently released NEPA documents, and the fact that road signs were put up, NPS and FHWA made a definitive decision to remove the bike lanes.   Indeed, at the March 25, 2026 status conference in this case, counsel for Defendants represented that such a decision had been made.  And Defendants have represented that work on the lanes could begin as early as April 23, 2026.  Joint Status Report & Proposed Schedule, at 2, Dkt. No. 7.  This unmistakable choice to remove an important piece of public infrastructure plainly constitutes final agency action.  *See Franklin v. Massachusetts*, 505 U.S. 788, 797 (1992) ("The core question is whether the agency has completed its decisionmaking process, and whether the result of that process is one that will directly affect the parties."); *see also U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 599 (2016) (describing "the 'pragmatic' approach [courts] have long taken to finality") (citation modified).

[13] The "National Capital" includes "the District of Columbia."  40 U.S.C. § 8702(2).

submitting agency with "a preliminary report and recommendations" regarding the plan. *Id.* The agency "may proceed," even if it disagrees with the Commission. *Id.* But before doing so, the agency "shall advise the Commission and provide the reasons why it does not agree." *Id.*[14]

This requirement applies to the Removal Project. The Defendants are federal agencies and their officers. And the Removal Project is a "proposed development[]" or "project[]" that will "affect the plan and development of the National Capital." *Id.* Indeed, the bike lanes are a key artery that connects D.C. with Virginia. Kiker Decl. ¶ 17; *Id.*, Att. 2, at 16 (describing the lanes as a "missing link"); Letter from Rep. Donald S. Beyer Jr. et al. to Jessica Bowron, Acting Dir., Nat'l Park Serv. (Mar. 20, 2026) ("[The 15th Street] lanes are an essential travel route for commuters from Virginia, D.C., Maryland, and visitors across the country . . . .").[15] As the Commission has recognized, "protected bike lanes" "facilitate connectivity" between "transit hubs and destinations." Nat'l Capital Planning Comm'n, *The Comprehensive Plan for the National Capital: Federal Elements – Transportation Element* 10 (2020).[16] NPS's decision to sever that link therefore affects D.C.'s "plan and development." 40 U.S.C. § 8722(b)(1).

When NPS *added* the lanes to 15th Street, it recognized its obligations under the NCPA.[17] *See* Kiker Decl., Att. 4, at 4–5. NPS, along with DDOT, submitted preliminary and final development plans to the Commission. *See id.* at 1–24. Commission staff recommended approval,

---

[14] The fact that an agency may ultimately proceed, despite disagreement from the Commission, does not alter the reviewability of an agency's refusal to complete the mandatory consultation. *Cf. Lemon v. Geren*, 514 F.3d 1312, 1314–15 (D.C. Cir. 2008) (explaining that an agency's preparation of an environmental impact statement under NEPA is justiciable, even though such a statement "will never 'force' an agency to change the course of action it proposes").

[15] https://perma.cc/2LCB-3YF6

[16] https://perma.cc/Z9WV-CK3V

[17] NPS also undertook a historic assessment pursuant to the National Historic Preservation Act, and submitted the project to the Commission on Fine Arts. Kiker Decl. ¶ 12.

16

because of "the intended goal of improving safety for all users and reducing vehicle, pedestrian, and bicycle conflicts in the heavily traveled corridor" and because the plan was consistent with the *Comprehensive Plan for the National Capital*. *Id.* at 3–4. The recommendation applauded NPS's and DDOT's "extensive" public engagement efforts. *Id.* at 4. The Commission agreed with the recommendation and approved the lane additions at a public meeting. Kiker Decl., Att. 5.

There has been no such opportunity for public Commission review of the Removal Project.[18] Instead, acting in secrecy, Defendants have hastened to implement the project without any input from the Commission or the public. Indeed, at the March 25, 2026, status conference, counsel for Defendants represented that there had been no Commission consultation process. There is no bike lane removal exception to the NCPA. *Cf.* 40 U.S.C. § 8722(b)(2)(A) (excepting "projects within the Capitol grounds" and certain "structures erected by the Department of Defense during wartime or national emergency").[19] The NCPA therefore requires consultation, and because that has not occurred, Defendants must not "proceed to take action." *Id.* § 8722(b)(1).

**B.    Defendants' Abrupt Bike Lane Removal Project is Arbitrary and Capricious.**

Under the APA, a court must "hold unlawful and set aside agency action, findings, and conclusions" that it finds to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2). An agency action is arbitrary and capricious "if the

---

[18] Because the Commission is a federal agency, *see* 40 U.S.C. § 8711(a), its proceedings are generally required to be open to the public, *see* 5 U.S.C. § 552b(b). Indeed, it recently noted that "Commission agendas, project materials, reports, and actions are all accurately reported and available to the public, as required by the Sunshine Act, Freedom of Information Act, and OMB's Open Government directive." Letter from Meghan Hottel-Cox, General Counsel and Chief FOIA Officer, Nat'l Capital Planning Comm'n (Apr. 14, 2025), https://perma.cc/A4J8-TG5N.

[19] The Commission also may "determine in advance" that certain "kinds of plans, developments, projects, improvements, or acquisitions . . . do not need to be submitted for review by the Commission." 40 U.S.C. § 8722(b)(2)(B). There does not appear to be any relevant advance determination that could apply to the Removal Project.

17

agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Moreover, "[a]n agency's decision is arbitrary and capricious if the agency . . . ignores the reasonable reliance interests of regulated parties." *Affirmed Energy, LLC v. FERC*, 166 F.4th 1070, 1079 (D.C. Cir. 2026) (citing *Regents of the Univ. of Cal.*, 591 U.S. at 30–32).

Defendants' actions here are arbitrary and capricious several times over: Defendants have offered no meaningful explanation for their sudden and unexplained reversal of position, compounded by shifting rationales; there is no indication Defendants considered the safety evidence about the 15th Street bike lanes specifically and bike lanes generally; and there is no indication that Defendants considered serious reliance interests relating to the popular bike lanes.

1. *Defendants' Sudden and Unexplained Change is Arbitrary and Capricious.*

The APA "mandates that [agencies] give reasoned explanation[s] for the actions that they do take." *Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 920 (D.C. Cir. 2017). "The requirement that agency action not be arbitrary or capricious includes a requirement that the agency adequately explain its result[.]" *Pub. Citizen, Inc. v. FAA*, 988 F.2d 186, 197 (D.C. Cir. 1993). Defendants have provided no such reasonable explanation.

At this point, the government's reasoning boils down to just a few sentences. One set of justifications is found in the NPS and FHWA NEPA documents:

> This project supports implementation of Executive Order 14252, "Making the District of Columbia Safe and Beautiful" by advancing coordinated stewardship and improved visual quality of prominent federal public spaces through removal of roadway appurtenances and restoration of a standardized, maintainable corridor configuration within the existing roadway prism.

