# EXHIBIT J

# DECLARATION OF WILLIAM SCHULTHEISS, PE

I, William Schultheiss, PE, declare as follows:

## BACKGROUND AND QUALIFICATIONS

1. My name is William Schultheiss. I am the Director of Engineering at the Toole Design Group, a transportation planning, design, and engineering firm that specializes in multimodal roadway design, including roadways with protected bicycle facilities. I have reviewed the District Department of Transportation's ("DDOT's") post-implementation analysis of the 15th Street, NW/SW Protected Bike Lane Project ("Project"), the Project's design history, and the physical conditions along the affected corridor.

2. I am also a 27 year resident of the District of Columbia, and a regular motorist, bicyclist and pedestrian within the project area.

3. I submit this declaration in support of Plaintiff's Motion for a Preliminary Injunction. The opinions expressed herein are my own professional judgments, based on my review of available data and my expertise in multimodal transportation engineering.

## CORRIDOR CONTEXT

4. The affected corridor traverses one of the most heavily visited pedestrian environments in the United States. The National Mall and Memorial Parks ("National Mall") unit receives approximately 24 million visitors annually. The corridor passes directly through or adjacent to destinations including the Washington Monument, the World War II Memorial, the Korean War Veterans Memorial, the Martin Luther King Jr. Memorial, the Holocaust Museum, multiple Smithsonian Institution museums, the Jefferson Memorial, and the Tidal Basin. The National Mall also serves as a critical destination for outdoor recreation, functioning as D.C.'s central public park and green space for residents and visitors.

5. This visitor population includes a significant number of users with mobility considerations, including veterans who travel to these memorials in wheelchairs and with mobility aids to honor their own service and that of fallen comrades. The visitor population also includes families with young children, elderly visitors, and international tourists who are unfamiliar with local traffic patterns. The corridor also serves as a recreational and commuter route for cyclists and pedestrians of all abilities, including disabled cyclists and veterans who rely on adaptive cycles. This pedestrian and mobility context is not incidental to the safety analysis—it is central to it.

## SAFETY PERFORMANCE OF THE EXISTING FACILITY

6. DDOT's 2026 before-and-after evaluation—drawing on crash data from January 2017 through December 2019 (the time period before the Project's construction) and March 2022 through October 2025 (the time period after the Project's construction)—found that

the protected bike lane produced improvements in three key areas: motor vehicle operations, pedestrian safety, and bicycle safety.

## FINDING 1: MOTOR VEHICLE OPERATIONS IMPROVED

7. Following installation, vehicle speeds on the corridor increased by 17% and peak-hour travel times decreased by up to 49 seconds. In my professional opinion, these gains are directly attributable to the reduction in pre-merge conflict along the approach to I-395.

8. The corridor between Maine Avenue and the 14th Street Bridge carried three southbound lanes pre-construction, which the installation of the protected bicycle facility reduced two lanes. The corridor between Pennsylvania Avenue and Maine Avenue carried two southbound through lanes pre-construction, which the installation reduced to one through lane. In both segments, the remaining through lanes converge to a single lane at the same I-395 highway entrance, compounding the fixed capacity constraint shared across all approach corridors. This severe geometric constraint is a well-documented source of aggressive pre-merge behavior. Drivers anticipating the bottleneck accelerate and execute repeated lateral lane changes in the approach blocks, competing for positions before capacity is eliminated. Critically, this behavior produces no benefit to overall throughput. The number of vehicles that can enter I-395 is fixed by the single-lane constraint regardless of approach speed or lane position.

9. The pre-installation crash record on this corridor reflects the predictable consequence of that dynamic—elevated rates of sideswipe, rear-end, and turn conflicts generated by vehicles operating at speed differentials in a constrained approach zone. The lane reductions directly diminished the volume of lateral lane-change maneuvers in the pre-merge zone on both segments. The corridor became more orderly and efficient for motor vehicles precisely because the incentive and opportunity for unproductive pre-merge competition was reduced.

10. Removal of the protected lane would restore the pre-installation approach geometry on both segments and, with it, the conditions that degraded motor vehicle operations and produced the pre-installation crash pattern. In my professional opinion, the claim that removal of the protected lane would improve motor vehicle operations is not supported by the available data. The data indicates the opposite.

11. The motor vehicle capacity argument for removal is further undermined by the geometry of the broader corridor. 14th Street, SW runs parallel to 15th Street and Raoul Wallenberg Place, and all motor vehicle traffic on both roads is destined for the same I-395 entrance. 14th Street currently operates as a motor vehicle priority corridor with three through southbound lanes and three through northbound lanes, constituting six lanes of capacity serving the identical destination. In my professional opinion, restoring one travel lane on 15th Street and Raoul Wallenberg Place would provide no meaningful increase in motor vehicle access to I-395 because the constraint is the highway entrance itself, which is shared across both parallel approach corridors. The pre-merge competition that produced elevated crash rates on the project corridor occurs in the context of this existing parallel

capacity—further evidence that the lane reductions on 15th Street and Raoul Wallenberg Place improved operations by reducing unproductive conflict rather than restricting throughput.

