NPS PMIS No. 212005    NPS Drwg No. 802/165501

| PROJECT | SHEET NUMBER |
|---|---|
| DC NP NAMA 21(2) | S06 |







*12" PIPE*



*15" TO 36" PIPE*

## GENERAL NOTES

1. CONTRACTOR TO PROVIDE ALL MATERIALS UNLESS OTHERWISE NOTED.
2. ALL DIMENSIONS, ELEVATIONS, SPECIFICATIONS, AND CAPACITIES ARE SUBJECT TO CHANGE.
3. THIS CPS UNIT IS DESIGNED FOR TREATMENT FLOWS THROUGH THE SCREEN. FLOWS GREATER THAN THE TREATMENT FLOW RATE WILL BYPASS OVER THE SCREEN.
4. A BYPASS LID IS REQUIRED SINCE THE OUTLET PIPE IS DIRECTLY BELOW THE CURB OPENING.
5. CPS IS COMPRISED OF 304 STAINLESS STEEL. THICKNESS IS 14 GAUGE. SCREEN PERFORATIONS ARE 5 MILLIMETERS IN DIAMETER. THE SCREEN AREA IS 50% OPEN SPACE.

## INSTALLATION NOTES

1. CONTRACTOR TO PROVIDE ALL LABOR, EQUIPMENT, MATERIALS, AND INCIDENTALS REQUIRED TO INSTALL THE CPS UNIT AND APPURTENANCES IN ACCORDANCE WITH THIS DRAWING AND THE MANUFACTURER'S SPECIFICATIONS, UNLESS OTHERWISE STATED IN MANUFACTURER'S CONTRACT.
2. POSITION THE CPS SO IT IS EVENLY SPACED AROUND THE CONNECTOR PIPE, ENSURING A MIN. OF 4" SPACING AWAY FROM ANY CORNERS. SCREEN BOTTOM SHALL BE FLUSH WITH THE CATCH BASIN FLOOR, OR WITH GAPS NO GREATER THAN 5 MM.
3. IF A BYPASS LID IS REQUIRED, VERIFY THE BYPASS HEIGHT NEEDED AND MARK THAT LOCATION ON THE WALL DIRECTLY ABOVE THE BASE UPRIGHTS. LIFT THE LID IN PLACE AND MARK THE HOLE LOCATIONS FOR THE LID MOUNTING BRACKETS. SECURE THE LID WITH STAINLESS STEEL NUTS.

| PIPE DIAMETER | A | B | C |
|---|---|---|---|
| 1'-0" | 1'-8" | 1'-11" | 0'-0" |
| 1'-3" | 2'-1" | 2'-4" | 0'-5" |
| 1'-6" | 2'-7" | 2'-10" | 0'-11" |
| 2'-0" | 3'-1" | 3'-4" | 1'-5" |
| 2'-6" | 3'-7" | 3'-10" | 1'-11" |
| 3'-0" | 4'-7" | 4'-10" | 2'-11" |

NPS-AR-000934

U.S. DEPARTMENT OF TRANSPORTATION
FEDERAL HIGHWAY ADMINISTRATION
OFFICE OF FEDERAL LANDS HIGHWAY

**EFLHD DETAIL**

## INLET TRASH SCREEN

*NO SCALE*

| DETAIL |
|---|
| E604-B |

NPS PMIS No. 212005    NPS Drwg No. 802/165501

| PROJECT | SHEET NUMBER |
|---|---|
| DC NP NAMA 21(2) | S07 |

*NOTE:*

*Place transverse expansion joints at intervals of not more than 60 feet for curbs and sidewalks.*



Granite curb, see Section View below

Pavement

Grass

*PLAN VIEW*



Granite curb, see Section View below

Pavement

Sidewalk

*PLAN VIEW*



1" in 12" batter on face of curb

¼" Radius

Granite curb smooth face (saw cut), See Table 1 for batter

Reveal

6"

6"

Grade

16"

Pavement structure

Concrete or aggregate base (saw cut concrete full depth)

Portland cement concrete dry mix

6"

6"

14"

*SECTION VIEW*

**STONE CURB TYPE 1, 16" DEPTH (GRANITE TYPE A OR B) (WITHOUT SIDEWALK)**



1" in 12" batter on face of curb

¼" Radius

Granite curb smooth face (saw cut), See Table 1 for batter

Reveal

6"

6"

½" Expansion joint

Sidewalk

Grade

16"

Pavement structure

Concrete or aggregate base

Portland cement concrete dry mix

5" bed course

6"

6"

14"

*SECTION VIEW*

**STONE CURB TYPE 1, 16" DEPTH (GRANITE TYPE A OR B) (WITH SIDEWALK)**



Varies    Varies    6"-8"

Sidewalk

Linear tree space

Granite curb

*PLAN VIEW*

**STONE CURB TYPE 1, 16" DEPTH (GRANITE TYPE A OR B) (WITH SIDEWALK AND LINEAR TREE SPACE)**

### TABLE 1

| BATTER FOR GRANITE CURB ||
|---|---|
| TYPE | BATTER (H:V) |
| A | 1:12 |
| B | 3/4:10 |

U.S. DEPARTMENT OF TRANSPORTATION
FEDERAL HIGHWAY ADMINISTRATION
OFFICE OF FEDERAL LANDS HIGHWAY

**GRANITE CURB**

NPS-AR-000935

NO SCALE

| DETAIL APPROVED FOR USE | DETAIL |
|---|---|
| APPROVED: MAY 2011 | E609-02 |
| REVISED: SEPTEMBER 2020 | |

28 June 2023  11:04 AM

M:\PROJECTS\nama\21(2)_50113\Proj_Dev\CADD\Std-Det\S07_st60902_detailGraniteCurb.dgn  [Sheet]

NPS PMIS No. 212005     NPS Drwg No. 802/165501

| PROJECT | SHEET NUMBER |
|---|---|
| DC NP NAMA 21(2) | S08 |

**NOTES:**

1. Match existing exposed aggregate concrete sidwalk color and texture.

2. Match existing transverse expansion joint.



**EXPOSED AGGREGATE CONCRETE SIDEWALK WITH CURB**

U.S. DEPARTMENT OF TRANSPORTATION
FEDERAL HIGHWAY ADMINISTRATION
OFFICE OF FEDERAL LANDS HIGHWAY

EFLHD DETAIL

**EXPOSED AGGREGATE CONCRETE SIDEWALK**

NPS-AR-000936

NO SCALE

DETAIL

E615-A

M:\PROJECTS\nama\21(2)_50113)\Proj_Dev\CADD\Std-Det\S08_st615A_detail_Exposed Agg ConcreteSidewalk.dgn   [ST-615A Detail - Sheet]

2 May 2024   4:06 PM



NPS PMIS No. 212005    NPS Drwg No. 802/165501

| PROJECT | SHEET NUMBER |
|---|---|
| DC NP NAMA 21(2) | S09 |

**PERPENDICULAR CURB RAMP**

- Protect existing exposed concrete sidewalk
- Saw cut, remove and reset accessibility ramp, granite slab
- ¼" Sealant joint between detectable warning panels and accessibility ramp, granite slab
- 1" Caulked expansion joint between detectable warning panel and granite slab/curb
- Protect existing accessibility ramp, granite slab
- Protect existing accessibility ramp, granite slab
- Face of existing curb
- Existing granite curb to remain
- 6' Var.
- 6'
- 6' Var.
- Width
- 2'
- 6' Ramp

**SECTION A-A**

- Saw cut and remove existing pavement (full depth)
- New asphalt (see Typical Sections)
- Remove and reset existing granite curb
- 11¾" x 11¾" x 4¼" truncated dome granite paver
- Sealant and backer rod (typ.)
- Saw cut existing granite slab (4" depth)
- Saw cut, remove and reset granite slab
- 1" Mortar setting bed
- 5" Existing concrete slab to remain
- 6" existing aggregate base to remain
- Saw cut and remove existing concrete slab
- Concrete bedding
- Match existing
- 1"
- Match existing
- ¼"
- ¼"
- Match existing
- 6"
- 6"
- 6"

**TRUNCATED DOME GRANITE PAVERS SPACING AND SECTION**

- Truncated dome (typ.)
- 2⅜"
- 2⅜"
- ⁹⁄₁₆"
- ³⁄₁₆"
- 1¹⁄₁₆"

**NOTES:**

1. Install detectable warning panel flush with the existing accessibility ramp, granite slabs.

2. Match detectable warning panel slope to the existing accessibility ramp, granite slabs.

**DIAGONAL CURB RAMP**

- Protect existing exposed concrete sidewalk
- Protect existing accessibility ramp, granite slab
- Saw cut, remove and reset accessibility ramp, granite slab
- Protect existing accessibility ramp, granite slab
- Face of existing granite curb
- Protect existing granite curb
- Protect existing granite curb
- 2'
- 6' Ramp
- 6'
- 6' Var.
- 6'
- 6' Var.
- Width

**1" EXPANSION JOINT**

- Existing granite curb
- Preformed compressible filler
- 1"
- Sealant and backer rod
- Detectable warning panels
- 1" Mortar setting bed
- 5" Concrete subgrade
- Subgrade
- Subgrade

**¼" SEALANT JOINT**

- 1/4"
- Preformed compressible filler
- Subgrade

| U.S. DEPARTMENT OF TRANSPORTATION |
|---|
| FEDERAL HIGHWAY ADMINISTRATION |
| OFFICE OF FEDERAL LANDS HIGHWAY |
| EFLHD DETAIL |
| **ACCESSIBILITY SIDEWALK AND CURB RAMPS** |

| | DETAIL |
|---|---|
| NO SCALE | E615-B |

NPS-AR-000937

15 May 2024  3:26 PM    M:\PROJECTS\nama\21(2)_50113\Proj_Dev\CADD\Std-Det\S09_st615B_detail_AccessibleRamp.dgn    [Sheet - E615-B - SXX]



NPS PMIS No. 212005    NPS Drwg No. 802/165501

**NOTES:**

1. Place pavement word and symbol markings in accordance with the "Manual on Uniform Traffic Control Devices" (MUTCD), latest edition.

2. Place all letters, numerals and symbols in accordance with the "Standard Highway Signs", latest edition.

3. Provide Accessibility Symbol marking as indicated in the plans or directed by the CO in one of the following configurations:
   (a) w/ Symbol only;
   (b) w/ Symbol and blue background; or
   (c) w/ Symbol, blue background, and white border

| PROJECT | SHEET NUMBER |
|---|---|
| DC NP NAMA 21(2) | S10 |

### PAVEMENT MARKING AREAS

| TYPE | SQFT |
|---|---|
| Through Lane-Use Arrow | 12 |
| Turn Lane-Use Arrow | 16 |
| Turn and Through Lane-Use Arrow | 26 |
| Yield Ahead Arrow (V<45 mph) | 26 |
| Yield Ahead Arrow (V≥45 mph) | 37 |
| Accessibility Marking (symbol only) | 2 |
| Accessibility Marking w/ border (White) | 5 |
| Accessibility Marking w/ border (Blue) | 9 |
| ONLY Word Marking | 21 |
| BUS Word Marking | 20 |
| WRONG-WAY ARROW | 35 |
| SHARED LANE MARKING | 11.8 |
| BICYCLE LANE MARKING WITH DIRECTIONAL ARROW | 12.2 |

**THROUGH LANE-USE ARROW**

**TURN LANE-USE ARROW**

**TURN AND THROUGH LANE-USE ARROW**

**LANE-REDUCTION ARROW (RIGHT) FOR LEFT LANE, USE MIRROR IMAGE**

**"BUS" WORD MARKING**

**WRONG-WAY ARROW**

**SHARED LANE MARKING**

**BICYCLE LANE MARKING WITH DIRECTIONAL ARROW**

**"ONLY" WORD MARKING**

Blue background when border specified in the Striping Plans

White border when specified in the Striping Plans

**ACCESSIBILITY PARKING SPACE SYMBOL**

U.S. DEPARTMENT OF TRANSPORTATION
FEDERAL HIGHWAY ADMINISTRATION
OFFICE OF FEDERAL LANDS HIGHWAY

EFLHD DETAIL

**PAVEMENT MARKINGS SYMBOLS AND WORDS**

NPS-AR-000938

NO SCALE

| DETAIL |
|---|
| E634-01A |

15 May 2024  3:50 PM    M:\PROJECTS\nama\21(2)_501(3)\Proj_Dev\CADD\Std-Det\S10_st634\01A_detail_PavementMarkingSymbols.dgn  [E634-01A Detail - Sheet]

NPS PMIS No. 212005     NPS Drwg No. 802/165501

| PROJECT | SHEET NUMBER |
|---|---|
| DC NP NAMA 21(2) | S11 |

Raised Pavement Marker
(See Notes 2 and 3)

Solid Yellow Striping

2"

4"

**VIEW A**

Single Solid White Striping (edge striping)

N

Raised Pavement Markers (typ.)

See View A

Single Solid Yellow Striping

**SINGLE SOLID YELLOW STRIPING
WITH RAISED PAVEMENT MARKERS**

## NOTES:

1. Install striping in accordance with the "Manual on Uniform Traffic Control Devices" (MUTCD), latest edition.

2. When raised pavement markers are required, space and install in accordance with the MUTCD and as shown in this Detail or as directed by the CO.

3. When raised pavement markers are required, see Detail E634-02.

Single Solid White Striping (edge striping)

10'   30'

4" wide
broken white striping

Double Solid Yellow Striping (centerline)

**BROKEN SINGLE WHITE AND
DOUBLE SOLID YELLOW STRIPING**

Single Solid White Striping (edge striping)

N

10'   30'

4" wide
broken white striping

2N or less

N

Raised Pavement Markers (typ.)

Double Solid Yellow Striping (centerline)

**BROKEN SINGLE WHITE AND
DOUBLE SOLID YELLOW STRIPING
WITH RAISED PAVEMENT MARKERS**

Edge of pavement (typ.)

N

10'   30'

4" wide
broken yellow striping

9'

3'

4" wide dotted white striping

**BROKEN SINGLE YELLOW AND
DOTTED WHITE STRIPING**

Edge of pavement (typ.)

N

10'   30'

4" wide
broken yellow striping

N

3'   9'   M

M

Raised Pavement Markers (typ.)

4" wide dotted white striping

**BROKEN SINGLE YELLOW AND
DOTTED WHITE STRIPING
WITH RAISED PAVEMENT MARKERS**

NPS-AR-000939

NO SCALE

U.S. DEPARTMENT OF TRANSPORTATION
FEDERAL HIGHWAY ADMINISTRATION
OFFICE OF FEDERAL LANDS HIGHWAY

EFLHD DETAIL

**PAVEMENT MARKINGS
WITH AND WITHOUT
RAISED PAVEMENT MARKERS**

| DETAIL APPROVED FOR USE | DETAIL |
|---|---|
| APPROVED: MAY 2011 REVISED: SEPTEMBER 2020 | E634-03 |

M:\PROJECTS\nama\21(2)_50\13\Proj_Dev\CADD\Std-Det\S11_st63403_detail_PavementMarkings.dgn    [Sheet]

28 June 2023   11:15 AM



**HIGH-VISIBILITY CROSSWALK AT UNSIGNALIZED MIDBLOCK**

TWO-WAY ROADWAY

ONE-WAY ROADWAY

PERPENDICULAR

LONGITUDINAL BAR

LONGITUDINAL BAR PAIR

TRANSVERSE DIAGONAL

BASIC

**TYPICAL CROSSWALK LAYOUTS**

**VIEW A - YIELD LINE LAYOUTS**

MINIMUM DIMENSIONS

MAXIMUM DIMENSIONS

\* Ensure triangle height for yield lines is equal to 1.5 times the base dimension.

**STANDARD CROSSWALK AT INTERSECTION**

## NOTES:

1. Install striping and signing in accordance with the "Manual on Uniform Traffic Control Devices" (MUTCD), latest edition.

2. Longitudinal bar crosswalk type is used for illustration purposes only. Refer to the plans for project crosswalk type and actual striping dimensions.

3. Smaller than shown yield lines may be used when installed on narrower, slow-speed facilities as approved by the CO.

4. If Stop Here for Pedestrians signs (R1-5b or R1-5c) are used instead of Yield Here to Pedestrians signs (R1-5 or R1-5a), use stop lines instead of yield lines.

5. The In-Street Pedestrian Crossing (R1-6 or R1-6a) sign may be used to remind road users of laws regulating right-of-way at an unsignalized pedestrian crosswalk according to the latest edition of the MUTCD as approved by the CO.

6. For longitudinal bar, longitudinal bar pair, and perpendicular crosswalk types, space line bars to avoid wheel path as shown in the plans or as approved by the CO.

7. When curb ramps are present, ensure that crosswalk markings are located so that the curb ramps are within the extension of the crosswalk markings.

8. At non-intersection crosswalk where the posted speed limit is 40 MPH or greater, provide a minimum crosswalk width of 8 feet unless otherwise specified in the plans.

### CROSSWALK STRIPING DIMENSIONS TABLE

| CROSSWALK TYPE | W1 | | W2* | | T | | d | |
|---|---|---|---|---|---|---|---|---|
| | Min. | Max. | Min. | Max. | Min. | Max. | Min. | Max. |
| Basic | | | | | 6" | 12" | | |
| Longitudinal Bar | 12" | 24" | 12" | 60" | | | | |
| Longitudinal Bar Pair | 8" | 12" | 24" | 60" | | | 8" | 12" |
| Perpendicular Bar | 12" | 24" | 12" | 60" | 6" | 24" | | |
| Transverse Diagonal | 12" | 24" | 12" | 60" | 6" | 24" | | |

\* Ensure lateral spacing of the longitudinal bars does not exceed 2.5 times the width of a longitudinal bar.

NPS-AR-000940

NPS PMIS No. 212005    NPS Drwg No. 802/165501

| PROJECT | SHEET NUMBER |
|---|---|
| DC NP NAMA 21(2) | S12 |

U.S. DEPARTMENT OF TRANSPORTATION
FEDERAL HIGHWAY ADMINISTRATION
OFFICE OF FEDERAL LANDS HIGHWAY

EFLHD DETAIL

**PAVEMENT MARKINGS PEDESTRIAN CROSSWALK**

| DETAIL APPROVED FOR USE | DETAIL |
|---|---|
| APPROVED: NOVEMBER 2021 | E634-06 |

NO SCALE

M:\PROJECTS\nama121(2)_50113\Proj_Dev\CADD\Std-Det\S12_st63406_detail_CrosswalkPavementMarkings.dgn   [Sheet]

15 May 2024   3:51 PM

NPS PMIS No. 212005    NPS Drwg No. 802/165501

| PROJECT | SHEET NUMBER |
|---|---|
| DC NP NAMA 21(2) | S13 |

## PROJECT NOTES:

### GENERAL NOTES:

1. ALL CONSTRUCTION MATERIALS AND PROCEDURES SHALL BE IN ACCORDANCE WITH THE STANDARD SPECIFICATIONS FOR HIGHWAYS AND STRUCTURES (GOLD BOOK) DATED 2013, ISSUED BY THE DISTRICT OF COLUMBIA DEPARTMENT OF TRANSPORTATION.

