

NPS-AR-001005

# 516 DM 1 – U.S. Department of the Interior Handbook of National Environmental Policy Act Implementing Procedures



## February 2026

NPS-AR-001006

Citations to this Handbook should be styled in the following format, using these specific citations as examples: DOI NEPA Handbook § 2.3(a)(3) or DOI NEPA Handbook Appendix § 2.

NPS-AR-001007

# TABLE OF CONTENTS

**PART 0—PURPOSE AND POLICY**
Section 0.1 Purpose and policy.                                          1
Section 0.2 Applicability.                                              1

**PART 1—NEPA AND AGENCY PLANNING**
Section 1.1 Determining when NEPA applies.                              2
Section 1.2 Determine the appropriate level of NEPA review.            3
Section 1.3 NEPA and agency decision-making.                           5
Section 1.4 Categorical exclusions.                                     6
Section 1.5 Environmental assessments.                                  7
Section 1.6 Findings of no significant impact.                         10
Section 1.7 Lead and cooperating agencies.                             10
Section 1.8 Notices of intent and scoping.                            11

**PART 2—ENVIRONMENTAL IMPACT STATEMENTS**
Section 2.1 Preparation of environmental impact statements.           12
Section 2.2 Purpose and need.                                         13
Section 2.3 Analysis within the environmental impact statement.       13
Section 2.4 Page limits.                                              14
Section 2.5 Deadlines.                                                15
Section 2.6 Publication of the environmental impact statement.        16

**PART 3—EFFICIENT ENVIRONMENTAL REVIEWS**
Section 3.1 Reliance on existing environmental documents              16
Section 3.2. Programmatic environmental impact statements or environmental assessments
        and tiering.                                                  17
Section 3.3 Publishing pre-decisional environmental documents.        19
Section 3.4 Combining documents.                                      19
Section 3.5 Incorporation by reference.                               19
Section 3.6 Supplements to environmental impact statements.           19
Section 3.7 Integrity and completeness of information.                20
Section 3.8 Integrating NEPA with other environmental requirements.   20
Section 3.9 Elimination of duplication with State, Tribal, and local procedures.  20
Section 3.10 Proposals for regulations.                               21
Section 3.11 Unique identification numbers.                           21
Section 3.12 Emergencies.                                             21

**PART 4—AGENCY DECISION-MAKING**
Section 4.1 Decision documents.                                       21
Section 4.2 Filing requirements.                                      22

NPS-AR-001008

**PART 5—PROCEDURES FOR APPLICANT-PREPARED AND CONTRACTOR-PREPARED ENVIRONMENTAL IMPACT STATEMENTS AND ENVIRONMENTAL ASSESSMENTS AND OTHER ENVIRONMENTAL DOCUMENTS**

Section 5.1 Procedures for applicant-prepared environmental impact statements and environmental assessments. ........ 22
Section 5.2 Using a bureau-directed contractor to prepare environmental documents. ........ 22

**PART 6—DEFINITIONS**
Section 6.1 Definitions. ........ 23

**PART 7—SEVERABILITY**
Section 7.1 Severability. ........ 26

**APPENDIX 1 - IMPLEMENTATION GUIDANCE TO BUREAUS**

1.  Scoping and Public Involvement ........ 27
2.  Categorical Exclusions (CE) and Extraordinary Circumstances Review Protocol ........ 31
3.  Using Existing NEPA Reviews ........ 33
4.  Analytical Elements Common to Environmental Assessments (EA) and Environmental Impact Statement (EIS) ........ 37
5.  Reasonably Foreseeable Effects of the Proposed Action and Any Action Alternatives. ........ 41
6.  Significance, including Reaching a Finding of No Significant Impact (FONSI) ........ 42
7.  Formal Aspects of Environmental Documents ........ 44
8.  Documenting Decisions ........ 46
9.  Applicant-Prepared and Contractor-Prepared EAs and EISs ........ 47
10.  Cooperating Agencies ........ 50

**APPENDIX 2 - BUREAU CATEGORICAL EXCLUSIONS**

Office of Native Hawaiian Relations ........ 54
U.S. Fish and Wildlife Service (Service) ........ 54
U.S. Geological Survey (USGS) ........ 57
Bureau of Indian Affairs (BIA) ........ 59
Bureau of Land Management (BLM) ........ 64
National Park Service (NPS) ........ 85
Office of Surface Mining Reclamation and Enforcement (OSMRE) ........ 90
Bureau of Reclamation (USBR) ........ 92
Bureau of Ocean Energy Management (BOEM), Bureau of Safety and Environmental Enforcement (BSEE) ........ 96
Categorical Exclusions Adopted from Other Agencies ........ 99

**PART 0—PURPOSE AND POLICY**

Section

0.1      Purpose and policy.

0.2      Applicability.

**Section 0.1 Purpose and policy.**

The purpose of these procedures is to integrate compliance with the National Environmental Policy Act (NEPA) into bureau decision-making processes. Specifically, the procedures: describe how bureaus determine what actions are subject to NEPA's procedural requirements and the appropriate level of NEPA review where applicable; ensure that relevant environmental information, including, as appropriate, economic information, is identified and considered early in the process to ensure informed decision-making; enable bureaus to conduct coordinated, consistent, predictable and timely environmental reviews; reduce unnecessary burdens and delays; and implement NEPA's mandates regarding lead, joint-lead, participating Federal and cooperating agency roles and responsibilities, page and time limits, and preparation of environmental impact statements or environmental assessments by applicants or applicant-directed contractors under Federal agency supervision.[1]

(a) *Procedural and Interpretive Guidance.* This document, along with 43 CFR Part 46, sets forth the Department of the Interior (DOI or Department) procedures for implementing NEPA. It further explains the Department's interpretation of certain key terms in NEPA. It does not, nor does it intend to, govern the individual rights and obligations of either regulated entities or persons. Additionally, this Handbook focuses only on the procedures governing bureau compliance with NEPA; in addition to the procedures set forth in this Handbook, bureaus must continue to comply with the requirements of other applicable laws and regulations and should comply with applicable policies.

(b) *Consultation with the Council on Environmental Quality*. In addition to the process for establishing or revising categorical exclusions set forth in section 1.4(b) and (d), the Department will consult with the Council while developing or revising its NEPA implementing procedures, in accord with NEPA section 102(2)(B), 42 U.S.C. section 4332(B).

**Section 0.2 Applicability.**

(a) *Applicability*. This Handbook is applicable to all DOI bureaus, as bureau is defined in 6.1.

(b) *Authority*. NEPA imposes certain procedural requirements on the exercise of the Department's legal authority in relevant circumstances. Nothing contained in these procedures is intended or should be construed to abrogate or limit the Department's other authorities or legal responsibilities.

---

[1] This Handbook is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or equity by a party against the United States, its departments, agencies, instrumentalities or entities, its officers or employees, or any other person. Although the Handbook may in places restate statutory or regulatory requirements, the procedures in this Handbook themselves do not have the force or effect of law.

1

**PART 1—NEPA AND AGENCY PLANNING**

Section

1.1        Determining when NEPA applies.
1.2        Determining the appropriate level of NEPA review.
1.3        NEPA and agency decision-making.
1.4        Categorical exclusions.
1.5        Environmental assessments.
1.6        Findings of no significant impact.
1.7        Lead and cooperating agencies.
1.8        Notices of intent and scoping.

**Section 1.1 Determining when NEPA applies.**

(a) The Responsible Official may document a determination that NEPA does not apply to a proposed action when:

(1) The activities or decision do not result in final agency action under the Administrative Procedure Act, *see* 5 U.S.C. section 704, or other relevant statute that also includes a finality requirement;

(2) The proposed action is expressly exempted from NEPA by law;

(3) Compliance with NEPA would clearly and fundamentally conflict with the requirements of another provision of law;

(4) A statute has prescribed direction with sufficient completeness and precision that the bureau retains no residual discretion to take environmental factors into consideration when determining whether to take the proposed action;

(5) The proposed action is an action for which another statute's requirements serve the function of the DOI bureau's compliance with NEPA; or

(6) The proposed action is not a "major Federal action."

(i) The terms "major" and "Federal action," each have independent force. NEPA applies only when both criteria are met. Such a determination is bound up in the facts and circumstances of each individual situation and is thus reserved to the judgment of the bureau in each instance.

(ii) NEPA does not apply to non-Federal actions. Therefore, for example, under the terms of the statute, NEPA does not apply to actions with no or minimal Federal funding, or with no or minimal Federal involvement where a Federal agency cannot control the outcome of the project. NEPA section 111(10)(B)(i), 42 U.S.C. section 4336e(10)(B)(i). Control over only a small part of an action is generally not sufficient to make an action "Federal" such that a NEPA obligation attaches.

(iii) In addition to the illustrative general categories set forth in NEPA section 111(10), 42 U.S.C. section 4336 e (10), bureaus have determined that the following non-exhaustive list of activities presumptively do not require preparation of an environmental document because they may not be major Federal actions and usually do not have significant environmental effects:

2

(A) All functions of the Office of Natural Resources Revenue including, but not limited to, such activities as: approval of royalty payment procedures, including royalty oil contracts; and determinations concerning royalty quantities and values, such as audits, royalty reductions, collection-procedures, reporting procedures, and any actions taken regarding royalty collections (including similar actions, relating to net profit and windfall profit taxes).

(B) All functions of the Bureau of Trust Funds Administration including, but not limited to, managing and disbursing the financial assets of American Indians held in trust by the Department, and maintaining the official archive of American Indian Records.

(C) Development of a National Outer Continental Shelf Oil and Gas Leasing Program by the Bureau of Ocean Energy Management and associated approval by the Secretary of the Interior. 43 U.S.C. section 1344.

(D) Certain decisions made by the U.S. Fish and Wildlife Service under the Endangered Species Act (ESA) do not require preparation of an environmental document under NEPA:

   (i)    Determinations whether a species should be listed as threatened or endangered;

   (ii)   Determinations that a species should be delisted;

   (iii)  Determinations that a species should be reclassified as threatened or endangered; and

   (iv)   Determinations whether to designate, amend, or rescind critical habitat;

   (v)    Creating protective regulations for threatened species pursuant to ESA section 4(d) that are promulgated concurrently with ESA section 4(a) decisions.

(7) The issuance or update of the Department's NEPA procedures is not subject to NEPA review.

(b) In determining whether NEPA applies to a proposed agency action, the Department should consider only the proposed action, not other actions or activities carried out by third parties.

**Section 1.2 Determine the appropriate level of NEPA review.**

(a)   If the Responsible Official determines under section 1.1 that NEPA applies to a proposed action, the Responsible Official should determine the appropriate level of NEPA review, exercising discretion as appropriate for its particular proposed action, in the following sequence and manner. At all steps in the following process, the Responsible Official should consider the proposed action and its effects.

(1) If the bureau has established, or adopted pursuant to NEPA section 109, 42 U.S.C. section 4336c, a categorical exclusion that covers the proposed action, the Responsible Official should apply the categorical exclusion, where determined appropriate, pursuant to 43 CFR 46.205.

(2) If another agency has already established a categorical exclusion that covers the proposed action and the bureau has not yet adopted it pursuant to NEPA section 109, 42 U.S.C. section 4336c, the bureau should consider whether to adopt that categorical exclusion pursuant to section 1.4(c) so that it can be applied to the proposed action at issue, and to future activities or decisions of that type, pursuant to section 1.4(e).

(3) If the proposed action warrants the establishment of a new categorical exclusion, or the revision of an existing categorical exclusion, pursuant to section 1.4(b), the bureau should consider whether to establish or revise, and then may apply the categorical exclusion to the proposed action pursuant to section 1.4(e), if appropriate. To establish a new or revise an existing categorical exclusion, the bureau must work with the Department and follow the procedures at 43 CFR 46.205(h).

(4) If the Responsible Official cannot apply a categorical exclusion to the proposed action consistent with paragraphs (a)(1)-(a)(3), the Responsible Official will prepare an environmental assessment or environmental impact statement before issuing any decision to authorize the proposed action.

(5) When preparing an environmental assessment or an environmental impact statement, the bureau should analyze the reasonably foreseeable effects of the proposed action consistent with the definition of "effects" in section 6.1(k), and reasonable alternatives consistent with paragraph (b), and:

  (i) Should develop an environmental assessment, as described in section 1.5, if it is not reasonably foreseeable that the proposed action would have significant effects on the quality of the human environment or the significance of the reasonably foreseeable effects is unknown; or

  (ii) Will develop an environmental impact statement, as described in part 2 of this Handbook, if it is reasonably foreseeable that the proposed action would likely have significant effects on the quality of the human environment.

(b)   When considering whether the reasonably foreseeable effects of the proposed action or action alternatives would be significant, the Responsible Official should focus only on adverse environmental effects, considering any beneficial effects that directly offset those adverse effects to that specific resource value, and compare them to the potentially affected environment and evaluate the degree of the anticipated effects of the action. A Responsible Official may use any reliable data source, consistent with Secretary's Order 3441, *Implementing the Requirements of Executive Order 14303, Restoring Gold Standard Science* and should not undertake new research unless it is essential to evaluating alternatives or the significance of the impact, and the cost and time of obtaining it are not unreasonable.

  (1) In considering the potentially affected environment, the Responsible Official should consider, as appropriate to the proposed action, any connected actions, the scope of the affected area (national, regional, or local), reasonably foreseeable trends and planned actions within that area, and the affected area's natural and cultural resources.

  (2) In considering the degree of the effects, the Responsible Official should also consider the following criteria, as appropriate to the proposed action:

  (i) Both short- and long-term effects;

(ii) Both beneficial and adverse effects;

(iii) Effects on public health and safety;

(iv) Economic effects; and

(v) Effects on the quality of life of the American people.

**Section 1.3 NEPA and agency decision-making.**

(a) Responsible Officials should integrate the NEPA process with other planning, funding, permitting, and authorization processes at the earliest reasonable time to avoid delays and ensure that the bureau considers environmental effects in its planning and decisions.

(b) *Limitations on actions during the NEPA process*.

(1) While a NEPA review is ongoing, a bureau will take no action concerning the proposed action that:

(i) limits the choice of reasonable alternatives; or.

(ii) is not independently justified and accompanied by an adequate environmental review. During the preparation of an environmental impact statement or environmental assessment evaluating a program or plan, the Responsible Official may implement any major Federal action when that action is within the scope of, and analyzed in, an existing environmental impact statement or environmental assessment supporting the current plan or program, or can be approved in reliance on a categorical exclusion, so long as there is adequate environmental analyses and documentation to support the individual action.

(c) *Actions developed in response to third-party applications*. Acceptance for review of an application or proposal submitted by a third party for bureau consideration may result in the bureau proposing an action that requires preparation of an environmental assessment or environmental impact statement. Any such environmental assessment or environmental impact statement can be prepared by a bureau or bureau contractor, or by the applicant or a contractor directed by the applicant under bureau supervision. Bureau procedures for applicant-prepared environmental assessments and environmental impact statements are included in part 5 of this Handbook and 43 CFR 46.107. Where the proposed action consists of approval of an application for funding or implementation of a project, the Responsible Official should:

(1) coordinate with the applicant as early as reasonable to inform the entity what information the bureau requires to comply with NEPA, including to initiate the NEPA process.

(2) Establish a schedule for the applicant to provide information during the application process and the bureau to complete data collection and to establish milestone steps in the NEPA process, which are consistent with NEPA's statutory deadlines and any internal bureau NEPA schedule requirements; and

(3) determine whether NEPA applies, as described in section 1.1, and if it does, determine the appropriate level of NEPA review, as described in section 1.2, as soon as practicable after receiving the complete application.

(4) independently evaluate the environmental document and take responsibility for the contents.

(5) If a bureau is considering an application from a non-Federal entity and becomes aware that the applicant is about to take an action within the bureau's jurisdiction that would meet either of the criteria in section 1.3(b), the bureau should promptly notify the applicant that the bureau will take appropriate action to ensure that the objectives and procedures of NEPA are achieved. This section does not preclude development by applicants of plans or designs or performance of other activities necessary to support an application for Federal, State, Tribal, or local permits or assistance.

(d) *Rulemaking*. For informal rulemaking conducted pursuant to the Administrative Procedure Act, 5 U.S.C. section 553, if a bureau seeks public comment on an environmental assessment or draft finding of no significant impact or an environmental impact statement that evaluates the effects of a proposed rule, any such public comment period should generally run concurrently with the public comment period for the proposed rule.

(e) Mitigation

(1) *Authority for mitigation*. While NEPA requires bureaus to consider reasonable mitigation measures, it does not require bureaus to evaluate or select any specific form of mitigation. In addition, NEPA itself does not authorize bureaus to approve or implement mitigation; any such authority must be provided by other applicable laws.

(2) *Considering mitigation measures in NEPA reviews*.

(i) *Bureau proposed action*. The review of the proposed action and any alternatives must include review of the environmental effects of the proposed action and alternatives as well as the environmental effects of mitigation measures or best management practices considered. The environmental effects of mitigation measures can be reviewed either as elements of alternatives or in a separate discussion of mitigation.

(ii) *Bureau-proposed action regarding an application for Federal authorization*. An application presented to a bureau for NEPA review prior to any approval must include any elements (including stipulations, conditions, or best management practices) designed to reduce or preclude adverse environmental effects that are required to make the application conform to applicable legal requirements, as well as any such design elements the applicant may volunteer to include. Further, the environmental effect of any mitigation measures in addition to such elements designed to reduce or preclude adverse environmental effects that the applicant includes in the application whether by requirement or choice should also be subjected to NEPA review. This NEPA review can be structured as consideration of alternatives to approving the application or as consideration of separate mitigation measures to be imposed on any alternative selected for implementation.

## Section 1.4 Categorical exclusions.

(a) *Generally.* This section describes the process that bureaus use for establishing and revising categorical exclusions, for adopting other agencies' categorical exclusions, and for applying categorical exclusions to a proposed action. Categorical exclusions available to bureaus— including CEs established and substantiated consistent with Department NEPA procedures, legislatively established or directed CEs, and CEs adopted from other agencies—are listed in 43 CFR 46.210 or in bureau-specific lists provided in Appendix 2.

(b) *Establishing and revising categorical exclusions. See* 43 CFR 46.205(h).

NPS-AR-001015

(c) *Adopting categorical exclusions from other Federal agencies.* Consistent with NEPA section 109, 42 U.S.C. § 4336c, a bureau may adopt a categorical exclusion listed in another agency's NEPA procedures. When adopting a categorical exclusion, the bureau will:

   (1) Consult with the agency that established the categorical exclusion to ensure that the proposed adoption of the categorical exclusion is appropriate; and

   (2) Publish notice in the Federal Register that the bureau is adopting the categorical exclusion, including a brief description of the proposed action or category of proposed actions to which the bureau intends to apply the adopted categorical exclusion.

(d) *Removal of categorical exclusions. See* 43 CFR 46.205(i).

(e) *Applying categorical exclusions. See* 43 CFR 46.205. If a bureau modifies a proposed action by incorporating design elements that reduce or eliminate adverse impacts to resource values, the modified proposal is considered a new proposal for categorical exclusion consideration under DOI NEPA procedures. Considering the modified proposal a "new proposal" for purposes of categorical exclusion consideration does not require starting over with other aspects of the NEPA review. A bureau must evaluate the proposed action for the presence of any of the extraordinary circumstances listed at 43 CFR 46.215 before that bureau relies on a categorical exclusion.

(f) *Documentation of categorical exclusion determinations.* When the Responsible Official relies on a categorical exclusion to fulfill bureau obligations under NEPA, the Responsible Official will document its evaluation of the applicability of a categorical exclusion if required by law, regulation, or as specified in DOI or bureau policy.

(g) *Reliance on categorical exclusion determinations of other agencies. See* 43 CFR 46.205(e) and Appendix 1 § 3.

(h) *Applying multiple categorical exclusions. See* 43 CFR 46.205(f) and Appendix 1 § 2.

(i) *List of categorical exclusions. See* 43 CFR 46.210 and Appendix 2.

(j) Appendix 2 of this Handbook lists categorical exclusions that are available for use by each bureau.

(k) *Use of other bureau categorical exclusions. See* 43 CFR 46.205(g) and Appendix 1 § 2.

**Section 1.5 Environmental assessments.**

(a) *Generally.* Bureaus should prepare environmental assessments for actions described in 1.2(a)(5)(i). Bureaus should be mindful of statutory direction that environmental assessments are to be "concise." NEPA § 106(b)(2); 42 U.S.C. § 4336(b)(2).

(b) *Elements.* To provide evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact, environmental assessments will:

   (1) Briefly discuss the:

      (i) Purpose and need for the proposed action based on the bureau's statutory authority. When the proposed action concerns the bureau's duty to act on an application for authorization, the purpose and need for the proposed action will also be informed by the goals of the applicant;

(ii) The proposed action and alternatives to the extent required by NEPA section 102(2)(H), 42 U.S.C. § 4332(2)(H); and

(iii) The reasonably foreseeable effects of the proposed action and any action alternatives.

(c) *Scope of analysis*.

(1) In preparing the environmental assessment, the bureau should focus its analysis on those environmental effects of the proposed action that may be significant.

(2) Similarly, the bureau should document in the environmental assessment where and how it drew a reasonable and manageable line relating to its consideration of any environmental effects from the proposed action that extend outside the geographical territory of the project or might materialize later in time.[2]

(3) To the extent it assists in reasoned decision-making, the bureau may, but is not required to by NEPA, analyze environmental effects from other projects separate in time, or separate in place, or that fall outside of the bureau's regulatory authority, or that would have to be initiated by a third party. If the bureau determines that such analysis would assist it in reasoned decision-making regarding the proposed action, it should document this determination in the environmental assessment and explain where it drew a reasonable and manageable line relating to the consideration of such effects from such separate projects.

(d) *Page limits*.

(1) The text of an environmental assessment must not exceed 75 pages, not including citations or appendices.

(2) Appendices are to be used for voluminous materials, such as scientific tables, collections of data, statistical calculations, and the like, which substantiate the analysis provided in the environmental assessment.

(3) Environmental assessments should be formatted for an 8.5"x11" page with one-inch margins in an electronic or paper format with 12-point proportionally spaced font, single spaced. Footnotes may be in 10-point font. Such size restrictions do not apply to explanatory maps, diagrams, graphs, tables, and other means of graphically displaying quantitative or geospatial information, although pages containing such material do count towards the page limit. When an item of graphical material is larger than 8.5"x11", each such item counts as one page. Pages do not include citations or appendices.

(4) *Certification Related to Page Limits*. The breadth and depth of analysis in an environmental assessment should be tailored to ensure that the environmental analysis does not exceed this page limit. In this regard, as part of the finalization of the environmental assessment, the Responsible Official should certify (and the certification should be incorporated into the environmental assessment) that the bureau has considered the factors mandated by NEPA; that the environmental assessment represents the bureau's good-faith effort to prioritize documentation of the most important considerations required by the statute within the congressionally mandated page limits; that this prioritization reflects the bureau's expert judgment; and that any considerations addressed briefly or left unaddressed were, in the bureau's judgment, comparatively not of a substantive nature that meaningfully

---

[2] *Seven County Infrastructure Coalition v. Eagle County, Colorado*, 605 U.S. 168 (2025).

informed the consideration of environmental effects and the resulting decision on how to proceed.

(e) *Deadlines*. Bureaus should complete environmental assessments in a prompt and timely manner. Prompt and timely *completion* of environmental assessments requires, at a minimum, compliance with the statutory deadlines set by NEPA section 107(g), 42 U.S.C. § 4336a, or NEPA section 112, 42 U.S.C. § 4336f, as applicable, subject only to the rare case where an extension of that deadline is warranted, as described below.

(1) For proposed actions initiated in response to a third-party application or proposal, bureaus should document their receipt of an application or other written proposal, or any initial meeting with the third party. Within 60 days of receiving an application or proposal, or holding an initial meeting, the bureau should request in writing any additional information that it needs from the third party to initiate the NEPA process, unless a longer period is determined necessary by a policy maker in the Department in consultation with the Department's Office of the Solicitor. No later than 30 days after receiving that information, the bureau should initiate its NEPA process as described in paragraph (2) below.

(2) For environmental assessments subject to NEPA section 107(g), the bureau should complete the environmental assessment not later than the date that is 1 year after the earliest of the following dates:

  (i)  the date on which the Responsible Official determine that NEPA requires preparation of an environmental assessment for the proposed action;

  (ii) the date on which the Responsible Official notifies an applicant that the application for a right-of-way (ROW) is complete; or

  (iii) the date on which the bureau issues a notice of intent (NOI) for the proposed action.

(3) Where a project sponsor has paid the fee for expedited environmental review under NEPA section 112, 42 U.S.C. § 4336f, the bureau will complete the environmental assessment not later than the date that is 180 days after the payment of the fee by the project sponsor.

(4) The completion date for an environmental assessment is the issuance of the environmental assessment, or in the case of an environmental assessment issued for public review followed by a revised environmental assessment, the issuance date of the revised environmental assessment.

(5) The environmental assessment or revised environmental assessment in the case of an environmental assessment issued for public review, will issue (unless the deadline is extended pursuant to the provision below), at the latest, on the day the deadline elapses, in as substantially complete form as is possible.

(6) *Deadline extensions*. Bureaus should, to the maximum extent practicable, endeavor to meet the deadline prescribed by NEPA section 107(g)(1)(B), 42 U.S.C. § 4336a(g)(1)(B). To accomplish this goal, bureaus should develop schedules for their environmental assessments, monitor those schedules, and revise them as necessary. If a bureau finds, upon developing or revising its schedule, that it is unlikely to meet the statutory deadline, it should confer with the Office of the Solicitor to identify options for expediting its preparation of an environmental assessment. After conferring with the Office of the

Solicitor, if a bureau concludes that it is essential to seek additional time, it must consult with the applicant, if any, pursuant to NEPA section 107(g)(2), 42 U.S.C. § 4336a(g)(2). After any such consultation, and for cause stated, the bureau may recommend a new deadline to the Office of the Deputy Secretary for review and approval. Cause for establishing a new deadline is only established if the environmental assessment is so incomplete, at the time at which the bureau determines it is not able to meet the statutory deadline, that issuance pursuant to subsection (5) above would, in the bureau's view, result in an inadequate analysis. Any such new deadline should provide only so much additional time as is necessary to complete the environmental assessment.

(7) *Certification Related to Deadline.* When the environmental assessment is published, the Responsible Official should certify (and the certification should be incorporated into the environmental assessment) that the resulting environmental assessment represents the bureau's good-faith effort to fulfill NEPA's requirements within the congressional timeline; that such effort is substantially complete; that, in the bureau's expert opinion, it has thoroughly considered the factors mandated by NEPA; and that, in the bureau's judgment, the analysis contained therein is adequate to inform and reasonably explain bureau's decision regarding the proposed Federal action.

## Section 1.6 Findings of no significant impact.

(a) The Responsible Official will prepare a finding of no significant impact if the Responsible Official determines, based on the environmental assessment, not to prepare an environmental impact statement because the proposed action would not have significant effects. The finding of no significant impact should:

(1) Include the environmental assessment or incorporate it by reference;

(2) State and document the reasons why the Responsible Official has determined that the selected alternative would not have a significant effect on the quality of the human environment;

(3) State the authority for and describe any mitigation that the Responsible Official has adopted and any applicable monitoring or enforcement provisions. If the Responsible Official finds that the proposed action will not have significant effects due to mitigation, the mitigated finding of no significant impact will identify the mitigation measures that will be undertaken to avoid significant effects and the mechanisms to ensure their implementation.

(b) The bureau should make environmental assessments, any mitigation commitments, and findings of no significant impact available on a public website.

## Section 1.7 Lead and cooperating agencies.

A proposed action may involve multiple Federal agencies (*e.g.*, where multiple Federal authorizations are required with respect to a project sponsor's overall purpose and goal). When multiple agencies are involved in a proposed action, the agencies shall determine which of them will be the lead agency pursuant to the criteria identified in NEPA section 107(a)(1)(A), 42 U.S.C. § 4336a(a)(1)(A). When serving as the lead agency, a bureau is ultimately responsible for completing the NEPA process. When a joint lead relationship is established pursuant to NEPA section 107(a)(1)(B), 42 U.S.C. § 4336a(a)(1)(B), the bureau and the other joint lead agency or agencies are collectively responsible for completing the NEPA process.

NPS-AR-001019

(a) *How to designate lead agencies*. *See* 43 CFR 46.220.

(b) *How to select cooperating agencies*. *See* 43 CFR 46.225.

**Section 1.8 Notices of intent and scoping.**

(a) When a proposed action cannot be categorically excluded, the bureau should document the anticipated scope of environmental effects of the proposed action as a preliminary step to determining whether the bureau will prepare an environmental assessment or an environmental impact statement.

(b) *Notice of intent*. As soon as practicable after determining that a proposal is sufficiently developed to allow for meaningful public comment and requires an environmental impact statement, the bureau should publish in the Federal Register a notice of intent to prepare an environmental impact statement. If the Responsible Official intends to prepare an environmental assessment for a proposed action, the bureau may publish a notice of intent to prepare an environmental assessment.

(1) The notice of intent to prepare an environmental impact statement should include a description of the purpose and need for the proposed action, and a preliminary description of the proposed action and alternatives the environmental impact statement will consider and must include a request for public comment on alternatives or effects and on relevant information, studies, or analyses with respect to the proposed agency action. NEPA section 107(c); 42 U.S.C. § 4336a(c).

(2) The notice of intent for any environmental impact statement or environmental assessment may include:

(i) The purpose and need for the proposed action;

(ii) A brief summary of expected effects;

(iii) Anticipated permits and other authorizations (*i.e.*, anticipated connected actions);

(iv) A schedule for the decision-making process;

(v) A description of the public scoping process, including any scoping meetings;

(vi) Contact information for a person within the bureau who can answer questions about the proposed action and the environmental document; and

(vii) Identification of any cooperating and participating Federal agencies, and any information that such agencies require to facilitate their decisions or authorizations.

(c) *Scoping*. Bureaus should use an early and open process to determine the scope of issues for analysis in an environmental impact statement, including identifying substantive issues, which meaningfully inform the consideration of environmental effects and the resulting decision on how to proceed, and eliminating from further study non-substantive issues, and determining whether connected actions should be addressed in the same environmental document. Scoping may be used for an environmental assessment to identify issues that warrant assessment and issues that do not warrant assessment. Scoping should begin as soon as practicable after the proposal for action is sufficiently developed for consideration. Scoping may include appropriate pre-application procedures or work conducted prior to publication of the notice of intent, where applicable.

**PART 2—ENVIRONMENTAL IMPACT STATEMENTS**

Section

2.1        Preparation of environmental impact statements.
2.2        Purpose and need.
2.3        Analysis within the environmental impact statement.
2.4        Page limits.
2.5        Deadlines.
2.6        Publication of the environmental impact statements.

**Section 2.1 Preparation of environmental impact statements.**

(a) A bureau should prepare an environmental impact statement only with respect to proposed actions that the bureau reasonably foresees would have a significant effect on the quality of the human environment. NEPA section 106(b)(1); 42 U.S.C. § 4336(b)(1). Whether an impact rises to the level of "significant" is a matter for a bureau's expert judgment.

(b) During the preparation of an environmental impact statement, the Responsible Official:

(i) Will request the comments of:

(A) Any Federal agency that has jurisdiction by law or special expertise with respect to any environmental impact from the proposed action or is authorized to develop or enforce environmental standards that govern the proposed action, including cooperating agencies;

(B) Appropriate State, Tribal, and local agencies that are authorized to develop and enforce environmental standards.

(C) State, Tribal, or local governments that may be affected by the proposed action;

(D) Any agency that has requested it receive statements on actions of the kind proposed; and

(E) the applicant, if any.

(ii) May request the comments of the public, including by affirmatively soliciting comments in a manner designed to inform those persons or organizations who may be interested in or affected by the proposed action.

(c) This process of obtaining and requesting comments pursuant to (b) above may be undertaken at any time that is reasonable in the process of preparing the environmental impact statement and seek to provide 30 days, to the extent practicable. The bureau should ensure that the process of obtaining and requesting comments pursuant to (b) above, and the bureau's analysis of and response to those comments, does not cause the bureau to violate the congressionally mandated deadline for completion of an environmental impact statement.

(d) *Addressing Comments*. The bureau should address any substantive comments received consistent with paragraph (b) of this section in the environmental impact statement.

(e) Bureaus should provide information about their NEPA practice and environmental review documents for public comment through the following websites:

(i) Bureau of Ocean Energy Management
https://www.boem.gov/environment/environmental-assessment/nepa/national-environmental-policy-act-nepa

(ii) Bureau of Safety and Environmental Enforcement https://www.bsee.gov/what-we-do/environmental-compliance/environmental-programs/nepa-compliance

(iii) Bureau of Reclamation https://www.usbr.gov/nepa/

(iv) Office of Surface Mining Reclamation and Enforcement
https://www.osmre.gov/laws-and-regulations/nepa and https://www.osmre.gov/laws-and-regulations/nepa/projects

(v) National Park Service https://parkplanning.nps.gov

(vi) Bureau of Land Management https://eplanning.blm.gov

(vii) Indian Affairs https://www.bia.gov/service/nepa-compliance

(viii) U.S. Geological Survey https://www.usgs.gov/legal/nepa

(ix) U.S. Fish and Wildlife Service https://fws.gov/program/national-environmental-policy-act

(x) Office of Native Hawaiian Relations https://www.doi.gov/hawaiian

(xi) Office of Insular Affairs https://www.doi.gov/oia/NEPA-documentation

## Section 2.2 Purpose and need.

The statement should develop the purpose and need for the proposed action based on the bureau's statutory authority. When the proposed action concerns a bureau's duty to act on an application for authorization, the purpose and need for the proposed action should also be informed by the goals of the applicant.

## Section 2.3 Analysis within the environmental impact statement.

(a) The environmental impact statement will include a detailed statement on:

(1) reasonably foreseeable environmental effects of the proposed action;

(2) effects of any reasonably foreseeable adverse environmental effects which cannot be avoided should the proposal be implemented;

(3) a reasonable range of alternatives to the proposed action, including an analysis of any positive or beneficial environmental impacts of implementing the proposed action or any reasonable alternatives, that, in the bureau's expert judgment, are technically and economically feasible, and meet the bureau's purpose and need for action and are within the bureaus' legal authority to implement;

(4) the relationship between local short-term uses of the human environment and the maintenance and enhancement of long-term productivity;

(5) any irreversible and irretrievable commitments of Federal resources which would be involved in the proposed action should it be implemented; and

NPS-AR-001022

(6) Any means identified to mitigate adverse environmental effects of the proposed action. Bureaus are mindful that NEPA itself does not require or authorize a Responsible Official to impose any mitigation measures.

(b) *Scope of analysis*.

(1) In preparing the environmental impact statement, the bureau should focus its analysis on whether the environmental effects of the proposed action are significant.

(2) Similarly, the bureau should document in the environmental impact statement where and how it drew a reasonable and manageable line relating to its consideration of environmental effects from the proposed action that extend outside the geographical territory of the project or might materialize later in time.

(3) To the extent it assists in reasoned decision-making, the bureau may, but is not required to by NEPA, analyze environmental effects from other projects separate in time, or separate in place, or that fall outside of the bureau's regulatory authority, or that would have to be initiated by a third party. If the bureau determines that such analysis would assist it in reasoned decision-making regarding the proposed action, it should document this determination in the environmental impact statement and explain where it drew a reasonable and manageable line relating to the consideration of such effects from such separate projects.

(c) *Proportionate analysis*. Environmental impact statements should discuss effects in proportion to their significance. With respect to issues that are not significant, there should be no more than a brief discussion to explain why those issues are not significant and therefore do not warrant further analysis. Environmental impact statements should be analytic, concise, and no longer than necessary to comply with NEPA consistent with its page limits and deadlines.

## Section 2.4 Page limits.

(a) *Page limits*. Except as provided in paragraph (b), the text of an environmental impact statement will not exceed 150 pages, not including citations or appendices.

(b) An environmental impact statement for a proposed action of extraordinary complexity may not exceed 300 pages, not including any citations or appendices. The Responsible Official should determine at the earliest possible stage of preparation of an environmental impact statement whether the conditions for exceeding the page limit in paragraph (a) are present.

(c) Appendices are to be used for voluminous materials, such as scientific tables, collections of data, statistical calculations, and the like, which substantiate the analysis provided in the environmental impact statement.

(d) Environmental impact statements should be formatted for an 8.5"x11" page with one-inch margins in an electronic or paper format with 12-point proportionally spaced font, single spaced. Footnotes may be in 10-point font. Such size restrictions do not apply to explanatory maps, diagrams, graphs, tables, and other means of graphically displaying quantitative or geospatial information, although pages containing such material do count towards the page limit. When an item of graphical material is larger than 8.5"x11", each such item counts as one page. Pages do not include citations or appendices.

(e) *Certification Related to Page Limits*. The breadth and depth of analysis in an environmental impact statement should be tailored to ensure that the environmental impact

statement does not exceed these page limits. In this regard, as part of the finalization of the environmental impact statement, the Responsible Official should certify (and the certification should be incorporated into the environmental impact statement) that the bureau has considered the factors mandated by NEPA; that the environmental impact statement represents the bureau's good-faith effort to prioritize documentation of the most important considerations required by the statute within the congressionally mandated page limits; that this prioritization reflects the bureau's expert judgment; and that any considerations addressed briefly or left unaddressed were, in the bureau's judgment, comparatively unimportant or frivolous.

**Section 2.5 Deadlines.**

Bureaus should complete environmental impact statements in a prompt and timely manner. Prompt and timely completion of environmental impact statements requires, at a minimum, compliance with the statutory deadlines set by NEPA section 107(g), 42 U.S.C. § 4336a(g), subject only to the rare case where an extension of that deadline is warranted, as described below, or NEPA section 112, 42 U.S.C. § 4336f, as applicable.

(a) For proposed actions initiated in response to a third-party application or proposal, bureaus should document their initial receipt of an application or other written proposal, or any initial meeting with the third party. No later than 60 days of that initial review or meeting, the bureau should request, in writing, any additional information that it needs from the third party to initiate the NEPA process. No later than 30 days of receiving that information, the bureau should initiate its NEPA process as described in paragraph (b) below.

(b) For environmental impact statements subject to NEPA section 107(g), the bureau should complete and issue the environmental impact statement not later than the date that is 2 years after the earliest of the following dates:
    (1) the date on which the Responsible Official determines that NEPA requires preparation of an environmental impact statement for the proposed action,
    (2) the date on which the Responsible Official notifies an applicant that the application for a ROW is complete, or
    (3) the date on which the bureau issues a notice of intent (NOI) for the proposed action.

(c) Where a project sponsor has paid a fee for expedited environmental review under NEPA section 112, the bureau will complete the environmental impact statement not later than the date that is 1 year after the bureau issues an NOI.

(d) The environmental impact statement will publish (unless the deadline is extended pursuant to the provision below) on the day the deadline elapses, in as substantially complete form as is possible.

(e) Bureaus should, to the maximum extent practicable, endeavor to meet the deadline prescribed by NEPA section 107(g)(1)(A), 42 U.S.C. § 4336a(g)(1)(A), or NEPA section 112, 42 U.S.C. § 4336f, as applicable. To accomplish this goal, bureaus, working with lead and cooperating agencies and the project applicant, if any, should develop schedules for their environmental impact statements, monitor those schedules, and revise them as necessary. If a bureau finds, upon developing or revising its schedule, that it is unlikely to meet the statutory deadline, it should confer with the Office of the Solicitor to identify options for expediting its preparation of an environmental impact statement. After conferring with the Office of the Solicitor, if a bureau concludes that it is essential to seek additional time, it must consult with

the applicant, if any, pursuant to NEPA section 107(g)(2), 42 U.S.C. § 4336a(g)(2). After any such consultation, and for cause stated, the bureau may recommend a new deadline to the Office of the Deputy Secretary for review and approval. Cause for establishing a new deadline is only established if the environmental impact statement is so incomplete, at the time at which the bureau determines it is not able to meet the statutory deadline, that issuance pursuant to subsection (d) above would, in the bureau's view, result in an inadequate analysis. Any such new deadline must provide only so much additional time as is necessary to complete the environmental impact statement.

(f) *Certification Related to Deadlines.* When the environmental impact statement is published, the Responsible Official should certify (and the certification should be incorporated into the environmental impact statement) that the resulting environmental impact statement represents the bureau's good-faith effort to fulfill NEPA's requirements within the Congressional timeline; that such effort is substantially complete; and that, in the bureau's expert opinion, it has thoroughly considered the factors mandated by NEPA; and that, in the bureau's judgment, the analysis contained therein is adequate to inform and reasonably explain bureau's decision regarding the proposed Federal action.

## Section 2.6 Publication of the environmental impact statement.

The Responsible Official should make the entire environmental impact statement available by publishing it on a public website and a notice in the Federal Register through the process managed by the Environmental Protection Agency (EPA), Federal Activities Division.


## PART 3—EFFICIENT ENVIRONMENTAL REVIEWS

Section
3.1      Reliance on existing environmental documents
3.2      Programmatic environmental impact statements or environmental assessments and tiering.
3.3      Publishing pre-decisional documents.
3.4      Combining documents.
3.5      Incorporation by reference.
3.6      Supplemental environmental impact statements.
3.7      Integrity and completeness of information.
3.8      Integrating NEPA with other environmental requirements.
3.9      Elimination of duplication with State, Tribal, and local procedures.
3.10     Proposals for regulations.
3.11     Unique identification numbers.
3.12     Emergencies.


## Section 3.1 Reliance on existing environmental documents

If a proposed action has been adequately evaluated in an earlier environmental impact statement or environmental assessment, the Responsible Official may prepare a Determination of NEPA Adequacy (DNA), memorandum to file, or other writing to document that a proposed action is adequately analyzed in an existing environmental impact statement or environmental assessment. Before using existing NEPA analysis, the Responsible Official should reevaluate the analysis to

16
NPS-AR-001025

ensure the analysis and assumptions to be relied upon remain valid, considering whether any new and substantial information or circumstances not previously analyzed may result in substantially different environmental effects. The Responsible Official should document this reevaluation including the basis for the determination that the existing analysis adequately assesses the environmental effects of the new proposed action, and the analysis and assumptions remain valid.

(a) Generally. The bureau may rely on an environmental impact statement, environmental assessment, or portion thereof, provided that the statement, assessment, or portion thereof meets the standards for an adequate statement or assessment under these procedures. When relying on an environmental impact statement, environmental assessment, or portion thereof, the bureau should cite the document, briefly describe the content and relevance to the environmental document, and may make modifications that are necessary to render the relied-upon document, or portion thereof, fit for fulfilling NEPA's analytic requirements for evaluating the environmental effects of the proposed action and reasonable alternatives.

(b) Substantial Similarity.

(1) If the actions covered by the original environmental impact statement or environmental assessment and the proposed action are substantially the same, the bureau may, and generally will, republish the relied-upon statement or assessment.

(2) If the previously analyzed and proposed actions are not substantially the same, the bureau may modify the statement or assessment as necessary to render the statement fit for fulfilling NEPA's analytic requirements for evaluating the environmental effects of the proposed action and reasonable alternatives, and publish the relied-upon statement or assessment, as modified. Where appropriate, the bureau may solicit comment to the extent that solicitation of comment would assist the bureau in expeditiously adapting the relied-upon statement or assessment so that it is fit for the bureau's purposes.

**Section 3.2. Programmatic environmental impact statements or environmental assessments and tiering.**

(a) Bureaus may prepare environmental documents for programmatic Federal actions, such as new agency programs. Bureaus may evaluate programmatic Federal actions in one of the following ways:

(1) Geographically, including actions occurring in the same general location, such as body of water, region, or metropolitan area.

(2) By type of action, including actions that have relevant similarities, such as common timing, effects, alternatives, methods of implementation, media, or subject matter.

(3) By stage of technological development.

(b) A Responsible Official may rely on analysis included in a programmatic environmental impact statement or programmatic environmental assessment for which judicial review was available to support a decision on a new proposed action as follows:

(1) If the bureau initiates NEPA review of a proposed action fewer than five years after a bureau has issued a programmatic environmental impact statement or environmental assessment, the Responsible Official may rely on the analysis in the programmatic

environmental impact statement or environmental assessment without additional NEPA review if the Responsible Official determines there are no substantial new circumstances or information about the significance of adverse effects that bear on the analysis.

(2) If the bureau initiates NEPA review on a new proposed action more than five years after an agency has issued a programmatic environmental impact statement or environmental assessment, the Responsible Official may rely on the analysis in the programmatic environmental impact statement or environmental assessment after evaluating it and verifying that reliance on the analysis remains valid. When conducting such an evaluation, the Responsible Official may rely on previously completed reviews, if any, of the programmatic environmental impact statement or environmental assessment.

(c) Where a bureau's existing environmental document is relevant to a later proposed action, a bureau may employ tiering, whereby the bureau uses existing analysis from broader environmental documents, including programmatic reviews, in subsequent narrower reviews.

(1) When a bureau prepares a subsequent environmental document that tiers to analysis from a programmatic review, the Responsible Official should first determine whether the existing analysis adequately covers the new proposed action. The tiered document should discuss the relationship between the tiered document and the previous review; summarize and incorporate by reference the issues discussed in the broader document; concentrate on the issues specific to the subsequent action, analyzing site-, phase-, or stage-specific conditions and reasonably foreseeable effects; and identify where the earlier document is publicly available.

(2) Tiering is appropriate when the sequence from an environmental impact statement or environmental assessment is:

(i) From a programmatic, plan, or policy environmental impact statement or environmental assessment to a program, plan, or policy statement or assessment of lesser or narrower scope or to a site-specific statement or assessment; or

(ii) From an environmental impact statement or environmental assessment prepared to support a specific action at an early stage to a subsequent environmental impact statement or environmental assessment prepared to support a specific action at a later stage.

(3) An environmental assessment may be prepared, and a finding of no significant impact reached, for a proposed action with significant effects, if the environmental assessment is tiered to an environmental impact statement that fully analyzes those significant effects. Tiering to a broader-scoped environmental impact statement may allow for the preparation of an environmental assessment and a finding of no significant impact for the individual proposed action, so long as any previously unanalyzed effects are not significant. A finding of no significant impact other than those already disclosed and analyzed in the environmental impact statement to which the environmental assessment is tiered may also

NPS-AR-001027

be called a "finding of no *new* significant impact" or a "finding of no *additional* significant impact."

### Section 3.3 Publishing pre-decisional environmental documents.

During the process of preparing any environmental document provided for by these procedures, a bureau may publish such draft, pre-decisional materials as in the bureau's judgment may assist in fulfilling its responsibilities under NEPA and these procedures.

### Section 3.4 Combining documents.

Bureaus should combine, to the fullest extent practicable, any environmental document or other NEPA compliance document with any other bureau document to reduce duplication and paperwork, ensuring that any findings or other required determinations are clearly identified and set forth. The page limits for environmental assessments and environmental impact statements apply to that portion of a jointly prepared Federal-state environmental compliance document that addresses NEPA compliance.

### Section 3.5 Incorporation by reference.

(a) Bureaus may incorporate material, such as planning studies, analyses, or other relevant information, into environmental documents by reference when the effect will be to reduce the length of an environmental document without impeding bureau and public review of the action. When incorporating material by reference, the bureau will identify, briefly describe the content and relevance to the environmental document, cite (by specific page number where applicable), and make the materials reasonably available for review by potentially interested parties. Bureaus are encouraged to incorporate by reference wherever appropriate, including to reduce the length of environmental impact statements and environmental assessments.

(b) Though NEPA itself does not require cost-benefit analysis, other authorities may require a bureau to conduct such an analysis. To the extent that such cost-benefit analysis is relevant to any alternatives analysis a bureau is conducting pursuant to NEPA, the bureau should incorporate the cost-benefit analysis by reference or append it to the environmental document to avoid duplication in evaluating the environmental effects. In such cases, the environmental document should discuss the relationship between that analysis and any analyses of unquantified environmental effects, values, and amenities.

### Section 3.6 Supplements to environmental impact statements.

(a)  *When a supplement must be prepared*. A bureau should prepare supplements to environmental impact statements only if a major Federal action remains to occur, and:

(1) The bureau makes substantial changes to the proposed action that are relevant to environmental concerns; or

(2) The bureau determines, in its discretion, that there are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its effects.

(b)  When preparing supplements, bureaus have discretion concerning how they facilitate public participation. A supplement need not be published or circulated in the same manner as the document being supplemented; rather, the Responsible Official may publish or circulate a supplement as appropriate to the scope of the supplement and the proposed action.

NPS-AR-001028

**Section 3.7 Integrity and completeness of information.**

(a) A bureau should not undertake new scientific and technical research to inform its analyses unless the bureau anticipates that the results of that research would be essential to a reasoned choice among alternatives and the overall costs and time frame of such undertaking are not unreasonable. Rather, the bureau should make use of reliable existing data and resources.

(b) When a bureau is evaluating an action's reasonably foreseeable significant effects on the human environment, and there is incomplete or unavailable information that cannot be obtained at a reasonable cost or the means to obtain it are unknown, the bureau should make clear in the relevant environmental document that such information is lacking, and the bureau has decided not to rely on such data or information.

**Section 3.8 Integrating NEPA with other environmental requirements.**

(a) To the fullest extent possible, bureaus should prepare environmental documents or other NEPA compliance documents concurrently with and integrated with analyses and related surveys and studies required by other Federal statutes and regulations.

(b) Bureaus should combine an environmental document or other document prepared in compliance with NEPA with any other agency document to reduce duplication and paperwork. Thus, bureaus may combine an environmental document or other NEPA compliance document with related plans, rules, or amendments as a single consolidated document. The consolidated document should contain and clearly identify the required sections of the environmental or other NEPA compliance document.

(c) If comments on a notice of intent or other aspects of a scoping process identify consultations, permits, or licenses necessary under other environmental laws, the environmental document or other NEPA compliance document should contain a section briefly listing the applicable requirements and how the bureau has met or will meet any such requirements that apply to the proposed action (*e.g.*, permits applied for or received, consultations initiated or concluded).

**Section 3.9 Elimination of duplication with State, Tribal, and local procedures.**

(a) Bureaus may cooperate with State, Tribal, and local agencies that are responsible for preparing environmental documents.

(b) To the fullest extent practicable unless specifically prohibited by law, bureaus should coordinate environmental reviews and project approaches with State, Tribal, and local agencies to reduce duplication between NEPA and State, Tribal, and local requirements, including through use of studies, analysis, and decisions developed by State, Tribal, or local agencies. Such cooperation may include:

(1) Joint planning processes,

(2) Joint environmental research and studies,

(3) Joint public hearings (except where otherwise provided by statute), or

(4) Joint environmental documents.

**Section 3.10 Proposals for regulations.**

Where the proposed action is the promulgation of a rule or regulation, procedures and documentation pursuant to other statutory or Executive order requirements may satisfy one or more requirements of this subchapter. When a procedure or document satisfies one or more requirements of this subchapter, a bureau may substitute it for the corresponding requirements in this subchapter and need not carry out duplicative procedures or documentation. Bureaus should identify which corresponding requirements in this subchapter are satisfied and consult with the Council on Environmental Quality to confirm such determinations.

**Section 3.11 Unique identification numbers.**

For all proposed actions requiring documented environmental review under NEPA, bureaus should provide a unique identification number for tracking purposes, which bureaus will refer to on all associated environmental review documents prepared for the proposed action and in any database or tracking system for such documents. Bureaus should coordinate with the Council on Environmental Quality concerning their use of identification numbers.

**Section 3.12 Emergencies.**

Procedures for emergency alternate arrangements for NEPA are addressed in the DOI NEPA regulations at 43 CFR 46.150.

**PART 4—AGENCY DECISION-MAKING**

Section
4.1        Decision documents.
4.2        Filing requirements.

**Section 4.1 Decision documents.**

(a) At the time of its decision on a proposed action evaluated by an environmental impact statement or environmental assessment, a bureau should timely prepare and publish a concise public decision document or joint decision document notifying the public that the Responsible Official has certified that the bureau has considered all relevant information raised in the NEPA process and that the NEPA process has closed. When reaching a decision, agencies have discretion to select from among or from a blend of the alternatives they have evaluated.

(1) Bureaus should document a decision on a proposed action in a record of decision when the bureau has prepared an environmental impact statement to evaluate the proposed action.

(2) Bureaus should document a decision on a proposed action in a Decision Record or other appropriate decision document when the bureau has prepared an environmental assessment, supported by a finding of no significant impact.

(b) Bureaus should document, and may publish, a decision on a proposed action in a Decision Record or other appropriate decision document when the bureau relies on a documented categorical exclusion, determination of NEPA adequacy, or similar documentation demonstrating compliance with NEPA.

NPS-AR-001030

**Section 4.2 Filing requirements.**

Bureaus should file all environmental impact statements, including draft, final, or supplemental statements, together with any comments and responses with the Environmental Protection Agency, Federal Activities Division for publication on their website and of a notice of availability in the *Federal Register*.

**PART 5—PROCEDURES FOR APPLICANT-PREPARED AND CONTRACTOR-PREPARED ENVIRONMENTAL IMPACT STATEMENTS AND ENVIRONMENTAL ASSESSMENTS AND OTHER ENVIRONMENTAL DOCUMENTS**

Section
5.1     Procedures for applicant-prepared environmental impact statements and environmental assessments.
5.2     Using a bureau-directed contractor to prepare environmental documents.

**Section 5.1 Procedures for applicant-prepared environmental impact statements and environmental assessments.**

Procedures for applicant-prepared NEPA reviews are addressed in the DOI NEPA regulations at 43 CFR 46.107.

**Section 5.2 Using a bureau-directed contractor to prepare environmental documents.**

Procedures for bureau-directed contractors preparing environmental documentation are addressed in the DOI NEPA regulations at 43 CFR 46.105.

NPS-AR-001031

## PART 6—DEFINITIONS

**Section 6.1 Definitions.**

As used in these implementing procedures, terms have the meanings provided in NEPA section 111, 42 U.S.C. section 4336e. In addition:

(a) *NEPA* means the National Environmental Policy Act, as amended (42 U.S.C. section 4321, *et seq.*).

(b) *Affected Environment* means the environmental conditions that would prevail in the absence of the implementation of the proposed action or action alternatives. It includes any reasonably foreseeable environmental trends and planned actions in the area to be affected by implementation of the proposed action or action alternatives.

(c) *Applicant* means a project sponsor or other third party seeking an authorization from a bureau or the Department.

(d) *Authorization* means any license, permit, approval, finding, determination, or other administrative decision issued by an agency that is required or authorized under Federal law that may be the subject of a proposed action.

(e) *Bureau* means bureau, office, or service within the Department of the Interior. The Department and its bureaus are "agencies" within the meaning of NEPA.

(f) *Categorical Exclusion* (CE) means a category of actions that a Federal agency has determined normally does not significantly affect the quality of the human environment.

(g) *Connected action* means a separate Federal action within the authority of a Federal agency that is closely related to the proposed action and should be addressed in a single environmental document because the proposed agency action:

(1) Automatically triggers the separate Federal action, which independently would require the preparation of additional environmental documents;

(2) Cannot proceed unless the separate Federal action is taken previously or simultaneously; or

(3) Is an interdependent part of a larger Federal action that includes a separate Federal action, which mutually depend on the larger Federal action for their justification.

(h) *Cooperating Agency* means any Federal, State, Tribal, or local agency that has been designated as a cooperating agency under section 107(a)(3) of NEPA.

(i) *Design features* (sometimes called *design elements*) means specific means, measures, or practices incorporated into the proposed action or action alternatives. Mitigation measures included in the proposed action or any action alternative and evaluated through the NEPA process are design features.

(j) *Determination of NEPA Adequacy (DNA)* means the Responsible Official's documentation of their evaluation as to whether the environmental effects of a proposed action lie within the scope of and have been analyzed in one or more existing environmental assessments or environmental impact statements and there are no new circumstances, new information, or potential for unanticipated or unanalyzed environmental effects that warrant new or supplemental analysis before the proposed action can be implemented. A determination of

23

NEPA adequacy is not an environmental document; rather it confirms the existence of environmental documentation adequate to fulfill NEPA compliance requirements.

(k) *Effects* or *impacts* means changes to the human environment from the proposed action or action alternatives that are reasonably foreseeable and have a reasonably close causal relationship to the proposed action or action alternatives.

(1) Effects include ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic (such as the effects on employment), social, local custom and culture or health effects. Effects appropriate for analysis under NEPA may be either beneficial or detrimental, or both, with respect to these values.

(2) A "but for" causal relationship is insufficient to make an agency responsible for a particular effect under NEPA. Effects should generally not be considered if they are remote in time, geographically remote, or the product of a lengthy causal chain, but may be considered to the extent it assists in reasoned decision-making. Effects do not include those effects that the agency has no ability to prevent due to the limits of its regulatory authority, or that would occur regardless of the proposed action, or that would need to be initiated by a third party.

(l) *Environmental document* means an environmental impact statement, an environmental assessment, or a finding of no significant impact.

(m) *Human environment* means comprehensively the natural and physical environment and the relationship of Americans with that environment. (*See also* the definition of "effects" in paragraph (j) of this section.)

(n) *Jurisdiction by law* means agency authority to approve, veto, or finance all or part of the proposal.

(o) *Mitigation* means measures that avoid, minimize, or compensate for effects caused by a proposed action or alternatives as described in an environmental document or record of decision and that have a nexus to those effects. While NEPA requires consideration of mitigation, it does not mandate the form or adoption of any mitigation. Mitigation includes:

(1) Avoiding the impact altogether by not taking a certain action or parts of an action.

(2) Minimizing effects by limiting the degree or magnitude of the action and its implementation.

(3) Rectifying the impact by repairing, rehabilitating, or restoring the affected environment.

(4) Reducing or eliminating the impact over time by preservation and maintenance operations during the life of the action.

(5) Compensating for the impact by replacing or providing substitute resources or environments.

(p) *NEPA process* means all measures necessary for compliance with the requirements of section 2 and title I of NEPA.

(q) *Notice of intent* means a public notice that an agency will prepare and consider an environmental impact statement or environmental assessment.

(r) *Page* means an 8.5"x11" electronic or paper sheet with one-inch margins using a word processor with 12-point proportionally spaced font, single spaced, excluding graphics, maps, diagrams, tables, citations, and appendices.

(s) *Proposed Action* means a proposal or a recommendation for agency approval that is subject to NEPA. It includes agency-initiated and third party–initiated (e.g., applicant-initiated) proposals that exist at a stage when an agency, subject to NEPA, has a goal or is actively preparing to decide on one or more alternative means of accomplishing that goal and the effects can be meaningfully evaluated. Proposed action includes a bureau's exercise of discretion over a non-Federal entity's planned activity that falls under a Federal agency's authority to issue permits, licenses, grants and cooperative agreements, rights-of-way, or other common Federal approvals, funding, or regulatory instruments. As the Supreme Court has explained, "'the 'proposed action'" is "the project at hand—not other future or geographically separate projects."[3] As a unit of analysis, therefore, the "proposed action" excludes (1) other projects that are "separate in time"; (2) other projects that are "separate in … place"; (3) other projects that "fall outside the [DOI's] authority"; and (4) other projects that "would be initiated, if at all, by third parties." *Id.* at 1515.

(t) *Publish* and *publication* mean methods found by the agency to efficiently and effectively make environmental documents and information available for review by interested persons, including electronic publication.

(u) *Related action* means an action undertaken by an agency, e.g., a permitting action, some other type of authorization action, an analysis required by statute, or the like, that bears a relationship to other actions undertaken by other agencies relevant to NEPA, e.g., that a set of related actions are all related to one overarching project.

(v) *Reasonable alternatives* means a reasonable range of alternatives that are technically and economically feasible, meet the purpose and need for the proposed action, are within the jurisdiction of the bureau, and, where applicable, meet the goals of the applicant.

(w) *Reasonably foreseeable* means sufficiently likely to occur such that a person of ordinary prudence would take it into account in reaching a decision.

(x) *Record of Decision* means a concise public document that explains what the bureau decision is, describes the alternatives considered, discusses any preferences among alternatives based on relevant factors including economic and technical considerations and bureau statutory missions, and states whether all practicable means to avoid or minimize environmental harm from the alternative selected have been adopted, and, if not, why they were not. A record of decision may include any mitigation, monitoring, or enforcement plan as appropriate.

(y) *Responsible Official* is the bureau employee who is delegated the authority to make and implement a decision on a proposed action and is responsible for ensuring compliance with NEPA.

(z) *Scope* consists of the range of actions, alternatives, and effects to be considered in the NEPA process. The scope of an individual environmental impact statement or environmental assessment may depend on its relationships to other environmental impact statements or

---

[3] *Seven County*, 605 U.S. at 186-87.

environmental assessments or the relationship between the proposed action and other agency actions.

(aa) *Tiering* refers to the reliance on and incorporation by reference of discussions of general matters in broader environmental impact statements or environmental assessments (such as national program or policy statements) in subsequent narrower or environmental analyses (such as regional or basin-wide program environmental impact statements or environmental assessments or ultimately site -specific environmental impact statements or environmental assessments).

(bb) *Tribe* means an Indian Tribe under section 102 of the Federally Recognized Indian Tribe List Act of 1994 (25 U.S.C. 5131).

## PART 7—Severability.

### Section 7.1 Severability.

The sections of this Handbook are separate and severable from one another. If any section or portion therein is stayed or determined to be invalid, or the applicability of any section to any person or entity is held invalid, it is Interior's intention that the validity of the remainder of those parts will not be affected. The remaining sections, portions therein, and applications shall continue in effect.

NPS-AR-001035



# DOI Handbook of NEPA Procedures Appendix 1

## Implementation Guidance to Bureaus

U.S. Department of the Interior

February 2026

Because NEPA imposes only procedural requirements on federal agencies, this appendix provides further guidance on ten procedural concepts to assist bureaus as they develop and review proposed actions under NEPA: 1. Scoping and Public Involvement; 2. Categorical Exclusions (CE) and Extraordinary Circumstances Review Protocol; 3. Using Existing NEPA; 4. Analytical Elements Common to Environmental Assessments (EA) and Environmental Impact Statements (EIS); 5. Reasonably Foreseeable Effects of the Proposed Action and Action Alternatives; 6. Significance, Including Reaching a Finding of No Significant Impact (FONSI); 7. Formal Aspects of Environmental Documents; 8. Documenting Decisions; 9. Applicant-Prepared and Contractor-Prepared EAs and EISs; and 10. Cooperating Agencies.

## 1.    Scoping and Public Involvement

This section discusses both mandatory and discretionary scoping and public involvement considerations specific to NEPA. NEPA does not require scoping, and NEPA only requires the solicitation of public comment on a Notice of Intent to prepare an EIS. As discussed below, there may be reason to engage the public further, depending on the proposed action. There may also be other statutes, regulations, or guidance specific to the proposed action that may require scoping or further public involvement. For example, public scoping may include official Tribal consultation as a part of the scoping process, although Tribal consultation and public scoping are not one and the same, and if the proposed action has implications for Federally recognized Tribal members, assets, or resources, Tribal consultation is required. The Responsible Official should determine whether the proposed action requires any public involvement over and above what NEPA requires.

*Introduction to scoping.* Scoping is a process where bureaus collect information to learn more about potentially significant issues related to a proposed action. Issues may point to significant environmental effects—including ecological, aesthetic, historic, cultural, economic, social, local custom and cultural, or health effects—and a bureau's recognition of issues can help shape its

27

evaluation of the proposed action and alternatives.[4] Comments and questions received during scoping should be addressed, as appropriate, in the environmental review process and typically do not need specific responses.

While scoping is not required by NEPA, it is often a useful tool. Through scoping, bureaus can lay the groundwork for coordinating and consulting with other Federal agencies, and, where appropriate, State, Tribal, or local agencies or governments, or the public. Where applicants are involved, scoping can bring them into the process to identify necessary information, how other environmental reviews, which include ecological, aesthetic, historic, cultural, economic, social, local custom and cultural, and health effects, can be integrated into the NEPA document, and any obstacles that can cause delays. Scoping can also assist bureaus as they identify resources for preparation of the environmental document, including staff time, data, and funding.

*Mechanics of scoping.* Bureaus should initiate scoping as soon as practicable after the bureau has sufficiently developed the proposal for action and evaluation. Scoping should be flexible and tailored to the proposed action being considered. Scoping can occur at any stage of the NEPA process, but it is most useful when accomplished early in that process. Scoping can assist the bureau in identifying potential impacts as part of determining whether a CE applies or the extent to which certain issues may warrant evaluation in an environmental document. Information can come from a variety of sources, including, for example, intra-agency personnel, inter-agency personnel, Tribal governments, State and local governments, or interested stakeholders (e.g., community residents, visitors, commercial users, traditional/subsistence users). The bureau may hold public meetings, as appropriate. The bureau may seek various kinds of information, for example:

- Significant resource issues
- Interested parties
- Alternatives to be considered
- The potentially affected geographical area
- Land Status (e.g., Federal, Tribal Trust, Private, State, Individual Indian Allotment, Fee Lands, Split Estate)
- Economic impacts
- Other impacts on the human environment

As part of scoping, Responsible Officials may find it useful to frame potential issues in a manner that would draw out potential cause-and-effect relationships and assist in defining the scope of analysis. Analysis can be streamlined by identifying the specific aspect of the action that may have an effect and the specific aspect of the resource that may be affected. For example:

- How would construction and operation of wind turbines affect sage grouse nesting?
- How would sediment production from road construction affect water quality in Elk Creek?
- How would a prescribed burn affect the short-term and long-term visitor experience for recreational users of the Pacific Crest Trail?

---

[4] "Environmental effects" under NEPA includes ecological, aesthetic, historic, cultural, economic, social, local custom and cultural, and health effects. DOI NEPA Handbook 6.1(k)(1).

NPS-AR-001037

- How would quarry expansion affect local employment opportunities?

Simply naming a resource, such as "wildlife" or "air quality," without identifying the quality and function of the specific resource and how the proposed action may affect the resource, does not adequately identify an issue. This approach would not meaningfully inform a bureau's evaluation or identify a potential cause-and-effect relationship with the proposed action.

*Public involvement requirements when using a Categorical Exclusion.* NEPA does not require public involvement when a bureau uses a CE. Some legislatively established or legislatively directed CEs may include their own public involvement requirements that must be fulfilled when using such CEs.

*Public involvement requirements when preparing an Environmental Assessment.* NEPA does not require public involvement when a bureau prepares an EA. Therefore, the Responsible Official has discretion to determine whether to involve the public, when to involve the public, and what kind of public involvement is most appropriate when the bureau is preparing an EA to support decision-making on a proposed action and anticipates reaching a Finding of No Significant Impact (FONSI). A Responsible Official may determine that the proposed action to be evaluated in an EA is of sufficient public interest or that the bureau would benefit from receiving information from the public such that the bureau elects to involve the public in the preparation of an EA. In general, public involvement may include virtual or in-person meetings, or may be limited to electronic submission of comments. Public comment periods, if offered, should generally not be fewer than 15 days or more than 30 days.

*Public involvement requirements when preparing an Environmental Impact Statement.* NEPA requires that a bureau solicit public comment only when the bureau publishes a Notice of Intent to prepare an EIS in the Federal Register. NEPA does not require any further public involvement when preparing an EIS. Therefore, the Responsible Official has discretion to determine whether any further public involvement would be helpful, and the parameters of that involvement within the two-year EIS timeframe. When soliciting public comment, bureaus should provide 30 days for public comment periods for an EIS, to the extent practicable.

*Specific considerations concerning discretionary public involvement.* The Department recommends that the Responsible Officials determine whether public involvement over and above the NEPA's requirements would be helpful prior to initiating the NEPA process to inform the schedule. Early coordination with interested parties helps to identify issues that would benefit from additional public involvement such as impacts to the local environment, including economic impacts or the effects on quality of life. Members of the public may have unique insight into issues that warrant consideration in the environmental document such as emerging uses of public lands important to the local community.

  i. Consider whether and to what degree public review or comment would be useful, including by considering the following:
     1. Public Interest: From the number of potentially substantive public issues raised in scoping for the project, is engagement with the public likely to provide new insights or information the bureau lacks?

29

2. Complexity: Is the project so complex that public discussion is likely to generate significant substantive stakeholder information the bureau lacks?
3. Process Efficiency: Would public input improve the overall efficiency of the process, perhaps by providing information the bureau lacks?

ii. Public involvement may occur at any point in the NEPA process or at multiple points during the NEPA process, and may include any or all the following:
1. Public notification: This is often achieved by creating and publishing a project webpage with a description of the proposed action and other early information such as preliminary alternatives and issues. While the bureau might not specifically request comments, any received comments should be considered and documented.
2. External scoping: As discussed above, this involves actively soliciting public input early in the process.
3. Public meetings: These provide a forum for direct engagement and discussion, and can be held in person, virtually, or both.
4. Public review and comment: If the Responsible Official elects to invite public review or comment on an EA or a draft document, such as a draft EIS, the Responsible Official should publish such material for review. If the Responsible Official publishes such material for public review, specify the period, preferably no more than 30 days, when possible, and method for comments.

*Addressing and responding to public comments.*
When responding to public comments, responses are based on their 'substantive' and 'non-substantive' relation to the proposed project. Substantive comments do one or more of the following:
- Question, with a reasoned basis related to the analysis, the accuracy of information in the EIS or EA.
- Question, with a reasoned basis related to the analysis, the adequacy of, methodology for, or assumptions used for the analysis.
- Present new information relevant to the analysis.
- Present reasonable alternatives or issues outside those analyzed in the EIS or EA, or those mentioned in the Notice of Intent.
- Present relevant additional issues for analysis in the EIS or EA.
- Prompt potential changes or revisions to one or more of the alternatives.

Non-substantive comments would include the following:
- Comments for or against the proposed action or alternatives without supporting criteria (such as "we disagree with Alternative Two and believe the bureau should select Alternative Three").
- Comments that only agree or disagree with bureau policy or resource decisions but do not provide justification or supporting data (e.g., "less grazing should be permitted").
- Comments that do not pertain to the proposed project (e.g., "the government should eliminate all dams" for a proposed grazing permit).
- Open-ended question or vague comments.

NPS-AR-001039

- Comments citing other comments or sources without providing substantive reasoning (e.g., "consider the following list of scientific papers …" or "consider all of our previous comments on other projects" without citing specific examples).

Bureaus are not required to address comments that are non-substantive.

Bureaus have several options for addressing substantive comments, including:
- Modifying one or more alternative(s);
- Developing and evaluating suggested alternatives not previously given serious consideration by the bureau;
- Supplementing, improving, or modifying the analysis;
- Making factual corrections; or
- Explaining why the comments do not warrant further bureau response, citing sources, authorities, or reasons to support the bureau's position.

A bureau is not required to respond to comments that are received after the close of the comment period. However, bureaus should review untimely comments to consider whether they are relevant to the adequacy of the environmental document, particularly comments from agencies with jurisdiction by law or special expertise.

Documenting any comments or responses: If a bureau solicits public comments, it should document how those comments were addressed. When responding to comments, bureaus may summarize comments and respond to common topics or issues.

## 2.    Categorical Exclusions (CE) and Extraordinary Circumstances Review Protocol

*Available CEs.* There are three methods by which CE categories may become available for use by a bureau:

1) The Department or any of its bureaus may administratively establish CEs through a verification process established by DOI that relies on existing bureau NEPA analysis, research, or benchmarking to another agency's established CEs;
2) A bureau may adopt and apply a CE listed in another agency's NEPA procedures (42 U.S.C. 4336c); or
3) Congress may legislatively establish or direct establishment of CEs; use of these CEs must occur according to the terms of the legislation.

A bureau may also rely on another agency's CE determination for a particular proposed action by using that determination, if that bureau's action is substantially the same as the action the other agency has concluded can be approved in using a CE. This reliance on another agency's determination is done on a proposed action-by-proposed action basis. See *Relying on Another Agency's Categorical Exclusion Determination* for more information.

*Identifying potential CEs for use.* To determine whether a proposed action is covered under a CE, begin by verifying that the proposed action fits within one or more of the CEs available to the bureau. The Responsible Official should review the available CEs to determine if the proposed action falls into one of the listed categories. Some proposed actions may be covered in

31

their entirety by more than one CE and bureaus should select the CE that most closely matches and is specific to the proposed action. The Responsible Official should first consider whether one of their own bureau CEs or one of the CEs listed at 43 CFR 46.210 may apply, or, if not, whether another bureau has a CE that would cover the action. If so, cite the applicable CE according to 43 CFR 46.210 or Appendix 2 of this Handbook. The Responsible Official may also consider whether a CE adopted by their own or another bureau may apply. Before using a CE established by another bureau or one adopted by another bureau or the Department, Responsible Officials should familiarize themselves with the other bureau's CE or the adopted CE to ensure a sound understanding of how that CE is used; the Responsible Official should confer with the other bureau, or the agency from whom the CE was adopted if needed. Depending on the terms of the CE, the CE may not include specific mention of the proposed action; however, the proposed action must fit readily within the category of actions described in the CE.

A Responsible Official may use several CEs to support a proposed action that consists of several elements each of which falls within a CE; however, this use must be documented and include a finding that none of the elements of the proposed action would result in significant impacts on the quality of the human environment, taken separately or as included together in the proposed action. This documentation must be included in the official record supporting the decision to be made, as evidence that the decision was preceded by a NEPA review.

*Reviewing for extraordinary circumstances.* If a proposed action is covered by a CE or its component elements are covered by multiple CEs available to the bureau, unless exempt from such review by statute, the bureau must review the proposed action for the presence of extraordinary circumstances that would, if present, preclude use of the CE or CEs. DOI's extraordinary circumstances are listed in 43 CFR 46.215 and must be considered when using administratively established or adopted categorical exclusions; any exceptions to the extraordinary circumstances review requirement is noted in the terms of the categorical exclusion itself. If the proposed action, considered together with any connected actions, would implicate any of the extraordinary circumstances, and the bureau cannot eliminate those extraordinary circumstances by modifying the proposed action to reduce or remove potentially significant impacts, then the bureau would need to develop an environmental assessment or environmental impact statement.

If the proposed action or its component elements meet the terms of the CE (or CEs) and no extraordinary circumstances are present for the proposed action, then the Responsible Official can approve the proposed action using the CE(s). There are limited exceptions to the requirement that a Responsible Official must conduct review for extraordinary circumstances when using a CE. When using certain statutorily established CEs, bureaus do not need to evaluate the presence of extraordinary circumstances. In other circumstances, statutorily established CEs direct bureaus to consider a different set of extraordinary circumstances. For example, the BLM must review any proposed use of the CEs established under section 40806 of the Infrastructure Investment and Jobs Act (Pub. L. 117-58) against the U.S. Forest Service extraordinary circumstances at 36 CFR 220.6. Refer to the authorizing statute for any requirements regarding use of legislatively established or legislatively directed CEs. When bureaus adopt CEs established by other agencies, the adopting bureau can provide for consideration of other extraordinary circumstances, in addition to DOI extraordinary circumstances, if the DOI extraordinary circumstances do not

32

adequately address the potential for significant effects from an action covered by the CE. When bureaus rely on another agency's categorical exclusion determination, no separate DOI extraordinary circumstances review is necessary.

*Documenting CE use.* Documentation requirements for CEs vary. When a Responsible Official relies on a CE to comply with NEPA, documentation is required for all CEs notated in Appendix 2 with an asterisk (*). When a bureau relies on multiple CEs in combination to cover a single proposed action with multiple elements, it must document that use, even if use of each CE on its own would not require documentation. Legislatively established or legislatively directed CEs may have specific documentation requirements. A Responsible Official may always elect to document use of a CE; for example, a Responsible Official may elect to document use of another bureau's CE. In addition, individual bureaus may have program-specific requirements or policy regarding public notification of a decision supported by a CE that may include publication of documentation of CE use.

## 3. Using Existing NEPA Reviews

The Department recommends that Responsible Officials use existing environmental analyses to disclose effects associated with a proposed action when doing so would avoid redundancy while still providing a coherent and logical record of the analytical and decision-making process. Bureaus may rely on existing analyses as the basis for decision-making (following a Determination of NEPA Adequacy (DNA) or similar documentation, or reliance on another agency's NEPA analysis) or may rely on components of those analyses through tiering and incorporation by reference, as set forth in the DOI NEPA Procedures and described below. The DOI NEPA Procedures allows for the use of a DNA, memorandum to file or other writing to document this evaluation. For simplicity, DNA will be used to refer to this evaluation throughout the guidance.

*Using existing bureau NEPA documentation in its entirety.* Not all new proposed actions will require a new environmental analysis. A bureau may use a DNA, following appropriate review and evaluation, if the effects of a proposed action are already adequately analyzed in an existing bureau environmental document. Before relying on existing environmental documents, the bureau must ensure that the existing environmental document adequately analyzes the proposed action and must evaluate the analysis to ensure the analysis and its assumptions remain valid, considering whether any new and substantial information or circumstances not previously analyzed may result in substantially different environmental effects, including ecological, aesthetic, historic, cultural, economic, social, local custom and cultural, and health effects. This review and evaluation process may reveal a need for additional analysis, or the evaluation may determine that supplementation is not necessary and that the existing environmental document can be relied on in its entirety. For example, if a bureau receives an application for a special recreation permit from an entity that held a similar permit in the same or similar area in previous years, the bureau may be able to rely on the environmental document prepared to support approval of the original special recreation permit, depending on the results of the bureau's review and evaluation of that environmental document.

NPS-AR-001042

Before relying on an existing environmental document, the Responsible Official should review the existing environmental document and answer the following questions to determine whether they adequately cover a proposed action currently under consideration:

- Is the new proposed action a feature of, or substantially the same as an alternative analyzed in the existing environmental document?
- Is the proposed action within the same analysis area, or if the location of the proposed action is different, are the geographic and resource conditions sufficiently like those analyzed in the existing environmental document? If there are differences, can the bureau explain why they are not substantial?
- Is the range of alternatives analyzed in the existing environmental document appropriate with respect to the new proposed action, given current environmental concerns and resource values?
- Is the existing analysis valid considering any new information or circumstances relevant to the proposed action? Can the bureau reasonably conclude that new information and new circumstances do not warrant substantial change to the analysis of the new proposed action?
- Are the environmental effects (e.g., ecological, aesthetic, historic, cultural, economic, social, local custom and cultural, or health effects) that would result from implementation of the new proposed action similar (both quantitatively and qualitatively) to those analyzed in the existing environmental document?

The Responsible Official should document responses to these questions and include specific citations to the existing EA or EIS. If the Responsible Official answers "yes" to the above questions, additional analysis will not be necessary. If the Responsible Official answers "no" to any of the above questions, the bureau must prepare additional NEPA analysis. However, it may still be appropriate to prepare new NEPA analysis that tiers to or incorporates by reference material from the existing EA or EIS, including by supplementing the existing EIS (provided that the Federal action has not yet been implemented).

In addition to answering the above questions, the Responsible Official should evaluate whether any public involvement and interagency review associated with existing EAs or EISs are adequate for the new proposed action. Providing public involvement or interagency review for the preparation of a DNA or similar document is at the discretion of the Responsible Official, as is the level of public involvement. Bureau-specific requirements may exist for public involvement for the preparation of a decision supported by a DNA or similar document.

Bureaus may rely on one or several existing environmental documents to comply with NEPA for a new proposed action. For example, environmental documents that may be relevant include:

- EISs and EAs associated with land use or management plans as applicable to individual bureaus
- EISs or EAs for programmatic actions
- EISs or EAs associated with project specific bureau approval actions
- EISs or EAs prepared by other agencies

If the existing document is an EIS or EA prepared by another agency, the bureau should follow the procedures to rely on the EIS or EA, detailed below.

34

*Incorporation by Reference and Tiering.* Incorporation by reference and tiering provide opportunities to reduce paperwork, shorten the length of an environmental document, and avoid redundant analysis in the NEPA process. While related, incorporation by reference and tiering are distinct concepts with specific meanings and approaches.

Incorporation by reference refers to other available documents that cover similar issues, effects, or resources considered in the NEPA analysis you are currently preparing. Incorporation by reference allows you to briefly summarize the relevant portions of these other documents rather than repeat them.

Tiering refers to the reliance on and incorporation by reference of discussions of general matters in broader EISs or EAs in subsequent narrower circumstances.

Incorporation by reference is a necessary step in tiering, but tiering is not the same as incorporation by reference:
- Tiering allows a Responsible Official to narrow the scope of the subsequent analysis and focus on issues that are necessary for decision-making and exclude from consideration issues already decided or not yet ripe. Incorporation by reference does not.
- A Responsible Official may only tier to previous EAs or EISs evaluating proposed actions with which the new proposed action is consistent, whereas material may be incorporated by reference from any type of document.

**Incorporation by Reference.** Incorporation by reference is useful in preparing both EAs and EISs. It involves two steps: citation and summarization.
1. Cite the source of the incorporated material, including hyperlinks (if available) or other information sufficient to "make the materials reasonably available for review." Give the name of the document and (to the extent possible) page numbers where the incorporated material can be found. Make this citation as specific as possible so there is no ambiguity for the reader about what material is being incorporated. If unpublished, state where cited material is available. For citing information that is not publicly available or cannot be made available to the public, Responsible Officials should refer to the appropriate attorneys in the Office of the Solicitor, as each reference is matter- and context-specific.
2. Summarize the incorporated material. Briefly describe the content and relevance of the incorporated material. For example, if analysis is incorporated by reference from one environmental document into another, summarize the previous analysis, and explain any conclusion based on that previous analysis and how it relates to the action in question. The summary of the incorporated material should be sufficient to allow the Responsible Official and other readers to follow the analysis and arrive at a conclusion.

**Tiering.** Tiering uses the existing analysis from a broader environmental document, such as a programmatic EA or EIS, to a subsequent narrower review; however, a Responsible Official should first evaluate the broader environmental document to determine if it sufficiently analyzed site-specific effects and considered the current proposed action in the context of evaluating the original proposed action that was the subject of the broader environmental

35

document. If the Responsible Official determines that the existing analysis is sufficient to address any site-specific effects that may result from the new proposed action, the Responsible Official may be able to prepare a DNA or similar document rather than need to prepare a subsequent, tiered environmental document.

In the tiered document, bureaus need only reexamine alternatives analyzed in the broader document or re-analyze effects on resources fully analyzed in the broader document that are relevant to the new proposed action. Tiering can be particularly useful for describing reasonably foreseeable environmental trends and analyzing the effects of planned actions in the area. A programmatic EIS will often analyze the effects reasonably foreseeable as typical of the individual actions that make up a program, as well as the total effects of the overall program.

When preparing a tiered EA or EIS:
1.  State that it tiers to another EA or EIS,
2.  Describe the relationship between the tiered document and the existing NEPA analysis, and
3.  Summarize and incorporate by reference the relevant portions of the EA or EIS to which it is tiered (cite and summarize, as described in *Incorporation by Reference* above). Concentrate on the issues discussed in the broader EA or EIS that are specific to the subsequent proposed action.

When considering a narrower action, a bureau may tier to an EA or EIS for a broader action The analysis in the EA or EIS for the new proposed action tiers to the analysis in the existing EA or EIS, not to the decision. Note that tiering applies only to EAs and EISs; an EA or EIS cannot tier to a document that is not an environmental document as defined under NEPA. In a DNA or similar document, the bureau is relying on an existing EA or EIS, but this reliance is not considered tiering because there is no development of alternatives or analysis of issues in a DNA. Tiering is not applicable when using a CE, as CE determinations are not environmental analyses.

*Relying on another agency's EA or EIS.* A bureau may use another agency's EA or EIS to support decision-making, consistent with the following requirements:
*   If a bureau is a cooperating agency in the preparation of the EA or EIS, and the bureau determines that (a) the EA or EIS adequately addressed the environmental impacts of the bureau's proposed action; (b) the EA or EIS satisfies the bureau's requirements; and (c) the EA or EIS adequately addressed the bureau's comments and suggestions, then the bureau may rely the EA or EIS. The Bureau should, to the extent practicable, prepare a joint Record of Decision (ROD) or concurrent decision document with the lead agency. If the bureau makes these determinations but does not issue a joint or concurrent decision, however, the bureau may later rely on that EA or EIS without republishing it.
*   If the bureau is not a cooperating agency in the preparation of an EA or EIS, the bureau may rely on it after republishing the document consistent with the following requirements:
    o   If the actions analyzed in the original EIS and the bureau's proposed action are substantially the same, the bureau should republish the relied upon statement.

36

- o A bureau must issue its own ROD on a relied upon EIS for which it was not a cooperating agency and must document its reliance of the EIS and its conclusion regarding the adequacy of the EIS in the ROD.
- o If the bureau concludes that the actions analyzed in the original EA are substantially the same as the bureau's proposed action, and the EA addresses the environmental impacts of the proposed action and satisfies the bureau's requirements, and the bureau elects to proceed with the action, it must issue its own FONSI to document formal reliance on the EA and its conclusions regarding the adequacy of the EA.
- o The FONSI relying on the original EA must be made publicly available. In certain limited circumstances, a bureau's program requirements may require the bureau to publish or otherwise make the FONSI available in draft for public review for 30 days prior to any bureau decision being made in reliance on the FONSI.

Relying on a portion of another agency's EA or EIS should be accomplished through incorporation by reference of the material into the new EA or EIS. *See* DOI NEPA Handbook 3.5.

*Relying on Another Agency's Categorical Exclusion Determination*. A bureau may rely on another agency's determination that a CE applies to a proposed action for the bureau's decision-making. A bureau may rely on the other agency's CE determination even if the CE used is not on the Departmental or bureau lists of CEs. However, the bureau must ensure that its proposed action is substantially the same action as that which is the subject of the original agency's CE determination. "Substantially the same" in this case means that the bureau's proposed action and the other agency's proposed action are for the same project or activity (not simply the same type of project or activity) and the bureau's proposed action and the other agency's proposed action would result in similar non-significant environmental effects, including similar ecological, aesthetic, historic, cultural, economic, social, local custom and cultural, and health effects.

The Department recommends that bureaus approach reliance on a CE determination similarly to reliance another agency's EA or EIS and coordinate on development of a joint CE determination that addresses both agencies' requirements and is documented by both agencies. However, if this is not feasible, the Responsible Official may rely on a CE determination by documenting the determination (with explanation) that the proposed action is substantially the same as the action covered by the original CE. In either circumstance, the Responsible Official must document decisions in accordance with bureau-specific requirements.

**4. Analytical Elements Common to Environmental Assessments (EA) and Environmental Impact Statements (EIS)**

A bureau must prepare an EA when the proposed action cannot be statutorily or categorically excluded, and when it is unknown whether the proposed action would result in potentially significant impacts. One purpose of an EA is to determine whether the proposed action will have reasonably foreseeable significant environmental impacts. If the answer to that question is yes, the bureau should prepare an EIS. If the answer to that question is no, it should prepare a FONSI. Both EISs and FONSIs are discussed in further detail below.

37

Preparation of an EA or EIS involves briefly discussing (1) the purpose and need for the proposed action based on the bureau's statutory authority (including the applicant's goals, if applicable); (2) the proposed action and alternatives to the extent required by NEPA § 102(2)(H), 42 U.S.C. § 4332(2)(H); and (3) the reasonably foreseeable effects of the proposed action and the alternatives considered (covered in Section 5, below).

(1) *Purpose and need.* In the purpose and need section of the EA or EIS, present a brief statement of what the proposal is and why the bureau is considering the action (i.e., what are the underlying needs to which the bureau is responding). This statement helps define the scope of the proposed action and limit the range of alternatives for detailed analysis to those that meet the purpose and need.
- "Purpose" and "need" are not differentiated in the DOI NEPA Procedures; however, thinking of these terms as separate concepts can be helpful in some circumstances. For example, the "purpose" can be described as an outcome that the bureau is trying to reach. Often, the "purpose" can be presented as the solution to the problem described in the "need" for the action. For example, the "need" for a culvert replacement project might describe how the existing culvert blocks fish passage; the "purpose" might be to replace the culvert with one that allows fish passage.
- The purpose and need statement for an externally generated action should be informed by the applicant's or external proponent's goals.
- Draft the bureau purpose and need statement early in the NEPA process and include the statement with any scoping materials to help focus any scoping discussions or input.
- Reexamine and update the bureau purpose and need statement as appropriate throughout the NEPA process, especially when refining the proposed action and developing action alternatives for analysis. This is particularly important since all action alternatives must meet the purpose and need for action.
- A carefully crafted purpose and need statement can be an effective tool to control the scope of the analysis and thereby increase efficiency by eliminating unnecessary analysis and reducing delays in the process. Again, the purpose and need statement dictates the range of alternatives, because action alternatives are not "reasonable" if they do not respond to the purpose and need for the action. For example, in the culvert replacement example above, the scope of the analysis would be narrowed by describing a more specific "purpose" of replacing the existing culvert to allow cutthroat trout fish passage in the spring; reasonable alternatives might include analyzing various culvert sizes or moving the culvert. Conversely, the scope of the analysis would be unnecessarily broadened by describing a more general "purpose" of improving fish passage; reasonable alternatives to such an unnecessarily broad purpose might include culvert removal and road decommissioning.

(2) *Proposed action and alternatives.* The proposed action should be defined in terms of the Federal decision to be made. If there are no unresolved conflicts about the proposed action with respect to alternative uses of available resources, the Responsible Official need only evaluate the proposed action in comparison to what would occur absent such action. If no other action alternatives are included for detailed analysis, the EA or EIS should explain why. If there are reasonable alternatives warranting discussion, this section of the EA or EIS

38

should describe those alternatives in a manner that is brief and tightly focused on potentially significant issues.

- **"No action alternative."** A "no action alternative" may be considered as part of the NEPA analysis when doing so would set a useful reference against which the effects of the proposed action (and any action alternatives) would be measured. A "no action alternative" consists of a continuation of the reasonably foreseeable environmental trends and planned actions as they would occur should the bureau not implement the proposed action or any action alternatives. The "no action alternative" is therefore often described as "the future without the proposed major Federal action." While EISs and EAs do not require a separate "No Action Alternative," incorporating such an alternative into those documents is often useful to compare the effects of the proposed action to the future without the Federal action.

- **Identification of alternatives.** Action alternatives include the proposed action and reasonable alternatives that will be evaluated in detail in the EA or EIS. Bureaus should use their expert judgment and exercise their discretion in identifying the reasonable alternatives, which should be technically and economically "feasible."[5]
  - NEPA does not require bureaus to identify a preferred alternative in an EA or an EIS, although it may be helpful for situations in which the bureau considers a broad range of alternatives. The Responsible Official should review program-specific requirements on this issue.
  - Alternatives considered but eliminated from detailed study do not need to be addressed in an EA; however, in an EIS, the bureau may describe in brief the reasons for such elimination. Whether the bureau is preparing an EA or an EIS, the bureau should explain its reasons for not evaluating alternatives, particularly when those alternatives have been recommended for consideration through scoping or other public participation, including any public comments. If appropriate, the Responsible Official can provide such explanation in an appendix.

- **Description of alternatives.** The description of alternatives, including the no action alternative, may include the following items:
  - Location of alternatives
  - Alternative project features
  - Estimated acres to be affected
  - Numbers, locations, and photographs or drawings of structures to be constructed
  - Description of project operations and maintenance
  - Mitigation and/or restoration plans
  - Estimated costs associated with the alternative
  - Modifications or removal of existing facilities or structures, including numbers, locations, and photographs or drawings of those structures

- **Comparison of Alternatives.** The bureau must present analysis for each action alternative analyzed in detail so that the decision-maker may evaluate the environmental

---

[5] *See Seven County Infrastructure Coalition v. Eagle County, Colorado*, 605 U.S. 168, 181–82 (2025).

39

impacts of each action alternative by comparing them to each other and to the no action alternative. An EA does not require the same level of detailed analysis of alternatives that is required for an EIS; these discussions in an EA should be brief and tightly focused on potentially significant issues. An EA or EIS must include a focused scientific and analytic comparison of the proposed action and alternatives, including what may occur in the absence of agency action. In this section, often called the "Environmental Consequences" section, the bureau will discuss the effects of all the feasible action alternatives selected to analyze and compare each to the reasonably foreseeable trends and planned actions that would continue in the absence of the Federal action. When making this comparison, an EIS must consider both the negative and positive environmental impacts associated with implementing the proposed action and action alternatives,[6] but both EISs and EAs should compare the effects of the proposed action in relation to the reasonably foreseeable trends and planned actions that would continue in the absence of the Federal action. The analysis of the effects should focus on those resources that may be affected in a significant way by implementation of the proposed action. The bureau should present both potential beneficial and adverse effects. If implementation of the proposed action would not affect critical environmental areas, wetlands, endangered species, or other scarce, sensitive, or important resources, your EA or EIS should state this, as well. Bureaus should use their expert judgment and exercise their discretion when determining how much each alternative should be discussed, as well as the effects of each action alternative, including any significant effects.[7]

- **Mitigation measures.** Mitigation measures address potential impacts by avoiding, minimizing, or compensating for adverse effects. Bureaus may consider mitigation measures in different alternatives, specific design features within alternatives, or as separate mitigation measures the bureau may impose on any alternative selected for implementation. However, NEPA does not require bureaus to evaluate or select any specific form of mitigation. In addition, NEPA itself does not authorize bureaus to approve or implement mitigation; any such authority must be provided by other applicable laws.

- **Affected Environment.** The Affected Environment section succinctly describes the existing condition and trends of the environment that may be affected by implementing the proposed action or any of the alternatives. The EA or EIS should emphasize only those resources, or resource uses, that may be affected by the proposed action or action alternatives, and only to the extent necessary to enable an understanding of the extent and context of the anticipated environmental effects, including ecological, aesthetic, historic, cultural, economic, social, local custom and cultural, and health effects. Describe the present condition and any reasonably foreseeable trends of the affected resources within the identified geographic scope and timeframe of the analysis.

---

[6] By evaluating any positive environmental effects, in addition to negative environmental effects, resulting from implementation of the proposed action or action alternatives, DOI bureaus will comply with NEPA's requirement to include in EISs "an analysis of any negative environmental impacts of not implementing the proposed agency action in the case of a no action alternative." 42 U.S.C. § 4332(2)(C)(iii).

[7] *See Seven County*, 605 U.S. at 181–83.

40

NPS-AR-001049

In most cases, bureaus should combine the description of the affected environment, which comprises the reasonably foreseeable environmental trends and planned actions in the area that may be affected by the proposed action, with the description of future conditions without the authorization or implementation of the proposed action or any action alternatives. That is, the no action alternative represents a continuation of the affected environment absent the Federal action under consideration.

**5.      Reasonably Foreseeable Effects of the Proposed Action and Any Action Alternatives.**

The comparison of alternatives, whether in an EA or EIS, must include a concise description of the reasonably foreseeable effects of the proposed action and all action alternatives identified; this discussion is the scientific and analytic base of the EA or EIS and allows comparison between the reasonably foreseeable effects of the Federal action, including any reasonable alternatives, and what would occur absent the Federal action. The bureau *must* consider the environmental effects, including ecological, aesthetic, historic, cultural, economic, social, local custom and cultural, and health effects, resulting from the "project at hand."[8] The bureau *may* determine "how far to go" in considering indirect environmental effects, including ecological, aesthetic, historic, cultural, economic, social, local custom and cultural, and health effects, from the project at hand. *Id.* at 11. In addition, the bureau is **not** required to consider environmental effects, including ecological, aesthetic, historic, cultural, economic, social, local custom and cultural, and health effects, from *other projects* that (1) are separate in time or place from the project at hand, (2) fall outside an agency's regulatory authority, or (3) are carried out independently by third parties. *Id.* Ultimately, "where an agency has no ability to prevent a certain effect due to its limited statutory authority over the relevant actions, the agency cannot be considered a legally relevant 'cause' of the effect."[9]

For example, downstream oil refining and upstream oil drilling are separate projects from the construction and operation of an 88-mile railroad line. These are "future or geographically separate projects that may be built (or expanded) as a result of or in the wake of the immediate project under consideration."[10] Even then, however, the Responsible Official may still exercise discretion to determine where to draw the line, so long as it's reasonable and documented. Since the U.S. Surface Transportation Board (STB) approves railroad lines; it does not regulate oil drilling, oil wells, oil and gas leases, or oil refineries. *Id.* at 17. As such, in another example, the STB was not required to analyze the environmental effects, including ecological, aesthetic, historic, cultural, economic, social, local custom and cultural, and health effects, of projects over which they do not exercise regulatory authority, such as the environmental effects, including ecological, aesthetic, historic, cultural, economic, social, local custom and cultural, and health effects, from oil refineries along the Gulf Coast. *Id.* at 20.

---

[8] *See Seven County*, 605 U.S. at 182–83.

[9] *Department of Transportation v. Public Citizen*, 541 U.S. 752, 770 (2004).

[10] *See Seven County*, 605 U.S. at 187.

41

**6.    Significance, including Reaching a Finding of No Significant Impact (FONSI)**

The primary purpose of an EA is to determine whether the reasonably foreseeable effects of the proposed action will be *significant*. Actions likely to have significant environmental impacts require preparation of an EIS; actions that will not have significant environmental impacts do not require preparation of an EIS and can be supported by a FONSI.

Section 1.2 of the DOI NEPA Procedures set forth several considerations the Responsible Official may weigh when determining the "significance" of a proposed action. Here is more detail on each of the considerations:

(1)    **Both short- and long-term effects.** In analyzing the degree of effects, consider both the short- and long-term duration of the effects. When addressing this consideration, you may focus solely on the duration of the effect to assist you in determining whether duration is a substantial contributor to the significance of the effect. However, identifying an effect as short-term does not, by definition, translate to non-significance and a long-term effect does not, by definition, translate to a significant effect. Whether short-term and long-term effects are significant also depends on the specific circumstances of the situation and the degree of the effect. As a result, it may be useful to combine this consideration with your discussion of beneficial and adverse effects as described below.

(2)    **Both beneficial and adverse effects.** In analyzing the degree of effects, consider that effects may be both beneficial and adverse. Even if the effect of an action will be beneficial on balance, significant adverse effects may exist. For example, removing oil or other hazardous substances may have long-term beneficial effects on restoring natural resource services. However, the process of removing the oil or hazardous substances may have short-term adverse effects on the natural resources.

In determining whether short- and long-term effects and adverse effects may be significant consider the following (among other factors): the uniqueness of the resource impacted and the nature and extent of the impact; whether the impact sets a precedent; established thresholds such as those articulated in land use plans; other similar impacts determinations within the resource; and uncertainty with respect to the impacts.

*Although your EA or EIS must evaluate the degree of both beneficial and adverse effects of the proposed action, rather than simply the net effects, only adverse effects can rise to the level of significance warranting preparation of an EIS.*

(3)    **Effects on public health and safety.** Consider the degree to which the action would affect public health and safety –for example, evaluation of hazardous and solid wastes, air and water quality. In the context of evaluating significance, describe resource effects in consideration of their relation to established regulatory thresholds if they exist. There may be instances of effects to public health and safety without defined regulatory thresholds. In these cases, consider the setting and degree of effects in your evaluation of significance. For instance, subsidence areas with

42

NPS-AR-001051

residential structures may be analyzed to assess public health and safety even though there are no regulatory thresholds.

(4) **Economic effects.** Consider the degree to which the action, including any changes to the natural and physical environment, would affect economic activity. This may require evaluation of jobs and income, spending and output, property values, and/or other economic factors. When evaluating significance, evaluate the degree of the economic effects against an established baseline where possible. If quantitative assessments are not available, consider the qualitative information and the degree of the effects in your evaluation of significance. Economic effects by themselves generally do not require preparation of an EIS. Consider effects on the local economy and not only those to the State or national economy. The impacts of a closure of an area or a limitation on livestock grazing in an area may not have any impact to the State, but it may have impacts on the local county or municipality economy.

(5) **Effects on the quality of life of the American people**. Consider the degree to which the action, including any changes to the natural and physical environment, would affect the quality of life of the American people. For evaluating quality of life in an environmental document, we recommend you consider the following:
  - Access to products, which may include evaluations of opportunities to consume, use, possess, or purchase products extracted or produced from Federal lands and in the Outer Continental Shelf.
  - Visitor experience, which may include evaluations of recreation access and visitor services.
  - Public services, which may include evaluations of provisioning of emergency services, public water supply, transportation, education, social services, etc.
  - Way of life and culture for Native Americans, which may include evaluations of traditional land and water use and practices, and their cultural heritage.
  - Passive use of ecosystems, which may include evaluations of stewardship, existence values, and bequest values.
  - Education and knowledge, which may include evaluations of learning, interpretation, and research opportunities related to cultural, historic, and natural resources.
  - These effects should be evaluated at the local level (county or municipality) and, if applicable, separately at the State or national level.

When evaluating significance, evaluate the degree of effects of the proposed action compared to reasonably foreseeable environmental trends and planned actions (i.e., the Affected Environment). It may be beneficial to consider the economic effects in context with the effects on the quality of life because these effects may be interrelated. If quantitative assessments are not available, consider the qualitative information and the degree of the effects in your evaluation of significance.

The DOI NEPA Procedures also require agencies to consider the potentially affected environment in determining significance. This includes any connected actions, as defined in 6.1,

43

the affected area (national, regional, or local) and its resources. The Department recommends that bureaus identify any unique characteristics of the affected area.

**7.        Formal Aspects of Environmental Documents**

*Format for an EA or EIS*. A suggested format for EAs or EISs is shown below:
- Title page
- Table of contents
- Introduction, including:
  - EA or EIS NEPA Number
  - Type of Project
  - Location of the proposed action
  - Name and location of preparing office
  - The subject function code, lease, serial, or case file number (where applicable)
  - Applicant name (where applicable)
- Statement of Purpose and Need for Action
- Decision to be Made i.e., a description of the pending agency action
- Description of Proposed Action and Alternatives
- Evaluation of reasonably foreseeable effects of the Proposed Action and Action Alternatives as compared to the Affected Environment /Description of Conditions that would continue absent Federal Action (i.e., the No Action Alternative)
- Appendices. Appendices are for support of critical analyses in the EA or EIS. An appendix is not a data bank or library for total reference support, but contains major substantiating data, essential relevant descriptions of environmental components, or other information necessary for complete use of the EA or EIS for analytical or decision-making purposes. It may be appropriate to keep other supporting material in the decision file and make it available if requested, instead of including it as an appendix. Supporting material may be included as an appendix documenting a list of the parties consulted including, for example, other Federal agencies, Tribal Governments, cooperating agencies, and other members of the public. Include a record of compliance with other applicable statutes (ESA, CWA, etc.). To the extent possible, integrate any surveys and studies required by the NHPA, FWCA, ESA, other environmental laws, or any appropriate State, Tribal, or local laws. Finally, preparers may create a list of required permits (Federal, State, Tribal, and local), along with a determination of who will be responsible for obtaining these permits. Appendices can also be used for bibliographies or references cited.

  Appendices generally include:

  - References cited
  - Consultation and coordination
  - Lists of permits

<div align="center">44</div>

> o   Public Comments and Responses (in an EA/FONSI or final EIS, as appropriate)

*Page limits, deadlines, and certifications.*

NEPA sets out page and time limits for the preparation of EAs and for the preparation of EIS. Bureaus are strongly encouraged to stay well within these limits as these page limits cannot be waived, and requests for extension of these time limits will not be automatically granted. See the DOI NEPA Procedures Sections 1.5 and 2.5 for more information.

Bureaus should complete EAs in one year absent unusual circumstances. One year is measured from the start date to the publication of the EA or the revised EA (if any). See the DOI NEPA Handbook Section 1.5 for more information on how to measure the "start date." Bureaus should complete EISs in two years absent unusual circumstances. For an EIS, the two years is measured from the start date to the publication of the EIS, or final EIS if a draft EIS is issued. See the DOI NEPA Handbook Section 2.5 for more information how to measure the "start date." Bureaus should develop schedules that identify the milestones as appropriate to ensure timely completion of environmental documents.

A bureau that is unlikely to meet a statutory deadline should confer with the Office of the Solicitor to identify options for expediting the preparation of the EA or EIS. Document the bureau's rationale for any delays in the event it is needed to report to Congress on missing deadlines.

Any required certification should be placed on the cover page of the EA or EIS. See the DOI NEPA Procedures Sections 1.5 and 2.5 for more information about the content of the certification.

*Circulation, Publication and Filing*

- *Circulation of Environmental Documents*

  Prior to completion of an EIS, circulate the EIS to, and obtain comments from, cooperating agencies, as appropriate. Consider in that circulation the role of the cooperating agency and its relationship to the lead bureau, and any other Federal agency that has jurisdiction by law or special expertise with respect to any environmental effect, including ecological, aesthetic, historic, cultural, economic, social, local custom and cultural, and health effects. When obtaining cooperating agency comment bureaus should provide 30 days for an EIS, to the extent practicable. Cooperating agency comments should be addressed, as appropriate, according to the procedures noted above in *Addressing and responding to public comments*.

- *Publication of Environmental Documents*

  Publish the completed environmental documents as well as (for an EIS) any comments from or views of any appropriate Federal, State, Tribal, and local

45

NPS-AR-001054

agencies and governments. Unless required under specific programs, there is no need to publish bureau-specific notice in the Federal Register for an EIS.

Issue a notice of the availability of an environmental document for public review or comment, when appropriate, on a public website and through notice to participating agencies and interested parties, as applicable.

An EIS does not require a bureau-specific Federal Register notice but should be announced in the Federal Register through the process of filing the EIS with the Environmental Protection Agency (EPA).

- *Filing your EIS with the EPA.*
  You must file each published EIS, including all draft, final, or supplemental EISs, with the EPA, which publishes its own Federal Register notice. The Federal Register publishes a notice prepared by the EPA every Friday. Federal agencies file an EIS by submitting the complete EIS, including appendices, to the EPA through the e-NEPA electronic filing system. For instructions on the steps required to file an EIS with the EPA, refer to the EPA's website.

## 8.   Documenting Decisions

The DOI NEPA procedures require development and publication of a concise public decision document for all bureau EA and EIS processes that are concluded. This is often a Record of Decision, or ROD, or another form of a decision, such as a Decision Record. Decision documents must certify that the bureau has considered all relevant information raised in the NEPA process and that the NEPA process has concluded. It is generally preferable to meet the requirements of other statutes, such as the National Historic Preservation Act or Endangered Species Act, prior to issuing a decision.

Your decision must be within the range of alternatives analyzed in detail in the environmental document. You may select an alternative that is intermediate between two alternatives or combines elements of alternatives if the effects of the selected alternative are reasonably apparent in the analysis. This includes selecting an alternative that is intermediate between an action alternative and the no action alternative (that is, partial implementation of an action alternative). When selecting such an intermediate or combined alternative, ensure that the effects do not combine in a manner that would result in effects outside the scope of the effects analyzed in the environmental document.

An environmental document or documentation of use of a CE is not itself a decision document. Prepare a Decision Record or bureau- or program- specific decision document for a proposed action evaluated in an EA, EIS, or relying on a DNA. Some decisions regarding proposed actions analyzed in an EA may also need to be documented in accordance with program-specific requirements.

Follow program-specific requirements on the content and format of a Record of Decision or a decision document. If there are no program-specific requirements or if they are only general, we

46

recommend that you organize the Record of Decision or decision document using the content outline below:

- Describe conformance with any applicable land or offshore use plans (e.g., BLM Resource Management Plans; National Park Service unit Management Plans; U.S. Fish and Wildlife Service Refuge Management Plans) and compliance with laws pertinent to the decision, such as the Endangered Species Act, Marine Mammal Protection Act, National Historic Preservation Act, Outer Continental Shelf Lands Act, or other statutes.
- Identify the selected alternative. Describe as precisely as possible specific design features of the action approved in the decision or incorporate by reference the description of the selected action from the environmental document.
- Identify mitigation measures and any associated monitoring and enforcement plans that have been selected to be implemented. Although described and analyzed in an environmental document, the mitigation measures that will be implemented are explicitly adopted in the Record of Decision or decision document.
- If the bureau prepared an EA to support the decision, reference the FONSI indicating that the action has been analyzed in an EA and found to have no significant impacts, thus an EIS is not required.
- Summarize any public involvement undertaken and any comments received and describe how the bureau considered any substantive public input in making the decision, including those of cooperating agencies.
- Explain the rationale for the decision. When an EA or EIS supports the decision, explain how the selected alternative addresses the purpose and need for action and why it was selected over other alternatives. You should discuss the preferences among alternatives based on relevant factors including economic and technical considerations and the bureau's statutory mission. State whether all practicable means to avoid or minimize environmental harm from the alternative selected have been adopted, and, if not, why they were not.
- Include all program-specific requirements.
- Describe any relevant protest or appeal opportunities that may be applicable to the decision.
- The Responsible Official must sign and date the decision document.
- Provide notice of the signed decision document and associated environmental document.

When appropriate, the decision should be published at the same time as the EA or EIS is published.

## 9.    Applicant-Prepared and Contractor-Prepared EAs and EISs

NEPA as amended allows for an applicant or an applicant-directed contractor to prepare an EA or EIS. Bureaus remain responsible for the accuracy, scope, and content of the EA or EIS and must independently evaluate and approve each such analysis before the bureau may rely on it. Bureaus may request more information, revise analysis methodologies, or choose not to rely on an EA or EIS prepared by an applicant or its contractor at any time. If the bureau determines that

47

NPS-AR-001056

the EA or EIS submitted by an applicant or applicant-directed contractor does not meet the bureau's standards, the bureau should work with the applicant or applicant-directed contractor to improve the document with an objective of meeting the bureau's standards while meeting applicable statutory deadline. If necessary, the bureau may elect to complete the EA or EIS itself.

Applicant or applicant-directed contractor preparation of an EA or EIS occurs when the applicant either directly prepares an EA or EIS or the applicant hires a contractor and directs the contractor as its agent to prepare the EA or EIS. Applicant or applicant-directed preparation of an EA or EIS is thus different from circumstances where a bureau uses a bureau-directed contractor who may be funded by the applicant (an arrangement often referred to as "third party contracting"). Bureaus may also select and fund their own contractors to prepare environmental documents for bureau use.

For applicant or applicant-directed contractor prepared EAs and EISs, Responsible Officials should consider implementing the following best practices:

- *Early Coordination*. Early coordination with the applicant improves efficiency both before and after initiation of the NEPA process. Bureaus should coordinate with applicants as soon as applicants present an initial version of an application (e.g., application for permit to drill, application for a special recreation permit, application for a right-of-way, etc.), plan of operation, or plan of development. Bureaus should invite applicants to share drafts of their applications early for bureau input and suggestions for refinement. Bureaus should hold a kick-off meeting with the applicant to identify the information needed for a complete application package as well as respective roles and responsibilities for the bureau and the applicant as soon as practicable after the application is received. These meetings should be documented so changes in bureau personnel do not cause these meetings to be repeated. As part of early coordination, the bureau, cooperating agencies (if applicable) and the applicant should develop a schedule for the applicant to provide information during the application process and the bureau to complete data collection and to establish milestone steps in the NEPA process. Within 60 days of the initial review or meeting, the bureau should identify in writing any additional information needed from the applicant or applicant-directed contractor to initiate the NEPA process.

- *Outlining Responsibilities.* Early in the process, bureaus should engage with the applicant and provide written documentation outlining the bureau's expectations regarding roles, responsibilities, the project schedule, coordination, deliverables (including environmental information, draft and final documents), and supervision. It is recommended that bureaus develop Memoranda of Understanding (MOUs) or other agreements with applicants and applicant-directed contractors to outline roles and responsibilities for all entities involved in the project. The MOU or other appropriate agreement should also describe the quality standards for the environmental analysis as well as any other applicable bureau-specific guidelines. These standards may require use of specific data sources or bureau-approved methodologies. The MOU or other agreement must provide for the applicant or applicant-directed contractor to certify that it will provide the bureau with all relevant supporting information, including all studies, surveys, and technical reports pertaining to the environment prepared by the applicant or applicant-directed contractor for the proposed action. The MOU or other agreement will also include a professional integrity statement

48

from the applicant certifying that the environmental analysis will be prepared with professional and scientific integrity, using reliable data and resources, and will meet any relevant Federal information quality standards and bureau needs for decision-making. Close coordination with the bureau throughout the NEPA process will increase efficiency and improve the NEPA analysis.

- *Environmental Information*. Once bureaus have sufficient information to identify preliminary issues for analysis and resources that would be potentially affected, bureaus will, as appropriate, request that applicants provide environmental information necessary to inform the level of NEPA analysis. The environmental information may include inventories, surveys, or monitoring and written reports of any relevant results. Bureaus should specify any necessary survey or study protocols while identifying environmental information needed for analysis.
- *Determination of the level of NEPA Review Needed to Support Decision-Making.* To determine the appropriate level of NEPA review for the proposed action, the Responsible Official should have a complete project description and other necessary information, which may include written documentation of likely environmental effects, including ecological, aesthetic, historic, cultural, economic, social, local custom and cultural, and health effects. Bureaus should rely on program-specific requirements to determine what information is necessary for a complete project description.
- *Development of a project schedule.* Once the bureau has enough information to determine the appropriate level of NEPA review needed to support decision-making, the bureau should work with the applicant to develop a project schedule that meets the applicable statutory deadline for completing NEPA.
- *Acceptance of a complete application.* Once the above steps have been completed and the environmental information and reports have been completed, reviewed and evaluated, and accepted by bureau resource specialists, the bureau should accept the application as complete. No later than 30 days of receiving, evaluating, and accepting the information that the bureau identified in writing under "*early coordination,*" the bureau should initiate its NEPA process.
- *NEPA Analysis.* We recommend that the bureau remain in close coordination with the applicant or applicant-directed contractor throughout the NEPA process. This process can be set forth in the MOU or appropriate agreement, as well as in the project schedule.

*Evaluation*

Bureaus must independently evaluate and approve information and analysis provided by the applicant before the bureau may rely on it. To maintain the scientific quality and integrity of the impact assessment, a bureau may confer with another bureau or cooperating agency if in-house subject matter experts are not available for technical evaluations.

- ***Evaluation of environmental information.*** The bureau must evaluate any environmental information provided by an applicant or applicant-directed contractor to determine if the information meets bureau program standards for professional and scientific integrity. The bureau must document the evaluation and its results.

NPS-AR-001058

If a Responsible Official intends to rely on an applicant or applicant-directed contractor to prepare any of the following information, the Responsible Official must obtain and independently evaluate such information prior to initiating the NEPA process:

- o The purpose and need for the proposed action;
- o The proposed action and reasonable alternatives;
- o A public engagement plan (if appropriate);
- o Permits and authorizations required to implement the proposed action;
- o Any agencies the bureau might want to invite to be cooperating agencies;
- o The process for consultation with relevant Federal, State, Tribal, and local agencies to ensure compliance with environmental laws and regulations;
- o Other issues or resources that may warrant analysis in the EA or EIS, and a summary of any applicable analysis methodology; and
- o Schedule for preparation of the EA or EIS.

Bureaus retain the responsibility for compliance with other laws and procedures that are inherently governmental such as NHPA Section 106, ESA Section 7, and government-to-government consultation. Bureaus are responsible for managing any cooperating or participating agency relationships.

The Responsible Official must document the results of the bureau's independent evaluation of these elements, as applicable, for instance in a memorandum for the decision file.

- **_Evaluation of the Analysis in the EA or EIS._** Once the applicant or applicant-directed contractor has completed the analysis for the EA or EIS, it must certify that the materials provided to the bureau—the EA or EIS, as well as all supporting documentation—are complete for the bureau's independent review and inclusion in its decision file. The bureau will evaluate the analysis and contents of the decision file and, if that evaluation indicates that the analysis satisfies professional integrity, scientific integrity, and program specific requirements, may accept the EA or EIS and analysis contained therein. The bureau should document its evaluation.

## 10.   Cooperating Agencies

The cooperating agency relationship is distinctive, moving beyond consultation to engage officials and staff of other agencies and levels of government in working partnerships. Cooperating agencies share skills and resources to help shape bureau environmental analyses that better reflect the policies, needs, and conditions of their jurisdictions or special expertise. The cooperating agency relationship provides a framework for intergovernmental efforts by:

- Gaining early and consistent involvement of cooperating agency partners
- Incorporating local knowledge of economic, social, and environmental conditions, as well as Federal, State, Tribal, and local land use requirements
- Addressing intergovernmental issues
- Avoiding duplication of effort
- Enhancing local credibility of environmental impact statements
- Encouraging cooperating agency support for decisions
- Building relationships of trust and cooperation

50

- Making better, more informed decisions

In any Federal undertaking, harmonizing national, regional, and local governance entails coordination. Experience shows that there are three primary approaches that can lead to success when working across government boundaries. They are:

(1) Federal, State, Tribal, and local partners need to recognize that the cooperating agency relationship is a forum for sharing information and expertise, not for asserting authority. Engaging in a cooperating agency relationship neither augments nor diminishes an entity's jurisdiction and authority. However, mutual respect for each agency's authority and jurisdiction is critical.

(2) Bureau Responsible Officials should acknowledge that the cooperating agency relationship requires new ways of doing business. Engaging with government partners as cooperating agencies is a unique form of consultation. Cooperating agencies expect, and should be given, a significant role (commensurate with available time and knowledge) in shaping environmental analyses—instead of merely commenting on them.

(3) All parties will find the cooperating agency relationship most productive when they emphasize mutual, rather than individual, gains and seek solutions that meet others' needs as well as their own.

Cooperating agencies are typically not treated as advisory committees under the purview of the Federal Advisory Committee Act (FACA, 5 U.S.C. App.). This is because meetings held exclusively between Federal officials and elected officers of State, Tribal, and local governments (or their designated employees authorized to act on their behalf) acting in their official capacities are generally exempt from the requirements of FACA when the meetings are solely for the purpose of exchanging views, information, or advice related to implementation of Federal programs established pursuant to a public law that provides intergovernmental responsibilities or administration (2 U.S.C. 1534(b)).

Both lead agencies and cooperating agencies assume significant obligations in offering and accepting the cooperating agency relationship, meaning:

- As a lead agency, the bureau is expected to use the analyses and proposals of a cooperating agency to the maximum extent possible consistent with its responsibility.
- Cooperating agencies accept obligations to contribute staff to the environmental impact statement team, develop and review analyses for which they have particular expertise, and fund their own participation.

Responsible Officials are expected to make a reasonable effort to identify Federal, State, Tribal, and local entities possessing jurisdiction by law or special expertise concerning an environmental impact statement. Once these entities are identified, Responsible Officials must extend invitations to eligible agencies and governments for an environmental impact statement process and when the bureau determines useful, for an environmental assessment process. Requests from other Federal, State, Tribal and local entities for cooperating agency should not be arbitrarily denied.

51

52

Bureaus should work with cooperating agencies to develop and adopt a Memorandum of Understanding or other appropriate documented agreement that describes their respective roles, assignment of issues, schedules, and staff commitments so that the NEPA process remains on track and on time. It is important that agreements establishing a cooperating agency relationship be completed in a timely manner—preferably before the notice of intent or initiation of the NEPA process. Memorandums of Understanding, however, cannot limit the ability of the agency to participate in any protest, appeal or other administrative or federal court proceedings.

Cooperating agencies may, by agreement with the lead bureau, assist in doing the following:
- Identifying issues to be addressed
- Arranging for the collection and/or assembly of necessary resource, environmental, social, economic, and institutional data
- Analyzing data
- Developing alternatives
- Evaluating alternatives and estimating the effects of implementing each alternative
- Carrying out any other tasks necessary for the development of the environmental analysis and documentation

Working with other government officials through the cooperating agency relationship makes better outcomes more likely and can establish a foundation for long-term cooperation that benefits all partners.

NPS-AR-001061



# DOI Handbook of NEPA Procedures Appendix 2

## Bureau Categorical Exclusions

U.S. Department of the Interior

February 2026

The following pages include all the Department of the Interior (Department) Categorical Exclusions (CEs): legislative, established, or adopted for the use of bureaus. While the CEs are grouped by bureau or adopted CEs, the DOI NEPA procedures provide that any bureau can use another bureau's established or adopted CE, including those listed under CEs adopted from other agencies. *See* DOI NEPA Handbook, Appendix 1, 2. Categorical Exclusions (CE) and Extraordinary Circumstances Review Protocol, *Identifying potential CEs for use*. An asterisk (*) indicates a requirement to document the applicability of the CE and review of extraordinary circumstances. Even if it is not required to document a categorical exclusion, the Responsible Official may document the use of a CE at their discretion. Citations to these CEs should follow this format: DOI NEPA Handbook, Appendix 2, [*SECTION NUMBER], [PARAGRAPH NUMBER OR LETTER]*. Subject areas are purely for organization and do not limit application of a CE to a specific program area.

NPS-AR-001062

# Office of Native Hawaiian Relations

7.5    <u>Categorical Exclusion.</u>  Approval of conveyances, exchanges, and other transfers of land or interests in land between Department of Hawaiian Homelands, and an agency of the State of Hawaii, or a Federal agency, where no change in the land use is planned.  This activity is a single, independent action not associated with larger, existing, or proposed complexes or facilities.

# U.S. Fish and Wildlife Service (Service)

8.5    <u>Categorical Exclusions</u>.

    A.  <u>General</u>.

        (1) Changes or amendments to an approved action when such changes have no or minor potential environmental impact.

        (2) Personnel training, environmental interpretation, public safety efforts, and other educational activities, which do not involve new construction or major additions to existing facilities.

        (3) The issuance and modification of procedures, including manuals, orders, guidelines, and field instructions, when the impacts are limited to administrative effects.

        (4) The acquisition of real property obtained either through discretionary acts or when acquired by law, whether by way of condemnation, donation, escheat, right-of-entry, escrow, exchange, lapses, purchase, or transfer and that will be under the jurisdiction or control of the United States.  Such acquisition of real property shall be in accordance with 602 DM 2 and the Service's procedures, when the acquisition is from a willing seller, continuance of or minor modification to the existing land use is planned, and the acquisition planning process has been performed in coordination with the affected public.[11]

    B.  <u>Resource Management</u>.  Prior to carrying out these actions, the Service should coordinate with affected Federal agencies and State, tribal, and local governments.

        (1) Research, inventory, and information collection activities directly related to the conservation of fish and wildlife resources which involve negligible animal mortality or habitat destruction, no introduction of contaminants, or no introduction of organisms not indigenous to the affected ecosystem.

        (2) The operation, maintenance, and management of existing facilities and routine recurring management activities and improvements, including renovations and replacements which result in no or only minor changes in the use, and have no or negligible environmental effects on-site or in the vicinity of the site.

---

[11] BLM adopted this CE prior to the 2025 DOI NEPA Procedures. *See* 90 FR 3908.

NPS-AR-001063

(3) The construction of new, or the addition of, small structures or improvements, including structures and improvements for the restoration of wetland, riparian, instream, or native habitats, which result in no or only minor changes in the use of the affected local area.  The following are examples of activities that may be included.

    (a)    The installation of fences.
    (b)    The construction of small water control structures.
    (c)    The planting of seeds or seedlings and other minor revegetation actions.
    (d)    The construction of small berms or dikes.
    (e)    The development of limited access for routine maintenance and management purposes.[12]

(4) The use of prescribed burning for habitat improvement purposes, when conducted in accordance with local and State ordinances and laws.[13]

(5) Fire management activities, including prevention and restoration measures, when conducted in accordance with Departmental and Service procedures.[14]

(6) The reintroduction or supplementation (e.g., stocking) of native, formerly native, or established species into suitable habitat within their historic or established range, where no or negligible environmental disturbances are anticipated.

(7) Minor changes in the amounts or types of public use on Service or State-managed lands, in accordance with existing regulations, management plans, and procedures.

(8) Consultation and technical assistance activities directly related to the conservation of fish and wildlife resources.

(9) Minor changes in existing master plans, comprehensive conservation plans, or operations, when no or minor effects are anticipated.  Examples could include minor changes in the type and location of compatible public use activities and land management practices.

(10) The issuance of new or revised site, unit, or activity-specific management plans for public use, land use, or other management activities when only minor changes are planned. Examples could include an amended public use plan or fire management plan.

(11) Natural resource damage assessment restoration plans, prepared under sections 107, 111, and 122(j) of the Comprehensive Environmental Response Compensation and Liability Act (CERCLA); section 311(f)(4) of the Clean Water Act; and the Oil Pollution Act; when only minor or negligible change in the use of the affected areas is planned.

---

[12] BLM adopted this CE prior to the 2025 DOI NEPA Procedures. *See* 90 FR 3908.
[13] NPS adopted this CE prior to the 2025 DOI NEPA Procedures. *See* 90 FR 24644.
[14] BLM adopted this CE prior to the 2025 DOI NEPA Procedures. *See* 90 FR 42432.

NPS-AR-001064

C.  Permit and Regulatory Functions.

(1) The issuance, denial, suspension, and revocation of permits for activities involving fish, wildlife, or plants regulated under 50 CFR Chapter 1, Subsection B, when such permits cause no or negligible environmental disturbance.  These permits involve endangered and threatened species, species listed under the Convention on International Trade in Endangered Species of Wild Fauna and Flora (CITES), marine mammals, exotic birds, migratory birds, eagles, and injurious wildlife.

(2) The issuance of ESA section 10(a)(1)(B) incidental take permits that, individually or cumulatively, have a minor or negligible effect on the species covered in the habitat conservation plan.

(3) The issuance of special regulations for public use of Service-managed land, which maintain essentially the permitted level of use and do not continue a level of use that has resulted in adverse environmental effects.

(4) The issuance or reissuance of permits for limited additional use of an existing right-of-way for underground or above ground power, telephone, or pipelines, where no new structures (i.e., facilities) or major improvement to those facilities are required; and for permitting a new right-of-way, where no or negligible environmental disturbances are anticipated.[15]

(5) The issuance or reissuance of special use permits for the administration of specialized uses, including agricultural uses, or other economic uses for management purposes, when such uses are compatible, contribute to the purposes of the refuge system unit, and result in no or negligible environmental effects.

(6) The denial of special use permit applications, either initially or when permits are reviewed for renewal, when the proposed action is determined not compatible with the purposes of the refuge system unit.

(7) Activities directly related to the enforcement of fish and wildlife laws, not included in 43 CFR 210.  These activities include:
    (a)    Assessment of civil penalties.
    (b)    Forfeiture of property seized or subject to forfeiture.
    (c)    The issuance or reissuance of rules, procedures, standards, and permits for the designation of ports, inspection, clearance, marking, and license requirements pertaining to wildlife and wildlife products, and for the humane and healthful transportation of wildlife.

(8) Actions where the Service has concurrence or co-approval with another agency and the action is a categorical exclusion for that agency.  This would normally involve one Federal action or connected actions where the Service is a cooperating agency.

---

[15] BLM adopted this CE prior to the 2025 DOI NEPA Regulations Procedures. *See* 90 FR 3908.

NPS-AR-001065

(9) The adding of species to the list of injurious wildlife regulated under the Lacey Act (18 U.S.C. section 42, as amended) as implemented under 50 CFR subchapter B, part 16, which prohibits the importation into the United States and interstate transportation of wildlife found to be injurious.

D. Recovery Plans.  Issuance of recovery plans under section 4(f) of the ESA.

E. Financial Assistance.

(1) State, local, or private financial assistance (grants and/or cooperative agreements), including State planning grants and private land restorations, where the environmental effects are minor or negligible.

(2) *Grants for categorically excluded actions in paragraphs A, B, and C, above; and categorically excluded actions in 43 CFR 46.210 and for categorically excluded actions adopted under NEPA Section 109.

# U.S. Geological Survey (USGS)

9.5 Categorical Exclusions.  The following USGS actions are designated categorical exclusions unless one or more of the Department's extraordinary circumstances applies.  The categorical exclusions shall apply to internal program initiatives performed in the United States and its Trust Territories and Possessions, including Federal lands and the Outer Continental Shelf.

A. Topographic, land use and land cover, geological, mineralogic, resources evaluation, and hydrologic mapping activities, including aerial topographic surveying, photography, and geophysical surveying.

B. Collection of data and samples for geologic, paleontologic, hydrologic, mineralogic, geochemical and surface or subsurface geophysical investigations, and resource evaluation, including contracts therefor.[16]

C. Acquisition of existing geological, hydrological or geophysical data from private exploration ventures.

D. Well logging, aquifer response testing, digital modeling, inventory of existing wells and water supplies, water-sample collection.

E. Operation, construction, installation, and removal – including restoration of sites to the pre-structure condition or equivalent of the surrounding environment – of hydrologic and water quality monitoring structures and equipment including but not limited to weirs, cableways, stream-gaging stations, groundwater wells, and meteorologic structures.

F. Routine exploratory or observation groundwater well drilling operations that do not

---

[16] BLM adopted this CE prior to the 2025 DOI NEPA Procedures. *See* 90 FR 42432.

NPS-AR-001066

require a special access road, and that use portable tanks to recycle and remove drilling mud, and create no significant surface disturbance.[17]

G. Test or exploration drilling and downhole testing, including contracts therefor.[18]

H. Establishment of survey marks, placement and operation of field instruments, and installation of any research/monitoring devices.[19]

I. Digging and subsequent site restoration of exploratory trenches not to exceed one acre of surface disturbance.[20]

J. Establishment of seasonal and temporary field camps.

K. Off-road travel to drilling, data collection, or observation sites that do not impact ecologically sensitive areas such as wilderness areas, wetlands, or areas of critical habitat for listed endangered or threatened species.[21]

L. Hydraulic fracturing of rock formations for the singular purpose of in situ stress measurements.

M. Reports to surface management agencies, or any state, territorial, tribal, commonwealth, or Federal agencies concerning mineral and water resources appraisals.

N. Other actions where USGS has concurrence or co-approval with another Department bureau and the action is a categorical exclusion for that bureau.

O. Minor, routine, or preventive maintenance activities at USGS facilities and lands, and geological, hydrological, or geophysical data collection stations; and

P. Minor activities required to gain or prepare access to sites selected for completion of exploration drilling operations or construction of stations for hydrologic, geologic, or geophysical data collection.[22]

---

[17] BLM adopted this CE prior to the 2025 DOI NEPA Procedures. *See* 90 FR 42432.
[18] BLM adopted this CE prior to the 2025 DOI NEPA Regulations Procedures. *See* 90 FR 42432.
[19] NPS adopted this CE prior to the 2025 DOI NEPA Regulations Procedures. *See* 90 FR 24644.
[20] BLM adopted this CE prior to the 2025 DOI NEPA Regulations Procedures. *See* 90 FR 42432.
[21] BLM adopted this CE prior to the 2025 DOI NEPA Regulations Procedures. *See* 90 FR 42432.
[22] BLM adopted this CE prior to the 2025 DOI NEPA Procedures. *See* 90 FR 42432.

NPS-AR-001067

# Bureau of Indian Affairs (BIA)

10.5   Categorical Exclusions.

A. *Operation, Maintenance, and Replacement of Existing Facilities. Examples are normal renovation of buildings, road maintenance and limited rehabilitation of irrigation structures.

B. Transfer of Existing Federal Facilities to Other Entities. Transfer of existing operation and maintenance activities of Federal facilities to tribal groups, water user organizations, or other entities where the anticipated operation and maintenance activities are agreed to in a contract, follow BIA policy, and no change in facility operations or maintenance is anticipated.

C. Human Resources Programs. Examples are social services, education services, employment assistance, tribal operations, law enforcement and credit and financing activities not related to development.

D. Administrative Actions and Other Activities Relating to Trust Resources. Examples are: Management of trust funds (collection and distribution), budget, finance, estate planning, wills and appraisals.

E. Self-Determination and Self-Governance.

    (1) Self-Determination Act contracts and grants for BIA programs listed as categorical exclusions, or for programs in which environmental impacts are adequately addressed in earlier NEPA analysis.

    (2) Self-Governance compacts for BIA programs which are listed as categorical exclusions or for programs in which environmental impacts are adequately addressed in earlier NEPA analysis.

F. Rights-of-Way.

    (1) *Rights-of-Way inside another right-of-way, or amendments to rights-of-way where no deviations from or additions to the original right-of-way are involved and where there is an existing NEPA analysis covering the same or similar impacts in the right-of-way area.

    (2) *Service line agreements to an individual residence, building or well from an existing facility where installation will involve no clearance of vegetation from the right-of-way other than for placement of poles, signs (including highway signs), or buried power/cable lines.

    (3) *Renewals, assignments, conversions, or temporary construction easements within existing rights-of-way where there would be essentially no change in use and continuation would not lead to environmental degradation.

59

NPS-AR-001068

G.  <u>Minerals</u>.

   (1) Approval of permits for geologic mapping, inventory, reconnaissance and surface sample collecting.

   (2) Approval of unitization agreements, pooling or communitization agreements.

   (3) Approval of mineral lease adjustments and transfers, including assignments and subleases.

   (4) Approval of royalty determinations such as royalty rate adjustments of an existing lease or contract agreement.

H.  <u>Forestry</u>.

   (1) Approval of free-use cutting, without permit, to Indian owners for on-reservation personal use of forest products, not to exceed 2,500 feet board measure when cutting will not adversely affect associated resources such as riparian zones, areas of special significance, etc.

   (2) Approval and issuance of cutting permits for forest products not to exceed $5,000 in value.

   (3) *Approval and issuance of paid timber cutting permits or contracts for products valued at less than $25,000 when in compliance with policies and guidelines established by a current management plan addressed in earlier NEPA analysis.

   (4) *Approval of annual logging plans when in compliance with policies and guidelines established by a current management plan addressed in earlier NEPA analysis.

   (5) Approval of Fire Management Planning Analysis detailing emergency fire suppression activities.

   (6) *Approval of emergency forest and range rehabilitation plans when limited to environmental stabilization on less than 10,000 acres and not including approval of salvage sales of damaged timber.

   (7) *Approval of forest stand improvement projects of less than 2000 acres when in compliance with policies and guidelines established by a current management plan addressed in earlier NEPA analysis.

   (8) *Approval of timber management access skid trail and logging road construction when consistent with policies and guidelines established by a current management plan addressed in earlier NEPA analysis.

   (9) *Approval of prescribed burning plans of less than 2000 acres when in compliance

60

with policies and guidelines established by a current management plan addressed in earlier NEPA analysis.

(10) *Approval of forestation projects with native species and associated protection and site preparation activities on less than 2000 acres when consistent with policies and guidelines established by a current management plan addressed in earlier NEPA analysis.

(11) *Harvesting live trees not to exceed 70 acres, requiring no more than 0.5 mile of temporary road construction.  Such activities:

    (a)  Shall not include even-aged regeneration harvests or vegetation type conversions.

    (b)  May include incidental removal of trees for landings, skid trails, and road clearing.

    (c)  May include temporary roads which are defined as roads authorized by contract, permit, lease, other written authorization, or emergency operation not intended to be part of the BIA or Tribal transportation systems and not necessary for long-term resource management.  Temporary roads shall be designed to standards appropriate for the intended uses, considering safety, cost of transportation, and impacts on land and resources; and

    (d)  Shall require the treatment of temporary roads constructed or used so as to permit the reestablishment by artificial or natural means, of vegetative cover on the roadway and areas where the vegetative cover was disturbed by the construction or use of the road, as necessary to minimize erosion from the disturbed area.  Such treatment shall be designed to reestablish vegetative cover as soon as practicable, but at least within 10 years after the termination of the contract. Examples include, but are not limited to:

        (i)  Removing individual trees for sawlogs, specialty products, or fuelwood.

        (ii) Commercial thinning of overstocked stands to achieve the desired stocking level to increase health and vigor.

(12) *Salvaging dead or dying trees not to exceed 250 acres, requiring no more than 0.5 mile of temporary road construction.  Such activities:

    (a)  May include incidental removal of live or dead trees for landings, skid trails, and road clearing.

    (b)  May include temporary roads which are defined  as roads authorized by contract, permit, lease, other written authorization, or emergency operation not intended to be part of the BIA or Tribal transportation systems and not necessary for long-term resource management.  Temporary roads shall be designed to standards appropriate for the intended uses, considering safety, cost of transportation, and impacts on land and resources; and

    (c)  Shall require the treatment of temporary roads constructed or used so as to permit the reestablishment, by artificial or natural means, of vegetative cover on the roadway and areas where the vegetative cover was disturbed by the construction or use of the road, as necessary to minimize erosion from the disturbed area.  Such treatment shall be designed to reestablish vegetative cover as soon as practicable, but at least within 10 years after the termination

61

of the contract.

    (d) For this CE, a dying tree is defined as a standing tree that has been severely damaged by forces such as fire, wind, ice, insects, or disease, such that in the judgment of an experienced forest professional or someone technically trained for the work, the tree is likely to die within a few years.
Examples include, but are not limited to:
        (i)  Harvesting a portion of a stand damaged by a wind or ice event.
        (ii) Harvesting fire damaged trees.

(13) *Commercial and non-commercial sanitation harvest of trees to control insects or disease not to exceed 250 acres, requiring no more than 0.5 miles of temporary road construction.  Such activities:
    (a) May include removal of infested/infected trees and adjacent live uninfested/uninfected trees as determined necessary to control the spread of insects or disease; and
    (b) May include incidental removal of live or dead trees for landings, skid trails, and road clearing.
    (c) May include temporary roads which are defined as roads authorized by contract, permit, lease, other written authorization, or emergency operation not intended to be part of the BIA or tribal transportation systems and not necessary for long-term resource management.  Temporary roads shall be designed to standards appropriate for the intended uses, considering safety, cost of transportation, and impacts on land and resources; and
    (d) Shall require the treatment of temporary roads constructed or used so as to permit the reestablishment, by artificial or natural means, of vegetative cover on the roadway and areas where the vegetative cover was disturbed by the construction or use of the road, as necessary to minimize erosion from the disturbed area.  Such treatment shall be designed to reestablish vegetative cover as soon as practicable, but at least within 10 years after the termination of the contract. Examples include, but are not limited to:
        (i)  Felling and harvesting trees infested with mountain pine beetles and immediately adjacent uninfested trees to control expanding spot infestations (a buffer); and
        (ii) Removing or destroying trees infested or infected with a new exotic insect or disease, such as emerald ash borer, Asian longhorned beetle, or sudden oak death pathogen.

I.   <u>Land Conveyance and Other Transfers</u>.

Approvals or grants of conveyances and other transfers of interests in land where no change in land use is planned.

J.   <u>Reservation Proclamations</u>.

Lands established as or added to a reservation pursuant to 25U.S.C. 467, where no change in land use is planned.

62

K.  <u>Waste Management</u>.

(1)  *Closure operations for solid waste facilities when done in compliance with other federal laws and regulations and where cover material is taken from locations which have been approved for use by earlier NEPA analysis.

(2)  *Activities involving remediation of hazardous waste sites if done in compliance with applicable federal laws such as the Resource Conservation and Recovery Act (P.L. 94-580), Comprehensive Environmental Response, Compensation, and Liability Act (P.L. 96-516) or Toxic Substances Control Act (P.L. 94-469).

L.  <u>Roads and Transportation</u>.

(1)  *Approval of utility installations along or across a transportation facility located in whole within the limits of the roadway right-of-way.

(2)  *Construction of bicycle and pedestrian lanes and paths adjacent to existing highways and within the existing rights-of-way.

(3)  *Activities included in a "highway safety plan" under 23 CFR 402.

(4)  *Installation of fencing, signs, pavement markings, small passenger shelters, traffic signals, and railroad warning devices where no substantial land acquisition or traffic disruption will occur.

(5)  Emergency repairs under 23 U.S.C. 125.

(6)  *Acquisition of scenic easements.

(7)  Alterations to facilities to make them accessible for the elderly or handicapped.

(8)  Resurfacing a highway without adding to the existing width.

(9)  *Rehabilitation, reconstruction or replacement of an existing bridge structure on essentially the same alignment or location (e.g., widening, adding shoulders or safety lanes, walkways, bikeways or guardrails).

(10)  Approvals for changes in access control within existing rights-of-way.

(11)  *Road construction within an existing right-of-way which has already been acquired for a HUD housing project and for which earlier NEPA analysis has already been prepared.

(12)  *Oversight of a Tribe's Tribal Transportation Program (TTP) activities under 25 CFR Part 170, when the categorical exclusions under NEPA at 23 CFR 771.117 governing the use of funds made available through title 23 apply to qualifying TTP projects involving the construction or maintenance of roads. (25 CFR 170.453)

63

M. <u>Other</u>.

    (1) *Data gathering activities such as inventories, soil and range surveys, timber cruising, geological, geophysical, archeological, paleontological and cadastral surveys.

    (2) *Establishment of non-disturbance environmental quality monitoring programs and field monitoring stations including testing services.

    (3) *Actions where BIA has concurrence or co-approval with another Bureau and the action is categorically excluded for that Bureau.

    (4) *Approval of an Application for Permit to Drill for a new water source or observation/geotechnical monitoring well.

    (5) *Approval of conversion of an abandoned oil well to a water well if water facilities are established only near the well site.[23]

    (6) *Approval and issuance of permits under the Archaeological Resources Protection Act (16 U.S.C. 470aa-ll) when the permitted activity is being done as part of an action for which a NEPA analysis has been, or is being prepared.

    (7) *Approval of leases, easements or funds for single-family homesites and associated improvements, including but not limited to, construction of homes, outbuildings, access roads, and utility lines, which encompass five acres or less of contiguous land, provided that such sites and associated improvements do not adversely affect any tribal cultural resources or historic properties and are in compliance with applicable federal and tribal laws. Home construction may include up to four dwelling units, whether in a single building or up to four separate buildings.

# Bureau of Land Management (BLM)

11.9  <u>Categorical Exclusions.</u> The following BLM actions are designated categorical exclusions unless one or more of the Department's extraordinary circumstances apply. As proposed actions are designed and then reviewed against the CE list, proposed actions or activities must be, at a minimum, consistent with DOI and BLM manuals, handbooks, policies, and applicable land use plans regarding design features, best management practices, terms and conditions, conditions of approval, and stipulations.

CEs established by statute, adopted under Section 109 or marked by an asterisk require documentation. For most other actions that are categorically excluded using administrative CEs, BLM recommends that the Responsible Official document which CX applies. Documentation would often not be necessary for:

---

[23] BLM adopted this CE prior to the 2025 DOI NEPA Procedures. *See* 90 FR 42432.

NPS-AR-001073

- Actions that have no environmental effect (e.g., personnel actions (43 CFR 46.210(a)), routine financial transactions (43 CFR 46.210(c)), mineral lease transfers (DOI NEPA Handbook, Appendix 2, 11.9 (B)(2)), or transfer of rights-of-way from one agency to another (DOI NEPA Handbook, Appendix 2, 11.9 (E)(10)); or

- Actions that have negligible environmental effect (e.g., nondestructive data collection (43 CFR 46.210(e)), installation of routine signs and markers (DOI NEPA Handbook, Appendix 2, 11.9 (G)(2)), placement of portable sanitation devices (DOI NEPA Handbook, Appendix 2, 11.9 (G)(4)), or installation of small monitoring devices (DOI NEPA Handbook, Appendix 2, 11.9 (K)(3)).

A.  <u>Fish and Wildlife</u>.

(1) Modification of existing fences to provide improved wildlife ingress and egress.

(2) Minor modification of water developments to improve or facilitate wildlife use (e.g., modify enclosure fence, install flood valve, or reduce ramp access angle).

(3) Construction of perches, nesting platforms, islands, and similar structures for wildlife use.

(4) Temporary emergency feeding of wildlife during periods of extreme adverse weather conditions.

(5) Routine augmentations, such as fish stocking, providing no new species are introduced.

(6) Relocation of nuisance or depredating wildlife, providing the relocation does not introduce new species into the ecosystem.[24]

(7) Installation of devices on existing facilities to protect animal life, such as raptor electrocution prevention devices.

B.  <u>Oil, Gas, and Geothermal Energy</u>.

(1) Issuance of future interest leases under the Mineral Leasing Act for Acquired Lands, where the subject lands are already in production.

(2) Approval of mineral lease adjustments and transfers, including assignments and subleases.

(3) Approval of unitization agreements, communitization agreements, drainage agreements, underground storage agreements, development contracts, or geothermal unit or participating area agreements.

---

[24] NPS adopted this CE prior to the 2025 DOI NEPA Procedures. *See* 90 FR 24644.

65

(4) Approval of suspensions of operations, force majeure suspensions, and suspensions of operations and production.

(5) Approval of royalty determinations, such as royalty rate reductions.

(6) Approval of Notices of Intent to conduct geophysical exploration of oil, gas, or geothermal, pursuant to 43 CFR 3150 or 3250, when no temporary or new road construction is proposed.

(7) *Approval of an operations plan and associated Geothermal Drilling Permits for a geothermal resource confirmation project pursuant to 43 CFR part 3200, subpart 3260; which:
  (a) Does not include resource utilization;
  (b) Does not exceed 20 acres of total (contiguous or noncontiguous) surface disturbance;
  (c) Requires reclamation of all surface disturbances when their intended purpose has been fulfilled;
  (d) Requires reclamation of temporary routes when their intended purpose(s) has been fulfilled, unless through a separate review and decision-making process the BLM incorporates and appropriately designates the route as part of its transportation system;
  (e) Does not make a temporary route available for public use unless the temporary route is specifically intended to accommodate public use;
  (f) Requires temporary routes to be constructed or used so as to allow for the reclamation, by artificial or natural means, of vegetative cover on the temporary route and areas where the vegetative cover was disturbed by the construction or use of the route, and requires such treatment to be designed to reestablish vegetative cover as soon as possible, but at most within 10 years after approved reclamation commences; and,
  (g) Includes design elements to protect resources and resource uses consistent with the applicable Resource Management Plan, laws, regulations, and lease terms

(8) Approval of a Notice of Intent to Conduct Geothermal Resource Exploration Operations, pursuant to 43 CFR part 3200 subpart 3250, that:
  (a) Does not include the direct testing of geothermal resources or resource utilization;
  (b) Does not exceed 10 acres of total (contiguous or noncontiguous) surface disturbance;
  (c) Requires reclamation of surface disturbances when their intended purpose has been fulfilled;
  (d) Requires reclamation of temporary routes when their intended purpose(s) has been fulfilled, unless through a separate review and decision-making process the BLM incorporates and appropriately designates the route as part of its transportation system.
  (e) Does not make a temporary route available for public use unless the temporary route is specifically intended to accommodate public use;
  (f) Requires temporary routes to be constructed or used so as to allow for the reclamation, by artificial or natural means, of vegetative cover on the

66

NPS-AR-001075

temporary route and areas where the vegetative cover was disturbed by the construction or use of the route, and requires such treatment to be designed to reestablish vegetative cover as soon as possible, but at most within 10 years after approved reclamation commences; and,

(g) Includes design elements to protect resources and resource uses consistent with the applicable Resource Management Plan, laws, regulations, and any lease terms (as applicable).

C. <u>Forestry</u>.

(1) Land cultivation and silvicultural activities (excluding herbicide application) in forest tree nurseries, seed orchards, and progeny test sites.

(2) Sale and removal of individual trees or small groups of trees which are dead, diseased, injured, or which constitute a safety hazard, and where access for the removal requires no more than maintenance to existing roads.

(3) Seeding or reforestation of timber sales or burn areas where no chaining is done, no pesticides are used, and there is no conversion of timber type or conversion of non-forest to forest land.  Specific reforestation activities covered include: seeding and seedling plantings, shading, tubing (browse protection), paper mulching, bud caps, ravel protection, application of non-toxic big game repellant, spot scalping, rodent trapping, fertilization of seed trees, fence construction around out-planting sites, and collection of pollen, scions and cones.

(4) Pre-commercial thinning and brush control using small mechanical devices.

(5) Disposal of small amounts of miscellaneous vegetation products outside established harvest areas, such as Christmas trees, wildings, floral products (ferns, boughs, etc.), cones, seeds, and personal use firewood.

(6) Felling, bucking, and scaling sample trees to ensure accuracy of timber cruises. Such activities:
    (a) Shall be limited to an average of one tree per acre or less,
    (b) Shall be limited to gas-powered chainsaws or hand tools,
    (c) Shall not involve any road or trail construction,
    (d) Shall not include the use of ground based equipment or other manner of timber yarding, and
    (e) Shall be limited to the Coos Bay, Eugene, Medford, Roseburg, and Salem Districts and Lakeview District, Klamath Falls Resource Area in Oregon.

(7) Harvesting live trees not to exceed 70 acres, requiring no more than 0.5 mile of temporary road construction.  Such activities:
    (a) Shall not include even-aged regeneration harvests or vegetation type conversions.
    (b) May include incidental removal of trees for landings, skid trails, and road clearing
    (c)  May include temporary roads which are defined as roads authorized by

67

contract, permit, lease, other written authorization, or emergency operation not intended to be part of the BLM transportation system and not necessary for long-term resource management. Temporary roads shall be designed to standards appropriate for the intended uses, considering safety, cost of transportation, and impacts on land and resources; and

(d) Shall require the treatment of temporary roads constructed or used so as to permit the reestablishment by artificial or natural means, or vegetative cover on the roadway and areas where the vegetative cover was disturbed by the construction or use of the road, as necessary to minimize erosion from the disturbed area. Such treatment shall be designed to reestablish vegetative cover as soon as practicable, but at least within 10 years after the termination of the contract. Examples include, but are not limited to:

　　(i) Removing individual trees for sawlogs, specialty products, or fuelwood.

　　(ii) Commercial thinning of overstocked stands to achieve the desired stocking level to increase health and vigor.

(8) Salvaging dead or dying trees not to exceed 250 acres, requiring no more than 0.5 mile of temporary road construction. Such activities:

(a) May include incidental removal of live or dead trees for landings, skid trails, and road clearing.

(b) May include temporary roads which are defined as roads authorized by contract, permit, lease, other written authorization, or emergency operation not intended to be part of the BLM transportation system and not necessary for long-term resource management. Temporary roads shall be designed to standards appropriate for the intended uses, considering safety, cost of transportation, and impacts on land and resources; and

(c) Shall require the treatment of temporary roads constructed or used so as to permit the reestablishment, by artificial or natural means, of vegetative cover on the roadway and areas where the vegetative cover was disturbed by the construction or use of the road, as necessary to minimize erosion from the disturbed area. Such treatment shall be designed to reestablish vegetative cover as soon as practicable, but at least within 10 years after the termination of the contract.

(d) For this CX, a dying tree is defined as a standing tree that has been severely damaged by forces such as fire, wind, ice, insects, or disease, and that in the judgment of an experienced forest professional or someone technically trained for the work, is likely to die within a few years. Examples include, but are not limited to:

　　(i) Harvesting a portion of a stand damaged by a wind or ice

　　(ii) Harvesting fire damaged trees.

(9) Commercial and non-commercial sanitation harvest of trees to control insects or disease not to exceed 250 acres, requiring no more than 0.5 miles of temporary road construction. Such activities:

(a) May include removal of infested/infected trees and adjacent live uninfested/uninfected trees as determined necessary to control the spread of insects or disease; and

68

(b) May include incidental removal of live or dead trees for landings, skid trails, and road clearing.

(c) May include temporary roads which are defined as roads authorized by contract, permit, lease, other written authorization, or emergency operation not intended to be part of the BLM transportation system and not necessary for long-term resource management.  Temporary roads shall be designed to standards appropriate for the intended uses, considering safety, cost of transportation, and impacts on land and resources; and

(d) Shall require the treatment of temporary roads constructed or used so as to permit the reestablishment, by artificial or natural means, of vegetative cover on the roadway and areas where the vegetative cover was disturbed by the construction or use of the road, as necessary to minimize erosion from the disturbed area.  Such treatment shall be designed to reestablish vegetative cover as soon as practicable, but at least within 10 years after the termination of the contract.  Examples include, but are not limited to:

(i) Felling and harvesting trees infested with mountain pine beetles and immediately adjacent uninfested trees to control expanding spot infestations; and

(ii) Removing or destroying trees infested or infected with a new exotic insect or disease, such as emerald ash borer, Asian longhorned beetle, or sudden oak death pathogen.

D.  Rangeland Management.

(1) Approval of transfers of grazing preference.

(2) Placement and use of temporary (not to exceed one month) portable corrals and water troughs, providing no new road construction is needed.

(3) Temporary emergency feeding of livestock or wild horses and burros during periods of extreme adverse weather conditions.

(4) Removal of wild horses or burros from private lands at the request of the landowner.

(5) Processing (transporting, sorting, providing veterinary care, vaccinating, testing for communicable diseases, training, gelding, marketing, maintaining, feeding, and trimming of hooves of) excess wild horses and burros.

(6) Approval of the adoption of healthy, excess wild horses and burros.

(7) Actions required to ensure compliance with the terms of Private Maintenance and Care agreements.

(8) Issuance of title to adopted wild horses and burros.

(9) Destroying old, sick, and lame wild horses and burros as an act of mercy.

69

E. <u>Realty</u>.

(1)    Withdrawal extensions or modifications, which only establish a new time period and entail no changes in segregative effect or use.

(2)    Withdrawal revocations, terminations, extensions, or modifications; and classification terminations or modifications which do not result in lands being opened or closed to the general land laws or to the mining or mineral leasing laws.

(3)    Withdrawal revocations, terminations, extensions, or modifications; classification terminations or modifications; or opening actions where the land would be opened only to discretionary land laws and where subsequent discretionary actions (prior to implementation) are in conformance with and are covered by a Resource Management Plan/EIS (or plan amendment and EA or EIS).

(4)    Administrative conveyances from the Federal Aviation Administration (FAA) to the State of Alaska to accommodate airports on lands appropriated by the FAA prior to the enactment of the Alaska Statehood Act.

(5)    Actions taken in conveying mineral interest where there are no known mineral values in the land under Section 209(b) of the Federal Land Policy and Management Act of 1976 (FLPMA).

(6)    Resolution of class one color-of-title cases.

(7)    Issuance of recordable disclaimers of interest under Section 315 of FLPMA.

(8)    Corrections of patents and other conveyance documents under Section 316 of FLPMA and other applicable statutes.

(9)    Renewals and assignments of leases, permits, or rights-of-way where no additional rights are conveyed beyond those granted by the original authorizations.

(10)    Transfer or conversion of leases, permits, or rights-of-way from one agency to another (e.g., conversion of Forest Service permits to a BLM Title V Right-of-way).

(11)    Conversion of existing right-of-way grants to Title V grants or existing leases to FLPMA Section 302(b) leases where no new facilities or other changes are needed.

(12)    Grants of right-of-way wholly within the boundaries of other compatibly developed rights-of-way.[25]

(13)    Amendments to existing rights-of-way, such as the upgrading of existing facilities, which entail no additional disturbances outside the right-of-way boundary.

(14)    Grants of rights-of-way for an overhead line (no pole or tower on BLM land)

---

[25] NPS adopted this CE prior to the 2025 DOI NEPA Procedures. *See* 90 FR 24644.

70

crossing over a corner of public land.

(15) Transfers of land or interest in land to or from other bureaus or federal agencies where current management will continue and future changes in management will be subject to the NEPA process.

(16) Acquisition of easements for an existing road or issuance of leases, permits, or rights-of-way for the use of existing facilities, improvements, or sites for the same or similar purposes.

(17) Grant of a short rights-of-way for utility service or terminal access roads to an individual residence, outbuilding, or water well.

(18) Temporary placement of a pipeline above ground.

(19) Issuance of short-term (3 years or less) rights-of-way or land use authorizations for such uses as storage sites, apiary sites, and construction sites where the proposal includes rehabilitation to restore the land to its natural or original condition.

(20) One-time issuance of short-term (3 years or less) rights-of-way or land use authorizations which authorize trespass action where no new use or construction is allowed, and where the proposal includes rehabilitation to restore the land to its natural or original condition.

F. Solid Minerals.

(1) Issuance of future interest leases under the Mineral Leasing Act for Acquired Lands where the subject lands are already in production.

(2) Approval of mineral lease readjustments, renewals, and transfers including assignments and subleases.

(3) Approval of suspensions of operations, force majeure suspensions, and suspensions of operations and production.

(4) Approval of royalty determinations, such as royalty rate reductions and operations reporting procedures.

(5) Determination and designation of logical mining units.

(6) Findings of completeness furnished to the Office of Surface Mining Reclamation and Enforcement for Resource Recovery and Protection Plans.

(7) Approval of minor modifications to or minor variances from activities described in an approved exploration plan for leasable, salable, and locatable minerals (e.g., the approved plan identifies no new surface disturbance outside the areas already identified to be disturbed).

71

(8)    Approval of minor modifications to or minor variances from activities described in an approved underground or surface mine plan for leasable minerals (e.g., change in mining sequence or timing).

(9)    Digging of exploratory trenches for mineral materials, except in riparian areas.

(10)    Disposal of mineral materials, such as sand, stone, gravel, pumice, pumicite, cinders, and clay, in amounts not exceeding 50,000 cubic yards or disturbing more than 5 acres, except in riparian areas.

G.    Transportation.
(1)    Incorporation of eligible roads and trails in any transportation plan when no new construction or upgrading is needed.

(2)    Installation of routine signs, markers, culverts, ditches, waterbars, gates, or cattleguards on/or adjacent to roads and trails identified in any land use or transportation plan, or eligible for incorporation in such plan.

(3)    Temporary closure of roads and trails.

(4)    Placement of recreational, special designation, or information signs, visitor registers, kiosks, and portable sanitation devices.

H.    Recreation Management.  Issuance of Special Recreation Permits for day use or overnight use up to 14 consecutive nights; that impacts no more than 3 staging area acres; and/or for recreational travel along roads, trails, or in areas authorized in a land use plan. This CX cannot be used for commercial boating permits along Wild and Scenic Rivers. This CX cannot be used for the establishment or issuance of Special Recreation Permits for "Special Area" management (43 CFR 2932.5).

I.    Emergency Stabilization.

(1)    Planned actions in response to wildfires, floods, weather events, earthquakes, or landslips that threaten public health or safety, property, and/or natural and cultural resources, and that are necessary to repair or improve lands unlikely to recover to a management-approved condition as a result of the event.  Such activities shall be limited to:  repair and installation of essential erosion control structures; replacement or repair of existing culverts, roads, trails, fences, and minor facilities; construction of protection fences; planting, seeding, and mulching; and removal of hazard trees, rocks, soil, and other mobile debris from, on, or along roads, trails, campgrounds, and watercourses.  These activities:
(a)    Shall be completed within one year following the event;
(b)    Shall not include the use of herbicides or pesticides;
(c)    Shall not include the construction of new roads or other new permanent infrastructure;
(d)    Shall not exceed 4,200 acres; and
(e)    May include temporary roads which are defined as roads authorized by

72

contract, permit, lease, other written authorization, or emergency operation not intended to be part of the BLM transportation system and not necessary for long-term resource management.  Temporary roads shall be designed to standards appropriate for the intended uses, considering safety, cost of transportation, and impacts on land and resources; and

(f) Shall require the treatment of temporary roads constructed or used so as to permit the reestablishment by artificial or natural means, or vegetative cover on the roadway and areas where the vegetative cover was disturbed by the construction or use of the road, as necessary to minimize erosion from the disturbed area.  Such treatment shall be designed to reestablish vegetative cover as soon as practicable, but at least within 10 years after the termination of the contract. [26]

J. Habitat Restoration

Reserved.

K. Other.

(1) Reserved.

(2) Acquisition of existing water developments (e.g., wells and springs) on public land.

(3) Conducting preliminary hazardous materials assessments and site investigations, site characterization studies and environmental monitoring.  Included are siting, construction, installation and/or operation of small monitoring devices such as wells, particulate dust counters and automatic air or water samples.

(4) Use of small sites for temporary field work camps where the sites will be restored to their natural or original condition within the same work season.

(5) Reserved.

(6) A single trip in a one month period for data collection or observation sites.

(7) Construction of snow fences for safety purposes or to accumulate snow for small water facilities.

(8) Installation of minor devices to protect human life (e.g., grates across mines).

(9) Construction of small protective enclosures, including those to protect reservoirs and springs and those to protect small study areas.

(10) Removal of structures and materials of no historical value, such as abandoned automobiles, fences, and buildings, including those built in trespass and reclamation

---

[26] NPS adopted this CE prior to the 2025 DOI NEPA Procedures. *See* 90 FR 24644.

73

NPS-AR-001082

of the site when little or no surface disturbance is involved.

(11) Actions where the BLM has concurrence or co-approval with another DOI agency and the action is categorically excluded for that DOI agency.

(12) Rendering formal classification of lands as to their mineral character, waterpower, and water storage values.

11.10 Categorical Exclusions Established or Directed by Statute

A. The Energy Policy Act of 2005 (Public Law 109-58) (42 USC 15942) established actions for categorical exclusion from NEPA analysis. Use of Energy Policy Act categorical exclusions does not require review for extraordinary circumstances. This is because these CXs are established by statute, and their application is governed by that statute. Section 390 of the Energy Policy Act of 2005 provides:

(a) NEPA Review.—Action by the Secretary of the Interior in managing the public lands, with respect to any of the activities described in subsection (b), shall be subject to a rebuttable presumption that the use of a categorical exclusion under the National Environmental Policy Act (NEPA) of 1969 would apply if the activity is conducted pursuant to the Mineral Leasing Act for the purpose of exploration or development of oil or gas.

(1) Activities Described.—The activities referred to in subsection (a) are the following: Individual surface disturbances of less than 5 acres so long as the total surface disturbance on the lease is not greater than 150 acres and site- specific analysis in a document prepared pursuant to NEPA has been previously completed.

(2) Drilling an oil or gas well at a location or well pad site at which drilling has occurred previously within 5 years prior to the date of spudding the well.

(3) Drilling an oil or gas well within a developed field for which an approved land use plan or any environmental document prepared pursuant to NEPA analyzed such drilling as a reasonably foreseeable activity, so long as such plan or document was approved within 5 years prior to the date of spudding the well.

(4) Placement of a pipeline in an approved right-of-way corridor, so long as the corridor was approved within 5 years prior to the date of placement of the pipeline.

(5) Maintenance of a minor activity, other than any construction or major renovation of a building or facility.

B. Section 3023 "Grazing Permits and Leases" of Public Law 113-291, The Carl Levin and Howard P. 'Buck' McKeon National Defense Authorization Act for Fiscal Year 2015, amended Section 402 of FLPMA. The amended text is now included in FLPMA, as amended, as Section 402(h). Therefore, the BLM may use the grazing permit categorical exclusion (1) or the trailing and crossing categorical exclusion (2). Application of either categorical exclusion requires extraordinary circumstances review. Section 402(h) of FLPMA provides:

(1) IN GENERAL.—The issuance of a grazing permit or lease by the Secretary

74

concerned may be categorically excluded from the requirement to prepare an environmental assessment or an environmental impact statement under the National Environmental Policy Act of 1969 (42 U.S.C. 4321 et seq.) if—

 (A) the issued permit or lease continues the current grazing management of the allotment; and

 (B) the Secretary concerned—

  (i) has assessed and evaluated the grazing allotment associated with the lease or permit; and

  (ii) based on the assessment and evaluation under clause (i), has determined that the allotment—

   (I) with respect to public land administered by the Secretary of the Interior—

    (aa) is meeting land health standards; or

    (bb) is not meeting land health standards due to factors other than existing livestock grazing; or

(2) TRAILING AND CROSSING.—The trailing and crossing of livestock across public land and the implementation of trailing and crossing practices by the Secretary concerned may be categorically excluded from the requirement to prepare an environmental assessment or an environmental impact statement under the National Environmental Policy Act of 1969 (42 U.S.C. 4321 et seq.)

C. The Agriculture Improvement Act of 2018 (P.L. 115-334) amended Title VI of the Healthy Forests Restoration Act of 2003 (HFRA) (16 U.S.C. 6591 et seq.) to add Section 606. Section 606 directed development of a categorical exclusion for covered vegetation management activities carried out to protect, restore, or improve habitat for greater sage-grouse or mule deer (HFRA, Section 606(b)(1)). This categorical exclusion may be used to carry out a "covered vegetation management activity" (defined at HFRA, Section 606(a)(1)(B)) whose purpose is for the management of greater sage-grouse and mule deer habitat on public lands that was designated under HFRA section 602(b), on December 20, 2018 (HFRA, Section 606(g)(2)). Application of this categorical exclusion requires extraordinary circumstances review. Section 606 of HFRA provides:

 (a) Definitions.—In this section:

  (1) COVERED VEGETATION MANAGEMENT ACTIVITY.—

   (A) IN GENERAL.—The term 'covered vegetation management activity' means any activity described in subparagraph (B) that—

    (i) (II) is carried out on public land administered by the Bureau of Land Management;

    (ii) with respect to public land, meets the objectives of the order of the Secretary of the Interior numbered 3336 and dated January 5, 2015;

    (iii) conforms to an applicable land use plan;

    (iv) protects, restores, or improves greater sage-grouse or mule deer habitat in a sagebrush steppe ecosystem as described in—

     (I) Circular 1416 of the United States Geological Survey entitled 'Restoration Handbook for Sagebrush Steppe Ecosystems with Emphasis on Greater Sage-Grouse Habitat—Part 1. Concepts for

75

Understanding and Applying Restoration' (2015); or
(II) the habitat guidelines for mule deer published by the Mule Deer Working Group of the Western Association of Fish and Wildlife Agencies;

(v) will not permanently impair—
(I) the natural state of the treated area;
(II) outstanding opportunities for solitude;
(III) outstanding opportunities for primitive, unconfined recreation;
(IV) economic opportunities consistent with multiple-use management; or
(V) the identified values of a unit of the National Landscape Conservation System;

(vi)
(I) restores native vegetation following a natural disturbance;
(II) prevents the expansion into greater sage-grouse or mule deer habitat of—
(aa) juniper, pinyon pine, or other associated conifers; or
(bb) nonnative or invasive vegetation;
(III) reduces the risk of loss of greater sage-grouse or mule deer habitat from wildfire or any other natural disturbance; or
(IV) provides emergency stabilization of soil resources after a natural disturbance; and

(vii) provides for the conduct of restoration treatments that—
(I) maximize the retention of old-growth and large trees, as appropriate for the forest type;
(II) consider the best available scientific information to maintain or restore the ecological integrity, including maintaining or restoring structure, function, composition, and connectivity;
(III) are developed and implemented through a collaborative process that—
(aa) includes multiple interested persons representing diverse interests; and
(bb)
(AA) is transparent and nonexclusive; or
(BB) meets the requirements for a resource advisory committee under subsections (c) through (f) of section 205 of the Secure Rural Schools and Community Self-Determination Act of 2000 (16 U.S.C. 7125); and
(IV) may include the implementation of a proposal that complies with the eligibility requirements of the

76

NPS-AR-001085

Collaborative Forest Landscape Restoration Program under section 4003(b) of the Omnibus Public Land Management Act of 2009 (16 U.S.C. 7303(b)).

(B) DESCRIPTION OF ACTIVITIES.—An activity referred to in subparagraph (A) is—

    (i) manual cutting and removal of juniper trees, pinyon pine trees, other associated conifers, or other nonnative or invasive vegetation;

    (ii) mechanical mastication, cutting, or mowing, mechanical piling and burning, chaining, broadcast burning, or yarding;

    (iii) removal of cheat grass, medusa head rye, or other nonnative, invasive vegetation;

    (iv) collection and seeding or planting of native vegetation using a manual, mechanical, or aerial method;

    (v) seeding of nonnative, noninvasive, ruderal vegetation only for the purpose of emergency stabilization;

    (vi) targeted use of an herbicide, subject to the condition that the use shall be in accordance with applicable legal requirements, Federal agency procedures, and land use plans;

    (vii) targeted livestock grazing to mitigate hazardous fuels and control noxious and invasive weeds;

    (viii) temporary removal of wild horses or burros in the area in which the activity is being carried out to ensure treatment objectives are met;

    (ix) in coordination with the affected permit holder, modification or adjustment of permissible usage under an annual plan of use of a grazing permit issued by the Secretary concerned to achieve restoration treatment objectives;

    (x) installation of new, or modification of existing, fencing or water sources intended to control use or improve wildlife habitat; or

    (xi) necessary maintenance of, repairs to, rehabilitation of, or reconstruction of an existing permanent road or construction of temporary roads to accomplish the activities described in this subparagraph.

(C) EXCLUSIONS.—The term 'covered vegetation management activity' does not include—

    (i) any activity conducted in a wilderness area or wilderness study area;

    (ii) any activity for the construction of a permanent road or permanent trail;

    (iii) any activity conducted on Federal land on which, by Act of Congress or Presidential proclamation, the removal of vegetation is restricted or prohibited;

    (iv) any activity conducted in an area in which activities under

77

subparagraph (B) would be inconsistent with the applicable resource management plan; or.

   (2) SECRETARY CONCERNED.—The term 'Secretary concerned' means—

      (B) the Secretary of the Interior, with respect to public land.

   (3) TEMPORARY ROAD.—The term 'temporary road' means a road that is—

      (A) authorized—

         (i) by a contract, permit, lease, other written authorization; or

         (ii) pursuant to an emergency operation;

      (B) not intended to be part of the permanent transportation system of a Federal department or agency;

      (C) not necessary for long-term resource management;

      (D) designed in accordance with standards appropriate for the intended use of the road, taking into consideration—

         (i) safety;

         (ii) the cost of transportation; and

         (iii) impacts to land and resources; and

      (E) managed to minimize—

         (i) erosion; and

         (ii) the introduction or spread of invasive species.

(b) Categorical Exclusion.—

   (1) IN GENERAL.—Not later than 1 year after the date of enactment of this section, the Secretary concerned shall develop a categorical exclusion (as defined in section 1508.4 of title 40, Code of Federal Regulations (or a successor regulation)) for covered vegetation management activities carried out to protect, restore, or improve habitat for greater sage-grouse or mule deer.

   (2) ADMINISTRATION.—In developing and administering the categorical exclusion under paragraph (1), the Secretary concerned shall—

      (A) comply with the National Environmental Policy Act of 1969 (42 U.S.C. 4321 et seq.);

      (C) with respect to public land, apply the extraordinary circumstances procedures under section 46.215 of title 43, Code of Federal Regulations (or successor regulations), in determining whether to use the categorical exclusion; and

      (D) consider—

         (i) the relative efficacy of landscape-scale habitat projects;

         (ii) the likelihood of continued declines in the populations of greater sage-grouse and mule deer in the absence of landscape-scale vegetation management; and

         (iii) the need for habitat restoration activities after wildfire or other natural disturbances.

(c) Implementation Of Covered Vegetative Management Activities Within The Range Of Greater Sage-Grouse And Mule Deer.—If the categorical exclusion developed under subsection (b) is used to implement a covered vegetative management activity in an area within the range of both greater sage-grouse and mule deer, the covered vegetative management activity shall protect, restore, or

78

improve habitat concurrently for both greater sage-grouse and mule deer.

    (d) Long-Term Monitoring And Maintenance.—Before commencing any covered vegetation management activity that is covered by the categorical exclusion under subsection (b), the Secretary concerned shall develop a long-term monitoring and maintenance plan, covering at least the 20-year period beginning on the date of commencement, to ensure that management of the treated area does not degrade the habitat gains secured by the covered vegetation management activity.

    (e) Disposal Of Vegetative Material.—Subject to applicable local restrictions, any vegetative material resulting from a covered vegetation management activity that is covered by the categorical exclusion under subsection (b) may be—

        (1) used for—

            (A) fuel wood; or

            (B) other products; or

        (2) piled or burned, or both.

    (f) Treatment For Temporary Roads.—

        (1) IN GENERAL.—Notwithstanding subsection (a)(1)(B)(xi), any temporary road constructed in carrying out a covered vegetation management activity that is covered by the categorical exclusion under subsection (b)—

            (A) shall be used by the Secretary concerned for the covered vegetation management activity for not more than 2 years; and

            (B) shall be decommissioned by the Secretary concerned not later than 3 years after the earlier of the date on which—

                (i) the temporary road is no longer needed; and

                (ii) the project is completed.

        (2) REQUIREMENT.—A treatment under paragraph (1) shall include reestablishing native vegetative cover—

            (A) as soon as practicable; but

            (B) not later than 10 years after the date of completion of the applicable covered vegetation management activity.

    (g) Limitations.—

        (1) PROJECT SIZE.—A covered vegetation management activity that is covered by the categorical exclusion under subsection (b) may not exceed 4,500 acres.

D. Section 11318 of the Infrastructure Investment and Jobs Act (Pub. L. 117-58) established a CE for sundry notices or rights-of-way for gathering lines and associated field compression or pumping units on Federal land servicing oil and gas wells under the conditions described below.

Section 11318. CERTAIN GATHERING LINES LOCATED ON FEDERAL LAND AND INDIAN LAND of the Infrastructure Investment and Jobs Act provides:

(a) Definitions.--In this section:

    (1) Federal land.-

        (A) In general.--The term ``Federal land'' means land the title to which is held by the United States.

        (B) Exclusions.--The term ``Federal land'' does not include—

            (i) a unit of the National Park System;

79

NPS-AR-001088

      (ii)   a unit of the National Wildlife Refuge System;

     (iii)  a component of the National Wilderness Preservation System;

     (iv)  a wilderness study area within the National Forest System; or

     (v)   Indian land

(2) Gathering line and associated field compression or pumping unit.

    (A) In general.--The term ``gathering line and associated field compression or pumping unit'' means—

      (i)  a pipeline that is installed to transport oil, natural gas and related constituents, or produced water from 1 or more wells drilled and completed to produce oil or gas; and

     (ii)  if necessary, 1 or more compressors or pumps to raise the pressure of the transported oil, natural gas and related constituents, or produced water to higher pressures necessary to enable the oil, natural gas and related constituents, or produced water to flow into pipelines and other facilities.

    (B) Inclusions.--The term ``gathering line and associated field compression or pumping unit'' includes a pipeline or associated compression or pumping unit that is installed to transport oil or natural gas from a processing plant to a common carrier pipeline or facility.

    (C) Exclusions.--The term ``gathering line and associated field compression or pumping unit'' does not include a common carrier pipeline.

(3) Indian land.--The term ``Indian land'' means land the title to which is held by—

    (A) the United States in trust for an Indian Tribe or an individual Indian; or

    (B) an Indian Tribe or an individual Indian subject to a restriction by the United States against alienation.

(4) Produced water.--The term ``produced water'' means water produced from an oil or gas well bore that is not a fluid prepared at, or transported to, the well site to resolve a specific oil or gas well bore or reservoir condition.

(5) Secretary.--The term ``Secretary'' means the Secretary of the Interior.

(b) Certain Gathering Lines.—

(1)    In general.--Subject to paragraph (2), the issuance of a sundry notice or right-of-way for a gathering line and associated field compression or pumping unit that is located on Federal land or Indian land and that services any oil or gas well may be considered by the Secretary to be an action that is categorically excluded (as defined in section 1508.1 of title 40, Code of Federal Regulations (as in effect on the date of enactment of this Act)) for purposes of the National Environmental Policy Act of 1969 (42 U.S.C. 4321 et seq.) if the gathering line and associated field compression or pumping unit—

    i)    are within a field or unit for which an approved land use plan or an environmental document prepared pursuant to the National Environmental Policy Act of 1969 (42 U.S.C. 4321 et seq.) analyzed transportation of oil, natural gas, or produced water from 1 or more oil or gas wells in the field or unit as a reasonably foreseeable activity;

80

NPS-AR-001089

    ii)      are located adjacent to or within—

      (1) any existing disturbed area; or

      (2) an existing corridor for a right-of-way; and

    iii)     would reduce—

      (1) in the case of a gathering line and associated field compression or pumping unit transporting methane, the total quantity of methane that would otherwise be vented, flared, or unintentionally emitted from the field or unit; or

      (2) in the case of a gathering line and associated field compression or pumping unit not transporting methane, the vehicular traffic that would otherwise service the field or unit.

  b) Applicability.--Paragraph (1) shall apply to Indian land, or a portion of Indian land—

    i)     to which the National Environmental Policy Act of 1969 (42 U.S.C. 4321 et seq.) applies; and

    ii)     for which the Indian Tribe with jurisdiction over the Indian land submits to the Secretary a written request that paragraph (1) apply to that Indian land (or portion of Indian land).

2) Effect on Other Law.--Nothing in this section—

  a) affects or alters any requirement—

    i)  relating to prior consent under—

      (1) section 2 of the Act of February 5, 1948 (62 Stat.18, chapter 45; 25 U.S.C. 324); or

      (2) section 16(e) of the Act of June 18, 1934 (48 Stat. 987, chapter 576; 102 Stat. 2939; 114 Stat. 47; 25 U.S.C. 5123(e)) (commonly known as the ``Indian Reorganization Act'');

    ii)  under section 306108 of title 54, United States Code; or

    iii)     under any other Federal law (including regulations) relating to Tribal consent for rights-of-way across Indian land; or

  b) makes the National Environmental Policy Act of 1969 (42 U.S.C. 4321 et seq.) applicable to land to which that Act otherwise would not apply.

NPS-AR-001090

E.  Section 40806 of the Infrastructure Investment and Jobs Act (Pub. L. 117-58) excludes forest management activities for the establishment of fuel breaks in forests and other wildland vegetation from preparation of an EA or EIS under NEPA, as described below.

Section 40806. ESTABLISHMENT OF FUEL BREAKS IN FORESTS AND OTHER WILDLAND VEGETATION of the Infrastructure Investment and Jobs Act provides:

(a) DEFINITION OF SECRETARY CONCERNED.—In this section, the term ''Secretary concerned'' means—

(1) the Secretary of Agriculture, with respect to National Forest System land; and

(2) the Secretary of the Interior, with respect to public lands (as defined in section 103 of the Federal Land Policy and Management Act of 1976 (43 U.S.C. 1702)) administered by the Bureau of Land Management.

(b) CATEGORICAL EXCLUSION ESTABLISHED.—Forest management activities described in subsection (c) are a category of actions designated as being categorically excluded from the preparation of an environmental assessment or an environmental impact statement under the National Environmental Policy Act of 1969 (42 U.S.C. 4321 et seq.) if the categorical exclusion is documented through a supporting record and decision memorandum.

(c) FOREST MANAGEMENT ACTIVITIES DESIGNATED FOR CATEGORICAL EXCLUSION.—

(1) IN GENERAL.—The category of forest management activities designated under subsection (b) for a categorical exclusion are forest management activities described in paragraph (2) that are carried out by the Secretary concerned on public lands (as defined in section 103 of the Federal Land Policy and Management Act of 1976 (43 U.S.C. 1702)) administered by the Bureau of Land Management or National Forest System land the primary purpose of which is to establish and maintain linear fuel breaks that are—

(A) up to 1,000 feet in width contiguous with or incorporating existing linear features, such as roads, water infrastructure, transmission and distribution lines, and pipelines of any length on Federal land; and

(B) intended to reduce the risk of uncharacteristic wildfire on Federal land or catastrophic wildfire for an adjacent at-risk community.

.

(2) ACTIVITIES.—Subject to paragraph (3), the forest management activities that may be carried out pursuant to the categorical exclusion established under subsection (b) are—

(A) mowing or masticating;

(B) thinning by manual and mechanical cutting;

NPS-AR-001091

(C) piling, yarding, and removal of slash or hazardous fuels;

(D) selling of vegetation products, including timber, firewood, biomass, slash, and fenceposts;

(E) targeted grazing;

(F) application of—

(i) pesticide;

(ii) biopesticide; or

(iii) herbicide;

(G) seeding of native species;

(H) controlled burns and broadcast burning; and

(I) burning of piles, including jackpot piles.

(3) EXCLUDED ACTIVITIES.—A forest management activity described in paragraph (2) may not be carried out pursuant to the categorical exclusion established under subsection (b) if the activity is conducted—

(A) in a component of the National Wilderness Preservation System;

(B) on Federal land on which the removal of vegetation is prohibited or restricted by Act of Congress, Presidential proclamation (including the applicable implementation plan), or regulation;

(C) in a wilderness study area; or

(D) in an area in which carrying out the activity would be inconsistent with the applicable land management plan or resource management plan.

(4) EXTRAORDINARY CIRCUMSTANCES.—The Secretary concerned shall apply the extraordinary circumstances procedures under section 220.6 of title 36, Code of Federal Regulations (or a successor regulation), in determining whether to use a categorical exclusion under subsection (b).

(d) ACREAGE AND LOCATION LIMITATIONS.—Treatments of vegetation in linear fuel breaks covered by the categorical exclusion established under subsection (b)—

(1) may not contain treatment units in excess of 3,000 acres;

(2) shall be located primarily in—

83

(A) the wildland-urban interface or a public drinking water source area;

(B) if located outside the wildland-urban interface or a public drinking water source area, an area within Condition Class 2 or 3 in Fire Regime Group I, II, or III that contains very high wildfire hazard potential; or

(C) an insect or disease area designated by the Secretary concerned as of the date of enactment of this Act; and

(3) shall consider the best available scientific information.

(e) ROADS.—

(1) PERMANENT ROADS.—A project under this section shall not include the establishment of permanent roads.

(2) EXISTING ROADS.—The Secretary concerned may carry out necessary maintenance and repairs on existing permanent roads for the purposes of this section.

(3) TEMPORARY ROADS.—The Secretary concerned shall decommission any temporary road constructed under a project under this section not later than 3 years after the date on which the project is completed.

(f) PUBLIC COLLABORATION.—To encourage meaningful public participation during the preparation of a project under this section, the Secretary concerned shall facilitate, during the preparation of each project—

(1) collaboration among State and local governments and Indian Tribes; and

(2) participation of interested persons.

84

NPS-AR-001093

# National Park Service (NPS)

12.5 <u>Categorical Exclusions</u>. The following NPS actions are designated categorical exclusions unless the action qualifies as an exception under an extraordinary circumstance.

A. <u>Actions Related to General Administration</u>.

(1)  *Changes or amendments to an approved action when such changes would cause no or only minimal environmental impact.[27]

(2)  Land and boundary surveys,

(3)  *Minor boundary changes,

(4)  *Reissuance/renewal of permits, rights-of-way or easements not involving new environmental impacts,

(5)  *Conversion of existing permits to rights-of-way, when such conversions do not continue or initiate unsatisfactory environmental conditions,

(6)  *Issuances, extensions, renewals, reissuances or minor modifications of concession contracts or permits not entailing new construction,[28]

(7)  *Commercial use licenses involving no construction,

(8)  *Leasing of historic properties in accordance with 36 CFR Part 18 and NPS-38,

(9)  Preparation and issuance of publications,

(10) *Modifications or revisions to existing regulations, or the promulgation of new regulations for NPS-administered areas, provided the modifications, revisions or new regulations do not:
   (a) Increase public use to the extent of compromising the nature and character of the area or causing physical damage to it,
   (b) Introduce noncompatible uses which might compromise the nature and characteristics of the area, or cause physical damage to it,
   (c) Conflict with adjacent ownerships or land uses, or
   (d) Cause a nuisance to adjacent owners or occupants.

(11) *At the direction of the NPS responsible official, actions where NPS has concurrence or coapproval with another bureau and the action is a categorical exclusion for that bureau.

---

[27] BLM adopted this CE prior to the 2025 DOI NEPA Procedures. *See* 90 FR 42432.
[28] BLM adopted this CE prior to the 2025 DOI NEPA Procedures. *See* 90 FR 42432.

NPS-AR-001094

B.  Plans, Studies and Reports.

(1)  *Changes or amendments to an approved plan, when such changes would cause no or only minimal environmental impact.[29]

(2)  *Cultural resources maintenance guides, collection management plans and historic furnishings reports.

(3)  *Interpretive plans (interpretive prospectuses, audio-visual plans, museum exhibit plans, wayside exhibit plans).

(4)  Plans, including priorities, justifications and strategies, for non-manipulative research, monitoring, inventorying and information gathering.

(5)  Statements for management, outlines of planning requirements and task directives for plans and studies.

(6)  Technical assistance to other Federal, State and local agencies or the general public.

(7)  Routine reports required by law or regulation.

(8)  Authorization, funding or approval for the preparation of Statewide Comprehensive Outdoor Recreation Plans.

(9)  Adoption or approval of surveys, studies, reports, plans and similar documents which will result in recommendations or proposed actions which would cause no or only minimal environmental impact.

(10) Preparation of internal reports, plans, studies and other documents containing recommendations for action which NPS develops preliminary to the process of preparing a specific Service proposal or set of alternatives for decision.

(11) *Land protection plans which propose no significant change to existing land or visitor use.

(12) Documents which interpret existing mineral management regulations and policies, and do not recommend action.

C.  Actions Related to Development.

(1)  *Land acquisition within established park boundaries.

(2)  *Land exchanges which will not lead to significant changes in the use of land.

(3)  *Routine maintenance and repairs to non-historic structures, facilities, utilities, grounds and trails.

---

[29] BLM adopted this CE prior to the 2025 DOI NEPA Procedures. *See* 90 FR 42432.

86

(4)   *Routine maintenance and repairs to cultural resource sites, structures, utilities and grounds under an approved Historic Structures Preservation Guide or Cyclic Maintenance Guide; or if the action would not adversely affect the cultural resource.[30]

(5)   *Installation of signs, displays, kiosks, etc.

(6)   *Installation of navigation aids.[31]

(7)   *Establishment of mass transit systems not involving construction, experimental testing of mass transit systems, and changes in operation of existing systems (e.g., routes and schedule changes).

(8)   *Replacement in kind of minor structures and facilities with little or no change in location, capacity or appearance.

(9)   *Repair, resurfacing, striping, installation of traffic control devices, repair/replacement of guardrails, etc., on existing roads.

(10)  Sanitary facilities operation.

(11)  *Installation of wells, comfort stations and pit toilets in areas of existing use and in developed areas.

(12)  *Minor trail relocation, development of compatible trail networks on logging roads or other established routes, and trail maintenance and repair.

(13)  *Upgrading or adding new overhead utility facilities to existing poles, or replacement poles which do not change existing pole line configurations.

(14)  *Issuance of rights-of-way for overhead utility lines to an individual building or well from an existing line where installation will not result in significant visual intrusion and will involve no clearance of vegetation other than for placement of poles.

(15)  *Issuance of rights-of-way for minor overhead utility lines not involving placement of poles or towers and not involving vegetation management or significant visual intrusion in an NPS-administered area.

(16)  *Installation of underground utilities in previously disturbed areas having stable soils, or in an existing utility right-of-way.

(17)  *Construction of minor structures, including small improved parking lots,

---

[30] BLM adopted this CE prior to the 2025 DOI NEPA Procedures. *See* 90 FR 42432.
[31] BLM adopted this CE prior to the 2025 DOI NEPA Procedures. *See* 90 FR 42432.

NPS-AR-001096

in previously disturbed or developed areas.[32]

(18) *Construction or rehabilitation in previously disturbed or developed areas, required to meet health or safety regulations, or to meet requirements for making facilities accessible to the handicapped.

(19) *Landscaping and landscape maintenance in previously disturbed or developed areas.

(20) *Construction of fencing enclosures or boundary fencing posing no effect on wildlife migrations.

D. Actions Related to Visitor Use.

(1)   *Carrying capacity analysis.

(2)   *Minor changes in amounts or types of visitor use for the purpose of ensuring visitor safety or resource protection in accordance with existing regulations.[33]

(3)   Changes in interpretive and environmental education programs.

(4)   *Minor changes in programs and regulations pertaining to visitor activities.[34]

(5)   *Issuance of permits for demonstrations, gathering, ceremonies, concerts, arts and crafts shows, etc., entailing only short-term or readily mitigable environmental disturbance.[35]

(6)   *Designation of trail side camping zones with no or minimal improvements.

E. Actions Related to Resource Management and Protection.

(1)   *Archeological surveys and permits involving only surface collection or small-scale test excavations.

(2)   Day-to-day resource management and research activities.

(3)   *Designation of environmental study areas and research natural areas.

(4)   Stabilization by planting native plant species in disturbed areas.

(5)   Issuance of individual hunting and/or fishing licenses in accordance with State and Federal regulations.

---

[32] BLM adopted this CE prior to the 2025 DOI NEPA Procedures. *See* 90 FR 3908.
[33] BLM adopted this CE prior to the DOI NEPA Procedures. *See* 90 FR 42432.
[34] BLM adopted this CE prior to the 2025 DOI NEPA Procedures. *See* 90 FR 42432.
[35] BLM adopted this CE prior to the 2025 DOI NEPA Procedures. *See* 90 FR 42432.

NPS-AR-001097

(6)   *Restoration of noncontroversial native species into suitable habitats within their historic range and elimination of exotic species.[36] (

(7)   *Removal of park resident individuals of non-threatened/endangered species which pose a danger to visitors, threaten park resources or become a nuisance in areas surrounding a park, when such removal is included in an approved resource management plan.

(8)   *Removal of non-historic materials and structures in order to restore natural conditions.

(9)   Development of standards for, and identification, nomination, certification and determination of eligibility of properties for listing in the National Register of Historic Places and the National Historic Landmark and National Natural Landmark Programs.

F.   <u>Actions Related to Grant Programs</u>.

(1)   *Proposed actions essentially the same as those listed in paragraphs A-E above.

(2)   *Grants for acquisition of areas which will continue in the same or lower density use with no additional disturbance to the natural setting.

(3)   *Grants for replacement or renovation of facilities at their same location without altering the kind and amount of recreational, historical or cultural resources of the area; or the integrity of the existing setting.

(4)   *Grants for construction of facilities on lands acquired under a previous NPS or other Federal grant provided that the development is in accord with plans submitted with the acquisition grant.

(5)   *Grants for the construction of new facilities within an existing park or recreation area, provided that the facilities will not:
   (a) Conflict with adjacent ownerships or land use, or cause a nuisance to adjacent owners or occupants; e.g., extend use beyond daylight hours;
   (b) Introduce motorized recreation vehicles;
   (c) Introduce active recreation pursuits into a passive recreation area;
   (d) Increase public use or introduce noncompatible uses to the extent of compromising the nature and character of the property or causing physical damage to it; or
   (e) Add or alter access to the park from the surrounding area.

(6)   *Grants for the restoration, rehabilitation, stabilization, preservation and reconstruction (or the authorization thereof) of properties listed on or eligible for listing on the National Register of Historic Places at their same location and provided that such actions:

---

[36] BIA, BLM, BOR, FWS, OSMRE, USGS, and Office of Insular Affairs adopted this CE prior to the 2025 DOI NEPA Procedures. *See* 89 FR 101040.

NPS-AR-001098

(a)  Will not alter the integrity of the property or its setting;

(b)  Will not increase public use of the area to the extent of compromising the nature and character of the property; and

(c)  Will not cause a nuisance to adjacent property owners or occupants.

# Office of Surface Mining Reclamation and Enforcement (OSMRE)

13.5    Categorical Exclusions.

A.  The following OSM actions are deemed not to be major Federal actions within the meaning of Section 102(2)(C) of NEPA under Sections 501(a) or 702(d) of the SMCRA:

(1)    Promulgation of interim regulations.

(2)    Approval of State programs.

(3)    Promulgation of Federal programs where a State fails to submit, implement, enforce, or maintain an acceptable State program.

(4)    Promulgation and implementation of the Federal lands program.

B.  The following OSM actions (SMCRA sections are in parentheses) are designated categorical exclusions:

(1)    Monetary allotments to States for mining and mineral resources institutes (301).

(2)    Allocation of research funds to institutes (302).

(3)    Any research effort associated with ongoing abandoned mine land reclamation projects where the research is coincidental to the reclamation (401(c)(6)).

(4)    Collection of reclamation fees from operators (402(a)).

(5)    Findings of fact and entries on land adversely affected by past coal mining (407(a)).

(6)    Acquisition of particular parcels of abandoned mine lands for reclamation (407(c)).

(7)    Filing liens against property adversely affected by past coal mining (408).

(8)    Interim regulatory grants (502(e)(4)).

(9)    Disapproval of a proposed State program (503(c)).

(10)  Review of permits issued under a previously approved State program (504(d)).

90

(11) Five-year permit renewal on life-of-mine plans under the Federal lands program or the Federal program for a State where the environmental impacts of continued mining are adequately analyzed in a previous environmental document for the mining operation (506(d)).

(12) Small operator assistance program (507(c)).

(13) Issuance of public notices and holding public hearings on permit applications involving Federal lands or under a Federal program for a State (513).

(14) Routine inspection and enforcement activities (517).

(15) Conflict of interest regulations (517(g)).

(16) Assessment of civil penalties (518).

(17) Releases of performance bonds or deposits for mining on Federal lands or under a Federal program for a State (519).

(18) Issuance of cessation orders for coal mining and reclamation operations (521(a)(2) and (3)).

(19) Suspension or revocation of permits (521(a)(4)).

(20) Federal oversight and enforcement of ineffective State programs (521(b)).

(21) Cooperative agreements between a state and the Secretary to provide for State regulation of surface coal mining and reclamation operations on Federal lands (523(c)).

(22) Development of a program to assure that, with respect to the granting of permits, leases, or contracts for Federally-owned coal, no one shall be unreasonably denied purchase of the mined coal (523(d)).

(23) Annual grants programs to States for program development, administration, and enforcement (705(a)).

(24) Assistance to States in the development, administration, and enforcement of State programs (705(b)).

(25) Increasing the amount of annual grants to States (705(c)).

(26) Submission of the Secretary's annual report to the Congress (706).

(27) The proposal of legislation to allow Indian tribes to regulate surface coal mining on Indian lands (710(a)).

91

NPS-AR-001100

(28)  The certification and training of blasters (719).

(29)  Approval of State Reclamation Plans for abandoned mine lands (405).

(30)  Development of project proposals for AML grants, including field work only to the extent necessary for the preparation and design of the proposal.

(31)  Use of AML funds to allow States or tribes to set aside State share funds in a special trust for future AML projects.

(32)  Use of AML funds in an insurance pool for the purposes of compensation for damage caused by mining prior to the date of the Act.

(33)  AML reclamation projects involving:  No more than 100 acres; no hazardous wastes; no explosives; no hazardous or explosive gases; no dangerous impoundments; no mine fires and refuse fires; no undisturbed, noncommercial borrow or disposal sites, no dangerous slides where abatement has the potential for damaging inhabited property; no subsidences involving the placement of material into underground mine voids through drilled holes to address more than one structure, and no unresolved issues with agencies, persons, or groups or adverse effects requiring specialized mitigation.  Departmental exceptions in 516 DM 2, Appendix 2 apply to this exclusion.  All sites considered in this categorical exclusion would have to first meet the eligibility test in sections 404, 409 and 411 of SMCRA.  Also projects that have been declared an emergency pursuant to section 410 of SMCRA, may be candidates for this exclusion.[37]

# Bureau of Reclamation

14.5    Categorical Exclusions. In addition to the actions listed in the Departmental categorical exclusions, the following Bureau actions are designated documented categorical exclusions unless one or more of the extraordinary circumstances applies:

A.  General Activities.

(1)    *Changes in regulations or policy directives and legislative proposals where the impacts are limited to economic and/or social effects.
(2)    *Training activities of enrollees assigned to the various youth programs. Such training may include minor construction activities for other entities.
(3)    *Research activities, such as nondestructive data collection and analysis, monitoring, modeling, laboratory testing, calibration, and testing of instruments or procedures and nonmanipulative field studies.

B.  Planning Activities.

(1)    *Routine planning investigation activities where the impacts are expected to be localized, such as land classification surveys, topographic surveys, archeological

---

[37] NPS adopted this CE prior to the 2025 DOI NEPA Procedures. *See* 90 FR 24644.

NPS-AR-001101

surveys, wildlife studies, economic studies, social studies, and other study activity during any planning, preconstruction, construction, or operation and maintenance phases.

(2)    *Special, status, concluding, or other planning reports that do not contain recommendations for action, but may or may not recommend further study.

(3)    *Data collection studies that involve test excavations for cultural resources investigations or test pitting, drilling, or seismic investigations for geologic exploration purposes where the impacts will be localized.

C.  Project Implementation Activities.

(1)    *Classification and certification of irrigable lands.

(2)    *Minor acquisition of land and rights-of-way or easements.

(3)    *Minor construction activities associated with authorized projects which correct unsatisfactory environmental conditions or which merely augment or supplement, or are enclosed within existing facilities.

(4)    *Approval of land management plans where implementation will only result in minor construction activities and resultant increased operation and maintenance activities.[38]

D.  Operation and Maintenance Activities.

(1)    *Maintenance, rehabilitation, and replacement of existing facilities which may involve a minor change in size, location, and/or operation.[39]

(2)    *Transfer of the operation and maintenance of Federal facilities to water districts, recreation agencies, fish and wildlife agencies, or other entities where the anticipated operation and maintenance activities are agreed to in a contract or a memorandum of agreement, follow approved Reclamation policy, and no major change in operation and maintenance is anticipated.

(3)    *Administration and implementation of project repayment and water service contracts, including approval of organizational or other administrative changes in contracting entities brought about by inclusion or exclusion of lands in these contracts.

(4)    *Approval, execution, administration, and implementation of water-related contracts and contract renewals, amendments, supplements, and assignments, and water transfers, exchanges, and replacements, for which one or more of the following apply: (a) for minor amounts of long-term water use, where the action does not lead to long-term changes and impacts are expected to be minor and localized; (b) for

---

[38] NPS adopted this CE prior to the 2025 DOI NEPA Procedures. *See* 90 FR 24644.
[39] BLM adopted this CE prior to the 2025 DOI NEPA Procedures. *See* 90 FR 42432.

NPS-AR-001102

temporary (limited to 1 year or less) or interim (limited to 10 years or less) water use where the action does not lead to long-term changes and where the impacts are expected to be minor and localized; or (c) where the only result will be to implement an administrative or financial practice or change. A ''water-related'' contract is any legally binding agreement to which Reclamation becomes a party, pursuant to its authority under Federal law that (1) makes water available from or to the United States; (2) allows water to be stored, removed, introduced, conveyed, carried, or delivered in facilities Reclamation owns, manages, operates, or funds; or (3) establishes operation, maintenance, and replacement responsibilities for such facilities.

(5)    *Approval of changes in pumping power and water rates charged contractors by the Bureau for project water service or power.

(6)    *Execution and administration of recordable contracts for disposal of excess lands.

(7)    *Withdrawal, termination, modification, or revocation where the land would be opened to discretionary land laws and where such future discretionary actions would be subject to the NEPA process, and disposal and sale of acquired lands where no major change in usage is anticipated.

(8)    *Issuance or renewal of use authorizations (as defined in 43 CFR 429.2, including crossing agreements which provide rights-of-way) that authorize use of Reclamation land, facilities, or waterbodies where one or more of the following apply: (a) impacts of the action are expected to be minor and localized; (b) the action does not lead to a major public or private action; (c) the only result of the authorization will be to implement an administrative or financial practice or change; or (d) the level of use or impacts to resources is not increased.

(9)    *Issuance of permits for removal of gravel or sand by an established process from existing quarries.[40]

(10)   Reserved

(11)   *Implementation of improved appearance and soil and moisture conservation programs where the impacts are localized.

(12)   *Conduct of programs of demonstration, educational, and technical assistance to water user organizations for improvement of project and on-farm irrigation water use and management.

(13)   *Follow-on actions such as access agreements, contractual arrangements, and operational procedures for hydropower facilities which are on or appurtenant to Bureau facilities or lands which are permitted or licensed by the Federal Energy Regulatory Commission (FERC), when FERC has accomplished compliance with NEPA (including actions to be taken by the Bureau) and when the Bureau's

---

[40] BLM adopted this CE prior to the 2025 DOI NEPA Procedures. *See* 90 FR 42432.

94

NPS-AR-001103

environmental concerns have been accommodated in accordance with the Bureau/FERC Memorandum of Understanding of June 22, 1981.

(14)    Reserved

(15)    *Approval of second party water sales agreements for small amounts of water (usually less than 10 acre-feet) where the Bureau has an existing water sales contract in effect.

(16)    *Approval and execution of contracts requiring the repayment of funds furnished or expended on behalf of an entity pursuant to the Emergency Fund Act of June 26, 1948 (43 U.S.C. 502), where the action taken is limited to the original location of the damaged facility.

(17)    *Minor safety of dams construction activities where the work is confined to the dam, abutment areas, or appurtenant features, and where no major change in reservoir or downstream operation is anticipated as a result of the construction activities.

E.  Grant and Loan Activities.

(1)    *Financial assistance, cooperative agreements, grants, loans, contracts, or other funding, where (a) the underlying action being funded would be covered by another Reclamation CE if Reclamation were implementing the action itself, or (b) the action is confined to areas already impacted by farming or development activities and the impacts are expected to be minor and localized.

(2)    Reserved

(3)    Reserved

F.  Title Transfer Activities

(1)    *Transfer from Federal ownership of facilities and/or interest in lands to a qualifying entity where there are no competing demands for use of the facilities; where the facilities are not hydrologically integrated; where, at the time of transfer, there would be no planned change in land or water use, or in operation, or maintenance of the facilities; and where the transfer would be consistent with the Secretary's responsibilities, including but not limited to existing contracts or agreements, the protection of land resources and water rights held in trust for federally recognized Indian tribes and Indian individuals, and ensuring compliance with international treaties and interstate compacts.

NPS-AR-001104

# Bureau of Ocean Energy Management (BOEM), Bureau of Safety and Environmental Enforcement (BSEE)

Categorical exclusions used by the Bureau of Ocean Energy Management (BOEM) and Bureau of Safety and Environmental Enforcement (BSEE), formerly Minerals Management Service (MMS).

15.4 Categorical Exclusions.

A. General.

(1) Inventory, data, and information collection, including the conduct of environmental monitoring and nondestructive research programs.

(2) Actions for which BOEM or BSEE has concurrence or co-approval with another Bureau if the action is a categorical exclusion for that Bureau.

B. Internal Program Initiatives.

(1) *All resource evaluation activities including surveying, mapping, and geophysical surveying which do not use solid or liquid explosives.

(2) *Collection of geologic data and samples including geologic, paleontologic, mineralogic, geochemical, and geophysical investigations which does not involve drilling beyond 50 feet of consolidated rock or beyond 300 feet of unconsolidated rock, including contracts therefor.

(3) Acquisition of existing geological or geophysical data from otherwise private exploration ventures.

(4) Well logging, digital modeling, inventory of existing wells, and installation of recording devices in wells.

(5) *Establishment and installation of any research/monitoring devices.

(6) Test or exploration drilling and downhole testing included in a project previously subject to the NEPA process.

(7) Insignificant revisions to the approved 5-year leasing program.

(8) Prelease planning steps such as the Call for Information and Area Identification.

C. Permit and Regulatory Functions.

(1) *Issuance and modification of regulations, Orders, Standards, Notices to Lessees and Operators. Guidelines and field rules for which the impacts are limited to administrative, economic, or technological effects and the environmental impacts are minimal.

(2) Approval of production measurement methods, facilities, and procedures.

96

NPS-AR-001105

(3)   *Approval of off-lease storage in existing facilities.

(4)   Approval of unitization agreements, pooling, or communitization agreements.

(5)   Approval of commingling of production.

(6)   Approval of suspensions of operations and suspensions of production.

(7)   Approval of lease consolidation applications, lease assignments or transfers, operating rights, operating agreements, lease extensions, lease relinquishments, and bond terminations.

(8)   Administration decisions and actions and record keeping such as:
   (a) Approval of applications for pricing determinations under the Natural Gas Policy Act.
   (b) Approval of underground gas storage agreements from a presently or formerly productive reservoir.
   (c) Issuance of paying well determinations and participating area approvals.
   (d) Issuance of drainage determinations.

(9)   *Approval of offshore geological and geophysical mineral exploration activities, except when the proposed activity includes the drilling of deep stratigraphic test holes or uses solid or liquid explosives.

(10)  *Approval of an offshore lease or unit exploration. development/production plan or a Development Operation Coordination Document in the central or western Gulf of America (30 CFR 250.2) except those proposing facilities:  (1) In areas of high seismic risk or seismicity, relatively untested deep water, or remote areas, or (2) within the boundary of a proposed or established marine sanctuary, and/or within or near the boundary of a proposed or established wildlife refuge or areas of high biological sensitivity; or (3) in areas of hazardous natural bottom conditions; or (4) utilizing new or unusual technology.

(11)  *Approval of minor revisions of or minor variances from activities described in an approved offshore exploration or development/production plan, including pipeline applications.

(12)  *Approval of an Application for Permit to Drill (APD) an offshore oil and gas exploration or development well, when said well and appropriate mitigation measures are described in an approved exploration plan, development plan, production plan, or Development Operations Coordination Document.

(13)  *Preliminary activities conducted on a lease prior to approval of an exploration or development/production plan or a Development Operations Coordination Plan. These are activities such as geological, geophysical, and other surveys necessary to develop a comprehensive exploration plan, development/production plan, or Development Operations Coordination Plan.

97

(14)  Approval of Sundry Notices and Reports on Wells.

(15)  *Rights-of-ways, easements, temporary use permits, and any revisions thereto that do not result in a new pipeline corridor to shore.

NPS-AR-001107

# Categorical Exclusions Adopted from Other Agencies

Under Section 109 of NEPA, federal agencies are authorized to adopt CEs established administratively by other agencies. DOI bureaus have formally adopted the following list of CEs. Subject headings are for organizational purposes only. Any bureau or program may apply any appropriate CE.

Responsible Officials must document reliance on any CE marked with an asterisk (*). This documentation must include a description of how the proposed action conforms to the terms of the categorical exclusion relied upon and written confirmation that none of the DOI extraordinary circumstances apply and any other noted requirements.

Strikeouts indicate that the CE has been adopted with limitations. Brackets indicate where bureau name can be substituted for establishing agency name or provide other information.

16.1 Adopted Categorical Exclusions

A.    Fish and Wildlife.
   (1)    Department of Energy, 10 CFR 1021(D) (Appendix B1.20), as adopted by BIA and BLM in 90 FR 4774. Make sure DOE's "Integral Elements" are incorporated in each DOE CX (10 CFR 1021Appendix B).

   *PROTECTION OF CULTURAL RESOURCES, FISH AND WILDLIFE HABITAT. Small-scale activities undertaken to protect cultural resources (such as fencing, labeling, and flagging) or to protect, restore, or improve fish and wildlife habitat, fish passage facilities (such as fish ladders and minor diversion channels), or fisheries. Such activities would be conducted in accordance with an existing natural or cultural resource plan, if any.

   (2)    Department of Energy, 10 CFR 1021(D) (Appendix B1.21), as adopted by BLM in 90 FR 42432. Make sure DOE's "Integral Elements" are incorporated in each DOE CX (10 CFR 1021 Appendix B).

   *NOISE ABATEMENT. Noise abatement measures (including, but not limited to, construction of noise barriers and installation of noise control materials).

   (3)    Department of the Navy, 32 CFR 775.6(f)(40) as adopted by BLM in 90 FR 42432.

   *Installation of devices to protect human or animal life (e.g., raptor electrocution prevention devices, fencing to restrict wildlife movement onto airfields, and fencing and grating to prevent accidental entry to hazardous areas);

B.    Oil, Gas, and Geothermal Energy.

   (1)    USDA - U.S. Forest Service, 7 CFR 1b.4(d)(32), as adopted by BLM in 89 FR 28797 and 90 FR 42432. The Department has adopted the following categorical exclusions for the limited purpose of approving Notices of Intent to Conduct

99

NPS-AR-001108

Geothermal Exploration Operations (Form 3200-9).

*Short-term (1 year or less) mineral, energy, or geophysical investigations and their incidental support activities that may require cross-country travel by vehicles and equipment, construction of less than 1 mile of temporary road, or use and minor repair of existing roads. Examples include, but are not limited to:

(i) Authorizing geophysical investigations which use existing roads that may require incidental repair to reach sites for drilling core holes, temperature gradient holes, or seismic shot holes;

(ii) Gathering geophysical data using shot hole, vibroseis, or surface charge methods;

(iii) Trenching to obtain evidence of mineralization;

(iv) Clearing vegetation for sight paths or from areas used for investigation or support facilities;

(v) Redesigning or rearranging surface facilities within an approved site;

(vi) Approving interim and final site restoration measures; and

(vii) Approving a plan for exploration which authorizes repair of an existing road and the construction of 1⁄3 mile of temporary road; clearing vegetation from an acre of land for trenches, drill pads, or support facilities.

(2)    Department of the Navy, 32 CFR 775.6(f)(39) as adopted by BLM in 89 FR 28797 and 90 FR 42432.

*Pre-lease upland exploration activities for oil, gas, or geothermal reserves, (e.g., geophysical surveys).

(3)    Department of Energy, 10 CFR 1021(D) (Appendix B1.17), as adopted by BLM in 90 FR 42432. Make sure DOE's "Integral Elements" are incorporated in each DOE CX (10 CFR 1021 Appendix B).

*POLYCHLORINATED BIPHENYL REMOVAL. Removal of polychlorinated biphenyl (PCB)-containing items (including, but not limited to, transformers and capacitors), PCB-containing oils flushed from transformers, PCB-flushing solutions, and PCB-containing spill materials from buildings or other aboveground locations in accordance with applicable requirements (such as 40 CFR part 761).

(4)    Department of Energy, 10 CFR 1021(D) (Appendix B1.18), as adopted by BLM in 90 FR 42432. Make sure DOE's "Integral Elements" are incorporated in each DOE CX (10 CFR 1021 Appendix B).

100

*WATER SUPPLY WELLS. Siting, construction, and operation of additional water supply wells (or replacement wells) within an existing well field, or modification of an existing water supply well to restore production, provided that there would be no drawdown other than in the immediate vicinity of the pumping well, and the covered actions would not have the potential to cause significant long-term decline of the water table, and would not have the potential to cause significant degradation of the aquifer from the new or replacement well.

(5)   Department of Energy, 10 CFR 1021(D) (Appendix B1.26), as adopted by BLM in 90 FR 42432. Make sure DOE's "Integral Elements" are incorporated in each DOE CX (10 CFR 1021 Appendix B).

*SMALL WATER TREATMENT FACILITIES. Siting, construction, expansion, modification, replacement, operation, and decommissioning of small (total capacity less than approximately 250,000 gallons per day) wastewater and surface water treatment facilities whose liquid discharges are externally regulated, and small potable water and sewage treatment facilities.

(6)   Department of Energy, 10 CFR 1021(D) (Appendix B3.7), as adopted by BLM in 90 FR 42432. Make sure DOE's "Integral Elements" are incorporated in each DOE CX (10 CFR 1021 Appendix B).

*NEW TERRESTRIAL INFILL EXPLORATORY AND EXPERIMENTAL WELLS. Siting, construction, and operation of new terrestrial infill exploratory and experimental (test) wells, for either extraction or injection use, in a locally characterized geological formation in a field that contains existing operating wells, properly abandoned wells, or unminable coal seams containing natural gas, provided that the site characterization has verified a low potential for seismicity, subsidence, and contamination of freshwater aquifers, and the actions are otherwise consistent with applicable best practices and DOE protocols, including those that protect against uncontrolled releases of harmful materials. Such wells may include those for brine, carbon dioxide, coalbed methane, gas hydrate, geothermal, natural gas, and oil. Uses for carbon sequestration wells include, but are not limited to, the study of saline formations, enhanced oil recovery, and enhanced coalbed methane extraction. [The BLM will not use this CX to authorize permits for production level applications (i.e., Applications for Permit to Drill, mine plans, drilling permits… etc.).]

(7)   Department of Energy, 10 CFR 1021(D) (Appendix B5.(3)), as adopted by BLM in 90 FR 42432. Make sure DOE's "Integral Elements" are incorporated in each DOE CX (10 CFR 1021 Appendix B).

*MODIFICATION OR ABANDONMENT OF WELLS. Modification (but not expansion) or plugging and abandonment of wells, provided that site characterization has verified a low potential for seismicity, subsidence, and contamination of freshwater aquifers, and the actions are otherwise consistent with best practices and DOE protocols, including those that protect against uncontrolled releases of harmful materials. Such wells may include, but are not limited to,

101

storage and injection wells for brine, carbon dioxide, coalbed methane, gas hydrate, geothermal, natural gas, and oil. Covered modifications would not be part of site closure.

(8)    Department of Energy, 10 CFR 1021(D) (Appendix B5.6), as adopted by BLM in 90 FR 42432. Make sure DOE's "Integral Elements" are incorporated in each DOE CX (10 CFR 1021 Appendix B).

*OIL SPILL CLEANUP. Removal of oil and contaminated materials recovered in oil spill cleanup operations and disposal of these materials in accordance with applicable requirements (such as the National Oil and Hazardous Substances Pollution Contingency Plan).

C.    Forestry.

(1)    USDA - U.S. Forest Service, 7 CFR 1b.4(d)(29), as adopted by BLM in 90 FR 27655.

*Regeneration of an area to native tree species, including site preparation that does not involve the use of herbicides or result in vegetation type conversion. Examples include, but are not limited to:

 (i) Planting seedlings of superior trees in a progeny test site to evaluate genetic worth, and
(ii) Planting trees or mechanical seed dispersal of native tree species following a fire, flood, or landslide.

(2)    USDA - U.S. Forest Service, 7 CFR 1b.4(d)(30), as adopted by NPS in 90 FR 24644 and BLM in 90 FR 42432.

*Timber stand and/or wildlife habitat improvement activities that do not include the use of herbicides or do not require more than 1 mile of low standard road construction. Examples include, but are not limited to:

(a)    Girdling trees to create snags;

(b)    Thinning or brush control to improve growth or to reduce fire hazard including the opening of an existing road to a dense timber stand;

(c)    Prescribed burning to control understory hardwoods in stands of southern pine; and

(d)    Prescribed burning to reduce natural fuel build-up and improve plant vigor.

(3)    Tennessee Valley Authority, 18 CFR Part 1318, Subpart C, Appendix A, n. 31, as adopted by BLM in 90 FR 42432.

*The following forest management activities:

102

NPS-AR-001111

(a)    Actions to manipulate species composition and age class, including, but not limited to, harvesting or thinning of live trees and other timber stand improvement actions (e.g., prescribed burns, non-commercial removal, chemical control), generally covering up to 125 acres and requiring no more than 1 mile of temporary or seasonal permanent road construction;

(b)    Actions to salvage dead and/or dying trees including, but not limited to, harvesting of trees to control insects or disease or address storm damage (including removal of affected trees and adjacent live, unaffected trees as determined necessary to control the spread of insects or disease), generally covering up to 250 acres and requiring no more than 1 mile of temporary or seasonal permanent road construction; and

(c)    Actions to regenerate forest stands, including, but not limited to, planting of native tree species upon site preparation, generally covering up to 125 acres and requiring no more than 1 mile of temporary or seasonal permanent road construction.

D.    Rangeland Management.

(1)    USDA - U.S. Forest Service, 7 CFR 1b.4(d)(33), as adopted by BLM in 90 FR 27655.[41]

*Implementation or modification of minor management practices to improve allotment condition or animal distribution. Examples include, but are not limited to:

(i)   Rebuilding a fence to improve animal distribution;
(ii)  Adding a stock watering facility to an existing water line; and
(iii) Spot seeding native species of grass or applying lime to maintain forage condition.

E.    Realty, Facilities and Utilities

(1)    Department of Energy, 10 CFR 1021(D) (Appendix B1.19), as adopted by BIA and BLM in 90 FR 4774 and 90 FR 90 FR 42432. Make sure DOE's "Integral Elements" are incorporated in each DOE CX (10 CFR 1021 Appendix B). The use of this CX is restricted to existing communication sites.

*MICROWAVE, METEOROLOGICAL, AND RADIO TOWERS. Siting, construction, modification, operation, and removal of microwave, radio communication, and meteorological towers and associated facilities, provided that the towers and associated facilities would not be in a governmentally designated

---

[41] Note this language was modified by the USDA in the Interim Final Rule published July 3, 2024 to remove the phrase "when an allotment management plan is not yet in place." As discussed in the rule, the presence or absence of an allotment management plan does not change the on-the-ground effects of a rangeland improvement because AMPs do not override land management plans or grazing decisions. As such, the revision of language in the categorical exclusion is a minor change and technical in nature and does not modify the way rangeland improvements are designed or implemented, nor what is authorized in the land management plan or the grazing decision.

NPS-AR-001112

scenic area (see B(4)(iv) of this appendix) unless otherwise authorized by the appropriate governmental entity

(2)    Department of Energy, 10 CFR 1021(D) (Appendix B4.6), as adopted by BIA and BLM in 90 FR 4774. Make sure DOE's "Integral Elements" are incorporated in each DOE CX (10 CFR 1021 Appendix B).

*ADDITIONS AND MODIFICATIONS TO TRANSMISSION FACILITIES. Additions or modifications to electric power transmission facilities within a previously disturbed or developed facility area. Covered activities include, but are not limited to, switchyard rock grounding upgrades, secondary containment projects, paving projects, seismic upgrading, tower modifications, load shaping projects (such as reducing energy use during periods of peak demand), changing insulators, and replacement of poles, circuit breakers, conductors, transformers, and crossarms.

(3)    Department of Energy, 10 CFR 1021(D) (Appendix B4).7), as adopted by BIA and BLM in 90 FR 4774. Make sure DOE's "Integral Elements" are incorporated in each DOE CX (10 CFR 1021 Appendix B).

*FIBER OPTIC CABLE. Adding fiber optic cables to transmission facilities or burying fiber optic cable in existing powerline or pipeline rights-of-way. Covered actions may include associated vaults and pulling and tensioning sites outside of rights-of-way in nearby previously disturbed or developed areas.

(4)    Department of Energy, 10 CFR 1021(D) (Appendix B4.13), as adopted by BIA and BLM in 90 FR 4774. Make sure DOE's "Integral Elements" are incorporated in each DOE CX (10 CFR 1021 Appendix B).

*UPGRADING AND REBUILDING EXISTING POWERLINES. Upgrading or rebuilding existing electric powerlines, which may involve relocations of small segments of the powerlines within an existing powerline right-of-way or within otherwise previously disturbed or developed lands (as discussed at 10 CFR 1021.410(g)(1)). Upgrading or rebuilding existing electric powerlines also may involve widening an existing powerline right-of-way to meet current electrical standards if the widening remains within previously disturbed or developed lands and only extends into a small area beyond such lands as needed to comply with applicable electrical standards. Covered actions would be in accordance with applicable requirements, including the "Integral Elements" listed at the start of appendix B of this part; and would incorporate appropriate design and construction standards, control technologies, and best management practices. This categorical exclusion does not apply to underwater powerlines. As used in this categorical exclusion, "small" has the meaning discussed at 10 CFR 1021.410(g)(2).

(5)    Department of Energy, 10 CFR 1021(D) (Appendix B4.14), as adopted by BIA and BLM in 90 FR 4774. Make sure DOE's "Integral Elements" are incorporated in each DOE CX (10 CFR 1021 Appendix B).

104

NPS-AR-001113

*CONSTRUCTION AND OPERATION OF ELECTROCHEMICAL-BATTERY OR FLYWHEEL ENERGY STORAGE SYSTEMS. Construction, operation, upgrade, or decommissioning of an electrochemical-battery or flywheel energy storage system within a previously disturbed or developed area or within a small (as discussed at 10 CFR 1021.410(g)(2)) area contiguous to a previously disturbed or developed area. Covered actions would be in accordance with applicable requirements (such as land use and zoning requirements) in the proposed project area and the "Integral Elements" listed at the start of appendix B of this part, and would incorporate appropriate safety standards (including the current National Fire Protection Association 855, Standard for the Installation of Stationary Energy Storage Systems), design and construction standards, control technologies, and best management practices.

(6)    Department of Energy, 10 CFR 1021(D) (Appendix B5.16), as adopted by BIA and BLM in 90 FR 4774 and 90 FR 42432. Make sure DOE's "Integral Elements" are incorporated in each DOE CX (10 CFR 1021 Appendix B).

*SOLAR PHOTOVOLTAIC SYSTEMS.
(a) The installation, modification, operation, or decommissioning of commercially available solar photovoltaic systems:
    (1) Located on a building or other structure (such as rooftop, parking lot or facility, or mounted to signage, lighting, gates, or fences); or
    (2) Located within a previously disturbed or developed area.
(b) Covered actions would be in accordance with applicable requirements (such as land use and zoning requirements) in the proposed project area and the "Integral Elements" listed at the start of appendix B of this part, and would be consistent with applicable plans for the management of wildlife and habitat, including plans to maintain habitat connectivity, and incorporate appropriate control technologies and best management practices.

(7)    Department of Energy, 10 CFR 1021(D) (Appendix B5.23), as adopted by BIA and BLM in 90 FR 4774. Make sure DOE's "Integral Elements" are incorporated in each DOE CX (10 CFR 1021 Appendix B).

*ELECTRIC VEHICLE CHARGING STATIONS. The installation, modification, operation, and removal of electric vehicle charging stations, using commercially available technology, within a previously disturbed or developed area. Covered actions are limited to areas where access and parking are in accordance with applicable requirements (such as local land use and zoning requirements) in the proposed project area and would incorporate appropriate control technologies and best management practices.

(8)    National Telecommunication and Information Administration, 89 FR 22688, Categorical Exclusions, Operational, C-4 as adopted by BIA and BLM in 90 FR 4774.

105

*New construction or improvement of land, operations, or support facilities, switching stations, maintenance facilities, and other non-tower structures supporting wired or wireless communications systems in a developed area and/or on previously disturbed ground with no more than 1 acre (0.4 hectare) of ground disturbance where the proposed facility use is generally compatible with the surrounding land use and applicable zoning standards and will not require additional support infrastructure.

(9)     National Telecommunication and Information Administration, 89 FR 22688, Categorical Exclusions, Operational, C-5 as adopted by BIA and BLM in 90 FR 4774 and NPS in 90 FR 24644.

*Installing, operating, maintaining, retrofitting, upgrading, repairing, removing, and/or replacement of existing microwave or radio communication towers, instruments, structures, or buildings that do not require ground disturbance outside of the original footprint, including installing or collocating equipment such as antennas, microwave dishes, or power units. For communications towers at or below 199 feet, renovations and equipment additions must not cause the total height of the tower to exceed 199 feet. Existing structures must not be eligible for listing in the National Register of Historic Places.

(10)    National Telecommunication and Information Administration, 89 FR 22688, Categorical Exclusions, Operational, C-6 as adopted by BIA and BLM in 90 FR 4774 and NPS in 90 FR 24644.

*New construction or improvement of temporary buildings or experimental equipment (e.g., trailers, prefabricated buildings, and test slabs) on previously disturbed ground, with no more than 1 acre (0.4 hectare) of ground disturbance, where the proposed facility use is generally compatible with the surrounding land use and applicable zoning standards and will not require additional support infrastructure.

(11)    National Telecommunication and Information Administration, 89 FR 22688, Categorical Exclusions, Operational, C-7 as adopted by BIA and BLM in 90 FR 4774 and by NPS, in part, in 90 FR 24644.

*New construction of self-supporting (e.g., monopole or lattice) wireless communication towers at or below 199 feet with no guy wires that require less than 1 acre (0.4 hectare) of ground disturbance and where another Federal agency would not require an EA or EIS for its acquisition, installation, operations, or maintenance.

(12)    National Telecommunication and Information Administration, 89 FR 22688, Categorical Exclusions, Operational, C-8: as adopted by BIA and BLM in 90 FR 4774 and NPS in 90 FR 24644.

*Acquisition, installation, reconstruction, repair by replacement, and operation of aerial or buried utility (e.g., water, sewer, electrical), communication (e.g., fiber optic cable, data processing cable and similar electronic equipment), and security

106

systems that use existing rights-of-way, easements, grants of license, distribution systems, facilities, or similar arrangements.

(13)  Tennessee Valley Authority, 18 CFR Part 1318, Subpart C, Appendix A, n. 17, as adopted by BLM in 90 FR 27655.

*Routine modification, repair, and maintenance of, and minor upgrade of and addition to, existing transmission infrastructure, including the addition, retirement, and/or replacement of breakers, transformers, bushings, and relays; transmission line uprate, modification, reconductoring, and clearance resolution; and limited pole replacement. This exclusion also applies to improvements of existing access roads and construction of new access roads outside of the right-of-way that are generally no more than 1 mile in length.

(14)  Indian Health Service, categorical exclusion J, 58 FR 569, as adopted by BIA in 90 FR 27657.

*Construction of Sanitation Facilities — Actions associated with construction of sanitation facilities to serve Indian homes and communities, except that the following actions are not excluded: (1) Construction of a sanitary landfill at a new solid waste disposal site, and (2) Construction of a new wastewater treatment facility with direct discharge of treated sewage to surface waters.

(15)  Farm Service Agency, 7 CFR 799.31(b)(4), as adopted by BLM in 90 FR 42432.

*Planting actions. The following list includes categorical exclusions for planting proposed actions:

| | |
|---|---|
| (i) | Bareland planting or planting without site preparation; |
| (ii) | Bedding site establishment for wildlife; |
| (iii) | Chiseling and subsoiling; |
| (iv) | Clean tilling firebreaks; |
| (v) | Conservation crop rotation; |
| (vi) | Contour farming; |
| (vii) | Contour grass strip establishment; |
| (viii) | Cover crop and green manure crop planting; |
| (ix) | Critical area planting; |
| (x) | Firebreak installation; |
| (xi) | Grass, forbs, or legume planting; |
| (xii) | Heavy use area protection; |
| (xiii) | Installation and maintenance of field borders or field strips; |
| (xiv) | Pasture, range, and hayland planting; |
| (xv) | Seeding of shrubs; |
| (xvi) | Seedling shrub planting; |
| (xvii) | Site preparation; |
| (xviii) | Strip cropping; |
| (xix) | Wildlife food plot planting; and |
| (xx) | Windbreak and shelterbelt establishment; |

107

(16)   U.S. Army Corps of Engineers, 33 CFR 230.9(i), as adopted by BLM in 90 FR 42432.

*Real estate grants for rights-of-way which involve only minor disturbances to earth, air, or water:

(1)   Minor access roads, streets and boat ramps.

(2)   Minor utility distribution and collection lines, including irrigation.

(3)   Removal of sand, gravel, rock, and other material from existing borrow areas.

(17)   Department of Energy, 10 CFR 1021(D) (Appendix B4.11), as adopted by BLM in 90 FR 42432. Make sure DOE's "Integral Elements" are incorporated in each DOE CX (10 CFR 1021 Appendix B)

*ELECTRIC POWER SUBSTATIONS AND INTERCONNECTION FACILITIES. Construction or modification of electric power substations or interconnection facilities (including, but not limited to, switching stations and support facilities).

(18)   Department of Energy, 10 CFR 1021(D) (Appendix B5.5), as adopted by BLM in 90 FR 42432. Make sure DOE's "Integral Elements" are incorporated in each DOE CX (10 CFR 1021 Appendix B)

*SHORT PIPELINE SEGMENTS. Construction and subsequent operation of short (generally less than 20 miles in length) pipeline segments conveying materials (such as air, brine, carbon dioxide, geothermal system fluids, hydrogen gas, natural gas, nitrogen gas, oil, produced water, steam, and water) between existing source facilities and existing receiving facilities (such as facilities for use, reuse, transportation, storage, and refining), provided that the pipeline segments are within previously disturbed or developed rights-of-way.

(19)   Department of Energy, 10 CFR 1021(D) (Appendix B5.15), as adopted by BLM in 90 FR 42432. Make sure DOE's "Integral Elements" are incorporated in each DOE CX (10 CFR 1021 Appendix B)

*SMALL-SCALE RENEWABLE ENERGY RESEARCH AND DEVELOPMENT AND PILOT PROJECTS. Small-scale renewable energy research and development projects and small-scale pilot projects, provided that the projects are located within a previously disturbed or developed area. Covered actions would be in accordance with applicable requirements (such as local land use and zoning requirements) in the proposed project area and would incorporate appropriate control technologies and best management practices.

(20)   Tennessee Valley Authority, 18 CFR Part 1318, Subpart C, Appendix A, n. 16, as

108

adopted by BLM in 90 FR 42432.

*Construction of new transmission line infrastructure, including electric transmission lines generally no more than 10 miles in length and that require no more than 125 acres of new developed rights-of-way and no more than 1 mile of new access road construction outside the right-of-way; and/or construction of electric power substations or interconnection facilities, including switching stations, phase or voltage conversions, and support facilities that generally require the physical disturbance of no more than 10 acres.

(21)    Tennessee Valley Authority, 18 CFR Part 1318, Subpart C, Appendix A, n. 19, as adopted by BLM in 90 FR 42432.

*Removal of conductors and structures, and/or the cessation of right-of-way vegetation management, when existing transmissions lines are retired; or the rebuilding of transmission lines within or contiguous to existing rights-of-way involving generally no more than 25 miles in length and no more than 125 acres of expansion of the existing right-of-way.

(22)    Rural Utility Service, 7 CFR 1970.54(c)(2), as adopted by BLM in 90 FR 42432.

*Construction of electric power lines and associated facilities designed for or capable of operation at a nominal voltage of either:

   (iv)Less than 69 kilovolts (kV);

   (v) Less than 230 kV if no more than 25 miles of line are involved; or

   (iii) 230 kV or greater involving no more than three miles of line, but not for the integration of major new generation resources into a bulk transmission system;

(23)    Tennessee Valley Authority, 18 CFR Part 1318, Subpart C, Appendix A n. 40 as adopted by NPS in 90 FR 24644.

*Demolition and disposal of structures, buildings, equipment and associated infrastructure and subsequent site reclamation, subject to applicable review for historical value, on sites generally less than 10 acres in size.

(24)    Department of Energy, 10 CFR 1021(D) (Appendix B1.28), as adopted by BLM in 90 FR 42432. Make sure DOE's "Integral Elements" are incorporated in each DOE CX (10 CFR 1021 Appendix B).

*PLACING A FACILITY IN AN ENVIRONMENTALLY SAFE CONDITION. Minor activities that are required to place a facility in an environmentally safe condition where there is no proposed use for the facility. These activities would include, but are not limited to, reducing surface contamination, and removing materials, equipment or waste (such as final defueling of a reactor, where there are adequate existing facilities for the treatment, storage, or disposal of the materials,

109

equipment or waste). These activities would not include conditioning, treatment, or processing of spent nuclear fuel, high-level waste, or special nuclear materials.

(25)   USDA - U.S. Forest Service, 7 CFR 1b.4(d)(43), as adopted by BLM in 90 FR 27655.

*Construction, reconstruction, decommissioning, relocation, or disposal of buildings, infrastructure, or other improvements at an existing administrative site, as that term is defined in section 502(1) of Public Law 109-54 (119 Stat. 559; 16 U.S.C. 580d note). Examples include but are not limited to:

(i)     Relocating an administrative facility to another existing administrative site;

(ii)    Construction, reconstruction, or expansion of an office, a warehouse, a lab, a greenhouse, or a fire-fighting facility;

(iii)    Surface or underground installation or decommissioning of water or waste disposal system infrastructure;

(iv)    Disposal of an administrative building; and

(v)     Construction or reconstruction of communications infrastructure.

(26)   Department of Energy, 10 CFR 1021(D) (Appendix B6.10), as adopted by BLM in 90 FR 42432. Make sure DOE's "Integral Elements" are incorporated in each DOE CX (10 CFR 1021 Appendix B)

*UPGRADED OR REPLACEMENT WASTE STORAGE FACILITIES. Siting, construction, modification, expansion, operation, and decommissioning of a small upgraded or replacement facility (less than approximately 50,000 square feet in area) within or contiguous to a previously disturbed or developed area (where active utilities and currently used roads are readily accessible) for storage of waste that is already at the site at the time the storage capacity is to be provided. These actions do not include the storage of high-level radioactive waste, spent nuclear fuel or any waste that requires special precautions to prevent nuclear criticality. (See also B6.4, B6.5, B6.6 of this appendix, and C16 of appendix C.)

(27)   Department of Energy, 10 CFR 1021(D) (Appendix B6.2), as adopted by BLM in 90 FR 42432. Make sure DOE's "Integral Elements" are incorporated in each DOE CX (10 CFR 1021 Appendix B)

*WASTE COLLECTION, TREATMENT, STABILIZATION, AND CONTAINMENT FACILITIES. The siting, construction, and operation of temporary (generally less than 2 years) pilot-scale waste collection and treatment facilities, and pilot-scale (generally less than 1 acre) waste stabilization and containment facilities (including siting, construction, and operation of a small-scale laboratory building or renovation of a room in an existing building for sample analysis), provided that the action (1) Supports remedial investigations/feasibility

110

studies under CERCLA, or similar studies under RCRA (such as RCRA facility investigations/corrective measure studies) or other authorities and (2) would not unduly limit the choice of reasonable remedial alternatives (such as by permanently altering substantial site area or by committing large amounts of funds relative to the scope of the remedial alternatives).

(28)   Department of Energy, 10 CFR 1021(D) (Appendix B6.4), as adopted by BLM in 90 FR 42432. Make sure DOE's "Integral Elements" are incorporated in each DOE CX (10 CFR 1021 Appendix B)

*FACILITIES FOR STORING PACKAGED HAZARDOUS WASTE FOR 90 DAYS OR LESS. Siting, construction, modification, expansion, operation, and decommissioning of an onsite facility for storing packaged hazardous waste (as designated in 40 CFR part 261) for 90 days or less or for longer periods as provided in 40 CFR 262.34(d), (e), or (f) (such as accumulation or satellite areas).

F.   Solid Minerals.

(1)   Department of Energy, 10 CFR 1021(D) (Appendix B5.12), as adopted by BIA and BLM in 90 FR 4774. Make sure DOE's "Integral Elements" are incorporated in each DOE CX (10 CFR 1021 Appendix B).

*WORKOVER OF EXISTING WELLS. Workover (operations to restore production, such as deepening, plugging back, pulling and resetting lines, and squeeze cementing) of existing wells (including, but not limited to, activities associated with brine, carbon dioxide, coalbed methane, gas hydrate, geothermal, natural gas, and oil) to restore functionality, provided that workover operations are restricted to the existing well pad and do not involve any new site preparation or earthwork that would have the potential to cause significant impacts on nearby habitat; that site characterization has verified a low potential for seismicity, subsidence, and contamination of freshwater aquifers; and the actions are otherwise consistent with best practices and DOE protocols, including those that protect against uncontrolled releases of harmful materials.

(2)   Department of Energy, 10 CFR 1021(D) (Appendix B1.10), as adopted by BLM in 90 FR 42432. Make sure DOE's "Integral Elements" are incorporated in each DOE CX (10 CFR 1021 Appendix B).

*ONSITE STORAGE OF ACTIVATED MATERIAL. Routine, onsite storage at an existing facility of activated equipment and material (including, but not limited to, lead) used at that facility, to allow reuse after decay of radioisotopes with short half-lives.

G.   Transportation.

(1)   USDA - U.S. Forest Service, 7 CFR 1b.4(d)(42), as adopted by BLM in 90 FR 27655.

111

*Activities that restore, rehabilitate, or stabilize lands occupied by roads and trails, including unauthorized roads and trails and National Forest System roads and National Forest System trails, to a more natural condition that may include removing, replacing, or modifying drainage structures and ditches, reestablishing vegetation, reshaping natural contours and slopes, reestablishing drainage-ways, or other activities that would restore site productivity and reduce environmental impacts. Examples include but are not limited to:

(i)     Decommissioning a road to a more natural state by restoring natural contours and removing construction fills, loosening compacted soils, revegetating the roadbed and removing ditches and culverts to reestablish natural drainage patterns;

(ii)     Restoring a trail to a natural state by reestablishing natural drainage patterns, stabilizing slopes, reestablishing vegetation, and installing water bars; and

(iii)     Installing boulders, logs, and berms on a road segment to promote naturally regenerated grass, shrub, and tree growth.

(2)     USDA- U.S. Forest Service, 7 CFR 1b.4(d)(45), as adopted by BLM in 90 FR 27655.

*Road management activities on up to 8 miles of NFS roads and associated parking areas. Activities under this category cannot include construction or realignment. Examples include but are not limited to:

(i) Rehabilitating an NFS road or parking area where management activities go beyond repair and maintenance;

(ii) Shoulder-widening or other safety improvements within the right-of-way for an NFS road; and

(iii) Replacing a bridge along an NFS road.

(3)     Department of Energy, 10 CFR 1021(Appendix (B1.13), as adopted by BIA and BLM in 90 FR 4774. Make sure DOE's "Integral Elements" are incorporated in each DOE CX (10 CFR 1021 subpart D, appendix B). Make sure DOE's "Integral Elements" are incorporated in each DOE CX (10 CFR 1021 Appendix B).

*PATHWAYS, SHORT ACCESS ROADS, AND RAIL LINES. Construction, acquisition, and relocation, consistent with applicable right-of-way conditions and approved land use or transportation improvement plans, of pedestrian walkways and trails, bicycle paths, small outdoor fitness areas, and short access roads and rail lines (such as branch and spur lines).

(4)     Federal Highway Administration, 23 CFR 771.117(c)(3) as adopted by NPS in 90 FR 24644.

*Construction of bicycle and pedestrian lanes, paths, and facilities.

112

(5)      Federal Highway Administration, 23 CFR 771.117(c)(26), along with sections (e)(1)-(6) and (d)(13) as adopted by NPS in 90 FR 24644.

*Modernization of a highway by resurfacing, restoration, rehabilitation, reconstruction, adding shoulders, or adding auxiliary lanes (including parking, weaving, turning, and climbing lanes), if the actions meet the constraints [below] in paragraph (e) of this section. Actions described in (c)(26), (c)27, and (c)(28) of this section may not be processed as CEs under paragraph (e) if they involve:

(1) An acquisition of more than a minor amount of right-of-way or that would result in any residential or non-residential displacements;

(2) An action that needs a bridge permit from the U.S. Coast Guard, or an action that does not meet the terms and conditions of a U.S. Army Corps of Engineers nationwide or general permit under section 404 of the Clean Water Act and/or section 10 of the Rivers and Harbors Act of 1899;

(3) A finding of "adverse effect" to historic properties under the National Historic Preservation Act, the use of a resource protected under 23 U.S.C. 138 or 49 U.S.C. 303 (section 4(f)) except for actions resulting in *de minimis* impacts, or a finding of "may affect, likely to adversely affect" threatened or endangered species or critical habitat under the Endangered Species Act; *de minimis* impacts, or a finding of "may affect, likely to adversely affect" threatened or endangered species or critical habitat under the Endangered Species Act;

(4) Construction of temporary access or the closure of existing road, bridge, or ramps that would result in major traffic disruptions;

(5) Changes in access control;

(6) A floodplain encroachment other than functionally dependent uses (e.g., bridges, wetlands) or actions that facilitate open space use (e.g., recreational trails, bicycle and pedestrian paths); or construction activities in, across or adjacent to a river component designated or proposed for inclusion in the National System of Wild and Scenic Rivers.

Additional Actions that meet the criteria for a CE in the CEQ regulations (40 CFR 1508.4) and paragraph (a) of this section may be designated as CEs only after Administration approval unless otherwise authorized under an executed agreement pursuant to paragraph (g) of this section. The applicant must submit documentation that demonstrates that the specific conditions or criteria for these CEs are satisfied, and that significant environmental effects will not result. Examples of such actions include but are not limited to: Actions described in paragraphs (c)(26), (c)(27), and (c)(28) of this section that do not meet the constraints in paragraph (e) of this section. [If the action triggers a constraint (1)-(6) above, the CE can still be applied if the documentation demonstrates that the action fits within the CE and significant environmental effects will not result.]

113

NPS-AR-001122

(6)    Federal Highway Administration, 23 CFR 771.117(c)(28), along with sections (e)(1)-(6) and (d)(13) as adopted by NPS in 90 FR 24644 and BLM in 90 FR 42432.

*Bridge rehabilitation, reconstruction or replacement or the construction of grade separation to replace existing at-grade railroad crossings, if the actions meet the constraints [below] ~~in paragraph (e) of this section~~. Actions ~~described in (c)(26), (c)27, and (c)(28) of this section~~ may not be processed as CEs ~~under paragraph (e)~~ if they involve:

(e)(1) An acquisition of more than a minor amount of right-of-way or that would result in any residential or non-residential displacements;

(e)(2) An action that needs a bridge permit from the U.S. Coast Guard, or an action that does not meet the terms and conditions of a U.S. Army Corps of Engineers nationwide or general permit under section 404 of the Clean Water Act and/or section 10 of the Rivers and Harbors Act of 1899;

(e)(3) A finding of "adverse effect" to historic properties under the National Historic Preservation Act, the use of a resource protected under 23 U.S.C. 138 or 49 U.S.C. 303 (section 4(f)) except for actions resulting in *de minimis* impacts, or a finding of "may affect, likely to adversely affect" threatened or endangered species or critical habitat under the Endangered Species Act; *de minimis* impacts, or a finding of "may affect, likely to adversely affect" threatened or endangered species or critical habitat under the Endangered Species Act;

(e)(4) Construction of temporary access or the closure of existing road, bridge, or ramps that would result in major traffic disruptions;

(e)(5) Changes in access control;

(e)(6) A floodplain encroachment other than functionally dependent uses (e.g., bridges, wetlands) or actions that facilitate open space use (e.g., recreational trails, bicycle and pedestrian paths); or construction activities in, across or adjacent to a river component designated or proposed for inclusion in the National System of Wild and Scenic Rivers.

(d)(13) ~~Additional~~ Actions ~~that meet the criteria for a CE in the CEQ regulations (40 CFR 1508.4) and paragraph (a) of this section~~ may be designated as CEs only after ~~Administration approval unless otherwise authorized under an executed agreement pursuant to paragraph (g) of this section. The applicant must submit~~ documentation that demonstrates that the specific conditions or criteria for these CEs are satisfied, and that significant environmental effects will not result. ~~Examples of such actions include but are not limited to: Actions described in paragraphs (c)(26), (c)(27), and (c)(28) of this section that do not meet the constraints in paragraph (e) of this section.~~ [If the action triggers a constraint (1)-(6) above, the CE can still be applied if the documentation demonstrates that the action fits within the CE and significant environmental effects will not result.]

(7)    USDA- U.S. Forest Service, 7 CFR 1b.4(d)(46), as adopted by NPS in 90 FR 24644

and BLM in 90 FR 42432.

*Construction and realignment of up to 2 miles of [NFS] roads and associated parking areas. Examples include but are not limited to:

(i) Constructing an [NFS] road to improve access to a trailhead or parking area;

(ii) Rerouting an [NFS] road to minimize resource impacts; and

(iii) Improving or upgrading the surface of an [NFS] road to expand its capacity.

(8)    USDA - U.S. Forest Service, 7 CFR 1b.4(c)(22), as adopted in 90 FR 42432.

*Repair and maintenance of roads, trails, and landline boundaries. Examples include but are not limited to:

(i) Authorizing a user to grade, resurface, and clean the culverts of an established NFS road;

(ii) Grading a road and clearing the roadside of brush without the use of herbicides;

(iii) Resurfacing a road to its original condition;

(iv) Pruning vegetation and cleaning culverts along a trail and grooming the surface of the trail; and

(v) Surveying, painting, and posting landline boundaries.

H.    Recreation Management and Visitor Use.

(1)    USDA - U.S. Forest Service, 7 CFR 1b.4(c)(23), as adopted by BLM in 90 FR 27655.

*Repair and maintenance of recreation sites and facilities. Examples include but are not limited to:

(i) Applying registered herbicides to control poison ivy on infested sites in a campground;

(ii) Applying registered insecticides by compressed air sprayer to control insects at a recreation site complex;

(iii) Repaving a parking lot; and

(iv) Applying registered pesticides for rodent or vegetation control.

(2)    USDA - U.S. Forest Service, 7 CFR 1b.4(c)(29), as adopted by BLM in 90 FR 27655.

115

*Issuance of a new authorization or amendment of an existing authorization for recreation special uses that occur on existing roads or trails, in existing facilities, in existing recreation sites, or in areas where such activities are allowed. Subject to the foregoing condition, examples include but are not limited to:

(i) Issuance of an outfitting and guiding permit for mountain biking on NFS trails that are not closed to mountain biking;

(ii) Issuance of a permit to host a competitive motorcycle event;

(iii)Issuance of an outfitting and guiding permit for backcountry skiing;

(iv) Issuance of a permit for a one-time use of existing facilities for other recreational events; and

(v) Issuance of a campground concession permit for an existing campground that has previously been operated by the Forest Service.

(3)     U.S. Forest Service, 36 CFR 220.6(e)(1), as adopted by BLM in 90 FR 27655 and NPS in 90 FR 24644.

*Construction and reconstruction of trails. Examples include, but are not limited to:

 (i) Constructing or reconstructing a trail to a scenic overlook, and

 (ii) Reconstructing an existing trail to allow use by handicapped individuals. [This CE cannot be applied to NPS off-road vehicle routes.]

(4)     USDA - U.S. Forest Service, 7 CFR 1b.4(d)(44), as adopted by BLM in 90 FR 27655.

*Construction, reconstruction, decommissioning, or disposal of buildings, infrastructure, or improvements at an existing recreation site, including infrastructure or improvements that are adjacent or connected to an existing recreation site and provide access or utilities for that site. Recreation sites include but are not limited to campgrounds and camping areas, picnic areas, day use areas, fishing sites, interpretive sites, visitor centers, trailheads, ski areas, and observation sites. Activities within this category are intended to apply to facilities located at recreation sites managed by the Forest Service and those managed by concessioners under a special use authorization. Examples include but are not limited to:

 (i)     Constructing, reconstructing, or expanding a toilet or shower facility;

 (ii)    Constructing or reconstructing a fishing pier, wildlife viewing platform, dock, or other constructed feature at a recreation site;

 (iii)    Installing or reconstructing a water or waste disposal system;

116

(iv)    Constructing or reconstructing campsites;

(v)    Disposal of facilities at a recreation site;

(vi)    Constructing or reconstructing a boat landing;

(vii)    Replacing a chair lift at a ski area;

(viii)    Constructing or reconstructing a parking area or trailhead; and

(ix)    Reconstructing or expanding a recreation rental cabin.

(5)    Tennessee Valley Authority, 18 CFR Part 1318, Subpart C, Appendix A, n. 22, as adopted by BLM in 90 FR 27655 and NPS in 90 FR 24644.

*Development of dispersed recreation sites (generally not to exceed 10 acres in size) to support activities such as hunting, fishing, primitive camping, wildlife observation, hiking, and mountain biking. Actions include, but are not limited to, installation of guardrails, gates and signage, hardening and stabilization of sites, trail construction, and access improvements/controls.

(6)    Tennessee Valley Authority, 18 CFR Part 1318, Subpart C, Appendix A, n. 23, as adopted by BLM in 90 FR 27655.

*Development of public use areas that generally result in the physical disturbance of no more than 10 acres, including, but not limited to, construction of parking areas, campgrounds, stream access points, and day use areas.

(7)    USDA - U.S. Forest Service, 7 CFR 1b.4(c)(26), as adopted by BLM in 90 FR 42432.

*Approval, modification, or continuation of minor, short-term (1 year or less) special uses of NFS lands. Examples include, but are not limited to:

(i)    Approving, on an annual basis, the intermittent use and occupancy by a State-licensed outfitter or guide;

(ii)    Approving the use of NFS land for apiaries; and

(iii)    Approving the gathering of forest products for personal use.

(8)    USDA - U.S. Forest Service, 7 CFR 1b.4(c)(28), as adopted by BLM in 90 FR 42432.

*Issuance of a new special use authorization to replace an existing or expired special use authorization, when such issuance is to account only for administrative changes, such as a change in ownership of authorized improvements or expiration

117

of the current authorization, and where there are no changes to the authorized facilities or increases in the scope or magnitude of authorized activities. The applicant or holder must be in compliance with all the terms and conditions of the existing or expired special use authorization. Subject to the foregoing conditions, examples include but are not limited to:

(i)      Issuing a new authorization to replace a powerline facility authorization that is at the end of its term;

(ii)     Issuing a new permit to replace an expired permit for a road that continues to be used as access to non-NFS lands; and

(iii)    Converting a transitional priority use outfitting and guiding permit to a priority use outfitting and guiding permit.

(9)    USDA - U.S. Forest Service, 7 CFR 1b.4(d)(28), as adopted by BLM in 90 FR 42432.

*Approval, modification, or continuation of special uses that require less than 20 acres of NFS lands. Subject to the preceding condition, examples include but are not limited to:

(i)      Approving the construction of a meteorological sampling site;

(ii)     Approving the use of land for a one-time group event;

(iii)    Approving the construction of temporary facilities for filming of staged or natural events or studies of natural or cultural history;

(iv)    Approving the use of land for a utility corridor that crosses a national forest;

(v)     Approving the installation of a driveway or other facilities incidental to use of a private residence; and

(vi)    Approving new or additional communication facilities, associated improvements, or communication uses at a site already identified as available for these purposes.

I.        Emergency Response

(1) USDA- Natural Resource Conservation Service, 7 CFR 1b.4(d)(6) as adopted by NPS in 90 FR 24644.

    i.  *Replacing and repairing existing culverts, grade stabilization, and water control structures and other small structures that were damaged by natural disasters where there is no new depth required and only minimal dredging, excavation, or placement of fill is required. [This CE may only used for actions that mitigate soil erosion, sedimentation, and downstream flooding; perpetuate native, non-invasive vegetation; are

118

consistent with Federal principals of natural stream dynamics and processes; incorporate conservation practice standards and do not involve a significant risk of exposure to toxic or hazardous substances.]

(2) USDA- U.S. Forest Service, 7 CFR 1b.4(d)(41) as adopted by NPS in 90 FR 24644 and BLM in 90 FR 42432.

*Removing and/or relocating debris and sediment following disturbance events (such as floods, hurricanes, tornados, mechanical/engineering failures, etc.) to restore uplands, wetlands, or riparian systems to pre-disturbance conditions, to the extent practicable, such that site conditions will not impede or negatively alter natural processes. Examples include but are not limited to:

    i. Removing an unstable debris jam on a river following a flood event and relocating it back in the floodplain and stream channel to restore water flow and local bank stability;

    ii. Clean-up and removal of infrastructure flood debris, such as, benches, tables, outhouses, concrete, culverts, and asphalt following a hurricane from a stream reach and adjacent wetland area; and

    iii. Stabilizing stream banks and associated stabilization structures to reduce erosion through bioengineering techniques following a flood event, including the use of living and nonliving plant materials in combination with natural and synthetic support materials, such as rocks, riprap, geo-textiles, for slope stabilization, erosion reduction, and vegetative establishment and establishment of appropriate plant communities (bank shaping and planting, brush mattresses, log, root wad, and boulder stabilization methods).

(3) Department of Energy, 10 CFR 1021(D) (Appendix B1.28), as adopted by BLM in 90 FR 42432. Make sure DOE's "Integral Elements" are incorporated in each DOE CX (10 CFR 1021 Appendix B).

*PLACING A FACILITY IN AN ENVIRONMENTALLY SAFE CONDITION. Minor activities that are required to place a facility in an environmentally safe condition where there is no proposed use for the facility. These activities would include, but are not limited to, reducing surface contamination, and removing materials, equipment or waste (such as final defueling of a reactor, where there are adequate existing facilities for the treatment, storage, or disposal of the materials, equipment or waste). These activities would not include conditioning, treatment, or processing of spent nuclear fuel, high-level waste, or special nuclear materials.

(4) Department of Energy, 10 CFR 1021(D) (Appendix B6.1), as adopted by BLM in 90 FR 42432. Make sure DOE's "Integral Elements" are incorporated in each DOE CX (10 CFR 1021 Appendix B)

*CLEANUP ACTIONS. Small-scale, short-term cleanup actions, under RCRA, Atomic Energy Act, or other authorities, less than approximately 10 million dollars in cost (in 2011 dollars), to reduce risk to human health or the environment from the release or

119

NPS-AR-001128

threat of release of a hazardous substance other than high-level radioactive waste and spent nuclear fuel, including treatment (such as incineration, encapsulation, physical or chemical separation, and compaction), recovery, storage, or disposal of wastes at existing facilities currently handling the type of waste involved in the action. These actions include, but are not limited to:

(a)      Excavation or consolidation of contaminated soils or materials from drainage channels, retention basins, ponds, and spill areas that are not receiving contaminated surface water or wastewater, if surface water or groundwater would not collect and if such actions would reduce the spread of, or direct contact with, the contamination;

(b)      Removal of bulk containers (such as drums and barrels) that contain or may contain hazardous substances, pollutants, contaminants, CERCLA-excluded petroleum or natural gas products, or hazardous wastes (designated in 40 CFR part 261 or applicable State requirements), if such actions would reduce the likelihood of spillage, leakage, fire, explosion, or exposure to humans, animals, or the food chain;

(c)      Removal of an underground storage tank including its associated piping and underlying containment systems in accordance with applicable requirements (such as RCRA, subtitle I; 40 CFR part 265, subpart J; and 40 CFR part 280, subparts F and G) if such action would reduce the likelihood of spillage, leakage, or the spread of, or direct contact with, contamination;

(d)      Repair or replacement of leaking containers;

(e)      Capping or other containment of contaminated soils or sludges if the capping or containment would not unduly limit future groundwater remediation and if needed to reduce migration of hazardous substances, pollutants, contaminants, or CERCLA-excluded petroleum and natural gas products into soil, groundwater, surface water, or air;

(f)      Drainage or closing of man-made surface impoundments if needed to maintain the integrity of the structures;

(g)      Confinement or perimeter protection using dikes, trenches, ditches, or diversions, or installing underground barriers, if needed to reduce the spread of, or direct contact with, the contamination;

(h)      Stabilization, but not expansion, of berms, dikes, impoundments, or caps if needed to maintain integrity of the structures;

(i)      Drainage controls (such as run-off or run-on diversion) if needed to reduce offsite migration of hazardous substances, pollutants, contaminants, or CERCLA-excluded petroleum or natural gas products or to prevent precipitation or run-off from other sources from entering the release area from other areas;

(j)      Segregation of wastes that may react with one another or form a mixture that could result in adverse environmental impacts;

120

(k)      Use of chemicals and other materials to neutralize the pH of wastes;

(l)      Use of chemicals and other materials to retard the spread of the release or to mitigate its effects if the use of such chemicals would reduce the spread of, or direct contact with, the contamination;

(m)      Installation and operation of gas ventilation systems in soil to remove methane or petroleum vapors without any toxic or radioactive co-contaminants if appropriate filtration or gas treatment is in place;

(n)      Installation of fences, warning signs, or other security or site control precautions if humans or animals have access to the release; and

(o)      Provision of an alternative water supply that would not create new water sources if necessary immediately to reduce exposure to contaminated household or industrial use water and continuing until such time as local authorities can satisfy the need for a permanent remedy.

J.     Habitat Restoration.

(1) USDA - U.S. Forest Service, 7 CFR 1b.4(d)(31), as adopted by BLM in 90 FR 3908 and NPS in 90 FR 24644.

    i.   *Modification or maintenance of stream or lake aquatic habitat improvement structures using native materials or normal practices. Examples include, but are not limited to:

    ii.   Reconstructing a gabion with stone from a nearby source;

    iii.   Adding brush to lake fish beds; and

    (iii) Cleaning and resurfacing a fish ladder at a hydroelectric dam.

(2) USDA - U.S. Forest Service, 7 CFR 1b.4(d)(40), as adopted by BLM in 90 FR 3908 and by NPS in 90 FR 24644.

*Restoring wetlands, streams, riparian areas or other water bodies by removing, replacing, or modifying water control structures such as, but not limited to, dams, levees, dikes, ditches, culverts, pipes, drainage tiles, valves, gates, and fencing, to allow waters to flow into natural channels and floodplains and restore natural flow regimes to the extent practicable where valid existing rights or special use authorizations are not unilaterally altered or canceled. Examples include but are not limited to:

    i.   Repairing an existing water control structure that is no longer functioning properly with minimal dredging, excavation, or placement of fill, and does not involve releasing hazardous substances;

    ii.    Installing a newly-designed structure that replaces an existing culvert to improve aquatic organism passage and prevent resource and property damage where the road or trail maintenance level does not change;

NPS-AR-001130

     iii.    Removing a culvert and installing a bridge to improve aquatic and/or terrestrial organism passage or prevent resource or property damage where the road or trail maintenance level does not change; and

     iv.    Removing a small earthen and rock fill dam with a low hazard potential classification that is no longer needed.

(3) USDA - U.S. Forest Service, 7 CFR 1b.4(d)(47), as adopted by NPS in 90 FR 24644 and BLM in 90 FR 42432.

\*Forest and grassland management activities with a primary purpose of meeting restoration objectives or increasing resilience. Activities to improve ecosystem health, resilience, and other watershed and habitat conditions may not exceed 2,800 acres.

     i.    Activities to meet restoration and resilience objectives may include, but are not limited to:

          a.    Stream restoration, aquatic organism passage rehabilitation, or erosion control;
          b.    Invasive species control and reestablishment of native species;
          c.    Prescribed burning;
          d.    Reforestation;
          e.    Road and/or trail decommissioning (system and non-system);
          f.    Pruning;
          g.    Vegetation thinning; and
          h.    Timber harvesting.

     ii.    The following requirements or limitations apply to this category:

          a.    Projects shall be developed or refined through a collaborative process that includes multiple interested persons representing diverse interests;
          b.    Vegetation thinning or timber harvesting activities shall be designed to achieve ecological restoration objectives, but shall not include salvage harvesting as defined in Agency policy; and
          c.    Construction and reconstruction of permanent roads is limited to 0.5 miles. Construction of temporary roads is limited to 2.5 miles, and all temporary roads shall be decommissioned no later than 3 years after the date the project is completed. Projects may include repair and maintenance of [NFS] roads and trails to prevent or address resource impacts; repair and maintenance of [NFS] roads and trails is not subject to the above mileage limits.

(4) Tennessee Valley Authority, 18 CFR Part 1318, Subpart C, Appendix A n. 29 as adopted by NPS in 90 FR 24644.

<div align="center">122</div>

NPS-AR-001131

*Actions to restore and enhance wetlands, riparian, and aquatic ecosystems that generally involve physical disturbance of no more than 10 acres, including, but not limited to, construction of small water control structures; revegetation actions using native materials; construction of small berms, dikes, and fish attractors; removal of debris and sediment following natural or human-caused disturbance events; installation of silt fences; construction of limited access routes for purposes of routine maintenance and management; and reintroduction or supplementation of native, formerly native, or established species into suitable habitat within their historic or established range.

(5) Tennessee Valley Authority, 18 CFR Part 1318, Subpart C, Appendix A n. 30 as adopted by NPS in 90 FR 24644 and BLM in 90 FR 42432.

*Actions to maintain, restore, or enhance terrestrial ecosystems that generally involve physical disturbance of no more than 125 acres, including, but not limited to, establishment and maintenance of non-invasive vegetation; bush hogging; prescribed fires; installation of nesting and roosting structures, fencing, and cave gates; and reintroduction or supplementation of native, formerly native, or established species into suitable habitat within their historic or established range. [Herbicide and pesticide use is not covered under this CE.]

K.    Other.

(1) Department of Energy, 10 CFR 1021(D) (Appendix B1.11), as adopted by BIA and BLM in 90 FR 4774. Make sure DOE's "Integral Elements" are incorporated in each DOE CX (10 CFR 1021 Appendix B).

 *FENCING. Installation of fencing, including, but not limited to border marking, that would not have the potential to significantly impede wildlife population movement (including migration) or surface water flow.

(2) National Telecommunications and Information administration, 89 FR 22688, Categorical Exclusions, Operational, C-2, as adopted BIA and BLM in 90 FR 4774.

*Outdoor research activities conducted in compliance with all applicable laws, regulations, and requirements. Examples include types of research, development, testing, and evaluation activities conducted outdoors where no new ground disturbance occurs and no sensitive resources (e.g., threatened or endangered species, archaeological sites, Tribal resources, wetlands, and waterbodies) are present, such as radar testing, radio noise measurements, and public safety communications research.

(3) Federal Highway Administration, 23 CFR 771.117(c)(24) as adopted by NPS in 90 FR 24644.

*Localized geotechnical and other investigation to provide information for preliminary design and for environmental analyses and permitting purposes, such as drilling test bores for soil sampling; archeological investigations for archeology resources assessment or similar survey; and wetland surveys.

123

(4) DHS- U.S. Coast Guard, Department of Homeland Security Instruction Manual 023-01-001-01, Rev 01, Appendix A, Table 1 *L42 as adopted by NPS in 90 FR 24644.

*Environmental site characterization studies and environmental monitoring including: siting, constructing, operating, and dismantling or closing of characterization and monitoring devices. Such activities include but are not limited to the following:

(a) Conducting geological, geophysical, geochemical, and engineering surveys and mapping, including the establishment of survey marks.
(b) Installing and operating field instruments, such as stream-gauging stations or flow-measuring devices, telemetry systems, geochemical monitoring tools, and geophysical exploration tools.
(c) Drilling wells for sampling or monitoring of groundwater, well logging, and installation of water-level recording devices in wells.
(d) Conducting aquifer response testing.
(e) Installing and operating ambient air monitoring equipment.
(f) Sampling and characterizing water, soil, rock, or contaminants.
(g) Sampling and characterizing water effluents, air emissions, or solid waste streams.
(h) Sampling flora or fauna.
(i) Conducting archeological, historic, and cultural resource identification and evaluation studies in compliance with 36 CFR part 800 and 43 CFR part 7.
(j) Gathering data and information and conducting studies that involve no physical change to the environment. Examples include topographic surveys, bird counts, wetland mapping, and other inventories.

(5) DHS- U.S. Coast Guard, Department of Homeland Security Instruction Manual 023-01-001-01, Rev 01, Appendix A, Table 1 *L26 as adopted by NPS in 90 FR 24644.

*Maintenance dredging and debris disposal where no new depths are required, applicable permits are secured, and disposal will be at an existing approved disposal site.

(6) Department of Homeland Security, 18 CFR Part 1318, Subpart C, Appendix A, n. 34, as adopted by BLM in 90 FR 42432.

*Proposed activities and operations to be conducted in an existing structure that would be compatible with and similar in scope to its ongoing functional uses and would be consistent with previously established safety levels and in compliance with applicable Federal, Tribal, State, or local requirements.

(7) Department of Energy, 10 CFR 1021(D) (Appendix B)(B3)(1), as adopted by BLM in 90 FR 42432.

*SITE CHARACTERIZATION AND ENVIRONMENTAL MONITORING. Site characterization and environmental monitoring (including, but not limited to, siting, construction, modification, operation, and dismantlement and removal or otherwise proper closure (such as of a well) of characterization and monitoring devices, and siting, construction, and associated operation of a small-scale laboratory building or renovation of

124

a room in an existing building for sample analysis). Such activities would be designed in conformance with applicable requirements and use best management practices to limit the potential effects of any resultant ground disturbance. Covered activities include, but are not limited to, site characterization and environmental monitoring under CERCLA and RCRA. (This class of actions excludes activities in aquatic environments. See B3.16 of this appendix for such activities.) Specific activities include, but are not limited to:

(a)     Geological, geophysical (such as gravity, magnetic, electrical, seismic, radar, and temperature gradient), geochemical, and engineering surveys and mapping, and the establishment of survey marks. Seismic techniques would not include large-scale reflection or refraction testing;

(b)     Installation and operation of field instruments (such as stream-gauging stations or flow-measuring devices, telemetry systems, geochemical monitoring tools, and geophysical exploration tools);

(c)     Drilling of wells for sampling or monitoring of groundwater or the vadose (unsaturated) zone, well logging, and installation of water-level recording devices in wells;

(d)     Aquifer and underground reservoir response testing;

(e)     Installation and operation of ambient air monitoring equipment;

(f)     Sampling and characterization of water, soil, rock, or contaminants (such as drilling using truck- or mobile-scale equipment, and modification, use, and plugging of boreholes);

(g)     Sampling and characterization of water effluents, air emissions, or solid waste streams;

(h)     Installation and operation of meteorological towers and associated activities (such as assessment of potential wind energy resources);

(i)     Sampling of flora or fauna; and

(j)     Archeological, historic, and cultural resource identification in compliance with 36 CFR part 800 and 43 CFR part 7.

(8) Animal and Plant Health Inspection Service, 7 CFR 372.5(c)(1), as adopted by BLM in 90 FR 42432.

*Routine measures.

(i) Routine measures, such as identifications, inspections, surveys, sampling that does not cause physical alteration of the environment, testing, seizures, quarantines, removals, sanitizing, inoculations, control, and monitoring employed by agency programs to pursue their missions and functions. Such measures may include the use—according to any label

125

instructions or other lawful requirements and consistent with standard, published program practices and precautions—of chemicals, pesticides, or other potentially hazardous or harmful substances, materials, and target-specific devices or remedies, provided that such use meets all of the following criteria (insofar as they may pertain to a particular action):

(A)    The use is localized or contained in areas where humans are not likely to be exposed, and is limited in terms of quantity, i.e., individualized dosages and remedies;

(B)    The use will not cause contaminants to enter water bodies, including wetlands;

(C)    The use does not adversely affect any federally protected species or critical habitat; and

(D)     The use does not cause bioaccumulation.

(ii) Examples of routine measures include:

(A)    Inoculation or treatment of discrete herds of livestock or wildlife undertaken in contained areas (such as a barn or corral, a zoo, an exhibition, or an aviary);

(B)    Use of vaccinations or inoculations including new vaccines (e.g., genetically engineered vaccines) and applications of existing vaccines to new species provided that the project is conducted in a controlled and limited manner, and the impacts of the vaccine can be predicted; and

(C)    Isolated (for example, along a highway) weed control efforts.

(9) Department of Energy, 10 CFR 1021(D) (Appendix B1.2), as adopted by BLM in 90 FR 42432. Make sure DOE's "Integral Elements" are incorporated in each DOE CX (10 CFR 1021 Appendix B).

*TRAINING EXERCISES AND SIMULATIONS. Training exercises and simulations (including, but not limited to, firing-range training, small-scale and short-duration force-on-force exercises, emergency response training, fire fighter and rescue training, and decontamination and spill cleanup training) conducted under appropriately controlled conditions and in accordance with applicable requirements.

(10)    Department of Energy, 10 CFR 1021(D) (Appendix B1.8), as adopted by BLM in 90 FR 42432.

*SCREENED WATER INTAKE AND OUTFLOW STRUCTURES. Modifications to screened water intake and outflow structures such that intake velocities and volumes and water effluent quality and volumes are consistent with existing permit limits.

(11)    Department of Energy, 10 CFR 1021(D) (Appendix B1.12), as adopted by BLM in 90

126

FR 42432. Make sure DOE's "Integral Elements" are incorporated in each DOE CX (10 CFR 1021 Appendix B).

*DETONATION OR BURNING OF EXPLOSIVES OR PROPELLANTS AFTER TESTING. Outdoor detonation or burning of explosives or propellants that failed (duds), were damaged (such as by fracturing), or were otherwise not consumed in testing. Outdoor detonation or burning would be in areas designated and routinely used for those purposes under existing applicable permits issued by Federal, state, and local authorities (such as a permit for a RCRA miscellaneous unit (40 CFR part 264, subpart X)).

(12)    Department of Energy, 10 CFR 1021(D) (Appendix B1.16), as adopted by BLM in 90 FR 42432. Make sure DOE's "Integral Elements" are incorporated in each DOE CX (10 CFR 1021 Appendix B).

*ASBESTOS REMOVAL. Removal of asbestos-containing materials from buildings in accordance with applicable requirements (such as 40 CFR part 61, ''National Emission Standards for Hazardous Air Pollutants''; 40 CFR part 763, ''Asbestos''; 29 CFR part 1910, subpart I, ''Personal Protective Equipment''; and 29 CFR part 1926, ''Safety and Health Regulations for Construction''; and appropriate state and local requirements, including certification of removal contractors and technicians).

(13)    Department of Energy, 10 CFR 1021(D) (Appendix B1.29), as adopted by BLM in 90 FR 42432. Make sure DOE's "Integral Elements" are incorporated in each DOE CX (10 CFR 1021 Appendix B).

*DISPOSAL FACILITIES FOR CONSTRUCTION AND DEMOLITION WASTE. Siting, construction, expansion, modification, operation, and decommissioning of small (less than approximately 10 acres) solid waste disposal facilities for construction and demolition waste, in accordance with applicable requirements (such as 40 CFR part 257, ''Criteria for Classification of Solid Waste Disposal Facilities and Practices,'' and 40 CFR part 61, ''National Emission Standards for Hazardous Air Pollutants'') that would not release substances at a level, or in a form, that could pose a threat to public health or the environment.

(14)    Department of Energy, 10 CFR 1021(D) (Appendix B1.33), as adopted in 90 FR 42432. Make sure DOE's "Integral Elements" are incorporated in each DOE CX (10 CFR 1021 Appendix B).

*STORMWATER RUNOFF CONTROL. Design, construction, and operation of control practices to reduce stormwater runoff and maintain natural hydrology. Activities include, but are not limited to, those that reduce impervious surfaces (such as vegetative practices and use of porous pavements), best management practices (such as silt fences, straw wattles, and fiber rolls), and use of green infrastructure or other low impact development practices (such as cisterns and green roofs).

(15)    Department of Energy, 10 CFR 1021(D) (Appendix B1.34), as adopted by BLM in 90 FR 42432. Make sure DOE's "Integral Elements" are incorporated in each DOE CX (10

127

CFR 1021 Appendix B).

*LEAD-BASED PAINT CONTAINMENT, REMOVAL, AND DISPOSAL. Containment, removal, and disposal of lead-based paint in accordance with applicable requirements (such as provisions relating to the certification of removal contractors and technicians at 40 CFR part 745, "Lead Based Paint Poisoning Prevention In Certain Residential Structures").

(16)    Department of Energy, 10 CFR 1021(D) (Appendix B1.35), as adopted by BLM in 90 FR 42432. Make sure DOE's "Integral Elements" are incorporated in each DOE CX (10 CFR 1021 Appendix B).

*DROP-OFF, COLLECTION, AND TRANSFER FACILITIES FOR RECYCLABLE MATERIALS. Siting, construction, modification, and operation of recycling or compostable material drop-off, collection, and transfer stations on or contiguous to a previously disturbed or developed area and in an area where such a facility would be consistent with existing zoning requirements. The stations would have appropriate facilities and procedures established in accordance with applicable requirements for the handling of recyclable or compostable materials and household hazardous waste (such as paint and pesticides). Except as specified above, the collection of hazardous waste for disposal and the processing of recyclable or compostable materials are not included in this class of actions.

(17)    Department of Energy, 10 CFR 1021(D) (Appendix B6.9), as adopted by BLM in 90 FR 42432. Make sure DOE's "Integral Elements" are incorporated in each DOE CX (10 CFR 1021 Appendix B).
*MEASURES TO REDUCE MIGRATION OF CONTAMINATED GROUNDWATER. Small-scale temporary measures to reduce migration of contaminated groundwater, including the siting, construction, operation, and decommissioning of necessary facilities. These measures include, but are not limited to, pumping, treating, storing, and reinjecting water, by mobile units or facilities that are built and then removed at the end of the action.

(18)    Department of Energy, 10 CFR 1021(D) (Appendix B6.10), as adopted in 90 FR 42432. Make sure DOE's "Integral Elements" are incorporated in each DOE CX (10 CFR 1021 Appendix B).

*UPGRADED OR REPLACEMENT WASTE STORAGE FACILITIES. Siting, construction, modification, expansion, operation, and decommissioning of a small upgraded or replacement facility (less than approximately 50,000 square feet in area) within or contiguous to a previously disturbed or developed area (where active utilities and currently used roads are readily accessible) for storage of waste that is already at the site at the time the storage capacity is to be provided. These actions do not include the storage of high-level radioactive waste, spent nuclear fuel or any waste that requires special precautions to prevent nuclear criticality. (See also B6.4, B6.5, B6.6 of this appendix, and C16 of appendix C.)

L.  Cultural Resources.

128

(1)  Tennessee Valley Authority, 18 CFR Part 1318, Subpart C, Appendix A, n. 34, as adopted by BLM in 90 FR 27655 and NPS in 90 FR 24644.

*Reburial of human remains and funerary objects under the Native American Graves Protection and Repatriation Act that are inadvertently discovered or intentionally excavated on [TVA] land.

(2)  The Presidio Trust, 36 CFR 1010.7(a)(21) as adopted by NPS in 90 FR 24644.

*Rehabilitation, modification, or improvement of historic properties that have been determined to be in conformance with the Secretary of the Interior's "Standards for the Treatment of Historic Properties" at 36 CFR part 68 and that would have no or only minimal environmental impact.

(3)  Tennessee Valley Authority, 18 CFR Part 1318, Subpart C, Appendix A, n33 as adopted by NPS in 90 FR 24644.

*Actions to protect cultural resources including, but not limited to, fencing, gating, signing, and bank stabilization (generally up to 1/2 mile in length when along stream banks or reservoir shoreline).

129



**National Park Service**
**U.S. Department of the Interior**

**National Mall and Memorial Parks**
**Date: 02/20/2026**

# ASSESSMENT OF ACTIONS HAVING AN EFFECT ON HISTORIC PROPERTIES
## A. DESCRIPTION OF UNDERTAKING

**1. Park:** National Mall and Memorial Parks

**2. Project Description:**

**Project Name:**   15th Street Cycle Track Removal and road repaving
**Prepared by:** Daniel Weldon    **Date Prepared:**    **Telephone:**
**PEPC Project Number:**   134934
**Locations:**

      **County, State:**  District of Columbia, DC

**Describe project:**

The work consists of removing existing cycle-track and bicycle-related traffic control features and restoring the roadway to a conventional lane configuration within the existing curb lines along three segments—15th St NW / Raoul Wallenberg Pl SW (Constitution Ave NW to Maine Ave SW), Maine Ave SW (15th St NW to Ohio Dr SW/East Basin Dr SW—southbound), and Ohio Dr SW/East Basin Dr SW (Maine Ave SW to the Jefferson Memorial Food Kiosk—southbound)—including removal of cycle track barriers/delineator posts and anchor bolts with restoration of resulting voids; milling and overlaying asphalt within curb faces to a maximum treatment depth of $\leq 4$ inches; grinding/removing existing pavement markings within concrete bus laybys; removing bicycle signal faces and retiming/rephasing traffic signals as needed; removing bicycle route signage and installing new signage (and striping transitions) at the north and south project limits to safely transition bicyclists; and restriping the corridor to a typical cross-section of two northbound lanes and two southbound lanes (plus turn lanes where feasible), with crosswalk markings replaced in-kind on asphalt and new stop bars and lane-use arrows installed at intersection approaches as warranted.

This project supports implementation of Executive Order 14252, "Making the District of Columbia Safe and Beautiful" by advancing coordinated stewardship and improved visual quality of prominent federal public spaces through removal of roadway appurtenances and restoration of a standardized, maintainable corridor configuration within the existing roadway prism.

With the upcoming National Cherry Blossom Festival and preparations underway for Americas 250th anniversary, ensuring safe access for residents, commuters, visitors, and emergency services is a shared priority. These nationally significant events draw substantial visitation and require coordinated infrastructure planning to support mobility, security, and a positive experience for all.

**Area of potential effects (as defined in 36 CFR 800.16[d])**

**3. Has the area of potential effects been surveyed to identify historic properties?**

    _____ **No**

    _X_ **Yes**

        **Source or reference:**  Washington Monument Grounds Cultural Landscape Inventory (2022)
        National Mall Historic District National Register Nomination (1981, additional documentation 2016)
        The Mall Cultural Landscape Inventory (2006, 2012, 2018)
        Tidal Basin CLR

West Potomac Park Cultural Landscape Inventory (2022)
East and West Potomac Parks NR Nomination 01000271 (1973, updated 2001)
Events and Celebrations of the National Mall and Presidents Park South Historic Resource Survey
Summer in the Parks Special Resource Study (2019)
Thomas Jefferson Memorial Cultural Landscape Inventory

## 4. Potentially Affected Resource(s):

**Archeological Resources Present:** No

**Archeological Resources Notes:**   There are no known archeological resources within the APE of the project.

**Historical Structures/Resources Present:** Yes

**Property Name:** Outlet Bridge - Res. 332   **LCS:** 46855   **Asset:** 33219000

**Property Name:** Monument Lodge - Res. 2   **LCS:** 100069   **Asset:** 00212000
**Location:** Reservation 2, 14th Street NW

**Property Name:** Constitution Avenue   **LCS:** 46871   **Asset:** 81000000
**Location:** Reservation 332, Constitution Gardens, NW Washington DC

**Property Name:** External- Smithsonian American History Museum   **LCS:**
**Location:** The Mall

**Property Name:** Washington Monument - Res. 2   **LCS:** 1372   **Asset:** 00220000
**Location:** Reservation 2 14th Street NW

**Property Name:** Independence Avenue, SW   **LCS:** 46872   **Asset:** 82000000
**Location:** Reservation 332, West Potomac Park, SW Washington DC

**Property Name:** External- US Department of Agriculture Building   **LCS:**

**Property Name:** Thomas Jefferson Memorial - Res. 332   **LCS:** 733   **Asset:** 33216001
**Location:** Reservation 332, East Basin Drive SW

**Property Name:** 15th Street, NW &SW   **LCS:**

**Historical Structures/Resources Notes:**   Per an executive order regarding access to public lands, NAMA is proposing to remove the cycle track as a part of a milling and overlay project for 15th street NW. NAMA will remove the existing rubber curbing and bike stops and return the space encompassed by the cycle track as a lane of vehicular traffic. The removal of the curb will return 15th Street back to a design that is in keeping with the historic character of the circulation route. The land use of the road way as a vehicular mode of transportation will continue.

15th Street is a contributing circulation corridor of the NAMA portfolio. The road was first platted in the L'Enfant Plan and extended in subsequent decades by the US Army Corp of Engineers and the Office of Public Buildings and Grounds and incorporated into the transportation network of Washington DC.

**Cultural Landscapes Present:** Yes

**Property Name:** The Mall, Reservations 3,3B, 4,5,6   **LCS:**
**Location:** Reservation 3, 3B, 4, 5 6, The Mall; SW and NW Washington DC

**Property Name:** Tidal Basin    **LCS:**
**Location:** Reservation 332; West Potomac Park, SW Washington DC

**Property Name:** Washington Monument Grounds    **LCS:**
**Location:** Reservation 2; Washington Monument Grounds, NW and SW Washington, DC

**Property Name:** West Potomac Park, Reservation 332    **LCS:**
**Location:** Reservation 332, West Potomac Park, NW and SW Washington DC

**Property Name:** Thomas Jefferson Memorial Landscape    **LCS:**
**Location:** Reservation 332, West Potomac Park, Thomas Jefferson Memorial Grounds, SW Washington DC

**Cultural Landscapes Notes:**   West Potomac Park, a spatially and functionally distinct area within the National Register-listed East and West Potomac Parks Historic District, and the National Register-listed National Mall Historic District, possesses historical significance and is potentially eligible on a national and local level under Criterion A in the areas of Politics/Government, Commemoration, Entertainment/Recreation, Social History, and Ethnic History (Black); on a national and local level under Criterion C in the areas of Community Planning and Development, Engineering, Architecture, Art, Landscape Architecture, and Transportation; and under Criterion D in the area of Archeology. The period of significance for Criterion A is 1791, the year in which President George Washington selected the site of the Nation's Capital and retained Pierre L'Enfant to develop a plan for the city, to the present, and 1791 to 1965 for Criteria C and D.

**Ethnographic Resources Present:** No

**5. The proposed action will: (check as many as apply)**

No   Destroy, remove, or alter features/elements from a historic structure

Yes  Replace historic features/elements in kind

No   Add non-historic features/elements to a historic structure

No   Alter or remove features/elements of a historic setting or environment (inc. terrain)

No   Add non-historic features/elements (inc. visual, audible, or atmospheric) to a historic setting or cultural landscape

No   Disturb, destroy, or make archeological resources inaccessible

No   Disturb, destroy, or make ethnographic resources inaccessible>

No   Potentially affect presently unidentified cultural resources

No   Begin or contribute to deterioration of historic features, terrain, setting, landscape elements, or archeological or ethnographic resources

No   Involve a real property transaction (exchange, sale, or lease of land or structures)

     Other (please specify): _____

**6. Supporting Study Data:**
**(Attach if feasible; if action is in a plan, EA or EIS, give name and project or page number.)**

**B. REVIEWS BY CULTURAL RESOURCE SPECIALISTS**

The park 106 coordinator requested review by the park's cultural resource specialist/advisors as indicated by check-off boxes or as follows:

**[ X ] 106 Advisor**
**Name:** Jason Theuer

**Date:** 02/19/2026
**Comments:** Undertaking restores the transportation feature to its original historic condition.

***Check if project does not involve ground disturbance* [    ]**
**Assessment of Effect:**  ___No Potential to Cause Effect    ___No Historic Properties Affected    __X__No Adverse Effect    ___Adverse Effect
**Recommendations for conditions or stipulations:**

**Doc Method:** Streamlined Review
**Activity:**
   3. Repair/Resurfacing/Removal of Existing, Roads, Trails and Parking Areas

---

**No Reviews From**: Curator, Archeologist, Historical Architect, Historian, Other Advisor, Anthropologist, Historical Landscape Architect

---

## C. PARK SECTION 106 COORDINATOR'S REVIEW AND RECOMMENDATIONS

### 1. Assessment of Effect:

|          |                                  |
|----------|----------------------------------|
|          | No Potential to Cause Effects    |
|          | No Historic Properties Affected  |
| X        | No Adverse Effect                |
|          | Adverse Effect                   |

### 2. Documentation Method:

**[    ] Standard 36 CFR Part 800 Consultation**
Further consultation under 36 CFR Part 800 is needed.

**[ X ] Streamlined Review Under the 2008 Servicewide Programmatic Agreement (PA)**
The above action meets all conditions for a streamlined review under section III of the 2008 Servicewide PA for Section 106 compliance.

**Applicable Activities:**

3. Repair/Resurfacing/Removal of Existing, Roads, Trails and Parking Areas.

**[    ] Program Comment on Stewardship and Management of National Park Service Mission 66-Era Facilities (1945-1972)**
The above action meets all of the requirements of this Program Comment for Section 106 compliance and required documents have been uploaded.

**[    ] Undertaking Related to Park Specific or Another Agreement**
The proposed undertaking is covered for Section 106 purposes under another document such as a park, region or statewide agreement established in accord with 36 CFR 800.7 or 36 CFR 800.14.

### 3. Consultation Information

**SHPO Required:**
**SHPO Sent:**
**SHPO Received:**

**THPO Required:** No
**THPO Sent:**
**THPO Received:**

**SHPO/THPO Notes:**

    **Advisory Council Participating:** No
    **Advisory Council Notes:**
    **Additional Consulting Parties:** No

**4. Stipulations and Conditions:** Following are listed any stipulations or conditions necessary to ensure that the assessment of effect above is consistent with 36 CFR Part 800 criteria of effect or to avoid or reduce potential adverse effects.

**5. Mitigations/Treatment Measures:** Measures to prevent or minimize loss or impairment of historic/prehistoric properties: (Remember that setting, location, and use may be relevant.)

    No Assessment of Effect mitigations identified.

**6. Assessment of Effect Notes:**

The project as presented will have "No Adverse Effect" on the cultural resources of the NAMA portfolio and generally conforms to the intent of the 2008 NHPA Programmatic Agreement Streamlined Activity No 3 regarding the repair and resurfacing of an existing roadway. The National Mall and Memorial Parks is proposing an undertaking that will remove the existing cycle track from 15th Street Northwest from Constitution Avenue south towards the Thomas Jefferson Memorial in West Potomac Park. The undertaking will remove the existing wheel stops, hazard cones, and striping associated with the existing non- historic cycle track. The removal of the cycle track will expand the number of vehicular lanes of travel to a configuration that historically was present on the corridor. The location of the cycle track will be treated with milling and overlaying that will match the remainder of the transportation corridor, making it undiscernible from the remainder of the route at the completion of the project.

Regarding archeological resources, while there is minimal ground disturbance, there are no known archeological sites within the APE of the project. Therefore, there will be no adverse effect to archeological resources.

Regarding cultural landscapes, the removal of the cycle track will not have an adverse effect on cultural resources as it will return the feature to a configuration that was present during the period of significance. The land use of 15th Street will remain the same and is in keeping with the use of the feature during the period of significance.

**D. RECOMMENDED BY PARK SECTION 106 COORDINATOR:**

**Compliance Specialist:**  Jason G. Theuer, Regional 106 Coordinator NPS-NCR; Acting NAMA RM Chief

**NHPA Specialist**
Daniel Weldon

JASON THEUER
Digitally signed by JASON THEUER
Date: 2026.02.23 07:31:03 -05'00'

**Date:**

**E. SUPERINTENDENT'S APPROVAL**

The proposed work conforms to the NPS *Management Policies* and *Cultural Resource Management Guideline*, and I have reviewed and approve the recommendations, stipulations, or conditions noted in Section C of this form.

NPS-AR-001143

**Superintendent:** **Signature**  KEVIN GRIESS  Digitally signed by KEVIN GRIESS  Date: 2026.02.23 07:42:59 -05'00'  **Date:** _____

Kevin Griess

NPS-AR-001144



**National Park Service**
**U.S. Department of the Interior**

**National Mall and Memorial Parks**

# Categorical Exclusion Documentation Form (CE Form)

**Project:** 15th Street Cycle Track Removal and road repaving

**PEPC Project Number:** 134934

**Description of Action (Project Description):** The work consists of removing existing cycle-track and bicycle-related traffic control features and restoring the roadway to a conventional lane configuration within the existing curb lines along three segments—15th St NW / Raoul Wallenberg Pl SW (Constitution Ave NW to Maine Ave SW), Maine Ave SW (15th St NW to Ohio Dr SW/East Basin Dr SW—southbound), and Ohio Dr SW/East Basin Dr SW (Maine Ave SW to the Jefferson Memorial Food Kiosk—southbound)—including removal of cycle track barriers/delineator posts and anchor bolts with restoration of resulting voids; milling and overlaying asphalt within curb faces to a maximum treatment depth of ≤ 4 inches; grinding/removing existing pavement markings within concrete bus laybys; removing bicycle signal faces and retiming/rephasing traffic signals as needed; removing bicycle route signage and installing new signage (and striping transitions) at the north and south project limits to safely transition bicyclists; and restriping the corridor to a typical cross-section of two northbound lanes and two southbound lanes (plus turn lanes where feasible), with crosswalk markings replaced in-kind on asphalt and new stop bars and lane-use arrows installed at intersection approaches as warranted.

This project supports implementation of Executive Order 14252, "Making the District of Columbia Safe and Beautiful" by advancing coordinated stewardship and improved visual quality of prominent federal public spaces through removal of roadway appurtenances and restoration of a standardized, maintainable corridor configuration within the existing roadway prism.

With the upcoming National Cherry Blossom Festival and preparations underway for America's 250th anniversary, ensuring safe access for residents, commuters, visitors, and emergency services is a shared priority. These nationally significant events draw substantial visitation and require coordinated infrastructure planning to support mobility, security, and a positive experience for all.

**Project Location:**
**County, State:** District of Columbia, DC

**Mitigation(s):**
There are no required mitigations identified.

**CE Citation:** DOI NEPA Handbook, Appendix 2, NPS, 12.6 (13).
Modernization of a highway by resurfacing, restoration, rehabilitation, reconstruction, adding shoulders, or adding auxiliary lanes (including parking, weaving, turning, and climbing lanes), if the actions meet the constraints [below] in paragraph (e) of this section. Actions described in (c)(26), (c)27, and (c)(28) of this section may not be processed as CEs under paragraph (c) if they involve:

1. An acquisition of more than a minor amount of right-of-way or that would result in any residential or non-residential displacements;
2. An action that needs a bridge permit from the U.S. Coast Guard, or an action that does not meet the terms and conditions of a U.S. Army Corps of Engineers nationwide or general permit under section 404 of the Clean Water Act and/or section 10 of the Rivers and Harbors Act of 1899;
3. A finding of "adverse effect" to historic properties under the National Historic Preservation Act, the use of a resource protected under 23 U.S.C. 138 or 49 U.S.C. 303 (section 4(f)) except for actions resulting in *de minimis*

NPS-AR-001145

impacts, or a finding of "may affect, likely to adversely affect" threatened or endangered species or critical habitat under the Endangered Species Act; *de minimis* impacts, or a finding of "may affect, likely to adversely affect" threatened or endangered species or critical habitat under the Endangered Species Act;

4. Construction of temporary access or the closure of existing road, bridge, or ramps that would result in major traffic disruptions;
5. Changes in access control;
6. A floodplain encroachment other than functionally dependent uses (e.g., bridges, wetlands) or actions that facilitate open space use (e.g., recreational trails, bicycle and pedestrian paths); or construction activities in, across or adjacent to a river component designated or proposed for inclusion in the National System of Wild and Scenic Rivers.

Actions may be designated as CEs only after documentation demonstrates that the specific conditions or criteria for these CEs are satisfied, and that significant environmental effects will not result. [If the action triggers a constraint (1)-(6) above, the CE can still be applied if the documentation demonstrates that the action fits within the CE and significant environmental effects will not result.] (90 FR 24644)

**CE Justification:** Based on the limited scope, confined limits of disturbance, and use of standard resurfacing and traffic-control methods, the action fits NPS CE 12.6(13) and, as documented below, does not trigger any of the six constraints such that significant environmental effects would be expected.

1. **An acquisition of more than a minor amount of right-of-way or that would result in any residential or non-residential displacements**

   All work is confined to the existing paved roadway area within existing curbs. No new right-of-way is needed and no acquisitions are proposed. The action does not require relocation of residences or businesses and does not change adjacent land uses.

2. **An action that needs a bridge permit from the U.S. Coast Guard, or an action that does not meet the terms and conditions of a U.S. Army Corps of Engineers nationwide or general permit under section 404 of the Clean Water Act and/or section 10 of the Rivers and Harbors Act of 1899**

   The action is roadway surface work and traffic-control equipment removal/adjustment within an existing roadway, with no bridge work and no in-water work. No dredge/fill discharge to waters of the U.S. is proposed and no structures are proposed in navigable waters.

3. **A finding of 'adverse effect' to historic properties under the NHPA, the use of a resource protected Section 4(f)) or a finding of 'may affect, likely to adversely affect' threatened or endangered species or critical habitat under the Endangered Species Act; de minimis impacts, or a finding of 'may affect, likely to adversely affect' threatened or endangered species or critical habitat under the Endangered Species Act**

   NHPA - the project removes appurtenant features (barriers, delineators, bicycle signal faces, bicycle signs), restores the roadway surface, and restripes within the existing paved roadway. With no new ground disturbance outside the pavement section and no new above-ground permanent additions beyond standard roadway markings/signing, the undertaking can be supported as No Adverse Effect.

   Section 4(f) - The action is within an existing transportation facility and does not convert parkland to transportation use; it changes lane configuration/operations on existing roadway pavement.

   ESA - For resurfacing/striping/signals action within existing roadway, there is no effect under the ESA.

4. **Construction of temporary access or the closure of existing road, bridge, or ramps that would result in major traffic disruptions**

   The proposed action is confined to the existing roadway prism and will be implemented using standard paving and traffic-control methods (lane shifts, short-duration lane closures, and/or off-peak work) to maintain traffic circulation and emergency access through the corridor. Any temporary restrictions needed to complete resurfacing, striping, and signal work would be limited in duration and extent, would not require construction of temporary access routes, and would not involve closure of a road, bridge, or ramp in a manner that causes major traffic disruptions.

5.   **Changes in access control**

The action does not introduce access control features suc as new medians restricting turning movements, new gates, restricted-access designation, or conversion to controlled-access facility. It is operational striping/signal timing within the existing roadway.

6.   **A floodplain encroachment**

The work is confined to an existing roadway prism. If any portion of the roadway is within a mapped floodplain, resurfacing within the existing footprint is typically treated as maintenance of an existing functionally dependent facility (transportation infrastructure) and does not create a new encroachment. No work is proposed in or across a designated/proposed Wild & Scenic River segment.

**Extraordinary Circumstances:**

| If implemented, would the proposal... | Yes/No | Explanation |
|---|---|---|
| **A.** Have significant impacts on public health or safety? | No | Removal of the separated bicycle facility will have an operational effect on bicyclists, including a change in facility type and user experience on a corridor that has been documented as carrying more than 2,000 bicycle users per day. However, NEPA significance for categorical exclusions is evaluated in terms of significant environmental impacts, including whether an action results in significant impacts on travel patterns or other natural, cultural, recreational, historic, air/noise/water resources. The proposed action is confined to the existing roadway prism and consists of resurfacing/rehabilitation and traffic-control changes (striping, signing, and signal adjustments) without expanding the transportation footprint or inducing land use change. The project includes traffic-control measures, clear transition signing/markings at the project termini, and coordination with the local transportation agency to maintain bicycle accommodation and manage operational transitions. With these measures, the action is not expected to cause significant environmental impacts or constitute an extraordinary circumstance. The project does not eliminate bicycle travel in the corridor; it changes the facility type and restores conditions that already existed prior to the installation of the separated bicycle facility. NPS will implement transition signing/markings and will monitor operations after implementation and adjust striping/signals as warranted to address observed operational issues. |
| **B.** Have significant impacts on such natural resources and unique geographic characteristics as historic or cultural resources; park, recreation or refuge lands; wilderness areas; wild or scenic rivers; national natural landmarks; sole or principal drinking water aquifers; prime farmlands; wetlands; floodplains; national monuments; migratory birds; and other ecologically significant or critical areas? | No | The proposed work is confined to the existing curb-to-curb roadway prism and consists of removing existing cycle track appurtenances (barriers/delineators and anchor bolts), resurfacing (mill-and-overlay, with a stated maximum treatment depth), restriping, and related signal/sign removals/adjustments. Because the project does not expand the roadway footprint, does not involve new ground disturbance outside the paved section, and does not propose in-water work, effects to the resource categories listed below are expected to be temporary, localized, and not significant. |
| **C.** Have highly uncertain and potentially significant environmental effects or involve unique or unknown environmental risks? | No | These are standard, well-understood construction activities with predictable, short-term effects (temporary construction noise, dust, traffic control, and material handling) and established best management practices. The action does not introduce new technology, new access routes, in-water work, excavation beyond the stated pavement treatment depth, or |

| If implemented, would the proposal... | Yes/No | Explanation |
|---|---|---|
| | | expansion into undeveloped areas that would create unknown risk pathways. Similarly, while the work is likely to result in changes in transportation conditions and modes of transportation used on these roads, the effects are predictable and well-understood and restore past roadway conditions. |
| **D.** Establish a precedent for future action or represent a decision in principle about future actions with potentially significant environmental effects? | No | It does not approve, commit, or predetermine any broader transportation program, corridor-wide redesign, roadway expansion, or land use change. Any future transportation or multimodal changes in the memorial core would require their own purpose-and-need, design development, and separate compliance review based on the specifics of those proposals and their potential effects. |
| **E.** Have a direct relationship to other actions that implicate potentially significant environmental effects? | No | While the project is being coordinated with routine roadway preservation and near-term construction scheduling in the vicinity, those activities are of the same general type (pavement rehabilitation/traffic control) and do not constitute a larger connected action that would trigger or depend on a separate action with potentially significant effects. The removal and resurfacing action has independent utility and does not rely on, commit the agency to, or predetermine any broader transportation program, footprint expansion, or land-use change. |
| **F.** Have significant impacts on properties listed, or eligible for listing, on the National Register of Historic Places as determined by the bureau? | No | The project occurs in a historically sensitive setting; however, it is confined to the existing curb-to-curb roadway prism and consists of removal of existing cycle track appurtenances with surface restoration, mill-and-overlay resurfacing (limited to the specified maximum depth), restriping, and minor signal/sign adjustments. It will restore roadway conditions that previously existed before the installation of the separated bicycle facility. The action does not expand the roadway footprint or disturb areas outside the existing paved facility. Section 106 documentation is completed for this undertaking; with a finding of no adverse effect. |
| **G.** Have significant impacts on species listed, or proposed to be listed, on the List of Endangered or Threatened Species or have significant impacts on designated Critical Habitat for these species? | No | The project does not include vegetation clearing, tree removal, habitat conversion, excavation outside the paved roadway section, or in-water work. Because effects are limited to temporary construction disturbances (noise, equipment presence, localized dust) within an already developed roadway, the action is not anticipated to adversely affect listed/proposed species or designated critical habitat, and significant impacts are not expected. |
| **H.** Significantly limit access to and ceremonial use of Indian sacred sites on Federal lands by Indian religious practitioners or significantly adversely affect the physical integrity of such sacred sites? | No | The project does not expand the transportation footprint, does not involve ground disturbance outside the paved roadway, and does not change public access to adjacent park areas beyond short-term, managed construction traffic control. Because the action occurs within an already developed roadway corridor and does not affect natural features, landscape elements, or access routes associated with ceremonial practice, it is not expected to limit access to or ceremonial use of Indian sacred sites, nor to adversely affect the physical integrity of such sites. |
| **I.** Contribute to potentially significant effects resulting from the introduction, continued existence, or spread of noxious weeds or non-native invasive species known to occur in the area or from other actions that promote the introduction, growth, or expansion of the range of such species (Federal Noxious Weed Control Act)? | No | The project does not include vegetation clearing, soil disturbance in landscaped areas, off-road staging, or import of fill/soil to vegetated areas—activities that typically create pathways for invasive plant introduction. Because disturbance is limited to paved surfaces and work areas can be kept on asphalt/concrete, the action is not expected to introduce, |

| If implemented, would the proposal... | Yes/No | Explanation |
|---|---|---|
| | | spread, or expand noxious weeds or non-native invasive species, and potentially significant effects are not anticipated. |

**Decision: I find that the action fits within the categorical exclusion(s) above. Therefore, I am categorically excluding the described project from further NEPA analysis. No extraordinary circumstances apply.**

**Superintendent Signature:** KEVIN GRIESS  Digitally signed by KEVIN GRIESS  Date: 2026.02.23 07:43:27 -05'00'    **Date:** _____

Kevin Griess

NPS-AR-001149



**National Park Service**
**U.S. Department of the Interior**

**National Mall and Memorial Parks**
**Date: 02/20/2026**

# ASSESSMENT OF ACTIONS HAVING AN EFFECT ON HISTORIC PROPERTIES

## A. DESCRIPTION OF UNDERTAKING

**1. Park:** National Mall and Memorial Parks

**2. Project Description:**

**Project Name:**  15th Street Cycle Track Removal and road repaving
**Prepared by:**  Daniel Weldon    **Date Prepared:**    **Telephone:**
**PEPC Project Number:**  134934
**Locations:**

　　**County, State:**  District of Columbia, DC

**Describe project:**

The work consists of removing existing cycle-track and bicycle-related traffic control features and restoring the roadway to a conventional lane configuration within the existing curb lines along three segments—15th St NW / Raoul Wallenberg Pl SW (Constitution Ave NW to Maine Ave SW), Maine Ave SW (15th St NW to Ohio Dr SW/East Basin Dr SW—southbound), and Ohio Dr SW/East Basin Dr SW (Maine Ave SW to the Jefferson Memorial Food Kiosk—southbound)—including removal of cycle track barriers/delineator posts and anchor bolts with restoration of resulting voids; milling and overlaying asphalt within curb faces to a maximum treatment depth of ≤ 4 inches; grinding/removing existing pavement markings within concrete bus laybys; removing bicycle signal faces and retiming/rephasing traffic signals as needed; removing bicycle route signage and installing new signage (and striping transitions) at the north and south project limits to safely transition bicyclists; and restriping the corridor to a typical cross-section of two northbound lanes and two southbound lanes (plus turn lanes where feasible), with crosswalk markings replaced in-kind on asphalt and new stop bars and lane-use arrows installed at intersection approaches as warranted.

This project supports implementation of Executive Order 14252, "Making the District of Columbia Safe and Beautiful" by advancing coordinated stewardship and improved visual quality of prominent federal public spaces through removal of roadway appurtenances and restoration of a standardized, maintainable corridor configuration within the existing roadway prism.

With the upcoming National Cherry Blossom Festival and preparations underway for Americas 250th anniversary, ensuring safe access for residents, commuters, visitors, and emergency services is a shared priority. These nationally significant events draw substantial visitation and require coordinated infrastructure planning to support mobility, security, and a positive experience for all.

**Area of potential effects (as defined in 36 CFR 800.16[d])**

**3. Has the area of potential effects been surveyed to identify historic properties?**

　　____　**No**

　　 X 　**Yes**

　　　　**Source or reference:**  Washington Monument Grounds Cultural Landscape Inventory (2022)
　　　　National Mall Historic District National Register Nomination (1981, additional documentation 2016)
　　　　The Mall Cultural Landscape Inventory (2006, 2012, 2018)
　　　　Tidal Basin CLR

West Potomac Park Cultural Landscape Inventory (2022)
East and West Potomac Parks NR Nomination 01000271 (1973, updated 2001)
Events and Celebrations of the National Mall and Presidents Park South Historic Resource Survey
Summer in the Parks Special Resource Study (2019)
Thomas Jefferson Memorial Cultural Landscape Inventory

## 4. Potentially Affected Resource(s):

**Archeological Resources Present:** No

**Archeological Resources Notes:**   There are no known archeological resources within the APE of the project.

**Historical Structures/Resources Present:** Yes

**Property Name:** Outlet Bridge - Res. 332    **LCS:** 46855    **Asset:** 33219000

**Property Name:** Monument Lodge - Res. 2    **LCS:** 100069    **Asset:** 00212000
**Location:** Reservation 2, 14th Street NW

**Property Name:** Constitution Avenue    **LCS:** 46871    **Asset:** 81000000
**Location:** Reservation 332, Constitution Gardens, NW Washington DC

**Property Name:** External- Smithsonian American History Museum    **LCS:**
**Location:** The Mall

**Property Name:** Washington Monument - Res. 2    **LCS:** 1372    **Asset:** 00220000
**Location:** Reservation 2 14th Street NW

**Property Name:** Independence Avenue, SW    **LCS:** 46872    **Asset:** 82000000
**Location:** Reservation 332, West Potomac Park, SW Washington DC

**Property Name:** External- US Department of Agriculture Building    **LCS:**

**Property Name:** Thomas Jefferson Memorial - Res. 332    **LCS:** 733    **Asset:** 33216001
**Location:** Reservation 332, East Basin Drive SW

**Property Name:** 15th Street, NW &SW    **LCS:**

**Historical Structures/Resources Notes:**   Per an executive order regarding access to public lands, NAMA is proposing to remove the cycle track as a part of a milling and overlay project for 15th street NW. NAMA will remove the existing rubber curbing and bike stops and return the space encompassed by the cycle track as a lane of vehicular traffic. The removal of the curb will return 15th Street back to a design that is in keeping with the historic character of the circulation route. The land use of the road way as a vehicular mode of transportation will continue.

15th Street is a contributing circulation corridor of the NAMA portfolio. The road was first platted in the L'Enfant Plan and extended in subsequent decades by the US Army Corp of Engineers and the Office of Public Buildings and Grounds and incorporated into the transportation network of Washington DC.

**Cultural Landscapes Present:** Yes

**Property Name:** The Mall, Reservations 3,3B, 4,5,6    **LCS:**
**Location:** Reservation 3, 3B, 4, 5 6, The Mall; SW and NW Washington DC

**Property Name:** Tidal Basin    **LCS:**
**Location:** Reservation 332; West Potomac Park, SW Washington DC

**Property Name:** Washington Monument Grounds    **LCS:**
**Location:** Reservation 2; Washington Monument Grounds, NW and SW Washington, DC

**Property Name:** West Potomac Park, Reservation 332    **LCS:**
**Location:** Reservation 332, West Potomac Park, NW and SW Washington DC

**Property Name:** Thomas Jefferson Memorial Landscape    **LCS:**
**Location:** Reservation 332, West Potomac Park, Thomas Jefferson Memorial Grounds, SW Washington DC

**Cultural Landscapes Notes:**   West Potomac Park, a spatially and functionally distinct area within the National Register-listed East and West Potomac Parks Historic District, and the National Register-listed National Mall Historic District, possesses historical significance and is potentially eligible on a national and local level under Criterion A in the areas of Politics/Government, Commemoration, Entertainment/Recreation, Social History, and Ethnic History (Black); on a national and local level under Criterion C in the areas of Community Planning and Development, Engineering, Architecture, Art, Landscape Architecture, and Transportation; and under Criterion D in the area of Archeology. The period of significance for Criterion A is 1791, the year in which President George Washington selected the site of the Nation's Capital and retained Pierre L'Enfant to develop a plan for the city, to the present, and 1791 to 1965 for Criteria C and D.

**Ethnographic Resources Present:** No

**5. The proposed action will: (check as many as apply)**

No   Destroy, remove, or alter features/elements from a historic structure

Yes  Replace historic features/elements in kind

No   Add non-historic features/elements to a historic structure

No   Alter or remove features/elements of a historic setting or environment (inc. terrain)

No   Add non-historic features/elements (inc. visual, audible, or atmospheric) to a historic setting or cultural landscape

No   Disturb, destroy, or make archeological resources inaccessible

No   Disturb, destroy, or make ethnographic resources inaccessible>

No   Potentially affect presently unidentified cultural resources

No   Begin or contribute to deterioration of historic features, terrain, setting, landscape elements, or archeological or ethnographic resources

No   Involve a real property transaction (exchange, sale, or lease of land or structures)

     Other (please specify): _____

**6. Supporting Study Data:**
**(Attach if feasible; if action is in a plan, EA or EIS, give name and project or page number.)**

**B. REVIEWS BY CULTURAL RESOURCE SPECIALISTS**

The park 106 coordinator requested review by the park's cultural resource specialist/advisors as indicated by check-off boxes or as follows:

**[ X ] 106 Advisor**
**Name:** Jason Theuer

**Date:** 02/19/2026
**Comments:** Undertaking restores the transportation feature to its original historic condition.

***Check if project does not involve ground disturbance* [    ]**
**Assessment of Effect:**   ___No Potential to Cause Effect    ___No Historic Properties Affected    __X__No Adverse Effect    ___Adverse Effect
**Recommendations for conditions or stipulations:**

**Doc Method:**  Streamlined Review
**Activity:**
   3. Repair/Resurfacing/Removal of Existing, Roads, Trails and Parking Areas

---

**No Reviews From**: Curator, Archeologist, Historical Architect, Historian, Other Advisor, Anthropologist, Historical Landscape Architect

---

## C. PARK SECTION 106 COORDINATOR'S REVIEW AND RECOMMENDATIONS

### 1. Assessment of Effect:

|            |                                   |
|------------|-----------------------------------|
|            | No Potential to Cause Effects     |
|            | No Historic Properties Affected   |
| X          | No Adverse Effect                 |
|            | Adverse Effect                    |

### 2. Documentation Method:

**[    ] Standard 36 CFR Part 800 Consultation**
Further consultation under 36 CFR Part 800 is needed.

**[ X ] Streamlined Review Under the 2008 Servicewide Programmatic Agreement (PA)**
The above action meets all conditions for a streamlined review under section III of the 2008 Servicewide PA for Section 106 compliance.

**Applicable Activities:**

3. Repair/Resurfacing/Removal of Existing, Roads, Trails and Parking Areas.

**[    ] Program Comment on Stewardship and Management of National Park Service Mission 66-Era Facilities (1945-1972)**
The above action meets all of the requirements of this Program Comment for Section 106 compliance and required documents have been uploaded.

**[    ] Undertaking Related to Park Specific or Another Agreement**
The proposed undertaking is covered for Section 106 purposes under another document such as a park, region or statewide agreement established in accord with 36 CFR 800.7 or 36 CFR 800.14.

### 3. Consultation Information

**SHPO Required:**
**SHPO Sent:**
**SHPO Received:**

**THPO Required:** No
**THPO Sent:**
**THPO Received:**

**SHPO/THPO Notes:**

**Advisory Council Participating:** No
**Advisory Council Notes:**
**Additional Consulting Parties:** No

**4. Stipulations and Conditions:** Following are listed any stipulations or conditions necessary to ensure that the assessment of effect above is consistent with 36 CFR Part 800 criteria of effect or to avoid or reduce potential adverse effects.

**5. Mitigations/Treatment Measures:** Measures to prevent or minimize loss or impairment of historic/prehistoric properties: (Remember that setting, location, and use may be relevant.)

No Assessment of Effect mitigations identified.

**6. Assessment of Effect Notes:**

The project as presented will have "No Adverse Effect" on the cultural resources of the NAMA portfolio and generally conforms to the intent of the 2008 NHPA Programmatic Agreement Streamlined Activity No 3 regarding the repair and resurfacing of an existing roadway. The National Mall and Memorial Parks is proposing an undertaking that will remove the existing cycle track from 15th Street Northwest from Constitution Avenue south towards the Thomas Jefferson Memorial in West Potomac Park. The undertaking will remove the existing wheel stops, hazard cones, and striping associated with the existing non- historic cycle track. The removal of the cycle track will expand the number of vehicular lanes of travel to a configuration that historically was present on the corridor. The location of the cycle track will be treated with milling and overlaying that will match the remainder of the transportation corridor, making it undiscernible from the remainder of the route at the completion of the project.

Regarding archeological resources, while there is minimal ground disturbance, there are no known archeological sites within the APE of the project. Therefore, there will be no adverse effect to archeological resources.

Regarding cultural landscapes, the removal of the cycle track will not have an adverse effect on cultural resources as it will return the feature to a configuration that was present during the period of significance. The land use of 15th Street will remain the same and is in keeping with the use of the feature during the period of significance.

**D. RECOMMENDED BY PARK SECTION 106 COORDINATOR:**

**Compliance Specialist:**  Jason G. Theuer, Regional 106 Coordinator NPS-NCR; Acting NAMA RM Chief

**NHPA Specialist**

Daniel Weldon

JASON THEUER
Digitally signed by JASON THEUER
Date: 2026.02.23 07:31:03 -05'00'

**Date:** _____

**E. SUPERINTENDENT'S APPROVAL**

The proposed work conforms to the NPS *Management Policies* and *Cultural Resource Management Guideline*, and I have reviewed and approve the recommendations, stipulations, or conditions noted in Section C of this form.

NPS-AR-001154

**Superintendent:** **Signature** KEVIN GRIESS Digitally signed by KEVIN GRIESS Date: 2026.02.23 07:42:59 -05'00'    **Date:** _____

Kevin Griess

NPS-AR-001155



**National Park Service**
**U.S. Department of the Interior**

**National Mall and Memorial Parks**

# Categorical Exclusion Documentation Form (CE Form)

**Project:** 15th Street Cycle Track Removal and road repaving

**PEPC Project Number:** 134934

**Description of Action (Project Description):** The work consists of removing existing cycle-track and bicycle-related traffic control features and restoring the roadway to a conventional lane configuration within the existing curb lines along three segments—15th St NW / Raoul Wallenberg Pl SW (Constitution Ave NW to Maine Ave SW), Maine Ave SW (15th St NW to Ohio Dr SW/East Basin Dr SW—southbound), and Ohio Dr SW/East Basin Dr SW (Maine Ave SW to the Jefferson Memorial Food Kiosk—southbound)—including removal of cycle track barriers/delineator posts and anchor bolts with restoration of resulting voids; milling and overlaying asphalt within curb faces to a maximum treatment depth of ≤ 4 inches; grinding/removing existing pavement markings within concrete bus laybys; removing bicycle signal faces and retiming/rephasing traffic signals as needed; removing bicycle route signage and installing new signage (and striping transitions) at the north and south project limits to safely transition bicyclists; and restriping the corridor to a typical cross-section of two northbound lanes and two southbound lanes (plus turn lanes where feasible), with crosswalk markings replaced in-kind on asphalt and new stop bars and lane-use arrows installed at intersection approaches as warranted.

This project supports implementation of Executive Order 14252, "Making the District of Columbia Safe and Beautiful" by advancing coordinated stewardship and improved visual quality of prominent federal public spaces through removal of roadway appurtenances and restoration of a standardized, maintainable corridor configuration within the existing roadway prism.

With the upcoming National Cherry Blossom Festival and preparations underway for America's 250th anniversary, ensuring safe access for residents, commuters, visitors, and emergency services is a shared priority. These nationally significant events draw substantial visitation and require coordinated infrastructure planning to support mobility, security, and a positive experience for all.

**Project Location:**
**County, State:** District of Columbia, DC

**Mitigation(s):**
There are no required mitigations identified.

**CE Citation:** DOI NEPA Handbook, Appendix 2, NPS, 12.6 (13).
Modernization of a highway by resurfacing, restoration, rehabilitation, reconstruction, adding shoulders, or adding auxiliary lanes (including parking, weaving, turning, and climbing lanes), if the actions meet the constraints [below] in paragraph (e) of this section. Actions described in (c)(26), (c)27, and (c)(28) of this section may not be processed as CEs under paragraph (c) if they involve:
1. An acquisition of more than a minor amount of right-of-way or that would result in any residential or non-residential displacements;
2. An action that needs a bridge permit from the U.S. Coast Guard, or an action that does not meet the terms and conditions of a U.S. Army Corps of Engineers nationwide or general permit under section 404 of the Clean Water Act and/or section 10 of the Rivers and Harbors Act of 1899;
3. A finding of "adverse effect" to historic properties under the National Historic Preservation Act, the use of a resource protected under 23 U.S.C. 138 or 49 U.S.C. 303 (section 4(f)) except for actions resulting in *de minimis*

impacts, or a finding of "may affect, likely to adversely affect" threatened or endangered species or critical habitat under the Endangered Species Act; *de minimis* impacts, or a finding of "may affect, likely to adversely affect" threatened or endangered species or critical habitat under the Endangered Species Act;

4. Construction of temporary access or the closure of existing road, bridge, or ramps that would result in major traffic disruptions;

5. Changes in access control;

6. A floodplain encroachment other than functionally dependent uses (e.g., bridges, wetlands) or actions that facilitate open space use (e.g., recreational trails, bicycle and pedestrian paths); or construction activities in, across or adjacent to a river component designated or proposed for inclusion in the National System of Wild and Scenic Rivers.

Actions may be designated as CEs only after documentation demonstrates that the specific conditions or criteria for these CEs are satisfied, and that significant environmental effects will not result. [If the action triggers a constraint (1)-(6) above, the CE can still be applied if the documentation demonstrates that the action fits within the CE and significant environmental effects will not result.] (90 FR 24644)

**CE Justification:** Based on the limited scope, confined limits of disturbance, and use of standard resurfacing and traffic-control methods, the action fits NPS CE 12.6(13) and, as documented below, does not trigger any of the six constraints such that significant environmental effects would be expected.

1. **An acquisition of more than a minor amount of right-of-way or that would result in any residential or non-residential displacements**

   All work is confined to the existing paved roadway area within existing curbs. No new right-of-way is needed and no acquisitions are proposed. The action does not require relocation of residences or businesses and does not change adjacent land uses.

2. **An action that needs a bridge permit from the U.S. Coast Guard, or an action that does not meet the terms and conditions of a U.S. Army Corps of Engineers nationwide or general permit under section 404 of the Clean Water Act and/or section 10 of the Rivers and Harbors Act of 1899**

   The action is roadway surface work and traffic-control equipment removal/adjustment within an existing roadway, with no bridge work and no in-water work. No dredge/fill discharge to waters of the U.S. is proposed and no structures are proposed in navigable waters.

3. **A finding of 'adverse effect' to historic properties under the NHPA, the use of a resource protected Section 4(f)) or a finding of 'may affect, likely to adversely affect' threatened or endangered species or critical habitat under the Endangered Species Act; de minimis impacts, or a finding of 'may affect, likely to adversely affect' threatened or endangered species or critical habitat under the Endangered Species Act**

   NHPA - the project removes appurtenant features (barriers, delineators, bicycle signal faces, bicycle signs), restores the roadway surface, and restripes within the existing paved roadway. With no new ground disturbance outside the pavement section and no new above-ground permanent additions beyond standard roadway markings/signing, the undertaking can be supported as No Adverse Effect.

   Section 4(f) - The action is within an existing transportation facility and does not convert parkland to transportation use; it changes lane configuration/operations on existing roadway pavement.

   ESA - For resurfacing/striping/signals action within existing roadway, there is no effect under the ESA.

4. **Construction of temporary access or the closure of existing road, bridge, or ramps that would result in major traffic disruptions**

   The proposed action is confined to the existing roadway prism and will be implemented using standard paving and traffic-control methods (lane shifts, short-duration lane closures, and/or off-peak work) to maintain traffic circulation and emergency access through the corridor. Any temporary restrictions needed to complete resurfacing, striping, and signal work would be limited in duration and extent, would not require construction of temporary access routes, and would not involve closure of a road, bridge, or ramp in a manner that causes major traffic disruptions.

5.   **Changes in access control**

The action does not introduce access control features suc as new medians restricting turning movements, new gates, restricted-access designation, or conversion to controlled-access facility. It is operational striping/signal timing within the existing roadway.

6.   **A floodplain encroachment**

The work is confined to an existing roadway prism. If any portion of the roadway is within a mapped floodplain, resurfacing within the existing footprint is typically treated as maintenance of an existing functionally dependent facility (transportation infrastructure) and does not create a new encroachment. No work is proposed in or across a designated/proposed Wild & Scenic River segment.

**Extraordinary Circumstances:**

| If implemented, would the proposal... | Yes/No | Explanation |
|---|---|---|
| **A.** Have significant impacts on public health or safety? | No | Removal of the separated bicycle facility will have an operational effect on bicyclists, including a change in facility type and user experience on a corridor that has been documented as carrying more than 2,000 bicycle users per day. However, NEPA significance for categorical exclusions is evaluated in terms of significant environmental impacts, including whether an action results in significant impacts on travel patterns or other natural, cultural, recreational, historic, air/noise/water resources. The proposed action is confined to the existing roadway prism and consists of resurfacing/rehabilitation and traffic-control changes (striping, signing, and signal adjustments) without expanding the transportation footprint or inducing land use change. The project includes traffic-control measures, clear transition signing/markings at the project termini, and coordination with the local transportation agency to maintain bicycle accommodation and manage operational transitions. With these measures, the action is not expected to cause significant environmental impacts or constitute an extraordinary circumstance.<br>The project does not eliminate bicycle travel in the corridor; it changes the facility type and restores conditions that already existed prior to the installation of the separated bicycle facility. NPS will implement transition signing/markings and will monitor operations after implementation and adjust striping/signals as warranted to address observed operational issues. |
| **B.** Have significant impacts on such natural resources and unique geographic characteristics as historic or cultural resources; park, recreation or refuge lands; wilderness areas; wild or scenic rivers; national natural landmarks; sole or principal drinking water aquifers; prime farmlands; wetlands; floodplains; national monuments; migratory birds; and other ecologically significant or critical areas? | No | The proposed work is confined to the existing curb-to-curb roadway prism and consists of removing existing cycle track appurtenances (barriers/delineators and anchor bolts), resurfacing (mill-and-overlay, with a stated maximum treatment depth), restriping, and related signal/sign removals/adjustments.<br>Because the project does not expand the roadway footprint, does not involve new ground disturbance outside the paved section, and does not propose in-water work, effects to the resource categories listed below are expected to be temporary, localized, and not significant. |
| **C.** Have highly uncertain and potentially significant environmental effects or involve unique or unknown environmental risks? | No | These are standard, well-understood construction activities with predictable, short-term effects (temporary construction noise, dust, traffic control, and material handling) and established best management practices. The action does not introduce new technology, new access routes, in-water work, excavation beyond the stated pavement treatment depth, or |

| If implemented, would the proposal... | Yes/No | Explanation |
|---|---|---|
| | | expansion into undeveloped areas that would create unknown risk pathways. Similarly, while the work is likely to result in changes in transportation conditions and modes of transportation used on these roads, the effects are predictable and well-understood and restore past roadway conditions. |
| **D.** Establish a precedent for future action or represent a decision in principle about future actions with potentially significant environmental effects? | No | It does not approve, commit, or predetermine any broader transportation program, corridor-wide redesign, roadway expansion, or land use change. Any future transportation or multimodal changes in the memorial core would require their own purpose-and-need, design development, and separate compliance review based on the specifics of those proposals and their potential effects. |
| **E.** Have a direct relationship to other actions that implicate potentially significant environmental effects? | No | While the project is being coordinated with routine roadway preservation and near-term construction scheduling in the vicinity, those activities are of the same general type (pavement rehabilitation/traffic control) and do not constitute a larger connected action that would trigger or depend on a separate action with potentially significant effects. The removal and resurfacing action has independent utility and does not rely on, commit the agency to, or predetermine any broader transportation program, footprint expansion, or land-use change. |
| **F.** Have significant impacts on properties listed, or eligible for listing, on the National Register of Historic Places as determined by the bureau? | No | The project occurs in a historically sensitive setting; however, it is confined to the existing curb-to-curb roadway prism and consists of removal of existing cycle track appurtenances with surface restoration, mill-and-overlay resurfacing (limited to the specified maximum depth), restriping, and minor signal/sign adjustments. It will restore roadway conditions that previously existed before the installation of the separated bicycle facility. The action does not expand the roadway footprint or disturb areas outside the existing paved facility. Section 106 documentation is completed for this undertaking; with a finding of no adverse effect. |
| **G.** Have significant impacts on species listed, or proposed to be listed, on the List of Endangered or Threatened Species or have significant impacts on designated Critical Habitat for these species? | No | The project does not include vegetation clearing, tree removal, habitat conversion, excavation outside the paved roadway section, or in-water work. Because effects are limited to temporary construction disturbances (noise, equipment presence, localized dust) within an already developed roadway, the action is not anticipated to adversely affect listed/proposed species or designated critical habitat, and significant impacts are not expected. |
| **H.** Significantly limit access to and ceremonial use of Indian sacred sites on Federal lands by Indian religious practitioners or significantly adversely affect the physical integrity of such sacred sites? | No | The project does not expand the transportation footprint, does not involve ground disturbance outside the paved roadway, and does not change public access to adjacent park areas beyond short-term, managed construction traffic control. Because the action occurs within an already developed roadway corridor and does not affect natural features, landscape elements, or access routes associated with ceremonial practice, it is not expected to limit access to or ceremonial use of Indian sacred sites, nor to adversely affect the physical integrity of such sites. |
| **I.** Contribute to potentially significant effects resulting from the introduction, continued existence, or spread of noxious weeds or non-native invasive species known to occur in the area or from other actions that promote the introduction, growth, or expansion of the range of such species (Federal Noxious Weed Control Act)? | No | The project does not include vegetation clearing, soil disturbance in landscaped areas, off-road staging, or import of fill/soil to vegetated areas—activities that typically create pathways for invasive plant introduction. Because disturbance is limited to paved surfaces and work areas can be kept on asphalt/concrete, the action is not expected to introduce, |

NPS-AR-001159

| If implemented, would the proposal... | Yes/No | Explanation |
|---|---|---|
|  |  | spread, or expand noxious weeds or non-native invasive species, and potentially significant effects are not anticipated. |

**Decision: I find that the action fits within the categorical exclusion(s) above. Therefore, I am categorically excluding the described project from further NEPA analysis. No extraordinary circumstances apply.**

**Superintendent Signature:** KEVIN GRIESS Digitally signed by KEVIN GRIESS
Date: 2026.02.23 07:43:27 -05'00'    **Date:** _____

Kevin Griess

NPS-AR-001160



U.S. Department
of Transportation

**Federal Highway
Administration**

Eastern Federal Lands Highway Division
NEPA Categorical Exclusion Form

| | | |
|---|---|---|
| **Project Number:** | 15th Street Cycle Track Removal and road repaving | **Date:** 2/27/2026 |
| **Project Name:** | 15th Street Cycle Track Removal and road repaving | |
| **Location:** | National Park Service, National Mall and Memorial Parks<br>District of Columbia, DC | |
| **CE Category** | 23 CFR 771.117(c)(26): Modernization of a highway by resurfacing, restoration, rehabilitation, reconstruction, adding shoulders, or adding auxiliary lanes (including parking, weaving, turning, and climbing lanes), if the action meets the constraints in paragraph (e)[..] | |

See 23 CFR 771.117 for full description of CE categories, including additional requirements when applying (c)26-28.

**Project Description**

The work consists of removing existing cycle-track and bicycle-related traffic control features and restoring the roadway to a conventional lane configuration within the existing curb lines along three segments—15th St NW / Raoul Wallenberg Pl SW (Constitution Ave NW to Maine Ave SW), Maine Ave SW (15th St NW to Ohio Dr SW/East Basin Dr SW—southbound), and Ohio Dr SW/East Basin Dr SW (Maine Ave SW to the Jefferson Memorial Food Kiosk—southbound)—including removal of cycle track barriers/delineator posts and anchor bolts with restoration of resulting voids; milling and overlaying asphalt within curb faces to a maximum treatment depth of ≤ 4 inches; grinding/removing existing pavement markings within concrete bus laybys; removing bicycle signal faces and retiming/rephasing traffic signals as needed; removing bicycle route signage and installing new signage (and striping transitions) at the north and south project limits to safely transition bicyclists; and restriping the corridor to a typical cross-section of two northbound lanes and two southbound lanes (plus turn lanes where feasible), with crosswalk markings replaced in-kind on asphalt and new stop bars and lane-use arrows installed at intersection approaches as warranted.

This project supports implementation of Executive Order 14252, "Making the District of Columbia Safe and Beautiful" by advancing coordinated stewardship and improved visual quality of prominent federal public spaces through removal of roadway appurtenances and

NPS-AR-001161



Eastern Federal Lands Highway Division
NEPA Categorical Exclusion Form

restoration of a standardized, maintainable corridor configuration within the existing roadway prism.

With the upcoming National Cherry Blossom Festival and preparations underway for Americas 250th anniversary, ensuring safe access for residents, commuters, visitors, and emergency services is a shared priority. These nationally significant events draw substantial visitation and require coordinated infrastructure planning to support mobility, security, and a positive experience for all.

**Environmental Commitments and Mitigation Measures**
N/A

**Summary of Section 7 of the Endangered Species Act Compliance**
Because effects are limited to temporary construction disturbances (noise, equipment presence, localized dust) within an already developed roadway, the action is not anticipated to adversely affect listed/proposed species or designated critical habitat, and significant impacts are not expected. The FHWA Eastern Federal Lands relies on the National Park Service determination.

**Summary of Section 106 of the National Historic Preservation Act Compliance**
On February 20, 2026, the National Park Service Cultural Resource experts determined the proposed federal undertaking would have **no adverse effect to historic properties**.

**Additional Agency Coordination and Compliance**
The FHWA Eastern Federal Lands relies upon the existing Categorical Exclusion decision made by the National Park Service and concurs with the National Park Service Categorical Exclusion documentation dated February 23, 2026.

Page **2** of **6**
EFLHD NEPA Categorical Exclusion Form                                    EFL-TM-ENV-03(04)
15th Street Cycle Track Removal and road repaving

NPS-AR-001162



U.S. Department
of Transportation
**Federal Highway
Administration**

Eastern Federal Lands Highway Division
NEPA Categorical Exclusion Form

**Categorical Exclusion Recommendation:**
On the basis of the environmental impact information in the statutory compliance file, with which I am familiar, I believe the project should be categorically excluded from further NEPA analysis.

KEVIN S ROSE  Digitally signed by KEVIN S ROSE
Date: 2026.02.27 13:58:39 -05'00'

_____          _____
Kelly Stern                                                            Date
Environmental Protection Specialist
Eastern Federal Lands Highway Division
Federal Highway Administration

**Categorical Exclusion Determination:**
On the basis of the environmental impact information in the statutory compliance file, with which I am familiar, I am categorically excluding the described project from further NEPA analysis.  The project meets the 23 CFR 771.117(a) definition of a categorical exclusion.  No unusual circumstances per 23 CFR 771.117(b) apply.

KEVIN S ROSE  Digitally signed by KEVIN S ROSE
Date: 2026.02.27 13:59:18 -05'00'

_____          _____
Kevin S. Rose                                                        Date
Environmental Team Leader
Eastern Federal Lands Highway Division
Federal Highway Administration

Page **3** of **6**
EFLHD NEPA Categorical Exclusion Form                                    EFL-TM-ENV-03(04)
15th Street Cycle Track Removal and road repaving

NPS-AR-001163



Eastern Federal Lands Highway Division
NEPA Categorical Exclusion Form

**Appendix A: Environmental Checklist**

| |
|---|
| **Section 7 of the Endangered Species Act:** |
| • Are Federally-listed species potentially present in the study area?  ☒Yes, see Notes[i] ☐No<br>If Yes, effects determination:<br>☒No Effect ☐May Affect, Not Likely to Adversely Affect ☐May Affect, Likely to Adversely Affect |
| **Section 106 of the National Historic Preservation Act:** |
| • Are historic properties known to be present in the study area? ☒Yes     ☐No<br>If Yes, will they be impacted by the project? ☐Yes     ☒No<br>• Will previously undisturbed ground be disturbed?<br>☐Yes     ☒No<br>• Effects determination:<br>☐No Historic Properties Affected   ☒No Adverse Effect ☐Adverse Effect, MOA Executed<br>• Was tribal consultation completed? ☐Yes     ☒No |
| **Water and Wetlands:** |
| • Section 404 of the Clean Water Act<br>Are impacts to Waters of the US anticipated? ☐Yes     ☒No<br>If Yes, approval anticipated:<br>☐Nationwide Permit (NWP) ☐Regional General Permit ☐Individual Permit<br>• Section 401 of the Clean Water Act<br>☐NWP certified by State   ☐Individual Certification<br>• Section 402 of the Clean Water Act (National Pollutant Discharge Elimination System)<br>Will the land disturbance threshold likely be exceeded to require a permit and SWPPP?<br>☐Yes     ☒ No<br>• Is post-construction stormwater management review/approval anticipated?  ☐Yes  ☒No<br>• ☒Project is consistent with Executive Order 11990, Protection of Wetlands |
| **Floodplains:** |
| • Is the project in a FEMA floodplain?<br>☒Yes   ☐No   ☐ Floodplain not mapped<br>• ☒ Project is consistent with Executive Order 11988, Floodplain Management |
| **Section 4(f) of the USDOT Act:** |
| • Does the project meet the Section 4(f) exemption for Federal lands transportation facilities under Section 1119(c)(2) of MAP-21, 23 U.S.C. 138(a)?     ☒Yes ☐No<br>• Is there a use of a Section 4(f) property in the study area? ☐Yes ☒No<br>If Yes, De Minimis Finding:☐  Programmatic:☐    Individual 4(f): ☐ |

NPS-AR-001164



Eastern Federal Lands Highway Division
NEPA Categorical Exclusion Form

| | |
|---|---|
| **Section 6(f) of the Land and Water Conservation Fund:** | |
| • Was the property purchased with grant funds from the Land and Water Conservation Fund? ☐Yes  ☒No | |
| • If Yes, was documentation of approval from National Park Service Director received for the conversion or replacement of 6(f) property? ☐Yes  ☐No | |
| **Coastal Zone Management Act of 1972:** | |
| • Is the project in a Coastal Zone? ☒Yes  ☐No | |
| • If yes, will a Federal Consistency Review be completed? ☐Yes  ☒No | |
| **Right of Way:** | |
| • Is the project completely within the transportation facility's right-of-way?  ☒Yes  ☐No | |
| • If no, will the project require relocations or easements? ☐Yes  ☐No | |
| **Hazardous Waste and Materials:** | |
| • Are hazardous materials or contamination exceeding regulatory thresholds (as set by U.S. EPA, County Environmental Health, etc.) present? ☐Yes  ☒No | |
| • If Yes, is the nature and extent of the hazardous materials or contamination fully known? ☐Yes  ☐No, plan for securing information provided in Notes | |
| **Section 7(a) of the Wild and Scenic Rivers Act:** | |
| • Are there Wild and Scenic Rivers? ☐Yes  ☒No  ☐Eligible<br>If Yes, has review by the river-administering agency been completed? ☐Yes  ☐No | |
| **Clean Air Act:** | |
| • Is the project in a non-attainment area? ☒Yes  ☐No<br>If Yes, is the project on the Transportation Improvement Program(TIP)/State Implementation Plan(SIP)? ☐ Yes  ☒No | |
| **Highway Traffic and Construction Noise Regulations:** | |
| • ☐ The proposed project is a Type I project (highway on a new location, substantial horizontal or vertical alteration, new through or auxiliary lanes).  Noise analysis is required. | |
| • ☐ The proposed project is a Type II project (retrofit for noise abatement). | |
| • ☒ The proposed project is a Type III project (noise analysis not required). | |
| • ☐ Does not apply. | |
| **Farmland Protection Policy Act for Highway Projects:** | |
| • Does the project displace, require acquisition of, or require an easement from farmland? ☐Yes  ☒No | |
| **Does the project affect any other resources not listed above? Explain below and list anticipated permits:** | |
| | |
| | |
| | |
| | |

NPS-AR-001165



Eastern Federal Lands Highway Division
NEPA Categorical Exclusion Form

[i] Federally-listed species per U.S. Fish and Wildlife Service's IPaC: Northern Long-Eared Bat (Endangered), Tricolored Bat (Proposed Endangered), Monarch Butterfly (Proposed Threatened)

**15th STREET & EAST BASIN DRIVE COLD WEATHER PAVING - 100% CPM**



**Project duration = 34 calendar days**

**Assumptions**

| Item | Quantity | Rate | Days | Item | Quantity | Rate | Days | Item | Quantity | Rate | Days |
|---|---|---|---|---|---|---|---|---|---|---|---|
| CONTRUCTION SUBMITTALS & PERMITS | 1 | 7 Days | 7 | | | | | | | | |
| MOBILIZATION & E. Basin Drive Prep | 1 | 5 Days | 5 | | | | | | | | |
| East Basin Dr MILLING & PAVING OHIO Dr. TO JEFFERSON MEMORIAL | 1 | 4 Days | 4 | | | | | | | | |
| 15th MILLING & PAVING CONSTITUTION TO INDEPENDENCE | 1 | 7 Days | 7 | | | | | | | | |
| 15th MILLING & PAVING INDEPENDENCE TO OHIO DR. | 1 | 7 Days | 7 | | | | | | | | |
| INSTALL PERMANENT PAVEMENT MARKINGS & TRAFFIC SIGNALS /SIGNS | 1 | 3 Days | 3 | | | | | | | | |

**REQUIRES FULL ROAD CLOSURES**   **ASSUMES PERFECT WEATHER**   **CALENDAR PROJECTION**

PHASE 1 - OHIO DR. / E. BASIN DR.          CONDITIONS AT PLANT AND SITE    NTP 03/09/26    FINISH 04/11/26

PHASE 2 - INDEPENDENCE TO OHIO DR.                                        NTP 03/16/26    FINISH 04/18/26

PHASE 3 - 15th STREET CONSTITUTION TO INDEPENDENCE



Beveridge
& Diamond

Nessa E Horewitch Coppinger
1900 N Street, NW, Suite 100
Washington, DC 20036
+1.202.789.6053
NCoppinger@bdlaw.com

March 13, 2026

**SENT VIA ELECTRONIC MAIL**

Regional Director Jen Nersesian
c/o National Capital Area
National Park Service
1100 Ohio Drive, SW
Washington, DC 20242
(202) 619-7020
Jen_Nersesian@nps.gov

Superintendent Kevin Griess
c/o National Mall and Memorial Parks
National Park Service
900 Ohio Drive SW
Washington, DC 20042
(202) 426-6841
kevin_griess@nps.gov

Director Sharon Kershbaum
District Department of Transportation
250 M Street SE
Washington, DC 20003
(202) 673-6813
sharon.kershbaum@dc.gov

   Re: 15th Street Bicycle Lane Removal

To Whom It May Concern:

Beveridge and Diamond, P.C. represents the Washington Area Bicyclist Association (WABA) and writes on their behalf in response to several sources confirming federal agency plans to remove or modify significant portions of the 15th Street NW/SW protected bike lane (Lane Removal) without any opportunity for public involvement or observation of required procedure and review. Unilaterally changing this protected bike lane would violate the National Capital

NPS-AR-001168



March 13, 2026
Page 2

Planning Act (NCPA), the National Environmental Policy Act (NEPA), and the National Historic Preservation Act (NHPA), and will make Washington, D.C. commuters, cyclists, and pedestrians less safe.

WABA respectfully requests the agencies reconsider, and maintain the Bike Lane as is. The Bike Lane has materially improved safety along this high-traffic corridor, and any modification would risk regression. At minimum, each procedural deficiency identified below is fatal and must be remedied before any action can proceed.

**Background**

As part of a "larger collaboration to improve pedestrian and bicyclist safety and access in and around Washington, D.C,"[1] the District Department of Transportation (DDOT) in partnership with the National Parks Service (NPS) proposed to construct the 15th Street NW/SW Protected Bike Lane ("Bike Lane" or "Project"). The Project most notably created a physically separated, two-way bike lane, but included some bus and pedestrian infrastructure improvements. NPS and DDOT identified 15th Street because it was a "high injury and crash location[]".[2]

As required under the NCPA, DDOT and NPS submitted their plans to the National Capital Planning Commission (NCPC). The NCPC approved the site development plans for safety improvements to 15th Street on June 3, 2021.[3] In its approval, the NCPC reiterated its support for the "goal of improving safety for all users and reducing vehicle, pedestrian, and bicycle conflicts in the heavily traveled corridor."[4]

The Project has done just that. DDOT has analyzed crash data following the bike lane installation which demonstrates at least a 59 percent reduction in all crashes.[5] DDOT's evaluation showed a 46 percent reduction in roadway crashes, and a 91 percent reduction in bicycle injury crashes.[6]

Despite the Project's safety successes, WABA has been informed that federal agencies are planning to unilaterally remove or modify a substantial portion of the Project. This Lane Removal is without required process and public input, and would make all commuters in this high-traffic area less safe.

Therefore, NPS, DDOT, and any other agencies must stall any proposed action and follow proper procedure to ensure public safety concerns are analyzed and considered in any action

---

[1] *New Bike Lane Coming to National Mall*, NPS (Oct. 7, 2021), https://www.nps.gov/nama/learn/news/new-bike-lane-coming-to-national-mall.htm.

[2] Executive Director's Recommendation, NCPC File No. 8272, *1 (June 3, 2021).

[3] Commission Action, NCPC File No. 8272 (June 3, 2021).

[4] *Id*.

[5] *DDOT 15th Street Bicycle Safety Improvements*, Nelson/Nygaard Consulting Associates, Inc. (visited Feb. 20, 2026), https://www.nelsonnygaard.com/ideas/ddot-15th-street-bicycle-safety-improvements.

[6] *15th St. NW/SW Protected Bike Lane Post-Implementation Analysis*, DDOT (as reported by PoPville on February 20, 2026).



March 13, 2026
Page 3

regarding the 15th Street Bike Lane. Any action to remove or modify the Bike Lane without such process violates federal law.

**Specific Comments on Lane Removal**

        **A.**      **The Lane Removal Violates the National Capital Planning Act.**

Under the NCPA, federal agencies "shall cooperate and correlate their efforts by using the [NCPC] as the central planning agency for federal activities in the National Capital region." 40 U.S.C. § 8722(a). The NCPA requires both federal and D.C. agencies to advise and consult with the NCPC. 40 U.S.C. § 8722(b)(1). Once the NCPC submits a final report, "the agency may proceed to take action in accordance with its legal responsibilities and authority." 40 U.S.C. § 8722(b)(1).

For the original construction, NPS, in partnership with DDOT, submitted the preliminary and final site development plans for the 15th Street Bike Lane to the NCPC for approval. Because the NCPA grants the NCPC review authority over federal projects in D.C., the proponents' plans had to demonstrate compliance with the agency's *Comprehensive Plan for the National Capital*, and indicate how the agencies are going to comply with other applicable statutes like NEPA and the NHPA.

The NCPC has already determined that the Project complied with the *Comprehensive Plan*, and that there were adequate indications to show NEPA and NHPA compliance back in 2021. No such determinations have been made regarding the Lane Removal.

Without submitting an application to the NCPC for approval, no agency can remove or modify the Bike Lane.

        **B.**      **Lane Removal Agencies Failed to Comply with NEPA.**

NEPA requires federal agencies to "ensure the professional integrity, including scientific integrity, of the discussion and analysis in an environmental document" and to base conclusions on reliable data and methods. 42 U.S.C. § 4332(2). NEPA directs agencies to analyze all "reasonably foreseeable environmental effects" of the proposed action, disclose the basis for their findings, and "study, develop, and describe technically and economically feasible alternatives" to the proposed action. 42 U.S.C. §§ 4332(2)(C)(i), (F). Each agency may identify actions that normally do not significantly affect the quality of the human environment as categorical exclusions. 42 U.S.C. § 4336e(1). An activity that qualifies for a categorical exclusion is not exempt from NEPA, but absent extraordinary circumstances, the agency will not have to prepare a project-specific analysis.

NPS and NCPC separately acknowledged their NEPA obligations during the original project plan review, both identifying categorical exclusions available for qualifying construction projects



March 13, 2026
Page 4

and trail improvements. For the original project, NPS applied categorical exclusion C.17 (then C.18) applying to construction of minor structures, including small, improved parking lots, in previously disturbed areas.[7] To satisfy its independent NEPA obligation, the NCPC relied on a categorical exclusion which allowed for "approval of the installation or restoration of minor site elements, such as but not limited to identification signs, sidewalks, patios, fences, curbs, retaining walls, landscaping, and trail or stream improvements."[8] 1 CFR 601.12(a)(2).

To date, there has been no NEPA process regarding the removal or modification of the 15th Street Bike Lane from NPS, NCPC, or otherwise. Moreover, unlike the original Bike Lane construction, there is no NPS categorical exclusion readily applicable to the destruction or modification of a bike lane, particularly one that so greatly improves public safety. Importantly, categorical exclusions are not available if extraordinary circumstances exist. The Department of Interior has identified a list of extraordinary circumstances which includes whether the action would "have significant impacts on public health or safety."[9] The Lane Removal would reverse the Project's safety gains increasing the risk of bicycle and car crashes. This reduction in public safety warrants additional scrutiny and public input to ensure any agency action does not cause unnecessary and avoidable injury.

Therefore, no agency may take action regarding the Lane Removal until they follow the proper NEPA procedures.

### C.    Lane Removal Agencies Failed to Comply with the NHPA.

Section 106 of the NHPA requires that any federal agency with "direct or indirect jurisdiction over a proposed Federal or federally assisted undertaking in any State" or "any Federal department or independent agency having authority to license any undertaking" must study ways to avoid or mitigate any adverse impacts the undertaking could have upon historic properties or other cultural resources. 54 U.S.C. § 306108.

The Advisory Council on Historic Preservation's regulations establish a four-step consultation process that agencies must complete before issuing a permit, license, or approval for an undertaking. *See* 36 CFR Part 800. First, the agency must determine if the project is a federal undertaking, thereby triggering Section 106. 36 CFR § 800.3(a). Second, the agency must identify the scope of potential effects and any historic properties and cultural resources that may be in the area. 36 CFR § 800.4. Third, the agency must determine whether the project will adversely impact any identified historic properties. 36 CFR § 800.5. Finally, the agency must identify mitigation steps for any adverse impacts and reach a Memorandum of Agreement with the State Historic Preservation Office, or Tribal Historic Preservation Officers for affected Native American tribes, and other relevant parties. 36 CFR § 800.6.

---

[7] Executive Director's Recommendation, NCPC File No. 8272, *4 (June 3, 2021); *see also* DOI Department Manual, 516 DM 12.5(C)(17).

[8] *Id*.

[9] 43 CFR 46.215(a); *see also* NEPA Handbook, DOI, Section 3.5 (2015).



March 13, 2026
Page 5

Similar to NEPA, both the NPS and the NCPC acknowledged their obligations to comply with the NHPA during the original bike lane consultation. For the construction, NPS relied on a nationwide programmatic agreement to streamline Section 106 review. This agreement allowed NPS to streamline "maintenance, repair, rehabilitation, or other activities that are not anticipated to have impacts on historic properties and are completed in accordance with a treatment plan."[10] Despite this potential streamlining measure, NPS and NCPC have not taken any action to comply with Section 106 regarding the Lane Removal.

No agency may remove or modify the Bike Lane until they comply with Section 106 of the NHPA.

### D.    Removing the Bike Lane Contradicts Public Policy

Both the NPS 2016 Paved Trails Study and the 2010 National Mall Plan identified a need for a separate bike facility along the 15th Street high-volume corridor.[11] The Bike Lane was also mentioned in significant DC public policies like the moveDC Plan and Vision Zero, a strategy to eliminate traffic fatalities and serious injuries.

After going through public notice and comment, one of the key elements of NPS's 2010 National Mall Plan was to "provide separate bicycle lanes or trails" around the National Mall.[12] The Project fit the bill, and has significantly reduced traffic crashes in the area.

D.C. Mayor Bowser's 2014 moveDC Plan included bicycle strategies and specifically identified the need to "install more protected bicycle lanes."[13] This effort wraps into Mayor Bowser's 2015 Vision Zero which aims to transform DC's roadway safety efforts. In the 2026-2030 Integrated Strategic Highway Safety Plan and Vision Zero Plan, Mayor Bowser prioritizes enhancing safety through protected bike lanes, bus priority projects, and expanded sidewalks over the next five years to further these key policies. Removing or shrinking existing protected bicycle infrastructure conflicts with these policies. DC and federal agencies should be expanding this must-needed infrastructure to increase access to biking, which, as Mayor Bowser acknowledges, "is a key component to our city's and region's transportation network."[14]

The NCPC had already determined that the Bike Lane was consistent with governing public policy as contained in the *Comprehensive Plan for the National Capital*. Principle 2 of the plan encourages federal promotion of non-auto transportation alternatives, including transit, walking,

---

[10] *Id*.
[11] 15th Street Cycle Track Installation CE Form, PEPC Project No. 92369, NPS (April 20, 2021).
[12] National Mall Plan: Summary, National Parks Service, *10 (2010).
[13] *See* Bicycle Priority Network, DDOT (visited Feb. 20, 2026), https://movedc-dcgis.hub.arcgis.com/pages/bicycles.
[14] 2026-2030 Integrated Strategic Highway Safety Plan and Vision Zero Plan, *3 (Dec. 2025), https://visionzero.dc.gov/.



March 13, 2026
Page 6

and bicycling.[15] The Transportation Element specifically identifies infrastructure to support safe bicycle use, including cycle tracks and protected bike lanes as critical components in expanding the District's mobility options. To that end, the Transportation Element directs the federal government to "work with local jurisdictions to ensure that there is adequate infrastructure for bicycles and pedestrians to safely and efficiently travel to and from federal destinations, including…protected bike lanes…."[16]

Removing the 15th Street Bike Lane without any justification contradicts NPS, DC, and NCPC public policies aimed at promoting safe bicycling infrastructure to accommodate residents, commuters, and visitors alike.

### E.    Lane Removal Would Violate the Administrative Procedure Act

Under the Administrative Procedure Act (APA), a court must hold unlawful agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2). The definition of "agency action" is broad and includes the destruction of property. 5 U.S.C. § 551. Therefore, any of the above-enumerated procedural deficiencies would violate the APA for failure to comply with applicable laws like the NCPA, NEPA, and the NHPA.

Importantly, removing or modifying the Bike Lane without process is a sharp deviation from prior practice. For the original installation, DDOT and NPS held two public meetings[17], conducted traffic studies, and received and addressed public comments. As described above, the agencies also submitted preliminary and final site development plans to the NCPC.[18]

The NCPC also reviewed and approved the Bike Lane proposal finding that the Project was consistent with the *Comprehensive Plan for the National Capital* and adequately complied with NEPA and Section 106 of the NHPA.

Here, all required, and previously-complied-with procedures have been ignored. Failure to comply with these procedures deprives the public of meaningful involvement and recklessly increases the risk facing cyclists and others. Any action impacting the viability or usability of this Bike Lane must comply with required procedures. Absent compliance, the Lane Removal is unlawful.

---

[15] *See* Executive Director's Recommendation, NCPC File No. CP01 (January 8, 2026).

[16] Comprehensive Plan for the National Capital: Federal Elements: Transportation Element, at 11 (approved by the NCPC January 8, 2026).

[17] *See* 15th Street Protected Bike Lane, DDOT (visited Feb. 20, 2021) https://ddot-dccycletrack-dcgis.hub.arcgis.com/; 15th Street Protected Bike Lane Public Meeting #1, DDOT (Feb. 8, 2021), https://ddot.dc.gov/release/15th-street-protected-bike-lane%C2%A0public-meeting-1.

[18] Executive Director's Recommendation, NCPC File No. 8272 (June 3, 2021).

NPS-AR-001173



March 13, 2026
Page 7

F.        Conclusion

WABA strongly encourages NPS and DDOT to reconsider any plans for removal and instead maintain the Bike Lane in its current condition. The Bike Lane has significantly improved safety in the area. Any removal or modification would jeopardize realized advancements and the public has heard no justification that would support increasing the risk of accidents.

WABA respectfully requests NPS and DDOT to reconsider the Lane Removal, or at least remedy the significant shortfalls identified herein. Should any activity occur without proper procedure, WABA is prepared to take legal action. WABA welcomes any additional discussion regarding the 15th Street NW/SW Bike Lane.

Sincerely,

Nessa E Horewitch Coppinger
Principal

# Congress of the United States

### Washington, DC 20515

March 20, 2026

Jessica Bowron
Acting Director
National Park Service
1849 C Street NW
Washington, DC 20240

Dear Acting Director Bowron:

We write regarding reports that the National Park Service (NPS) will be participating in, facilitating, or allowing the removal of the two-way protected bike lane on NPS land from the Tidal Basin to Constitution Avenue. That removal cannot proceed.

NPS must immediately reverse course and stop the removal of the bike lane. Failing to do so would indicate that NPS is either refusing to responsibly administer its D.C. lands, or that it is unable to protect those lands against interference from other federal agencies. In either case, NPS *must* act to protect transportation access to our nation's capital, recreation access ahead of the National Cherry Blossom Festival, and safety for all road users.

The bike lanes are part of a broader safe cycling corridor along 15th Street. Those lanes are an essential travel route for commuters from Virginia, D.C., Maryland, and visitors across the country, who rely on them to access jobs, NPS sites along the National Mall, and the Capitol complex. Allowing or actively working to remove these lanes will reverse a decade of improved bike access to those sites and intentionally cut off public access to their elected representatives and public lands.

Many of those commuters and visitors would continue to need access to this corridor. By removing the bike lanes, NPS would also force remaining bicyclists to share walkway space with pedestrians or roads with cars, creating danger for pedestrians, bikers, and cars alike. The D.C. Department of Transportation has found that the bike lane corridor reduced bike crashes by 69%, crashes causing injuries by 52%, and *all* crashes by 46%.[1] Deliberately making the roadway more dangerous is unacceptable.

According to posted signage, construction on the Ohio Drive portion could begin as early as today. It is imperative that NPS *immediately* take action to responsibly steward its own lands and stop the removal of this essential transportation corridor.

Sincerely,

---

[1] Post-Implementation Analysis | DDOT

Donald S. Beyer Jr.
Member of Congress

Eleanor Holmes Norton
Member of Congress

Mike Thompson
Member of Congress

Lloyd Doggett
Member of Congress

Rashida Tlaib
Member of Congress

Dave Min
Member of Congress

Mike Quigley
Member of Congress

Scott H. Peters
Member of Congress

Darren Soto
Member of Congress

Bill Foster
Member of Congress

Jamie Raskin
Member of Congress

NPS-AR-001176



**COUNCIL OF THE DISTRICT OF COLUMBIA**
JOHN A. WILSON BUILDING
1350 PENNSYLVANIA AVENUE NW
WASHINGTON, DC 20004

**JANEESE LEWIS GEORGE**
Ward 4 Councilmember
Chair of the Committee on
Facilities

**COMMITTEE MEMBER**
Committee on Transportation and the Environment
Committee on Executive Administration and Labor
Committee on Public Works and Operations

Jennifer Takouhi Nersesian
Regional Director
National Capital Area
National Park Service
1100 Ohio Drive, SW
Washington, DC 20242

March 20, 2026

Dear Director Nersesian,

I am deeply concerned by reports that the National Park Service plans to start removing the protected bike lane that runs along 15th Street NW between Constitution Avenue south to the Tidal Basin – and especially dismayed at the decision to do so during the height of the cherry blossom season and tourism to our beautiful city.

The removal of the protected bike lane will disrupt traffic and add to congestion in this high-traffic area. An evaluation by the District Department of Transportation ("DDOT") found that the 2021 installation of the lane has made the corridor more efficient for motorists, resulting in decreased vehicle traveling times during peak hours in both the northbound and southbound directions.

The 15th Street protected bike lane also led to increased safety for both vehicles and cyclists, leading to a 69% reduction in bicycle crashes, a 46% reduction in roadway crashes, and a 25% reduction in pedestrian crashes.

Protected bike lane is a common-sense strategy to ensure safety and efficiency along this highly trafficked corridor. But it's not just District residents who will be negatively impacted if this bike lane is removed – it is heavily utilized by tourists from all 50 states. Small businesses that provide rentals and tours have reported that thousands of visitors utilize the lane each week and would be less safe as they navigate the road alongside 2 or 3-ton vehicles.

NPS-AR-001177

The data speaks for itself. Removing protected bike lanes doesn't alleviate congestion – it will cause more of it as accidents increase. I urge you to reconsider the decision to remove the bike lane along this vital corridor.


In service,

Janeese Lewis George
Councilmember, Ward 4



**From:** Dowden, Kurt (FHWA) <Kurt.Dowden@dot.gov>
**Sent:** Thursday, February 19, 2026 3:10 PM
**To:** Fetzer, Julie <julie_fetzer@nps.gov>
**Cc:** Camacho, Daniel (FHWA) <Daniel.Camacho@dot.gov>; Close, Chris <Chris_Close@nps.gov>; O'Brien, Libby (FHWA) <libby.obrien@dot.gov>; Fabis, Joseph (FHWA) <Joseph.Fabis@dot.gov>; Stidham, Tammy (NPS) <tammy_stidham@nps.gov>
**Subject:** RE: [EXTERNAL] FW: 15st Paving Operations & MOT

Julie,

We will work to provide additional details by COB tomorrow, Friday 2/20.

Thanks

Kurt

---

**From:** Fetzer, Julie A <julie_fetzer@nps.gov>
**Sent:** Thursday, February 19, 2026 1:13 PM
**To:** Dowden, Kurt (FHWA) <Kurt.Dowden@dot.gov>
**Cc:** Camacho, Daniel (FHWA) <Daniel.Camacho@dot.gov>; Close, Chris <Chris_Close@nps.gov>; O'Brien, Libby (FHWA) <libby.obrien@dot.gov>; Fabis, Joseph (FHWA) <Joseph.Fabis@dot.gov>; Stidham, Tammy (NPS) <tammy_stidham@nps.gov>
**Subject:** Re: [EXTERNAL] FW: 15st Paving Operations & MOT

**CAUTION:** This email originated from outside of the Department of Transportation (DOT). Do not click on links or open attachments unless you recognize the sender and know the content is safe.

Hi all,

I'm looping in Tammy Stidham, Associate Regional Director of Lands and Planning, for compliance coordination.

We noted the offer below regarding additional specifics on the equipment layout and the MOT plan. We would appreciate any further details you can provide about the MOT plan at your earliest convenience, as the compliance path forward will depend on this information.

Thank you,

Julie

NPS-AR-00 1880

**Julie Fetzer**

**Transportation Program Manager (Acting)**

Facilities, Design & Construction Directorate

National Capital Regional Office

National Park Service

---

**From:** Fetzer, Julie A <julie_fetzer@nps.gov>
**Sent:** Thursday, February 19, 2026 11:33 AM
**To:** Dowden, Kurt (FHWA) <Kurt.Dowden@dot.gov>
**Cc:** Camacho, Daniel (FHWA) <Daniel.Camacho@dot.gov>; Close, Chris H <Chris_Close@nps.gov>; O'Brien, Libby (FHWA) <libby.obrien@dot.gov>; Fabis, Joseph (FHWA) <Joseph.Fabis@dot.gov>
**Subject:** Re: [EXTERNAL] FW: 15st Paving Operations & MOT

Good morning,

Thank you for the thoughtful response. I've shared your feedback with our compliance staff for their consideration. They had raised the question because the CE they had planned to utilize includes some limiting language regarding full roadway closures. They are now evaluating whether a rolling closure (i.e. full closures of roadway segments in phases instead of the whole corridor) could be permissible under the language of the CE.

Based on our previous discussion, I had communicated that this style of segmented rolling closure had been proposed (split into SB West Basin//Maine to Independence//Independence to Constitution), but please let me know if that's not the case. Otherwise, I'll let you know as soon as I have more information about the compliance.

Thank you,

Julie

**Julie Fetzer**

**Transportation Program Manager (Acting)**

Facilities, Design & Construction Directorate

National Capital Regional Office

National Park Service

---

**From:** Dowden, Kurt (FHWA) <Kurt.Dowden@dot.gov>
**Sent:** Thursday, February 19, 2026 10:32 AM
**To:** Fetzer, Julie A <julie_fetzer@nps.gov>
**Cc:** Camacho, Daniel (FHWA) <Daniel.Camacho@dot.gov>; Close, Chris H <Chris_Close@nps.gov>; O'Brien, Libby (FHWA) <libby.obrien@dot.gov>; Fabis, Joseph (FHWA) <Joseph.Fabis@dot.gov>
**Subject:** [EXTERNAL] FW: 15st Paving Operations & MOT

NPS-AR-001181

Case 1:26-cv-00988-ABJ   USDOCUMENT [EXTERNAL] FHWCH15th Paving Operation&MOL78 of 199

Kurt, as discussed

In reviewing the traffic control and construction logistics regarding the request to keep 15th St. open during the proposed work, we really need to maintain the full closure for these segments to hit our quality and schedule targets for this cold-weather paving operation.

From an operational standpoint, a partial opening presents a few significant hurdles:

- **Equipment Footprint:** Our plan for echelon paving (side-by-side formation to lay multiple lanes simultaneously)  requires a large equipment train, including 5 rollers, MTVs, and a constant flow of trucks. Between the machinery, paving labor, and the necessary QA/QC and additional research and inspection staff on the ground, we don't have the lateral clearance to safely manage live traffic alongside the work zone.

- **Traffic Management:** Managing local access at the intersections would be a major lift. A full closure is much cleaner to message to the public and avoids the confusion of who is allowed through, which keeps the work zone secure.

- **Resource Readiness:** We already have the full-closure signage in stock and ready to deploy. Shifting to a partial closure would require a new MOT plan and additional coordination with DC Police for intersection control, which could delay our start date.

- **Production & Quality:** Given the cold weather, we need to move quickly to maintain mat temperature. A full closure allows the crew to focus entirely on production without the delays associated with managing adjacent traffic.

Sticking with the full closure seems like the most straightforward path to getting this done safely and on schedule. Let me know if you need any more specifics on the equipment layout or the MOT plan.

Danny

**Daniel Camacho Maldonado, P.E.**

Construction Engineer

Eastern Federal Lands Highway Division

Federal Highway Administration

22001 Loudoun County Parkway

Building E-2, Suite 200

Ashburn, Virginia  20147

Office: 703-404-6263

Mobile: 703-307-5572

NPS-AR-001182

**This email has been received from outside of DOI - Use caution before clicking on links, opening attachments, or responding.**

Julie,

Following up yesterday's communication regarding full roadway closure for the subject project.  EFL discussed and offers the information in the email below.  In addition to the reasons offered below, I would also emphasize the additional safety that full road closure provides.  There has been some indication from the public that there may be an attempt to interrupt construction operations and maintaining full roadway closure will significantly improve the ability to control unauthorized vehicles from entering the construction area thereby protecting the workers as well as preventing interference with production.

Please let me know if we need to discuss.

Thanks



Kurt Dowden

Chief of Engineering

EFLHD-FHWA

U.S. Department of Transportation

Kurt.Dowden@dot.gov

---

**From:** Camacho, Daniel (FHWA) <Daniel.Camacho@dot.gov>
**Sent:** Thursday, February 19, 2026 9:28 AM
**To:** Dowden, Kurt (FHWA) <Kurt.Dowden@dot.gov>
**Cc:** Fabis, Joseph (FHWA) <Joseph.Fabis@dot.gov>
**Subject:** 15st Paving Operations & MOT

NPS-AR-001183

---

**3 attachments**



**NAMA 12(3) Maine Ave to Ohio Dr MOT example.pdf**
209K

**15th Street Northbound Detour.pdf**
4594K

**15th Street Southbound Detour.pdf**
9722K

NPS-AR-001184

| PMIS NO. | NPS NO. | STATE | PROJECT | SHEET NUMBER |
|---|---|---|---|---|
| 204832 | 802 | DC | NP-NAMA 12(3) | N02 |
| 212009 | 171525 | | | |

**N**

**MAP / DIAGRAM LABELS**

POND

LINCOLN MEMORIAL

REFLECTING POOL

23RD STREET

17TH STREET

14TH STREET

15TH STREET

WASHINGTON MONUMENT

D. FRENCH DR.

27

13

29

INDEPENDENCE AVE

WEST POTOMAC PARK

OHIO DRIVE

WEST BASIN DRIVE

KUTZ BRIDGE

TIDAL BASIN

50'

50'

500'

500'

JEFFERSON ST.

SMITHSONIAN

RAOUL WALLENBERG PL.

12TH STREET

C STREET

D STREET

INDEPENDENCE AVENUE

3 — Mount sign on barricade, Type 3

OUTLET BRIDGE

EAST BASIN DRIVE

JEFFERSON MEMORIAL

INLET BRIDGE

POTOMAC RIVER

14th STREET S.W.

R.R. BRIDGE

MAINE AVENUE

FRANCIS CASE MEMORIAL BRIDGE

L'ENFANT PROMENADE

I-395

ROUTE 1

BUCKEYE DRIVE

NPS

OHIO DRIVE

WASHINGTON CHANNEL

EAST POTOMAC PARK

NPS-AR-001185

**SIGN LAYOUTS (left side)**

(A)
E BASIN DR WILL CLOSE ON
MM/DD/YY TO MM/DD/YY
Portable Changeable Message Sign (Prior to work)

To South 395
FOLLOW DETOUR
Portable Changeable Message Sign (During work)

(11) East Basin Drive — SP-1

(12) Detour to South — SP-2

(13) To Jefferson Memorial — SP-3

(25)
INTERSTATE
395
M1-1

(B)
E BASIN DR WILL CLOSE ON
MM/DD/YY TO MM/DD/YY
Portable Changeable Message Sign (Prior to work)

E BASIN DR CLOSED
FOLLOW DETOUR
Portable Changeable Message Sign (During work)

(24)
DETOUR AHEAD
W20-2

**SIGN LEGEND (right side)**

(2)
ROAD CLOSED 500 FT
W20-3

(3)
ROAD CLOSED
R11-2
Mount sign on barricade, Type 3

(4)
END ROAD WORK
G20-2

(6)
END DETOUR
M4-8a

(27)
DETOUR ←
M4-9L

(29)
DETOUR ↑
M4-9R (Mod.)

(7)
←
M6-1

(8)
→
M6-1

(10)
↑
M6-3

U.S. DEPARTMENT OF TRANSPORTATION
FEDERAL HIGHWAY ADMINISTRATION
EASTERN FEDERAL LANDS HIGHWAY DIVISION
STERLING, VIRGINIA

**NATIONAL MALL AND MEMORIAL PARKS**

**TRAFFIC CONTROL PLAN**
**TOTAL CLOSURE LAYOUTS**
**EAST BASIN DRIVE SOUTHBOUND**

Sheet 1 of 2

NO SCALE

26-Jan-2021 02:38 PM    M:\PROJECTS\nama\12(3)\Pro_Dev\CADD\Current CADD Files from my C-drive\000t   CADD\N01-N04-nomot(3)_tcp.dgn



NPS-AR-001186



NPS-AR-001187



NPS-AR-001188

3/23/26, 9:57 AM

Case 1:26-cv-00988-ABJ   Document 17-6   Filed 03/31/26   Page 185 of 199
US DOT Mail 15th Street Cycle Track Removal and road repaving_EFL-TM-ENV-03_Categorical-Exclusion-FHWA (1).pdf



Rose, Kevin <kevin.rose@dot.gov>

## 15th Street Cycle Track Removal and road repaving_EFL-TM-ENV-03_Categorical-Exclusion-FHWA (1).pdf
3 messages

**Rose, Kevin (FHWA)** <Kevin.Rose@dot.gov>                                             Fri, Feb 27, 2026 at 1:59 PM
To: "Stern, Kelly (FHWA)" <kelly.stern@dot.gov>

I signed it anyway!

 **15th Street Cycle Track Removal and road repaving_EFL-TM-ENV-03_Categorical-Exclusion-FHWA (1).pdf**
351K

**Rose, Kevin (FHWA)** <Kevin.Rose@dot.gov>                                             Wed, Mar 4, 2026 at 9:01 AM
To: "Stern, Kelly (FHWA)" <kelly.stern@dot.gov>

Thanks again for getting this done. Kurt just asked about it and I was able to inform him that it had been completed.

**From:** Rose, Kevin (FHWA)
**Sent:** Friday, February 27, 2026 2:00 PM
**To:** Stern, Kelly (FHWA) <kelly.stern@dot.gov>
**Subject:** 15th Street Cycle Track Removal and road repaving_EFL-TM-ENV-03_Categorical-Exclusion-FHWA (1).pdf

I signed it anyway!

**Stern, Kelly (FHWA)** <kelly.stern@dot.gov>                                            Wed, Mar 4, 2026 at 9:02 AM
To: "Rose, Kevin (FHWA)" <Kevin.Rose@dot.gov>

You're welcome!



Kelly Stern

Environmental Protection Specialist

Eastern Federal Lands Highway Division

U.S. Department of Transportation

kelly.stern@dot.gov

[Quoted text hidden]



**Dowden, Kurt <kurt.dowden@dot.gov>**

## RE: [EXTERNAL] FW: 15st Paving Operations & MOT

1 message

**Dowden, Kurt (FHWA)** <Kurt.Dowden@dot.gov>                    Wed, Mar 4, 2026 at 8:46 AM
To: "Rose, Kevin (FHWA)" <Kevin.Rose@dot.gov>
Cc: "Gutierrez, Vivian M (FHWA)" <vivian.m.gutierrez@dot.gov>

Kevin,

Just checking in on status of FHWA's NEPA for subject project.

Thanks

Kurt

---

**From:** Dowden, Kurt (FHWA) <Kurt.Dowden@dot.gov>
**Sent:** Monday, February 23, 2026 6:31 PM
**To:** Rose, Kevin (FHWA) <Kevin.Rose@dot.gov>; Hsieh, Milton (FHWA) <Milton.Hsieh@dot.gov>
**Cc:** Marshall, Timothy (FHWA) <Timothy.Marshall@dot.gov>; Bell, Holly (FHWA) <Holly.Bell@dot.gov>; Gutierrez, Vivian M (FHWA) <vivian.m.gutierrez@dot.gov>; O'Brien, Libby (FHWA) <libby.obrien@dot.gov>
**Subject:** Fw: [EXTERNAL] FW: 15st Paving Operations & MOT

Kevin and Milton,

Attached is the completed CE for the subject project.

Kurt

---

**From:** Fetzer, Julie A <julie_fetzer@nps.gov>
**Sent:** Monday, February 23, 2026 6:24 PM
**To:** O'Brien, Libby (FHWA) <libby.obrien@dot.gov>; Dowden, Kurt (FHWA) <Kurt.Dowden@dot.gov>
**Cc:** Camacho, Daniel (FHWA) <Daniel.Camacho@dot.gov>; Close, Chris <Chris_Close@nps.gov>; Fabis, Joseph (FHWA) <Joseph.Fabis@dot.gov>; Burnell, Chris (FHWA) <Chris.Burnell@dot.gov>; O'Brien, Sean (FHWA) <Sean.O'Brien@dot.gov>
**Subject:** Re: [EXTERNAL] FW: 15st Paving Operations & MOT

**CAUTION:** This email originated from outside of the Department of Transportation (DOT). Do not click on links or open attachments unless you recognize the sender and know the content is safe.

Hi all,

The compliance has been completed. Please see the attached documentation.

I have been keeping internal leadership informed that a green light from FHWA leadership is still pending. Please let us know as soon as any updates are available, or whenever you have additional materials to share (e.g. schedule, paving plan, striping plan revisions).

Thank you,
Julie

**Julie Fetzer**

**Transportation Program Manager (Acting)**

Facilities, Design & Construction Directorate

National Capital Regional Office

National Park Service

---

**From:** Fetzer, Julie A <julie_fetzer@nps.gov>
**Sent:** Friday, February 20, 2026 11:23 AM
**To:** O'Brien, Libby (FHWA) <libby.obrien@dot.gov>; Dowden, Kurt (FHWA) <Kurt.Dowden@dot.gov>
**Cc:** Camacho, Daniel (FHWA) <Daniel.Camacho@dot.gov>; Close, Chris H <Chris_Close@nps.gov>; Fabis, Joseph (FHWA) <Joseph.Fabis@dot.gov>; Stidham, Tammy <Tammy_Stidham@nps.gov>; Burnell, Chris (FHWA) <Chris.Burnell@dot.gov>; O'Brien, Sean (FHWA) <Sean.O'Brien@dot.gov>
**Subject:** Re: [EXTERNAL] FW: 15st Paving Operations & MOT

Thank you, Libby! Our compliance staff will review may follow up with any questions or concerns.

In the interim, I did want to flag that based on the proposed closures, outreach will be required minimally to the Bureau of Engraving and Printing, the Holocaust Memorial Museum, and the African American History Museum. Impacts to their building access may have been less noticeable in Fall 2025 due to the federal shutdown, but I do believe advanced notice in this case will be required, as soon as the construction schedule is better defined.

Additionally, based on the draft MOT plan, it appears a DDOT Public Space Permit would be required due to proposed signage and detours within DDOT right-of-way. I understand discussions between FHWA and DDOT are still ongoing, but wanted to flag it for awareness.

Thanks,

Julie

**Julie Fetzer**

NPS-AR-001192

**Transportation Program Manager (Acting)**

Facilities, Design & Construction Directorate

National Capital Regional Office

National Park Service

---

**From:** O'Brien, Libby (FHWA) <libby.obrien@dot.gov>
**Sent:** Friday, February 20, 2026 10:34 AM
**To:** Dowden, Kurt (FHWA) <Kurt.Dowden@dot.gov>; Fetzer, Julie A <julie_fetzer@nps.gov>
**Cc:** Camacho, Daniel (FHWA) <Daniel.Camacho@dot.gov>; Close, Chris H <Chris_Close@nps.gov>; Fabis, Joseph (FHWA) <Joseph.Fabis@dot.gov>; Stidham, Tammy <Tammy_Stidham@nps.gov>; Burnell, Chris (FHWA) <Chris.Burnell@dot.gov>; O'Brien, Sean (FHWA) <Sean.O'Brien@dot.gov>
**Subject:** RE: [EXTERNAL] FW: 15st Paving Operations & MOT

Julie,

Attached are the MOT plans used for the 15th Street paving in Oct/Nov 2025 and the MOT plan used for the recent work on Maine/Ohio/ East Basin in NAMA 12(3). Both utilize complete road closures, but are intended to be completed in phases/rolling closures as indicated in your email below. The 15th Street MOT can remain as is since we just used this 4 months ago. We are still evaluating the Maine/Ohio/East Basin MOT to ensure its comprehensive to the work and the availability of proposed signage, but it is a great base to work from. I don't anticipate any major changes. Let me know if you need more detail to keep NEPA moving.

Thanks,

Libby



Libby O'Brien, PE
Highway Design Branch Chief
Eastern Federal Lands Highway Division
Federal Highway Administration
U.S. Department of Transportation
Office: (703) 948-1440
Cell: (703) 965-0053
Libby.OBrien@dot.gov

---

**From:** Dowden, Kurt (FHWA) <Kurt.Dowden@dot.gov>
**Sent:** Thursday, February 19, 2026 3:10 PM
**To:** Fetzer, Julie <julie_fetzer@nps.gov>
**Cc:** Camacho, Daniel (FHWA) <Daniel.Camacho@dot.gov>; Close, Chris <Chris_Close@nps.gov>; O'Brien, Libby (FHWA) <libby.obrien@dot.gov>; Fabis, Joseph (FHWA) <Joseph.Fabis@dot.gov>; Stidham, Tammy (NPS) <tammy_stidham@nps.gov>
**Subject:** RE: [EXTERNAL] FW: 15st Paving Operations & MOT

Julie,

We will work to provide additional details by COB tomorrow, Friday 2/20.

Thanks

Kurt

NPS-AR-001193

**From:** Fetzer, Julie A <julie_fetzer@nps.gov>
**Sent:** Thursday, February 19, 2026 1:13 PM
**To:** Dowden, Kurt (FHWA) <Kurt.Dowden@dot.gov>
**Cc:** Camacho, Daniel (FHWA) <Daniel.Camacho@dot.gov>; Close, Chris <Chris_Close@nps.gov>; O'Brien, Libby (FHWA) <libby.obrien@dot.gov>; Fabis, Joseph (FHWA) <Joseph.Fabis@dot.gov>; Stidham, Tammy (NPS) <tammy_stidham@nps.gov>
**Subject:** Re: [EXTERNAL] FW: 15st Paving Operations & MOT

**CAUTION:** This email originated from outside of the Department of Transportation (DOT). Do not click on links or open attachments unless you recognize the sender and know the content is safe.

Hi all,

I'm looping in Tammy Stidham, Associate Regional Director of Lands and Planning, for compliance coordination.

We noted the offer below regarding additional specifics on the equipment layout and the MOT plan. We would appreciate any further details you can provide about the MOT plan at your earliest convenience, as the compliance path forward will depend on this information.

Thank you,
Julie

**Julie Fetzer**
**Transportation Program Manager (Acting)**
Facilities, Design & Construction Directorate
National Capital Regional Office
National Park Service

---

**From:** Fetzer, Julie A <julie_fetzer@nps.gov>
**Sent:** Thursday, February 19, 2026 11:33 AM
**To:** Dowden, Kurt (FHWA) <Kurt.Dowden@dot.gov>
**Cc:** Camacho, Daniel (FHWA) <Daniel.Camacho@dot.gov>; Close, Chris H <Chris_Close@nps.gov>; O'Brien, Libby (FHWA) <libby.obrien@dot.gov>; Fabis, Joseph (FHWA) <Joseph.Fabis@dot.gov>
**Subject:** Re: [EXTERNAL] FW: 15st Paving Operations & MOT

Good morning,

Thank you for the thoughtful response. I've shared your feedback with our compliance staff for their consideration. They had raised the question because the CE they had planned to utilize includes some limiting language regarding full roadway closures. They are now evaluating whether a rolling closure (i.e. full closures of roadway segments in phases instead of the whole corridor) could be permissible under the language of the CE.

Based on our previous discussion, I had communicated that this style of segmented rolling closure had been proposed (split into SB West Basin//Maine to Independence//Independence to Constitution), but please let me know if that's not the case. Otherwise, I'll let you know as soon as I have more information about the compliance.

Thank you,
Julie

**Julie Fetzer**
**Transportation Program Manager (Acting)**
Facilities, Design & Construction Directorate
National Capital Regional Office
National Park Service

---

**From:** Dowden, Kurt (FHWA) <Kurt.Dowden@dot.gov>
**Sent:** Thursday, February 19, 2026 10:32 AM
**To:** Fetzer, Julie A <julie_fetzer@nps.gov>
**Cc:** Camacho, Daniel (FHWA) <Daniel.Camacho@dot.gov>; Close, Chris H <Chris_Close@nps.gov>; O'Brien, Libby (FHWA) <libby.obrien@dot.gov>; Fabis, Joseph (FHWA) <Joseph.Fabis@dot.gov>
**Subject:** [EXTERNAL] FW: 15st Paving Operations & MOT

---

**This email has been received from outside of DOI - Use caution before clicking on links, opening attachments, or responding.**

---

Julie,

Following up yesterday's communication regarding full roadway closure for the subject project. EFL discussed and offers the information in the email below. In addition to the reasons offered below, I would also emphasize the additional safety that full road closure provides. There has been some indication from the public that there may be an attempt to interrupt construction operations and maintaining full roadway closure will significantly improve the ability to control unauthorized vehicles from entering the construction area thereby protecting the workers as well as preventing interference with production.

Please let me know if we need to discuss.

Thanks



Kurt Dowden
Chief of Engineering
EFLHD-FHWA
U.S. Department of Transportation
Kurt.Dowden@dot.gov

---

**From:** Camacho, Daniel (FHWA) <Daniel.Camacho@dot.gov>
**Sent:** Thursday, February 19, 2026 9:28 AM
**To:** Dowden, Kurt (FHWA) <Kurt.Dowden@dot.gov>
**Cc:** Fabis, Joseph (FHWA) <Joseph.Fabis@dot.gov>
**Subject:** 15st Paving Operations & MOT

Kurt, as discussed

In reviewing the traffic control and construction logistics regarding the request to keep 15th St. open during the proposed work, we really need to maintain the full closure for these segments to hit our quality and schedule targets for this cold-weather paving operation.

From an operational standpoint, a partial opening presents a few significant hurdles:

- **Equipment Footprint:** Our plan for echelon paving (side-by-side formation to lay multiple lanes simultaneously) requires a large equipment train, including 5 rollers, MTVs, and a constant flow of trucks. Between the machinery, paving labor, and the necessary QA/QC and additional research and inspection staff on the ground, we don't have the lateral clearance to safely manage live traffic alongside the work zone.

NPS-AR-001195

- **Traffic Management:** Managing local access at the intersections would be a major lift. A full closure is much cleaner to message to the public and avoids the confusion of who is allowed through, which keeps the work zone secure.

- **Resource Readiness:** We already have the full-closure signage in stock and ready to deploy. Shifting to a partial closure would require a new MOT plan and additional coordination with DC Police for intersection control, which could delay our start date.

- **Production & Quality:** Given the cold weather, we need to move quickly to maintain mat temperature. A full closure allows the crew to focus entirely on production without the delays associated with managing adjacent traffic.

Sticking with the full closure seems like the most straightforward path to getting this done safely and on schedule. Let me know if you need any more specifics on the equipment layout or the MOT plan.

Danny

**Daniel Camacho Maldonado, P.E.**
Construction Engineer
Eastern Federal Lands Highway Division
Federal Highway Administration
22001 Loudoun County Parkway
Building E-2, Suite 200
Ashburn, Virginia  20147
Office: 703-404-6263
Mobile: 703-307-5572

NPS-AR-001196

 **Outlook**

## Fw: [EXTERNAL] Bike Lanes

| | |
|---|---|
| **From** | Stidham, Tammy <Tammy_Stidham@nps.gov> |
| **Date** | Thu 3/26/2026 4:16 PM |
| **To** | Porsia, Sara C <sara.porsia@sol.doi.gov> |

-------------------------------------------

Tammy Stidham

Associate Regional Director- Lands and Planning

National Park Service

1100 Ohio Drive SW

Washington, DC 20242

voice- (202)619-7474

mobile- (202)438-0028

tammy_stidham@nps.gov

**From:** Sullivan, Diane <diane.sullivan@ncpc.gov>
**Sent:** Monday, March 23, 2026 11:58 AM
**To:** Stidham, Tammy <Tammy_Stidham@nps.gov>
**Subject:** [EXTERNAL] Bike Lanes

> **This email has been received from outside of DOI - Use caution before clicking on links, opening attachments, or responding.**

Tammy – I'm confirming that NCPC would not review the removal of bike lanes.

Diane Sullivan
Director, Urban Design and Plan Review
National Capital Planning Commission
401 9th Street, NW | Suite 500 | Washington, DC 20004
202 482 7200 | Facebook Twitter Instagram
www.ncpc.gov



NPS-AR-001197

Case 1:26-cv-00988-ABJ     Document 17-6     Filed 03/31/26     Page 194 of 199

NPS-AR-001198

# EXHIBIT A

NPS-AR-001199

## DECLARATION OF ELIZABETH KIKER

I, Elizabeth Kiker, declare as follows:

1. My name is Elizabeth Kiker, and I am the Executive Director of the Washington Area Bicyclist Association ("WABA").  The statements made and facts set forth in this declaration are based on my personal and professional knowledge, as well as information made available to me in my duties as Executive Director.

2. I have served in WABA for almost three years, focused on advocacy to improve the safety of our streets and to achieve better bicycling across the metropolitan District of Columbia ("D.C.") region.  As a result, I am very familiar with WABA's programs, and especially its litigation and advocacy activities.

3. WABA is a nonprofit organization, founded in 1972.  WABA has been working for more than 50 years to improve the safety of our streets and achieve better bicycling across the metropolitan D.C. region.  We have about 5,000 members and nearly 23,000 regional advocacy supporters.  Our mission is to empower people to ride bicycles, strengthen community connections, and reshape places.  We are working to build a just and sustainable transportation system where walking, biking, and public transit are the easiest and best ways to travel in the metropolitan D.C. area.

4. WABA's advocacy work focuses on: D.C.; Prince George's County, Maryland; Montgomery County, Maryland; Arlington County, Virginia; Fairfax County, Virginia; Alexandria, Virginia; Falls Church, Virginia; Fairfax City, Virginia; and Vienna, Virginia. WABA collaborates with groups advocating in other Maryland and Virginia counties, as well as at the state level in Maryland and Virginia.

5. WABA advocates on behalf of metropolitan D.C. residents who ride bicycles on bicycle lanes in the region.  The public safety, health, and quality of life of regional residents are primary concerns to WABA.

6. According to the District Department of Transportation ("DDOT")'s sustainable transportation initiative goDCgo, over 18,000 D.C. residents bicycle to work on a daily basis.  This figure represents 5% of commuters.  The article including these statistics is attached as Attachment 1.  WABA also advocates for the several thousands of shared mobility users who logged 6,369,376 Capital Bikeshare rides in 2025.

7. WABA and community members have been calling for safe connection along 15th Street since at least 2013.  WABA coordinated with the National Park Service ("NPS") and DDOT staff to develop the 15th Street, NW/SW bicycle lanes to help community members learn and engage with the project.  WABA also advocated for the 15th Street protected bicycle lane to be included in moveDC, D.C.'s master plan of transportation, which was last updated in 2021.  WABA further worked with Advisory Neighborhood Commissioners to pass resolutions in support of the project.

1

8. Before the 15th Street bicycle lane was constructed, the proposed project went through a thorough and legally required public engagement process. During the process, the government solicited public comments via the National Capital Planning Commission ("NCPC" or "Commission"). DDOT and NPS held two public meetings, conducted traffic studies, and received and addressed public comments for the last installation. These agencies also submitted preliminary and final site development plans to the NCPC.

9. WABA participated in that process and advocated the project's value to road safety.

10. The process for constructing the 15th Street, NW/SW Protected Bike Lane Project ("Project") began in October 2020. Over the following months, a traffic analysis was performed, crash data was evaluated, and a conceptual design was developed. DDOT held the first public meeting about the Project on February 18, 2021, and a second on May 12, 2021. NPS and DDOT continued to meet with stakeholders in early to mid-2021. The slide deck presented at the February 18, 2021 meeting is attached as Attachment 2.

11. NPS met its obligations under various federal statutes throughout the process. The agency evaluated the Project under the National Environmental Policy Act ("NEPA") and concluded that it did not significantly affect the environment by relying on a categorical exclusion. NPS also evaluated the Project's potential effects on historic resources under the National Historic Preservation Act and determined the effects were minor. NPS's NEPA and historic assessment documentation is attached as Attachment 3.

12. The agency then secured approval from the Commission on Fine Arts. NPS subsequently submitted the Project and its NEPA and historic assessment documents to the NCPC. Based on staff recommendations, the Commission approved the Project at a public meeting and voiced support for its safety objectives for all road users. The staff report is attached as Attachment 4 and the Commission's approval as Attachment 5.

13. DDOT completed the Project, an initiative that enhanced D.C.'s cycling infrastructure, in fall 2021. The Project was part of a larger effort to install 20 miles of protected bike lanes by 2022, prioritizing improvements at locations with high injuries and crashes. The bicycle lanes are managed in coordination with NPS. The Project involves a traffic analysis and review of other data sources to develop a design that improves safety for all users.

14. The 15th Street Bike Lane Project creates a safe right-of-way for all people, regardless of whether they walk, bike, or drive. It improved the function of the street and intersections to make them easier to use and understand.

15. The 15th Street Bike Lane Project also aligns with NPS's 2010 National Mall Plan and supports the continued growth of bicycling to reach the attractions on and near the National Mall. These renowned attractions include the: Washington Monument; Lincoln Memorial; Martin Luther King, Jr. Memorial; Jefferson Memorial; World War I and II Memorials; Vietnam War Veterans Memorial; Korean War Veterans Memorial; Constitution Gardens; White House; Capitol Building; and Smithsonian museums.

NPS-AR-001201

16. Our members regularly use the 15th Street Bike Lanes between Constitution Avenue and the Jefferson Memorial, and would continue to do so if the bike lanes are not removed. I estimate that 900 of our members travel on 15th Street bike lanes every day. Most of these lanes fall under the DDOT's jurisdiction, but this portion is on federal land. Our members also regularly use the bike lanes that run along Ohio Drive, SW and East Basin Drive. The U.S. Department of the Interior ("DOI"), within which NPS is situated, has jurisdiction over this land.

17. This corridor, which carries roughly 4,000 daily riders, is a crucial backbone for the bicycle infrastructure throughout the entire region. This specific segment connects D.C.'s first protected bicycle lane on 15th Street with the 14th Street Bridge, which transports thousands of Virginians to and from D.C. by bicycle each day. It is the only entirely low-stress connection between Virginia and the core of D.C.

18. Analysis by DDOT shows that the 15th Street Bike Lane has helped WABA achieve all of our original stated goals. All modes of transportation are safer as a result of the Project. The DDOT's 2026 post-implementation study of the 15th Street Bike Lane Project found that collisions in all transportation modes have decreased along this corridor. The DDOT study further showed that the Project reduced all roadway crashes by 46% and bicycle injury crashes by 91%. These crashes not only damage property; they also result in serious injuries and potentially death. The safety assessment is attached as Attachment 6 and the assessment's methodology as Attachment 7.

19. In addition to increasing public safety and health, the Project has become an essential part of residents' lives. As a result of the Project, every mode of transportation – including driving, transit, walking, and bicycling – operates through this corridor. The DDOT analysis found that it resulted in a 3% increase in bicycle traffic along the corridor. The study also showed that Capital Bikeshare stations along the corridor are among the most used in the system, with the Jefferson Street station seeing 232,658 Capital Bikeshare trip starts and ends since 2022.

20. The Project also improved the flow of traffic, fostering an expediency that residents rely on in their everyday routines. After the Project's implementation, speeds increased by 17%. Peak hour northbound travel time decreased by 36 seconds, while southbound travel time decreased by 40 seconds on the corridor.

21. Residents and WABA members have interests in reduced traffic congestion, efficient management of public lands, and expedient and secure transit experiences. These interests are directly tied to increased public safety, health, and quality of life in the D.C. metropolitan region.

22. In early February 2026, WABA members heard from contacts in the DOI and DDOT that the federal government was considering removing the bike lanes. On March 13, 2026, WABA sent a letter to NPS expressing concern that the change would endanger bicyclist safety and damage the regional bike network. The letter urged the agency to comply with its obligations under the APA, NCPA, NEPA, and NHPA to evaluate safety,

3

environmental, and historic impacts.  As of the date of this declaration, WABA has not received a response from NPS.  A copy of the letter is attached as Attachment 8.

23. On March 19, 2026, signs announcing imminent road closures and detours appeared on and around the part of 15th Street that crosses the National Mall.

24. On approximately March 20, 2026, according to two DDOT staffers and credible information given to WABA and another local bicycle group, WABA learned that NPS, with the assistance of the Federal Highway Administration, was expected to begin removal on March 23, 2026 of the 15th Street NW Bike Lane that goes through the National Mall. This information only became available to WABA and the public on March 20, 2026. WABA is not aware of any public explanation or justification for this removal beyond the brief statement that NPS submitted to *The 51st*, a publication that covers D.C. news.  "With the upcoming National Cherry Blossom Festival and preparations underway for America's 250th anniversary, ensuring safe access for residents, commuters, visitors, and emergency services is a shared priority.  These nationally significant events draw substantial visitation and require coordinated infrastructure planning to support mobility, security, and a positive experience for all," NPS wrote in its statement.  The article from *The 51st*, published on March 20, 2026, is attached as Attachment 9.  A *Washington Post* article containing similar reporting and the same statement, also published March 20, 2026, is attached as Attachment 10.

25. In the past, the government provided for public comments about the original bike lane construction through the NCPC.  It now has departed from these practices without any public explanation for the removal.  For the past installation, DDOT and NPS held two public meetings, conducted traffic studies, and received and addressed public comments. The agencies also submitted preliminary and final site development plans to the NCPC.

26. Removing these bicycle lanes threatens public safety and health.  Removing the bicycle lanes between Constitution Avenue and the Tidal Basin would increase conflicts between pedestrians, cyclists, and vehicles.  WABA and its members have similar safety concerns about removing the bicycle lanes in areas between Ohio Drive, SW and East Basin Drive. Pushing cyclists into traffic and crowded sidewalks risks their safety, as well as the safety of pedestrians and other travelers.

27. As major events occur during the National Mall's busy spring and summer season, including the National Cherry Blossom Festival and the Freedom250 celebrations, it is vital to maintain a safe traffic flow to accommodate the hundreds of thousands of visitors expected in D.C.  For at least the last three Cherry Blossom Festivals, the bike lanes have been installed and there are no incidents associated with them.  The Festival has highlighted the bike lanes as part of its transportation guidance—for D.C. residents and visitors alike. A festival guide illustrating ways to access the festival, including the 15th Street lanes, is attached as Attachment 11.

28. WABA members regularly use the bicycle lanes and WABA anticipates that they will continue to use them if they are not removed.  Some of our members will be forced to find

4

NPS-AR-001203