

# EXHIBIT B

NPS-AR-001333

**DECLARATION OF ALLISON FOSTER**

I, Allison Foster, declare as follows:

1. My name is Allison Foster, and I am the CEO of a non-profit organization that credentials public health professionals. I am a member of the Washington Area Bicyclist Association ("WABA"). I have been a member for six years and am on the Board of Directors. The statements made in this declaration are based on my personal knowledge and the information made available to me in my duties as a member of the Board.

2. I live in Arlington, Virginia.

3. I regularly travel to and from Washington, D.C. for both professional and personal reasons and have been doing so for years. The 15th Street Bike Lane is a prominent part of my commuting route from Arlington to D.C.

4. I regularly travel to and from D.C. for work to meet with regional and national organizations connected to my professional responsibilities. Bicycling into the city using the 15th Street Bike Lane provides me with a direct, practical, and safer route to reach meetings and other work-related events. The bike lane helps me navigate a very busy area of the city with greater separation from vehicle traffic. I also use the 15th Street Bike Lane as a Virginia resident traveling into D.C. for personal reasons, including visiting restaurants, theaters, and other destinations in the city.

5. In my experience, the 15th Street Bike Lane is valuable not only because it provides a north-south connection through a heavily traveled part of the city, but also because it makes bicycling feel safer and more feasible. Removing it would make my trips into D.C. more difficult and less safe. The removal would also discourage me from biking into the city as often for work and personal activities. Without the bike lane, I would travel into D.C. less frequently. If I did travel into the city, I have to choose between a significantly longer route, or risking my life by biking with cars on streets that do not have separated bike lanes. Because of that tradeoff, I would have to travel by car more frequently, which is much more expensive than biking.

6. The 15th Street Bike Lane serves important transportation needs for people like me who live outside of D.C. but regularly travel into the city. It is an important piece of infrastructure that I actively rely on personally and professionally. I regularly use the bicycle lanes and will continue to use them if they are not removed. I will be forced to find alternate routes and methods of transportation if they close. My burden will be exacerbated as the cherry blossom festival, which has brought increased traffic to the area, has begun.

7. I learned on March 22 that the government plans to extend the lane removal beyond the 15th Street corridor and include some portion of bike lanes that run along Ohio Drive, SW and East Basin Drive. I regularly bike on lanes in this area and would continue to bike there if they were not removed. Removing lanes in this area would make my transit into D.C. more dangerous and difficult. The removal would also force me

to find alternate means of transportation that are less safe, more time-consuming, and less convenient.

8.  If the protected bike lanes are removed, I would bike along the 15th Street sidewalks.  I expect to do this despite the dangers of biking on sidewalks without protected lanes because this route is vital to my ability to move around D.C.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and

correct.

Executed on March 26, 2026, in Washington, D.C.

_____

Allison Foster

NPS-AR-001335

# EXHIBIT C

NPS-AR-001336

## <u>DECLARATION OF NICHOLAS JOHNSON</u>

I, Nicholas Johnson, declare as follows:

1. My name is Nicholas Johnson, and I am employed as a Senior Fellow at the Institute on Taxation and Economic Policy.  The statements made in this declaration are based on my personal knowledge.

2. I live in Washington, D.C.

3. I have been a member of the Washington Area Bicyclist Association ("WABA") for at least 20 years and served on WABA's Board of Directors since 2021.

4. I use the 15th Street bicycle lanes nearly every day.  I use them to commute from my home in Southwest D.C. to my office near DuPont Circle.  I also use them to travel to other downtown destinations for recreation and on professional or personal business.

5. I usually ride my own bicycle, but sometimes I use a bicycle through Capital Bikeshare D.C.  I use the bicycle lanes at various hours throughout the day or and evening, including rush hour.

6. The 15th Street bicycle lanes are an essential part of the bicycle infrastructure in D.C.  They are the most important connector between Downtown D.C., as well as the Wharf and Southwest area.  I know they are also crucial for anyone traveling to Virginia via the 395 Bridge, the East Potomac Park and Hains Point, and the Jefferson Memorial.  I also observe many people use them on bicycles and scooters, including commuters, tourists, children, and adults.

7. The bicycle lanes are protected from traffic and therefore dramatically increase my safety as a cyclist.  There are many cyclists, pedestrians, cars, and buses that use 15th Street every day.  Physical separation from cars and buses, which the bicycle lanes provide, makes it much safer to ride bicycles on 15th Street.

8. The 15th Street bicycle lanes increase my willingness to commute and run errands on my bicycle because I know I can reach my destination more safely.  Since I feel safe biking, I am not driving my car or calling a rideshare vehicle, thereby reducing traffic congestion on 15th Street and beyond.  I have noticed an overall reduction in motor vehicle traffic in downtown areas, which I believe is due to the 15th Street bicycle lanes.

9. The bicycle lanes are particularly valuable to me during times of the year when the roads are very congested, such as during the National Cherry Blossom Festival, which is actively happening.  They allow me to safely coexist on the roadways with the many cars and buses that travel downtown.  They also encourage others to use non-vehicle forms of travel, making it easier for me to travel.

NPS-AR-001337

10. Removal of the bike lanes will worsen my quality of life, as well as threaten my safety and health. I will be less safe on a bicycle and reduce my use of a bicycle to reach my place of employment or complete errands. I also will be forced to rely more on other forms of transportation such as cars, which will contribute to traffic congestion. If the bike lanes are not removed, I would continue to regularly use them.

11. I learned on March 22, 2026 that the government intends to extend the lane removal beyond the 15th Street corridor to include some portion of bike lanes that run along Ohio Drive, SW and East Basin Drive. I regularly use the lanes in this area and would continue to bike there if they were not removed. Removing these lanes would make traveling to D.C. more dangerous for me. If the government removes these lanes, I will have to use other transportation methods that are more expensive, less convenient, and more time-consuming.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 23, 2026, in Washington, D.C.

Nicholas Johnson

2

NPS-AR-001338

# EXHIBIT D

NPS-AR-001339

<u>DECLARATION OF DAVID WACKER</u>

I, David Wacker, declare as follows:

1. My name is David Wacker. I am an airline pilot based out of Washington's National Airport (DCA).  The statements made in this declaration are based on my personal knowledge.

2. I am a member of the Washington Area Bicyclist Association.

3. I reside in Washington, DC.

4. I regularly commute between my home and DCA by bicycle, often carrying luggage for trips lasting between one and four days.  On occasion, I also transport my three-year-old daughter by bicycle along this same route.

5. Since their installation, the 15th Street bike lanes, and the connected bike lanes along Ohio Drive, SW and East Basin Drive, have fundamentally transformed my commute.  Before they existed, I was forced to choose between riding on crowded sidewalks, creating frequent and unsafe conflicts with pedestrians, particularly during large events such as the Cherry Blossom Festival, or riding in traffic alongside motor vehicles, where I was routinely subjected to aggressive and unsafe driver behavior.  Neither option provided a safe or reliable means of transportation.

6. The protected bike lanes created a dedicated, predictable space for bicycle travel.  This separation has significantly reduced conflict with both pedestrians and vehicles, improved safety for all users, and provided a reliable corridor through the city.  As a direct result, I have maintained a consistent and dependable commute and have not been late for a flight in over four years.

7. Reliability and risk reduction are not abstract concerns in my profession, they are essential.  As an airline pilot, I am trained to identify and mitigate hazards, particularly by maintaining separation between different types of traffic. This principle is foundational in aviation safety.  The 15th Street bike lanes apply that same principle on the ground by separating bicycles from pedestrians and motor vehicles.  Removing that separation would reintroduce known hazards and increase the risk of collisions and conflict.

8. The bike lanes also serve a broader public function.  They enable safe access to major public spaces, including the National Mall, support commuting by essential workers such as myself and others traveling to the airport, and foster a sense of community among users. I have personally met and regularly encounter fellow airport workers who rely on this infrastructure.

9. The removal of the 15th Street bike lanes, or the bike lanes along Ohio Drive, SW and East Basin Drive, would significantly degrade the safety and reliability of my commute.  It

1

NPS-AR-001340

would force me, and others, back into shared spaces with pedestrians or motor vehicles, increasing the likelihood of conflict, delay, and injury. It would also negatively impact my ability to report to work reliably, which has implications not only for me personally but for the traveling public I serve.

