**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

WASHINGTON AREA BICYCLIST
ASSOCIATION, INC.,
    1110 Hamlin Street, NE
    Washington, DC 20017

               *Plaintiff*,

v.

DOUGLAS BURGUM, in his official capacity
as SECRETARY OF THE INTERIOR;
    1849 C Street, NW
    Washington, DC 20240

DEPARTMENT OF THE INTERIOR;
    1849 C Street, NW
    Washington, DC 20240

JESSICA BOWRON, in her official capacity
as ACTING DIRECTOR, NATIONAL PARK
SERVICE;
    1849 C Street, NW
    Washington, DC 20240

NATIONAL PARK SERVICE;
    1849 C Street, NW
    Washington, DC 20240

SEAN DUFFY, in his official capacity as
SECRETARY OF TRANSPORTATION;
    1200 New Jersey Avenue, SE
    Washington, DC 20590

DEPARTMENT OF TRANSPORTATION;
    1200 New Jersey Avenue, SE
    Washington, DC 20590

Case No. 1:26-cv-00988-ABJ

**AMENDED COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF**

SEAN MCMASTER, in his official capacity as
ADMINISTRATOR, FEDERAL HIGHWAY
ADMINISTRATION;
  1200 New Jersey Avenue, SE
  Washington, DC 20590

FEDERAL HIGHWAY ADMINISTRATION,
  1200 New Jersey Avenue, SE
  Washington, DC 20590

                    *Defendants*.

## AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1.      This case seeks to halt the federal government's thoughtless, secretive, and unlawful plan to destroy critical traffic safety infrastructure on the National Mall and Memorial Parks ("National Mall").

2.      In 2021, after an extensive public consultation process, the National Park Service ("NPS"), in partnership with the District of Columbia Department of Transportation ("DDOT") installed separated, protected bicycle lanes along 15th Street, NW, in Washington, D.C.  That installation included lanes on the portion of 15th Street that crosses the National Mall.  The lanes continue from the end of 15th Street at Independence Avenue, SW, along Raoul Wallenberg Place, SW until Maine Avenue, SW.  (In this document, references to "15th Street" include this short stretch of Raoul Wallenberg Place.)  NPS and DDOT installed the protected lanes to reduce congestion during periods of heavy bicyclist use, and because they recognized the dangers faced by bicyclists and other road users along this busy road.

3.      The lanes have been a success.  Members of Plaintiff, the Washington Area Bicyclist Association, Inc. ("WABA"), bike along 15th Street regularly, benefiting from its safety

2

measures and useful route. And data shows that, after lane installation, bicycle injury accidents on this portion of 15th Street plummeted by more than 90%.

4.    But NPS, in partnership with the Federal Highway Administration ("FHWA"), is poised to reverse all that. Without any meaningful consideration of safety implications, and citing unsubstantiated concerns about traffic, the agencies—starting on April 23, 2026—plan to tear out the 15th Street bike lanes, as well as bike lanes along Ohio Drive, SW, and East Basin Drive (the "Removal Project"). The law does not permit them to be so rash. When NPS installed the lanes, it recognized its interlocking obligations to assess the lanes' effects under a number of federal statutes, including the National Capital Planning Act ("NCPA") and the National Environmental Policy Act ("NEPA"). The federal government has not complied with its obligations under these statutes to assess the impacts of removal of the bike lanes. In addition, the Administrative Procedure Act ("APA") requires that agencies, like NPS, engage in rational decision making, including by considering information relevant to important problems, like safety. Because NPS has done no such thing, the lane removal is unlawful.

5.    This imminent bike lane removal will immediately put lives at risk. Bicycling along busy roads without separation from cars is a recipe for life threatening (and life ending) accidents. Indeed, improving safety on this important route was a key reason NPS installed the lane in the first place. Without the separated lanes' protection, bicyclists in this busy part of the city, including many of WABA's members, are in grave danger.

6.    Moreover, the federal government's Removal Project covers even more ground than feared. WABA initially learned from the Department of Justice on the afternoon of March 22 that the lane removal efforts extended beyond the 15th Street corridor to include some unspecified portion of bike lanes that run along Ohio Drive, SW and East Basin Drive. Recently

3

produced documents in the Administrative Record confirm that Defendants intend to remove bike lanes from Maine Avenue SW (from 15th St. NW to Ohio Drive SW/East Basin Drive) and from Ohio Drive SW/East Basin Drive SW (from Maine Avenue SW to the Jefferson Memorial Food Kiosk). This portion of the removal effort is also dangerous and will also be done without any of the necessary consultations and public involvement. It therefore is unlawful for the same reasons that removing lanes along 15th Street is unlawful.

7. WABA filed suit on March 23. Subsequently, in a transparent attempt to bolster its litigating position, Defendants issued purportedly new decision documents attempting to justify the Removal Projects. These documents are not new decisions at all, but rather reflect post hoc rationalizations of an already-made decision. In any event, these documents continue to violate the relevant federal statutes and are arbitrary and capricious.

