# EXHIBIT A

**<u>SUPPLEMENTAL DECLARATION OF WILLIAM SCHULTHEISS, PE</u>**

I, William Schultheiss, PE, declare as follows:

1. My name is William Schultheiss.  I am the Director of Engineering at the Toole Design Group, a transportation planning, design, and engineering firm that specializes in multimodal roadway design, including roadways with protected bicycle facilities.  I have been a District of Columbia ("D.C.") resident for 27 years, and am a regular bicyclist, pedestrian, and motorist within the 15th Street, NW Bicycle Lane Cycle Track ("cycle track).

2. I submitted an initial declaration in support of Plaintiff's Motion for Preliminary Injunction on March 26, 2026.  I submit this supplemental declaration after reviewing the Administrative Record.

3. The planned action to remove the cycle track rests on several erroneous claims about the likelihood of irreparable harm, stemming from improper conclusions about the safety data and the methodology used to evaluate it, as well as the  transportation benefits of removing the cycle track. As a transportation engineer who has spent his career working on exactly these questions—how to measure multimodal safety for people traveling with an emphasis on people walking and bicycling, how to evaluate the performance of protected bicycle facilities, and how to weigh tradeoffs among different road users—I have direct professional opinions about those claims.  This declaration explains where the government's analysis departs from standard practice, what the data actually shows, and the irreparable harms of removing the cycle track.

## QUALIFICATIONS

4. I am a licensed professional engineer with more than 30 years of experience in multimodal transportation planning and engineering.  My work includes the planning, design, and safety evaluation of protected bicycle facilities in urban environments across the United States. I have contributed to the leading national guidance documents on pedestrian and bicyclist safety published by the Federal Highway Administration ("FHWA"), the National Cooperative Highway Research Program, and the American Association of State Highway Transportation Officials, including work that is directly relevant to the methodology questions raised in this case.

5. I am familiar with the 15th Street, NW/SW corridor from prior professional engagement and from my review of the DDOT ("D.C. Department of Transportation") Post-Implementation Analysis, the traffic counts and intersection analysis conducted in support of the cycle track installation, the August 2016 National Park Service ("NPS") National Capital Region Paved Trails Study, and the Administrative Record.

## WHAT THE SAFETY DATA ACTUALLY SHOWS ABOUT LIKELY INJURIES AND IRREPERABLE HARM

6. The DDOT Post-Implementation Analysis is methodologically sound, and the current cycle track reflects its safety findings.

7. First, the DDOT findings are consistent with what transportation engineers have documented across dozens of cities that have installed protected bicycle facilities. New York City's DOT ("NYC DOT") evaluation of its 9th Avenue protected bike lane found that injuries to all road users fell by 56 percent, injuries to cyclists fell by 57 percent, and injuries to pedestrians fell by 29 percent. (NYC DOT, Measuring the Street, 2012.) The DDOT data for this corridor—a 46 percent reduction in all-mode crashes, 52 percent reduction in injury crashes, 69 percent reduction in bicycle crashes, and 91 percent reduction in bicycle injury crashes—is consistent with this broader body of evidence. It is not an outlier that demands special skepticism.

8. The FHWA has formally designated separated bicycle lanes as a Proven Safety Countermeasure—meaning the agency's own research program has reviewed the evidence base and concluded that this type of facility reliably reduces crash risk and harm. A 2023 FHWA crash modification factor study confirmed that installing separated bike lanes produces a clear trend of reduced bicycle crashes. (FHWA Publication No. FHWA-HRT-23-078.)

9. FHWA's own published guidance states directly that because there is no commonly accepted exposure metric for pedestrians and bicyclists, federal non-motorized safety performance measures are based on counts of fatalities and serious injuries, not on rates expressed per vehicle miles traveled. (Guide for Scalable Risk Assessment Methods for Pedestrians and Bicyclists, FHWA-SA-18-032 (2018).) This guidance is reflected in binding federal regulation. FHWA's Safety Performance Management rules require state departments of transportation and metropolitan planning organizations to report non-motorized safety as the absolute number of non-motorized fatalities and serious injuries—not as a Vehicle Miles of Travel ("VMT")-normalized rate; only motorist safety is checked against a VMT-motorized rate. (23 C.F.R. § 490.207(b)(5)). The professionally accepted and federally mandated exposure metric counts of harms like non-motorized fatalities and serious injuries which DDOT measured directly. The critique that DDOT did not properly apply VMT to evaluate bicyclist and pedestrian safety incorrectly states the federal government's own guidance and regulations.