18

With the upcoming National Cherry Blossom Festival and preparations underway for Americas 250th anniversary, ensuring safe access for residents, commuters, visitors, and emergency services is a shared priority. These nationally significant events draw substantial visitation and require coordinated infrastructure planning to support mobility, security, and a positive experience for all.

NPS CE Form at 1, 7; FHWA CE Form at 1–2. A second, similar set of justifications appears in DOT's curt statement to a local TV station:

The nation's capital remains one of the most congested cities in America. As part of the President's initiative to revitalize Washington, D.C., we are collaborating with the Department of the Interior to restore common sense into city planning. The bike lanes on 15th St have dramatically reduced roadway capacity. With major events approaching—including the National Cherry Blossom Festival and Freedom250 celebrations—it is essential to improve traffic flow for the hundreds of thousands of tourists expected in D.C. this year. Bike lane placements must complement normal road activities, not compete with them.

Randi Hildreth, *DC Mayor Bowser Opposes Removal of 15th Street Bike Lanes*, WUSA9 (Mar. 21, 2026).[20] But these statements—none of which cited any evidence—in no way explain how removing bike lanes contributes to improving visual quality or ensuring safe access. Neither do they explain how such an action supports mobility, security, or a positive experience for anyone. The invocation of the National Cherry Blossom Festival is particularly perplexing. The Removal Project was poised to begin on March 23. *See* Kiker Decl. ¶¶ 24, 29. But the Festival would have already started—it runs from March 20 to April 12, 2026.[21] If Defendants wanted to ensure safe access and support a positive experience for Festival visitors, then they would presumably not have planned to commence disruptive roadwork *during* the festival. And their new schedule seems to abandon this justification by pushing the start date into late April. *See* Joint Status Report & Proposed Schedule, at 2, Dkt. No. 7. Defendants' scant "explanations" are not reasonable.

---

[20] https://perma.cc/WN7Q-T32C

[21] https://perma.cc/FPA9-VEK4

Further, when an agency departs from prior practice without any explanation, its actions are arbitrary and capricious. *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) ("An agency may not, for example, depart from a prior policy *sub silentio* or simply disregard rules that are still on the books."); *Smiley v. Citibank (S.D.), N.A.*, 517 U.S. 735, 742 (1996) (A "[s]udden and unexplained change" is arbitrary and capricious.). Moreover, "the requirement that an agency provide reasoned explanation for its action would ordinarily demand that it display awareness that it *is* changing position." *Fox Television*, 556 U.S. at 515. And when a "new policy rests upon factual findings that contradict those which underlay its prior policy," the agency must "provide a more detailed justification than what would suffice for a new policy." *Id.* at 515–16.

Defendants have offered no explanation for their policy shift. NPS's position has long been that bike lanes are important to safety, and that position justified the installation of the bike lanes. In a February 2021 public meeting, NPS and DDOT presented the "15th Street Safety Improvements Project Overview," which explained their reasoning for the bike lane. Kiker Decl., Att. 2. NPS and DDOT delineated the goals for the project: Creating a safe right-of-way regardless of transportation method, improving function of the street and intersections to make them easier to understand, and balancing travel and right-of-way and access for everyone using the street. *Id.* at 27. This was consistent with NPS's broad effort to "mak[e] improvements to roads, multi-use trails and crosswalks around the National Mall." Nat'l Park Serv., *Improving Roads and Multi-Use Trails Around the National Mall* (last updated Aug. 31, 2021).[22]

NPS's recognition of bike lanes' safety and other benefits predates the 15th Street project. In 2016, the NPS released the *Paved Trails Study for the National Capital Region*, which highlighted the popularity of paved trails for cyclists and made recommendations on how to

---

[22] https://perma.cc/J6PU-GJF9

respond to that increased interest.    Nat'l Park Serv., *Paved Trails Study* (2016).[23]    One "challenge/opportunity" listed in the study was "Gaps in the Trail Network," *id.* at ES-2, and along these lines, in its February 2021 presentation, NPS described the 15th Street and Tidal Basin bike lanes as the "missing link," Kiker Decl., Att. 2, at 16.  The study also states that "[p]edestrian and bicycle safety is of primary importance to the NPS and is expressed as a specific objective within this study."    Nat'l Park Serv., *Paved Trails Study*, at ES-3 (2016).[24]    The study noted that "[b]icycles require less infrastructure than cars in terms of parking," and it identified the 15th Street bike lane as a "much-needed connection."  *Id.* at 4-2, 6-39.  Similarly, the NPS's 2010 National Mall Plan identified a need for a separate bike facility along the 15th Street corridor and concluded that a "stronger connection with the National Mall and a sense of arrival at the Tidal Basin will be achieved by redesigning and separating pedestrian, bicycle, and vehicular circulation."  Nat'l Park Serv., *National Mall Plan: Summary* 21 (2010).[25]    One key element of the plan was to "provide separate bicycle lanes or trails" around the Mall.  *Id.* at 10.  Removing existing protected bicycle infrastructure conflicts with these long-standing NPS positions.

To reverse these years of policy, NPS provides at most these sentences, buried in a table near the end of its just-released form NEPA assessment:

> Removal of the separated bicycle facility will have an operational effect on bicyclists, including a change in facility type and user experience on a corridor that has been documented as carrying more than 2,000 bicycle users per day. . . . The project does not eliminate bicycle travel in the corridor; it changes the facility type and restores conditions that already existed prior to the installation of the separated bicycle facility.  NPS will implement transition signing/markings and will monitor operations after implementation and adjust striping/signals as warranted to address observed operational issues.

---

[23] https://perma.cc/B6AP-Q7AZ

[24] https://perma.cc/B6AP-Q7AZ

[25] https://perma.cc/6RCU-LMTJ

NPS CE Form at 9. For NPS in 2021, bikes were central to the Mall's future, and these specific bike lanes were the "missing link." Kiker Decl., Att. 2, at 16. For NPS in 2026, demolishing the missing link is "a change in facility type and user experience." NPS CE Form at 9. NPS plainly has not adequately explained its sudden change in position. *See Brady Campaign to Prevent Gun Violence v. Salazar*, 612 F. Supp. 2d 1, 18 (D.D.C. 2009) (finding that Interior failed to adequately justify a departure from its prior position that "firearm restrictions in national parks and wildlife refuges were necessary to 'ensure public safety'"). NPS also fails to satisfy the requirement that when it changes position, it must "display awareness that it *is* changing position." *Fox Television*, 556 U.S. at 515. Removing well-considered bike lanes in such an abrupt manner without explanation is arbitrary and capricious.