## FINDING 2: PEDESTRIAN SAFETY IMPROVED

12. The protected lane produced substantial safety gains for pedestrians across the full length of the corridor. According to DDOT's evaluation per 100 days, pedestrian crashes declined by 25% and pedestrian injury crashes declined by 67%.

13. Given the corridor's visitor volumes and user mix described above—including veterans, tourists, families, and mobility-impaired users—these figures represent a meaningful reduction in harm to some of the most vulnerable road users in D.C. The sidewalks along the corridor are heavily used throughout the day by visitors moving between memorials, museums, transit stops, and parking areas.

14. In my professional opinion, these improvements are a direct consequence of the operational clarity the protected facility introduced. By providing cyclists with dedicated and physically separated infrastructure, the lane removed cyclists from the sidewalk environment and eliminated a significant source of pedestrian conflict along the full corridor. Removal of the facility would displace cyclists back onto those sidewalks, directly reversing the safety gains documented above.

15. The consequences of removing the protected bike lane would be particularly challenging on the segment between Independence Avenue, SW and the 14th Street Bridge, where visitor access to the Tidal Basin memorials generates persistently high pedestrian densities. The existing sidewalks along this stretch are of insufficient width to safely accommodate the current volume and mix of users, which includes a significant population of wheelchair users and individuals using mobility aids—among them disabled veterans visiting the memorials that honor their service and that of fallen soldiers. Introducing cyclists displaced from the roadway would further reduce the effective clearance available to these users, creating foreseeable conflicts and increasing the risks of falls and injuries for a population that is disproportionately vulnerable to serious harm from such incidents. A similar challenge exists between Pennsylvania Avenue, NW and Independence Avenue, SW, where high pedestrian volumes generated by the museums, monuments, and federal buildings along that segment create comparable conditions.

16. The removal of the protected bike lane within the segment between Independence Avenue, SW and the 14th Street Bridge presents elevated motor vehicle conflict risks, as described above in paragraphs eight through 11. The protected lane provides a physical buffer between the high-speed pre-merge vehicle activity and the sidewalk environment. Its removal would eliminate that buffer, reducing the margin of safety for pedestrians, including disabled users, near the most active motor vehicle conflict zone on the corridor. Bicyclists who remain in the roadway rather than the sidewalk would face comparable risks. This segment attracts a significant number of recreational and tourist cyclists, including Capital Bikeshare users accessing the memorials and Tidal Basin, many of whom

are likely less experienced with bicycling in urban conditions. Without the protected lane, these users would be exposed to the high-speed merge dynamics described above in paragraphs eight through 11, increasing the likelihood of bicycle-vehicle conflicts for an inexperienced riding population.

## FINDING 3: BICYCLE SAFETY IMPROVED

17. The protected lane produced significant safety improvements for cyclists. According to DDOT's evaluation per 100 days, bicycle crashes declined by 69%, bicycle injury crashes declined by 91%, and fixed-object crashes were eliminated entirely.

18. These results are consistent with the established body of research on protected bicycle facilities. Physical separation between cyclists and motor vehicles reduces conflict points and crash severity. Bicycle volumes along the corridor have increased since 2021. In my professional opinion, a higher number of cyclists operating without physical protection from motor vehicles would increase the frequency of potential conflict points beyond those observed in the pre-installation period.

19. The sidewalks along this corridor are lined with bollards, which were installed as counterterrorism security measures to protect the federal buildings and monuments along the route. Removing bicyclists from the sidewalk environment eliminates their exposure to these fixed objects, a likely contributing factor to the complete elimination of fixed-object crashes documented in DDOT's post-installation evaluation.

## OVERALL CRASH RECORD

20. Across all modes, DDOT's before-and-after evaluation documents the following per 100 days, all roadway crashes declined by 46%, from approximately 11% to 5.9%. Injury crashes also declined by 52%, from 2.7% to 1.3%.

## PROFESSIONAL OPINION ON SAFETY RISKS OF REMOVAL

21. It is my professional opinion that the removal of the protected lanes would most likely result in crash rates returning to or exceeding the pre-installation levels across all modes. The above findings are not independent: the protected lane simultaneously improved motor vehicle operations, cleared the sidewalk environment for pedestrians throughout the corridor, and separated cyclists from traffic. Removal would reverse all three effects at once.

22. Specifically: the corridor would return to pre-installation approach geometry on both segments, restoring the conditions for unproductive pre-merge speed and lateral conflict. Cyclists would be displaced onto sidewalks that already operate beyond a safe capacity for their existing users, including disabled veterans and mobility-impaired visitors. The physical buffer between high-speed merge activity and the pedestrian zone would be eliminated.

23. The stated justification for the removal, improving motor vehicle operations, directly contradicts the data. It is further undermined by the existence of 14th Street, SW as a parallel six-lane motor vehicle priority corridor serving the identical I-395 destination. In my professional opinion, removing the facility—particularly without a safety analysis, an alternatives assessment, or a public process—would foreseeably degrade motor vehicle operations and increase the collision risks for pedestrians and cyclists, including disabled veterans and mobility-impaired users.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 26, 2026, in Washington, D.C.

Wm Schultheiss

William Schultheiss, PE