2. ALL WORK SHALL BE DONE IN ACCORDANCE WITH THE DESIGN & ENGINEERING MANUAL (DEM) DATED JANUARY 2019.

3. PER AMERICANS WITH DISABILITIES ACT ACCESSIBILITY GUIDELINES (ADAAAG), ALL SIDEWALK CROSS SLOPES SHALL NOT EXCEED 2%.

### PAVEMENT MARKING & SIGNING NOTES:

4. ALL STRIPING AND SIGN WORK SHALL BE IN ACCORDANCE WITH THE STANDARD SPECIFICATIONS FOR HIGHWAYS AND STRUCTURES (GOLD BOOK) DATED 2013, DESIGN & ENGINEERING MANUAL (DEM) DATED JANUARY 2019, AND THE 2009 MANUAL ON UNIFORM TRAFFIC CONTROL (MUTCD) REQUIREMENTS.

5. PAVEMENT MARKINGS ON ASPHALT PAVEMENT SHALL BE THERMOPLASTIC TYPE EXCEPT GREEN PAVEMENT PAINT WHICH SHALL BE (RIDE AWAY OR SIMILAR PRODUCT).

6. ALL EXISTING PAVEMENT MARKINGS MAY NOT BE SHOWN ON PLANS. ALL EXISTING PAVEMENT MARKINGS THAT CONFLICT WITH PROPOSED PAVEMENT MARKINGS SHALL BE ERADICATED BY A METHOD APPROVED BY DDOT.

7. NOT ALL DRIVEWAYS HAVE BEEN LOCATED FOR THIS STRIPING AND SIGNAGE PLAN. THE CONTRACTOR SHALL BE RESPONSIBLE FOR FIELD VERIFYING ALL DRIVEWAY LOCATIONS PRIOR TO BEGINNING STRIPING WORK.

8. NOT ALL FIRE HYDRANTS HAVE BEEN LOCATED FOR THIS STRIPING PLAN. THE CONTRACTOR SHALL BE RESPONSIBLE FOR FIELD VERIFYING FIRE HYDRANT LOCATIONS AND STRIPING NO PARKING ZONES FOR 10 FEET ON EITHER SIDE OF THE FIRE HYDRANTS WHERE THEY ARE LOCATED ALONG A PARKING LANE. SEE TYPICAL DDOT TYPICAL LANE STRIPING DETAIL FOR TYPICAL FIRE HYDRANT TREATMENT.

9. IF A CROSSWALK IS PRESENT, PARKING SPACES SHALL BE STRIPED WITH A MINIMUM CLEARANCE OF 25 FEET FROM THE CROSSWALK (THIS IS TYPICAL TREATMENT PER THE DDOT DEM).

10. THE CONTRACTOR SHALL COORDINATE WITH THE DDOT FIELD OPERATIONS DIVISION (FOD), SIGNS AND MARKING DIVISION, REGARDING THE INTENSITY AND REFLECTIVITY OF SIGNS TO BE INSTALLED. THE CONTACT FOR THIS WORK IS OGECHI ELEKWACHI, PHONE NUMBER: 202-369-7483.

11. PROPOSED SIGNS SHALL BE INSTALLED SO THAT NO PORTION OF THE SIGN PANEL OVERHANGS ADJACENT ROADWAY PAVEMENT.

12. PROPOSED SIGN POSTS SHALL BE LOCATED A MINIMUM OF 2 FEET BEHIND FACE OF CURB. IF LOCATED IN OR ADJACENT TO SIDEWALKS, A 32" MINIMUM CLEAR AND 48" PREFERRED PASSING SPACE ON EXISTING AND PROPOSED SIDEWALKS SHALL BE MAINTAINED.

13. ALL TRAFFIC SIGNS SHALL BE MOUNTED ON A STANDARD DDOT BREAKAWAY TYPE METAL SIGN POST UNLESS OTHERWISE SPECIFIED IN PLANS.

14. PROPOSED SIGNS AT NEW LOCATIONS SHALL BE INSTALLED SO THEY DO NOT BLOCK THE VISIBILITY OF ANY EXISTING SIGNS OR SIGNALS.

15. PROPOSED SIGNS AND POSTS SHALL BE CLEAR OF EXISTING FIRE HYDRANTS, SURFACE UTILITY, AND OVERHEAD UTILITY EQUIPMENT A MINIMUM OF 10 FEET.

16. FOR NEW POST INSTALLATION, THE CONTRACTOR SHALL VERIFY THAT THERE ARE NO CONFLICTING UNDERGROUND OR OVERHEAD UTILITIES.

17. SIGNS MOUNTED TO EXISTING LIGHT, SIGNAL OR UTILITY POLES SHALL BE FASTENED WITH A MANUFACTURED STEEL BANDING SYSTEM. POLES SHALL NOT BE DRILLED DIRECTLY. THE CONTRACTOR SHALL SUBMIT MANUFACTURER INFORMATION ON THE BANDING SYSTEM TO DDOT FOR APPROVAL PRIOR TO INSTALLATION.

18. THE CONTRACTOR SHALL FOLLOW MUTCD AND DDOT STANDARD DETAILS AND PROCEDURES FOR MAINTENANCE OF TRAFFIC FOR STRIPING AND CONCRETE WORK. THE CONTRACTOR SHALL BE RESPONSIBLE FOR MAINTAINING A PROPER WORK ZONE UNTIL ALL WORK IS COMPLETED.

19. THE CONTRACTOR SHALL NOT INSTALL THERMOPLASTIC PAVEMENT MARKINGS, CONCRETE BARRIERS, WHEEL STOPS, OR FLEXIBLE CHANNELIZING POSTS OVER EXISTING MANHOLES.




## BUS PLATFORM PEDESTRIAN CROSSING DETAIL
NOT TO SCALE



## CYCLE TRACK STRIPING BARRIER CURB DETAIL
NOT TO SCALE

NOTE:
1. BIKE LANE SYMBOLS SHALL BE SPACED 250' UNLESS OTHERWISE DIMENSIONED ON THE LAYOUT PLANS.

2. BIKE LANES AND BUFFER WIDTHS VARY FROM DETAIL ABOVE PER PLAN. REFER TO INDIVIDUAL PLAN SHEETS FOR INSTALLATION.

3. GRANITE AND EXPOSED PCC BARRIERS ARE TO BE CONSTRUCTED IN WIDTHS OF 18-INCHES OR 2-FEET; SEE PLANS FOR SPECIFIC IMPLEMENTATION.

4. BOTH PRECAST CONCRETE BARRIERS AND GRANITE AND EXPOSED PCC BARRIERS SHALL NOT BE INSTALLED OVER MANHOLE COVERS, SEE PLANS FOR MANHOLE LOCATIONS



### PLAN
GRANITE AND EXPOSED PCC
2-FT CYCLE TRACK BARRIER CURB
NOT TO SCALE

NOTE:
1. GRANITE CURB INSTALLATION TO BE CONSISTENT WITH DDOT REFERENCE DRAWING NO. 606.02

### CYCLE TRACK CROSSING DETAIL
NOT TO SCALE

NOTE:
1.

A 3-COAT SYSTEM SHALL BE USED FOR THE INSTALLATION OF THE ENNIS FLINT RIDE-A-WAY PRODUCT. ALL MANUFACTURER APPLICATION INSTRUCTIONS SHALL BE FOLLOWED.



### FIRE HYDRANT STRIPING DETAIL
NOT TO SCALE

U.S. DEPARTMENT OF TRANSPORTATION
FEDERAL HIGHWAY ADMINISTRATION
OFFICE OF FEDERAL LANDS HIGHWAY

EFLHD DETAIL

## CYCLE TRACK BARRIER CURB & PAVEMENT MARKINGS

| | DETAIL |
|---|---|
| | E634-A |

NPS-AR-000941

M:\PROJECTS\nama\21(2)_S01(3)\Proj_Dev\CADD\Std-Det\S13_E634-A_detail_CycleTrack.dgn   [Print]

15 May 2024  3:54 PM

NPS PMIS No. 212005    NPS Drwg No. 802/165501

| PROJECT | SHEET NUMBER |
|---|---|
| DC NP NAMA 21(2) | S14 |



**RURAL AREA**

**URBAN AREA**

**FIXED ROADWAY SIGNS**

## NOTES:

1. Mount signs that are wider than 3 feet or larger than 10 square feet on double posts.

2. All lumber dimensions are nominal.

3. Submit alternate details for portable signs. Ensure sign mounts hold the sign face in a vertical plane.  Portable signs may be mounted lower than fixed signs when approved by the CO.  Ensure all portable sign supports meet the requirements of the NCHRP Report 350 for crashworthiness.

4. When parking is permitted within 200 feet of the sign, mount the sign a minimum of 7 feet above the pavement surface.

5. When approved by the CO and the Utility Company, utility poles may be used for sign mounting.

6. For 4- by 6-inch and greater posts, see the Breakaway Sign Support View.  If breakaway design cannot be used due to post spacing, place the sign outside the clearzone or shield with a barrier. Do not place holes in posts of non-breakaway signs.

7. Signs requiring 6- by 6-inch and greater posts are considered non-breakaway if multiple posts are required and the posts cannot be spaced a minimum of 7 feet apart.



**BREAKAWAY SIGN SUPPORT**
(FIXED SIGNS 4'' X 6'' AND GREATER POSTS)
(See Notes 6 and 7)

**PORTABLE SIGNS**
(See Notes 3 and 4)

### POST SIZE TABLE

| POST SIZE | D | HOLE DIAMETER | MAXIMUM SIGN AREA (SQFT) | | | |
|---|---|---|---|---|---|---|
| | | | 1 Post | 2 Post | 3 Post | 4 Post |
| 4'' x 4'' | 4' | None Required | 10 | 20 | | |
| 4'' x 6'' | 4' | 1.5'' | | 35 | 50 | 70 |
| 6'' x 6'' | 5' | 2'' | | 50 | 75 | 100 |
| 6'' x 8'' | 5' | 3'' | | 85 | 125 | 165 |

U.S. DEPARTMENT OF TRANSPORTATION
FEDERAL HIGHWAY ADMINISTRATION
OFFICE OF FEDERAL LANDS HIGHWAY

EFLHD DETAIL

# TEMPORARY TRAFFIC CONTROL SIGN MOUNTING

NPS-AR-000942

*NO SCALE*

| DETAIL APPROVED FOR USE | DETAIL |
|---|---|
| APPROVED:  MAY 2011 | E635-01 |
| REVISED:  SEPTEMBER 2020 | |

28 June 2023  11:18 AM

M:\PROJECTS\nama\21(2)_501(3)\Proj_Dev\CADD\Std-Det\S14_std6301_detail_TemporaryTrafficControlSignMounting.dgn    [Sheet]

NPS PMIS No. 212005    NPS Drwg No. 802/165501

| PROJECT | SHEET NUMBER |
|---|---|
| DC NP NAMA 21(2) | S15 |

## SIGN SPACING TABLE

| ROAD TYPE | DISTANCE BETWEEN SIGNS (LNFT) | | |
|---|---|---|---|
| | A | B | C |
| Urban and Rural 30 MPH and less | 100 | 100 | 100 |
| Urban and Rural 35 MPH to 50 MPH | 350 | 350 | 350 |
| Rural greater than 50 MPH | 500 | 500 | 500 |
| Expressway / Freeway | 1000 | 1500 | 2640 |

W20-1
See Note 10

W20-1
See Note 10

G20-1
See Note 11

ROAD WORK
NEXT xx MILES

ROAD WORK xxxxxxx

ROAD WORK xxxxxx

XX MPH
W13-1P (optional)

ADVANCE WARNING AREA
(See Sign Spacing Table)

G20-2
END ROAD WORK

W20-1 over
W16-8P
See Note 9

ROAD WORK AHEAD

ROAD NAME

Major Road

Work zone Area of Influence
as determined by the CO

END ROAD WORK
G20-2

ROAD WORK AHEAD
W20-1

Minor Road

G20-2
END ROAD WORK

END ROAD WORK
G20-2

ROAD WORK AHEAD

W20-1 over
W16-8P
See Note 9

ROAD NAME

Project Limits

Road Name

ADVANCE WARNING AREA
(See Sign Spacing Table)

ROAD WORK xxxxx
W20-1
See Note 10

W20-1
See Note 10
ROAD WORK xxxxxxx

XX MPH
W13-1P (optional)

ROAD WORK NEXT xx MILES
G20-1
See Note 11

## NOTES:

1. Erect all project advance warning signs before starting construction work.

2. Not all details shown on the temporary traffic control sheets may be applicable to this project. Add or delete information and details in this traffic control plan as necessary to accommodate actual operations.

3. Where advance warning signs, placed as shown, interfere with permanent signs, locate the warning signs as determined by the CO for best results. Vary messages as required.

4. Additional or different message signs may be required to fit the actual construction conditions.

5. Install advisory speed plates under the W20 series warning signs as needed to indicate a maximum recommended speed through the construction area.

6. Ensure all sign supports exposed to impact by traffic meet the requirements of NCHRP-350 or MASH for crashworthiness.

7. Maintain two-way traffic during all non-work hours except as approved by the CO.

8. Do not store traffic control devices along the roadway when not in use. Cover post-mounted signs when not applicable.

9. If W20-1 is placed on a roadway other than that on which the actual construction work occurs, include a supplementary plaque indicating the name of the road on which the construction does occur (applies to major roads only).

10. The message on the W20-1 signs may be "ROAD WORK AHEAD" or may specify the distance to the work area in feet or in miles. Install an additional W20-1 sign when approach speeds exceed 50 MPH. When used place the two W20-1 signs "B" feet apart according to the Sign Spacing Table.

11. For work zones that are 2 miles or more in length, install G20-1 signs at each end of the project. Show the distance on the G20-1 sign to the nearest whole mile.

12. If signing on a roadway under a jurisdiction other than the client agency, verify that an encroachment permit has been obtained.

13. State standards may be used as an alternative if approved by the CO.

14. Refer to the Section 635 for allowable retroreflective sheeting types.

U.S. DEPARTMENT OF TRANSPORTATION
FEDERAL HIGHWAY ADMINISTRATION
OFFICE OF FEDERAL LANDS HIGHWAY

EFLHD DETAIL

## TEMPORARY TRAFFIC CONTROL ADVANCE SIGNING

| STANDARD APPROVED FOR USE 6/2005 | DETAIL |
|---|---|
| REVISED: 6/2014  3/2016  9/2019  9/2020 | ET 635-1 |

NO SCALE

NPS-AR-000943

28 June 2023  11:20 AM

M:\PROJECTS\nama\21(2)_501(3)\Proj_Dev\CADD\Std-Det\S15_std6350\_detail_TTC-AdvancedSigning_EFL_TEMP.dgn    [Sheet]

NPS PMIS No. 212005   NPS Drwg No. 802/165501

| PROJECT | SHEET NUMBER |
|---|---|
| DC NAMA 21(2) | S16 |

**NOTE:**

1. To substitute raised pavement markers for lines, use the following patterns:

   2' broken line:  two pavement markers spaced 2' apart allowed by the gap shown based on curvature.

   Single solid line:   pavement markers spaced on 10' centers.

   Double solid line:  two pavement markers, side by side, spaced on 10' centers.

2. On two- or three-lane roads, signs may be used instead of temporary pavement markings as shown on Standard 635-3.



*DETAIL A1*
*Passing zone both directions*
*Two-way traffic*



*DETAIL B1*
*Passing zone both directions*
*Two-way traffic*



*DETAIL A2*
*No passing zone one direction*
*Two-way traffic*



*DETAIL B2*
*No Passing zone one direction*
*Two-way traffic*




*DETAIL A3*
*No passing zone both directions*
*Two-way traffic*



*DETAIL B3*
*No Passing zone both directions*
*Two-way traffic*

**DETAIL  A**
*Curves < 500' Radius*

**DETAIL B**
*Tangents or Curves ≥ 500' Radius*

U.S. DEPARTMENT OF TRANSPORTATION
FEDERAL HIGHWAY ADMINISTRATION
OFFICE OF FEDERAL LANDS HIGHWAY

FLH STANDARD

**TEMPORARY PAVEMENT MARKINGS**

NPS-AR-000944

*NO SCALE*

| STANDARD APPROVED FOR USE  6/2005 | STANDARD |
|---|---|
| REVISED:  7/2022 | 635-2 |

M:\PROJECTS\nama\21(2)_501(3)\Proj_Dev\CADD\Std-Dett\Std635-2.dgn   (Std 635-2)

16 May 2024   5:17 PM



NPS PMIS No. 212005    NPS Drwg No. 802/165501

| PROJECT | SHEET NUMBER |
|---|---|
| DC NP NAMA 21(2) | S17 |

## TYPICAL APPLICATION: ONE WAY, TWO LANE ROADWAY, CLOSING ONE LANE

ROAD WORK 1 MILE
W20-1 36" x 36"

RIGHT LANE CLOSED ½ MILE
W20-5 36" x 36"
XX M.P.H.
W13-1P 24" x 24"

W4-2 36" x 36"

Remove conflicting pavement marking as required (See Note 4)

Temporary 4" solid edge stripe (See Note 4)

Channelizing Devices (See Note 2)

G20-2 36" x 18"    END ROAD WORK

Traffic flow →

Traffic flow →

10' (min.) See Note 5

Advance warning arrow panel

Device Spacing (See Table)

ROAD WORK 1 MILE
W20-1 36" x 36"

RIGHT LANE CLOSED ½ MILE
W20-5 36" x 36"
XX M.P.H.
W13-1P 24" x 24"

W4-2 36" x 36"

G20-2 36" x 18"    END ROAD WORK

| 2600' | 1600' (ADVANCE WARNING AREA) | 1000' | TAPER LENGTH (See Table) | 100' (min.) BUFFER SPACE | VARIABLE (WORK SPACE) | 100' | 500' |

### NOTES:

1. Final location and spacing of temporary traffic control devices may be changed to fit field conditions as approved by the CO.

2. For operations that require a lane closure for a day or less, drums may be substituted with cones, type A in the work area as approved by the CO.

3. Right lane closure is shown. For left lane closure, substitute W20-5 and W4-2 left lane closure signs.

4. For long-term operations (operations where the lane is continuously closed for more than three days) remove conflicting pavement markings and place edge stripe as shown.

5. Use minimum width shown unless otherwise specified in Section 156.

### LENGTH AND SPACING TABLE

| APPROACH SPEED (MPH) | MINIMUM TAPER LENGTH (LNFT) LANE WIDTH (LNFT) | | | CHANNELIZING DEVICE SPACING (LNFT) | |
|---|---|---|---|---|---|
| | 10 | 11 | 12 | TAPER AREA | WORK AREA |
| 25 | 105 | 115 | 125 | 25 | 50 |
| 30 | 150 | 165 | 180 | 30 | 60 |
| 35 | 205 | 225 | 245 | 35 | 70 |
| 40 | 270 | 295 | 320 | 40 | 80 |
| 45 | 450 | 495 | 540 | 45 | 90 |
| 50 | 500 | 550 | 600 | 50 | 100 |
| 55 | 550 | 605 | 660 | 55 | 100 |

\*   Approach speed based on the regulatory posted speed, not the advisory speed.