10. In my professional judgment, eliminating dedicated bicycle infrastructure in a high-traffic corridor is a step backward in safety. It replaces a proven, risk-reducing design with conditions that are demonstrably more dangerous..

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 25, 2026, in Washington, D.C.

_____
David Wacker

2

NPS-AR-001341

# EXHIBIT E

NPS-AR-001342

# <u>DECLARATION OF STEVEN R. BOUCHARD</u>

I, Steven R. Bouchard, declare as follows:

1. My name is Steven Bouchard, and I am a partner in a communications firm with a location in Alexandria, Virginia where I have lived for most of the last 27 years. The statements made in this declaration are based on my personal knowledge.

2. I am a member of the Washington Area Bicyclist Association ("WABA").

3. I live in Alexandria, Virginia.

4. I regularly travel to and from Washington, DC for a variety of reasons: professional meetings and events, personal meetings, including standing meetings on both Saturday and Sunday mornings, for volunteer activities, and for exercise and recreation.

5. When I travel in and out of DC, I use the 15th Street bike lanes (as well as the bike lanes on Ohio Drive, SW and East Basin Drive) whenever possible for not just convenience, as it is the quickest route between my home and the places to which I am traveling, but also specifically for safety. These lanes provide a very clearly defined delineation between motor vehicle traffic and bike traffic.

6. On the safety front, as someone who was riding on 15th Street prior to the installation of the bike lanes, I can say that travel without the lanes was unsafe to both me and to automobile drivers. I, and other cyclists sometimes slowed down traffic as it isn't always possible to keep pace. This caused a traffic flow problem behind me, and it irritated drivers. Drivers who are irritated with cyclists tend to speed up to hastily get around, and sometimes stop to yell, or to cut off cyclists very closely.

7. Vehicles making right hand turns off of 15th Street posed significant threat to cyclists prior to the installation of the bike lanes. Specifically, vehicles turning right onto Constitution Avenue, and at 15th and Independence Avenue.

8. Since the installation of the bike lanes and other cycling enhancements (bollards, better street signage and lights, the painting of the bike lanes) right hand turns no longer pose a threat as drivers clearly see where cyclists will be traveling, and the bollards prevent early turning.

9. Even the Intersection of 15th/Raoul Wallenberg and Maine has become significantly safer. Whereas vehicles used to make an illegal right hand turn of Wallenberg Place on to Maine, the introduction of the bike lanes make it virtually impossible to do so.

10. I have personally been nearly struck at each of the above intersections in the years prior to the bike lanes, and have had no problems since the installation of the lanes.

NPS-AR-001343

11. I often bring Virginia friends or friends from outside this region into DC on bikes. To a person they marvel at the quality, safety, and effectiveness of the 15th Street lanes. They find it to be a pleasurable and safe way to get into the city and to visit sites.

12. Based on my first-hand experience of using these lanes, I firmly believe removing these lanes would make cycling less safe, driving less safe, and will not make the vehicle traffic any quicker. Moreover, when I don't bike into the city, this route is my way out when driving as well, and the bike lanes have never been a problem in terms of speed, safety or congestion.

13. If these lanes are removed, I will likely continue to use the 15th Street/Ohio Drive/East Basin Drive route, but it will be in the road where necessary, or if allowed, on the sidewalk (which is incredibly dangerous to both pedestrians and myself).

14. I think the 15th Street and connected lanes could and should be used as a model for effective urban planning. They are a safe, reliable, practical, and attractive way to enable transportation on 15th Street by vehicles, bicycles, and on foot.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 25th, 2026, in Alexandria, Virginia

Steven Bouchard

2

NPS-AR-001344

# EXHIBIT F

NPS-AR-001345

## DECLARATION OF DAVID ALPERT

I, David Alpert, declare as follows:

1.  My name is David Alpert.  I am retired.  The statements made in this declaration are based on my personal knowledge.

2.  I am a member of the Washington Area Bicyclist Association.

3.  I reside in Washington, D.C.

4.  I regularly use the bicycle lanes on: 15th Street, NW; 15th Street, SW; Raoul Wallenberg Place, SW; Ohio Drive, SW; and East Basin Drive, SW ("15th Street Bike Lane Route"). I often bike three times per week in each direction to travel between my home and Arlington, Virginia to exercise at Movement Crystal City, as well as for other personal errands such as shopping and dining.

5.  The 15th Street Bike Lane Route provides me with a safe and practical route between D.C. and Arlington.

6.  When I do not travel by bicycle to Movement Crystal City, I use a personal car, which creates more pollution, costs money, and yields fewer personal fitness benefits.  The removal of the bike lanes and need to use a car in lieu of them diminishes my enjoyment of National Park Service ("NPS") land, including the National Mall and East Potomac Park.  Using cars also contributes to air pollution and greenhouse gas emissions, which threaten land preservation for my and others' future use.

7.  Before the construction of the 15th Street Bike Lane Route, I did not feel safe traveling by bicycle along this route.  When I traveled to Arlington, I did not typically consider bicycling to be a viable option.

8.  Years ago, I traveled along Maine Avenue northbound for a bicycle trip from D.C.'s SW Waterfront area.  This road segment, which is west of Raoul Wallenberg Place, SW has no sidewalks and no bicycle paths.  I was riding legally in the rightmost lane.  A police officer pulled up behind me and announced over the loudspeaker that I was not allowed to ride in this roadway.  To my knowledge, this officer was incorrect and I was allowed to ride in the roadway.  However, this experience made me feel unsafe riding in this area.

9.  I first learned on February 13, 2026 from a WABA email that the group suspected that NPS planned to remove some portions of the 15th Street Bike Route.  Removing any portion of the 15th Street Bike Route would make the trip more dangerous for me and others.

10.  Without a bike lane along East Basin Drive, traveling northbound across the George Mason Bridge would force me to ride on the sidewalk along the Tidal Basin, take a substantially longer western route, or avoid bicycling altogether.  Using the sidewalk would potentially interfere with pedestrians.  Neither route would be as safe or as convenient to me.  Removing the 15th Street Bike Lane Route would lead me to bike less

NPS-AR-001346

often for these trips and drive more instead, increasing my costs, reducing health benefits, and contributing to traffic congestion.

11. I would still bike along the 15th Street route, to some extent, even without the protected bike lanes. I expect to do this despite the dangers because of how important this route is to moving around the city.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 26, 2026, in Washington, D.C.

_____
David Alpert

2

# EXHIBIT G

NPS-AR-001348

## DECLARATION OF ASHWIN JAGANNATHAN

I, Ashwin Jagannathan, declare as follows:

1. My name is Ashwin Jagannathan. The statements made in this declaration are based on my personal knowledge.

2. I am a member of the Washington Area Bicyclist Association.

3. I reside in Washington, D.C.

4. I regularly bike throughout Washington, D.C. as a means of necessary transportation and for recreational purposes. I have not owned a car since 2017. I have my own bicycle and also use the Capital Bikeshare system to travel around the city.

5. The 15th Street bike lane has long been one of my favorites and most frequently used routes through the city, because it is convenient, fast, and safe. 15th Street runs through many parts of the city, including northwest D.C. near the U Street area and southwest D.C., closer to the monuments and the National Mall. It is an important and commonly used bike lane for residents and tourists. I regularly see people from all walks of life use the lane.

6. The most important feature of the 15th Street bike lane is that it is protected from traffic, which makes it much safer for cyclists than other routes through D.C. that lack this protective infrastructure. Simply painting on a bike lane does little to make me feel safe, but having physical separation from cars, like the 15th Street bike lane provides, takes human error out of the equation and actively prevents crashes from happening. This security makes me and many others feel much more comfortable biking. Even if it requires me to travel a longer physical distance, I often re-route my trips through the 15th Street bike lane because I know I will be protected from harm.

7. Protected bike lanes, like the one on 15th Street, also reduce traffic for drivers. Instead of having to share roads designed primarily for cars, the 15th Street bike lane allows drivers and cyclists to have their own spaces, reducing the likelihood of crashes for both people. Protected bike lanes also reduce congestion during busy events, including the National Cherry Blossom Festival, by incentivizing travelers to opt for safe and convenient alternatives to driving, such as cycling or public transportation.