8. On April 6, the Court ordered that any amended complaint to be filed pursuant to Federal Rule of Civil Procedure 15(a)(1) must be docketed by April 7, 2026. The Court also ordered that, "[t]o the extent the government is asserting that a separate 'decision' was made on March 31, 2026 with respect to the 15th Street Cycle Track Removal and Road Repaving Project," the government must "file any portions of the administrative record underlying that 'decision' that have not yet been docketed by April 7, 2026."

9. Although WABA disagrees that the government has replaced its February decision with a different final agency action, WABA files this Amended Complaint out of an abundance of caution to make clear that its allegations and claims extend to action described in the March 31 documents, to the extent that those documents constitute separate "decision" documents supporting a "new" agency action.

4

**PARTIES**

10.     Plaintiff WABA is a non-profit corporation founded in 1972 that has been working for more than 50 years to improve bicycling across the D.C. region.  WABA is a membership organization comprised of approximately 5,000 members and 23,000 regional advocacy supporters.  Its mission is to empower people to ride bikes, build connections, and transform places.  WABA envisions a just and sustainable transportation system where walking, biking, and transit are the best ways to travel.  WABA has actively advocated for the creation and preservation of the 15th Street protected and dedicated bicycle lanes.

11.     Defendant Douglas Burgum is the Secretary of the Interior.  As the head of the U.S. Department of the Interior ("DOI"), he oversees the Department's management and conservation of federal lands, including the National Mall.  He is sued in his official capacity.

12.     Defendant U.S. Department of the Interior is an executive department charged with the management and conservation of most federal lands, including the National Mall.  The Department is headquartered in Washington, D.C.

13.     Defendant Jessica Bowron was appointed Acting Director of NPS in or about January 2025.  Defendant Bowron is NPS's highest ranking official.  Accordingly, she is responsible for overseeing NPS's management of the country's national parks, including the National Mall.  She is sued in her official capacity.

14.     Defendant National Park Service is a federal agency within the DOI that is charged with the management of most of the country's national parks, including the National Mall.  NPS is headquartered in Washington, D.C.

15.     Defendant Sean Duffy is the Secretary of Transportation.  As head of the U.S. Department of Transportation, he oversees the Department's work to support the nation's transportation system.  He is sued in his official capacity.

5

16.     Defendant U.S. Department of Transportation is an executive department charged with supporting a nationwide transportation system that is safe, efficient, and convenient.  The Department is headquartered in Washington, D.C.

17.     Defendant Sean McMaster is the Administrator of the Federal Highway Administration.  Defendant McMaster is the FHWA's highest ranking official.  He is responsible for overseeing FHWA's participation in roadwork undertaken on behalf of other federal agencies, including NPS.  He is sued in his official capacity.

18.     Defendant Federal Highway Administration is a federal agency within the Department of Transportation.  FHWA supports the design, construction, and maintenance of America's highway system, including on federally owned land, like the National Mall.  FHWA is headquartered in Washington, D.C.

## JURISDICTION AND VENUE

19.     The Court has jurisdiction over this action under (a) 28 U.S.C. § 1346(a)(2) because agencies of the United States government are named defendants; (b) 28 U.S.C. § 1331 because this action arises under the laws and Constitution of the United States; and (c) 28 U.S.C. § 1361 because this action seeks to compel officers of the United States to perform their duties.

20.     Venue is proper in this district for three independent reasons: (a) WABA resides in this judicial district, (b) a defendant in the action resides in this judicial district, and (c) a substantial part of the events or omissions giving rise to the claims occurred in this judicial district.  28 U.S.C. § 1391(e).

## FACTUAL BACKGROUND

**A.     NPS and the Bike Lanes on 15th Street.**

21.     NPS is a federal agency housed in the DOI operating under the direction of the Secretary of the Interior, which Congress has charged with managing the National Park System.

6

54 U.S.C. § 100101(a).  One of those National Parks is the National Mall, located within the heart of D.C.

22.    NPS, as part of its management of the National Mall, has authority over the streets and paths that are essential for traversing the area.  NPS shares this street management with DDOT.  As part of this shared responsibility, NPS and DDOT have worked cooperatively for years to co-manage 15th Street.

23.    The project to install the 15th Street bike lane began in October 2020, as part of a larger effort to install 20 miles of protected bike lanes by 2022, prioritizing improvements at locations with high rates of injuries and crashes.  At the start of the project, DDOT conducted a traffic analysis, reviewed crash data, and created a conceptual design.

24.    The goals of the new lane project were to: "[c]reate a safe right-of-way for people, regardless of walking, biking, or driving"; "[i]mprove function of the street and intersections to make them easier to use and understand"; and "[b]alance travel delay with right-of-way capacity and access for everyone who uses the street."

25.    DDOT held the first public meeting to consider this proposed project on February 18, 2021, and the second on May 12, 2021.  In the first half of 2021, federal and other stakeholder meetings also took place.

26.    As required under the NCPA, DDOT and NPS submitted their plans to the National Capital Planning Commission ("NCPC").  The NCPC approved the site development plans for safety improvements to 15th Street on June 3, 2021.  In its approval, the NCPC reiterated its support for the "goal of improving safety for all users and reducing vehicle, pedestrian, and bicycle conflicts in the heavily traveled corridor."