10. Fewer cars on the road due to post-pandemic telework meant fewer vehicle-bicycle interactions and therefore fewer crashes and harms, regardless of whether the cycle track was present. This stated critique of DDOT's findings may have some validity as a methodological caution when solely evaluating motor vehicle operations, but it cuts in both directions. If lower vehicle volumes in the post-installation period reduced the volume of traffic and therefore the potential number of vehicle-bicycle interactions, then the safety improvements documented by DDOT are conservative—the cycle track was producing those results under conditions of reduced exposure to the primary crash threat. As vehicle

volumes return to pre-pandemic levels and the number of vehicle-bicycle interactions increases, a facility that physically separates those users becomes more important from a safety perspective, not less. It is inappropriate to use suppressed vehicle volumes to dismiss the safety data while simultaneously arguing that restoring the pre-2021 configuration—which will operate under fully recovered traffic volumes—will have no significant safety consequences. Concerns about increased traffic volume post-telework, if anything, strengthens the case for keeping the protection in place.

11. The probability framing—that less than one reported crash per week with 75 percent not resulting in injury means the safety concern is minimal—reflects a risk management approach that has produced measurable, documented harm at the national level. The VMT metric, by construction, can improve as more miles are driven—meaning a system can appear safer even as the absolute number of people killed holds steady or rises. This distortion is especially acute in dense, multimodal urban environments like D.C. When trips shift from walking, cycling, and transit to private vehicles, VMT increases and a VMT-normalized crash rate can improve even as actual crashes and injuries rise simply because the denominator grew. In a corridor like 15th Street, NW where the existing modal mix includes high volumes of pedestrians, cyclists, and transit users, applying a VMT-based safety metric systematically undercounts the people most at risk and rewards the modal shift that produces the most harm. Relying on VMT-normalized rates as the primary basis for safety decisions in this context does not measure safety—it measures vehicle throughput and calls it safety. The U.S. Department of Transportation's ("USDOT") adoption of the Safe System Approach ("SSA") as the organizing framework for its National Roadway Safety Strategy, https://www.transportation.gov/sites/dot.gov/files/2022-02/USDOT-National-Roadway-Safety-Strategy.pdf, is a formal acknowledgment by the government itself that a VMT focused-approach has failed. The right primary measure is human lives, not vehicle miles, and that the transportation system bears primary responsibility for preventing fatal and serious injury outcomes. Applying VMT-normalized probability framing to justify removing a facility that demonstrably reduced injuries is inconsistent with the SSA.

12. This analysis matters directly for the tradeoff being made here. The planned action accepts a known, predictable, and often irreparable harm—an increase in crash risk that often causes fatal or life-altering injuries—in exchange for saving a few seconds of intersection delay for a few hundred motorists who have parallel route alternatives available. These motorists face no safety consequence from the existing configuration—the harm to them is measured in seconds of additional intersection delay, not injury risk. This type of harm is categorically different from the physical injury risk borne by cyclists and pedestrians when protected infrastructure is removed. This tradeoff disregards the value the SSA places on human life.

13. The probability framing is also built on an incomplete dataset. Police-reported crash data is known to undercount bicycle and pedestrian crashes significantly. A systematic review of ten data-linkage studies, published by the University of California ("UC") Berkeley Safe Transportation Research and Education Center, found that estimates of reporting levels ranged from 44 to 75 percent for pedestrian crashes and from 7 to 46 percent for bicycle

crashes—meaning the majority of pedestrian crashes and a substantial share of bicycle crashes may be missing from police-reported data entirely. (Doggett, Ragland & Felschundneff, Evaluating Research on Data Linkage to Assess Underreporting of Pedestrian and Bicyclist Injury in Police Crash Data, UC Berkeley SafeTREC (2018), available at https://escholarship.org/uc/item/0jq5h6f5; cited by the FHWA/NHTSA-funded Pedestrian and Bicycle Information Center, https://www.pedbikeinfo.org/factsfigures/facts_safety.php.) Notably, crashes involving only pedestrians and bicyclists—with no motor vehicle involved - are rarely captured in police-reported crash databases, which are primarily designed to capture motor vehicle collisions (Ferenchak, N. N., & Osofsky, R. B. (2022). Police-reported pedestrian crash matching and injury severity misclassification by body region in New Mexico, USA. Accident Analysis & Prevention, 167, 106573 available at https://www.sciencedirect.com/science/article/abs/pii/S0001457522000094). In situations where police reports are filed with active transportation users, these reports are often wrong with respect to cause and seriousness of injury (Soltani, S., Schwarcz, L., Morris, D., Plevin, R., Dicker, R., Juillard, C., ... & Wier, M. (2022). What is counted counts: An innovative linkage of police, hospital, and spatial data for transportation injury prevention. Journal of safety research, 83, 35-44. Available at https://www.sciencedirect.com/science/article/abs/pii/S0022437522001074). The "less than one crash per week" figure the government relies upon is a floor, not an accurate count. Any safety analysis that accepts this undercount as a complete picture of harm—and then uses it to characterize the consequences of removal as minimal—is not sufficiently rigorous.