> 2. *Defendants' Failure to Consider Safety and Traffic Data is Arbitrary and Capricious.*

In deciding to remove the bike lanes, there is no indication that Defendants considered general safety data about bike lanes, nor that they considered publicly available safety data that directly addresses how this specific bike lane has improved safety and how it has affected traffic. To have failed to consider an important aspect of the problem and to have ignored the available evidence is arbitrary and capricious.

For an agency action "[t]o pass muster, the agency must examine the relevant data and articulate a satisfactory explanation for its action, including 'a rational connection between the facts found and the choice made.'" *Nat'l Council of Nonprofits v. OMB*, 763 F. Supp. 3d 36, 54 (D.D.C. 2025) (citations omitted). "An agency's action is arbitrary and capricious if the agency has . . . entirely failed to consider an important aspect of the problem . . . ." *Baystate Franklin Med. Ctr. v. Azar*, 950 F.3d 84, 89 (D.C. Cir. 2020) (citation modified); *see also Advocs. for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.*, 429 F.3d 1136, 1147 (D.C. Cir.

2005) (agency action arbitrary and capricious where it "simply disregarded the volumes of evidence" regarding safety).

Here, NPS has shown no indication that it has grappled with the safety data related to bike lanes—an important aspect of the problem. There is ample public data showing that bike lanes—including these bike lanes specifically—provide many benefits, including increasing safety by reducing collisions for cyclists and motorists. Defendants have not explained whether or how they considered this data or how it could be rational to remove infrastructure that increases safety.

In a 2026 report, DDOT "conducted a data-driven evaluation" of the installed bike lanes along 15th Street "to understand the vehicular, bicycle, and pedestrian impacts." Kiker Decl., Att. 6, at 4. The report concluded that the "project reduced all roadway crashes by 46% and bicycle injury crashes by 91%" and that there was a "3% increase in bicycle traffic along the corridor." *Id.* DDOT concluded the report by reiterating that the goal of the 15th Street lanes was "to improve safety for cyclists and pedestrians on the already popular stretch," adding that "[s]eparating cyclists from vehicles makes the corridor more efficient for vehicles and reduces commute times." *Id.* at 9–10. So, the data show that the 15th Street bike lanes improve safety, speed, and efficiency.

Other government sources support the conclusion that bike lanes increase safety. For example, a study from the FHWA shows that installing plastic posts to separate bike lanes from motor vehicle lanes reduces total crashes by up to 53%, while adding paint-only bike lanes on four-lane undivided urban local roads can reduce crashes up to 49%. Fed. Highway Admin., *Proven Safety Countermeasures: Bicycle Lanes* (last visited Mar. 22, 2026).[26] A 2012 DDOT study assessing the impact of various bike safety treatments concluded that "bicycle treatments improved conditions for cycling without negatively impacting other modes in the vicinity of the

---

[26] https://perma.cc/KH6L-FCJJ

investment." Dist. Dep't of Transp., *Bicycle Facility Evaluation* 4 (2012).[27] That same study looked at bike lane installations on another portion of 15th Street and found that motor vehicle volume remained roughly constant and travel speeds were not changed significantly. *Id.* at 12.

The government appears to have considered none of this. NPS's form NEPA document does ask whether the Removal Project would "[h]ave significant impacts on public health or safety." NPS CE Form at 9. NPS wrote "no," but brushed off safety impacts as a change in "user experience on a corridor that has been documented as carrying more than 2,000 bicycle users per day." *Id.* It claimed that it would "adjust striping/signals as warranted" to resolve "observed operational issues." *Id.* None of the studies or data above were addressed.

On top of this, the congestion cost of additional safety has been nonexistent. DOT blustered to the press that "[t]he bike lanes on 15th St have dramatically reduced roadway capacity" and labeled D.C. "one of the most congested cities in America." Randi Hildreth, *DC Mayor Bowser Opposes Removal of 15th Street Bike Lanes*, WUSA9 (Mar. 21, 2026).[28] But DDOT's 2026 report showed *improvements* in traffic congestion along 15th Street after installation of the bike lanes, noting that "speeds increased by 17%" and "[p]eak hour northbound travel time decreased by 36 seconds, while southbound travel time decreased by 40 seconds on the corridor." Kiker Decl., Att. 6, at 4. DOT cites no contrary evidence. To have apparently ignored this evidence, without comment or explanation, is arbitrary and capricious.

      3.     *Defendants' Failure to Consider Serious Reliance Interests is Arbitrary and Capricious.*

Defendants' seeming failure to consider any reliance interests also renders their decision to abruptly move forward with the Removal Project arbitrary and capricious.

---

[27] https://perma.cc/7XKH-6L55

[28] https://perma.cc/WN7Q-T32C

"An agency must be especially 'cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account.'" *CSL Plasma Inc.*, 628 F. Supp. 3d at 259 (quoting *Regents of the Univ. of Cal.*, 591 U.S. at 30). Because the agency is not "writing on a blank slate," it must assess "whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *Regents of the Univ. of Cal.*, 591 U.S. at 33. "If an agency changes its policy despite reliance interests, it must provide a 'reasoned explanation' therefor." *MediNatura, Inc. v. FDA*, 998 F.3d 931, 941 (D.C. Cir. 2021) (quoting *Regents of the Univ. of Cal.*, 591 U.S. at 35).

The 15th Street bike route—"one of D.C.'s longest protected bike lanes"—is popular, stretches the distance from the Tidal Basin to Columbia Heights, and provides a cycling connection to Virginia. Kiker Decl., Att. 9, at 1. WABA's members rely on this bike lane to ease their commutes and keep them safe. For WABA member Allison Foster, who commutes from Arlington to D.C. for work and personal reasons, the 15th Street bike route is critical. Foster Decl. ¶ 3. Removal of this safety infrastructure would discourage Foster from commuting on her bike. *Id.* ¶ 5. WABA member David Wacker also uses the route for his commuting, and without the bike lanes the "reliability" of his trips would be "degrade[d]" and the likelihood of delay increased. Wacker Decl. ¶¶ 4, 9. Foster and Wacker are just two of the 4,000-odd cyclists who use the lanes every day. Kiker Decl., Att. 10, at 2.