U.S. DEPARTMENT OF TRANSPORTATION
FEDERAL HIGHWAY ADMINISTRATION
OFFICE OF FEDERAL LANDS HIGHWAY

EFLHD DETAIL

**TEMPORARY TRAFFIC CONTROL SINGLE LANE CLOSURE LAYOUT**

| DETAIL APPROVED FOR USE | DETAIL |
|---|---|
| APPROVED: MAY 2011 | E635-05 |

NO SCALE

NPS-AR-000945

28 June 2023  11:29 AM

M:\PROJECTS\nama\21(2)_501(3)\Proj_Dev\CADD\Std-Det\S17_st63505_detail_TemporaryTrafficControlSingleLaneClosureLayout.dgn    [Sheet]

| PROJECT | SHEET NUMBER |
|---|---|
| DC NP NAMA 21(2)DC NP NAMA 21(2) | S18 |

## LENGTH AND SPACING TABLE

| APPROACH SPEED* | BUFFER SPACE LENGTH | CHANNELIZING DEVICE | | |
|---|---|---|---|---|
| | | TAPER AREA | BUFFER SPACE | WORK SPACE |
| MPH | FEET | SPACING IN FEET | | |
| 20 | 115 | 20 | 40 | 40 |
| 25 | 155 | 20 | 50 | 50 |
| 30 | 200 | 20 | 60 | 60 |
| 35 | 250 | 20 | 70 | 70 |
| 40 | 305 | 20 | 80 | 80 |
| 45 | 360 | 20 | 90 | 90 |
| 50 | 425 | 20 | 100 | 100 |
| 55 | 495 | 20 | 110 | 110 |
| 60 | 570 | 20 | 120 | 120 |
| 65 | 645 | 20 | 130 | 130 |
| 70 | 730 | 20 | 140 | 140 |

\* Approach speed based on the regulatory posted speed, not the advisory speed.

## SIGN SPACING TABLE

| ROAD TYPE | DISTANCE BETWEEN SIGNS IN FEET | | |
|---|---|---|---|
| | A | B | C |
| Urban and Rural 30 MPH and less | 100 | 100 | 100 |
| Urban and Rural 35 MPH to 50 MPH | 350 | 350 | 350 |
| Rural greater than 50 MPH | 500 | 500 | 500 |
| Expressway / Freeway | 1000 | 1500 | 2640 |

## NOTE:

1. Signs are shown for one direction of travel only.  Place signs similar to those depicted for the opposite direction of travel.

2. Final location and spacing of devices may be changed to fit field conditions as approved by the CO.

3. For pilot car operation, mount the PILOT CAR FOLLOW ME (G20-4) sign at a conspicuous location on the rear of vehicle.  Prominently display the name of the Contractor on the pilot car.

4. If closure is completely within the project limits, eliminate the ROAD WORK AHEAD (W20-1) and END ROAD WORK (G20-2) signs.

5. For night time flagging operation, provide floodlighting at flagger stations.

6. For project specific minimum width, refer to the Special Contract Requirements, Section 156.

7. Do not allow equipment, materials, or vehicles to be parked or stored in the buffer space.



U.S. DEPARTMENT OF TRANSPORTATION
FEDERAL HIGHWAY ADMINISTRATION
OFFICE OF FEDERAL LANDS HIGHWAY

FLH STANDARD
**TEMPORARY TRAFFIC CONTROL**
**SINGLE LANE CLOSURE LAYOUT**
**(WITH FLAGGERS)**

| STANDARD APPROVED FOR USE  6/2005 | STANDARD |
|---|---|
| REVISED:  7/2022 | 635-6 |

NPS-AR-000946

NO SCALE

M:\PROJECTS\nama\21(2)_S01(3)\Proj_Dev\CAD\Std-Det\S18_Std635-6 (1)_detail_TTCSingleLaneClosureWFlaggers.dgn   [Std 635-6]

28 June 2023   11:29 AM

NPS PMIS No. 212005    NPS Drwg No. 802/165501

| PROJECT | SHEET NUMBER |
|---|---|
| DC NP NAMA 21(2) | S19 |

Washington style luminaire: 55 watt LED retrofit luminaire with I.E.S. type V distribution, top mount in existing globe

Power supply assembly with AC surge protection

Intergral snap-in wire connection (AC power side) to power supply assembly

Existing acorn style decorative post top globe

Integral "Button" Type Photocell (install according to manufacturer's instructions)

Existing cast iron cross arm

2-#10 AWG W/1-#10Gnd. (pole wire) routed from splice point to LED power supply

Existing Twin 20 light steel pole

Existing ground

Existing cast iron slipover base

Splice point

Existing conduit to pullbox

### TWIN 20 STYLE LIGHTING STANDARD WITH LED RETROFIT UPGRADE

M:\PROJECTS\nama\21(2)_S0I(3)\Proj_Dev\CADD\Std-Det\S19_E636_A_detail-Twin20Ugiht.dgn  [E636-B Detail - Sheet]

15 May 2024  3:55 PM

U.S. DEPARTMENT OF TRANSPORTATION
FEDERAL HIGHWAY ADMINISTRATION
OFFICE OF FEDERAL LANDS HIGHWAY

EFLHD DETAIL

## LED RETROFIT STREET LIGHT

NPS-AR-000947

*NO SCALE*

| | DETAIL |
|---|---|
| | E636-A |

NPS PMIS No. 212005    NPS Drwg No. 802/165501

| PROJECT | SHEET NUMBER |
|---|---|
| DC NP NAMA 21(2) | S20 |

## DETAIL B - POLE ONLY, WITH PEDESTRIAN HEADS

## DETAIL C - DUAL VEHICLE HEADS

## DETAIL A - BIKE SIGNAL, NO PEDESTRIAN HEADS

INSTALL R10-10B SIGN ADJACENT TO BICYCLE SIGNAL HEAD

PROVIDE VERTICAL OFFSET RELATIVE TO VEHICLE SIGNAL HEAD WHERE POSSIBLE

PROVIDE VERTICAL OFFSET RELATIVE TO VEHICLE SIGNAL HEAD WHERE POSSIBLE

INSTALL R10-10B SIGN ADJACENT TO BICYCLE SIGNAL HEAD

INSTALL R10-10B SIGN ADJACENT TO BICYCLE SIGNAL HEAD

3'-0" (IF AVAILABLE)

3'-0" (IF AVAILABLE)

3'-0" (IF AVAILABLE)

3'-0" (IF AVAILABLE)

3'-0" (IF AVAILABLE)

SIGNAL

SIGNAL

SIGNAL

MINIMUM 14'-0" (NO LUMINAIRE)

MINIMUM 14'-0" (NO LUMINAIRE)

MINIMUM 14'-0" (NO LUMINAIRE)

MINIMUM 10'-0"

MINIMUM 14'-0" (NO LUMINAIRE)

MINIMUM 10'-0"

MINIMUM 14'-0" (NO LUMINAIRE)

MINIMUM 10'-0"

MINIMUM 14'-0" (NO LUMINAIRE)

INSTALL R10-10B SIGN ADJACENT TO BICYCLE SIGNAL HEAD

## DETAIL NOTES:

A. EXISTING STREET NAME SIGNS VARY BY LOCATION AND ARE TO BE MAINTAINED WHERE EXISTING. NO NEW STREET NAME SIGNS ARE TO BE INSTALLED.

B. ALL TRAFFIC AND BIKE SIGNAL HEAD POLE INSTALLATIONS ARE TO CONFORM TO DDOT STANDARD DRAWING NO. 613.05.

C. REFER TO S-PLANS FOR SIGNAL HEAD ARRANGEMENT.

U.S. DEPARTMENT OF TRANSPORTATION
FEDERAL HIGHWAY ADMINISTRATION
OFFICE OF FEDERAL LANDS HIGHWAY

## TRAFFIC SIGNAL HEAD
## POLE MOUNTING

NPS-AR-000948

*NO SCALE*

DETAIL
E636-B

M:\PROJECTS\nama\21(2)_50113\Proj_Dev\CADD\Std-Det\S20_detail_TrafficSignalHeadPoleMounting.dgn  [Print]

28 June 2023  11:31 AM



NPS-AR-000949

NPS PMIS No. 212005    NPS Drwg No. 802/165501

| PROJECT | SHEET NUMBER |
|---|---|
| DC NP NAMA 21(2) | S21 |

NOTE:
1. PUSH BUTTON AND SIGN TO FACE IN SAME DIRECTION

GREEN FIELD CONDUIT

JUNCTION BOX

CONNECTOR

14'-0"

10'-0"

11'-0"

TYPICAL WOOD POLE SIGNAL INSTALLATION

1" RIGID CONDUIT

PUSH BUTTON FOR WALK SIGNAL

STEEL BANDS

6"

42"

PEDESTRIAN PUSH BUTTON SEE DGN 613.39

TYPICAL PEDESTRIAN PUSH BUTTON INSTALLATION ON WOOD POLE

STD. HIGHWAY SIGN R-10-3 OR R-10-4 9" x 12" (TYP.)

STEEL BANDS

PUSH BUTTON FOR WALK SIGNAL

6"

42"

PEDESTRIAN PUSH BUTTON SEE DGN 613.39

TYPICAL PEDESTRIAN PUSH BUTTON INSTALLATION ON METAL POLE

*NO SCALE*

M:\PROJECTS\nama\21(2)_501(3)\Proj_Dev\CADD\Std-Det\S21-S23_detail_PedestrianPushButtonEtc.dgn  [Button Installation]

5 May 2023  9:24 AM

| ISSUED: 8/2015 | RECOMMENDED: | | |
|---|---|---|---|
| REVISION | APPROVAL | | |

PROJECT MANAGER

APPROVED: *Muhammed Khalid*

CHIEF ENGINEER

TRAFFIC SIGNAL HARDWARE
WOOD POLES AND PEDESTRIAN
PUSH BUTTON INSTALLATION

d.

DISTRICT OF COLUMBIA
DEPARTMENT OF TRANSPORTATION

DWG. NO.    613.09

U.S. DEPARTMENT OF TRANSPORTATION
FEDERAL HIGHWAY ADMINISTRATION
OFFICE OF FEDERAL LANDS HIGHWAY

EFLHD DETAIL

**PEDESTRIAN PUSH BUTTON INSTALLATION**

| | DETAIL |
|---|---|
| | E636-C |

NPS-AR-000950



NOTES:

1. DDOT COMBINATION POLE AND APS ALIGNMENT ALLOWANCE: POLE CENTER TO ALIGN WITH RAMP GRADE BREAK AT SIDEWALK, BUT NOT LESS THAN 3' NOR GREATER THAN 8' FROM OUTER CURB EDGE.

2. POLE CENTER TO FLARE EAGE MIN. 20".

3. POLE AT BASE NOT TO REDUCE PAR CLEAR SPACE LESS THAN 4'.

4. 30"x48" CLEAR GROUND SPACE 2% SLOPE ALL DIRECTIONS.

5. IF DIFFERENT TYPE OF RAMP, PLEASE ASK ADA COORDINATOR FOR APS LOCATION.

NO SCALE

| | PROJECT | SHEET NUMBER |
|---|---|---|
| | DC NP NAMA 21(2) | S23 |

NPS PMIS No. 212005    NPS Drwg No. 802/165501

ISSUED: 8/2015

REVISION | APPROVAL

RECOMMENDED: _____ PROJECT MANAGER

APPROVED: Muhammed Khalid CHIEF ENGINEER

PEDESTRIAN PUSH BUTTON LOCATION FOR PERPENDICULAR RAMP

d.

DISTRICT OF COLUMBIA DEPARTMENT OF TRANSPORTATION

DWG. NO.    613.41

U.S. DEPARTMENT OF TRANSPORTATION
FEDERAL HIGHWAY ADMINISTRATION
OFFICE OF FEDERAL LANDS HIGHWAY

EFLHD DETAIL

**PEDESTRIAN PUSH BUTTON LOCATION FOR PERPENDICULAR RAMP**

DETAIL
E636-D

NPS-AR-000951

28 June 2023  2:40 PM   M:\PROJECTS\nama\21(2)_501(3)\Proj_Dev\CADD\Std-Det\S21-S23_detail_PedestrianPushButtonEtc.dgn  [Button Location]



# United States Department of the Interior

NATIONAL PARK SERVICE
National Mall and Memorial Parks
1100 Ohio Drive SW
Washington, DC 20242



IN REPLY REFER TO:

1.A.2

November 18, 2024

Mr. David Maloney
State Historic Preservation Officer
District of Columbia Office of Planning
1100 4th Street SW, Suite 650 East
Washington, Dc 20024

Dear Mr. Maloney:

The National Mall and Memorial Parks (NAMA), a unit of the National Park Service, wishes to initiate consultation with the District of Columbia State Historic Preservation Office under Section 106 of the National Historic Preservation Act regarding the completion of road repaving along a collection of park managed roads in West Potomac Park and the Washington Monument Grounds and the installation of a permanent cycle track curb along 15th Street, NW, in accordance with 36 CFR 800.3.

**Project Purpose and Identification of Historic Properties**

The National Mall and Memorial Parks proposes to engage in the rehabilitation of roadbed materials associated with existing park managed roads. The overall project will include the repaving of the asphalt milling and overlay on 15th Street from Constitution Avenue south to just north of the intersection of Maine Avenue and Raoul Wallenberg. This project also includes the repaving of the asphalt milling and overlay of westbound Independence Avenue from 14th Street to 23rd Street. Drawings detailing the area that will be impacted are submitted for your review. As reflected in the plans, there are several locations of full depth patching on 15th Street. This project also includes in- kind street light replacements along the 15th Street limits, pedestrian crossing improvements through reconstructed curb cut ramps on 15th Street, repainting of existing pavement markings, and some minor areas of sidewalk panel replacement along 15th Street.

Existing condition photographs and drawings showing proposed configurations are provided in the consultation packet. These undertakings largely conform to the streamlined activities defined in the 2008 National Historic Preservation Act signed by the National Park Service and the National Council of State Historic Preservation Offices.

1

However, this project includes an activity that falls outside the scope of a streamlined review. A portion of the project will also upgrade the existing 15th Street cycle track median buffer between the cycle track and the driving lanes. The current median buffer consists of pavement markings and rubber wheel stops. This project will replace the existing median with a granite curbed median with exposed aggregate PCC in between the granite curbs, for the majority of the corridor, with the exception being the final approximately 200' of median to the south of Constitution, which will be a slightly narrower concrete curb median due to the narrowing of 15th street as it approaches Constitution Avenue. Please note that pictures with approximate alignment stationing have been attached below, as well as screen shots for the two cycle track median configurations and the detail from the plans for the cycle track granite curb median.

The Area of Potential Effect for this project includes the Washington Monument Grounds, West Potomac Park, and the Thomas Jefferson Memorial Grounds cultural landscapes.

The Washington Monument Grounds is a cultural landscape located within National Mall and Memorial Parks (NAMA). The unit straddles NW and SW Washington D.C. and comprises U.S. Reservation 2. Containing approximately 106 acres, the inventory unit is bounded by 14th Street to the east, Constitution Avenue to the north, 17th Street to the west, and the Tidal Basin to the south.

The Washington Monument Grounds was first listed in the National Register of Historic Places automatically in 1966 under the National Historic Preservation Act. An updated 1980 nomination concluded that the site possesses national significance, and is listed under Criterion C for its architecture, engineering and landscape architecture, with a period of significance lasting from 1848-1849. In 1997, a National Register nomination for the L'Enfant Plan for the City of Washington, D.C. was accepted by the Keeper and found Washington D.C.'s Monumental Core, within which the monument grounds are located, to be nationally significant under Criterion A in the areas of politics/government, social history, and commemoration. The period of significance listed by this nomination is 1791-1943.

West Potomac Park is bounded on the west by the Potomac River and on the north by Constitution Avenue NW. The eastern boundary in the north part of the park is formed by 17th Street NW and the eastern boundary follows the shoreline of the Tidal Basin. The Potomac Railroad embankment acts as the dividing line between the East and West Potomac Parks, although the embankment is within East Potomac Park.

West Potomac Park, a spatially and functionally distinct area within the National Register-listed East and West Potomac Parks Historic District, and the National Register-listed National Mall Historic District, possesses historical significance and is potentially eligible on a national and local level under Criterion A in the areas of Politics/Government, Commemoration, Entertainment/Recreation, Social History, and Ethnic History (Black); on a national and local level under Criterion C in the areas of Community Planning and Development, Engineering, Architecture, Art, Landscape Architecture, and Transportation; and under Criterion D in the area of Archeology. The period of significance for Criterion A is 1791, the year in which President George Washington selected the site of the Nation's Capital and retained Pierre L'Enfant to develop a plan for the city, to the present, and 1791 to 1965 for Criteria C and D.

2

NPS-AR-000953

The Thomas Jefferson Memorial Grounds encompasses 19.2 acres of land at the southern end of the Tidal Basin in SW Washington DC within Reservation 332. The memorial is a neoclassical limestone and marble edifice originally designed by John Russell Pope with a bronze statue by Rudolf Evans and multiple inscriptions on the walls of the monument. The Thomas Jefferson Memorial, designed based on the Pantheon of Rome, is significant as America's foremost memorial to its third president, as an original adaptation of Neoclassical architecture, and as a key landmark in the monumental core of Washington, D.C., in accordance with the McMillan Commission plan of 1902.

The Jefferson Memorial was listed as a contributing feature on the National Register of Historic Places nomination for East and West Potomac Parks. That nomination, written in 1973, was updated in 2000. Additional documentation on the Jefferson Memorial was submitted to the National Register in 1981. This landscape is historically significant under National Register criteria A and C. The period of significance for the memorial landscape spans the years from 1934 to 1943. In 1934 Congress established the Thomas Jefferson Memorial Commission to create a permanent memorial to the third President. That memorial was dedicated on April 13, 1943, the bicentennial of Jefferson's birth. The period of significance for the Jefferson Memorial, 1934 to 1943, falls within the period of significance for East and West Potomac Parks, 1897 to 1943.

**Consultation**

We look forward to consulting with your office on this project. If you have any questions, please do not hesitate to contact Daniel Weldon, Cultural Resources Program Manager, Section 106 Coordinator at 202-465-5176 or via email at daniel_weldon@nps.gov.
.

Sincerely,

JEFFREY REINBOLD
Digitally signed by JEFFREY REINBOLD
Date: 2024.11.18 07:36:46 -05'00'

Jeffrey Reinbold
Superintendent

3

Before/After Evaluations

15th ST NW/SW PROTECTED BIKE LANE

# Post-Implementation Analysis

Overview | Results | Methodology

## Analysis Overview





*Mouse over the image above to see before and after views of the corridor.*

In Fall 2021, DDOT completed the **15th St NW/SW Protected Bike Lane Project** (Pennsylvania Ave NW to Maine Ave SW). The goals of this project were to:

- Create a safe right-of-way for people, regardless of walking, biking, or driving
- Improve function of the street and intersections to make them easier to use and understand
- Balance travel delay with right-of-way capacity and access for everyone who uses the street

To understand the impact of the project, in 2026 DDOT conducted a data-driven evaluation of the corridor to understand the vehicular, bicycle, and pedestrian impacts.

DDOT's evaluation showed that:

- The project **reduced all roadway crashes by 46%** and **bicycle injury crashes by 91%**.
- The new protected facility resulted in a **3% increase in bicycle traffic** along the corridor.
- Capital Bikeshare stations along the corridor are among the most used in the system, with the **Jefferson Street station seeing 232,658 CaBi trip starts and ends since 2022.**
- After the project was installed, **speeds increased by 17%**. Peak hour **northbound travel time decreased by 36 seconds**, while **southbound travel time decreased by 40 seconds** on the corridor.

View full results below ⤵

---

To evaluate how the project achieved DDOT's goals, the team collected data on **crashes**, **volumes**, and **vehicle speeds** prior to, and soon after construction work. The timeline below show the specific dates of the pre- and post- data collection period.