8. Removing the 15th Street bike lanes will significantly reduce my quality of life, as well as that of the many riders who use them. The removal would subject me to greater risk of bodily harm while cycling, which I do for necessary transport. It is riskier to bike in areas that lack protected lanes, which is why I regularly re-route my trips through the 15th Street bike lanes. All of the alternate routes I would be forced to take if the lanes were removed would likely be less convenient and more dangerous.

9. I learned on March 22, 2026, that the federal government plans to remove bike lanes beyond 15th Street, including along Ohio Drive, SW and the East Basin Drive. I have also used these bike lanes and removing them would make traveling through those parts of D.C.

more dangerous and difficult.  I would continue to bike in these areas if these protected lanes were not removed.


Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.


Executed on March 26, 2026, in Washington, D.C.

*Ashwin Jagannathan*

Ashwin Jagannathan

NPS-AR-001350

# **EXHIBIT J**

NPS-AR-001351

## DECLARATION OF WILLIAM SCHULTHEISS

I, William Schultheiss, PE, declare as follows:

## BACKGROUND AND QUALIFICATIONS

1. My name is William Schultheiss.  I am the Director of Engineering at the Toole Design Group, a transportation planning, design, and engineering firm that specializes in multimodal roadway design, including roadways with protected bicycle facilities.  I have reviewed the District Department of Transportation's ("DDOT's") post-implementation analysis of the 15th Street, NW/SW Protected Bike Lane Project ("Project"), the Project's design history, and the physical conditions along the affected corridor.

2. I am also a 27 year resident of the District of Columbia, and a regular motorist, bicyclist and pedestrian within the project area.

3. I submit this declaration in support of Plaintiff's Motion for a Preliminary Injunction. The opinions expressed herein are my own professional judgments, based on my review of available data and my expertise in multimodal transportation engineering.

## I. CONTEXT

4. The affected corridor traverses one of the most heavily visited pedestrian environments in the United States.  The National Mall and Memorial Parks ("National Mall") unit receives approximately 24 million visitors annually.  The corridor passes directly through or adjacent to destinations including the Washington Monument, the World War II Memorial, the Korean War Veterans Memorial, the Martin Luther King Jr. Memorial, the Holocaust Museum, multiple Smithsonian Institution museums, the Jefferson Memorial, and the Tidal Basin.  The National Mall also serves as a critical destination for outdoor recreation, functioning as D.C.'s central public park and green space for residents and visitors.

5. This visitor population includes a significant number of users with mobility considerations, including veterans who travel to these memorials in wheelchairs and with mobility aids to honor their own service and that of fallen comrades.  The visitor population also includes families with young children, elderly visitors, and international tourists who are unfamiliar with local traffic patterns.  The corridor also serves as a recreational and commuter route for cyclists and pedestrians of all abilities, including disabled cyclists and veterans who rely on adaptive cycles.  This pedestrian and mobility context is not incidental to the safety analysis—it is central to it.

## A SET OF CASES THE EXISTING ANALYSIS

6. DDOT's 2026 before-and-after evaluation—drawing on crash data from January 2017 through December 2019 (the time period before the Project's construction) and March 2022 through October 2025 (the time period after the Project's construction)—found that

1

NPS-AR-001352

the protected bike lane produced improvements in three key areas: motor vehicle operations, pedestrian safety, and bicycle safety.

## I  I          T      EHI    E    E  ATI      I          E

7. Following installation, vehicle speeds on the corridor increased by 17% and peak-hour travel times decreased by up to 49 seconds.  In my professional opinion, these gains are directly attributable to the reduction in pre-merge conflict along the approach to I-395.

8. The corridor between Maine Avenue and the 14th Street Bridge carried three southbound lanes pre-construction, which the installation of the protected bicycle facility reduced two lanes.  The corridor between Pennsylvania Avenue and Maine Avenue carried two southbound through lanes pre-construction, which the installation reduced to one through lane.  In both segments, the remaining through lanes converge to a single lane at the same I-395 highway entrance, compounding the fixed capacity constraint shared across all approach corridors.  This severe geometric constraint is a well-documented source of aggressive pre-merge behavior.  Drivers anticipating the bottleneck accelerate and execute repeated lateral lane changes in the approach blocks, competing for positions before capacity is eliminated.  Critically, this behavior produces no benefit to overall throughput.  The number of vehicles that can enter I-395 is fixed by the single-lane constraint regardless of approach speed or lane position.

9. The pre-installation crash record on this corridor reflects the predictable consequence of that dynamic—elevated rates of sideswipe, rear-end, and turn conflicts generated by vehicles operating at speed differentials in a constrained approach zone.  The lane reductions directly diminished the volume of lateral lane-change maneuvers in the pre-merge zone on both segments.  The corridor became more orderly and efficient for motor vehicles precisely because the incentive and opportunity for unproductive pre-merge competition was reduced.

10. Removal of the protected lane would restore the pre-installation approach geometry on both segments and, with it, the conditions that degraded motor vehicle operations and produced the pre-installation crash pattern.  In my professional opinion, the claim that removal of the protected lane would improve motor vehicle operations is not supported by the available data.  The data indicates the opposite.

11. The motor vehicle capacity argument for removal is further undermined by the geometry of the broader corridor.  14th Street, SW runs parallel to 15th Street and Raoul Wallenberg Place, and all motor vehicle traffic on both roads is destined for the same I-395 entrance. 14th Street currently operates as a motor vehicle priority corridor with three through southbound lanes and three through northbound lanes, constituting six lanes of capacity serving the identical destination.  In my professional opinion, restoring one travel lane on 15th Street and Raoul Wallenberg Place would provide no meaningful increase in motor vehicle access to I-395 because the constraint is the highway entrance itself, which is shared across both parallel approach corridors.  The pre-merge competition that produced elevated crash rates on the project corridor occurs in the context of this existing parallel

2

capacity—further evidence that the lane reductions on 15th Street and Raoul Wallenberg Place improved operations by reducing unproductive conflict rather than restricting throughput.

I. I.   E ET IA  A ET I   E

12. The protected lane produced substantial safety gains for pedestrians across the full length of the corridor.  According to DDOT's evaluation per 100 days, pedestrian crashes declined by 25% and pedestrian injury crashes declined by 67%.

13. Given the corridor's visitor volumes and user mix described above—including veterans, tourists, families, and mobility-impaired users—these figures represent a meaningful reduction in harm to some of the most vulnerable road users in D.C.  The sidewalks along the corridor are heavily used throughout the day by visitors moving between memorials, museums, transit stops, and parking areas.

14. In my professional opinion, these improvements are a direct consequence of the operational clarity the protected facility introduced.  By providing cyclists with dedicated and physically separated infrastructure, the lane removed cyclists from the sidewalk environment and eliminated a significant source of pedestrian conflict along the full corridor.  Removal of the facility would displace cyclists back onto those sidewalks, directly reversing the safety gains documented above.

15. The consequences of removing the protected bike lane would be particularly challenging on the segment between Independence Avenue, SW and the 14th Street Bridge, where visitor access to the Tidal Basin memorials generates persistently high pedestrian densities.  The existing sidewalks along this stretch are of insufficient width to safely accommodate the current volume and mix of users, which includes a significant population of wheelchair users and individuals using mobility aids—among them disabled veterans visiting the memorials that honor their service and that of fallen soldiers.  Introducing cyclists displaced from the roadway would further reduce the effective clearance available to these users, creating foreseeable conflicts and increasing the risks of falls and injuries for a population that is disproportionately vulnerable to serious harm from such incidents.  A similar challenge exists between Pennsylvania Avenue, NW and Independence Avenue, SW, where high pedestrian volumes generated by the museums, monuments, and federal buildings along that segment create comparable conditions.

16. The removal of the protected bike lane within the segment between Independence Avenue, SW and the 14th Street Bridge presents elevated motor vehicle conflict risks, as described above in paragraphs eight through 11.  The protected lane provides a physical buffer between the high-speed pre-merge vehicle activity and the sidewalk environment.  Its removal would eliminate that buffer, reducing the margin of safety for pedestrians, including disabled users, near the most active motor vehicle conflict zone on the corridor.  Bicyclists who remain in the roadway rather than the sidewalk would face comparable risks.  This segment attracts a significant number of recreational and tourist cyclists, including Capital Bikeshare users accessing the memorials and Tidal Basin, many of whom

3

NPS-AR-001354

are likely less experienced with bicycling in urban conditions.  Without the protected lane, these users would be exposed to the high-speed merge dynamics described above in paragraphs eight through 11, increasing the likelihood of bicycle-vehicle conflicts for an inexperienced riding population.