27. In Fall 2021, DDOT completed the project, which included the construction of a two-way protected bicycle facility between Pennsylvania Avenue, NW and the 14th Street Bridge.

**B.     WABA's Involvement and the Bike Lanes' Success.**

28. WABA and its members—who have been calling for a safe connection along 15th Street since at least 2013—were actively involved throughout the planning process for the 15th Street bike lanes. WABA members also were instrumental advocates in highlighting the value of the road safety project to the NCPC and broader public.

29. Analysis by DDOT shows this bike lane has achieved all of the project's original goals. Every mode of transportation, including driving, transit, walking, and biking, travels through this corridor faster as a result of the bicycle lanes. Further, and much more importantly, all modes of transport are safer due to the bike lanes. DDOT's research shows that collisions are down for every single mode of transport along this corridor since the bike lane was completed.

30. A DDOT evaluation conducted in 2025 after the bike lane installation was completed showed that the project reduced all roadway crashes by 46% and bicycle injury crashes by 91%. The new protected bike lane resulted in a 3% increase in bicycle traffic along the corridor.

31. Further, stations along the corridor for Capital Bikeshare, the D.C. area's short-term bike rental program, are among the most used in the system, with the Jefferson Street station seeing 232,658 Capital Bikeshare trip starts and ends since 2022.

32. After the project was completed, according to the DDOT evaluation, vehicle speeds increased by 17%. And the time it took cars to traverse the corridor *decreased* across the board.

**C.     WABA Learns that the Federal Government Plans to Remove the 15th Street Bike Lanes, Suddenly and in Secret.**

33. In February 2026, WABA members began to hear from contacts in the government that there were plans to entirely remove the 15th Street bike lanes. Concerned about this rumored,

impending removal of critical public safety infrastructure, WABA wrote to key Government officials expressing its concern over the possibility of the removal of the bicycle lane, including to Regional Director Jen Nersesian of the National Capital Area for NPS and Superintendent Kevin Griess of the National Mall and Memorial Parks, a component of the NPS.  WABA expressed significant concerns with the absence of any public notification or public process surrounding any reported plans, and identified substantive safety concerns that would come with any planned removal.  WABA never received a response to this letter.

34.     On March 20, news sources, including the *Washington Post* and *The 51st*, reported that NPS and FHWA planned to remove the bike lanes on Monday, March 23.  NPS, in response to press inquiries, told *The 51st* that "[w]ith the upcoming National Cherry Blossom Festival and preparations underway for America's 250th anniversary, ensuring safe access for residents, commuters, visitors, and emergency services is a shared priority.  These nationally significant events draw substantial visitation and require coordinated infrastructure planning to support mobility, security, and a positive experience for all."

35.     Despite vigorous opposition from WABA, the public, and local officials, the federal government seemed poised to move forward, even though the extra utilization of the National Mall associated with the Cherry Blossom Festival cuts against sudden changes to traffic infrastructure. After all, the Festival concentrates vehicular and pedestrian traffic in the Tidal Basin area and heightens the risk faced by WABA members and visitors that would result from removal of this protective bike lane.  The bike lanes have been in place for at least three previous Cherry Blossom Festivals without incident—in fact, they have become an important part of the Festival's transportation plan.  The removal will also diminish the convenience and recreational enjoyment that bike lane users have experienced.

9

**D.      The Government Delays Implementation of the Removal Project.**

36.      After the federal government learned of this impending suit, it assured WABA's counsel that any construction activity would begin no earlier than March 30.  Defendants later assured WABA and the Court that construction activity would not begin earlier than April 23, as memorialized in a Joint Status Report to the Court.  Dkt. No. 7.

37.      When that date arrives, the Removal Project will damage even more infrastructure than initially expected.  On the afternoon of March 22, in correspondence connected to this litigation, WABA first learned from the government that the lane removal efforts include not just 15th Street, but also some portions of connected bike lanes that run along Ohio Drive, SW and East Basin Drive—like 15th Street, portions of the bike link between D.C. and Virginia. Documents in the Administrative Record confirm that Defendants intend to remove bike lanes from Maine Avenue SW (from 15th Street, NW to Ohio Drive, SW/East Basin Drive) and from Ohio Drive, SW/East Basin Drive SW (from Maine Avenue, SW to the Jefferson Memorial).  This removal effort will put bicyclists, including WABA's members, in danger.  It also will be done without any of the necessary analysis, consultations, or public involvement.

38.      The removal of all these bicycle lanes would sever one of D.C.'s longest protected bike lanes, which stretches virtually uninterrupted from the Tidal Basin to Columbia Heights. These lanes also serve as a vital cycling connection to the 14th Street Bridge into Virginia.

E.    **Defendants Justify Their Decision Using Post Hoc Rationalizations.**

39.    Defendants' April 3 brief asserts that since the filing of this suit, they have subsequently reconsidered and replaced their February decision to remove the bike lanes with a different final agency action memorialized by NPS on March 31, 2026.

40.    That action—which results in the removal of the same bike lanes—also lacks the necessary analysis, consultations, or public involvement, as reflected by the Administrative Record.