## DIRECTING CYCLISTS TO THE SIDEWALK IS NOT A SAFETY SOLUTION—IT TRANSFERS RISK

14. WABA members who perceive increased risk cannot simply choose to use the adjacent sidewalk or an alternative route. This approach mischaracterizes what the research shows about sidewalk cycling risks and corresponding irreparable harms like death and grave injuries, particularly on a high-volume urban corridor like 15th Street, NW.

15. A sidewalk is not a safe substitute for a protected bicycle facility. The peer-reviewed literature is consistent on this point. A case-crossover study of 690 injured cyclists in Toronto and Vancouver, published in the American Journal of Public Health, found that cycle tracks had the lowest injury risk of all 14 route types examined—approximately one-ninth the risk of a major street without bike infrastructure. The same study found that sidewalks and multiuse paths did not provide statistically significant harm reductions compared to major streets, and that sidewalks and multiuse paths presented higher risks than bike-only paths and cycle tracks. (Teschke et al., Route Infrastructure and the Risk of Injuries to Bicyclists: A Case-Crossover Study, 102 Am. J. Public Health 2336 (2012).) A separate literature review of 23 studies on cycling infrastructure and injury risk, published in Environmental Health, concluded that "sidewalks and multi-use trails pose the highest risk" among the facility types examined. (Reynolds et al., The Impact of Transportation Infrastructure on Bicycling Injuries and Crashes: A Review of the Literature, 8 Envtl. Health 47 (2009).)

16. This finding is not a peripheral.  It reflects the fundamental reason that transportation engineers build protected bicycle facilities in the first place: to move cyclists out of mixed-traffic conditions and away from pedestrian environments where conflicts and injuries are more frequent, not less.  The sidewalks along this corridor are not low-volume paths.  The NPS Paved Trails Study identified this area as experiencing high volumes of pedestrian and cyclist activity that "can result in conflicts."  Directing cyclists onto those sidewalks following removal of the cycle track would move them from the safest facility type documented in the research literature to one of the most hazardous—on a corridor that NPS itself has recognized as having exactly the user mix and volumes that make separation most necessary.  The government's planned approach is not a safety solution.  It transfers risk from motorists to cyclists, scooter users, and pedestrians—a population that includes a large share of the tourists and visitors the government claims the removal of the cycle track is intended to serve for America 250.

## THIS CORRIDOR WAS IDENTIFIED AS A FEDERAL PRIORITY IN NPS'S OWN PLANNING DOCUMENTS

17. In August 2016, NPS National Capital Region published its Paved Trails Study—a comprehensive planning document for the agency's 95-mile paved trail network in the Washington area.  The study formally identified the extension of the 15th Street, NW cycle track across the National Mall as Project N1.2, classified it as a gap-closure project of regional significance, designated it as a short-term priority (zero to two years), and assigned primary responsibility for constructing this facility to NPS. The study described it as a project that "would improve bicycle access along a high-volume corridor" and "could improve recreational bicycle mobility in the National Mall area by separating trail users— an objective of the National Mall Plan."

18. The same study identified the NAMA trail network as carrying some of the highest user volumes in the entire National Capitol Region paved trail network, serving "heavy usage by residents, tourists, commuters, as well as those seeking to use other regional routes" including the East Coast Greenway and U.S. Bicycle Route 1, which pass through the National Mall trails.  The study also formally designated the 15th, NW Street cycle track as a component of its "National Capital Trail" backbone—the corridors that form the "spine" of the regional network and "warrant special design, maintenance and operational considerations to adequately and safely address the high volume of users."

19. The NPS Decision Memo dated March 31, 2026 makes no reference to the Paved Trails Study, Project N1.2, or the National Capital Trail designation.  It does not analyze what severing this network connection means for the users who depend on it.