Defendants have not acknowledged these reliance interests at all. Instead, the best they can offer is: Just bike with the cars. *See* NPS CE Form at 9 ("The project does not eliminate bicycle travel in the corridor; it changes the facility type and restores conditions that already existed prior to the installation of the separated bicycle facility."). This ignores that the bike lanes are a vital portion of one of the longest protected bike routes in the District; they connect the

25

District to Virginia, providing an essential link in the region's transportation infrastructure. Letter from Rep. Donald S. Beyer Jr. et al. to Jessica Bowron, Acting Dir., Nat'l Park Serv. (Mar. 20, 2026).[29] Moreover, as an unidentified source told *The 51st*, despite the agency's shift in official position under the current administration, in the past NPS has been "thrilled we have this in place because many people bike to the cherry blossoms." Kiker Decl., Att. 9, at 3. The Cherry Blossom Festival's official "Getting to the Cherry Blossoms 2026" guide provides specific directions for bikes on each highlighted event and denotes the 15th Street bike lane on its map and as one of the best options for accessing the Blossom Kite Festival, the Blossom Parade, and the Credit Union Cherry Blossom 10 Mile. Kiker Decl., Att. 11. Just yesterday, March 25, NPS posted on its official X account for the National Mall that "[w]e strongly recommend walking, biking, [or] taking the Metro" to see the cherry blossoms. National Mall NPS (@NationalMallNPS), X (Mar. 25, 2026, at 07:50 PM).[30] The lane's many bikeshare users too will be left in the lurch, and yet NPS appears not to have considered their interests either.

The citizens of the District, visitors to the District, and the Cherry Blossom Festival planners have all shown how crucial the 15th Street and Tidal Basin bike lanes are and the reliance they engender. The APA requires that Defendants acknowledge these reliance interests.

C.    **Defendants Have Unlawfully Ignored Their Procedural Obligations Under the National Environmental Policy Act.**

"NEPA is a purely procedural statute" that acts as a "cross-check." *Seven Cnty. Infrastructure Coal.*, 605 U.S. at 173. It has "twin aims": To "place[] upon an agency the obligation to consider every significant aspect of the environmental impact of a proposed action," and to "ensure[] that the agency will inform the public that it has indeed considered environmental

---

[29] https://perma.cc/2LCB-3YF6

[30] https://perma.cc/DM8K-GFMP

26

concerns in its decisionmaking process." *Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 97 (1983) (citation omitted). To accomplish this, NEPA "requires federal agencies . . . to consider and report on the environmental effect of their proposed actions." *WildEarth Guardians*, 738 F.3d at 302. When an action is "major" and "significantly affect[s] the quality of the human environment," agencies must prepare an Environmental Impact Statement ("EIS"), and analyze all "reasonably foreseeable environmental effects" of proposed actions, to disclose the basis for their findings, and to "study, develop, and describe technically and economically feasible alternatives" to the proposed action. 42 U.S.C. §§ 4332(2)(C)(i), (F).

Although agencies need not always prepare an EIS, at least *some* preliminary NEPA assessment is generally required to determine whether an EIS is necessary. While agencies may identify actions that normally do not significantly affect the quality of the human environment as categorical exclusions, even the categorical exclusion process requires a level of analysis to determine that it properly applies. 42 U.S.C. § 4336e(1); 43 C.F.R. § 46.205 (describing certain Department of the Interior actions categorically excluded from NEPA review); *id.* § 46.205(c)(1) ("Any action that is normally categorically excluded must be evaluated to determine whether it meets any of the extraordinary circumstances in § 46.215; if it does, further analysis and environmental documents must be prepared for the action.").

For the Removal Project, NPS and FHWA invoked categorical exclusions. FHWA's NEPA document cites FHWA's list of categorical exclusions without identifying which exclusion applied to the Removal Project. *See* FHWA CE Form at 3 (citing 23 C.F.R. § 771.117(a)). NPS's NEPA document is more specific: It invokes an exclusion for "[m]odernization of a highway by resurfacing, restoration, rehabilitation, reconstruction, adding shoulders, or adding auxiliary lanes (including parking, weaving, turning, and climbing lanes)." NPS CE Form at 7. That exclusion,

so-called exclusion 12.6(13), is drawn from Interior's NEPA Handbook, which, in turn, adopts it from FHWA's list of categorical exclusions.  *See id.* (citing Dep't of the Interior, *NEPA Handbook*, Appendix 2, NPS, § 12.6(13)[31]); 90 Fed. Reg. 24,644, 24,645–46 (June 11, 2025) (explaining that NPS copied this categorical exclusion from FHWA's 23 C.F.R. § 771.117(c)(26)).

But that categorical exclusion—reserved for routine projects with no meaningful environmental effects—is unavailable for the Removal Project, for four reasons.  *First*, the text's plain meaning does not cover the Removal Project.  Exclusion 12.6(13) lists six covered "[m]odernization" activities: "[1] resurfacing, [2] restoration, [3] rehabilitation, [4] reconstruction, [5] adding shoulders, or [6] adding auxiliary lanes."  Dep't of the Interior, *NEPA Handbook*, Appendix 2, NPS, § 12.6(13); *accord* 23 C.F.R. § 771.117(c)(26) (same).  Conspicuously absent from this list is *removing* entire lanes of traffic.  The fact that 12.6(13) cannot cover bike lane removal is underlined by the existence of another NPS categorical exclusion (also adopted from FHWA's list) applicable to the "*[c]onstruction* of bicycle and pedestrian lanes, paths, and facilities."  Dep't of the Interior, *NEPA Handbook*, Appendix 2, NPS, § 12.6(7) (emphasis added); *see* 90 Fed. Reg. at 24,645 (explaining that NPS copied this categorical exclusion from FHWA's 23 C.F.R. § 771.117(c)(3)).  Because NPS (and FHWA) chose to exclude bike lane "construction," but said nothing about bike lane "destruction," ordinary principles of interpretation counsel that demolishing bike lanes is not covered by 12.6(13), or by any other categorical exclusion.  *See Esteras v. United States*, 606 U.S. 185, 195 (2025) (describing the "well-established canon of statutory interpretation" that "expressing one item of an associated group or series excludes another left unmentioned" (citation modified)); *cf. Gorbach v. Reno*, 219 F.3d 1087, 1095 (9th Cir. 2000) ("There is no general principle that what one can do, one can undo.").

---

[31] https://perma.cc/4BWK-P7DV

*Second*, Interior's regulations provide that categorical exclusions are inapplicable where "[e]xtraordinary circumstances . . . exist for individual actions . . . [that] [h]ave significant impacts on public health or safety."  43 C.F.R. § 46.215(a).  NPS's NEPA document for the Removal Project seems to take the position that health and safety impacts do not count for NEPA purposes: "NEPA significance for categorical exclusions is evaluated in terms of significant environmental impacts, including whether an action results in significant impacts on travel patterns or other natural, cultural, recreational, historic, air/noise/water resources."  NPS CE Form at 9.  That is illogical, as it effectively reads out this exception to a categorical exclusion.  In any event, "[p]ublic safety" is "indisputably encompassed within the definition of 'environmental impacts' that must be considered pursuant to NEPA."  *Brady Campaign*, 612 F. Supp. 2d at 18 (citation omitted); *accord* 42 U.S.C. § 4331(b)(3) ("it is the continuing responsibility of the Federal Government to use all practicable means . . . to . . . attain the widest range of beneficial uses of the environment without degradation, *risk to health or safety*, or other undesirable and unintended consequences" (emphasis added)).  Accordingly, Interior Department agencies "cannot rely on categorical exclusions . . . , when the proposed action may have . . . 'significant impacts on public health or safety.'"  *Rocky Mountain Peace & Just. Ctr. v. U.S. Fish & Wildlife Serv.*, 40 F.4th 1133, 1144 (10th Cir. 2022) (citation omitted).  As explained *supra* Part I.B.2, and *infra* Part II, the bike lanes markedly improved the safety of road users, and removing them will reverse those benefits, putting life and limb in danger.  The categorical exclusion documentation cites no contrary evidence.