 **1**
### Pre-construction Data Collection
January 2017 - December 2019

 **2**
### Project Opened
October 2021

 **3**
### Post-construction Data Collection
March 2022 - October 2025

## Overall Results

### Crashes:

↓ **69%** reduction in bicycle crashes

### Pedestrians and Bicycles:

### Vehicle Speeds:

After the installation, it takes an average of **38 fewer seconds** to drive the corridor

NPS-AR-000955

Before/After Evaluations

↓ **52%** reduction in injury crashes

**View results**

during peak hours

↓ **2%** decrease in pedestrian volumes

during peak hours

**View results**

**View results**

## Crash Analysis

**CRASH SEVERITY HIGHLIGHTS** | RATES PER 100 DAYS

- ↓ **46%** reduction in **all crashes**.
- ↓ **52%** reduction in **crashes resulting in injury**.
- ↓ **46%** reduction in **property-damage only crashes**.

**BICYCLE & PEDESTRIAN CRASHES** | PER 100 DAYS

- ↓ **69%** reduction in **bicycle** crashes.
- ↓ **91%** reduction in **bicycle injury** crashes.
- ↓ **25%** reduction in **pedestrian** crashes.
- ↓ **67%** reduction in **pedestrian injury crashes**.

**COLLISION TYPE HIGHLIGHTS** | PER 100 DAYS

- ↓ **59%** reduction in **side swipes**.
- ↓ **26%** reduction in **rear ends**.
- ↓ **69%** reduction in **right turn hits**.
- ↓ **69%** reduction in **left turn hits**.
- ↓ **100%** reduction in **fixed object crashes**.

NPS-AR-000956

Before/After Evaluations



## Crashes Per Million Entering Vehicles | per 100 Days



## Crashes by Type | per 100 Days



NPS-AR-000957

Before/After Evaluations

*Before data collected: January 2017 - December 2019 | After data collected: March 2022 - March 2025*

## Volume Analysis by Mode

**BICYCLE VOLUMES** | PEAK HOUR AVERAGE

- ↑ **11%** increase during **AM peak period.**
- ↓ **3%** decrease during **PM peak period.**

**PEDESTRIAN VOLUMES** | PEAK HOUR AVERAGE

- ↓ **23%** decrease during **AM peak period.**
- ↑ **4%** increase during **PM peak period.**

**VEHICLE VOLUMES** | PEAK HOUR AVERAGE

- ↓ **61% decrease** in the northbound direction and ↓ **56% decrease** in the southbound direction during **AM peak period**.
- ↓ **48% decrease** in the northbound direction and ↓ **38% decrease** in the southbound direction during **PM peak period**.

**SHARED MICROMOBILITY**

- Additional usage data indicates **sustained high bicycle ridership** among shared micromobility (Capital Bikeshare, Lime) users, with **the segment being among the most popular in the District.**
- All three **Capital Bikeshare stations** along the segment are among the **top 90th percentile** for trip starts and ends, with the **Jefferson Station ranking 4th most popular** in the system; together they are a part of **1 in every 58 trips taken on Capital Bikeshare** (May 2023).

💡 DDOT proposed the 15th St Protected Bike Lane project in response to high bicycle ridership along the corridor. Large increases in cycling post-implementation were not a goal of the project; rather **DDOT sought to improve safety for cyclists and pedestrians on the already popular stretch.**



⬆ Share this card

Before/After Evaluations

## Speeds Analysis

**VEHICLE SPEEDS** | PEAK PERIOD AVERAGE

- ↑ **15%** increase in the northbound direction and ↑ **18%** increase in the southbound direction during **AM peak period**.
- ↑ **30%** increase in the northbound direction and during ↑ **6%** increase in the southbound direction during **PM peak period**.

**TRAVEL TIME** | PEAK PERIOD AVERAGE

- ↓ **22 second** decrease in the northbound direction and ↓ **37 second** decrease in the southbound direction during **AM peak period**.
- ↓ **49 second** decrease in the northbound direction and ↓ **42 second** decrease in the southbound direction during **PM peak period**.

💡 Speeds along the corridor saw an average increase of 17% during peak hours. **Separating cyclists from vehicles makes the corridor more efficient** for vehicles and reduces commute times.



*Before data collected: May, October 2018 | After data collected: May, October 2024*

## Post-implementation Analysis Documents

Learn more about the methodology used to create DDOT's before/after analysis of the **15th St Protected Bike Lane** project below.

 View Methodology PDF

**Need translation assistance?**

Spanish (Español)      French (Français)      Vietnamese (Tiếng Việt)      Amharic (አማርኛ)      Chinese (中文)      Korean (한국어)

NPS-AR-000959

Before/After Evaluations

**District Department of Transportation**
250 M St SE
Washington, DC 20003

Projects and Programs

Submit a 311

Phone: (202) 673-6813
Fax: (202) 671-0650
TTY: (202) 673-6813
ddot@dc.gov

Explore Feeds    Manage Privacy

Before/After Evaluations

**District Department of Transportation**
250 M St SE
Washington, DC 20003

Projects and Programs

Submit a 311

Phone: (202) 673-6813
Fax: (202) 671-0650

NPS-AR-000960

115+44 to 12

## PROPOSED:



NPS-AR-000961



| | |
|---|---|
| **National Park Service**<br>**U.S. Department of the Interior** | **National Mall and Memorial Parks**<br>**Date: 01/08/2025** |

# ASSESSMENT OF ACTIONS HAVING AN EFFECT ON HISTORIC PROPERTIES

## A. DESCRIPTION OF UNDERTAKING

**1. Park:** National Mall and Memorial Parks

**2. Project Description:**

**Project Name:** 15th Street and WB Independence Avenue Resurfacing
**Prepared by:** Daniel Weldon    **Date Prepared:** 11/14/2024    **Telephone:**
**PEPC Project Number:** 126494
**Locations:**
       **County, State:** District of Columbia, DC
**Describe project:**
SITE DESCRIPTION:

West Potomac Park is bounded on the west by the Potomac River and on the north by Constitution Avenue NW. The eastern boundary in the north part of the park is formed by 17th Street NW and the eastern boundary follows the shoreline of the Tidal Basin. The Potomac Railroad embankment acts as the dividing line between the East and West Potomac Parks, although the embankment is within East Potomac Park. The Thomas Jefferson Memorial, which is not a component cultural landscape of West Potomac Park, lies in the southeastern part of the park.

PROJECT BACKGROUND
Project NAMA 21(2) is scheduled in the Regional Federal Lands Transportation Program (FLTP) Multi-year Program for obligation of construction funds in FY2025. It is anticipated to be advertised in April 2025, based on Federal Highway Administration's (FHWA) current schedule. The project construction cost is currently estimated at $5,905,000.

PROJECT PURPOSE AND SCOPE
This project consists of asphalt milling and overlay on 15th Street from Constitution Avenue south to just north of the intersection of Maine Avenue and Raoul Wallenberg. This project also includes the asphalt milling and overlay of westbound Independence Avenue from 14th Street to 23rd Street. As reflected in the plans, there are several locations of full depth patching on 15th Street. This project also includes: street light replacements in-kind along the 15th Street limits, pedestrian crossing improvements through reconstructed curb cut ramps on 15th Street, repainting of existing pavement markings, and some minor areas of sidewalk panel replacement along 15th Street. This project also will be upgrading the existing 15th Street cycle track median buffer between the cycle track and the driving lanes. The current median buffer consists of pavement markings and rubber wheel stops. This project will replace the existing median with a granite curbed median with exposed aggregate PCC in between the granite curbs, for the majority of the corridor, with the exception being the final approximately 200' of median to the south of Constitution, which will be a slightly narrower concrete curb median due to the narrowing of 15th street as it approaches Constitution Avenue. Please note that pictures with approximate alignment stationing have been attached below, as well as screen shots for the two cycle track median configurations and the detail from the plans for the cycle track granite curb median.

SIGNIFICANCE:
West Potomac Park, a spatially and functionally distinct area within the National Register-listed East and West Potomac Parks Historic District, and the National Register-listed National Mall Historic District, possesses historical significance and is potentially eligible on a national and local level under Criterion A in the areas of Politics/Government, Commemoration, Entertainment/Recreation, Social History, and Ethnic History (Black); on a national and local level under Criterion C in the

areas of Community Planning and Development, Engineering, Architecture, Art, Landscape Architecture, and Transportation; and under Criterion D in the area of Archeology. The period of significance for Criterion A is 1791, the year in which President George Washington selected the site of the Nation's Capital and retained Pierre L'Enfant to develop a plan for the city, to the present, and 1791 to 1965 for Criteria C and D.

**Area of potential effects (as defined in 36 CFR 800.16[d])**
The APE will be limited to West Potomac Park, Washington Monument Grounds, and the Thomas Jefferson Memorial Grounds.

**3. Has the area of potential effects been surveyed to identify historic properties?**

 _____ **No**

 _X_ **Yes**

 **Source or reference:**  East and West Potomac Parks NR Nomination 01000271 (1973, updated 2001)
 West Potomac Park Cultural Landscape Inventory (2022)
 Washington Monument Grounds Cultural Landscape Inventory (2022)
 Thomas Jefferson Memorial Cultural Landscape Inventory
 Tidal Basin CLR

**4. Potentially Affected Resource(s):**

**Archeological Resources Present:** No

**Archeological Resources Notes:**  No known archeological sites are contained within the historic roadways. However, there are known sites within the larger APEs.

**Historical Structures/Resources Present:** Yes

 **Property Name:** 17th Street, NW & SW   **LCS:** 46873   **Asset:** 83000000
 **Location:** Reservation 332, West Potomac Park/ Washington Monument Grounds; SW NW Washington DC

 **Property Name:** Independence Avenue, SW   **LCS:** 46872   **Asset:** 82000000
 **Location:** Reservation 332, West Potomac Park, SW Washington DC

 **Property Name:** 15th Street, NW &SW   **LCS:**

**Historical Structures/Resources Notes:**  This project as presented consists of asphalt milling and overlay on 15th Street from Constitution Avenue south to just north of the intersection of Maine Avenue and Raoul Wallenberg. This project also includes the asphalt milling and overlay of westbound Independence Avenue from 14th Street to 23rd Street. Full depth patch repairs will occur in select locations.

These roads are historic contributing roads to the West Potomac and Washington Monument Grounds. The project will address materials within the roadbed of the structures with practices that are in keeping with maintaining the circulation corridors. The roadbeds will not be expanded, nor will the historic alignment be modified during the course of the project, ensuring that spatial and design relationships with other contributing resources are maintained in the historic district. This undertaking would qualify for a streamlined review.

However, the proposal is adding a bicycle track curb along the route. Currently, the cycle track is demarcated by flex poles. While this is a substantial physical addition to the cultural landscape and the roadway proper, it is in keeping with the character of the feature as a transportation corridor. This same treatment cannot be recommended for other NAMA roadways, such as Pennsylvania Avenue NW.

**Cultural Landscapes Present:** Yes

    **Property Name:** Washington Monument Grounds    **LCS:**
    **Location:** Reservation 2; Washington Monument Grounds, NW and SW Washington, DC

    **Property Name:** West Potomac Park, Reservation 332    **LCS:**
    **Location:** Reservation 332, West Potomac Park, NW and SW Washington DC

    **Property Name:** Landscapes of Civil Rights: African American/ Black Sites    **LCS:**

    **Property Name:** Landscape Development: City Beautiful and the McMillan Plan of 1902    **LCS:**

    **Property Name:** Landscape Developments Modernist Era improvements including the Beautification Program    **LCS:**

    **Property Name:** Thomas Jefferson Memorial Landscape    **LCS:**
    **Location:** Reservation 332, West Potomac Park, Thomas Jefferson Memorial Grounds, SW Washington DC

    **Property Name:** Landscape Development: Parkways of the National Capital Region    **LCS:**
    **Location:** Reservation 360; Rock Creek and Potomac Parkway

**Cultural Landscapes Notes:**   West Potomac Park, a spatially and functionally distinct area within the National Register-listed East and West Potomac Parks Historic District, and the National Register-listed National Mall Historic District, possesses historical significance and is potentially eligible on a national and local level under Criterion A in the areas of Politics/Government, Commemoration, Entertainment/Recreation, Social History, and Ethnic History (Black); on a national and local level under Criterion C in the areas of Community Planning and Development, Engineering, Architecture, Art, Landscape Architecture, and Transportation; and under Criterion D in the area of Archeology. The period of significance for Criterion A is 1791, the year in which President George Washington selected the site of the Nation's Capital and retained Pierre L'Enfant to develop a plan for the city, to the present, and 1791 to 1965 for Criteria C and D.

The addition of the curb, while new, is in keeping with the transportation character of the associated circulation corridor. The curb will alter the overall design integrity of the feature. It can be argued that the addition of the curb, while more substantial in physical foot print, is less visually intrusive in regards to the height of the flex poles.

**Ethnographic Resources Present:** No

**5. The proposed action will: (check as many as apply)**

    No  Destroy, remove, or alter features/elements from a historic structure

    Yes Replace historic features/elements in kind

    Yes Add non-historic features/elements to a historic structure

    Yes Alter or remove features/elements of a historic setting or environment (inc. terrain)

    Yes Add non-historic features/elements (inc. visual, audible, or atmospheric) to a historic setting or cultural landscape

    No  Disturb, destroy, or make archeological resources inaccessible

    No  Disturb, destroy, or make ethnographic resources inaccessible>

    No  Potentially affect presently unidentified cultural resources

    No  Begin or contribute to deterioration of historic features, terrain, setting, landscape elements, or archeological or ethnographic resources

    No  Involve a real property transaction (exchange, sale, or lease of land or structures)

    Other (please specify): _____

**6. Supporting Study Data:**
**(Attach if feasible; if action is in a plan, EA or EIS, give name and project or page number.)**

**B. REVIEWS BY CULTURAL RESOURCE SPECIALISTS**

The park 106 coordinator requested review by the park's cultural resource specialist/advisors as indicated by check-off boxes or as follows:

**[ X ] Historical Landscape Architect**
**Name:** Timothy Layton
**Date:** 11/12/2024
**Comments:** I have reviewed the proposed project and information obtained for NAMA during the Washington Monument Grounds CLI, certified in 2009 and updated in 2022, and the West Potomac Park CLI, certified in 2023.

Independence Ave is evaluated as contributing with proposed work involving milling, repaving, and restriping. The 15th Street corridor is evaluated as non-contributing due to redesign and construction in 1997, and the Raoul Wallenberg Place corridor is evaluated as contributing retaining the 15th Street layout. The proposed work for 15th Street and Raoul Wallenberg Place involves the addition of curbing and paving to define a bike lane and the removal of curb stops presently defining the vehicular and bike lanes. For the contributing Raoul Wallenberg Place corridor, the proposal doesn't change the layout or geometry. Light standards are also proposed for replacement in kind.

Overall, the proposed project meets streamlined review activities #3 and #14 and will have no adverse effect on the cultural landscape.

***Check if project does not involve ground disturbance* [    ]**
**Assessment of Effect:**    ___No Potential to Cause Effect    ___No Historic Properties Affected    _X_ No Adverse Effect    ___Adverse Effect    _X_ Streamlined Review
**Recommendations for conditions or stipulations:**

**Doc Method:**  Streamlined Review (PA)
**Streamlined Activity:**
  3. Repair/Resurfacing/Removal of Existing, Roads, Trails and Parking Areas
  14. Mechanical, Electrical and Plumbing Systems

**No Reviews From**: Curator, Archeologist, Historical Architect, Historian, 106 Advisor, Other Advisor, Anthropologist

**C. PARK SECTION 106 COORDINATOR'S REVIEW AND RECOMMENDATIONS**

**1. Assessment of Effect:**

_____ No Potential to Cause Effects

_____ No Historic Properties Affected

____X____ No Adverse Effect

_____ Adverse Effect

**2. Documentation Method:**

**[ X ] A. Standard 36 CFR Part 800 Consultation**
Further consultation under 36 CFR Part 800 is needed.

**[    ] B. Streamlined Review Under the 2008 Servicewide Programmatic Agreement (PA)**
The above action meets all conditions for a streamlined review under section III of the 2008 Servicewide PA for Section 106 compliance.

**Applicable Streamlined Review Criteria**
(Specify 1-16 of the list of streamlined review criteria.)

**[    ] C. Undertaking Related to Park Specific or Another Agreement**
The proposed undertaking is covered for Section 106 purposes under another document such as a park, region or statewide agreement established in accord with 36 CFR 800.7 or 36 CFR 800.14.

**[    ] D. Combined NEPA/NHPA Process**
Process and documentation required for the preparation of an EA/FONSI or an EIS/ROD to comply with Section 106 is in accord with 36 CFR 800.8.c.

**[    ] E. Memo to Project File**

**3. Consultation Information**

**SHPO Required:** Yes
**SHPO Sent:** Nov 18, 2024
**SHPO Received:** Dec 12, 2024

**THPO Required:** No
**THPO Sent:**
**THPO Received:**

**SHPO/THPO Notes:** We understand the NPS proposes to undertake a variety of roadway improvements and related work along the above-referenced section of 15th Street (see attached narrative scope of work) and that most of these improvements qualify for streamlined review under the Nationwide NPS Programmatic Agreement (PA). The one action that is not streamlined under the NPS PA is the proposal to replace the existing rubber cycletrack wheel stops with concrete and granite curbs up to 18" in width to create a more permanent separation between bikes and vehicles. Although such curbs are not streamlined under the NPS PA, they are streamlined under the Federal Highway Aid PA that FHWA and the ACHP entered into with our office, provided the curbs are no wider than 18" within the L'Enfant City. Since we understand that 18" is the proposed maximum width, and because we consider the granite and concrete curbs, including those that already exist on 4th Street, more visually appropriate for the National Mall setting, we have determined this undertaking will have "no adverse effect" on historic properties. Please contact me at andrew.lewis@dc.gov or at 202-442-8841 if you should have any questions or concerns regarding this matter.Otherwise, thank you for providing this opportunity to review and comment.

    **Advisory Council Participating:** No
    **Advisory Council Notes:**
    **Additional Consulting Parties:** No

**4. Stipulations and Conditions:** Following are listed any stipulations or conditions necessary to ensure that the assessment of effect above is consistent with 36 CFR Part 800 criteria of effect or to avoid or reduce potential adverse effects.

**5. Mitigations/Treatment Measures:** Measures to prevent or minimize loss or impairment of historic/prehistoric properties: (Remember that setting, location, and use may be relevant.)

    **Required Mitigations** - For the proposed project actions to be within compliance requirements during construction and/or project implementation, the following mitigations must be adhered to:

- ▪ Spill containment kits and fire extinguishers shall be available on site at all times.
  Portable generators should be low-emission, fuel efficient, and contain noise reduction features.
  To reduce emissions and noise pollution, portable generators should be run only when necessary.
- ▪ Equipment must be free of any fluid leaks (fuel, oil, hydraulic fluid, etc.) upon arrival to the work site and will be inspected at the beginning of each shift for leaks. Leaking equipment will be removed off site for necessary repairs before the commencement of work.
- ▪ When feasible the project shall follow NPS EO 13693 (ii) diverting at least 50 percent of non-hazardous solid waste, including food and compostable material, construction and demolition materials and debris, and pursuing opportunities for net-zero waste or additional diversion opportunities.