I  I  BI  E  A  ET  I  E

17. The protected lane produced significant safety improvements for cyclists.  According to DDOT's evaluation per 100 days, bicycle crashes declined by 69%, bicycle injury crashes declined by 91%, and fixed-object crashes were eliminated entirely.

18. These results are consistent with the established body of research on protected bicycle facilities.  Physical separation between cyclists and motor vehicles reduces conflict points and crash severity.  Bicycle volumes along the corridor have increased since 2021.  In my professional opinion, a higher number of cyclists operating without physical protection from motor vehicles would increase the frequency of potential conflict points beyond those observed in the pre-installation period.

19. The sidewalks along this corridor are lined with bollards, which were installed as counterterrorism security measures to protect the federal buildings and monuments along the route.  Removing bicyclists from the sidewalk environment eliminates their exposure to these fixed objects, a likely contributing factor to the complete elimination of fixed-object crashes documented in DDOT's post-installation evaluation.

E  A  A  H  E

20. Across all modes, DDOT's before-and-after evaluation documents the following per 100 days, all roadway crashes declined by 46%, from approximately 11% to 5.9%.  Injury crashes also declined by 52%, from 2.7% to 1.3%.

E  I  A  I  I  A  ET  I  E  A

21. It is my professional opinion that the removal of the protected lanes would most likely result in crash rates returning to or exceeding the pre-installation levels across all modes. The above findings are not independent: the protected lane simultaneously improved motor vehicle operations, cleared the sidewalk environment for pedestrians throughout the corridor, and separated cyclists from traffic.  Removal would reverse all three effects at once.

22. Specifically: the corridor would return to pre-installation approach geometry on both segments, restoring the conditions for unproductive pre-merge speed and lateral conflict. Cyclists would be displaced onto sidewalks that already operate beyond a safe capacity for their existing users, including disabled veterans and mobility-impaired visitors.  The physical buffer between high-speed merge activity and the pedestrian zone would be eliminated.

4

NPS-AR-001355

23. The stated justification for the removal, improving motor vehicle operations, directly contradicts the data.  It is further undermined by the existence of 14th Street, SW as a parallel six-lane motor vehicle priority corridor serving the identical I-395 destination.  In my professional opinion, removing the facility—particularly without a safety analysis, an alternatives assessment, or a public process—would foreseeably degrade motor vehicle operations and increase the collision risks for pedestrians and cyclists, including disabled veterans and mobility-impaired users.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 26, 2026, in Washington, D.C.

William Schultheiss, PE

5

NPS-AR-001356



U.S. DEPARTMENT OF TRANSPORTATION
FEDERAL HIGHWAY ADMINISTRATION
EASTERN FEDERAL LANDS HIGHWAY DIVISION
STERLING, VIRGINIA

**NATIONAL MALL AND MEMORIAL PARKS**

# TRAFFIC CONTROL PLAN
## TOTAL CLOSURE LAYOUTS
### EAST BASIN DRIVE SOUTHBOUND

Sheet 1 of 2

NPS-AR-001357

NO SCALE

**U.S. Department of Transportation**

**Federal Highway Administration**

# Memorandum

| | |
|---|---|
| Subject: **INFORMATION:** Analysis of 15th Street NW/SW bike lane between Pennsylvania Avenue and Maine Avenue | Date: March 31, 2026 |
| From: David R. Winter, P.E. | In Reply Refer To: |
| Director, Office of Highway Policy (HPPI) Information | HPPI |
| To: File | |

An internal review by the FHWA, Office of Highway Policy Information, that included the FHWA statistician and several engineers, regarding the District Department of Transportation (DDOT) 15th St NW/SW Protected Bike Lane Post-Implementation Analysis has identified significant methodological flaws. The report's claim of a "46% reduction in all crashes" is mathematically unsupported. The study relies on raw crash frequencies rather than standard, volume-and-distance-adjusted rates. Furthermore, it fails to account for city-wide post-pandemic traffic reductions, ignores potential traffic diversion to adjacent routes, and entirely omits the necessary multi-modal exposure rates required to evaluate a bicycle facility.

## 1. Failure to Account for the Shift in Telework and Corridor Length

**The Issue:** The DDOT report highlights crash reductions using a "per 100 day" metric (a raw frequency count over time). The "per 100 days" metric is very unusual as the typical denominator is Miles Traveled or Trips occurred. For example, 3 events per 100 million miles traveled or 3 events per 1 million trips occurred.

**Statistical Assessment:** The "Before" data is from 2017–2019 (pre-pandemic), while the "After" data spans 2022–2025. Because the before and after periods have different lengths, the researchers normalize the safety measures by dividing by the number of 100-day periods. From an evaluation perspective, before-after designs have many potential threats that may affect the validity of the results. One is a failure to account for the impact of the pandemic on transportation. Because D.C. experienced a massive shift toward telework during this timeframe, there were simply fewer cars on the road. The decrease in vehicle volume is likely a strong contributor to the drop in raw crashes. The number of days used as the denominator does not account for travel behaviors changes and is not the correct exposure measure.

NPS-AR-001358

To prove a continuous corridor is inherently safer, crashes must be normalized against both traffic volume and distance. The standard traffic engineering metric for a corridor is Crashes per 100 million Vehicle Miles Traveled (VMT). By relying on raw time frequencies (and incorrectly displaying intersection-style "Entering Vehicle" metrics elsewhere on their dashboard), the analysis appears to fail to capture actual driver exposure. If traffic VMT dropped by a larger percentage than the crash frequency, the actual mathematical risk of an accident per mile driven may have increased.

## 2. Unmeasured Cyclist Exposure

**The Issue:** Evaluating the safety of a Protected Bike Lane primarily using motor vehicle metrics or simple timeframes is fundamentally incomplete.

**Statistical Assessment:** The report boasts a 69% reduction in bicycle crashes per 100 days. However, to determine if the route is genuinely safer for the vulnerable road users it was built for, crashes must be normalized against bicycle volumes (e.g., Cyclist Crashes per 100,000 Cyclist Miles or per 10,000 Bike Trips). While the report briefly notes a 3% increase in bike traffic, it fails to calculate a true, volume-adjusted rate for cyclists. Without this multi-modal link, the safety claims lack proper context.

## 3. Failure to Account for Global City-Wide Trends

**The Issue:** The study utilizes a before-after evaluation design without a control group or comparison corridor, making it impossible to establish a counterfactual and isolate the bike lane's specific effects.

**Statistical Assessment:** A baseline assessment of global D.C. trends shows that crashes went down across the entire city during this exact timeframe. D.C. reported roughly 25,700 crashes a year from 2017–2019, dropping to about 23,000 crashes a year from 2022–2025. This city-wide ~10% decrease is related to the reduction seen on 15th Street, independent of the bike lane implementation.

## 4. Omission of Raw Data

**The Issue:** The public dashboard heavily promotes percentage reductions but fails to provide the actual case counts.

**Statistical Assessment:** The study likely suffers from a small sample size (N) problem, where large percentage shifts are driven by very small changes in absolute numbers. If the total number of crashes is small (under 100), the statistical validity of these large percentage claims cannot be properly assessed without analyzing the underlying raw data.

## 5. Failure to Analyze Traffic Diversion on Adjacent Routes

**The Issue:** The study isolates 15th Street from the broader transportation network, failing to examine traffic trends on adjacent routes to determine where displaced vehicle traffic may have gone. Altering the design and traffic flow on an urban corridor frequently diverts

vehicles to adjacent streets. Without evaluating these parallel routes, the study cannot definitively conclude whether the project reduced overall crash risk or simply shifted crashes and congestion to other parts of the grid (the network spillover effect).