41.    WABA brings this action to compel the Defendants to comply with the procedural and decision-making requirements that help to inform and protect the public and ensure the decision-making agencies have fully considered all relevant information.

**STANDING**

42.    An association "has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).

43.    WABA members are harmed by the Removal Project, and therefore would have standing to sue in their own right.  For example, WABA member Nicholas Johnson uses and enjoys the 15th Street bike lanes, as well as lanes along Ohio Drive, SW and East Basin Drive, almost every day to travel from home to work and back.  The bike lanes protect him on that trip, and if the government keeps them in place, he will continue to regularly use them.  But if NPS removes the lanes, he will either have to face new dangers to his personal safety, or use alternative means of transportation. Dkt. 9-4.  Likewise with WABA member Allison Foster.  She lives in Arlington, Virginia, and uses the 15th Street lanes, as well as lanes along Ohio Drive, SW and East Basin

Drive, to travel between Arlington and D.C. She uses and enjoys the lanes regularly for personal and business trips, and will continue to do so if they remain. But if NPS removes them, she will face new dangers on bike trips and would travel into D.C. less often. She would also rely on cars to travel more often, costing her money. And, when she did bike into D.C., she would likely use a longer, more arduous route so as to maintain better protection from cars. Dkt. 9-3.

44.     Elizabeth Kiker is the Executive Director of WABA. In her view, removing these bicycle lanes threatens public safety and health. Removing the bicycle lanes between Constitution Avenue and the Tidal Basin would increase conflicts between pedestrians, cyclists, and vehicles. WABA and its members have similar safety concerns about removing the bicycle lanes in areas between Ohio Drive, SW and East Basin Drive. Pushing cyclists into traffic and crowded sidewalks risks their safety, as well as the safety of pedestrians and other travelers. WABA members regularly use the bicycle lanes, and WABA anticipates that its members will continue to use them if they are not removed. Some WABA members will be forced to find alternate routes and methods of transportation if they are removed. Other WABA members will continue to ride along this route, at significantly increased risk to their safety. In Kiker's view, the burden will be exacerbated during the spring, which is actively occurring and is the National Mall's busiest season. If any NCPC, NEPA, or other public comment proceedings occurred, she believes WABA's members would participate in them. In her belief, compliance with required procedures would provide WABA's members an opportunity to engage in and potentially influence the decisionmaking process. Dkt. No. 9-2.

45.     Some WABA members who perceive increased risk simply use the adjacent sidewalk or an alternative route. Sidewalk cycling comes with its own risks, like death and grave injuries, especially on a high-volume urban corridor like 15th Street, NW.

46.      David Wacker is a WABA member.  He regularly commutes between his home and the Ronald Reagan Washington National Airport, often carrying language for trips lasting up to four days.  He occasionally transports his three-year-old child by bicycle along this same route.  In his view, removing the 15th Street, NW bike lanes would significantly degrade the safety and reliability of his commute.  It would force him and his child back into shared spaces with motor vehicles and pedestrians, increasing the likelihood of conflict, injury, and delay.  Dkt. No. 9-5.

47.      Steven Bouchard is a WABA member.  He uses the 15th Street, NW and Ohio Drive, SW and East Basin Drive bike lanes specifically for safety when he travels for professional and recreational purposes.  In his view, traveling on the pre-installation vehicular lanes was unsafe for both him and automobile drivers.  He and other cyclists sometimes slowed down traffic as it was not always possible to keep pace with vehicles.  He said the pre-installation lanes caused a traffic flow problem behind him and irritated drivers.  In his experience, drivers who are irritated with cyclists tend to speed to hastily get around, as well as obstruct and yell at cyclists.  Dkt. No. 9-6.

48.      David Alpert is a WABA member.  He often bikes three times per week in each direction to travel between his home and Arlington, Virginia.  Without a bike lane along East Basin Drive, traveling northbound across the George Mason Bridge would force him to ride on the sidewalk along the Tidal Basin, take a substantially longer western route, or avoid bicycling altogether.  Using the sidewalk would potentially interfere with pedestrians.  Neither route would be as safe or as convenient for him.  Removing the 15th Street bike lane would lead him to bike less often for these trips and drive more instead, increasing his costs, reducing health benefits, and contributing to traffic congestion.  Despite the dangers, he would still bike along the 15th Street

route, to some extent without the protected bike lanes because of how important this route is to him for moving around the city. Dkt. 9-7.

49.    Ashwin Jagannathan is a WABA member. He believes that removing the 15th Street, NW bike lanes will significantly reduce his quality of life, as well as that of the many riders who use them. In his view, the Removal Project would subject him to greater risk of bodily harm while cycling, which he does for necessary transport. He would continue to bike in these areas if these protected lanes were removed because of their importance in his life. Dkt. 9-8.

50.    The interests that WABA seeks to vindicate here align with its purpose and are common to many of its members. WABA's central objective is to advocate for safer, better bike infrastructure. The Removal Project will make biking more dangerous, stressful, and difficult. And every WABA member who uses the threatened bike lanes will be injured in similar ways, through threats to their safety, costs to their wallets, limits their recreation and enjoyment opportunities, and disruption to their patterns of daily life.