## WHO ACTUALLY USES THIS CORRIDOR — AND WHAT THE AMERICA 250 EVENTS WILL GENERATE

20. Washington, D.C. is one of the most transit-accessible cities in the United States, and the National Mall sits at its center.  Six Metro transit stations serve the National Mall perimeter directly.   NPS's own visitor guidance actively discourages driving, stating that

"Washington, D.C.'s busy metropolitan traffic can be a nightmare, while parking is at a premium" and that "public transportation is the best option." NPS further describes bicycles, scooters, and e-bikes as "the perfect way to get around the National Mall." (NPS, Plan Like a Park Ranger: Top 10 Tips for Visiting the National Mall, nps.gov/articles/000/namatop10.htm.) These are not incidental observations—they reflect the basic physical reality of the National Mall, which has limited vehicle parking and is surrounded by one of the most heavily used transit networks in the country. Washington, D.C. ranks consistently among the top five most walkable and transit-accessible large cities in the United States, according to Walk Score's annual rankings. Capital Bikeshare data from the project team's own planning analysis shows that 7 of the top 10 station trip pairs systemwide in 2018–2019 involved stations on the National Mall, reflecting high demand for bicycle access to this specific corridor. The pedestrian volumes recorded at the 15th Street, NW and Constitution Avenue, NW intersection reinforce this picture: 192 pedestrians in a single 15-minute AM peak period on a weekday, and 1,380 in a peak hour on a Saturday. This is a pedestrian- and cyclist-dominated environment for much of the day. The demand for shared micromobility in this corridor is not incidental—Capital Bikeshare recorded 6.1 million rides across the Washington metropolitan area in 2024, a 37 percent increase over 2023, making it the fastest-growing bikeshare system in the United States and second only to New York City's Citi Bike in total ridership. (Office of the Mayor, District of Columbia, Bowser Administration Celebrates 15th Anniversary of Capital Bikeshare, September 19, 2025, mayor.dc.gov; Capital Bikeshare system data, available at capitalbikeshare.com/system-data). Combined with private e-scooter and e-bike operators—Lime alone recorded 5.9 million rides in D.C. in 2024—shared micromobility has become a primary circulation mode for residents and visitors alike in the National Mall area.

21. Washington, D.C. welcomed 27.2 million visitors in 2024, according to Destination D.C., the city's official destination marketing organization. Many of those visitors drive into the region. But the motorists using 15th Street southbound are not, in general, Mall visitors. They are most likely commuters and through-traffic moving between downtown and the highway network. Like prior major Mall events, America 250 events will draw hundreds of thousands of people who then circulate among Mall destinations on foot and by shared mobility. Restoring one southbound vehicle lane on 15th Street, NW does not serve that population. It serves a marginal increment of commuters and through travelers whose delay savings, as documented in Section VII, amount to seconds at a single intersection, and perhaps at most up to a minute within the corridor.

22. Motorists using this corridor also have options. The downtown grid provides parallel north-south capacity on 7th, 9th, 12th, and 17th Streets. Adjacent 14th Street is designated by DDOT as a truck and bus through route with direct I-395 access—the project team's own traffic analysis identified it as the primary diversion route for this corridor and concluded that all eliminated turning movements could be accommodated on alternative routes. The cyclists and pedestrians displaced by removal of the cycle track have no equivalent alternative. The 15th Street, NW facility fills the only protected network gap between Virginia, the 14th Street Bridge, and the National Mall for non-motorized users. Motorists have a grid; cyclists have this corridor.

6

23. Beyond the intersection-level analysis, the broader corridor capacity is constrained by factors that restoring one lane on 15th Street NW cannot address. Downtown Washington operates predominantly on fixed signal timing, and the key access points surrounding the National Mall—I-395, the 14th Street Bridge, and the permanent street closures around the U.S. Capitol and White House—represent fixed throughput constraints that govern how many vehicles can realistically enter and exit the area regardless of lane configuration on 15th Street, NW. Adding one southbound lane does not expand the capacity of those bottlenecks. It adds queuing space upstream of constraints that will not move. A competent traffic analysis in support of this proposal would quantify the motorists' benefit being claimed—including an assessment of those constraints and their relationship to 15th Street, NW operations.

24. A significant portion of the delay increase at Constitution Avenue, NW and Madison Drive, NW was driven not by the lane removal itself but by signal timing changes that eliminated unsafe simultaneous pedestrian-vehicle movements—permissive turn phases that had been allowing vehicles to cross active pedestrian crossings at the same time as pedestrians were in the crosswalk. Restoring the vehicle lane does not automatically reverse those signal changes, and doing so would reintroduce the pedestrian conflicts those changes were specifically designed to eliminate—increasing crash risk to the very visitors the government claims the removal is intended to serve. The delay benefit to motorists from removal is therefore smaller than the raw numbers suggest, and any attempt to fully realize that benefit by restoring the old signal timing would come at direct cost to pedestrian safety.