*Third*, FHWA's regulations provide that categorical exclusions are inappropriate for actions that "have significant impacts on travel patterns."  23 C.F.R. § 771.117(a).  But of course, one of the government's justifications for the Removal Project is that it *will* have significant impacts on travel patterns.  According to DOT, "[t]he bike lanes on 15th St have *dramatically*

29

reduced roadway capacity" and it is now "essential to improve traffic flow for the hundreds of thousands of tourists expected in D.C. this year."  Randi Hildreth, *DC Mayor Bowser Opposes Removal of 15th Street Bike Lanes*, WUSA9 (Mar. 21, 2026) (emphasis added).[32]  The government cannot have it both ways:  If the effect of the bike lanes is "dramatic[]," then no categorical exclusion is available; but if the lanes do not actually have a "significant impact,[]" then there is no reason to remove them in the first place.  *See Nat. Res. Def. Council v. U.S. Nuclear Regul. Comm'n*, 879 F.3d 1202, 1214 (D.C. Cir. 2018) ("Of course, it would be arbitrary and capricious for the agency's decision making to be 'internally inconsistent.'" (citation omitted)).  In any event, FHWA's categorical exclusion document does not even discuss this exception.

    *Fourth*, FHWA's regulations also provide that, when an action involves "[s]ubstantial controversy on environmental grounds," FHWA should "conduct appropriate environmental studies" before applying a categorical exclusion.  23 C.F.R. § 771.117(b)(2).  Substantial controversy under § 771.117(b)(2) exists "where 'a substantial dispute exists as to the size, nature, or effect of the major federal action rather than to the existence of opposition to a use.'"  *NAACP Erie Unit 2262 v. Fed. Highway Admin.*, 648 F. Supp. 3d 576, 595 (W.D. Pa. 2022) (quoting *Friends of the Ompompanoosuc v. FERC*, 968 F.2d 1549, 1557 (2d Cir. 1992)).  That is the case here.  The agencies dismissed safety concerns, despite widespread dispute over the scope of this effect.  *See, e.g.*, *supra* Part I.B.2; *infra* Part II.  So, "appropriate environmental studies" were required, but were not conducted.  *Cf. NAACP Erie Unit 2262*, 648 F. Supp. 3d at 595 ("[I]t has been found that a substantial dispute exists where the agency received numerous responses from conservationists, biologists, and other knowledgeable individuals, all highly critical of the agency's determinations and conclusions." (citation modified)).

---

[32] https://perma.cc/WN7Q-T32C

The practical consequence of the agencies' failure to comply with their NEPA obligations is that NEPA's "twin aims" have not been vindicated. *Baltimore Gas & Elec. Co.*, 462 U.S. at 97. NPS and FHWA have not "consider[ed]" safety, a "significant aspect of the environmental impact" of the Lane Removal Project, nor have they "inform[ed] the public" of their "decisionmaking process." *Id.* (citation omitted). That kind of engagement certainly was possible. After all, NPS extensively engaged the public when it installed the lanes. *See supra* Background Part B. Even when a categorical exclusion may apply, NPS's own NEPA guidance recognizes that "[p]ublic input" can "provide information that will help determine whether any extraordinary circumstances exist." Nat'l Park Serv., *NEPA Handbook* § 2.1 (2015).[33] Public input here would have helped NPS properly assess whether to remove the bike lanes, including the safety impacts.

It is true that NEPA "[r]ather than 'dictate particular decisional outcomes,' . . . 'merely prohibits uninformed—rather than unwise—agency action.'" *El Puente v. United States Army Corps of Eng'rs*, 100 F.4th 236, 246 (D.C. Cir. 2024) (citation omitted). This requirement "is intended to ensure agencies 'look before they leap.'" *Wilderness Soc'y v. U.S. Dep't of Interior*, No. 22-cv-1871, 2024 WL 3443754, at *5 (D.D.C. July 16, 2024). But here, NPS is just leaping and taking manifestly "uninformed" action—something NEPA "prohibits." *El Puente*, 100 F.4th at 246.

**D.      Defendants' Lane Removal Project Does Not Comply with the Park Service Organic Act's Mandate.**

Under the Park Service Organic Act, NPS must "promote and regulate the use of" Park System units, consistent with their "fundamental purpose," which is "to conserve the scenery, natural and historic objects, and wild life in the System units and to provide for the enjoyment of

---

[33] https://perma.cc/J8FX-FQJ5

the scenery, natural and historic objects, and wild life in such manner and by such means as will leave them unimpaired for the enjoyment of future generations." 54 U.S.C. § 100101 (formerly at 16 U.S.C. § 1). "Congress has charged the National Park Service with regulating the use of the [National] Mall so as to conform" with this "fundamental purpose." *Friends of the Vietnam Veterans Mem'l*, 116 F.3d at 496 (citation modified).

The Organic Act constrains NPS. Its language is "broad," but it does not provide "unlimited discretion in determining what actions are best calculated to protect Park resources." *Daingerfield Island Protective Soc. v. Babbitt*, 40 F.3d 442, 446 (D.C. Cir. 1994) (citation modified); *see Greater Yellowstone Coal. v. Kempthorne*, 577 F. Supp. 2d 183, 193 (D.D.C. 2008) (NPS's "discretion is bounded by the . . . Organic Act."). Two constraints are most relevant here.

*First*, "NPS is required to exercise its discretion in a manner that is 'calculated to protect park resources' and genuinely seeks to minimize adverse impacts on park resources and values." *Greater Yellowstone*, 577 F. Supp. 2d at 193 (citation omitted); *see Bicycle Trails Council of Marin v. Babbitt*, 82 F.3d 1445, 1461 (9th Cir. 1996), *as amended* (June 17, 1996) (concluding that the Organic Act "includes as an overarching concern the goal of resource protection"). By prioritizing without adequate explanation motor vehicle traffic on 15th Street and in the Tidal Basin, NPS has ignored its obligation to consider and protect park resources and values.