  The waste diversion tracking sheet and or disposal manifest needs to be reported to the park Environmental Compliance Program Manager monthly for the duration of the project and or at the end of the project. The park tracks this to meet the NPS EO 13693 of diverting (recycling) at least 50 % of our solid waste generated. This is reported to WASO annually.
- ▪ All work shall be replacement in-kind.
- ▪ Work shall be replacement in kind of character defining features
- ▪ All work shall be replace in-kind effected materials or use will a new material that matches the color, form, texture and character of the existing material..
- ▪ Review and approval required from SOI Qualified individuals
- ▪ Resource Managment, including qualified Regional Office CR Staff, will participate in additional design review while final construction drawings are developed due to details and specifications provided during the initial consultation.
- ▪ No exterior wet work shall be completed when air temperature is below 40 degrees F. No cleaning work shall be completed when either the air or surface temperature is below 40 degrees F unless approved means are provided.
  1. Protect adjacent surroundings prior to cleaning (including adjacent buildings, site, landscape features, motor vehicles, public rights of way, and other surrounding elements).
  2. Hot water is to be between 140-160 degrees F
  3. Begin with a low-pressure spray from 100-400 psi with a rotating tip, if needed utilize a medium-pressure spray from 400-800 psi.
  4. Power wash the curbs and walks with a 40 degree fan tip nozzle.
  5. Proceed with cleaning in an orderly and uniform manner: work from the top to bottom of each section width and from one end of each section to the other. Ensure that dirty residues and rinse water do not wash over dry, cleaned surfaces.
  6. Do not use wire brushes.

## 6. Assessment of Effect Notes:

The project as presented will have "No Adverse Effect" on the cultural resources of West Potomac Park and the Washington Monument. It was determined that due to the scale and scope of the undertaking that the project will undergo a Standard 4-Step Review with the DC SHPO. While the project was previously reviewed under PEPC 92369, the process was flawed and inaccurate as it was streamlined with a lack of qualified reviews for the undertaking. An earlier iteration of the proposal was reviewed by CFA and NCPC, with no SHPO review.

NAMA is proposing to engage in a repaving project that will encompass park maintained portions of 15th Street NW& SW, as well as the portions of Independence Avenue SW from 23rd Street to 14th Street. The undertaking will consist of remilling and limited full depth replacement. The roadbeds will not be expanded nor will the alignment be modified. However, the park is proposing to install a granite curb to delineate the bicycle track along 15th Street. Please review the drawings in the compliance package for specifications of the curb. This treatment is consistent with the maintenance of a transportation route.

Generally, the curb will follow the length of 15th Street south to Maine Avenue SW. The profile of the curb is wider and slightly higher than what was previously reviewed by the agencies. However, visually, it is significantly lower than the flex poles that currently line the track. The addition of the curb, while new, will not adversely change the character of the historic

roadway.

No archeological resources will be affected by the undertaking.

## D. RECOMMENDED BY PARK SECTION 106 COORDINATOR:

**Compliance Specialist:**

**NHPA Specialist**

Daniel Weldon

DANIEL
WELDON

Digitally signed by
DANIEL WELDON
Date: 2025.01.08
09:58:21 -05'00'

**Date:** _____

## E. SUPERINTENDENT'S APPROVAL

The proposed work conforms to the NPS *Management Policies* and *Cultural Resource Management Guideline*, and I have reviewed and approve the recommendations, stipulations, or conditions noted in Section C of this form.

**Signature**

**Superintendent:** _____

KEVIN
GRIESS

Digitally signed by KEVIN
GRIESS
Date: 2025.01.16
13:41:59 -05'00'

**Date:** _____

Kevin Griess

NPS-AR-000968



**National Park Service**
**U.S. Department of the Interior**

**National Mall and Memorial Parks**
**Date: 01/08/2025**

# Categorical Exclusion Documentation Form (CE Form)

**Project:** 15th Street and WB Independence Avenue Resurfacing
**PEPC Project Number:** 126494
**Description of Action (Project Description):**

SITE DESCRIPTION:

West Potomac Park is bounded on the west by the Potomac River and on the north by Constitution Avenue NW. The eastern boundary in the north part of the park is formed by 17th Street NW and the eastern boundary follows the shoreline of the Tidal Basin. The Potomac Railroad embankment acts as the dividing line between the East and West Potomac Parks, although the embankment is within East Potomac Park. The Thomas Jefferson Memorial, which is not a component cultural landscape of West Potomac Park, lies in the southeastern part of the park.

PROJECT BACKGROUND Project NAMA 21(2) is scheduled in the Regional Federal Lands Transportation Program (FLTP) Multi-year Program for obligation of construction funds in FY2025. It is anticipated to be advertised in April 2025, based on Federal Highway Administration's (FHWA) current schedule. The project construction cost is currently estimated at $5,905,000.

PROJECT PURPOSE AND SCOPE This project consists of asphalt milling and overlay on 15th Street from Constitution Avenue south to just north of the intersection of Maine Avenue and Raoul Wallenberg. This project also includes the asphalt milling and overlay of westbound Independence Avenue from 14th Street to 23rd Street. As reflected in the plans, there are several locations of full depth patching on 15th Street. This project also includes: street light replacements in-kind along the 15th Street limits, pedestrian crossing improvements through reconstructed curb cut ramps on 15th Street, repainting of existing pavement markings, and some minor areas of sidewalk panel replacement along 15th Street. This project also will be upgrading the existing 15th Street cycle track median buffer between the cycle track and the driving lanes. The current median buffer consists of pavement markings and rubber wheel stops. This project will replace the existing median with a granite curbed median with exposed aggregate PCC in between the granite curbs, for the majority of the corridor, with the exception being the final approximately 200' of median to the south of Constitution, which will be a slightly narrower concrete curb median due to the narrowing of 15th street as it approaches Constitution Avenue. Please note that pictures with approximate alignment stationing have been attached below, as well as screen shots for the two cycle track median configurations and the detail from the plans for the cycle track granite curb median.

SIGNIFICANCE: West Potomac Park, a spatially and functionally distinct area within the National Register-listed East and West Potomac Parks Historic District, and the National Register-listed National Mall Historic District, possesses historical significance and is potentially eligible on a national and local level under Criterion A in the areas of Politics/Government, Commemoration, Entertainment/Recreation, Social History, and Ethnic History (Black); on a national and local level under Criterion C in the areas of Community Planning and Development, Engineering, Architecture, Art, Landscape Architecture, and Transportation; and under Criterion D in the area of Archeology. The period of significance for Criterion A is 1791, the year in which President George Washington selected the site of the Nation's Capital and retained Pierre L'Enfant to develop a plan for the city, to the present, and 1791 to 1965 for Criteria C and D.

**Project Locations:**

**Location**

| County: | District of Columbia | State: | DC |
|---|---|---|---|

**Mitigation(s):**

- Spill containment kits and fire extinguishers shall be available on site at all times.
  Portable generators should be low-emission, fuel efficient, and contain noise reduction features.
  To reduce emissions and noise pollution, portable generators should be run only when necessary.
- Equipment must be free of any fluid leaks (fuel, oil, hydraulic fluid, etc.) upon arrival to the work site and will be inspected at the beginning of each shift for leaks. Leaking equipment will be removed off site for necessary repairs before the commencement of work.
- When feasible the project shall follow NPS EO 13693 (ii) diverting at least 50 percent of non-hazardous solid waste, including food and compostable material, construction and demolition materials and debris, and pursuing opportunities for net-zero waste or additional diversion opportunities.

  The waste diversion tracking sheet and or disposal manifest needs to be reported to the park Environmental Compliance Program Manager monthly for the duration of the project and or at the end of the project. The park tracks this to meet the NPS EO 13693 of diverting (recycling) at least 50 % of our solid waste generated. This is reported to WASO annually.
- All work shall be replacement in-kind.
- Work shall be replacement in kind of character defining features
- All work shall be replace in-kind effected materials or use will a new material that matches the color, form, texture and character of the existing material..
- Review and approval required from SOI Qualified individuals
- Resource Managment, including qualified Regional Office CR Staff, will participate in additional design review while final construction drawings are developed due to details and specifications provided during the initial consultation.
- No exterior wet work shall be completed when air temperature is below 40 degrees F. No cleaning work shall be completed when either the air or surface temperature is below 40 degrees F unless approved means are provided.
  1. Protect adjacent surroundings prior to cleaning (including adjacent buildings, site, landscape features, motor vehicles, public rights of way, and other surrounding elements).
  2. Hot water is to be between 140-160 degrees F
  3. Begin with a low-pressure spray from 100-400 psi with a rotating tip, if needed utilize a medium-pressure spray from 400-800 psi.
  4. Power wash the curbs and walks with a 40 degree fan tip nozzle.
  5. Proceed with cleaning in an orderly and uniform manner: work from the top to bottom of each section width and from one end of each section to the other. Ensure that dirty residues and rinse water do not wash over dry, cleaned surfaces.
  6. Do not use wire brushes.

**CE Citation:** 3.3.C.9 Repair, resurfacing, striping, installation of traffic control devices, repair/replacement of guardrails, etc., on existing roads.

**CE Justification:**

Resurfacing and addition of safety control devices for the cycle track are in line with this CE.

**Decision: I find that the action fits within the categorical exclusion above. Therefore, I am categorically excluding the described project from further NEPA analysis. No extraordinary circumstances apply.**

**Signature**

**Superintendent:**

KEVIN
GRIESS

Digitally signed by KEVIN
GRIESS
Date: 2025.01.21
12:44:46 -05'00'

**Date:**

Kevin Griess

NPS-AR-000970

**Extraordinary Circumstances:**

| If implemented, would the proposal... | Yes/No | Explanation |
|---|---|---|
| **A.** Have significant impacts on public health or safety? | No | Would not have significant impacts on public health or safety. |
| **B.** Have significant impacts on such natural resources and unique geographic characteristics as historic or cultural resources; park, recreation, or refuge lands; wilderness areas; wild or scenic rivers; national natural landmarks; sole or principal drinking water aquifers; prime farmlands; wetlands (Executive Order 11990); floodplains (Executive Order 11988); national monuments; migratory birds; and other ecologically significant or critical areas? | No | Would not have significant impacts on such natural resources and unique geographic characteristics as historic or cultural resources; park, recreation, or refuge lands; wilderness areas; wild or scenic rivers; national natural landmarks; sole or principal drinking water aquifers; prime farmlands; wetlands (Executive Order 11990); floodplains (Executive Order 11988); national monuments; migratory birds; and other ecologically significant or critical areas. |
| **C.** Have highly controversial environmental effects or involve unresolved conflicts concerning alternative uses of available resources (NEPA section 102(2)(E))? | No | Would not have highly controversial environmental effects or involve unresolved conflicts concerning alternative uses of available resources (NEPA section 102(2)(E)). |
| **D.** Have highly uncertain and potentially significant environmental effects or involve unique or unknown environmental risks? | No | Would not have highly uncertain and potentially significant environmental effects or involve unique or unknown environmental risks. |
| **E.** Establish a precedent for future action or represent a decision in principle about future actions with potentially significant environmental effects? | No | Would not establish a precedent for future action or represent a decision in principle about future actions with potentially significant environmental effects. |
| **F.** Have a direct relationship to other actions with individually insignificant, but cumulatively significant, environmental effects? | No | Would not have a direct relationship to other actions with individually insignificant, but cumulatively significant, environmental effects. |
| **G.** Have significant impacts on properties listed or eligible for listing on the National Register of Historic Places, as determined by either the bureau or office? | No | The project as presented will have "No Adverse Effect" on the cultural resources of West Potomac Park and the Washington Monument. |
| **H.** Have significant impacts on species listed or proposed to be listed on the List of Endangered or Threatened Species, or have significant impacts on designated Critical Habitat for these species? | No | Would not have significant impacts on species listed or proposed to be listed on the Federal List of Endangered or Threatened Species, or have significant impacts on designated Critical Habitat for these species. |
| **I.** Violate a federal, state, local or tribal law or requirement imposed for the protection of the environment? | No | Would not violate a federal, state, local or tribal law or requirement imposed for the protection of the environment. |
| **J.** Have a disproportionately high and adverse effect on low income or minority populations (EO 12898)? | No | Would not have a disproportionately high and adverse effect on low income or minority populations (EO 12898). |
| **K.** Limit access to and ceremonial use of Indian sacred sites on federal lands by Indian religious practitioners or adversely affect the physical integrity of such sacred sites (EO 130007)? | No | Would not limit access to and ceremonial use of Indian sacred sites on federal lands by Indian religious practitioners or adversely affect the physical integrity of such sacred sites (EO 130007). |
| **L.** Contribute to the introduction, continued existence, or spread of noxious weeds or non-native invasive species known to occur in the area or actions that may promote the introduction, growth, or expansion of the range of such species (Federal Noxious Weed Control Act and Executive Order 13112)? | No | Would not contribute to the introduction, continued existence, or spread of noxious weeds or non-native invasive species known to occur in the area or actions that may promote the introduction, growth, or expansion of the range of such species (Federal Noxious Weed Control Act and Executive Order 13112). |

NPS-AR-000971

NPS-AR-000972

**Guidance for Non-Impairment Determinations and the NPS NEPA Process**
**April 2025**

This document provides guidance for completing non-impairment determinations for NPS actions requiring preparation of an environmental assessment (EA) or environmental impact statement (EIS) pursuant to the National Environmental Policy Act (NEPA).

A non-impairment determination states in writing that, in the professional judgment of the NPS decision-maker, the action selected in a finding of no significant impact (FONSI) or record of decision (ROD) will not result in impairment to park resources or values. The non-impairment determination is prepared for the selected action only, and must be completed prior to the signing of a FONSI or ROD by the NPS decision-maker. It must be appended to the FONSI or ROD in its entirety. If an action would impair park resources or values, it may not be selected.

### Why is a Non-Impairment Determination Required?

Section 1.4.7 of *Management Policies 2006* states that

> *[b]efore approving a proposed action that could lead to an impairment of park resources and values, an NPS decision-maker must consider the impacts of the proposed action and determine, in writing, that the activity will not lead to an impairment of park resources and values.*

Actions that require preparation of EAs and EISs constitute actions that may have the potential to impair park resources or values. Therefore, a non-impairment determination must be made for any action selected in a FONSI or ROD that could impact park resources and values and to which the NPS is a signatory.

To minimize the possibility of reaching impairment, *Management Policies 2006* Section 1.4.7.1 also requires the Service to avoid impacts that it determines to be unacceptable. A written determination for unacceptable impacts is not required, but the decision maker should consider whether the selected action would result in unacceptable impacts while reviewing the non-impairment determination.

### What is Impairment?

Sections 1.4.5 and 1.4.6 of *Management Policies 2006* provide an explanation of impairment.

Section 1.4.5 defines impairment as

> *an impact that, in the professional judgment of the responsible NPS manager, would harm the integrity of park resources or values, including the opportunities that otherwise would be present for the enjoyment of those resources or values.*

Section 1.4.5 goes on to state that

1

NPS-AR-000973

*[a]n impact to any park resource or value may, but does not necessarily, constitute an impairment. An impact would be more likely to constitute impairment to the extent that it affects a resource or value whose conservation is:*

- *necessary to fulfill specific purposes identified in the establishing legislation or proclamation of the park, or*
- *key to the natural or cultural integrity of the park or to opportunities for enjoyment of the park, or*
- *identified in the park's general management plan or other relevant NPS planning documents as being of significance.*

An impact would be less likely to constitute an impairment if it is an unavoidable result of an action necessary to preserve or restore the integrity of park resources or values and it cannot be further mitigated.

Section 1.4.6 of *Management Policies 2006* identifies the park resources and values that are subject to the no-impairment standard:

The "park resources and values" that are subject to the no-impairment standard include:
- the park's scenery, natural and historic objects, and wildlife, and the processes and conditions that sustain them, including, to the extent present in the park: the ecological, biological, and physical processes that created the park and continue to act upon it; scenic features; natural visibility, both in daytime and at night; natural landscapes; natural soundscapes and smells; water and air resources; soils; geological resources; paleontological resources; archeological resources; cultural landscapes; ethnographic resources; historic and prehistoric sites, structures, and objects; museum collections; and native plants and animals;
- appropriate opportunities to experience enjoyment of the above resources, to the extent that can be done without impairing them;
- the park's role in contributing to the national dignity, the high public value and integrity, and the superlative environmental quality of the national park system, and the benefit and inspiration provided to the American people by the national park system; and
- any additional attributes encompassed by the specific values and purposes for which the park was established.

## How is a Non-Impairment Determination Made?

Section 1.4.7 of *Management Policies 2006* states that

*[i]n making a determination of whether there would be an impairment, an NPS decision maker must use his or her professional judgment. This means that the decision-maker must consider any environmental assessments or environmental impact statements required by the National Environmental Policy Act of 1969 (NEPA); consultations required under section 106 of the National Historic Preservation Act (NHPA), relevant scientific and scholarly studies; advice or insights offered by subject matter experts and*

2

NPS-AR-000974

*others who have relevant knowledge or experience; and the results of civic engagement and public involvement activities relating to the decision.*

*Management Policies 2006* defines "professional judgment" as

*a decision or opinion that is shaped by study and analysis and full consideration of all the relevant facts, and that takes into account the decision-maker's education, training, and experience; advice or insights offered by subject matter experts and others who have relevant knowledge and experience; good science and scholarship; and, whenever appropriate, the results of civic engagement and public involvement activities relating to the decision.*

### How is a Written Non-Impairment Determination Prepared?

A non-impairment determination states in writing that, in the professional judgment of the NPS decision-maker, the action selected in a FONSI or ROD will not result in impairment to park resources or values. The non-impairment determination is prepared for the selected action only and must be completed prior to the signing of a FONSI or ROD by the NPS decision-maker. It must be appended to the FONSI or ROD in its entirety. If an action would impair park resources or values, it may not be selected.

Non-impairment determinations are not included in EAs or EISs, however the issue of impairment should be considered throughout the NEPA process. A non-impairment determination must include a discussion of why the selected action's impacts will not result in impairment for each impacted resource in the associated EA or EIS. The non-impairment determination does not include discussion of impacts to wilderness, visitor experience, socioeconomics, public health and safety, environmental justice, land use, park operations, etc., as these do not constitute impacts to park resources and values subject to the Organic Act no impairment standard. *See* Section 1.4.6 of *Management Policies 2006.* If the EA or EIS only carries forward for detailed analysis resources that are not subject to the no-impairment standard, a non-impairment determination should still be prepared. That determination should explain that the resources evaluated in detail are not subject to the no-impairment standard and include a discussion of other resources and unacceptable impacts as discussed below. Compliance with other laws should be addressed in the Basis or Rationale for the Decision in the FONSI or ROD and elsewhere in the project file, not in the non-impairment determination.

### What steps should be followed when preparing a non-impairment determination?

*Step 1. Identify the park's purpose, fundamental resources and values, and significant resources.*

Review the park's foundation document or enabling legislation if a foundation document is not available, to determine whether any of the resources retained for detailed analysis in the EA or EIS are necessary to fulfill the park's purpose, are fundamental resources and values of the park or are included in the park's significance statements. The non-impairment determination should identify resources carried forward for analysis that are identified as these types of resources if they are subject to the no-impairment standard in Section 1.4.6 of *Management Policies 2006*.

3

*Step 2. Describe why the selected action will not result in impairment for each resource carried forward for detailed analysis in the EA or EIS.*

Remember, if the analysis indicates that the action would cause impairment, it may not be selected.