**Traffic Analysis:** The Highway Performance Monitoring System (HPMS) data submitted by DDOT to the FHWA (see table below) indicates that while the 15th Street project site shows a 43% reduction in measured Annual Average Daily Traffic (AADT) between 2019 and 2024, parallel traffic on 17th Street also experienced reductions ranging from 6% to over 18% between that same period. Additionally, the segment of 16th Street north of the project shows a 30% reduction. These surrounding trends suggest that the benefits attributed specifically to the 15th Street project may be overly optimistic. If the project used Vehicle Miles Traveled as the denominator for exposure, the lowering of the crash rate attributed to the project is most likely all wiped out.

Furthermore, traffic on New York Avenue and Pennsylvania Avenue decreased by 47% and 50%, respectively. Conversely, Constitution Avenue and F Street experienced substantial growth within the project vicinity, ranging from 74% to -36%. These shifts demonstrate a fluid traffic distribution pattern resulting from new constraints and varying demand scenarios.

| HPMS ID | Street Name (Project and Adjacent) | 2019 AADT | 2023 AADT | 2023 Change from 2019 | % 2023 Change from 2019 |
|---|---|---|---|---|---|
| 11001502 | 15th (the project) | 16,856 | 9,734 | -7,122 | -42.3% |
| 11001402 | 16th Street | 7,581 | 5,343 | -2,238 | -29.5% |
| 11001702 | 17th St (Constitution to E) | 18,772 | 15,323 | -3,449 | -18.4% |
| 11001702 | 17th St (E to H street) | 24,829 | 19,650 | -5,179 | -20.9% |
| 11025352 | Constitution Avenue | 16,432 | 29,673 | 13,241 | 80.6% |
| 11034382 | F Street | 11,384 | 7,294 | -4,090 | -35.9% |
| 11042442 | H Street | 16,143 | 11,677 | -4,466 | -27.7% |
| 11064672 | New York Avenue | 12,897 | 11,108 | -1,789 | -13.9% |
| 11069812 | Pennsylvania Ave | 9,756 | 4,876 | -4,880 | -50.0% |

| HPMS ID | Street Name (Project and Adjacent) | 2019 AADT | 2024 AADT | 2024 Change from 2019 | % 2024 Change from 2019 |
|---|---|---|---|---|---|
| 11001502 | 15th (the project) | 16,856 | 9,644 | -7,212 | -42.8% |
| 11001402 | 16th Street | 7,581 | 5,343 | -2,238 | -29.5% |
| 11001702 | 17th St (Constitution to E) | 18,772 | 15,323 | -3,449 | -18.4% |
| 11001702 | 17th St (E to H street) | 24,829 | 23,358 | -1,471 | -5.9% |
| 11025352 | Constitution Avenue | 16,432 | 28,644 | 12,212 | 74.3% |
| 11034382 | F Street | 11,384 | 7,294 | -4,090 | -35.9% |
| 11042442 | H Street | 16,143 | 13,247 | -2,896 | -17.9% |

NPS-AR-001360

| 11064672 | New York Avenue | 12,897 | 6,876 | -6,021 | -46.7% |
| 11069812 | Pennsylvania Ave | 9,756 | 4,876 | -4,880 | -50.0% |

**Conclusion**

The DDOT study's methodology is significantly compromised by its failure to utilize standard corridor exposure metrics (VMT) and multi-modal trip rates. Comparing unadjusted crash counts from 2017 to 2025 without a control group makes it impossible to validate the stated safety improvements against overarching post-pandemic traffic shifts and network-wide traffic diversions.



## Eastern Federal Lands Highway Division
## Re-Evaluation

| | | |
|---|---|---|
| **Project Number:** | 15th Street Cycle Track Removal and road repaving | **Date:** 3/31/2026 |
| **Project Name:** | 15th Street Cycle Track Removal and road repaving | |
| **Location:** | National Park Service, National Mall and Memorial Parks<br>District of Columbia, DC | |
| **CE Category** | 23 CFR 771.117(c)(26): Modernization of a highway by resurfacing, restoration, rehabilitation, reconstruction, adding shoulders, or adding auxiliary lanes (including parking, weaving, turning, and climbing lanes), if the action meets the constraints in paragraph (e)[..] | |

See 23 CFR 771.117 for full description of CE categories, including additional requirements when applying (c)26-28.

In accordance with 23 CFR 771.129, FHWA has evaluated proposed changes to the 15th Street Cycle Track Removal and Road Repaving Project and associated impacts, to determine if FHWA's NEPA decision remains valid. On February 27, 2026, FHWA determined that the 15th Street Cycle Track Removal and Road Repaving Project could be categorically excluded, relying on 23 CFR 771.117(c)(26). The February CE Form was issued on the assumption that the project would start on or around that date. Since that form was signed, the project was delayed. The February CE Form assumed that all work would be completed prior to the National Cherry Blossom Festival, or would not interfere with the National Cherry Blossom Festival, which has already begun and will run through April 12, 2026. The project is now anticipated to begin on April 23, 2026, and to conclude by May 14, 2026. Also, since the February CE Form was issued, the National Park Service (NPS) reevaluated its NEPA decision given the revised window for work.  FHWA's reevaluation also considered NPS's updated categorical exclusion documentation issued March 31, 2026.

FHWA has reanalyzed the impacts of the project given the revised work window and has determined that continuing to rely on 23 CFR 771.117(c)(26) is appropriate.  The project scope has not changed; the work still consists of removing existing cycle-track and bicycle-related traffic control features and restoring the roadway to a conventional lane configuration within the existing curb lines along three segments—15th St NW / Raoul Wallenberg Pl SW (Constitution

Page **1** of **2**
EFLHD NEPA Categorical Exclusion Form                                                    EFL-TM-ENV-03(04)
15th Street Cycle Track Removal and road repaving

NPS-AR-001362



**Eastern Federal Lands Highway Division
Re-Evaluation**

Ave NW to Maine Ave SW), Maine Ave SW (15th St NW to Ohio Dr SW/East Basin Dr SW—southbound), and Ohio Dr SW/East Basin Dr SW (Maine Ave SW to the Jefferson Memorial Food Kiosk— southbound). As stated in the NPS CE and confirmed by FHWA, the project will be implemented using standard traffic-control methods (lane shifts, short-duration lane closures, and/or off-peak work) to maintain traffic circulation and emergency access through the corridor. Any temporary restrictions needed to complete the work will be limited in duration and extent and are not anticipated to result in major traffic disruptions.

According to NPS, shifting work to April 23-May 14, 2026 means the work will now be completed "in the early peak visitor/event season and immediately ahead of the planned U.S. Semiquincentennial (250th) special events period (mid-May through August 2026)."  NPS determined that the selected three weeks represent the best window of time to complete this work before the 250th special events period for the reasons stated in its CE.  FHWA believes that the phased work can be completed from April 23-May 14, 2026 and will work with NPS to mitigate impacts on traffic and emergency access during this higher visitation period.

**KEVIN S ROSE**   Digitally signed by
KEVIN S ROSE
Date: 2026.03.31
15:54:26 -04'00'

_____          _____
Kevin S. Rose                                                                       Date
Environmental Team Leader
Eastern Federal Lands Highway Division
Federal Highway Administration

Page **2** of **2**
EFLHD NEPA Categorical Exclusion Form                                    EFL-TM-ENV-03(04)
15th Street Cycle Track Removal and road repaving

NPS-AR-001363



**National Park Service**
**U.S. Department of the Interior**

**National Mall and Memorial Parks**

# Categorical Exclusion Documentation Form (CE Form)

**Project:** 15th Street Cycle Track Removal and road repaving

**PEPC Project Number:** 134934

**Description of Action (Project Description):** The work consists of removing existing cycle-track and bicycle-related traffic control features and restoring the roadway to a conventional lane configuration within the existing curb lines along three segments—15th St NW / Raoul Wallenberg Pl SW (Constitution Ave NW to Maine Ave SW), Maine Ave SW (15th St NW to Ohio Dr SW/East Basin Dr SW—southbound), and Ohio Dr SW/East Basin Dr SW (Maine Ave SW to the Jefferson Memorial Food Kiosk—southbound)—including removal of cycle track barriers/delineator posts and anchor bolts with restoration of resulting voids; milling and overlaying asphalt within curb faces to a maximum treatment depth of $\leq 4$ inches; grinding/removing existing pavement markings within concrete bus laybys; removing bicycle signal faces and retiming/rephasing traffic signals as needed; removing bicycle route signage and installing new signage (and striping transitions) at the north and south project limits to safely transition bicyclists; and restriping the corridor to a typical cross-section of two northbound lanes and two southbound lanes (plus turn lanes where feasible), with crosswalk markings replaced in-kind on asphalt and new stop bars and lane-use arrows installed at intersection approaches as warranted.