51.    William Schultheiss, PE, is the Director of Engineering at the Toole Design Group, a transportation planning, design, and engineering firm that specializes in multimodal roadway design, including roadways with protected bicycle facilities. In his view, the Removal Project accepts a known and predictable harm—an increase in crash risk that often causes fatal or life-altering injuries—in exchange for shaving off seconds of intersection delay for a few hundred motorists who have parallel route alternatives available. In his opinion, this tradeoff disregards human life. Exh. A.

52.    Moreover, follow-up research from DDOT supports its original conclusion that the bike lanes improved safety. In response to an inquiry about the methodology for its original study, DDOT conducted additional analysis. This analysis showed that after the bike lanes were installed,

14

the 15th Street corridor "saw a decrease in crashes and no effect on vehicle congestion." DDOT concluded that, "[d]epending on the method for normalizing, crash reductions ranged from 16% to 24% for all roadway crashes and 93% reduction in bicycle-related crashes," which "[o]utpaced the city in crash reductions by 39% for all crashes and 20% by bicycle crashes." Exh. B.

## CLAIMS FOR RELIEF

## COUNT ONE
### Violation of the APA (Failure to Consult with the NCPC, 40 U.S.C. § 8722)

53.    WABA restates and incorporates by reference all other paragraphs of this Complaint.

54.    Enacted in 1952, the NCPA established the NCPC "as the central planning agency for . . . the appropriate and orderly development and redevelopment of the National Capital and the conservation of the important natural and historical features thereof." National Capital Planning Act of 1952, Pub. L. No. 82-592, § 2(a), 66 Stat. 781, 782 (1952) (codified as amended at 40 U.S.C. § 8711(a) ("The [NCPC] is the central federal planning agency for the Federal Government in the National Capital, created to preserve the important historical and natural features of the National Capital . . . .")).

55.    Under the NCPA, federal agencies "shall cooperate and correlate their efforts by using the [NCPC] as the central planning agency for federal activities in the National Capital region." 40 U.S.C. § 8722(a). The NCPA requires both federal and D.C. agencies to advise and consult with the NCPC. *Id.* § 8722(b)(1).

56.    An agency intending to engage in development in the District of Columbia must "advise and consult" with the NCPC "before preparing construction plans the agency originates for proposed developments and projects," and must thereafter continue to advise and consult with the NCPC as it "prepares [its] plans and programs in preliminary and successive stages." *Id.*

15

"After receiving the [federal agency's] plans," the NCPC is tasked with "promptly . . . mak[ing] a preliminary report and recommendations to the agency." *Id.* The agency then has the opportunity, if it disagrees with the NCPC's preliminary report and recommendations, to advise the NCPC of the reasons for its disagreement. *Id.* Thereafter, the NCPC must make a final report and ruling on the project. *Id.*; *see id.* § 8722(d). Once the NCPC submits a final report, "the agency may proceed to take action in accordance with its legal responsibilities and authority." *Id.* § 8722(b)(1).

57. Defendants' decision to remove the 15th Street bike lanes without consulting the NCPC is not in accordance with law because, under the NCPA, any federal agency, "*before* preparing construction plans the agency originates for proposed developments and projects," "*shall* advise and consult with the Commission as the agency prepares plans and programs in preliminary and successive stages that affect the plan and development of the National Capital." 40 U.S.C. § 8722(b)(1) (emphasis added).

58. The Removal Project is a "proposed development[]" or "project[]" that will "affect the plan and development of the National Capital." *Id.* The bike lanes are essential infrastructure that connect the 15th Street corridor, from the Tidal Basin to Columbia Heights, and connect the District to Virginia.

59. Without advising and consulting with the NCPC, no agency can lawfully remove or modify the bike lanes along 15th Street, Ohio Drive, SW, or East Basin Drive.

60. Because the NCPA grants the NCPC review authority over federal projects in the District of Columbia, the proponents' plans must demonstrate compliance with the Comprehensive Plan for the National Capital and indicate how the agencies would comply with other applicable statutes like NEPA and the National Historic Preservation Act ("NHPA").

61.     NPS recognized these obligations for the original construction.  NPS, in partnership with DDOT, submitted the preliminary and final site development plans for the 15th Street bike lane to the NCPC for approval.  The NCPC previously determined that the project complied with the Comprehensive Plan for the National Capital, and that NPS had demonstrated NEPA and NHPA compliance.  No such determinations have been made regarding the Removal Project, and there are no official documents in the Administrative Record reflecting an NCPC determination regarding the Removal Project. *Cf.* NPS-AR-001197.

62.     The NCPC is charged by statute with "preparing, adopting, and amending a comprehensive plan for the federal activities" in the District of Columbia and its federal environs, and with "making related recommendations to the appropriate developmental agencies."  *Id.* § 8711(e)(1); *see id.* § 8721.  The comprehensive plan (the "Comprehensive Plan"), which must by law be made available to the public, *see id.* § 8721(g), is published on the NCPC's website.