25. There is no travel time savings study in the administrative record. There are no vehicle throughput projections for America 250 event conditions. There is no origin-destination analysis showing that the motorists who use this corridor are the visitors the agency is trying to serve. There is no demand modeling showing that one additional southbound lane on 15th Street will produce any measurable improvement in access for events drawing tens of thousands of visitors to the National Mall, the vast majority of whom will not arrive by private vehicle. These would be expected as part of a careful, professionally conducted analysis of the traffic flow issues.

26. The decision to move forward with the planned bike lane removal depends upon accepting a predictable increase in crashes—including crashes that will result in fatal or life-altering injury—to save approximately 30 to 40 seconds of intersection delay (DDOT analysis) for a few hundred motorists (a detailed model of the corridor, which includes the known constraints would be necessary to establish a precise figure). Those motorists can choose to have alternative routes or modes of transportation. The people who bear the safety cost of this decision—cyclists, pedestrians, and all road users on the corridor—are disproportionately the visitors, residents, and commuters who use the cycle track to access the National Mall by means other than a private vehicle, thus trading the safety of the millions of people who visit the National Mall each year for the convenience of a relatively small number of people who choose to drive through this constrained and congested location.

27. In my professional judgment, this tradeoff is inconsistent with the SSA that USDOT has adopted as the governing framework for federal roadway safety or that a competent transportation safety analysis would support.

## CONCLUSION

Based on my review of the record and my professional experience in transportation safety, I offer the following opinions:

28. The DDOT safety findings are consistent with the established body of research on protected bicycle facilities as to how to protect users and prevent irreparable harm, including FHWA's own Proven Safety Countermeasures program.

29. The government's methodological critique of the DDOT analysis applies an exposure metric—vehicle miles traveled—that FHWA's own guidance and binding federal regulations identify as inappropriate for evaluating bicycle and pedestrian crash risk. The correct metric is counts of non-motorized (bicycle and pedestrian) fatalities and serious injuries, which DDOT measured directly. This VMT-centered approach is especially problematic in dense, multimodal urban environments like D.C. where pedestrians and bicyclists are disproportionately over-represented in serious injury and fatal crashes relative to their share of total travel—a disparity that VMT-normalized metrics systematically obscure. USDOT's own SSA was adopted specifically to replace this framing.

30. Directing cyclists to the sidewalk following removal of the cycle track is not a safety solution. It is a blueprint for foreseeable, irreparable, and preventable harm. The peer-reviewed literature consistently finds that cycle tracks have the lowest injury risk of any facility type, while sidewalks and multiuse paths have among the highest. This corridor's pedestrian volumes, relatively narrow sidewalks (relative to volumes of users), and the intense and widespread placement of security bollards on the sidewalk network make sidewalk cycling particularly hazardous to both bicyclists and pedestrians—a population that, given the nature of the National Mall and its visitors, includes a significant share of elderly visitors, people with mobility impairments, and families with young children who are among the most vulnerable to pedestrian-cyclist conflicts.

31. The 15th Street, NW cycle track is a formally planned, federally recognized priority network corridor, identified as Project N1.2 in NPS's own Paved Trails Study. The Administrative Record does not acknowledge these planning efforts.

32. The National Mall is a high-volume pedestrian and cyclist environment served by six Metro stations and surrounded by a dense transit network. NPS's own visitor guidance discourages driving and recommends transit, walking, and cycling as the primary means of access. The motorists on this corridor are predominantly commuters and through-traffic with parallel alternatives on the downtown grid. The cyclists and pedestrians displaced by removal have no equivalent protected alternative and become subject to harms like death and grave injuries.

8

33. The maximum intersection-level delay benefit that restoration of the southbound lane can deliver to motorists—based on the project team's own traffic analysis—is approximately 30 to 40 seconds per vehicle at the most affected intersection.  This benefit is unquantified and unverified in the Decision Memo and unsupported by any updated analysis in the administrative record.

34. It is my professional opinion, to a reasonable degree of engineering certainty, that removal of the 15th Street, NW cycle track will disproportionately increase crash risks and irreparable harms for cyclists, pedestrians, e-scooter users, and all road users on this corridor; that this increase is predictable and preventable; and that the administrative record does not contain the analysis that would be needed to support the agency's conclusion that the benefits of removal outweigh its safety costs or that no less risky alternatives exist to achieve the project's stated goals.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 7, 2026, in Minneapolis.

Digitally signed by William Schultheiss
DN: C=US,
E=wschultheiss@tooledesign.com, O=Toole
Design Group, OU=Director of Design and
Engineering, CN=William Schultheiss
Date: 2026.04.07 09:18:37-05'00'

William Schultheiss, PE

9