Courts have repeatedly rejected insufficiently explained attempts by NPS to prioritize motorized vehicles on the properties it manages. For example, in *Greater Yellowstone*, this Court rejected a use plan for Yellowstone National Park that would have allowed a significant number of snowmobiles, because the plan "clearly elevates[d] use over conservation of park resources and values and fail[ed] to articulate why." 577 F. Supp. 2d at 210. And in *Bluewater Network v. Salazar*, this Court concluded that NPS's decision to reintroduce jetskis to two national parks was

inconsistent with the Organic Act because it was "not based on reasoned explanations."  721 F. Supp. 2d 7, 9, 38 (D.D.C. 2010).  To be sure, the Mall is a more urban context than in *Greater Yellowstone* or *Bluewater*.  Regardless, the Mall is subject to NPS's Organic Act obligations. *Friends of the Vietnam Veterans Mem'l*, 116 F.3d at 496.  Motorized vehicles and their noise, pollution, and danger detract from the Mall's beauty and peaceful environment, including the vista for which it is renowned.  *Cf. Greater Yellowstone*, 577 F. Supp. 2d at 210 (discussing snowmobiles' "air pollution" and "adverse impacts to the natural soundscape").  As NPS elsewhere explains, the Mall's "long, uninterrupted vista embodies continuity between the ideals of the founding era and the living democracy of the present, making it not only a defining feature of Washington's design but also a powerful expression of the American experiment itself."  Nat'l Park Serv., *The Mall* (last updated Dec. 22, 2025).[34]  But NPS appears to have paid no heed to this, in violation of the Organic Act.  *Cf.* NPS CE Form at 7–11 (discussing none of this).

*Second*, the Organic Act's "broad mandate," along with NPS's implementing regulations, "call upon the NPS to 'balance access with safety, and take into account conservation and resources.'"  *Terbush v. United States*, 516 F.3d 1125, 1135 (9th Cir. 2008) (quoting *Childers v. United States*, 40 F.3d 973, 976 (9th Cir. 1994), *as amended* (Jan. 17, 1995)).  The Lane Removal Project ignores safety concerns, and therefore conflicts with the Organic Act.  NPS may (and often must) "balance" visitor safety against other park values.  *Terbush*, 516 F.3d at 1135.  But as with any agency decision, when NPS makes decisions under the Organic Act it must "articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made."  *Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 100 (D.D.C. 2006) (quoting *PPL Wallingford Energy LLC v. FERC*, 419 F.3d 1194, 1198 (D.C. Cir. 2005)).  Here, despite the well-

---

[34] https://perma.cc/NK5F-HV8C

33

documented safety benefits of the bike lanes, NPS is plowing ahead with removal, apparently without considering—much less articulating—why removal is consistent with visitor safety.

## II.    WABA's Members Will Suffer Irreparable Harm Without a Preliminary Injunction.

To establish irreparable harm, an "injury must be both certain and great, actual and not theoretical, beyond remediation, and of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm." *Am. Ass'n of Pol. Consultants v. U.S. Small Bus. Admin.*, 613 F. Supp. 3d 360, 370 (D.D.C. 2020) (internal quotation marks omitted), *aff'd*, 810 F. App'x 8 (D.C. Cir. 2020). "The law requires that irreparable injury be 'likely in the absence of an injunction.'" *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, No. 16-cv-1534, 2021 WL 2036662, at *61 (D.D.C. May 21, 2021); *accord Cmty. Oncology All. v. Becerra*, No. 23-cv-2168, 2023 WL 9692027, at *4 (D.D.C. Dec. 21, 2023) ("An injury constitutes irreparable harm for preliminary injunction purposes when there is a significant risk that the moving party will suffer harm that cannot be remedied with compensatory or other corrective relief at a later date.").

Imminent risk of injury and death is a form of irreparable harm. It is true that "the mere fact that an injunction would cause a reduction in risk" can be "insufficient to establish that irreparable harm is likely in the absence of an injunction." *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 540 F. Supp. 3d 45, 60 (D.D.C. 2021) (quotation marks omitted). But "[t]he standard for preliminary injunctive relief requires a *threat* of irreparable harm, not that irreparable harm already have occurred." *Mullins v. City of New York*, 626 F.3d 47, 55 (2d Cir. 2010). And so "[f]acing requests for preliminary injunctive relief, courts often find a showing of irreparable harm where the movant's health is in imminent danger." *Al-Joudi v. Bush*, 406 F. Supp. 2d 13, 20 (D.D.C. 2005); *accord Costa v. Bazron*, 456 F. Supp. 3d 126, 137 (D.D.C. 2020). After all, "[t]here can be no injury more irreparable" than "a very real risk of serious, lasting illness or

34

death." *Thakker v. Doll*, 451 F. Supp. 3d 358, 365 (M.D. Pa. 2020).  So too for the serious injuries and deaths that all too often attend bicycle traffic accidents.

Accordingly, courts often conclude that elevated health and safety risks amount to irreparable harm.  For example, when a county brought suit to obtain elevator-repair equipment, an injunction in the County's favor "[wa]s necessary to prevent immediate and irreparable harm" because "the evidence demonstrates that there are thousands of individuals who use the elevators on a daily basis and who could potentially be harmed by a malfunctioning elevator." *Cnty. of Berks v. Otis Elevator Co.*, No. 15-cv-4862, 2015 WL 5585732, at *3 (E.D. Pa. Sept. 23, 2015).  Similarly, a municipality's attempt to block construction of a radar system at an airport caused "a threat of irreparable harm" because a delay in construction "could deprive the flying public of enhanced air safety for several years and disrupt a national program to improve air traffic control safety." *United States v. City of Berkeley*, 735 F. Supp. 937, 938, 940 (E.D. Mo. 1990).  And courts agree that exposure to other types of hazards, such as harmful chemicals, is irreparable harm. *See, e.g.*, *Nat'l Ass'n of Farmworkers Orgs. v. Marshall*, 628 F.2d 604, 613 (D.C. Cir. 1980) (being "exposed to" dangerous "pesticides and chemicals" "make[s] out a case of irreparable harm"); *W. Va. Rivers Coal., Inc. v. Chemours Co. FC, LLC*, 793 F. Supp. 3d 790, 811 (S.D.W. Va. 2025) ("exposure to a harmful pollutant" constituted irreparable harm, despite an argument that an injunction was unavailable because "the harm [wa]s hard to quantify").