- If your NEPA analysis is organized by issues, rather than resource impact topics, consider the underlying resource analyzed in the issue.
- The level of detail provided in the non-impairment determination should be commensurate with the severity of the impacts. Greater detail is generally necessary for those impacted resources that are necessary to fulfill the park's purpose, fundamental resources and values, or significant resources (These resources should be identified above under Step 1). Section 1.4.5 of *Management Policies 2006* specifically mentions these types of resources as more likely to be subject to impairment from an impact.
- The analysis in the EA or EIS should be incorporated by reference and appropriately cited, but the non-impairment determination must contain enough explanation to stand on its own. The determination must avoid unsupported, conclusory statements. Rather, conclusions should be supported with "because" statements that provide specific information regarding the magnitude, extent, timing, duration, context, intensity, etc. of impacts.
- Consistent with the NEPA review, the analysis should disclose how the condition of each resource would change from its condition under no action. However, the analysis should ultimately focus on the condition of the resource that would result if the selected action were implemented.
- *Management Policies Section 1.4* and the Organic Act prohibit the impairment of park resources, not parks or areas of parks. As noted above, your analysis should focus on the condition of each resource overall, and the context of that resource within the park, not the condition of an area (although the condition of the area may be a relevant to context). Include relevant information about context to explain why a resource is not impaired. For example, you may wish to note how many or much of a resource you are impacting, its importance, or its abundance to explain why an action will not result in impairment.

*Step 3. Address resources that were considered but dismissed in the EA and EIS and unacceptable impacts.*

For impacts to resources that were considered but dismissed in your EA or EIS because the impacts were found to be of low intensity, in most cases you should include language similar to the paragraph below at the end of the non-impairment determination:

> As was documented in the [EA or EIS], the Selected Action was found to have [minimal, negligible, or no] impacts on other resources such as [insert resources that were discussed in issues considered but dismissed]. See [appropriate sections of the EA or EIS] for more information. The impacts to these resources are small and insignificant.  The resources will remain available to be enjoyed by current and future generations. Therefore, they will not be impaired by implementation of the Selected Action.

4

NPS-AR-000976

In instances where an issue or impact has been dismissed in an EA or EIS but there could still be meaningful adverse impacts to certain resources, you may want to address impacts to those resources along with the other resources that were carried forward for detailed analysis in the EA or EIS, as described above in Step 2. If this situation applies, you should consult with the Regional Environmental Coordinator to determine the best course of action.

Additionally, include a statement in the non-impairment determination that unacceptable impacts were considered but will not occur. As discussed above, a separate written determination is not required.

*Step 4. Append the non-impairment determination in its entirety to the FONSI or ROD.*

The non-impairment determination does not need a separate signature.

5



THE SECRETARY OF THE INTERIOR

WASHINGTON

**ORDER NO. 3428**

**Subject**: Making the District of Columbia Safe and Beautiful

Sec. 1. **Purpose.** This Order implements Executive Order (EO) No. 14252, titled "Making the District of Columbia Safe and Beautiful," issued by President Trump on March 27, 2025. It establishes responsibilities for relevant Department of the Interior (Department) Bureaus and Offices to assist the President and his designees in their efforts to protect and preserve our Nation's capital city by preventing crime, protecting American monuments, and promoting the beautification of the District of Columbia.

Sec. 2. **Authorities.** This Order is issued under the authority of section 2 of Reorganization Plan No. 3 of 1950 (64 Stat. 1262), as amended. Other authorities include, but are not limited to, the National Park Service Organic Act, as amended, 54 U.S.C. § 100101 et seq., relevant Bureau law enforcement authorities, including (1) 54 U.S.C. § 102701 et seq. for the National Park Service (NPS) and (2) D.C. Code § 5-206 and related authorities for the U.S. Park Police (USPP).

Sec. 3. **Background.** The Department has a long and distinguished history of protecting and preserving our Nation's iconic national monuments, memorials, parks, and other Federal lands in the District of Columbia. From its establishment by President George Washington in 1791, the USPP has provided comprehensive law enforcement across Federal lands and parkways in the District of Columbia and beyond, protecting iconic monuments, managing demonstrations and special events, and ensuring public safety for the millions of visitors who come to connect with America's extraordinary heritage each year. NPS likewise has preserved and maintained 38 units of the National Park System and hundreds of individual park areas in the District of Columbia since NPS' establishment in 1916, ensuring that our Nation's great story is told and inspires our collective pride for generations to come.

The President has directed a coordinated effort to ensure that these sites remain beautiful and secure by preventing crime, protecting our monuments, and promoting beautification. The President's directive recognizes the Department's unique responsibility in this mission, including NPS and USPP jurisdiction over approximately 1,000 acres of the District of Columbia's most significant cultural landscapes and its long history in their protection.

With this Order, the Department is taking action to ensure that the District of Columbia showcases beautiful, clean, and safe public spaces where residents, commuters, and visitors feel secure at all hours, in all areas.

NPS-AR-000978

2

Sec. 4. **Implementation.**

    a.    **Making the District of Columbia Safe by Fighting Crime.** The Assistant Secretary – Policy, Management and Budget (AS-PMB), in coordination with the Director of the Office of Law Enforcement and Security (OLES) and the relevant Bureau Directors of Law Enforcement (BDLE), including the Chief of the USPP, shall:

        1.    Ensure appropriate representation on the D.C. Safe and Beautiful Task Force (Task Force) established by the EO;

        2.    Support the Task Force in its efforts to implement section 3 of the EO; and

        3.    Prepare monthly updates to the Secretary regarding safety in the District of Columbia and progress on the tasks set forth in section 3 of the EO.

    b.    **Making the District of Columbia Beautiful.** The Assistant Secretary for Fish and Wildlife and Parks (AS-FWP) is responsible for the following:

        1.    Developing and implementing, in accordance with the consultation requirements of section 4(a) of the EO, a program to beautify and make safe the District of Columbia;

        2.    Ensuring that the program includes, at a minimum, the following elements, as appropriate and consistent with applicable law:

            i.    A coordinated beautification plan for Federal and local facilities, monuments, lands, parks, and roadways in and around the District of Columbia;

            ii.    Restoration of Federal public monuments, memorials, statues, markers, or similar properties that have been damaged or defaced or inappropriately removed or changed in recent years;

            iii.    Removal of graffiti from commonly visited areas, with local assistance;

            iv.    Proposals to ensure Federal buildings or lands under the Department's jurisdiction adequately uplift and beautify public spaces and generate in the citizenry pride in and respect for our Nation;

            v.    A coordinated Federal and local approach to ensure the cleanliness of public spaces, sidewalks, parks, highways, roads, and transit systems in and around the District of Columbia; and

            vi.    The encouragement of private-sector participation in coordinated beautification and cleanup efforts in the District of Columbia.

    c.    **Removal and Cleanup of Homeless Encampments and Graffiti.** In accordance with section 4(c) of the EO, the NPS Director shall ensure the prompt removal and cleanup of all homeless or vagrant encampments and graffiti on Federal land

3

within the District of Columbia subject to NPS jurisdiction, to the maximum extent permitted by law and applicable regulations.

Sec. 5. **Responsibilities.**

    a.    **AS-PMB:** The AS-PMB is responsible for overseeing the implementation of section 3 of the EO, as outlined in section 4(a) of this Order. The AS-PMB will submit a report to the Secretary within 60 days detailing progress in implementing these responsibilities.

    b.    **AS-FWP:** The AS-FWP is responsible for overseeing the development and implementation of the program to beautify and make safe the District of Columbia, as outlined in section 4(b) of this Order. The AS-FWP will submit a report to the Secretary within 60 days detailing progress in implementing these responsibilities.

Sec. 6. **Department Coordination**. The OLES Director shall ensure that activities under this Order are properly prioritized and coordinated among relevant stakeholders and shall act as the primary point of contact for internal and external parties with respect to such activities.

Sec. 7. **Effect of this Order.** This Order is intended to improve the internal management of the Department and to assure implementation of the above-referenced EO. This Order and any resulting report or recommendations are not intended to, and do not create any right or benefit, substantive or procedural, enforceable at law or equity by a party against the United States, its departments, agencies, instrumentalities, or entities, its officers or employees, or any other person. To the extent there is any inconsistency between the provisions of this Order and any Federal laws or regulations, the laws or regulations will control.

Sec. 8. **Effective Date.** This Order is effective immediately and will remain in effect until it is amended, superseded, or revoked, whichever occurs first.

Secretary of the Interior

Date:  **APR 04 2025**

NPS-AR-000980



# DOI Handbook of NEPA Procedures Appendix 3

## Implementation Guidance to Bureaus

U.S. Department of the Interior
June 2025

This appendix is intended to provide further guidance on nine NEPA concepts to assist bureaus as they develop and review proposed actions under NEPA: (1) Scoping and Public Involvement; (2) Categorical Exclusions (CE) and Extraordinary Circumstances Review Protocol; (3) Using Existing NEPA; (4) Analytical Elements Common to Environmental Assessments (EA) and Environmental Impact Statements (EIS); (5) Reasonably Foreseeable Effects of the Proposed Action and Action Alternatives; (6) Significance, Including Reaching a Finding of No Significant Impact (FONSI); (7) Formal Aspects of Environmental Documents; (8) Documenting Decisions; and (9) Applicant-Prepared and Contractor-Prepared EAs and EISs.

1.    <u>Scoping and Public Involvement</u>

This section discusses both mandatory and discretionary scoping and public involvement considerations specific to NEPA. NEPA does not require scoping, and NEPA only requires the solicitation of public comment on a Notice of Intent to prepare an EIS.  As discussed below, there may be reason to engage the public further, depending on the proposed action. There may also be other statutes, regulations, or guidance specific to the proposed action that may require scoping or further public involvement. The Responsible Official should determine whether the proposed action requires any public involvement over and above what NEPA requires.

*Introduction to scoping.* Scoping is a process where bureaus collect information to learn more about potentially significant issues related to a proposed action. Issues may point to significant environmental effects, and a bureau's recognition of issues can help shape its evaluation of the proposed action and alternatives.

While scoping is not required by NEPA, it is often a useful tool. Through scoping, bureaus can lay the groundwork for coordinating and consulting with other Federal agencies, and, where appropriate, State, Tribal, or local agencies or governments. Where applicants are involved, scoping can bring them into the process to identify necessary information, how other

1

environmental reviews can be integrated into the NEPA document, and any obstacles that can cause delays. Scoping can also assist bureaus as they identify resources for preparation of the environmental document, including staff time, data, and funding.

*Mechanics of scoping.* Bureaus should initiate scoping as soon as practicable after the bureau has sufficiently developed the proposal for action and evaluation. Scoping should be flexible and tailored to the proposed action being considered. Scoping can be done at any stage of the NEPA process, including on an informal basis prior to the start of the NEPA process. For example, scoping can assist the bureau in determining whether it can apply a CE or when identifying issues that warrant evaluation in an environmental document. Information can come from a variety of sources, including, for example, intra-agency personnel, inter-agency personnel, Tribal governments, or interested stakeholders (e.g., community residents, visitors, commercial users, traditional/subsistence users). The bureau may hold public meetings, as appropriate. The bureau may seek various kinds of information, for example:

- Significant resource issues
- Interested parties
- Alternatives to be considered
- The potentially affected geographical area
- Land Status (e.g., Federal, Tribal, Private, State, Indian Allotment, Split Estate)

As part of scoping, Responsible Officials may find it useful to frame potential issues in a manner that would draw out potential cause-and-effect relationships and assist in defining the scope of analysis. Analysis can be streamlined by identifying the specific aspect of the action that may have an environmental effect and the specific aspect of the resource that may be affected. For example:

- How would construction and operation of wind turbines affect sage grouse nesting?
- How would sediment production from road construction affect water quality in Elk Creek?
- How would a prescribed burning affect the short-term and long-term visitor experience for recreational users of the Pacific Crest Trail?
- How would quarry expansion affect local employment opportunities?

Simply naming a resource, such as "wildlife" or "air quality," without identifying how these specific resources may be affected by the proposed action, does not adequately identify an issue. This approach would not adequately inform a bureau's evaluation or identify a potential cause-and-effect relationship with the proposed action.

*Public involvement requirements when relying on a Categorical Exclusion.* NEPA does not require public involvement when a bureau relies on a CE. In addition, some legislatively established or legislatively directed CEs may have their own public involvement requirements that may be found in their authorizing legislation.

*Public involvement requirements when preparing an Environmental Assessment.* NEPA does not require public involvement when a bureau prepares an EA. Therefore, the Responsible Official has discretion to determine whether to involve the public, when to involve the public, and what

2

kind of public involvement is most appropriate when the bureau is preparing an EA to support decision-making on a proposed action and anticipates reaching a Finding of No Significant Impact (FONSI).

*Public involvement requirements when preparing an Environmental Impact Statement.* NEPA only requires public involvement—via solicitating public comment—when a bureau publishes a Notice of Intent to prepare an EIS in the Federal Register. NEPA does not require any further public involvement when preparing an EIS. Therefore, the Responsible Official has discretion to determine whether any further public involvement would be helpful, and the parameters of that involvement within the two-year EIS timeframe. It is recommended that public comment periods seek to provide 30 days, to the extent practicable.

*Specific considerations concerning discretionary public involvement.* The Department recommends that the Responsible Officials determine whether public involvement over and above the NEPA's requirements would be helpful prior to initiating the NEPA process to inform the schedule. Early coordination with interested parties helps to identify issues that would benefit from additional public involvement such as economic impacts or the effects on quality of life. Members of the public may have unique insight into issues that warrant consideration in the environmental document such as emerging uses of public lands important to the local community.

i.  Consider whether and to what degree public review or comment would be useful, including by considering the following:
1.  Public Interest: From the number of potentially substantive public issues raised in scoping for the project, is engagement with the public likely to provide new insights or information the bureau lacks?
2.  Complexity: Is the project so complex that public discussion is likely to generate significant substantive stakeholder information the bureau lacks?
3.  Process Efficiency: Would public input improve the overall efficiency of the process, perhaps by providing information the bureau lacks?

ii.  Public involvement may occur at any point in the NEPA process or at multiple points during the NEPA process, and may include any or all the following:
1.  Public notification: This is often achieved by creating and publishing a project webpage with a description of the proposed action and other early information such as preliminary alternatives and issues. While you might not specifically request comments, any received comments should be considered and documented.
2.  External scoping: As discussed above, this involves actively soliciting public input early in the process.
3.  Public meetings: These provide a forum for direct engagement and discussion, and can be held in person, virtually, or both.
4.  Public review and comment: If the Responsible Official elects to invite public review or comment on an EA or a draft document, such as a draft EIS, the Responsible Official should publish such material for review. If the Responsible Official publishes such material for public review, specify the period, preferably no more than 30 days, when possible, and method for comments.

NPS-AR-000983

*Addressing and responding to public comments.*
When responding to public comments, responses are based on their 'substantive' and 'non-substantive' relation to the proposed project. Substantive comments do one or more of the following:

- Question, with a reasoned basis related to the analysis, the accuracy of information in the EIS or EA.
- Question, with a reasoned basis related to the analysis, the adequacy of, methodology for, or assumptions used for the analysis.
- Present new information relevant to the analysis.
- Present reasonable alternatives or issues outside those analyzed in the EIS or EA, or those mentioned in the Notice of Intent.
- Present relevant additional issues for analysis in the EIS or EA.
- Prompt potential changes or revisions to one or more of the alternatives.

Non-substantive comments would include the following:

- Comments for or against the proposed action or alternatives without supporting criteria (such as "we disagree with Alternative Two and believe the bureau should select Alternative Three").
- Comments that only agree or disagree with bureau policy or resource decisions but do not provide justification or supporting data (e.g., "less grazing should be permitted").
- Comments that do not pertain to the proposed project (e.g., "the government should eliminate all dams" for a proposed grazing permit).
- Open-ended question or vague comments.
- Comments citing other comments or sources without providing substantive reasoning (e.g., "consider the following list of scientific papers …" or "consider all of our previous comments on other projects" without citing specific examples).

Bureaus are not required to address comments that are non-substantive.

Bureaus have several options for addressing substantive comments, including:

- Modifying one or more of the alternatives;
- Developing and evaluating suggested alternatives not previously given serious consideration by the bureau;
- Supplementing, improving, or modifying the analysis;
- Making factual corrections; or
- Explaining why the comments do not warrant further bureau response, citing sources, authorities, or reasons to support the bureau's position.

A bureau is not required to respond to comments that are received after the close of the comment period. However, bureaus should review untimely comments to consider whether they are relevant to the adequacy of the environmental document, particularly comments from agencies with jurisdiction by law or special expertise.

NPS-AR-000984

Documenting any comments or responses: If a bureau solicits public comments, it should document how those comments were addressed. When responding to comments, bureaus may summarize comments and respond to common topics or issues.

2.    <u>Categorical Exclusions (CE) and Extraordinary Circumstances Review Protocol:</u>

*Available CEs.* There are three methods by which CE categories may become available for use by a bureau:

1) The Department or any of its bureaus may administratively establish CEs through a verification process established by DOI that relies on existing bureau NEPA analysis, research, or benchmarking to another agency's established CEs;
2) A bureau may adopt and apply a CE listed in another agency's NEPA procedures (42 U.S.C. 4336c); or
3) Congress may legislatively establish or direct establishment of CEs; use of these CEs must occur according to the terms of the legislation.

A bureau may also rely on another agency's CE determination for a particular proposed action by using that determination, if that bureau's action is substantially the same as the action the other agency has concluded can be approved in reliance on a CE. This reliance on another agency's determination is done on a proposed action-by-proposed action basis. See *Relying Another Agency's Categorical Exclusion Determination* for more information.

*Identifying potential CEs for use.* To determine whether a proposed action is covered under a CE, begin by verifying that the proposed action fits within one or more of the CEs available to the bureau. The Responsible Official should review the available CEs to determine if the proposed action falls into one of the listed categories. Some proposed actions may be covered in their entirety by more than one CE and bureaus should select the CE that most closely matches and is specific to the proposed action. The proposed action does not have to be specifically mentioned in the text of a CE but should easily fit into the category of actions described in the CE. A Responsible Official may rely on several CEs to support a proposed action that consists of several elements; however, this reliance must be documented, including that none of the elements of the proposed action would result in significant impacts on the quality of the human environment, taken separately or as included in the proposed action.

*Reviewing for extraordinary circumstances.* If a proposed action is covered by a CE available to the bureau, unless exempt from such review by statute, the bureau must review the proposed action for the presence of extraordinary circumstances that would, if present, preclude reliance on the CE. Extraordinary circumstances are listed in Section 1.4(e) of the DOI NEPA Procedures. If the proposed action, considered together with any connected actions, would implicate any of the extraordinary circumstances, and the bureau cannot eliminate those extraordinary circumstances by modifying the proposed action to reduce or remove potentially significant impacts, then the bureau would need to develop an environmental document for NEPA compliance.

If the proposed action meets the terms of the CE and no extraordinary circumstances are present for the proposed action, then the Responsible Official can approve the proposed action in reliance on the CE.

NPS-AR-000985

There are limited exceptions to the requirement that a Responsible Official must conduct review for extraordinary circumstances when relying on a CE. When using certain statutorily established CEs, bureaus do not need to evaluate the presence of extraordinary circumstances. For example, under current policy, the Bureau of Land Management (BLM) need not review a proposed action for the presence of extraordinary circumstances when relying on the CEs established by section 390 of the Energy Policy Act of 2005 (Pub. L. 109-58; 42 U.S.C. 15942). In other circumstances, statutorily established CEs direct bureaus to consider a different list of extraordinary circumstances. For example, the BLM must review any proposed reliance on the CEs established under section 40806 of the Infrastructure Investment and Jobs Act (Pub. L. 117-58) against the U.S. Forest Service extraordinary circumstances at 36 CFR 220.6. Refer to the authorizing statute for any requirements regarding use of legislatively established or legislatively directed CEs. When bureaus adopt CEs established by other agencies, that adoption can provide for consideration of other extraordinary circumstances in addition to DOI extraordinary circumstances.