The impacts of this project were previously reviewed and documented in a CE Form signed on February 23, 2026. The February CE Form considered the impacts of the project based on the assumption that it would start on or around that date. Since that form was signed, the project was delayed. The February CE Form assumed that all work would be completed prior to the National Cherry Blossom Festival, or would not interfere with the National Cherry Blossom Festival, which has already begun and will run through April 12, 2026. The project is now anticipated to begin on April 23, 2026, and to conclude by May 14, 2026. In this CE Form, the NPS is reanalyzing the impacts of the project given this revised window for work activity, which will occur in advance of a number of special events celebrating the 250th birthday of the United States, beginning in mid-May 2026 and lasting through August 2026, at which the NPS expects significant attendance.

Shifting work from the pre–National Cherry Blossom Festival window assumed in the February CE Form to an April 23–May 14, 2026  work window changes the impact context primarily by moving the work into the early peak visitor/event season and immediately ahead of the planned U.S. Semiquincentennial (250th) special events period (mid-May through August 2026). With the Festival underway (through April 12, 2026), the revised window avoids direct overlap with Cherry Blossom Festival events, but it increases the likelihood of higher baseline traffic volumes, tour activity, and pedestrian/bicycle demand than typical shoulder-season conditions. The revised schedule also tightens the buffer between completion and the start of major 250th-related events. The NPS will work with the Federal Highways Administration to mitigate impacts during this higher visitation period.

This proposed project supports implementation of Executive Order 14252, "Making the District of Columbia Safe and Beautiful," Secretarial Order 3428 "Making the District of Columbia Safe and Beautiful," and Executive Order 14189 "Celebrating America's 250th Birthday." The upcoming events celebrating America's 250th birthday (beginning in mid-May and lasting through August 2026) will bring large numbers of Americans and international visitors to the National Mall, parks in the National Capital Region, and Washington, D.C., in general.

The proposed project will also improve the visual quality of these prominent federal public spaces through removal of roadway appurtenances and restoration of a standardized, maintainable corridor configuration. Improvements made in anticipation of nationally significant events celebrating the America's 250th birthday will also benefit future visitors to the National Mall and Memorial Parks.

**Project Location:**
**County, State:** District of Columbia, DC

**Mitigation(s):**
There are no required mitigations identified.

**CE Citation:** 516 Departmental Manual 1, DOI NEPA Handbook, Appendix 2, 16.1(G)(5) (Feb. 2026).
Modernization of a highway by resurfacing, restoration, rehabilitation, reconstruction, adding shoulders, or adding auxiliary lanes (including parking, weaving, turning, and climbing lanes), if the actions meet the constraints below. Actions may not be processed as CEs if they involve:

1.  An acquisition of more than a minor amount of right-of-way or that would result in any residential or non-residential displacements;
2.  An action that needs a bridge permit from the U.S. Coast Guard, or an action that does not meet the terms and conditions of a U.S. Army Corps of Engineers nationwide or general permit under section 404 of the Clean Water Act and/or section 10 of the Rivers and Harbors Act of 1899;
3.  A finding of "adverse effect" to historic properties under the National Historic Preservation Act, the use of a resource protected under 23 U.S.C. 138 or 49 U.S.C. 303 (section 4(f)) except for actions resulting in *de minimis* impacts, or a finding of "may affect, likely to adversely affect" threatened or endangered species or critical habitat under the Endangered Species Act; *de minimis* impacts, or a finding of "may affect, likely to adversely affect" threatened or endangered species or critical habitat under the Endangered Species Act;
4.  Construction of temporary access or the closure of existing road, bridge, or ramps that would result in major traffic disruptions;
5.  Changes in access control;
6.  A floodplain encroachment other than functionally dependent uses (e.g., bridges, wetlands) or actions that facilitate open space use (e.g., recreational trails, bicycle and pedestrian paths); or construction activities in, across or adjacent to a river component designated or proposed for inclusion in the National System of Wild and Scenic Rivers.

Actions may be designated as CEs only after documentation demonstrates that the specific conditions or criteria for these CEs are satisfied, and that significant environmental effects will not result. If the action triggers a constraint (1)-(6) above, the CE can still be applied if the documentation demonstrates that the action fits within the CE and significant environmental effects will not result.

**CE Justification:** Based on the limited scope, confined limits of disturbance, and use of standard resurfacing and traffic-control methods, the action fits DOI CE 16.1(G)(5), formerly numbered as 12.6(13), and, as documented below, does not trigger any of the constraints of the CE such that significant environmental effects would be expected.

1.  **An acquisition of more than a minor amount of right-of-way or that would result in any residential or non-residential displacements**

    All work is confined to the existing paved roadway area within existing curbs. No new right-of-way is needed and no acquisitions are proposed. The action does not require relocation of residences or businesses and does not change adjacent land uses.

2.  **An action that needs a bridge permit from the U.S. Coast Guard, or an action that does not meet the terms and conditions of a U.S. Army Corps of Engineers nationwide or general permit under section 404 of the Clean Water Act and/or section 10 of the Rivers and Harbors Act of 1899**

    The action is roadway surface work and traffic-control equipment removal/adjustment within an existing roadway, with no bridge work and no in-water work. No dredge/fill discharge to waters of the U.S. is proposed and no structures are proposed in navigable waters.

3.  **A finding of "adverse effect" to historic properties under the NHPA, the use of a resource protected Section 4(f)) except for actions resulting in de minimis impacts, or a finding of "may affect, likely to adversely affect" threatened or endangered species or critical habitat under the Endangered Species Act**

    NHPA -  The project removes appurtenant features (barriers, delineators, bicycle signal faces, bicycle signs), restores the roadway surface, and restripes within the existing paved roadway. As detailed in the February 23, 2026 "Assessment of Actions Having an Effect on Historic Properties," the project will have "No Adverse Effect" on historic properties.

Section 4(f) - The action is within an existing transportation facility and does not convert parkland to transportation use; it changes lane configuration/operations on existing roadway pavement.

ESA - The action is within an existing transportation facility and does not convert existing habitat to transportation use. As a resurfacing/striping/signals action within existing roadway, there are no effects on threatened or endangered species or critical habitat.

4. **Construction of temporary access or the closure of existing road, bridge, or ramps that would result in major traffic disruptions**

The proposed action is confined to the existing roadway prism and will be implemented using standard paving and traffic-control methods (lane shifts, short-duration lane closures, and/or off-peak work) to maintain traffic circulation and emergency access through the corridor. Any temporary restrictions needed to complete resurfacing, striping, and signal work would be limited in duration and extent, would not require construction of temporary access routes, and would not involve closure of a road, bridge, or ramp in a manner that causes major traffic disruptions.

5. **Changes in access control**

The action does not introduce access control features such as new medians restricting turning movements, new gates, restricted-access designation, or conversion to controlled-access facility. It is operational striping/signal timing within the existing roadway.

6. **A floodplain encroachment**

The work is confined to an existing roadway prism. If any portion of the roadway is within a mapped floodplain, resurfacing within the existing footprint is typically treated as maintenance of an existing functionally dependent facility (transportation infrastructure) and does not create a new encroachment. No work is proposed in or across a designated/proposed Wild & Scenic River segment.