63.     The NCPC considers proposed projects in open, public sessions.  The NCPC welcomes public comment both prior to and during these sessions.  The NCPC's website allows members of the public to submit written comments on "projects, plans, or initiatives where NCPC has a lead or shared responsibility."

64.     Here, required—and previously complied-with—procedures have not been followed.  There is no record of NPS consultation regarding the anticipated bicycle lane removals.  There has been no opportunity for public Commission review, and Defendants have rushed to remove the bike lanes without any feedback from either the public or the Commission.

65.     The Administrative Record contains a one-sentence email from an NCPC staff member that was sent the same day Plaintiffs filed this lawsuit.  It states that "NCPC would not review the removal of bike lanes."  NPS-AR-001197.

66.     But in order to exempt an agency from its consultation obligations, "*the Commission* shall determine *in advance* the *type or kinds* of plans, developments, projects, improvements, or acquisitions which do not need to be submitted for review by the Commission." 40 U.S.C. § 8722(b)(2)(B) (emphases added).   An email from an NCPC staff member (not the "Commission") sent on or after the commencement of a project (rather than "in advance") and purporting to establish a one-off carveout (rather than addressing the "type or kinds of plans" being excepted) does not satisfy these statutory requirements for establishing a lawful exemption.

67.     Defendants' contention that the Removal Project falls outside the statute because it purportedly does not involve "construction plans," but rather removal and repaving, is incorrect. Clearly, repaving a roadway—including resurfacing, restriping, new sign installation, lane reconfiguration, and detailed traffic-control planning, *see, e.g.*, NPS-AR-000868–000951; NPS-AR-001003–001005; NPS-AR-001167—involves "construction" such that Defendants' obligations to consult with NCPC attach.

68.     These procedural failures deprive the public of meaningful involvement and recklessly increase the risk facing cyclists and others.   Any action impacting the viability or usability of the bike lanes must comply with required procedures.   Absent compliance, the Removal Project is unlawful.

## COUNT TWO

**Violation of the APA (Arbitrary and Capricious Decisionmaking, 5 U.S.C. § 706(2)(A))**

69.     WABA restates and incorporates by reference all other paragraphs of this Complaint.

70.     The APA affords federal judicial review of agency action.  *See* 5 U.S.C. §§ 701–706.  A reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions

18

found to be," among other things, "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* § 706(2)(A).

71.     An agency action is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Manufacturers Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

72.     Here, Defendants' actions are arbitrary and capricious because: 1) they have offered no reasonable explanation for their actions; 2) the actions represent a sudden and unexplained change in position; 3) there is no indication Defendants sufficiently considered the available safety and traffic data; and 4) there is no indication that Defendants considered serious reliance interests of WABA members who have structured their lives in dependence on the bike lanes.

73.     The APA requires an agency to act reasonably and provide a reasonable explanation for its actions. *See Baystate Franklin Med. Ctr. v. Azar*, 950 F.3d 84, 89 (D.C. Cir. 2020).

74.     Defendants have provided no such reasonable explanation anywhere in the Administrative Record.  The only rationales for the removal of the bike lane that were publicly available prior to this suit are statements to the media that cite the National Cherry Blossom Festival and the Nation's 250th anniversary.  One of these statements, from NPS, asserts that "ensuring safe access for residents, commuters, visitors, and emergency services is a shared priority."  The statement notes that these events draw in substantial crowds and require infrastructure planning.  Another statement, from the Department of Transportation, cites congestion.

75.    These bare "explanations" are arbitrary and capricious because they do not provide even the minimal level of required analysis and are not reasonable on their face.  The National Cherry Blossom Festival has already started, and construction during the Festival cannot possibly ensure safety or a positive experience for visitors.  It is also inconsistent with the multiple successful Cherry Blossom Festivals that have been held since the bike lane was installed.  And data collected by DDOT indicates that the bike lanes *reduced* rather than increased congestion and enhanced visitor safety.

76.    Defendants' more recent "decision" documents, dated March 31, acknowledge that the Removal Project cannot be completed prior to the conclusion of the Cherry Blossom Festival, and now cite only events surrounding the Nation's 250th anniversary as justification for the removal.

77.    An agency also acts arbitrarily and capriciously when it departs from prior practice without any explanation.  *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

78.    Removing or modifying the bike lane without process is a sharp deviation from prior practice for which no explanation has been provided, and as such is arbitrary and capricious.

79.    NPS has long held the position that bike lanes in general are important for road safety, and that these lanes in particular are essential for enhancing safety, *see, e.g.*, NPS-AR-000775–841; NPS-AR-001212–59, yet has provided no explanation for such a sharp departure in asserting that bike lanes must now be removed to ensure safety.  NPS has also departed sharply from past practice without explanation, by failing to allow for public participation in the decision to remove the bike lane.

20

80.    An agency's decision is arbitrary and capricious if it fails to consider an important aspect of the problem.  *See Pub. Citizen v. Fed. Motor Carrier Safety Admin.*, 374 F.3d 1209, 1216 (D.C. Cir. 2004).

81.    Defendants failed to consider substantial evidence generated by DDOT indicating that the bicycle lanes improve public safety and transportation, even while transit times improved, thereby failing to grapple with an important aspect of the issue and ignoring the record that should have been before them.  This is the essence of arbitrary and capricious decisionmaking.