Without the separated lanes on 15th Street and in the Tidal Basin, bicyclists face dramatically elevated risks of injury and death.  D.C.'s 2015 Vision Zero Action Plan recognized that "[b]etween 2010 and 2014, approximately 85 percent of traffic fatalities occurred on arterial streets" like 15th Street.  Dist. Dep't of Transp., *A Plan of Action* 21 (2015).[35]  Between 2017 and

---

[35]https://perma.cc/93GX-WW3F

2021, about 6% of the District's traffic fatalities and 12% of traffic injuries were bicyclists. Vision Zero D.C., *Bicycle Safety* (last visited Mar. 21, 2026).[36] This, even though in 2018 just 4.5% of the District's commuters traveled by bike. MoveDC, *Bicycles* (last visited Mar. 21, 2026).[37] The dangers extend to the Tidal Basin lanes. After all, nationwide, "[b]icyclist injuries remain consistently, disproportionately high." Nat'l Highway Traffic Safety Admin., *Countermeasures That Work* 10-1 (11th ed. 2023).[38]

Along this specific stretch of 15th Street, there were more than 200 crashes between 2015 and 2020. Kiker Decl., Att. 2, at 17. So, NPS appropriately recognized the importance of protecting bicyclists on 15th Street when it first installed the protected lanes—as a press release pointed out, the lanes were "part of a larger collaboration to improve pedestrian and bicyclist safety and access in and around Washington, D.C." Nat'l Park Serv., *New Bike Lane Coming to National Mall* (Oct. 7, 2021).[39] And the lanes did just that. DDOT's safety evaluation of the 15th Street bike lanes found that, after lane installation, crashes on 15th Street fell by 46% and bicycle injury crashes by 91%. Kiker Decl., Att. 6, at 4. This is unsurprising, given the well-documented safety benefits of separated bike lanes. *See supra* Part I.B.2.

The Removal Project would instantly erase those safety improvements, or worse, as explained by William Schultheiss, a transportation-safety expert. Schultheiss is "the Director of Engineering at the Toole Design Group, a transportation planning, design, and engineering firm that specializes in multimodal roadway design, including roadways with protected bicycle facilities." Declaration of William Schultheiss, PE ("Schultheiss Decl.") ¶ 1, attached as Exhibit J.

---

[36] https://perma.cc/34N8-GM46

[37] https://perma.cc/RN7B-AH4W

[38] https://perma.cc/8Q95-V6TH

[39] https://perma.cc/JYN2-YGUM

He reviewed DDOT's safety assessment of the bike lanes, as well as the lanes' history and "physical conditions." *Id.* He concluded that the benefits to pedestrian safety found by DDOT were "a direct consequence of the operational clarity the protected facility introduced," and that the benefits to bicyclist safety were "produced" by the protected lanes. *Id.* ¶¶ 14, 17. Accordingly, in his "professional opinion," "the removal of the protected lanes would most likely result in crash rates returning to or exceeding the pre-installation levels across all modes." *Id.* ¶ 21.

WABA's members experience these dangers themselves, and know all too well how they will increase after the Lane Removal Project. For example, Nicholas Johnson, who uses the 15th Street lanes almost every day, explains he "will be less safe" after lane removal. Johnson Decl. ¶¶ 4, 10. So too for Allison Foster, who fears "risking [her] life by biking with cars on streets that do not have separated bike lanes." Foster Decl. ¶ 5. Before the lanes existed, Steven Bouchard was "nearly struck" by cars multiple times along the 15th Street route. Bouchard Decl. ¶ 10. Now, with the lanes in place, he has had "no problems." *Id.* These three are far from alone: Approximately 900 WABA members use the lanes every day. Kiker Decl. ¶ 16.

That irreparable harm is imminent: it will begin as early as April 23, 2026, when NPS and FHWA plan to begin removal of the separate lanes. *See* Joint Status Report & Proposed Schedule, at 2, Dkt. No. 7. As soon as the lanes are removed, the reason for the dramatic, 91% decrease in bicycle injuries will be reversed. Schultheiss Decl. ¶ 21. Injuries for which the lane removal is a but-for cause are therefore inevitable—and imminent health risks are "the prototypical irreparable harm." *Banks v. Booth*, 459 F. Supp. 3d 143, 159 (D.D.C. 2020); *see Coronel v. Decker*, 449 F. Supp. 3d 274, 281 (S.D.N.Y. 2020) (citation modified) ("[I]rreparable harm exists where, as here, [plaintiffs] face imminent risk to their health, safety, and lives.").

37

The significant increase in risk—effectively, a guarantee that some cyclists or other road users will be harmed in the absence of the bike lanes—plainly qualifies as irreparable injury. Indeed, the federal government itself has previously argued that "irreparable harm" will follow if traffic-control improvements are "delay[ed]," resulting in "accidents that could have been prevented." *Mooreforce, Inc. v. U.S. Dep't of Transp.*, 243 F. Supp. 2d 425, 434 (M.D.N.C. 2003); *see Protect Key W., Inc. v. Cheney*, 795 F. Supp. 1552, 1563 (S.D. Fla. 1992) (holding that "Plaintiff has demonstrated that irreparable harm will result" from a residential construction project because, "in the absence of an adequate [environmental assessment,] . . . "Plaintiff may suffer . . . increased traffic and congestion, and destruction of specimen trees and aesthetic resources"); *S. Dakota v. Frazier*, No. 4:20-cv-03018, 2020 WL 6262103, at *4 (D.S.D. Oct. 23, 2020) (finding that an abrupt speed-limit decrease could result in "more accidents" and therefore posed "a genuine threat of irreparable harm"); *S. E. Pa. Transp. Auth. v. Int'l Ass'n of Machinists & Aerospace Workers*, 708 F. Supp. 659, 663–64 (E.D. Pa. 1989) (finding "immediate and irreparable harm to plaintiff . . . as well as to the general public" because, among other things, failing to issue an injunction would "greatly increase the numbers of persons utilizing automobiles, causing congestion and standstills . . . , increase driving hazards[,] and cause high levels of air pollution"), *aff'd*, 882 F.2d 778 (3d Cir. 1989).

The possibility that the bike lanes could be reinstalled after removal does not make the harm any less irreparable. A *bike lane* can be repaired, but the injury and death caused by traffic accidents cannot. Every day that the lanes are missing, WABA members and others biking the route will "face imminent risk to their health, safety, and lives." *Coronel*, 449 F. Supp. 3d at 281; *see* Bouchard Decl. ¶ 13 ("If these lanes are removed, I will likely continue to use the 15th Street/Ohio Drive/East Basin Drive route, but it will be in the road where necessary, or if allowed,

38

on the sidewalk (which is incredibly dangerous to both pedestrians and myself).”); Alpert Decl. ¶ 11 (saying that, even without protected lanes, he “would still bike along the 15th Street route . . . despite the dangers because of how important this route is to moving around the city”); Wacker Decl. ¶ 9 (explaining that lane removal “would force me . . . back into shared spaces with pedestrians or motor vehicles”). And if this motion is denied, but WABA prevails at summary judgment, reinstallation cannot happen in an instant. It was more than four months between when NPS and DDOT held their final public-engagement meeting in May 2021, Kiker Decl. ¶ 10, and when the lanes opened in October 2021, *id.*, Att. 6, at 4. And the Tidal Basin lanes were delayed far longer—initially slated for Summer 2021 installation, but completed only in FY 2023. *See id.*, Att. 4, at 18; Dist. Dep’t of Transp., *2024 Performance Oversight Questions, Part II*, at 101.[40]

Moreover, this removal comes at a particularly dangerous time. Spring is a bustling period for the Mall, *see* Kiker Decl. ¶ 27, and as explained *supra* Part I.B.3, 15th Street is an important bike route to and through the area. By removing the route during this time, NPS is substantially increasing the likelihood of serious injury and death. The Court need not—and must not—wait for loss of life or limb to act. *See Otis Elevator Co.*, 2015 WL 5585732, at *3 (finding irreparable harm even though physical injuries “ha[d] not occurred to date”).