*Documenting CE use.* Documentation requirements for CEs vary. When a Responsible Official relies on a CE to comply with NEPA, documentation is required for all CEs notated in Appendix 2 with an asterisk (*). When a bureau relies on multiple CEs in combination to cover a single proposed action, it must document that reliance, even if use of each CE on its own would not require documentation. Legislatively established or legislatively directed CEs may have specific documentation requirements. A Responsible Official may always elect to document reliance on a CE. In addition, individual bureaus may require program-specific guidance for public notification of a decision supported by a CE that may include publication of documentation of CE reliance.

3.    Using Existing NEPA

The Department recommends that Responsible Officials use existing environmental analyses to disclose effects associated with a proposed action when doing so would avoid redundancy while still providing a coherent and logical record of the analytical and decision-making process. Bureaus may rely on existing analyses as the basis for decision-making (following a Determination of NEPA Adequacy (DNA) or similar documentation, or reliance on another agency's NEPA analysis) or may rely on components of those analyses through tiering and incorporation by reference, as set forth in the DOI NEPA Procedures and described below. The DOI NEPA Procedures allows for the use of a DNA, memorandum to file or other writing to document this evaluation. For simplicity, DNA will be used to refer to this evaluation throughout the guidance.

*Using existing NEPA documentation in its entirety.* Not all new proposed actions will require a new environmental analysis. A bureau may use a DNA, following appropriate review and evaluation, if the effects of a proposed action are already adequately analyzed in an existing environmental document. Before relying on existing environmental documents, the bureau must ensure that the existing environmental document adequately analyzes the proposed action and must evaluate the analysis to ensure the analysis and its assumptions remain valid, considering whether any new and substantial information or circumstances not previously analyzed may result in substantially different environmental effects. This review and evaluation process may reveal a need for additional analysis, or the evaluation may determine that supplementation is not

6

NPS-AR-000986

necessary and that the existing environmental document can be relied on in its entirety. For example, if a bureau receives an application for a special recreation permit from an entity that held a similar permit in the same or similar area in previous years, the bureau may be able to rely on the environmental document prepared to support approval of the original special recreation permit, depending on the results of the bureau's review and evaluation of that environmental document.

Before relying on an existing environmental document, the Responsible Official must review the existing environmental document and answer the following questions to determine whether they adequately cover a proposed action currently under consideration:

- Is the new proposed action a feature of, or essentially like an alternative analyzed in the existing environmental document?
- Is the proposed action within the same analysis area, or if the location of the proposed action is different, are the geographic and resource conditions sufficiently like those analyzed in the existing environmental document? If there are differences, can the bureau explain why they are not substantial?
- Is the range of alternatives analyzed in the existing environmental document appropriate with respect to the new proposed action, given current environmental concerns and resource values?
- Is the existing analysis valid considering any new information or circumstances relevant to the proposed action? Can the bureau reasonably conclude that new information and new circumstances do not warrant substantial change to the analysis of the new proposed action?
- Are the environmental effects that would result from implementation of the new proposed action similar (both quantitatively and qualitatively) to those analyzed in the existing environmental document?

The Responsible Official must document substantive and detailed responses to these questions and include specific citations to the existing EA or EIS. If the Responsible Official answers "yes" to the above questions, additional analysis will not be necessary. If the Responsible Official answers "no" to any of the above questions, the bureau must prepare a new EA or EIS. However, it may still be appropriate to tier to or incorporate by reference material from the existing EA or EIS, in any new EA or EIS, or supplement the existing EIS (provided that the Federal action has not yet been implemented).

In addition to answering the above questions, the Responsible Official must evaluate whether any public involvement and interagency review associated with existing EAs or EISs are adequate for the new proposed action. Providing public involvement or interagency review for the preparation of a DNA or similar document is at the discretion of the Responsible Official, as is the level of public involvement. Bureau-specific requirements may exist for public involvement for the preparation of a decision supported by a DNA or similar document.

Bureaus may rely on one or several existing environmental documents to comply with NEPA for a new proposed action. For example, environmental documents that may be relevant include:

- EISs and EAs associated with land use or management plans as applicable to individual bureaus

7

- EISs or EAs for programmatic actions
- EISs or EAs associated with project specific bureau approval actions
- EISs or EAs prepared by other agencies

If the existing document is an EIS or EA prepared by another agency, the bureau must follow the procedures to rely on the EIS or EA, detailed below.

*Incorporation by Reference and Tiering.* Incorporation by reference and tiering provide opportunities to reduce paperwork, shorten the length of an environmental document, and avoid redundant analysis in the NEPA process. While related, incorporation by reference and tiering are distinct concepts with specific meanings and approaches.

Incorporation by reference refers to other available documents that cover similar issues, effects, or resources considered in the NEPA analysis you are currently preparing. Incorporation by reference allows you to briefly summarize the relevant portions of these other documents rather than repeat them.

Tiering refers to the reliance on and incorporation by reference of discussions of general matters in broader EISs or EAs in subsequent narrower circumstances.

Incorporation by reference is a necessary step in tiering, but tiering is not the same as incorporation by reference:

- Tiering allows a Responsible Official to narrow the scope of the subsequent analysis and focus on issues that are necessary for decision-making and exclude from consideration issues already decided or not yet ripe. Incorporation by reference does not.

- A Responsible Official may only tier to previous EAs or EISs evaluating proposed actions with which the new proposed action is consistent, whereas material may be incorporated by reference from any type of document.

**Incorporation by Reference.** Incorporation by reference is useful in preparing both EAs and EISs. It involves two steps: citation and summarization.
1. Cite the source of the incorporated material, including hyperlinks (if available) or other information sufficient to "make the materials reasonably available for review." Give the name of the document and (to the extent possible) page numbers where the incorporated material can be found. Make this citation as specific as possible so there is no ambiguity for the reader about what material is being incorporated. If unpublished, state where cited material is available.
2. Summarize the incorporated material. Briefly describe the content and relevance of the incorporated material. For example, if analysis is incorporated by reference from one environmental document into another, summarize the previous analysis, and explain any conclusion based on that previous analysis and how it relates to the action in question. The summary of the incorporated material must be sufficient to allow the Responsible Official and other readers to follow the analysis and arrive at a conclusion.

8

**Tiering.**  Tiering uses the existing analysis from a broader environmental document, such as a programmatic EA or EIS, to a subsequent narrower review; however, a Responsible Official should first evaluate the broader environmental document to determine if it sufficiently analyzed site-specific effects and considered the current proposed action in the context of evaluating the original proposed action that was the subject of the broader environmental document. If the Responsible Official determines that the existing analysis is sufficient to address any site-specific effects that may result from the new proposed action, the Responsible Official may be able to prepare a DNA or similar document rather than need to prepare a subsequent, tiered environmental document.

In the tiered document, bureaus need only reexamine alternatives analyzed in the broader document or re-analyze effects on resources fully analyzed in the broader document that are relevant to the new proposed action. Tiering can be particularly useful for describing reasonably foreseeable environmental trends and analyzing the effects of planned actions in the area. A programmatic EIS will often analyze the effects reasonably foreseeable as typical of the individual actions that make up a program, as well as the total effects of the overall program.

When preparing a tiered EA or EIS:
1.  State that it tiers to another EA or EIS,
2.  Describe the relationship between the tiered document and the existing NEPA analysis, and
3.  Summarize and incorporate by reference the relevant portions of the EA or EIS to which it is tiered (cite and summarize, as described in *Incorporation by Reference* above). Concentrate on the issues discussed in the broader EA or EIS that are specific to the subsequent proposed action.

A bureau may tier to an EA or EIS for a broader action when the narrower action is clearly consistent with the decision associated with the broader action. Although the proposed action must be consistent with the decision associated with the broader action, the analysis in the EA or EIS for the new proposed action tiers to the analysis in the existing EA or EIS, not to the decision. Note that tiering applies only to EAs and EISs; an EA or EIS cannot tier to a document that is not an environmental document as defined under NEPA. In a DNA or similar document, the bureau is relying on an existing EA or EIS, but this reliance is not considered tiering because there is no development of alternatives or analysis of issues in a DNA. Tiering is not applicable when using a CE, as CE determinations are not environmental analyses.

*Relying on another agency's EA or EIS.* A bureau may use another agency's EA or EIS to support decision-making, consistent with the following requirements:
* If a bureau is a cooperating agency in the preparation of the EA or EIS, and the bureau determines that (a) the EA or EIS adequately addressed the environmental impacts of the bureau's proposed action; (b) the EA or EIS satisfies the bureau's requirements; and (c) the EA or EIS adequately addressed the bureau's comments and suggestions, then the bureau may rely the EA or EIS. The Bureau should, to the extent practicable, prepare a joint Record of Decision (ROD) or concurrent decision document with the lead agency. If

9

the bureau makes these determinations but does not issue a joint or concurrent decision, however, the bureau may later rely on that EA or EIS without republishing it.

- If the bureau is not a cooperating agency in the preparation of an EA or EIS, the bureau may rely on it after republishing the document consistent with the following requirements:
  - If the actions covered by the original EA or EIS and the bureau's proposed action are substantially the same, the bureau will republish the relied upon statement.
  - A bureau must issue its own ROD on a relied upon EIS for which it was not a cooperating agency and must document its reliance of the EIS and its conclusion regarding the adequacy of the EIS in the ROD.

Relying on a portion of another agency's EA or EIS should be accomplished through incorporation by reference of the material into the new EA or EIS.

A bureau may rely on another agency's EA for a FONSI and bureau decision-making if the actions covered by the original EA are substantially the same. If the bureau concludes that the EA adequately addresses the environmental impacts of the proposed action and satisfies the bureau's requirements, it must issue its own FONSI to document formal reliance of the EA and conclusions regarding the adequacy of the EA. The reliance on the EA must be publicly available. In certain limited circumstances, a bureau's program requirements may require it to publish or otherwise make the FONSI available for public review for 30 days.

*Relying on Another Agency's Categorical Exclusion Determination*.  A bureau may rely on another agency's determination that a CE applies to a proposed action for the bureau's decision-making. A bureau may rely on the other agency's CE determination even if the CE used is not on the Departmental or bureau lists of CEs. However, the bureau must ensure that its proposed action is substantially the same action as that which is the subject of the original agency's CE determination. "Substantially the same" means that the bureau's proposed action and the other agency's proposed action are for the same project or activity (not simply the same type of project or activity) and the bureau's proposed action and the other agency's proposed action would result in similar non-significant environmental effects.

The Department recommends that bureaus approach reliance on a CE determination similarly to reliance another agency's EA or EIS and coordinate on development of a joint CE determination that addresses both agencies' requirements and is documented by both agencies. However, if this is not feasible, you may rely on a CE determination through additional documentation that shows determination of the proposed action as substantially the same as the action covered by the original CE. In either circumstance, the Responsible Official must document decisions in accordance with bureau-specific requirements.

4.      Analytical Elements Common to Environmental Assessments (EA) and Environmental Impact Statements (EIS)

A bureau must prepare an EA when the proposed action cannot be statutorily or categorically excluded, and when it is unknown whether the proposed action would result in potentially significant impacts. The purpose of an EA is to determine whether the proposed action will have reasonably foreseeable significant environmental impacts. If the answer to that question is yes,

10

the bureau will prepare an EIS. If the answer to that question is no, it will prepare a FONSI. Both EISs and FONSIs are discussed in further detail below.

Preparation of an EA or EIS involves briefly discussing (1) the purpose and need for the proposed action based on the bureau's statutory authority (including the applicant's goals, if applicable); (2) the proposed action and alternatives to the extent required by NEPA § 102(2)(H), 42 U.S.C. § 4332(2)(H); and (3) the reasonably foreseeable effects of the proposed action and the alternatives considered (covered in Section 5, below).

(1) *Purpose and need.* In the purpose and need section of the EA or EIS, present a brief statement of what the proposal is and why the bureau is considering the action (i.e., what are the underlying needs to which the bureau is responding). This statement will help define the scope of the proposed action and limit the range of alternatives for detailed analysis to those that meet the purpose and need.

- "Purpose" and "need" are not differentiated in the DOI NEPA Procedures; however, thinking of these terms as separate concepts can be helpful in some circumstances. For example, the "purpose" can be described as an outcome that the bureau is trying to reach. Often, the "purpose" can be presented as the solution to the problem described in the "need" for the action. For example, the "need" for a culvert replacement project might describe how the existing culvert blocks fish passage; the "purpose" might be to replace the culvert with one that allows fish passage.
- The purpose and need statement for an externally generated action should be informed by the applicant's or external proponent's goals.
- Draft your purpose and need statement early in the NEPA process and include the statement with any scoping materials to help focus any scoping discussions or input.
- Reexamine and update your purpose and need statement as appropriate throughout the NEPA process, especially when refining the proposed action and developing action alternatives for analysis. This is particularly important since all action alternatives must meet the purpose and need for action.
- A carefully crafted purpose and need statement can be an effective tool to control the scope of the analysis and thereby increase efficiency by eliminating unnecessary analysis and reducing delays in the process. Again, the purpose and need statement dictates the range of alternatives, because action alternatives are not "reasonable" if they do not respond to the purpose and need for the action. For example, in the culvert replacement example above, the scope of the analysis would be narrowed by describing a more specific "purpose" of replacing the existing culvert to allow cutthroat trout fish passage in the spring; reasonable alternatives might include analyzing various culvert sizes or moving the culvert. Conversely, the scope of the analysis would be unnecessarily broadened by describing a more general "purpose" of improving fish passage; reasonable alternatives to such an unnecessarily broad purpose might include culvert removal and road decommissioning.

(2) *Proposed action and alternatives.* The proposed action should be defined in terms of the Federal decision to be made. If there are no unresolved conflicts about the proposed action with respect to alternative uses of available resources, the Responsible Official need only evaluate the proposed action in comparison to what would occur absent such action. If no

11

other action alternatives are included for detailed analysis, the EA or EIS should explain why. If there are reasonable alternatives warranting discussion, this section of the EA or EIS should describe those alternatives in a manner that is brief and tightly focused on potentially significant issues.

- **"No action alternative."** A "no action alternative" should be considered as part of the NEPA analysis, and doing so sets a useful baseline against which the effects of the proposed action (and any action alternatives) may be measured. A "no action alternative" consists of a continuation of the reasonably foreseeable environmental trends and planned actions as they would occur should the bureau not implement the proposed action or any action alternatives. The "no action alternative" is therefore often described as "the future without the proposed major Federal action." While EAs do not require a separate "No Action Alternative," incorporating such an alternative into EAs is often useful because EAs must compare the effects of the proposed action to the future without the Federal action.

- **Identification of alternatives.** Action alternatives include the proposed action and reasonable alternatives that will be evaluated in detail in the EA or EIS. Bureaus should use their expert judgment and exercise their discretion in identifying the reasonable alternatives, which must be technically and economically "feasible." *See Seven County Infrastructure Coalition v. Eagle County, Colorado*, No. 23–975, Slip Op. p. 10–11.
  - NEPA does not require bureaus to identify a preferred alternative in an EA or an EIS, although it may be helpful for situations in which the bureau is considering a broad range of alternatives. You should review program-specific requirements on this issue.
  - Alternatives considered but eliminated from detailed study do not need to be addressed in an EA; however, in an EIS, the bureau may describe in brief the reasons for such elimination. Whether you are preparing an EA or an EIS, we recommend that you explain your reasons for not evaluating alternatives, particularly when those alternatives have been recommended to you through scoping or other public participation, including public comments.

- **Description of alternatives.** The description of alternatives, including the no action alternative, may include the following items:
  - Location of alternatives
  - Alternative project features
  - Estimated acres to be affected
  - Numbers, locations, and photographs or drawings of structures to be constructed
  - Description of project operations and maintenance
  - Mitigation and/or restoration plans
  - Estimated costs associated with the alternative
  - Modifications or removal of existing facilities or structures, including numbers, locations, and photographs or drawings of those structures

- **Comparison of Alternatives.** The bureau must present analysis for each action alternative analyzed in detail so that the decision-maker may evaluate the environmental

12

impacts of each action alternative by comparing them to each other and to the no action alternative.  An EA does not require the same level of detailed analysis of alternatives that is required for an EIS; these discussions in an EA should be brief and tightly focused on potentially significant issues. An EA or EIS must include a focused scientific and analytic comparison of the proposed action and alternatives, including the no action alternative. In this section, often called the "Environmental Consequences" section, the bureau will discuss the effects of all the feasible action alternatives selected to analyze and compare each to the reasonably foreseeable trends and planned actions that would continue in the absence of the Federal action. The analysis of the effects should focus on those resources that may be affected in a significant way by implementation of the proposed action. The bureau should present both potential beneficial and adverse effects. If implementation of the proposed action would not affect critical environmental areas, wetlands, endangered species, or other scarce, sensitive, or important resources your EA or EIS should state this, as well. Bureaus will use their expert judgment and exercise their discretion when determining how much each alternative should be discussed, as well as the effects of each action alternative, including any significant effects. *See Seven County*, No. 23–975, Slip Op. p. 10–11.

- **Mitigation measures.** Mitigation measures address potential impacts by seeking to avoid, minimize, or compensate for adverse effects. Bureaus may consider mitigation measures through development of different alternatives, specific design features within alternatives, or as separate distinct mitigation measures the bureau may impose on any alternative selected for implementation.

- **Affected Environment.** The affected environment section succinctly describes the existing condition and trends of the environment that may be affected by implementing the proposed action or any of the alternatives. The EA or EIS should emphasize only those resources, or resource uses, that may be affected by the proposed action or action alternatives, and only to the extent necessary to enable an understanding of the extent and context of the anticipated environmental effects. Describe the present condition and any reasonably foreseeable trends of the affected resources within the identified geographic scope and timeframe of the analysis.

  In most cases, bureaus will combine the description of the affected environment, which comprises the reasonably foreseeable environmental trends and planned actions in the area that may be affected by the proposed action, with the description of future conditions without the authorization or implementation of the proposed action or any action alternatives. That is, the no action alternative represents a continuation of the affected environment absent the Federal action under consideration.

5.    <u>Reasonably Foreseeable Effects of the Proposed Action and Any Action Alternatives.</u>

The comparison of alternatives, whether in an EA or EIS, must include a concise description of the reasonably foreseeable effects of the proposed action and all action alternatives identified; this discussion is the scientific and analytic base of the EA or EIS and allows comparison between the reasonably foreseeable effects of the Federal action, including any reasonable alternatives, and what would occur absent the Federal action. The bureau *must* consider the

NPS-AR-000993

environmental effects resulting from the "project at hand." *See Seven County*, No. 23–975, Slip Op. p. 11, 15. The bureau *may* determine "how far to go" in considering indirect environmental effects from the project at hand. *Id.* at 11. In addition, the bureau is **not** required to consider environmental effects from *other projects* that (1) are separate in time or place from the project at hand, (2) fall outside an agency's regulatory authority, or (3) are carried out independently by third parties. *Id.* Ultimately, "where an agency has no ability to prevent a certain effect due to its limited statutory authority over the relevant actions, the agency cannot be considered a legally relevant 'cause' of the effect." *Department of Transportation v. Public Citizen*, 541 U. S. 752, 770 (2004).