**Extraordinary Circumstances:**

| If implemented, would the proposal... | Yes/No | Explanation |
|---|---|---|
| **A.** Have significant impacts on public health or safety? | No | Removal of the separated bicycle facility will have an operational effect on bicyclists, including a change in facility type and user experience on a corridor that has been documented as carrying more than 2,000 bicycle users per day. However, this change will not result in significant impacts on public health or safety because cyclists will continue to have the choice to ride on either the roadway or the adjacent sidewalks, consistent with Section 3(i)(i)(A) of the National Mall and Memorial Parks Superintendent's Compendium (Jan. 13, 2026), available at https://www.nps.gov/nama/learn/management/superintendent-s-compendium.htm. As a result, cyclists will continue to have a route to travel through the project area outside the motor vehicle roadway. Cyclists who prefer to ride in the roadway instead of on the sidewalk will be able to do so.<br><br>The proposed project will not have other significant impacts on public health or safety because it is confined to the existing roadway prism and consists of resurfacing/rehabilitation and traffic-control changes (striping, signing, and signal adjustments) without expanding the transportation footprint or inducing land use change. The project includes traffic-control measures, clear transition signing/markings at the project termini, and coordination with the local transportation agency to maintain bicycle accommodation and manage operational transitions. With these measures, the action is not expected to cause significant environmental impacts or constitute an extraordinary circumstance. |

| If implemented, would the proposal... | Yes/No | Explanation |
|---|---|---|
| | | The project does not eliminate bicycle travel in the corridor; it changes the facility type. NPS will implement transition signing/markings and will monitor operations after implementation and adjust striping/signals as warranted to address observed operational issues. |
| **B.** Have significant impacts on such natural resources and unique geographic characteristics as historic or cultural resources; park, recreation or refuge lands; wilderness areas; wild or scenic rivers; national natural landmarks; sole or principal drinking water aquifers; prime farmlands; wetlands; floodplains; national monuments; migratory birds; and other ecologically significant or critical areas? | No | The proposed work is confined to the existing curb-to-curb roadway prism and consists of removing existing cycle track appurtenances (barriers/delineators and anchor bolts), resurfacing (mill-and-overlay, with a stated maximum treatment depth), restriping, and related signal/sign removals/adjustments. Because the project does not expand the roadway footprint, does not involve new ground disturbance outside the paved section, and does not propose in-water work, effects to the listed resource categories are expected to be temporary, localized, and not significant. |
| **C.** Have highly uncertain and potentially significant environmental effects or involve unique or unknown environmental risks? | No | These are standard, well-understood roadway activities with predictable, short-term effects (temporary work noise, dust, traffic control, and material handling) and established best management practices. The action does not introduce new technology, new access routes, in-water work, excavation beyond the stated pavement treatment depth, or expansion into undeveloped areas that would create unknown risk pathways. The action will revert the roadway to pre-2021 conditions. |
| **D.** Establish a precedent for future action or represent a decision in principle about future actions with potentially significant environmental effects? | No | It does not approve, commit, or predetermine any broader transportation program, corridor-wide redesign, roadway expansion, or land use change. Any future transportation or multimodal changes in the memorial core would require their own purpose-and-need, design development, and separate compliance review based on the specifics of those proposals and their potential effects. |
| **E.** Have a direct relationship to other actions that implicate potentially significant environmental effects? | No | While the project is being coordinated with routine roadway preservation and near-term work scheduling in the vicinity, those activities are of the same general type (pavement rehabilitation/traffic control) and do not constitute a larger connected action that would trigger or depend on a separate action with potentially significant effects. The removal and resurfacing action has independent utility and does not rely on, commit the agency to, or predetermine any broader transportation program, footprint expansion, or land-use change. |
| **F.** Have significant impacts on properties listed, or eligible for listing, on the National Register of Historic Places as determined by the bureau? | No | The project occurs in a historically sensitive setting; however, it is confined to the existing curb-to-curb roadway prism and consists of removal of existing cycle track appurtenances with surface restoration, mill-and-overlay resurfacing (limited to the specified maximum depth), restriping, and minor signal/sign adjustments. The project will restore the roadway to its previous condition before the cycle track was installed in 2021. The action does not expand the roadway footprint or disturb areas outside the existing paved facility. Section 106 documentation is completed for this undertaking; with a finding of no adverse effect. |
| **G.** Have significant impacts on species listed, or proposed to be listed, on the List of Endangered or Threatened Species or have | No | The project does not include vegetation clearing, tree removal, habitat conversion, excavation outside the paved roadway section, or in-water work. Because effects are limited to temporary disturbances (noise, equipment presence, localized dust) within an already developed roadway, the action is not |

NPS-AR-001367

| If implemented, would the proposal... | Yes/No | Explanation |
|---|---|---|
| significant impacts on designated Critical Habitat for these species? | | anticipated to adversely affect listed/proposed species or designated critical habitat, and significant impacts are not expected. |
| **H.** Significantly limit access to and ceremonial use of Indian sacred sites on Federal lands by Indian religious practitioners or significantly adversely affect the physical integrity of such sacred sites? | No | The project does not expand the transportation footprint, does not involve ground disturbance outside the paved roadway, and does not change public access to adjacent park areas beyond short-term, managed construction traffic control. Because the action occurs within an already developed roadway corridor and does not affect natural features, landscape elements, or access routes associated with ceremonial practice, it is not expected to limit access to or ceremonial use of Indian sacred sites, nor to adversely affect the physical integrity of such sites. |
| **I.** Contribute to potentially significant effects resulting from the introduction, continued existence, or spread of noxious weeds or non-native invasive species known to occur in the area or from other actions that promote the introduction, growth, or expansion of the range of such species (Federal Noxious Weed Control Act)? | No | The project does not include vegetation clearing, soil disturbance in landscaped areas, off-road staging, or import of fill/soil to vegetated areas—activities that typically create pathways for invasive plant introduction. Because disturbance is limited to paved surfaces and work areas can be kept on asphalt/concrete, the action is not expected to introduce, spread, or expand noxious weeds or non-native invasive species, and potentially significant effects are not anticipated. |

**Decision: I find that the action fits within the categorical exclusion(s) above. Therefore, I am categorically excluding the described project from further NEPA analysis. No extraordinary circumstances apply.**

**Superintendent Signature:**

*Kevin J. Griess*
SUPERINTENDENT
National Mall and Memorial Parks
National Park Service

Kevin Griess

Date: 2026.03.31 16:42:03 -04'00'

**Date:** _____

NPS-AR-001368



**National Park Service**
**U.S. Department of the Interior**

**National Mall and Memorial Parks**
**Date: 03/31/2026**

# Decision Memorandum:
## 15th Street Cycle Track Removal and Road Repaving Project
## National Mall and Memorial Parks

This Decision Memorandum documents the National Park Service's ("NPS's") final decision to implement the 15th Street Cycle Track Removal and Road Repaving Project for the reasons set forth below.

### Description of Project

The 15th Street Cycle Track, a one-mile on-street protected bike lane that opened in the Fall of 2021, provides a connection from Pennsylvania Avenue NW and the 14th Street Bridge. Prior to the implementation of the Cycle Track, cyclists generally traversed the corridor in mixed traffic, riding in the general travel lane or along the adjacent sidewalks along with pedestrians.

This project will remove the Cycle Track facility from the corridor and return that space to general-purpose vehicle operations as they existed prior to 2021. The scope of the work is limited to the paved roadway withing the existing curbs and include removing the Cycle Track barriers/delineators/anchor bolts, performing an asphalt mill-and-overlay, grinding and removing paving markings, removing bicycle signal faces, rephasing/retiming traffic signals, removing bike route signage, installing new signage, and re-striping the roadway to re-establish two northbound/two southbound lane sections with standard crosswalks.

Once removal of the Cyle Track is complete, the transportation corridor will look and operate as a conventional, all-vehicle roadway within the existing curbs much as it did prior to the implementation of the Cycle Track. An additional lane will be open to vehicular traffic as it was prior to the installation of the Cycle Track in 2021. Roadwork activities necessary to accomplish the project are planned to commence on April 23, 2026, and thus will not impact the National Cherry Blossom Festival, which concludes on April 12, 2026. Work activities are expected to be completed prior to May 14, 2026, or to be modified or sequenced so that they do not interfere with special events occurring in and around the National Mall on the weekend of May 16, 2016.

The project will be completed as a joint project that will be carried out by the U.S. Department of Transportation, Federal Highway Administration, on behalf of the NPS on National Park System lands, consistent with the Agreement between the NPS and the Federal Highway Administration, dated May 19, 1983 ("1983 Agreement").

**Authority**

The proposed project is authorized under 54 U.S.C. § 101511(a) ("The Secretary may construct, reconstruct, and improve roads and trails, including bridges, in System units."), 54 U.S.C. § 100101, and other applicable authorities.