82.    Defendants' March 31 "decision" documents impermissibly provide new, post hoc rationalizations for Defendants' actions and only cursorily address DDOT's data and unreasonably give it little consideration.  They do not at all consider NPS's own previous analysis of the safety and transportation benefits of bike lanes.

83.    Even if this Court were to consider them, the new "decision" documents demonstrate that the Defendants' decision remains arbitrary and capricious.

84.    The March 31 "decision" documents say nothing about how Defendants have abandoned their past positions on the safety of bike lanes, the vital nature of these bike lanes as a regional connector, or general support for bike lanes.

85.    The AR sets forth a wealth of evidence that bike lanes promote safety, separate and apart from DDOT's research, which goes entirely unaddressed in the new documents.

86.    And nothing in the new documents indicates that Defendants considered reasonable alternatives to the permanent act of removing the bike lanes.  "An agency's decision is arbitrary and capricious if the agency . . . ignores the reasonable reliance interests of regulated parties." *Affirmed Energy, LLC v. FERC*, 166 F.4th 1070, 1079 (D.C. Cir. 2026) (citing *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30–32 (2020)).

87.     This popular bike lane is a critical link in the 15th Street corridor that connects Virginia to D.C. and creates a single passage for cyclists from the Tidal Basin to Columbia Heights. About 4,000 cyclists daily, including some 900 WABA members, rely on this bike lane to provide them with safe and protected bicycling infrastructure.

88.     The bike lanes were the product of extensive and careful planning of a regional bicycling transportation network.  Defendants failed to consider how removal of a central part of the network will impact the remainder of its operations to allow for continued safety and accessibility for thousands of bicycle facility users every day.

89.     Nor have Defendants offered any detailed assessment of the purported motor vehicle traffic flow benefits that would result from removal of the bike lanes.  They have failed to explain the departure from their prior position that lanes enhance traffic flows.

90.     Moreover, follow-up research from DDOT only confirms its original conclusion that the bike lanes improved safety and had no impact on congestion.  *See* Exh. B.

91.     Because Defendants have offered no rational explanation for the Removal Project, have failed to consider relevant data (or offer only impermissible post hoc rationalizations for their decision), and appear to have ignored engendered reliance interests, their actions are arbitrary and capricious.

## COUNT THREE

### Violation of the APA (Failure to Undertake NEPA Assessment, 42 U.S.C. § 4332)

92.     WABA restates and incorporates by reference all other paragraphs of this Complaint.

93.     Defendants' decision to remove the 15th Street bike lanes is not in accordance with law because they have not complied with their procedural obligations under NEPA.

94.     NEPA "requires federal agencies . . . to consider and report on the environmental effect of their proposed actions." *WildEarth Guardians v. Jewell*, 738 F.3d 298, 302 (D.C. Cir. 2013).   When an action is "major" and "significantly affect[s] the quality of the human environment, agencies must prepare an Environmental Impact Statement ("EIS"), and analyze all "reasonably foreseeable environmental effects" of proposed actions, to disclose the basis for their findings, and to "study, develop, and describe technically and economically feasible alternatives" to the proposed action.  42 U.S.C. §§ 4332(2)(C)(i), (F).

95.     Although agencies need not always prepare an EIS, at least some preliminary NEPA assessment is generally required to determine whether an EIS is necessary.

96.     Agencies, like NPS, can undertake that preliminary assessment in two ways.  First, they "may preliminarily prepare an Environmental Assessment (EA) to determine whether the more rigorous EIS is required." *Myersville Citizens for a Rural Cmty., Inc. v. FERC*, 783 F.3d 1301, 1322 (D.C. Cir. 2015); *see* 42 U.S.C. § 4336(b)(2).  Second, they may identify routine actions that normally do not significantly affect the quality of the human environment as categorical exclusions.  42 U.S.C. § 4336e(1); 43 C.F.R. § 46.205.

97.     These preliminary steps require at least minimal analysis.  Environmental assessments are more than blank pages; even when an EIS is not required, an agency must "set forth" in an environmental assessment "the basis of [its] finding of no significant impact."  42 U.S.C. § 4336(a)(2).  And even actions that are "normally categorically excluded must be evaluated to determine" whether they implicate "extraordinary circumstances," 43 C.F.R. § 46.205(c)(1), and those decisions must be documented, *see Compiling a Decision File for NEPA Reviews*, NPS NEPA Handbook Supplemental Guidance (last visited Apr. 7, 2026), https://perma.cc/DSK6-6Y57.

98.     When NPS constructed the 15th Street bike lanes initially, it recognized and complied with its NEPA obligations.  During the original project review, NPS completed a threshold NEPA analysis, and concluded that a categorical exclusion applied.  According to that assessment, the lane construction fell under an exception for the "[c]onstruction of minor structures, including small improved parking lots, in previously disturbed or developed areas."