Finally, the procedural injury Plaintiff and its members have suffered under NEPA further supports a finding of irreparable harm. “In the NEPA context, irreparable harm may be found when a procedural harm is combined with an aesthetic or other concrete injury.” *Comm. of 100 on Fed. City v. Foxx*, 87 F. Supp. 3d 191, 202 (D.D.C. 2015).

---

[40] https://perma.cc/X2EF-BQWC

**III.    The Balance of Equities and Public Interest Weigh in Favor of Preliminary Relief.**

"It is well settled that the balance of equities and public interest factors merge if the government is the opposing party." *Media Matters for Am. v. Paxton*, 138 F.4th 563, 585 (D.C. Cir. 2025). These factors weigh strongly in favor of a preliminary injunction, for three reasons.

*First*, "there is generally no public interest in the perpetuation of unlawful agency action." *Shawnee Tribe v. Mnuchin*, 984 F.3d 94, 102 (D.C. Cir. 2021) (alteration incorporated) (quoting *League of Women Voters of United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016)); *see also N.S. v. Hughes*, 335 F.R.D. 337, 355 (D.D.C. 2020) ("[T]he government has no legitimate interest in acting unlawfully."). By contrast, "there is a substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and operations.'" *Newby*, 838 F.3d at 12 (citation omitted). Here, for the reasons given above, the government's actions are unlawful, and thus there is no public interest in allowing the unlawful destruction of the bike lanes to proceed.

*Second*, the Removal Project threatens public health and safety. After lane installation, accidents along 15th Street fell dramatically; the Removal Project would do away with those improvements, putting bicyclists and pedestrians at risk. *See supra* Part II. The public interest therefore weighs decisively in WABA's favor. *Cf. Ctr. for Auto Safety v. Dole*, 582 F. Supp. 1444, 1451 (D.D.C. 1984) (explaining that "considerations of the public interest dictate . . . that concerns regarding safety be adequately addressed").

*Third*, maintaining the status quo—protected bike lanes on 15th Street—would impose little burden on the government. "[T]he balance of the equities and public interest [are] not in the government's favor when maintaining the status quo would not require the agency to take any affirmative action." *Mashpee Wampanoag Tribe v. Bernhardt*, No. 18-cv-2242, 2020 WL 3034854, at *4 (D.D.C. June 5, 2020) (citation modified) (quoting *Stellar IT Sols., Inc. v. U.S. Citizenship & Immigr. Serv.*, No. 18-cv-2015, 2018 WL 6047413, at *12 (D.D.C. Nov. 19, 2018)).

40

That is the case here.  The government, shrouded in secrecy, is leaping into action to disrupt what has been the status quo since 2021.  *See* Kiker Decl. ¶ 13. NPS "had no problem with maintaining the status quo" since the lane's installation and through multiple cherry blossom seasons.  *Mashpee Wampanoag Tribe*, 2020 WL 3034854, at \*4.  Moreover, NPS has not identified any urgent need to take this action.  Indeed, the fact that cherry blossom season is underway cuts *against* NPS's original plan to remove the lanes on March 23—a change to traffic patterns during the peak season of Mall visits will be especially disruptive.  And the government's shifting rationale as to when this activity is truly time-critical should make one wary of the legitimacy of the purported justification.  Accordingly, this Court's intervention to preserve the status quo is appropriate.

## IV.     The Court Should Not Require a Bond, Or, Alternatively, Should Require Only a Nominal Bond.

A court may issue a preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  Fed. R. Civ. P. 65(c).  District courts have "the 'widely recognized discretion' . . . 'not only to set the amount of security but to dispense with any security requirement whatsoever.'"  *Taylor v. Trump*, No. 25-cv-3742, 2026 WL 396844, at \*17 (D.D.C. Feb. 11, 2026) (quoting *Fed. Prescription Serv., Inc. v. Am. Pharm. Ass'n*, 636 F.2d 755, 759 (D.C. Cir. 1980)).

This Court routinely declines to require a bond or requires only a nominal bond, for several reasons that apply here.  *See, e.g.*, *Am. Oversight v. Hegseth*, 788 F. Supp. 3d 14, 32 (D.D.C. 2025) (nominal bond of $1 because the order would "not compel the Government to take costly steps or incur any damages"); *Taylor*, 2026 WL 396844, at \*17 (nominal bond of $1 given "the lack of representation" that defendants would "sustain any monetary injury from an injunction, the self-evidently limited financial resources of Plaintiffs, and the important rights they seek to vindicate");

*L.G.M.L. v. Noem*, 800 F. Supp. 3d 100, 133–134 (D.D.C. 2025) (similar); *N. Am.'s Bldg. Trades Unions v. Dep't of Def.*, 783 F. Supp. 3d 290, 315 (D.D.C. 2025) (no bond because "Defendants have not sufficiently demonstrated any likelihood of suffering costs or damages").  Here, delaying the Removal Project would *delay*, or potentially avoid altogether (if the NPS concludes that the project is not justified after actually considering the relevant evidence), the costs Defendants might incur.  And WABA, a non-profit with limited financial resources, is seeking to vindicate its members' rights under federal statutes to participatory, public-regarding decisionmaking.  The public interest thus would not be served by imposing a bond requirement here.

### CONCLUSION

For the reasons set forth herein, this Court should grant the motion for a preliminary injunction and should stay the Removal Project pursuant to 5 U.S.C. § 705.

March 26, 2026

Respectfully submitted,

/s/ Thomas Brugato

Thomas Brugato (D.C. Bar No. 1013523)
Gary S. Guzy (D.C. Bar No. 375977)
*Christina Coleburn (*pro hac vice* forthcoming)
*Kristin Oakley (*pro hac vice* forthcoming)
*Benjamin Rolsma (*pro hac vice* forthcoming)

COVINGTON & BURLING LLP
850 Tenth Street, NW
Washington, D.C. 20001-4956
(202) 662-5515
tbrugato@cov.com
gguzy@cov.com
ccoleburn@cov.com
koakley@cov.com
brolsma@cov.com

*Attorneys for Plaintiff Washington Area Bicyclist Association, Inc.*

42