For example, downstream oil refining and upstream oil drilling are separate projects from the construction and operation of an 88-mile railroad line. These are "future or geographically separate projects that may be built (or expanded) as a result of or in the wake of the immediate project under consideration." *See Seven County*, No. 23–975, Slip Op. p. 16. A residential development next door to and built at the same time as a ski resort may be projects that are "close in time and space." *Id.* at 19–20. Even then, however, the Responsible Official may still exercise discretion to determine where to draw the line, so long as it's reasonable and documented. Since the U.S. Surface Transportation Board (STB) approves railroad lines; it does not regulate oil drilling, oil wells, oil and gas leases, or oil refineries. *Id.* at 17. As such, in another example, the STB was not required to analyze the environmental effects of projects over which they do not exercise regulatory authority, such as the environmental effects from oil refineries along the Gulf Coast. *Id.* at 20.

6.      Significance, including Reaching a Finding of No Significant Impact (FONSI)

The primary purpose of an EA is to determine whether the reasonably foreseeable effects of the proposed action will be *significant*. Actions likely to have significant environmental impacts will require an EIS; actions that will not have significant environmental impacts require a FONSI.

Section 1.2 of the DOI NEPA Procedures set forth several considerations the Responsible Official may weigh when determining the "significance" of a proposed action.  Here is more detail on each of the considerations:

(1)  **Both short- and long-term effects.** In analyzing the degree of effects, consider both the short- and long-term duration of the effects. When addressing this consideration, you may focus solely on the duration of the effect to assist you in determining whether duration is a substantial contributor to the significance of the effect. However, identifying an effect as short-term does not, by definition, translate to non-significance and a long-term effect does not, by definition, translate to a significant effect. Whether short-term and long-term effects are significant also depends on the specific circumstances of the situation and the degree of the effect. As a result, it may be useful to combine this consideration with your discussion of beneficial and adverse effects as described below.

(2)  **Both beneficial and adverse effects.** In analyzing the degree of effects, consider that effects may be both beneficial and adverse. Even if the effect of an action will be beneficial on balance, significant adverse effects may exist. For example,

14

removing releases of oil or other hazardous substances may have long-term beneficial effects on restoring natural resource services. However, the process of removing the oil or hazardous substances may have short-term adverse effects on the natural resources.

In determining whether short- and long-term effects and adverse effects may be significant consider the following (among other factors): the uniqueness of the resource impacted and the nature and extent of the impact; whether the impact sets a precedent; established thresholds such as those articulated in land use plans; other similar impacts determinations within the resource; and uncertainty with respect to the impacts.

*Although your EA or EIS must evaluate and consider the degree of both beneficial and adverse effects of the proposed action, rather than simply the net effects, only adverse effects can rise to the level of significance warranting preparation of an EIS.*

(3) **Effects on public health and safety.** Consider the degree to which the action would affect public health and safety –for example, evaluation of hazardous and solid wastes, air and water quality. In the context of evaluating significance, describe resource effects in consideration of their relation to established regulatory thresholds if they exist. There may be instances of effects to public health and safety without defined regulatory thresholds. In these cases, consider the setting and degree of effects in your evaluation of significance. For instance, subsidence areas with residential structures may be analyzed to assess public health and safety even though there are no regulatory thresholds.

(4) **Economic effects.** Consider the degree to which the action, including any changes to the natural and physical environment, would affect economic activity. This may require evaluation of jobs and income, spending and output, property values, and/or other economic factors. When evaluating significance, evaluate the degree of the economic effects against an established baseline where possible. If quantitative assessments are not available, consider the qualitative information and the degree of the effects in your evaluation of significance. Economic effects by themselves generally do not require preparation of an EIS.

(5) **Effects on the quality of life of the American people**. Consider the degree to which the action, including any changes to the natural and physical environment, would affect the quality of life of the American people. For evaluating quality of life in an environmental document, we recommend you consider the following:
- Access to products, which may include evaluations of opportunities to consume, use, possess, or purchase products extracted or produced from Federal lands and in the Outer Continental Shelf.
- Visitor experience, which may include evaluations of recreation access and visitor services.
- Public services, which may include evaluations of provisioning of emergency services, public water supply, transportation, education, social services, etc.

15

NPS-AR-000995

- Way of life and culture for Native Americans, which may include evaluations of traditional land and water use and practices, and their cultural heritage.
- Passive use of ecosystems, which may include evaluations of stewardship, existence values, and bequest values.
- Education and knowledge, which may include evaluations of learning, interpretation, and research opportunities related to cultural, historic, and natural resources.

When evaluating significance, evaluate the degree of effects of the proposed action compared to reasonably foreseeable environmental trends and planned actions (i.e., the Affected Environment/No Action Alternative). It may be beneficial to consider the economic effects in context with the effects on the quality of life because these effects may be interrelated. If quantitative assessments are not available, consider the qualitative information and the degree of the effects in your evaluation of significance.

The DOI NEPA procedures also require agencies to consider the potentially affected environment in determining significance. This includes any connected actions, as defined in 6.1, the affected area (national, regional, or local) and its resources. The Department recommends that bureaus identify any unique characteristics of the affected area.

*Climate change and greenhouse gas (GHG) emissions.* A bureau does not need to prepare an EIS on the grounds of climate change or GHG effects alone. The Responsible Official can still reach a FONSI if the proposed action or action alternatives would result in an increase in GHG emissions. This is because the effects of GHG emissions and global climate change are fundamentally cumulative phenomena; therefore, it is not possible to track the effects of GHG emissions from a proposed action to climate change effects in a localized manner to be able to determine significance one way or the other and they need not be analyzed.

7.  Formal Aspects of Environmental Documents
    a.  *Format for an EA or EIS.* A suggested format for EAs or EISs is shown below:
        - Title page
        - Table of contents
        - Introduction, including:
            o  EA or EIS NEPA Number
            o  Type of Project
            o  Location of the proposed action
            o  Name and location of preparing office
            o  The subject function code, lease, serial, or case file number (where applicable)
            o  Applicant name (where applicable)
        - Statement of Purpose and Need for Action
        - Decision to be Made
        - Description of Proposed Action and Alternatives
        - Evaluation of reasonably foreseeable effects of the Proposed Action and Action Alternatives as compared to the Affected Environment/Description of

16

Conditions that would continue absent Federal Action (i.e., the No Action Alternative)

- Appendices. Appendices are for support of critical analyses in the EA or EIS. An appendix is not a data bank or library for total reference support, but contains major substantiating data, essential relevant descriptions of environmental components, or other information necessary for complete use of the EA or EIS for analytical or decision-making purposes. It may be appropriate to keep other supporting material in the decision file and make it available if requested, instead of including it as an appendix. Supporting material may be included as an appendix documenting a list of the parties consulted including, for example, other Federal agencies, Tribal Governments, cooperating agencies, and other members of the public. Include a record of compliance with other applicable statutes (ESA, CWA, etc.). To the extent possible, integrate any surveys and studies required by the NHPA, FWCA, ESA, other environmental laws, or any appropriate tribal, state, or local laws. Finally, preparers may create a list of required permits (Federal, State, Tribal, and local), along with a determination of who will be responsible for obtaining these permits. Appendices can also be used for bibliographies or references cited.

  Appendices generally include:
  - References cited
  - Consultation and coordination
  - Lists of permits
  - Public Comments and Responses (in an EA/FONSI or final EIS, as appropriate)

b. *Page limits, deadlines, and certifications.*
NEPA sets out page and time limits for the preparation of EAs and for the preparation of EIS. Bureaus are strongly encouraged to stay well within these limits and requests for extension of these time limits will not be automatically granted.  See the DOI NEPA Procedures Sections 1.5 and 2.5 for more information.

Bureaus will complete EAs in one year absent unusual circumstances. One year is measured from the start date to the publication of the EA or the revised EA (if any). See the DOI NEPA Procedures Section 1.5 for more information on how to measure the "start date." Bureaus will complete EISs in two years absent unusual circumstances.  For an EIS, the two years is measured from the start date to the publication of the EIS, or final EIS if a draft EIS is issued. See the DOI NEPA Procedures Section 2.5 for more information how to measure the "start date." Bureaus should develop schedules that identify the milestones as appropriate to ensure timely completion of environmental documents.

A bureau that is unlikely to meet a statutory deadline must confer with the Office of the Solicitor to identify options for expediting the preparation the EA or EIS.

17

Document the bureau's rationale for any delays in the event it is needed to report to Congress on missing deadlines.

Any required certification should be placed on the cover page of the EA or EIS. See the DOI NEPA Procedures Sections 1.5 and 2.5 for more information about the content of the certification.

c. *Circulation, Publication and Filing*
- Circulation *of Environmental Documents*
  Prior to completion of an EIS, circulate the EIS to and obtain comments from any Federal agency that has jurisdiction by law or special expertise with respect to any environmental effect involved.

- *Publication of Environmental Documents*
  Publish the completed environmental documents as well as (for an EIS) any comments from or views of any appropriate Federal, State, Tribal, and local agencies and governments. Unless required under specific programs, there is no need to publish bureau-specific notice in the Federal Register for an EIS.

  Issue a notice of the availability of an environmental document for public review or comment, when appropriate, on a public website and through notice to participating agencies and interested parties, as applicable.

  An EIS does not require a bureau-specific Federal Register notice but will be announced in the Federal Register through the process of filing the EIS with the Environmental Protection Agency (EPA).

- *Filing your* EIS *with the EPA.*
  You must file each published EIS, including all draft, final, or supplemental EISs, with the EPA, which publishes its own Federal Register notice. The Federal Register publishes a notice prepared by the EPA every Friday. Federal agencies file an EIS by submitting the complete EIS, including appendices, to the EPA through the e-NEPA electronic filing system. For instructions on the steps required to file an EIS with the EPA, refer to the EPA's website.

8.    Documenting Decisions

The DOI NEPA procedures require development and publication of a concise public decision document for all bureau EA and EIS processes that are concluded. This is often a Record of Decision, or ROD, or another form of a decision, such as a decision record. Decision documents must certify that the bureau has considered all relevant information raised in the NEPA process and that the NEPA process has concluded. It is generally preferable to meet the requirements of other statutes, such as the National Historic Preservation Act or Endangered Species Act, prior to issuing a decision.

Your decision must be within the range of alternatives analyzed in detail in the environmental document. You may select an alternative that is intermediate between two alternatives or

18

combines elements of alternatives if the effects of the selected alternative are reasonably apparent in the analysis. This includes selecting an alternative that is intermediate between an action alternative and the no action alternative (that is, partial implementation of an action alternative). When selecting such an intermediate or combined alternative, ensure that the effects do not combine in a manner that would result in effects outside the scope of the effects analyzed in the environmental document.

An environmental document or documentation of reliance on a CE is not itself a decision document. Prepare a Decision Record or bureau- or program- specific decision document for a proposed action evaluated in an EA, EIS, or relying on a DNA. Some decisions regarding proposed actions analyzed in an EA may also need to be documented in accordance with program-specific requirements.

Follow program-specific requirements on the content and format of a Record of Decision or a decision record. If there are no program-specific requirements or if they are only general, we recommend that you organize the Record of Decision and decision record using the content outline below:

- Describe conformance with any applicable land or offshore use plans (e.g., BLM Resource Management Plans; National Park Service unit Management Plans; U.S. Fish and Wildlife Service Refuge Management Plans) and compliance with laws pertinent to the decision, such as the Endangered Species Act, Marine Mammal Protection Act, National Historic Preservation Act, Outer Continental Shelf Lands Act, or other statutes.
- Identify the selected alternative. Describe as precisely as possible specific design features of the action approved in the decision or incorporate by reference the description of the selected action from the environmental document.
- Identify mitigation measures and any associated monitoring and enforcement plans that have been selected to be implemented. Although described and analyzed in an environmental document, the mitigation measures that will be implemented are explicitly adopted in the Record of Decision and decision record.
- If the bureau prepared an EA to support the decision, reference the FONSI indicating that the action has been analyzed in an EA and found to have no significant impacts, thus an EIS is not required.
- Summarize any public involvement undertaken and any comments received and describe how the bureau considered any substantive public input in making the decision.
- Explain the rationale for the decision. When an EA or EIS supports the decision, explain how the selected alternative addresses the purpose and need for action and why it was selected over other alternatives. You must discuss the preferences among alternatives based on relevant factors including economic and technical considerations and the bureau's statutory mission. State whether all practicable means to avoid or minimize environmental harm from the alternative selected have been adopted, and, if not, why they were not.
- Include all program-specific requirements.
- Describe any relevant protest or appeal opportunities that may be applicable to the decision.

NPS-AR-000999

- The Responsible Official must sign and date the decision document.
- Provide notice of the signed decision document and associated environmental document.

When appropriate, the decision will be published at the same time as the EA or EIS is published.

9. <u>Applicant-Prepared and Contractor-Prepared EAs and EISs</u>

NEPA as amended allows for an applicant or an applicant-directed contractor to prepare an EA or EIS. Bureaus remain responsible for the accuracy, scope, and content of the EA or EIS and must independently evaluate and approve each such analysis before the bureau may rely on it. Bureaus may request more information, revise analysis methodologies, or choose not to rely on an EA or EIS prepared by an applicant or its contractor at any time. If the bureau determines that the EA or EIS submitted by an applicant or applicant-directed contractor does not meet the bureau's standards, the bureau should work with the applicant or applicant-directed contractor to improve the document with an objective of meeting the bureau's standards while meeting applicable statutory deadline. If necessary, the bureau may elect to complete the EA or EIS itself.

Applicant or applicant-directed contractor preparation of an EA or EIS occurs when the applicant either directly prepares an EA or EIS or the applicant hires a contractor and directs the contractor as its agent to prepare the EA or EIS. Applicant or applicant-directed preparation of an EA or EIS is thus different from circumstances where a bureau uses a bureau-directed contractor who may be funded by the applicant (an arrangement often referred to as "third party contracting"). Bureaus may also select and fund their own contractors to prepare environmental documents for bureau use.

For applicant or applicant-directed contractor prepared EAs and EISs, Responsible Officials should consider implementing the following best practices:
- *Early Coordination*. Early coordination with the applicant will improve efficiencies both before and after initiation of the NEPA process. Bureaus should coordinate with applicants as soon as applicants present an initial version of an application (e.g., application for permit to drill, application for a special recreation permit, application for a right-of-way, etc.), plan of operation, or plan of development. Bureaus should invite applicants to share drafts of their applications early for bureau input and suggestions for refinement. Bureaus should hold a kick-off meeting with the applicant to identify the information needed for a complete application package as well as respective roles and responsibilities for the bureau and the applicant as soon as practicable after the application is received. As part of early coordination, the bureau, cooperating agencies (if applicable) and the applicant should develop a schedule for the applicant to provide information during the application process and the bureau to complete data collection and to establish milestone steps in the NEPA process. Within 60 days of the initial review or meeting, the bureau will identify in writing any additional information needed from the applicant or applicant-directed contractor to initiate the NEPA process.
- *Outlining Responsibilities*. Early in the process, bureaus must engage with the applicant and provide written documentation outlining the bureau's expectations regarding roles, responsibilities, the project schedule, coordination, deliverables (including environmental information, draft and final documents), and supervision. It is recommended that bureaus

20

NPS-AR-001000

develop Memoranda of Understanding (MOUs) or other agreements with applicants and applicant-directed contractors to outline roles and responsibilities for all entities involved in the project. The MOU or other appropriate agreement should also describe the quality standards for the environmental analysis as well as any other applicable bureau-specific guidelines. These standards may require use of specific data sources or bureau-approved methodologies. The MOU or other agreement must provide for the applicant or applicant-directed contractor to certify that it will provide the bureau with all relevant supporting information, including all studies, surveys, and technical reports pertaining to the environment prepared by the applicant or applicant-directed contractor for the proposed action. The MOU or other agreement will also include a professional integrity statement from the applicant certifying that the environmental analysis will be prepared with professional and scientific integrity, using reliable data and resources, and will meet any relevant Federal information quality standards and bureau needs for decision-making. Close coordination with the bureau throughout the NEPA process will increase efficiency and improve the NEPA analysis.

- *Environmental Information*. Once bureaus have sufficient information to identify preliminary issues for analysis and resources that would be potentially affected, bureaus will, as appropriate, request that applicants provide environmental information necessary to inform the level of NEPA analysis. The environmental information may include inventories, surveys, or monitoring and written reports of any relevant results. Bureaus will specify any necessary survey or study protocols while identifying environmental information needed for analysis.

- *Determination of the level of NEPA Review Needed to Support Decision-Making.* To determine the appropriate level of NEPA review for the proposed action, the Responsible Official must have a complete project description and other necessary information, which may include written documentation of likely environmental effects. Bureaus will rely on program-specific requirements to determine what information is necessary for a complete project description.

- *Development of a project schedule.* Once the bureau has enough information to determine the appropriate level of NEPA review needed to support decision-making, the bureau will work with the applicant to develop a project schedule that meets the applicable statutory deadline for completing NEPA.

- *Acceptance of a complete application.* Once the above steps have been completed and the environmental information and reports have been completed, reviewed and evaluated, and accepted by bureau resource specialists, the bureau will accept the application as complete. No later than 30 days of receiving, evaluating, and accepting the information that the bureau identified in writing under "*early coordination,*" the bureau will initiate its NEPA process.

- *NEPA Analysis.* We recommend that the bureau remain in close coordination with the applicant or applicant-directed contractor throughout the NEPA process. This process can be set forth in the MOU or appropriate agreement, as well as in the project schedule.

*Evaluation*

Bureaus must independently evaluate and approve information and analysis provided by the applicant before the bureau may rely on it. To maintain the scientific quality and integrity of the

21

NPS-AR-001001

impact assessment, a bureau may confer with another bureau or cooperating agency if in-house subject matter experts are not available for technical evaluations.

- ***Evaluation of environmental information.*** The bureau must evaluate any environmental information provided by an applicant or applicant-directed contractor to determine if the information meets bureau program standards for professional and scientific integrity. The bureau must document the evaluation and its results.

  If a Responsible Official intends to rely on an applicant or applicant-directed contractor to prepare any of the following information, the Responsible Official must obtain and independently evaluate such information prior to initiating the NEPA process:
  - The purpose and need for the proposed action;
  - The proposed action and reasonable alternatives;
  - A public engagement plan (if appropriate);
  - Permits and authorizations required to implement the proposed action;
  - Any agencies the bureau might want to invite to be cooperating agencies;
  - The process for consultation with relevant Federal, State, Tribal, and local agencies to ensure compliance with environmental laws and regulations;
  - Other issues or resources that may warrant analysis in the EA or EIS, and a summary of any applicable analysis methodology; and
  - Schedule for preparation of the EA or EIS.

  Bureaus retain the responsibility for compliance with other laws and procedures that are inherently governmental such as NHPA Section 106, ESA Section 7, and government-to-government consultation. Bureaus are responsible for managing any cooperating or participating agency relationships.

  The Responsible Official must document the results of the bureau's independent evaluation of these elements, as applicable, for instance in a memorandum for the decision file.

- ***Evaluation of the Analysis in the EA or EIS.*** Once the applicant or applicant-directed contractor has completed the analysis for the EA or EIS, it must certify that the materials provided to the bureau—the EA or EIS, as well as all supporting documentation—are complete for the bureau's independent review and inclusion in its decision file. The bureau will evaluate the analysis and contents of the decision file and, if that evaluation indicates that the analysis satisfies professional integrity, scientific integrity, and program specific requirements, may accept the EA or EIS and analysis contained therein and review a draft FONSI or draft a FONSI, if appropriate, and a Record of Decision, Decision Record, or other appropriate decision document. The bureau will document its evaluation.

NPS-AR-001002



NPS-AR-001003