**Basis for Decision**

July 4, 2026 is America's 250th birthday. The National Mall will be central to a months-long series of planned events celebrating the Semiquincentennial. These events will substantially increase visitation to the National Mall. Removal of the Cycle Track will open an additional lane on 15th Street from Pennsylvania Avenue to Maine Avenue to vehicular traffic, increasing carrying capacity of that road in advance of the upcoming America 250 events.

Removal of the Cycle Track supports implementation of Executive Order 14252, "Making the District of Columbia Safe and Beautiful," which calls for the Nation's Capital to "showcase beautiful, clean, and safe public spaces," and for the city's "highways, boulevards, and parks" to be "clean, well-kept, and pleasant."[1] It also supports implementation of Secretary's Order 3428 of the same name. The proposed project will improve the visual quality of these prominent federal public spaces through removal of roadway appurtenances and restoration of a standardized, maintainable corridor configuration, and will help the public enjoy those events by relieving vehicular traffic congestion and allowing existing roads to bring more people to the National Mall and through the National Mall. The Project will be coordinated with infrastructure planning to support mobility, security, and a positive visitor experience. Improvements made in anticipation of events planned for this Summer will benefit visitors to the National Mall and surrounding System lands for years to come.

Removal of the Cycle Track is also consistent with Executive Order 14189 "Celebrating America's 250th Birthday," which set the policy of the United States "to provide a grand celebration" on July 4, 2026, and "take other actions to honor the history of our great Nation."[2] The upcoming events celebrating America's 250th birthday will bring large numbers of visitors to the National Mall and surrounding National Park System lands. The project will facilitate the substantial visitation expected for these events.

The window for implementing the project is constrained as some of these celebratory events on or around the National Mall are scheduled to commence in mid-May 2026 and events will run through August 2026. Below is a list of some of the special events scheduled during this period, which are in addition to any scheduled or unscheduled demonstrations or special events unrelated to the Semiquincentennial that may be occurring in and around the National Mall:

- **Rededicate 250/ The Interfaith Day of Prayer** — This event, scheduled for May 17, with construction of event infrastructure beginning on May 10, will have an estimated six-figure attendance on the National Mall, with multiple events on May 17 from 6:00 a.m. through approximately 6:00 p.m. Other significant events that weekend include the George Washington University commencement on the Washington Monument grounds and the National Peace Officers' Memorial Service on Capitol grounds.

---

[1] Executive Order 14252 is publicly available at https://www.presidency.ucsb.edu/documents/executive-order-14252-making-the-district-columbia-safe-and-beautiful.

[2] Executive Order 14189 is publicly available at https://www.presidency.ucsb.edu/documents/executive-order-14189-celebrating-americas-250th-birthday.

NPS-AR-001370

- **UFC Event** — This event, scheduled for June 14, is expected to draw more than 100,000 people. The main event will take place on the South Grounds of the White House with viewing opportunities on surrounding NPS property, and related activities are planned for the area adjacent to the Lincoln Memorial.
- **FIFA Fan Fest** — This event, scheduled to last from June 11 to July 19, will have static viewing area on the National Mall between 3rd and 4th Streets.
- **The Great American State Fair** —Construction of event infrastructure is scheduled to start on June 1, with the event lasting from June 25 through July 10, and removal of event infrastructure is scheduled to end on July 30. The event is expected to feature pavilions throughout the National Mall on an east-west axis with space for all U.S. states and territories.
- **Salute to America: The Nation's 250th Birthday Fireworks Celebration—**The event will take place on July 4, but will be substantially larger than prior July 4th celebrations. Several hundred thousand visitors are expected to attend.
- **Indy Car Race** — The event is scheduled to take place on August 22-23 with construction of the track expected to begin on approximately August 8 and end on approximately September 1, with pedestrian bridges over several parts of the track.

The NPS has considered impacts to pedestrians and cyclists as a result of this project. Pedestrians and cyclists will continue to have access to the National Mall. The project will not change existing pedestrian walkways. Bicycle use will continue to be allowed on sidewalks adjacent to roadways, consistent with Section 3(i)(i)(A) of the National Mall and Memorial Parks Superintendent's Compendium (Jan. 13, 2026), available at https://www.nps.gov/nama/learn/management/superintendent-s-compendium.htm. Cyclists who prefer to ride in the roadway instead of on the sidewalk will be able to do so. The NPS will implement transition signing/markings and will monitor operations after implementation and adjust striping/signals as warranted to address any observed operational issues.

The NPS is aware of a Post-Implementation Analysis prepared by the D.C. Department of Transportation ("DDOT") on the 15th Street NW/SW Protected Bike Lane. This analysis has been reviewed by the Federal Highway Administration in an internal review that identified "significant methodological flaws" in the DDOT analysis and found that the "report's claim of a '46% reduction in all crashes' is mathematically unsupported." The Federal Highway Administration also noted that the report "fails to account for city-wide post-pandemic traffic reductions, ignores potential traffic diversion to adjacent routes, and entirely omits the necessary multi-modal exposure rates required to evaluate a bicycle facility."  Given that the Federal Highway Administration found the "DDOT study's methodology is significantly compromised by its failure to use standard corridor exposure metrics (VMT) and multimodal trip rates," the NPS gave limited weight to DDOT's study.

After weighing competing interests, the NPS concludes that this roadway space would be best used as an additional lane for vehicular traffic.

**Compliance with applicable laws and policies**

National Environmental Policy Act: The NPS completed a Categorical Exclusion Documentation Form (CE Form) on February 23, 2026, which concluded that the project fits within the CE that is now found at 516 Departmental Manual 1, DOI NEPA Handbook, Appendix 2, 16.1(G)(5) (at the time, it was numbered as 12.6(G)(13)), and that no extraordinary circumstances apply. The project was delayed. Thus, the NPS reconsidered its analysis in the February CE Form in light of the new timeframe for completion of the project and to update that analysis as needed. On March 31, 2026, the NPS completed a new CE Form. The updated analysis is consistent with the analysis in the February 2026 CE Form and also reflects updated information about the effects of the proposed project, in light of the change in the

timing of the proposed project. The updated analysis found that the project fits within the CE now found at 516 Departmental Manual 1, DOI NEPA Handbook, Appendix 2, 16.1(G)(5). Both CE Forms are incorporated herein by reference.

Section 106 of the National Historic Preservation Act: The NPS completed an Assessment of Actions Having an Effect on Historic Properties (Assessment) on February 23, 2026, which concluded that the project would have no adverse effect on historic properties, and meets all conditions for a streamlined review under Section III of the 2008 Servicewide Programmatic Agreement for Section 106 compliance. The change in timeframe for the proposed project does not affect or impact this analysis so the NPS did not revise the February Assessment. The Assessment is incorporated by reference in this decision memorandum.

Endangered Species Act: The project does not include vegetation clearing, tree removal, habitat conversion, excavation outside the paved roadway section, or in-water work. Because effects are limited to temporary construction disturbances (noise, equipment presence, localized dust) within an already developed roadway, the action is not anticipated to adversely affect listed/proposed species or designated critical habitat, and significant impacts are not expected.

National Capital Planning Act: The National Capital Planning Commission has for several years taken the position that it lacks jurisdiction to review projects that involve demolition. On March 23, 2026, the NPS verbally consulted with the Director of Urban Design and Plan Review of the National Capital Planning Commission regarding whether the Commission would review the project if it were submitted by the NPS. This was confirmed on that same day via email that the Commission would not review the proposed project.

NPS Organic Act: A written non-impairment determination is not required for this action. As stated in the *Guidance for Non-Impairment Determinations and the NPS NEPA Process* (April 2025), only actions that require an environmental assessment or an environmental impact statement have the potential to impair park resources and values. In any event, NPS has confirmed that this action will not impair park resources and values or have unacceptable impacts. As discussed in the CE Form, all work will be confined to the existing roadway footprint, and impacts to resources will be temporary, localized, and not significant.

**Conclusion**

For the foregoing reasons, the NPS has decided to implement the 15th Street Bike Lane Removal Project, as described in this Decision Memorandum and in the documents incorporated by reference.

**Regional Director, National Capital Region:** JENNIFER NERSESIAN

Digitally signed by JENNIFER NERSESIAN
Date: 2026.03.31 17:34:03 -04'00'

**Date:** 3/31/2026

Jennifer T. Nersesian