99.     The CE forms produced in the Administrative Record do not justify the government's decision to remove the bike lanes.  The CE forms that postdate the initiation of this litigation rely on categorical exclusions that plainly do not apply to the Removal Project.  The categorical exclusion relates to the "[m]odernization of a highway by resurfacing, restoration, rehabilitation, reconstruction, adding shoulders, or adding auxiliary lanes," but removing the bike lanes is not the same as eliminating a lane of traffic.  *See* NPS-AR-001145 (citing DOI NEPA Handbook, Appendix 2, NPS, 12.6(13)); NPS-AR-001362 (citing 23 C.F.R. 771.117(c)(26)).

100.     In any event, removing the lanes involves an "extraordinary circumstance," precluding the application of a categorical exclusion.  "Extraordinary circumstances . . . exist for individual actions . . . [that] [h]ave significant impacts on public health or safety."  43 C.F.R. § 46.215(a).  The separated lanes on 15th Street protect the lives of road users, and removing them puts all road users, especially bicyclists, in danger.  Because of that significant impact on public health and safety, no categorical exclusion can apply.

101.     Defendants' abrupt, imminent, unconsidered removal of the 15th Street bike lanes is therefore unlawful and violates NEPA's procedural requirements.

## COUNT FOUR

**Violation of the APA (Failure to Comply with the NPS Organic Act, 54 U.S.C. § 100101)**

102.   WABA restates and incorporates by reference all other paragraphs of this Complaint.

103.   Congress has required that NPS "promote and regulate the use of" Park System units, consistent with their "fundamental purpose," which is "to conserve the scenery, natural and historic objects, and wild life in the System units and to provide for the enjoyment of the scenery, natural and historic objects, and wild life in such manner and by such means as will leave them unimpaired for the enjoyment of future generations."  54 U.S.C. § 100101.

104.   That mandate includes the National Mall.  *Friends of the Vietnam Veterans Mem'l v. Kennedy*, 116 F.3d 495, 496 (D.C. Cir. 1997).

105.   Although the Organic Act's language is broad, it does not provide "unlimited discretion in determining what actions are best calculated to protect Park resources."  *Daingerfield Island Protective Soc. v. Babbitt*, 40 F.3d 442, 446 (D.C. Cir. 1994) (citation modified).  First, "NPS is required to exercise its discretion in a manner that is 'calculated to protect park resources' and genuinely seeks to minimize adverse impacts on park resources and values."  *Greater Yellowstone Coal. v. Kempthorne*, 577 F. Supp. 2d 183, 193 (D.D.C. 2008) (citation omitted).  Second, the Organic Act's "broad mandate," along with NPS's implementing regulations, "call[s] upon the NPS to 'balance access with safety, and take into account conservation and resources.'"  *Terbush v. United States*, 516 F.3d 1125, 1135 (9th Cir. 2008) (quoting *Childers v. United States*, 40 F.3d 973, 976 (9th Cir. 1994), *as amended* (Jan. 17, 1995)).

106.   The Removal Project is neither calculated to protect park resources nor undertaken with any attention to safety.  Any increased motor vehicle traffic would impinge on the National

Mall's beauty and its role as a memorial to the American experiment.  And the Removal Project puts lives at risk, without any publicly articulated benefit to the National Mall's conservation and resources.

107.    Because NPS has failed to comply with its obligations under the Organic Act, the abrupt, imminent, unconsidered removal of the 15th Street bike lanes is unlawful.

## PRAYER FOR RELIEF

WHEREFORE, WABA respectfully requests that the Court:

A.    Declare unlawful and set aside Defendants' decision to remove the 15th Street, Ohio Drive, SW, and East Basin Drive bicycle lanes as arbitrary, capricious, an abuse of discretion, other otherwise not in accordance with law under the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.*, the National Capital Planning Act, 40 U.S.C. § 8722, the National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.*, and the National Park Service Organic Act, 54 U.S.C. § 100101;

B.    Issue a permanent injunction preventing Defendants from moving forward with removing the 15th Street bicycle lanes, or bicycle lanes on Ohio Drive, SW, or East Basin Drive, until Defendants have satisfied their obligations under the Administrative Procedure Act, National Capital Planning Act, National Environmental Policy Act, and National Park Service Organic Act;

C.    Award WABA reasonable attorneys fees and costs;

D.    Grant such other relief as the Court deems necessary, just, and proper.

April 7, 2026                                   Respectfully submitted,


                                                _/s/ Thomas Brugato_

                                                Gary S. Guzy (D.C. Bar No. 375977)
                                                Thomas Brugato (D.C. Bar No. 1013523)
                                                Daniel Randolph (D.C. Bar No. 230150)
                                                Christina Coleburn (_pro hac vice_)
                                                Kristin Oakley (_pro hac vice_)
                                                Benjamin Rolsma (_pro hac vice_)

                                                COVINGTON & BURLING LLP
                                                850 Tenth Street, NW
                                                Washington, D.C. 20001-4956
                                                (202) 662-5515
                                                tbrugato@cov.com
                                                gguzy@cov.com
                                                drandolph@cov.com
                                                ccoleburn@cov.com
                                                koakley@cov.com
                                                brolsma@cov.com

                                                _Attorneys for Plaintiff Washington Area_
                                                _Bicyclist Association, Inc._

27