# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

<table>
<tr><td>

WASHINGTON AREA BICYCLIST
ASSOCIATION, INC.,

   *Plaintiff*,

v.

DOUGLAS BURGUM, in his official capacity
as SECRETARY OF THE INTERIOR;

DEPARTMENT OF THE INTERIOR;

JESSICA BOWRON, in her official capacity as
ACTING DIRECTOR, NATIONAL PARK
SERVICE;

NATIONAL PARK SERVICE;

SEAN DUFFY, in his official capacity as
SECRETARY OF TRANSPORTATION;

DEPARTMENT OF TRANSPORTATION;

SEAN MCMASTER, in his official capacity as
ADMINISTRATOR, FEDERAL HIGHWAY
ADMINISTRATION;

FEDERAL HIGHWAY ADMINISTRATION,

   *Defendants*.

</td><td>

Case No. 1:26-cv-00988-ABJ

</td></tr>
</table>

**PLAINTIFF'S COMBINED MEMORANDUM IN SUPPORT OF PLAINTIFF'S
MOTIONS FOR PRELIMINARY INJUNCTION AND SUMMARY JUDGMENT AND
OPPOSITION TO DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................... iv

INTRODUCTION ............................................................................................................ 1

FACTUAL BACKGROUND .............................................................................................. 3

     A.    WABA and Bike Lanes on the National Mall. ........................................... 3

     B.    The National Park Service Installs Protected Bike Lanes After a Meaningful Public Consultation Process. ................................................. 5

     C.    Safety Along 15th Street Dramatically Improves After Bike Lane Installation. ............................................................................................. 7

     D.    WABA Members Use and Rely on the Bike Lanes. .................................... 8

     E.    The Federal Government Plans in Secret to Remove the Bike Lanes. .................. 9

     F.    The Federal Government Decides That It Will Remove the 15th Street and Tidal Basin Bike Lanes on March 23, Until Forced to Delay by This Litigation. ............................................................................................. 11

LEGAL STANDARD ...................................................................................................... 14

ARGUMENT ................................................................................................................. 15

I.    Defendants' March 31 Documents are Post Hoc Rationalizations, Not a New Action. ..................................................................................................... 15

     A.    Defendants' Post Hoc Rationalizations Are Black-Letter *Chenery* Violations. ............................................................................................. 16

     B.    Defendants' Mootness and Finality Arguments Fail. ............................... 20

II.    WABA Prevails on the Merits. ........................................................................ 22

     A.    The Agencies Failed to Meet their Obligation to Engage in Consultation Under the National Capital Planning Act. .............................................. 22

     B.    Defendants' Abrupt Bike Lane Removal Project Is Arbitrary and Capricious. ............................................................................................. 24

          1.    Defendants' Sudden and Unexplained Change Is Arbitrary and Capricious. ............................................................................ 24

          2.    Defendants' Reasoning Is Arbitrary and Capricious. ............................... 27

3.      Defendants' Failure to Consider Serious Reliance Interests Is Arbitrary and Capricious..................................................................... 32

C.      Defendants Have Violated Their Procedural Obligations Under NEPA. ............. 32

D.      Defendants' Lane Removal Project Does Not Comply with the Organic Act. ...................................................................................................................... 35

III.    WABA Members Face Imminent and Irreparable Harms that Establish Standing and Warrant a Permanent Injunction. ................................................................. 37

A.      The Removal Project Will Cause WABA's Members Physical, Economic, Recreational, Aesthetic, and Procedural Injuries that Establish Standing............ 37

B.      If the Bike Lanes Are Removed, the Harms to WABA's Members Will Be Irreparable ........................................................................................................ 40

C.      Plaintiffs Have No Meaningful Way to Avoid the Harms................................... 43

IV.     The Balance of Equities and the Public Interest Favor WABA....................................... 44

CONCLUSION................................................................................................................. 45

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Al-Joudi v. Bush*,
406 F. Supp. 2d 13 (D.D.C. 2005) ..................................................................................41

*Allied Local & Reg'l Mfrs. Caucus v. EPA*,
215 F.3d 61 (D.C. Cir. 2000) .........................................................................................31

*Am. Fed'n of Gov't Emps. v. U.S. Dep't of Educ.*,
__F. Supp. 3d__, 2025 WL 3123707 (D.D.C. Nov. 7, 2025) ......................................44

*Anchor Line Ltd. v. Fed. Mar. Comm'n*,
299 F.2d 124 (D.C. Cir. 1962) ..................................................................................18, 19

*Ass'n of Am. Univs. v. Dep't of Def.*,
806 F. Supp. 3d 79 (D. Mass. 2025) ..............................................................................45

*Ass'n of Civilian Technicians v. Fed. Lab. Rels. Auth.*,
269 F.3d 1112 (D.C. Cir. 2001) ......................................................................................18

*Benavides v. Housing Authority of City of San Antonio, Tex.*,
238 F.3d 667 (5th Cir. 2001) ..........................................................................................43

*Brady Campaign to Prevent Gun Violence v. Salazar*,
612 F. Supp. 2d 1 (D.D.C. 2009) ...................................................................................34

*Camp v. Pitts*,
411 U.S. 138 (1973) ........................................................................................................19

*Carpenters Indus. Council v. Zinke*,
854 F.3d 1 (D.C. Cir. 2017) ...........................................................................................39

*Childers v. United States*,
40 F.3d 973 (9th Cir. 1994) ............................................................................................36

*Citizens for Resp. & Ethics in Wash. v. Fed. Election Comm'n*,
892 F.3d 434 (D.C. Cir. 2018) ........................................................................................16

*Clean Air Council v. Pruitt*,
862 F.3d 1 (D.C. Cir. 2017) ...........................................................................................21

*Collins v. Yellen*,
594 U.S. 220 (2021) ........................................................................................................39

iv

*Conservation L. Found. v. Ross,
   422 F. Supp. 3d 12 (D.D.C. 2019)......................................................................................40, 42

Council of S. Mountains, Inc. v. Donovan,
   653 F.2d 573 & 28 (D.C. Cir. 1981)............................................................................................21

Ctr. for Biological Diversity v. Env't Prot. Agency,
   861 F.3d 174 (D.C. Cir. 2017)....................................................................................................40

Daingerfield Island Protective Soc'y v. Babbitt,
   40 F.3d 442 (D.C. Cir. 1994).......................................................................................................37

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.,
   591 U.S. 1 (2020)..........................................................................................3, 16, 19, 20, 32

Desa Grp., Inc. v. U.S. Small Bus. Admin.,
   190 F. Supp. 3d 61 (D.D.C. 2016)...............................................................................................15

District of Columbia v. U.S. Dep't of Agric.,
   444 F. Supp. 3d 1 (D.D.C. 2020).................................................................................................42

*eBay Inc. v. MercExchange, L.L.C.,
   547 U.S. 388 (2006).....................................................................................................................44

El Puente v. U.S. Army Corps of Eng'rs,
   100 F.4th 236 (D.C. Cir. 2024)..............................................................................................18, 35

End Citizens United PAC v. FEC, 69 F.4th 916, 919 (D.C. Cir. 2023).......................................18

Esteras v. United States,
   606 U.S. 185 (2025)......................................................................................................................33

FBME Bank Ltd. v. Lew,
   142 F. Supp. 3d 70 (D.D.C. 2015)...............................................................................................19

FCC v. Fox Television Stations, Inc.,
   556 U.S. 502 (2009)......................................................................................................................24

Finca Santa Elena, Inc. v. U.S. Army Corps of Eng'rs,
   62 F. Supp. 3d 1 (D.D.C. 2014)...................................................................................................43

*Food & Water Watch,
   808 F.3d at 914 ............................................................................................................................38

Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.,
   528 U.S. 167 (2000)......................................................................................................................39

Friends of the Viet. Veterans Mem'l v. Kennedy,
   116 F.3d 495 (D.C. Cir. 1997)...........................................................................................5, 6, 36

*Fund For Animals v. Clark,
  27 F. Supp. 2d 8 (D.D.C. 1998) .................................................................................42

Gerber v. Norton, 294 F.3d 173, 183–84 (D.C. Cir. 2002) ............................................................18

GPA Midstream Ass'n v. Dep't of Transp.,
  67 F.4th 1188 (D.C. Cir. 2023) ..............................................................................3, 4

Greater Yellowstone Coalition v. Kempthorne,
  577 F. Supp. 2d 183 (D.D.C. 2008) ........................................................................37

Growth Energy v. Env't Prot. Agency,
  5 F.4th 1 (D.C. Cir. 2021) ......................................................................................40

Info Labs Inc. v. U.S. Citizenship & Immigr. Servs.,
  613 F. Supp. 3d 415 (D.D.C. 2020) ........................................................................14

Johnson v. Panetta,
  953 F. Supp. 2d 244 (D.D.C. 2013) ........................................................................32

Kingdomware Techs., Inc. v. United States,
  579 U.S. 162 (2016) ................................................................................................21

LaRouche v. Fowler,
  152 F.3d 974 (D.C. Cir. 1998) ................................................................................21

Loc. 814, Int'l Bhd. of Teamsters v. NLRB,
  546 F.2d 989 (D.C. Cir. 1976) ................................................................................19

Marcum v. Salazar, 694 F.3d 123, 126 (D.C. Cir. 2012) ..............................................................21

Michigan v. EPA,
  576 U.S. 743 (2015) ................................................................................................16

Monsanto Co. v. Geertson Seed Farms,
  561 U.S. 139 (2010) ................................................................................................45

Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,
  463 U.S. 29 (1983) ..................................................................................................28

NAACP Erie Unit 2262 v. Fed. Highway Admin.,
  648 F. Supp. 3d 576 (W.D. Pa. 2022) .....................................................................34

Nat'l Min. Ass'n v. U.S. Army Corps of Eng'rs,
  145 F.3d 1399 (D.C. Cir. 1998) ..............................................................................44

Nat'l Tr. for Historic Pres. in the U.S. v. NPS,
  No. 25-cv-4316, 2026 WL 877779 (D.D.C. Mar. 31, 2026) ...........................42, 43

*Nat'l Tr. for Historic Pres. in the United States v. Nat'l Park Serv.*,
No. CV 25-4316 (RJL), 2026 WL 533420 (D.D.C. Feb. 26, 2026) ...................................39, 40

*Paved Trails Study for the National Capital Region*
. NPS-AR-000371 .......................................................................................................4, 25

*PPL Wallingford Energy LLC v. FERC*,
419 F.3d 1194 (D.C. Cir. 2005)...........................................................................................37

*Pub. Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.*,
489 F.3d 1279 (D.C. Cir. 2007)...........................................................................................38

*Refugee & Immigrant Ctr. for Educ. & Legal Servs. v. Noem*,
793 F. Supp. 3d 19 (D.D.C. 2025).......................................................................................45

*Safari Club International v. Salazar*,
852 F. Supp. 2d 102 (D.D.C. 2012) .....................................................................................44

*SEC v. Chenery Corp.*,
318 U.S. 80 (1943).........................................................................................16, 18, 20

*Sierra Club v. Mainella*,
459 F. Supp. 2d 76 (D.D.C. 2006) .......................................................................................37

*Smiley v. Citibank (S.D.), N.A.*,
517 U.S. 735 (1996)...................................................................................................24, 27

*Terbush v. United States*,
516 F.3d 1125 (9th Cir. 2008) .............................................................................................36

*TikTok Inc. v. Trump*,
507 F. Supp. 3d 92 (D.D.C. 2020) .......................................................................................31

*United States v. Texas*,
599 U.S. 670 (2023).............................................................................................................39

*Wannall v. Honeywell, Inc.*,
775 F.3d 425 (D.C. Cir. 2014).............................................................................................24

*Whidden Mem'l Hosp. v. Sebelius*,
828 F. Supp. 2d 218 (D.D.C. 2011) ...............................................................................14, 15

*Xiaomi Corp. v. Dep't of Def.*,
No. 21-cv-280, 2021 WL 950144 (D.D.C. Mar. 12, 2021) ....................................................43

**Statutes**

5 U.S.C. § 702.............................................................................................................................42

16 U.S.C. § 1 ...................................................................................................................36

40 U.S.C. § 8722(a) .........................................................................................................22

40 U.S.C. § 8722(b) .........................................................................................................22

40 U.S.C. § 8722(b)(2)(B) ...............................................................................................23

42 U.S.C. § 4336(b)(2) .....................................................................................................35

54 U.S.C. § 100101 ..........................................................................................................36

54 U.S.C. § 100101(a) ........................................................................................................5

54 U.S.C. § 101511(a) ......................................................................................................22

**Regulatory Authorities**

23 C.F.R. 771.117(c)(26) .................................................................................................32

23 C.F.R. § 771.117(a) ...............................................................................................33, 34

23 C.F.R. § 771.117(b)(2) ................................................................................................34

23 C.F.R. § 771.117(c)(3) .................................................................................................33

23 C.F.R. § 771.117(c)(26) ..............................................................................................32

23 C.F.R. § 771.119(d) .....................................................................................................35

43 C.F.R. § 46.215(a) .......................................................................................................33

55 Fed. Reg. 42285, 42285 (Oct. 18, 1990) .....................................................................23

55 Fed. Reg. at 42286 ..................................................................................................23, 24

**Other Authorities**

Fed. Highway Admin., *Complete Streets - Safety Analysis* (last visited Apr. 7,
    2026), https://perma.cc/MC7J-XEBW .......................................................................29

Fed. Highway Admin., *Developing Crash Modification Factors for Separated
    Bike Lanes*, (last visited Apr. 7, 2026), https://perma.cc/3688-585G ......................29

Fed. Highway Admin., *Proven Safety Countermeasures: Bicycle Lanes* (last
    visited Apr. 7, 2026), https://perma.cc/KH6L-FCJJ ..................................................28

Nat'l Park Serv., *15th Street Cycle Track Removal and Road Repaving* (last
    visited Apr. 7, 2026), https://perma.cc/AMN4-D2AB ...............................................11

Nat'l Park Serv., *Traffic Advisory for March 28*, (last visited Apr. 7, 2026),
    https://perma.cc/3DNE-XYT5

Nat'l Park Serv., *Traffic Advisory for Today, Jan. 5* (last visited Apr. 7, 2026),
    https://perma.cc/GFD3-XCT9 ....................................................................................32

Randi Hildreth, *DC Mayor Bowser opposes removal of 15th Street bike lanes*,
    WUSA9 (last visited Apr. 7, 2026), https://perma.cc/WN7Q-T32C ......................................12

NPS Director's Order #75A, https://perma.cc/A6P7-FJH9 ...........................................................35

NPS Director's Order #12, https://perma.cc/LN43-7P7D .............................................................35

**INTRODUCTION**

Temporarily thwarted by this lawsuit in their hasty efforts to remove the 15th Street Bicycle Lanes in violation of multiple statutory mandates, the National Park Service ("NPS") and the Federal Highway Administration ("FHWA") now attempt to justify their planned action with a series of after-the-fact "decision" documents that did not exist at the time of their actual decision and that show the agencies' failure to grapple with the key safety issues that would be caused by their planned actions.  That gambit merely underscores the substantive and procedural deficiencies at the heart of this case.  It also is an attempt to evade judicial review, as evidenced by Defendants' late-breaking mootness and finality arguments premised on their new "decision" documents.  The Court should not countenance that gamesmanship and should vacate Defendants' decision to remove the bicycle lanes and issue a permanent injunction to prohibit them from issuing yet another new "decision" to do so in the future.

To start, FHWA and NPS's March 31, 2026 documents are *post hoc* rationales that this Court should not consider.  There is no suggestion in the Administrative Record ("AR") that Defendants engaged in *bona fide* reconsideration in a matter of days and despite their unwavering commitment to move forward with this action.  Nor did Defendants follow the proper procedure for reconsideration, which would have required a voluntary remand from this Court.  Instead, they have concocted new rationales for an already-made decision, even going so far as to invent a new set of critiques of the District Department of Transportation ("DDOT") study demonstrating the safety benefits of these bike lanes.

In any event, whether or not this Court considers the March 31 documents, the Defendants' decision to remove the bike lanes is unlawful, multiple times over.

*First*, Defendants cannot justify their failure to consult with the National Capital Planning Commission ("NCPC").  They claim, contrary to statements in the AR, that removing relevant

1

bike lanes does not involve "construction," such that the consultation requirement does not apply. That argument cannot be squared with the English language or Defendants' own explanation of the work they plan to undertake here (which is premised on the work involving "construction").

*Second*, the decision to remove the bike lanes is arbitrary and capricious. The March 31 documents (like the documents prepared before this lawsuit was filed) neither acknowledge nor explain Defendants' abrupt change in position regarding bike lanes. Previously, Defendants touted both the safety benefits and transportation connectivity those lanes provided; those prior positions have been abandoned without explanation. They do not meaningfully consider safety—other than criticizing the DDOT study, Defendants grapple with none of the evidence in the record, including their own statements and studies recognizing the safety (and other) benefits of bike lanes. And they do not consider WABA members' reliance interests.

*Third*, Defendants offer no satisfactory explanation for their failure to conduct an environmental assessment under the National Environmental Policy Act ("NEPA") for what is by no means a routine action. The plain text of the categorical exclusions ("CE") the agencies seek to rely on here is inapplicable. In any event, exceptions to the CE apply, including an exception for actions that have significant implications for public health and safety where this action will occur in a heavily used and trafficked corridor.

*Fourth*, for similar reasons, Defendants have failed to adequately justify their actions under NPS's Organic Act.

Remarkably, while Defendants seek to press forward with an ill-considered and unlawful plan to permanently destroy a critical piece of this city's transportation infrastructure, they at the same time assert that WABA's members—bicyclists who regularly use the 15th Street Bicycle Lanes—will not even be injured by that action. That breathtaking—and head-scratching—

assertion is based on a misunderstanding of Article III standing doctrine and a misreading of WABA's complaint and its members' declarations. If the bike lanes are removed, WABA's members will be injured in several ways: by the substantial risk of physical injury; by the loss of aesthetic and recreational benefits; and by classic harm to their pocketbooks (because alternative modes of transport are more expensive). Further, all of those harms are fully irreparable because—in this APA action—no money damages are available, and if the bike lanes are removed, this Court would at a minimum face serious obstacles in ordering their reinstallation.

As the Supreme Court has made clear, under the APA, "the Government should turn square corners in dealing with the people." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 24 (2020). Defendants "did not turn square corners here. [They] cut corners to the prejudice of the [plaintiff], the administrative process, and thus the public." *GPA Midstream Ass'n v. Dep't of Transp.*, 67 F.4th 1188, 1202 (D.C. Cir. 2023). This Court should vacate Defendants' decision to remove the bike lanes, and issue a permanent injunction to ensure that they do not issue yet another "decision" purporting to authorize such a removal.

## FACTUAL BACKGROUND

### A.    WABA and Bike Lanes on the National Mall.

WABA is a nonprofit dedicated to making streets safer and improving cycling across the D.C. region. NPS-AR-001200.[1] Founded in 1972, WABA has about 5,000 members and nearly 23,000 regional advocacy supporters. *Id.*

The installation of protected bikeways is central to ensuring the safety of cyclists, including WABA's members. Without dedicated lanes, separate from cars, bicyclists face dramatically

---

[1] This statement of facts supersedes the statement provided in WABA's opening Memorandum in Support of its Motion for a Preliminary Injunction, Dkt. No. 9-1 ("Opening Mem."), given the interceding filing of the AR.

higher risks of injury and death.  NPS-AR-001202.  Protected bike lanes separate bikers from faster, heavier cars; prevent cars from swerving into bikers; and keep pedestrians at a safer distance from moving traffic.  NPS-AR-001201.  Dedicated lanes also help transform biking into a practical means of transportation.  NPS-AR-001202.

For WABA and its members, travel along 15th Street, NW, its safety, and its role in the regional bike network have long been a focus.  NPS-AR-001200.  WABA has been calling for a safe connection along 15th Street since at least 2013.[2]  *Id.*  This is because 15th Street is a high-volume corridor, and links the D.C. region's northern and southern bicycle networks:



NPS-AR-001227.

NPS has long recognized the importance of bike lane safety, and it recommended creating the 15th Street Cycle Track in 2016 as part of a regional transportation planning process when it published the *Paved Trails Study for the National Capital Region*.  NPS-AR-000371.  NPS's *Study* identified "[e]xtend[ing] the existing cycle track south on 15th Street from Pennsylvania Avenue, NW to the 14th Street Bridge" as one of the "18 highest priority capital projects."  NPS-AR-

---

[2] Between Constitution Avenue and Maine Avenue, SW, 15th Street at times becomes Raoul Wallenberg Place, SW.  Kiker Decl., Dkt. No. 9-2, Att. 2, at 32.  When this document refers to "15th Street," it includes Raoul Wallenberg Place, SW.

000378; *see also* NPS-AR-000468 (Recommendation N1.2).  WABA coordinated with NPS and DDOT staff, and the public, to develop bicycle lanes along 15th Street.  NPS-AR-001200.

**B.      The National Park Service Installs Protected Bike Lanes After a Meaningful Public Consultation Process.**

Congress charged NPS, an agency housed in the Department of the Interior, with managing the National Park System's units "in such manner and by such means as will leave them unimpaired for the enjoyment of future generations."  54 U.S.C. § 100101(a).  One of those park units is the National Mall, located in the heart of Washington, D.C.  *See Friends of the Viet. Veterans Mem'l v. Kennedy*, 116 F.3d 495, 496 (D.C. Cir. 1997).  The Mall "is a uniquely symbolic space in the heart of our nation's capital," housing "the enduring symbols of our country," including "monuments, memorials, statues, and other commemorative works."  NPS-AR-000230.

While much of the Mall is designed for pedestrian traffic and serves as a public park for the Nation, it is also crisscrossed by streets and paths that are essential for traversing Washington, D.C.  NPS has authority over those streets, sharing a role in managing the streets of D.C. with DDOT.  NPS-AR-001229.  That shared role includes 15th Street (shown in teal on the map below), and connected segments of Ohio Drive, SW and East Basin Drive, SW (shown in dashed red, and referred to in this brief as the "Tidal Basin" lanes):

5



*Id.* For years, NPS and DDOT worked cooperatively to manage 15th Street and the Tidal Basin segment to "[i]mprove circulation and amenities for pedestrians, bicyclists, and other visitors" to the Mall. NPS-AR-0002340.

The process for installing the 15th Street bike lanes began in October 2020. NPS-AR-001201. Thereafter, a traffic analysis was conducted, crash data was reviewed, and a conceptual design was created. *Id.* DDOT held two public meetings, and met with stakeholders during the first half of 2021. *Id.* NPS assessed the project under NEPA and concluded that it did not significantly affect the environment, relying on a CE. NPS-AR-000543–45. After this, NPS submitted the project, along with its NEPA and historic assessment documents, to the NCPC. NPS-AR-000842. The Commission, on the recommendation of its staff and considering NPS's and DDOT's public consultation, approved the project at a public meeting, noting its support for the project's goal of improving safety for all road users. NPS-AR-001295.

DDOT completed construction of the 15th Street bike lanes in Fall 2021. NPS-AR-001201. The goals of the project were to "[c]reate a safe right-of-way for people, regardless of walking,

biking, or driving"; "[i]mprove function of the street and intersections to make them easier to use and understand"; and "[b]alance travel delay with right-of-way capacity and access for everyone who uses the street." NPS-AR-001300. The Tidal Basin segment was completed in FY 2023.[3] Dist. Dep't of Transp., *2024 Performance Oversight Questions, Part II*, at 101 (listing the "East Basin Dr SW" segment from "Maine Ave (N)" to the "14th Street Bridge Path" as having been "installed in FY23").[4]

### C.    Safety Along 15th Street Dramatically Improves After Bike Lane Installation.

After the installation of the bike lane, in 2026 DDOT conducted a data-driven evaluation of the 15th Street corridor and produced a report to understand the vehicular, bicycle, and pedestrian impacts of the bike lane. NPS-AR-001297; *see also* NPS-AR-000955–60. DDOT analyzed verified crash reports provided by the Metropolitan Police Department, a large dataset of vehicular speeds and travel times, bus speeds, and travel time provided by the Washington Metropolitan Area Transit Authority, and turning movement counts, which are collected at every signalized intersection on a regular basis. NPS-AR-001309–11.

DDOT's study showed that the 15th Street bike lane reduced all roadway crashes by 46% and bicycle injury crashes by 91%. NPS-AR-001300; *see also* NPS-AR-000956. The evaluation also showed that the protected lanes resulted in a 3% increase in bicycle traffic along the corridor. NPS-AR-001300. Finally, the report showed that speeds increased by 17%, and peak hour northbound travel time decreased by thirty-six seconds, while southbound travel time decreased by forty seconds. *Id.*; *see also* NPS-AR-000959. This demonstrates that the bike lanes did not

---

[3] NPS subsequently made further improvements to the bike lanes. *See* NPS-AR-000866; AR-000952–54; NPS-AR-000962–68; NPS-AR-000969.

[4] https://perma.cc/X2EF-BQWC.

have an adverse impact on traffic flow, likely because motorists no longer had to worry about coming into proximity with bicycles.

### D.    WABA Members Use and Rely on the Bike Lanes.

Many WABA members benefit from the 15th Street and Tidal Basin lanes and rely on their safety in their everyday lives. Allison Foster lives in Arlington, Virginia, but regularly travels to D.C. for work. NPS-AR-001334. The lanes help her "navigate a very busy area of the city with greater separation from vehicle traffic." NPS-AR-001334–35. That makes biking "safer and more feasible." NPS-AR-001334. Without the lanes, she "will be forced to find alternate routes." *Id.*

WABA member Nicholas Johnson "use[s] the 15th Street bicycle lanes nearly every day," and "regularly use[s]" the Tidal Basin lanes. NPS-AR-001337–38. He uses the 15th Street lane for his commute from his "home in Southwest D.C. to his office near DuPont Circle." *Id.* The lane's "[p]hysical separation from cars and buses . . . makes it much safer to ride bicycles on 15th Street." NPS-AR-001337. Removing the lanes, therefore, "threaten[s]" his "safety," and would force him "to rely more on other forms of transportation such as cars, which will contribute to traffic congestion." NPS-AR-001338. Removing the Tidal Basin lanes also "would make traveling to D.C. more dangerous" for him. NPS-AR-001338.

WABA member David Wacker is a pilot who "regularly commute[s]" by bike between his home in D.C. and his job at Ronald Reagan International Airport. NPS-AR-001340. The 15th Street and Tidal Basin lanes "fundamentally transformed" his commute because now he no longer has to "choose between riding on crowded sidewalks, creating frequent and unsafe conflicts with pedestrians, . . . [and] riding in traffic alongside motor vehicles, where [he] was routinely subjected to aggressive and unsafe driver behavior." NPS-AR-001340. So, the Removal Project "would significantly degrade the safety and reliability of [his] commute." NPS-AR-001340–41.

There are many more such WABA members.  Steven Bouchard lives in Alexandria and "regularly travel[s] to and from Washington, DC."  NPS-AR-001343.  He uses the 15th Street and Tidal Basin bike lanes because they are "the quickest route" and because of their "safety."  NPS-AR-001343.  With the lanes, "drivers clearly see where cyclists will be traveling, and the bollards prevent early turning."  *Id.*  David Alpert often uses the 15th Street and Tidal Basin lanes to get from his home in D.C. to Arlington.  NPS-AR-001346.  For him, the lanes are "a safe and practical route" that save him money by reducing his need for driving.  NPS-AR-001346.  Ashwin Jagannathan is in the same boat.  The lanes are one of his "most frequently used routes," and they keep him safe because "having physical separation from cars . . . takes the human error out of the equation and actively prevents crashes from happening."  NPS-AR-001349.  Further, WABA members employ the bike lanes for exercise and recreation and the "attractive" aesthetic the lanes create.  NPS-AR-001337; NPS-AR-001343; NPS-AR-001344.  Hundreds of WABA's members, like these, will continue to use the 15th Street and Tidal Basin lanes—if they continue to exist after April 23.  *See, e.g.*, NPS-AR-001334; NPS-AR-001338; NPS-AR-001344; NPS-AR-001349–50; NPS-AR-001202 ("I estimate that 900 of our members travel on 15th Street bike lanes every day.").  And if they do not exist, many will still use this crucial route—except now exposed to new and imminent dangers—and others will feel unsafe and no longer able to use this facility.  *See, e.g.*, NPS-AR-001344; NPS-AR-001347; NPS-AR-001340–41.

### E.    The Federal Government Plans in Secret to Remove the Bike Lanes.

The Government plans to soon erase these bicycle lanes.  This rapidly unfolding effort is referred to as the "Removal Project" in this memorandum.  Beginning in February, WABA heard from contacts in Interior and DDOT that the Government was considering removing the 15th Street bike lanes.  NPS-AR-001202–03.  Concerned that this change would put bicyclists' safety at risk and damage the regional bike network, and unable to find any public indication that this work was

9

planned, WABA sent a letter to NPS on March 13, 2026.  NPS-AR-001168–74.  The letter expressed concerns about any bike lane removal and urged NPS to comply with its legal obligations.  NPS-AR-001170–73.  WABA received no response.  NPS-AR-001202–03.  Nor is there any hint in the AR that WABA's concerns were considered by NPS.  Then, on March 19, signs announcing imminent road closures and detours appeared on and around the part of 15th Street that crosses the National Mall.  NPS-AR-001203.  Contacts in DDOT informally conveyed that NPS would move forward with removing bike lanes from the section of 15th Street that crosses the National Mall on Monday, March 23.  NPS-AR-001203.

While WABA scrambled for information, the Government already had a plan.  In documents dated late February, but publicly released only on March 25 in response to this litigation, NPS and FHWA described the Removal Project's scope.  NPS prepared a National Historic Preservation Act assessment document, NPS-AR-001139, as well as a NEPA "Categorical Exclusion Documentation Form," NPS-AR-001145 ("NPS February CE Form"). [5]  FHWA prepared its own "NEPA Categorical Exclusion Form," dated February 27, 2026.  NPS-AR-001161 ("FHWA February CE Form").  The documents provided street-segment information and explained that the 15th Street and Tidal Basin bike lanes would be entirely removed.  NPS-AR-001145; NPS-AR-001161.  These documents are the first indication in the AR that NPS was planning to remove the bike lanes.  No documents in the AR indicate that NPS or FHWA performed any traffic analysis, safety evaluations, site visits, or consulted with any stakeholders regarding the Removal Project prior to February 20, 2026.

---

[5] The historical assessment document is dated February 20, 2026.  NPS-AR-001139.  The NEPA form has no date, but is signed with a date of February 23, 2026.  NPS-AR-001149.

The agencies' purported justification for this action took up just a few sentences: the Removal Project was appropriate because it "supports implementation of Executive Order 14252, 'Making the District of Columbia Safe and Beautiful,'" and "[w]ith the upcoming National Cherry Blossom Festival and preparations underway for Americas 250th anniversary, ensuring safe access for residents, commuters, visitors, and emergency services is a shared priority." NPS-AR-001145; NPS-AR-001161–62. WABA and the public only learned of these documents after the Government posted them online in response to the Court's March 25 scheduling conference. *See* Nat'l Park Serv., *15th Street Cycle Track Removal and Road Repaving* (last visited Apr. 7, 2026).[6]

According to later CE Forms that post-date the filing of this lawsuit, the NPS February CE Form "assumed that all work would be completed prior to the National Cherry Blossom Festival, or would not interfere with the National Cherry Blossom Festival," which runs through April 12, 2026. Similarly, the FHWA February 27 CE Form was issued "on the assumption that the project would start on or around that date." NPS-AR-001362. The first documentation in the AR of construction planning for the Removal Project is dated March 6, 2026, and projects that construction will end four days before the *end* of the Cherry Blossom Festival. NPS-AR-001167. Nowhere in the record is there any projection that the Removal Project could have been completed before the Festival.

### F. The Federal Government Decides That It Will Remove the 15th Street and Tidal Basin Bike Lanes on March 23, Until Forced to Delay by This Litigation.

The Government effectively confirmed its intentions to remove the bike lanes on March 20, 2026. In a statement provided to press outlets, NPS said (quoting its then-secret NEPA document) that "[w]ith the upcoming National Cherry Blossom Festival and preparations

---

[6] https://perma.cc/AMN4-D2AB.

underway for America's 250th anniversary, ensuring safe access for residents, commuters, visitors, and emergency services is a shared priority."  NPS-AR-001322; NPS-AR-001327.  The agency added that "[t]hese nationally significant events draw substantial visitation and require coordinated infrastructure planning to support mobility, security, and a positive experience for all."  NPS-AR-001322; NPS-AR-001327.  A statement from FHWA's parent agency, the Department of Transportation ("DOT"), to a local news station said that "[a]s part of the President's initiative to revitalize Washington, D.C., we are collaborating with the Department of the Interior to restore common sense into city planning."  Randi Hildreth, *DC Mayor Bowser Opposes Removal of 15th Street Bike Lanes*, WUSA9 (Mar. 21, 2026).[7]  The statement claimed that the "bike lanes on 15th St have dramatically reduced roadway capacity," and cited a need to "improve[] traffic flow."  *Id.*

Prompted by reports like these, nine members of Congress wrote to NPS on March 20, urging NPS to "immediately reverse course and stop the removal of the bike lane."  NPS-AR-001175.  Washington, D.C. Mayor Muriel Bowser also called for the retention of the bike lanes and criticized NPS for increasing "conflicts between pedestrians, cyclists, and vehicles, especially at one of the busiest times of the year."  NPS-AR-001323.  News outlets then reported that lane removal was scheduled for Monday, March 23.  NPS-AR-001321; NPS-AR-001326.

Then the Government temporarily changed course—when faced with this lawsuit.  On the afternoon of March 22, after WABA's counsel informed the Government of the pendency of this litigation, the Department of Justice assured WABA that no work would be done on the bike lanes until March 30, at the earliest.  NPS-AR-001204.  But even as the Government delivered this slight reprieve, it revealed for the first time that the Tidal Basin protected bicycle lanes were also slated

---

[7] https://perma.cc/WN7Q-T32C.

for removal.  NPS-AR-001204.  This was the first time that WABA learned that the planned removal extended beyond the scope of the 15th Street lanes.  *Id.*

Next, on the afternoon of March 23, shortly after WABA filed its complaint, the Government delayed the Removal Project again, and represented to this Court that no work would begin "until, at the earliest, April 23, 2026."  Joint Status Report & Proposed Schedule, at 1–2, Dkt. No. 7.  According to Defendants, sometime in mid-March the Defendants "decided to delay the project" (though there is no evidence of such a delay in the AR) and "WABA's lawsuit was filed while they were reconsidering it."  Resp. at 5.  Counsel for Defendants indicated during the March 25 and 26, 2026 scheduling conferences that there simply was no flexibility in the projected start date for the removal action.  3/25/26 Tr. 4:10–5:8; 3/26/26 Tr. 3:22–4:16.

On March 31, 2026, five days after WABA filed its Motion for Preliminary Injunction, Dkt. No. 9, Defendants issued new documents.  FHWA issued a memorandum critiquing the DDOT's 15th St NW/SW Protected Bike Lane Post-Implementation Analysis, dated March 31. NPS-AR-001358 ("FHWA Memo").  NPS issued a new CE Form for the track removal, NPS-AR-001364 ("NPS March CE Form"), as well as a decision memorandum newly documenting its reasons for implementing the project, NPS-AR-001369 ("March 31 Memo").  And FHWA issued a "Re-Evaluation" of its February 27 CE Form, which considered NPS's new March CE Form. These new CE Forms indicate that removal work will begin on April 23, 2026.

NPS's purportedly "new" decisions drop the National Cherry Blossom Festival as a justification for the Removal Project and instead rely solely on America 250 and other events to rationalize the April 23 start date.  The March 31 Memo asserts that the removal will "facilitate the substantial visitation expected for these events," and will support implementation of Executive Order 14252 and Department of the Interior Secretary's Order 3428, NPS-AR-000978, both named

13

"Making the District of Columbia Safe and Beautiful," because it "will improve the visual quality of these prominent federal public spaces through removal of roadway appurtenances and restoration of a standardized, maintainable corridor configuration, and will help the public enjoy those events by relieving vehicular traffic congestion and allowing existing roads to bring more people to the National Mall and through the National Mall." NPS-AR-001370. The memo fails to address NPS's own previous analysis that had determined that the bike lanes would enable *more* visitors to access the Mall, *see* NPS-AR-000786–88, and would either improve or not significantly alter safety, ease of use, and delays for pedestrians, bikers, drivers, and tourists, *see* NPS-AR-000815. Nor does it address NCPC's analysis that informed the design approach that the bike lanes adopt "a context sensitive design approach that *maintains important viewsheds on the Mall.*" NPS-AR-000843. Nor do any of Defendants' new documents meaningfully address the safety implications of the Removal Project. Instead, in "consider[ing] the impacts to pedestrians and cyclists as a result of this project," NPS simply concluded that both will still have access to the Mall, and cyclists can either use the roadways themselves (with regular vehicular traffic) or the sidewalks (with pedestrians). NPS-AR-001371. Beyond criticizing DDOT's study, NPS does not address the safety, nor does it provide any analysis of the enhanced vehicular traffic flows that the project is attempting to achieve *See, e.g.*, NPS-AR-000775–841; NPS-AR-001212–59.

### LEGAL STANDARD

In reviewing agency action under the APA, a district court at summary judgment is to determine whether "the evidence in the administrative record permitted the agency to make the decision it did." *Info Labs Inc. v. U.S. Citizenship & Immigr. Servs.*, 613 F. Supp. 3d 415, 419 (D.D.C. 2020). "Summary judgment thus serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *Whidden Mem'l Hosp. v. Sebelius*, 828 F. Supp. 2d 218, 225

14

(D.D.C. 2011). That standard requires "courts to hold unlawful and set aside agency action, findings, and conclusions that are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* (quotation marks omitted). If a court cannot conclude that the agency "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made," the agency's action is arbitrary and capricious. *Desa Grp., Inc. v. U.S. Small Bus. Admin.*, 190 F. Supp. 3d 61, 68 (D.D.C. 2016) (quotation marks omitted).

## ARGUMENT

## I.    Defendants' March 31 Documents are Post Hoc Rationalizations, Not a New Action.

Despite Defendants' strained efforts, no new decision regarding the Removal Project was made by NPS or FHWA on March 31, 2026. Defendants' new "decision" documents are merely post hoc rationalizations of Defendants' earlier decision to remove the bike lanes because, among other things: (1) the Government has never represented that it was open to actually reconsidering the removal of the bike lanes (i.e., not removing them) or the timing of that action; (2) the Government's own representations to this Court, both at the status hearing and its brief, confirm that this was at most an effort to bolster a decision already made; (3) the March 31 Memo and documentation was prepared in the midst of litigation, without a voluntary remand, and under an extraordinarily expedited timeline, and (4) the March 31 documentation invents brand-new rationales for the agency decision, and thus is not merely an "amplified articulation" of the Defendants' original rationale for the removal decision.

Because this was not a new decision, there is no merit to Defendants' arguments that this lawsuit is moot or that the challenged agency action is non-final because it has been superseded. Defendants, prior to March 23, 2026, made a definitive decision to remove the bike lanes, and that

15

decision remains the live action subject to WABA's challenge.  In any event, WABA has filed an amended complaint, which addresses any potential mootness or finality issue.

> ### A.      Defendants' Post Hoc Rationalizations Are Black-Letter *Chenery* Violations.

It is a "foundational principle of administrative law that a court may uphold agency action only on the grounds that the agency invoked when it took the action." *Michigan v. EPA*, 576 U.S. 743, 758 (2015) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943)).  The "basic rule here is clear:  An agency must defend its actions based on the reasons it gave *when it acted*." *Regents*, 591 U.S. at 24 (emphasis added).  Defendants contend that *Chenery* does not apply here because "[t]he explanations provided . . . are the reasons given by the agencies, not their litigation attorneys." Resp. at 24.  Defendants rely on outdated case law: *Chenery's* rule applies "with equal force" to "those appearing on behalf of the agency" and to "agency officials themselves," "because the problem is the timing, not the speaker." *Regents*, 591 U.S. at 23.  Where an agency relies on post hoc rationalizations to support its decision, it has failed to "provide a reasoned explanation for its action." *Id.*

Accordingly, now that this lawsuit has "identified flaws in the original explanation," *Regents*, 591 U.S. at 23, Defendants are limited to the reasons they provided prior to the litigation because "[a]n agency cannot *sua sponte* update the administrative record when an action is pending in court." *Citizens for Resp. & Ethics in Wash. v. Fed. Election Comm'n*, 892 F.3d 434, 438 n.5 (D.C. Cir. 2018).  Instead, Defendants impermissibly attempt to justify the Removal Project with newly generated documents and call them a new "decision."  But this decision is not new at all.

*First*, Defendants have not once represented that they were open to actually reconsidering the removal of the bike lanes (i.e., not removing them) or to even altering the timing of that action.  Instead, Defendants generated documents responding to WABA's contentions in this litigation to justify their decision to remove the bike lanes under the guise of a "new" decision—a decision to

16

take the exact same action, just a few weeks later.  But Defendants' own statements to this Court belie this assertion.  For example, Defendants argue that WABA's claims are moot because, by producing these "new decision *documents*," Defendants have adequately explained or justified "*their decision* . . . in even more detail than before."  Resp. 13 (emphases added).  Thus, Defendants recognize that they have made one, singular decision—to remove the bike lanes—and have only now produced new documents in support of that decision.  Nowhere do Defendants claim that they have ever considered *not* removing the bike lanes or any other alternatives.

The timing of Defendants' actions further demonstrates that their new explanations are post-hoc rationalizations.  In late February, NPS and FHWA had already approved CE documents that described the Removal Project.  NPS-AR-001150 to NPS-AR-001166.  By March 6, there was a detailed schedule, with March 21 tentatively slated as the day to begin "milling & paving Ohio Dr. to Jefferson Memorial."  NPS-AR-001167 (capitalization modified); *see* AR Cert. at 4, Dkt. No. 15-1 (dating this schedule as "3/6/2026").  By March 20, NPS had created a map setting out a road-closure plan.  NPS-AR-001179; *see* AR Cert. at 4, Dkt. No. 15-1 (dating this map to "3/20/2026").  That same day, media outlets reported that bike lane removal would begin on March 23.  NPS-AR-001321; NPS-AR-001326.  It was only *after* this litigation began that the Government abruptly delayed lane demolition to April 23.  *See* Joint Status Report & Proposed Schedule at 1–2, Dkt. No. 7.  Even then, however, the agencies were still committed to the Removal Project.  At the March 25 hearing, the Court asked: "[H]as there been a decision made to get rid of these bike lanes?"  3/25/2026 Tr. at 7:14–15.  The Government said, "Yes."  *Id.* at 7:16.  And when asked about the timing of the agency action, the Government indicated that, "[i]t is still April 23 . . . . And agency decision-makers are not willing to move the date."  3/26/2026 Tr. 3:1–5.  Then, on the deadline for the Government to produce the AR, NPS and FHWA signed what

17

they now claim are documents that justify the decision behind the Removal Project.  *See* AR Cert. at 4, Dkt. No. 15-1 (listing a "Decision Memo" and three supporting documents, dated March 31, 2026).  These documents contain new rationalizations produced for purposes of this litigation.

Courts routinely reject belated gambits like this, particularly when the post hoc rationalizations postdate litigation about the decision the new documents attempt to rescue.  For example, in *Gerber v. Norton*, the Fish and Wildlife Service attempted to salvage its unjustified failure to provide a map during an Endangered Species Act comment period by "reaffirm[ing] its decision" "after [plaintiffs] filed their complaint and elaborated on their concerns."  294 F.3d 173, 183–84 (D.C. Cir. 2002).  The *Gerber* court gave no "credence to such post hoc rationalizations." *Id.* at 184.  Or in *End Citizens United PAC v. FEC*, "four days after [the plaintiff] filed its lawsuit," two Federal Election Commission members issued a "Statement of Reasons" purporting to justify the agency action that was the subject of the litigation.  69 F.4th 916, 919 (D.C. Cir. 2023).  This post hoc statement could not save the FEC's decision because its "basis" "must be measured by what the Commission did, not by what it might have done."  *Id.* at 921 (quoting *Chenery*, 318 U.S. at 93–94); *see, also, e.g.*, *Ass'n of Civilian Technicians v. Fed. Lab. Rels. Auth.*, 269 F.3d 1112, 1117 (D.C. Cir. 2001) ("Post-hoc rationalizations, developed for litigation are insufficient."); *cf. El Puente v. U.S. Army Corps of Eng'rs*, 100 F.4th 236, 252 (D.C. Cir. 2024) ("Because the Corps did not commission the supplemental analysis just to address a perceived shortcoming in its prior work, the facts here do not fit the pattern of a typical post-hoc rationalization.").

Finally, the fact that Defendants failed to ask this Court for a voluntary remand further demonstrates that no *bona fide* reconsideration took place.  "[W]hen an agency seeks to reconsider its action, it should move the court to remand or to hold the case in abeyance pending reconsideration by the agency."  *Anchor Line Ltd. v. Fed. Mar. Comm'n*, 299 F.2d 124, 125 (D.C.

18

Cir. 1962); *see FBME Bank Ltd. v. Lew*, 142 F. Supp. 3d 70, 73 (D.D.C. 2015). Defendants failed to do so here. Although seeking remand before reconsidering a decision is not aways required, "fail[ing] to follow that procedure" is inappropriate when the failure is "prejudicial in the circumstances of the present case." *Anchor Line Ltd.*, 299 F.2d at 125. Here, WABA already has had to substantially revise its arguments to account for late-breaking documents: first the NEPA CE forms that the Government released only on March 25, and now the March 31 documents.

Defendants also argue that their "reasoning in their new documentation" is simply "amplified articulation" for their removal decision. Resp. 24 (citing *Loc. 814, Int'l Bhd. of Teamsters v. NLRB*, 546 F.2d 989, 992 (D.C. Cir. 1976)). However, it is clear that "[w]hen an agency's initial explanation 'indicate[s] the determinative reason for the final action taken,' the agency may elaborate later on that reason (or reasons) but *may not provide new ones*." *Regents*, 591 U.S. at 21 (quoting *Camp v. Pitts*, 411 U.S. 138, 143 (1973)) (emphasis added). Defendants are not "elaborating" on their earlier reasons, but have instead provided brand new ones—as demonstrated by the FHWA Memo and March 31 Memo.

Those documents contain never-before-seen rationales to attempt to buttress a barren record. The FHWA Memo devotes four pages to critiquing a safety study of the 15th Street bike lanes—a study absent from every agency document that appears in the record before March 31, but called to NPS's attention by WABA's comments and opening brief. *See* NPS-AR-001358–61. In the NPS March CE Form, NPS for the first time asserts that the Removal Project will not have significant safety impacts because bicyclists can use sidewalks "to travel through the project area outside the motor vehicle roadway." NPS-AR-001366; *see* NPS-AR-001147 (not saying this). And in its March 31 Memo, NPS reiterates its new sidewalk-riding theory, accepts whole cloth FHWA's critique, and makes the novel and conclusory assertion that it has "weigh[ed]

19

competing interests" and "conclude[d] that this roadway space would be best used as an additional lane for vehicular traffic."  NPS-AR-001369–71.

Defendants' *Chenery* violation has caused mischief that rule seeks to prevent.  Forbidding post hoc rationalizations "ensure[s] that parties and the public can respond fully and in a timely manner to an agency's exercise of authority" and "instills confidence that the reasons given are not simply convenient litigating positions."  *Regents*, 591 U.S. at 23 (citation modified).  When "belated justifications" slip through, it "forc[es] both litigants and courts to chase a moving target."  *Id.*  Look no further than this case, where Defendants' decision has been a "moving target."  3/25/2026 Tr. at 17:14.  The March 31 documents impermissibly move the goalposts yet again.

## B.    Defendants' Mootness and Finality Arguments Fail.

Defendants argue that WABA's suit is moot because Defendants "new" decision documents mean that WABA's Complaint does not challenge the operative decision and must be dismissed as moot.  Defendants similarly argue that "[t]he February decision challenged by WABA is not a final agency action because it was subsequently reconsidered, and replaced, with a different final agency action."  Resp. at 20.  These arguments fail for two independent reasons.

*First,* for the reasons explained above, the March 31 memoranda are not new "decisions" at all, but rather mere post hoc rationalizations for a decision Defendants had already made.

20

Accordingly, Plaintiff *is* challenging the operative, active agency decision.[8]  Thus, this case is not moot and challenges a final agency action.[9]

Second, in any event, Plaintiff has amended its complaint to challenge Defendants' purportedly new actions, such that they are properly before this Court for resolution.  There is no prejudice to Defendants in proceeding on the current briefing in light of the Amended Complaint, as they have already taken the March 31 documents into account in their brief.  If anything, *WABA* is the party prejudiced by Defendants' moving target and belatedly generated rationalizations.

---

[8] Under Defendants' theory, the Government could unilaterally evade all challenges by simply issuing a "new" decision document delaying, by a single day, any challenged action, and thereby moot those challenges.  That cannot be the law and, in any event, in such circumstances the capable of repetition yet evading review exception to mootness would apply.  *See LaRouche v. Fowler*, 152 F.3d 974, 978 (D.C. Cir. 1998).  First, if this case is found to be moot and Defendants are allowed to proceed, Defendants estimate that the removal project will be complete within three weeks of April 23, 2026.  Resp. at 6.  In other contexts, the Supreme Court has concluded that "a period of two years is too short to complete judicial review." *Kingdomware Techs., Inc. v. United States*, 579 U.S. 162, 170 (2016).  Thus, this time frame is far too short for any challenge to Defendants' "new" decision to be fully litigated before the lanes are removed.  Second, not only is it reasonable to expect that WABA will be subjected to the same action again, WABA *already has* been subjected to the same action.  Only five days after WABA filed its motion for preliminary injunction did Defendants issue their "new" decision.

[9]  It is clear that a decision to delay an effective date does not render the original agency action nonfinal.  *See Council of S. Mountains, Inc. v. Donovan*, 653 F.2d 573, 579 nn.26 & 28 (D.C. Cir. 1981) (rejecting the argument that the court lacked jurisdiction to review an order "defer[ring] the implementation of regulations"); *see also Clean Air Council v. Pruitt*, 862 F.3d 1, 6 (D.C. Cir. 2017) (determining an action was final where the agency's actions "essentially" served only to "delay[ ] the [ ] effective date").  The only authority Defendants have cited to support their theory of finality provides no support.  In *Marcum v. Salazar*, the plaintiffs challenged an agency decision that was still under consideration because the *plaintiffs* had "submitted an administrative appeal" that was still "pending," and the agency had yet to take final action because of that appeal.  694 F.3d 123, 126 (D.C. Cir. 2012).  Moreover, in *Marcum*, "the Government never raised finality with the District Court and therefore forfeited the objection."  *Id.* at 128.

II.     **WABA Prevails on the Merits.**

A.      **The Agencies Failed to Meet their Obligation to Engage in Consultation Under the National Capital Planning Act.**

Defendants have no colorable defense for their failure to consult under the National Capital Planning Act ("NCPA").  Under that statute, all federal agencies "*shall* cooperate and correlate their efforts by using the National Capital Planning Commission as the central planning agency for federal activities in the National Capital region."  40 U.S.C. § 8722(a) (emphasis added).  And "[t]o ensure the comprehensive planning and orderly development of the National Capital," "*before* preparing construction plans the agency originates for proposed developments and projects . . . *shall* advise and consult with the Commission."  40 U.S.C. § 8722(b) (emphasis added).

Defendants do not dispute that NPS and FHWA are subject to these broad, mandatory consultation duties.  Nor do Defendants claim that they discharged these duties.  Instead, Defendants assert, Resp. at 31, that "removing bicycle lane barriers and repaving a roadway" do not involve "construction plans" and so "fall[] outside the ambit of the statute."  That argument is an affront to the English language: Clearly, "repaving a roadway"—including resurfacing, restriping, new sign installation, lane reconfiguration, and detailed traffic-control planning, *see, e.g.*, NPS-AR-000868–951; NPS-AR-001003–05; NPS-AR-001167—involves "construction." Indeed, that is the position Defendants have taken in *this* matter.  For example, as statutory authority for the removal, Defendants cited a provision that authorizes NPS to "*construct*, *reconstruct*, and improve roads and trails."  *See* NPS-AR-001369 (citing 54 U.S.C. § 101511(a)) (emphasis added).  And Defendants' own CE form states that the "effects" of the removal will be "limited to temporary *construction* disturbances."  NPS-AR-001372 (emphasis added).

Defendants contend, Resp. at 31–32, that the Commission "has long denied that it has jurisdiction over demolition and site preparation work for federal buildings on federal property,"

22

but the quoted language is simply a remark from a September 2025 meeting of the NCPC that did not address the Removal Project. Indeed, the quote is facially inapplicable to the Removal Project, which does not involve "demolition" or "site preparation" for any "federal buildings." In any event, the transcript provides no justification for that position, or evidence that the NCPC has "long" held it. Defendants also point, Resp. at 32, to a one-sentence email from an NCPC staff member that was sent the same day Plaintiff filed this lawsuit. NPS-AR-001197. But to exempt an agency from its consultation obligations, "*the Commission* shall determine *in advance* the *type or kinds* of plans, developments, projects, improvements, or acquisitions which do not need to be submitted for review by the Commission." 40 U.S.C. § 8722(b)(2)(B) (emphases added). Clearly, an email from an NCPC staff member (not the "Commission") sent on or after the commencement of a project (not "in advance") and purporting to establish a one-off carveout (rather than addressing the "type or kinds of plans" being excepted) does not satisfy these statutory requirements.

Notably, the NCPC has previously invoked 40 U.S.C. § 8722(b)(2)(B) in order to establish exceptions to the statute's consultation requirements, *see* National Capital Planning Commission Project Plans Submission Requirements, 55 Fed. Reg. 42285, 42285 (Oct. 18, 1990), but that formal guidance only confirms that the consultation obligations *do* apply here. The Commission advised that "plans for the following types of projects need not be submitted," including "[p]rojects involving the *replacement* of walks, roadways, and parking areas where *no change in the location or the existing character* or extent of the improvement is involved." 55 Fed. Reg. at 42286 (emphases added). The Removal Project falls outside this exception, as it will involve the destruction of bike lanes rather than the mere "replacement" of a "roadway[]" that will otherwise leave "the existing character" of the area intact. And none of the other exceptions outlined in the

23

guidance plausibly apply either. *See, e.g.*, 55 Fed. Reg. at 42286 (excepting under particular circumstances "[p]rojects involving the rehabilitation and improvement of buildings and structures").

In accordance with statutory mandates, NPS consulted with the NCPC before installing the 15th Street bike lanes. *See* NPS-AR-000822–65. Just like the Removal Project, that involved construction (including a mix of demolition, repaving, and new signage). Defendants offer no principled reason why the same statutory obligations should apply to one project but not the other.

**B.      Defendants' Abrupt Bike Lane Removal Project Is Arbitrary and Capricious.**

The Government does not even try to contend that Defendants' original decision documents passed muster under the APA. Instead, it relies on new documents, which for the reasons given above are mere post hoc rationalizations that the Court should not consider. *See supra* Part I. In any event, even if this Court were to consider them, those documents demonstrate that the Defendants' decision remained arbitrary and capricious, made clear by the Government's half-hearted, two-paragraph defense of Defendants' rationale.

*1.      Defendants' Sudden and Unexplained Change Is Arbitrary and Capricious.*

Defendants insist that they have justified their removal decision "in even more detail than before." Resp. at 13. But the AR contains neither an acknowledgement of nor an explanation for the agencies' sudden change from years of bike-lane promotion. Indeed, "the requirement that an agency provide reasoned explanation for its action would ordinarily demand that it display awareness that it *is* changing position." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). But Defendants display no such awareness. Their "[s]udden and unexplained change" is arbitrary and capricious. *Smiley v. Citibank (S.D.), N.A.*, 517 U.S. 735, 742 (1996).[10]

---

[10] Because Defendants failed to respond to those arguments, this Court should deem them conceded. *See* D.D.C. R. 7(b); *see also Wannall v. Honeywell, Inc.*, 775 F.3d 425, 428 (D.C. Cir.

24

The Removal Project is a clear departure from past practice that requires explanation. Even though Defendants included WABA's declarations and other evidence citing past support for bike lanes in the AR, the March 31 "decision" documents say nothing about how Defendants have abandoned their past positions on the safety of bike lanes for cyclists and pedestrians, the vital nature of these bike lanes as a regional connector, e.g. the "missing link," or general support for separate bike lanes. For example, NPS's 2016 *Paved Trails Study for the National Capital Region* is included in the AR. NPS-AR-000371–542. This Study notes that "[p]edestrian and bicycle safety is of primary importance to the NPS and is expressed as a specific objective within this study," NPS-AR-000375, and identifies the 15th Street bike lane as a "much-needed connection," NPS-AR-000497. The National Mall Plan is also in the AR and sets a goal to "provide separate bicycle lanes or trails." NPS-AR-000234; *see also* NPS-AR-000245 ("A stronger connection with the National Mall and a sense of arrival at the Tidal Basin will be achieved by redesigning and separating pedestrian, bicycle, and vehicular circulation."). NPS's own Management Policies state that: "Depending on a park unit's size, location, resources, and level of use, the Service will, where appropriate, emphasize and encourage alternative transportation systems, which may include a mix of buses, trains, ferries, trams, and—preferably—nonmotorized modes of access to and moving within parks." NPS-AR-000155. The Policy adds: "Park roads are generally not intended to provide fast and convenient transportation; rather, they are intended to enhance the quality of a visit while providing for safe and efficient travel with minimal or no impacts on natural and cultural resources." NPS-AR-000156. NPS also previously determined that these bike lanes would enable *more* visitors to access the National Mall. *See* NPS-AR-000786–88. At no point in *any*

---

2014) (explaining D.D.C. Local Rule 7(b) "is understood to mean that if a party files an opposition to a motion and therein addresses only some of the movant's arguments, the court may treat the unaddressed arguments as conceded.").

25

document—pre or post hoc—do Defendants mention any of these documents, contest their ongoing validity, or explain their bike-lane flip-flop.

Indeed, NPS never explains how its planned action is consistent with its long-established planning objectives regarding bicycling facilities for this region, set forth in its 2016 Paved Trails Study. NPS fails to consider or explain how its action would be consistent with: creating a widespread, interconnected regional paved trail system; enhancing regional mobility by providing transportation options for those in the region; coordinating with local jurisdictions and partners to advance trail priorities and projects that contribute to the success of the regional trail network; ensuring safe and accessible trail experiences; or providing a range of outdoor recreational experiences for trail users of all ages and abilities, among other goals. NPS-AR-000376.

What's more, the March 31 Memo introduces additional sudden and unexplained changes. The Memo does not explain why previous efforts to ensure the bike lane was "in keeping with the design aesthetic and quality of the National Mall," NPS-AR-000844; *see also* Resp. at 32, were insufficient or why further efforts are now needed. Instead, the agencies outsource their obligations to defend their actions, relying on two Executive Orders. But neither of those Orders can bear the weight Defendants place on them. The March 31 Memo fails to address NPS's previous analysis determining that the bike lanes would enable more visitors to access the Mall, *see* NPS-AR-000786–88, and would either improve or not significantly alter safety, ease of use, and delays for pedestrians, bikers, drivers, and tourists, *see* NPS-AR-000815. Nor does it address NCPC's analysis that the cycle track adopts "a context sensitive design approach that maintains important viewsheds on the Mall." NPS-AR-000843.

First, the Memo asserts that "Removal of the Cycle Track supports implementation of Executive Order 14252, "Making the District of Columbia Safe and Beautiful," which calls for the

26

Nation's Capital to "showcase beautiful, clean, and safe public spaces" and for the city's "highways, boulevards, and parks" to be "clean, well-kept, and pleasant." NPS-AR-001370. But the Memo never explains how the Removal Project can reasonably be expected to accomplish those goals. For example, the Memo never explains how adding *more* cars to the area around the Mall, which is expected to see *more* visitors during America 250, will make the area more beautiful, cleaner, or safer. Nor do the agencies provide any analysis of how adding this lane will ease the traffic burden, which is constrained by other limits. *See* NPS-AR-001353 ¶ 8; 2d Schultheiss Decl. ¶ 23 (discussing "fixed throughput constraints that govern how many vehicles can realistically enter and exit the area regardless of lane configuration on 15th Street."). Indeed, the change is counterintuitive: Increasing motor vehicle traffic will increase pollution and safety risks in the area. The Memo concludes (without explaining) that these changes will "benefit visitors for years to come," but there is no discussion of the long-term impact on D.C., its residents, tourists who depend upon these facilities, or the visual and safety appeal of increased alternative transportation options that use the bike lanes such as bikes and e-scooters. NPS-AR-001370.

The Memo's invocation of Executive Order 14189, "Celebrating America's 250th Birthday," accomplishes even less. NPS states that removing the bike lanes "will facilitate the substantial visitation expected for these events" and contribute to "a grand celebration"—but it nowhere explains how or why. Nor does the Memo explain why America 250, a temporary event, requires permanent changes to the National Mall's landscape.

Ultimately, the Removal Project remains a sudden and unexplained change. The Court should reject it as arbitrary and capricious. *Smiley,* 517 U.S. at 742.

    2.  *Defendants' Reasoning Is Arbitrary and Capricious.*

Despite the "new decision," Defendants have still "offered an explanation for [their] decision that runs counter to the evidence before the agency" and "is so implausible that it could

not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  Defendants merely (1) attack a single study, and (2) assert in a conclusory fashion that they "'weigh[ed] competing interests' including the impacts on pedestrians and bicyclists, as well as safety." *See* Resp. at 22 (citing NPS-AR-001371).  That is wholly insufficient.

**Safety and Traffic Concerns.**  Defendants contend they have considered safety because they "examined . . . closely" DDOT's 2025 traffic and safety study, Resp. at 13, but this framing is contrary to the AR and largely beside the point.  To start, nit-picking at the methodology of one safety study, of many, does not show that Defendants "considered" safety—it merely shows they considered one study's methodology.  And nowhere does the AR explain why even the "limited weight" given to the DDOT study does not cut against the decision to remove the bike lanes.

Crucially, the AR sets forth a wealth of evidence that bike lanes promote safety, separate from that DDOT study, which goes entirely unaddressed in the new decision documents. Defendants never acknowledge any of the other studies or sources, or more fundamentally address how safety of pedestrians and cyclists will be impacted by the Removal Project.  *See, e.g.*, NPS-AR-000129 (explaining that "[t]he saving of human life will take precedence over all other management actions as the Park Service strives to protect human life and provide for injury-free visits"); Fed. Highway Admin., *Proven Safety Countermeasures: Bicycle Lanes* (last visited Apr. 7, 2026) ("Separated bicycle lanes are recommended on roadways with higher vehicle volumes and speeds, such as arterials. . . .  Studies have found that roadways did not experience an increase in crashes or congestion when travel lane widths were decreased to add a bicycle lane. . . . Studies and experience in U.S. cities show that bicycle lanes increase ridership and may help jurisdictions

28

better manage roadway capacity.")[11]; Fed. Highway Admin., *Developing Crash Modification Factors for Separated Bicycle Lanes* 103 (last visited Apr. 7, 2026) ("The placement of effective design features, such as bicycle lanes, offers a safer and more efficient transportation system for all users.")[12]; Fed. Highway Admin., *Complete Streets—Safety Analysis* 4, 6 (last visited Apr. 7, 2026)[13] (identifying "add[ing] separated bike lane" as the first safety treatment "expected to improve the safety of pedestrians and bicyclists")[14]; NPS-AR-001353–55 (explaining safety features related to implementation of 15th Street protected bike lane and likely consequences of removal); NPS-AR-000815 (NPS's previous analysis determining bike lanes would either improve or not significantly alter safety, ease of use, and delays for pedestrians, bikers and drivers.

The AR contains copious references to the safety features of bike lanes beyond the 2026 DDOT Study, including DDOT's 2021 architectural designs and schematics for installation of 15th Street Cycle Track, which specifically identify the design as "Bicycle Safety Improvements," NPS-AR-000551; NPS and DDOT's 15th Street Safety Improvements Project Overview from March 2021, which details safety features on nearly every one of its 46 pages, NPS-AR-000775–821; and the NCPC Executive Director's Recommendation from June 3, 2021, which explains "the primary goal [is] to improve safety for all users in the corridor" in installing the bike lanes, NPS-AR-000842. Beyond the NPS's Management Policy favoring non-motor vehicles, it also only allows the designation of bike routes along park roads "based on a written determination that such use is . . . consistent with safety considerations," among other considerations. NPS-AR-000158.

---

[11] https://perma.cc/KH6L-FCJJ

[12] https://perma.cc/3688-585G

[13] https://perma.cc/MC7J-XEBW

Despite this mountain of evidence, Defendants' only mention of safety merely quibbles with the quality of one DDOT study.  Far from considering safety, the March 31 Memo confirms that Defendants have overlooked key safety and transit concerns.  The Memo baldly states that "NPS has considered impacts to pedestrians and cyclists as a result of this project," because "[t]he project will not change existing pedestrian walkways" and "bicycle use will continue to be allowed on sidewalks adjacent to roadways, consistent with Section 3(i)(i)(A) of the National Mall and Memorial Parks Superintendent's Compendium."  NPS-AR-001371; *cf.* NPS-AR-000405 ("The District of Columbia does not permit bicycling on sidewalks.").  Forcing cyclists onto the sidewalk will put pedestrians at risk, something Defendants never mention.  The AR makes clear that "Pushing cyclists into traffic and crowded sidewalks risks their safety, as well as the safety of pedestrians and other travelers."  NPS-AR-001203.  Declarants Wacker, Bouchard, and Alpert also spoke to the dangers of biking on crowded sidewalks for pedestrians.  NPS-AR-001340; NPS-AR-001344; NPS-AR-001346.   In the March 2021 presentation about the 15th Street Safety Improvements, one of the use cases explained that cyclists would no longer have to bike on the sidewalk because the protected lanes would provider her a safe alternative to "avoid fast and unsafe drivers."  NPS-AR-000792.  D.C. Mayor Muriel Bowser opposes the removal of the bike lanes because removal would "push cyclists into traffic or onto crowded sidewalks, creating new safety risks for everyone."  NPS-AR-001327.  Defendants never explain how it is rational to assert cyclists may ride their bikes on sidewalks provides a satisfactory solution here.

**Failure to Consider Reasonable Alternatives.**  Nothing in the AR indicates that Defendants considered reasonable alternatives to the permanent act of removing the bike lanes.  This failure "is a telltale sign that its decision-making process cannot 'be regarded as rational.'"

*See TikTok Inc. v. Trump*, 507 F. Supp. 3d 92, 110–12 (D.D.C. 2020) (quoting *Allied Local & Reg'l Mfrs. Caucus v. EPA*, 215 F.3d 61, 80 (D.C. Cir. 2000)).

Defendants have *never* explained why they would want *more* cars on the Mall during events where *hundreds of thousands* of people are expected to be—particularly given the historic pattern of closing or limiting motor vehicle access to the Mall in such scenarios. Defendants claim they need to remove the bike lanes to relieve traffic congestion for a limited-duration event. Resp. 22. But plenty of common-sense alternatives exist, and the AR contains no evidence that Defendants considered any. For example, Defendants could coordinate with DDOT to encourage increased use of public transit such as by adding additional Metro trains and offering free parking at Metro stations; increasing bus frequency; and converting vehicle parking lanes into bus-only lanes. Defendants could also encourage more—not less—bike usage through free rides on the Capital Bikeshare system and additional bike lanes. Or, consistent with Defendants' assertions that removing the bike lanes would return the area to its historic condition, NPS-AR-001142, they could close the road to cars completely and increase pedestrian footpaths. These efforts, any of which might "fully resolve the government's concerns" with these short-duration events, are reasonable and obvious alternatives that Defendants failed to consider. *TikTok Inc. v. Trump*, 507 F. Supp. 3d 92, 112 (D.D.C. 2020).

Defendants have recently used some of these alternatives for temporary events, and provide no explanation for why they would not suffice for America 250. For instance, on March 28, 2026, NPS closed certain roads to car traffic for events related to the National Cherry Blossom Festival "to accommodate three special events in the city." NPS encouraged "[r]esidents and visitors . . . to plan ahead, allow extra travel time, and consider alternate routes."[15] NPS also closed

---

[15] https://perma.cc/3DNE-XYT5

the roads surrounding the National Mall to car traffic on December 31, 2025[16] and January 5, 2026[17] for the Illumination of America: Washington Monument Lighting and Freedom 250.

> 3.    *Defendants' Failure to Consider Serious Reliance Interests Is Arbitrary and Capricious.*

The Government dismisses in passing WABA members' reliance interests, noting only that those "allegations . . . have no application here." Resp. at 23. This "perfunctory and undeveloped" counterargument constitutes waiver. *Johnson v. Panetta*, 953 F. Supp. 2d 244, 250 (D.D.C. 2013). The APA required Defendants to assess "whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns," especially where Defendants sought public input for installing the bike lanes. *Regents of the Univ. of Cal.*, 591 U.S. at 33; *see also* Opening Mem. at 24–26; NPS-AR-001200–01.

## C.    Defendants Have Violated Their Procedural Obligations Under NEPA.

NPS and FHWA rely on a CE for the "[m]odernization of a highway by resurfacing, restoration, rehabilitation, reconstruction, adding shoulders, or adding auxiliary lanes." NPS-AR-001145 (citing DOI NEPA Handbook, Appendix 2, NPS, 12.6(13)); NPS-AR-001362 (citing 23 C.F.R. 771.117(c)(26)). This CE is for "actions that, based on FHWA's past experience with similar actions, normally do not involve significant environmental impacts." *Id.* Demolition of a bike lane in one of our nation's most heavily-concentrated public spaces is anything but routine and the Removal Project does not qualify under the exclusion's plain language.

*First*, the regulatory text does not cover bike lane removal. NPS and FHWA's favored CE—they argue—"logically involves the removal of existing road features and striping." Resp. at 26 (citing 23 C.F.R. § 771.117(c)(26)); *see* NPS-AR-001122. But removing the bike lanes is

---

[16] https://perma.cc/3DNE-XYT5

[17] https://perma.cc/GFD3-XCT9

not the same as eliminating a lane of traffic—a fact underlined by the cases Defendants cite, which involve *maintaining* or *expanding* existing road uses. *See* Resp. at 26–27 (discussing cases where left-turn lanes were swapped for a hefty "double crossover diamond intersection," a bridge was "replac[ed]," and an "existing right-of-way" was "widen[ed]").

Defendants also argue that the existence of a separate categorical exclusion for "[c]onstruction of bicycle and pedestrian lanes, paths, and facilities," 23 C.F.R. § 771.117(c)(3); NPS-AR-001072, "only highlights that the type of work associated with [bike lanes] is not normally the type of work to cause significant impacts," Resp. at 27. This misunderstands the interpretive task—it is a "well-established canon of statutory interpretation" that "expressing one item of an associated group or series excludes another left unmentioned." *Esteras v. United States*, 606 U.S. 185, 195 (2025). The combination of this canon with the presence of a categorical exclusion for bike lane *construction* (but not destruction) yields the conclusion that the Lane Removal Project is not covered by a categorical exclusion. Defendants offer no contrary analysis.

*Second*, a categorical exclusion is inappropriate here because the Removal Project will "[h]ave significant impacts on public health or safety." 43 C.F.R. § 46.215(a). Defendants disagree, but their only justification is the safety-related assertions in NPS's March 31 "Decision Memorandum." Resp. at 27–28. Even if that post-hoc rationalization is considered, the memo's arguments are arbitrary and inadequate for the same reasons that they are arbitrary and inadequate when relied on to justify the Removal Project as a whole. *See supra* Part II.B, *infra* Part III.B.2.

*Third*, categorical exclusions are also improper for projects that "have significant impacts on travel patterns." 23 C.F.R. § 771.117(a). According to NPS and FHWA, the Removal Project "does not affect traffic patterns" because "[t]here will be no new connections between roadways, nor will existing connections be eliminated." Resp. at 29. This is not true. When NPS and DDOT

33

first constructed the 15th Street bike lanes, they added barriers and signage to prevent all right turns from 15th Street to Maine Avenue, including by closing a dedicated right-turn slip lane. *See* NPS-AR-000575 (final project blueprint showing new barriers and no-right-turn sign). NPS's Decision Memo says that the Removal Project will restore "vehicle operations as they existed prior to 2021." NPS-AR-001369. So, there will be a "new connection between," Resp. at 29, 15th Street and Maine Avenue. And, according to the Department of Transportation, the 15th Street project "dramatically reduced roadway capacity." NPS-AR-001328. Post demolition, the now "dramatically," *id.*, increased traffic will flow through the "new connection between," Resp. at 29, Maine Avenue and 15th Street. In addition, Defendants previously described the 15th Street bike lanes as a "missing link," which will now be severed. *See* Opening Mem. at 5–6, 21–22; *see also* NPS-AR-000784, NPS-AR-001227. So, according to Defendants' own telling, the Removal Project will assuredly "have significant impacts on travel patterns." 23 C.F.R. § 771.117(a).

*Fourth*, FHWA must "conduct appropriate environmental studies" because the Removal Project entails "[s]ubstantial controversy on environmental grounds." 23 C.F.R. § 771.117(b)(2). Defendants fault WABA for failing to "cite any case" where "safety concerns" created controversy related to "environmental considerations." Resp. at 30. But safety *is* an environmental consideration. *Brady Campaign to Prevent Gun Violence v. Salazar*, 612 F. Supp. 2d 1, 18 (D.D.C. 2009). And controversy exists when, as here, a number of "knowledgeable individuals" are "all highly critical of" an agency's environmental analysis. *NAACP Erie Unit 2262 v. Fed. Highway Admin.*, 648 F. Supp. 3d 576, 595 (W.D. Pa. 2022) (citation modified). *See also* NPS-AR-000955 (noting the reduction in roadway crashes and bicycle injury crashes); NPS-AR-001355-56 (discussing safety impacts of removing the bike lanes). The only response to this controversy mustered by Defendants is NPS's *Chenery*-violative Decision Memo. *See* Resp. at 30.

34

Because no categorical exclusion applies, Defendants were required to undertake (at least) an Environmental Assessment.  *See* 42 U.S.C. § 4336(b)(2).  Had they done so, FHWA and NPS regulations and guidance would have prompted some form of public process.  *See* 23 C.F.R. § 771.119(d) (requiring that, even if an FHWA environmental assessment is not "circulate[d] . . . for comment," the assessment "must be made available for public inspection . . . for 30 days"); NPS-AR-000339 ("[U]nless there is a specific situation that precludes it, public review and comment should be sought for every EA.").  In that process, WABA's members could and would have brought to Defendants' attention the Removal Project's shortcomings.  *See, e.g.*, NPS-AR-001204 ¶ 32.  More generally, NPS policies require that, "both adverse and beneficial impacts of NPS proposed actions are fully and openly evaluated before actions are taken that may impact the human environment.  This evaluation must include provisions for Meaningful participation by the public and other stakeholders", NPS Director's Order #12,[18] and "NPS decision makers are required to plan early for appropriate opportunities for public involvement when decisions are made for actions or policies that will significantly affect or interest the public," NPS Director's Order #75A.[19]  Instead, NPS and FHWA greenlit the removal, hidden from public view, and all while "uninformed" by the mandatory NEPA process.  *El Puente*, 100 F.4th at 246.

**D.      Defendants' Lane Removal Project Does Not Comply with the Organic Act.**

NPS neither considered the relevant factors nor reasonably concluded that the potential impacts of removing the Cycle Track and restoring the original lane configuration did not warrant further analysis for purposes of the statute.  The Organic Act requires NPS to regulate usage of the Mall in a manner that conserves park resources and values while providing for visitor enjoyment

---

[18] https://perma.cc/LN43-7P7D

[19] https://perma.cc/A6P7-FJH9

"as will leave them unimpaired for the enjoyment of future generations." 54 U.S.C. § 100101 (formerly at 16 U.S.C. § 1). NPS's use of the Mall must also "conform" with this "fundamental purpose." *Friends of the Vietnam Veterans Mem'l*, 116 F.3d at 496 (citation modified). NPS's own Management Policies confirm that these protected values include visitor safety and non-motorized access, stating that the saving of human life takes precedence over all other management actions and that NPS should emphasize "preferably—nonmotorized modes of access to and moving within parks." NPS-AR-000155. Despite substantial evidence that the existing cycle track improves safety for bicyclists and pedestrians using the National Mall, which hosts about 24 million visitors annually, NPS negated and minimized these safety considerations without sufficiently articulating why removal is consistent with visitor protection.

Defendants' contention that NPS satisfied the Organic Act because it exercised discretion and explained its decision contradicts the AR, which shows the opposite. *See* Resp. at 32. The AR reveals that NPS reversed years of thorough planning, evaluation, and research without fully grappling with the removal's harmful impacts on visitor safety, access, and enjoyment. The record exposes Defendants' failure to explain why prioritizing motor vehicle capacity over protected non-motorized access complies with the Organic Act. *E.g.*, NPS-AR-000822; NPS-AR-000775; NPS-AR-000551. The statute requires NPS to balance access with safety while accounting for conservation and resource protection. *Terbush v. United States*, 516 F.3d 1125, 1135 (9th Cir. 2008); *Childers v. United States*, 40 F.3d 973, 976 (9th Cir. 1994). NPS must "articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 100 (D.D.C. 2006) (quoting *PPL Wallingford Energy LLC v. FERC*, 419 F.3d 1194, 1198 (D.C. Cir. 2005)).

36

NPS implicitly concedes its duty to comply with the Organic Act in the March 31 Memo and purports to analyze (for the first time) those obligations.  NPS insists that the Removal Project is acceptable because "all work will be confined to the existing roadway footprint, and impacts to resources will be temporary, localized, and not significant."  NPS-AR-001372.  However, the memorandum cited by Defendants contradicts itself.  It says that the Project "will help the public enjoy [summer events] by relieving vehicular traffic congestion and allowing existing roads to bring more people to the National Mall and through the National Mall."  NPS-AR-001370.  While construction work may be confined to the roadway footprint, NPS's justification for the Project is precisely that its effects will extend across the National Mall and Memorial Parks unit.

Defendants moreover overstate the depth of NPS's discretion and the deference it commands.  Courts have held that NPS's discretion is bound to the Organic Act and must be exercised in a manner "calculated to protect park resources and values[,]" particularly when visitor safety is at risk.  *Daingerfield Island Protective Soc'y v. Babbitt*, 40 F.3d 442, 446 (D.C. Cir. 1994); *Greater Yellowstone Coalition v. Kempthorne*, 577 F. Supp. 2d 183, 193 (D.D.C. 2008).  In the face of evidence confirming that the protected bicycle lanes improve safety and access, Defendants nevertheless rush to dismantle the lanes without articulating how forcing cyclists and pedestrians into traffic advances visitor safety—a claim flatly disproved by the AR.  Defendants therefore fail to comply with the Organic Act's mandates.

**III.     WABA Members Face Imminent and Irreparable Harms that Establish Standing and Warrant a Permanent Injunction.**

**A.     The Removal Project Will Cause WABA's Members Physical, Economic, Recreational, Aesthetic, and Procedural Injuries that Establish Standing.**

Defendants' Article III standing argument is frivolous; it is based on a misunderstanding of the doctrine and a misreading of WABA's complaint and supporting declarations.  A "substantial" risk of future, physical harm—particularly serious injury or death—is obviously

37

sufficient for Article III standing.  And in any event, that is not the only type of injury that WABA's members will experience if Defendants carry out the Removal Project.  WABA's Complaint identified several categories of harms—each supported by fact declarations—that plainly clear the bar for Article III standing.  *See* Dkt. No. 1, Compl. ¶¶ 36, 40–41.

**Physical Harm.**  Defendants claim that WABA's allegations regarding the risk of physical injury are insufficient because WABA has failed to show "(i) a substantially increased risk of harm and (ii) a substantial probability of harm with that increase taken into account."  *Food & Water Watch*, 808 F.3d at 914 (quoting *Pub. Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.*, 489 F.3d 1279, 1295 (D.C. Cir. 2007)).  But the record contains clear evidence supporting both prongs.

WABA has easily shown a "substantially increased risk of harm," *id.*, by pointing to evidence that the 15th Street Bike Lanes have dramatically reduced roadway crashes and injuries. NPS-AR-000955 ("The project reduced all roadway crashes by 46% and bicycle injury crashes by 91%."); NPS-AR-001353–55 (explaining safety features related to implementation of 15th protected bike lane and likely consequences of removal).

And WABA has shown "a substantial probability of harm," *Food & Water Watch*, 808 F.3d at 914, by pointing to reliable DDOT data showing that protected bike lanes reduce crashes. *See* NPS-AR-000956 (explaining the project led to a 69% reduction in bicycle crashes and a 25% reduction in pedestrian crashes); *see also* 2d Schultheiss Decl.¶ 12 ("The planned action accepts a known" and "predictable … harm … in exchange for saving a few seconds of intersection delay for a few hundred motorists …."), ¶ 34 ("It is my professional opinion, to a reasonable degree of engineering certainty, that removal of the 15th Street, NW cycle track will disproportionately increase crash risks and irreparable harms" and "that this increase is predictable and preventable").

**Economic Harm.**  WABA's members will suffer classic pocketbook injuries if the bike lanes are removed.  For example, Declarants Foster, Johnson, and Alpert all explain that the removal of the bike lanes would cost them more money by requiring them to travel by car or other methods.  NPS-AR-001334; NPS-AR-001338; NPS-AR-001346.  Such "pocketbook injury" is "a prototypical form of injury in fact" and sufficient to demonstrate Article III standing.  *See Collins v. Yellen*, 594 U.S. 220, 243 (2021); *see also United States v. Texas*, 599 U.S. 670, 676 (2023) ("Monetary costs are of course an injury."); *Carpenters Indus. Council v. Zinke*, 854 F.3d 1, 5 (D.C. Cir. 2017) ("A dollar of economic harm is still an injury-in-fact for standing purposes.").

**Recreational and Aesthetic Harm.**  WABA's members will also suffer recreational and aesthetic harms if the bike lanes are removed.  For example, Declarants Johnson, Bouchard, and Alpert explain that the bike lanes provide exercise and recreation and create an "attractive" aesthetic to enjoy. NPS-AR-001337;  NPS-AR-001343;  NPS-AR-001344.    Those harms demonstrate Article III standing.  *See, e.g.*, *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 183 (2000) (standing established where plaintiffs "use the affected area and are persons for whom the aesthetic and recreational values of the area will be lessened by the challenged activity" (internal quotation marks omitted)); *see also Nat'l Tr. for Historic Pres. in the United States v. Nat'l Park Serv.*, No. CV 25-4316 (RJL), 2026 WL 533420, at \*5 (D.D.C. Feb. 26, 2026) (explaining the D.C. Circuit "has routinely found Article III injury" where plaintiffs allege aesthetic injury and collecting cases).

**Procedural Harm.**  Last, WABA has asserted procedural injuries that demonstrate Article III standing.  To show procedural injury, a plaintiff must identify a link between a procedural error, a "substantive government decision that may have been wrongly decided" due to the error, and a particularized injury related to the substantive decision.  *Id.*  (quoting *Ctr. for Biological Diversity*

39

*v. Env't Prot. Agency*, 861 F.3d 174, 184 (D.C. Cir. 2017)).  A plaintiff need *not* show that court-ordered procedural compliance would alter the agency's final decision; it suffices to show the agency "'*could* reach a different conclusion' if ordered to revisit its procedural error."  *Growth Energy v. Env't Prot. Agency*, 5 F.4th 1, 28 (D.C. Cir. 2021) (quoting *Ctr. for Biological Diversity*, 861 F.3d at 185)).  Here, WABA has shown procedural injury because it has identified multiple procedural errors that could have resulted in a decision not to carry out the Removal Project, which could have spared them the concrete injuries outlined above.

### B.   If the Bike Lanes Are Removed, the Harms to WABA's Members Will Be Irreparable

WABA's members face not only injury, but irreparable injury.  If the Removal Project goes forward, then no remedy at law or in equity will be adequate to compensate WABA's members for their harms.  A permanent injunction is necessary to avoid that result.  *See, e.g., Conservation L. Found. v. Ross,* 422 F. Supp. 3d 12 (D.D.C. 2019).  The threatened harms are irreparable for several, independent reasons.

*First*, if the bike lanes are removed, the risk of accident and physical injury that WABA's members will face is both great and imminent.  *See* Mot. 34-39.  The bike lanes "improved motor vehicle operations, cleared the sidewalk environment for pedestrians throughout the corridor, and separated cyclists from traffic," and "[r]emoval would reverse all three effects at once" and "increase the collision risks for pedestrians and cyclists."  NPS-AR-001355.  And follow-up research from DDOT supports its original conclusion that the bike lanes improved safety.  In response to an inquiry about the methodology for its original study, DDOT conducted additional analysis taking into account FHWA's stated methodological concerns.  This analysis showed that after the bike lanes were installed, the 15th Street corridor "saw a decrease in crashes and no effect on vehicle congestion."  DDOT Mem. at 5.  DDOT concluded that, [d]epending on

40

the method for normalizing, crash reductions ranged from 16% to 24% for all roadway crashes and 93% reduction in bicycle-related crashes," which "[o]utpaced the city in crash reductions by 39% for all crashes and 20% by bicycle crashes." *Id.*

Even Defendants concede that the data show there may be "one crash per week" without the lanes. *See* Resp. at 16–17. As an initial matter, this figure "is a floor, not an accurate count," and "[a]ny safety analysis that accepts this undercount as a complete picture of harm—and then uses it to characterize the consequences of removal as minimal—is not sufficiently rigorous." 2d Schultheiss ¶ 13. More important, the "planned action accepts a known, predictable, and often irreparable harm—an increase in crash risk that often causes fatal or life-altering injuries—in exchange for saving a few seconds of intersection delay for a few hundred motorists who have parallel route alternatives available." *Id.* ¶ 12. This risk of physical injury more than suffices to show irreparable harm. *See Al-Joudi v. Bush*, 406 F. Supp. 2d 13, 20 (D.D.C. 2005) ("It goes without saying that this Court need not wait to issue injunctive relief until [someone] has died.").

*Second*, if the bike lanes are removed, WABA members would experience recreational and aesthetic harms that could not be recovered. Bike rides not taken are irreplaceable. For example, Declarant Jagannathan, who bikes for "recreational purposes," considers the 15th Street bike lane "one of [his] favorites," on which he "regularly see[s] people from all walks of life." NPS-AR-001349. Declarant Bouchard, who uses the lanes "for exercise and recreation," bikes with out-of-towners who "marvel" at and receive "pleasur[e]" from the lanes." NPS-AR-001341-44. And Declarant Wacker describes how he "transport[s] [his] three-year-old daughter by bicycle along this same route," and how the lanes "foster a sense of community among users." NPS-AR-001340. Courts have recognized that the loss of such experiences constitute recreational and aesthetic harms that are inherently irreparable. *See, e.g., Conservation L. Found. v. Ross.*, 422 F. Supp. 3d

41

at 34 (harms to aesthetic and recreational interests of foundation's members "are noncompensable by legal remedies"); *Nat'l Tr. for Historic Pres. in the U.S. v. NPS*, No. 25-cv-4316, 2026 WL 877779, at *14 (D.D.C. Mar. 31, 2026) ("Aesthetic and environmental injuries are typically irreparable because they are seldom . . . adequately remedied by money damages and are often permanent or at least of long duration.") (internal quotation marks omitted).

*Third,* the procedural injury caused by Defendants' failure to comply with its legal obligations is also irreparable. While procedural injury "cannot stand alone as the basis for a finding of irreparable harm," WABA's members "would suffer other, concrete injuries should injunctive relief not be granted," as just described. *Fund For Animals v. Clark*, 27 F. Supp. 2d 8, 14 (D.D.C. 1998). Accordingly, the injury suffered by WABA members due to Defendants' procedural failures—combined with the physical, aesthetic, recreational, and pocketbook injuries they would suffer due to the Removal Project—satisfy "their burden of demonstrating the presence of an irreparable harm should the court not grant injunctive relief." *Id.* at 14.

*Fourth*, money damages are not an option to redress *any* of the injuries because the APA's waiver of sovereign immunity does not extend to damages claims. *See* 5 U.S.C. § 702 (allowing relief "other than money damages"). Thus, none of the injuries identified above could be redressed through damages. *See, e.g.*, *District of Columbia v. U.S. Dep't of Agric.*, 444 F. Supp. 3d 1, 34–35 (D.D.C. 2020) (noting that "economic loss caused by federal agency action" is "unrecoverable" and thus often "irreparable" because damages cannot be recovered in an APA action against the Government). And those economic losses could be "significant" depending on how long WABA's members are forced to pay additional, near-daily costs for alternative transportation. *See Xiaomi Corp. v. Dep't of Def.*, No. 21-cv-280, 2021 WL 950144, at *10 (D.D.C. Mar. 12, 2021) (recognizing that unrecoverable economic losses are irreparable where "significant"). *Id.*

42

*Finally*, if the bike lanes are removed, any future injunction directing their reinstallation would face significant legal and practical obstacles.  Indeed, "courts typically find challenges to completed projects to be moot."  *Nat'l Trust for Historic Preservation in the United States v. NPS*, No. 25-cv-4316, __ F. Supp. 3d. __, 2026 WL 877779, *15 (D.D.C. 2026)*; see also Finca Santa Elena, Inc. v. U.S. Army Corps of Eng'rs*, 62 F. Supp. 3d 1, 5 (D.D.C. 2014) (noting "a long line of cases in the courts of appeal holding ... challenges to completed construction projects to be moot").  The same is generally true when a project involves demolition.  *See, e.g.*, *Benavides v. Housing Authority of City of San Antonio, Tex.*, 238 F.3d 667, 670 (5th Cir. 2001) (action to enjoin demolition of housing project was mooted by substantial progress in the demolition).  Even if this Court were to order reconstruction, replacing the bike lanes could take months or even years to complete.  *See* Opening Mem. 39 (describing how "reinstallation cannot happen in an instant").  In the meantime, WABA members would experience all of the irreparable harms described above.

### C.    Plaintiffs Have No Meaningful Way to Avoid the Harms.

Defendants assert (at 2) that WABA and its members can simply take another route to avoid their injuries, and that by choosing to cycle in the area where the Removal Project is planned, they choose to be harmed.  Resp. at 2.  But there is no equivalent alternative to these bike lanes.  The Removal Project targets a "missing link" that agencies have worked toward completing for the last decade.  *See* Opening Mem. at 5–6, 21–22; *see also* NPS-AR-000784, NPS-AR-001227.  These bike lanes are a key artery that connects D.C. with Virginia.  *See* Opening Mem. at 16, 25–26.  WABA members cannot simply bike around them.

Defendants' suggestion that WABA members "use a different route or alternative mode of transportation," Resp. at 18, fares just as poorly.  Being required to take an alternative mode of transit emphasizes the pocketbook injury described by Declarants Foster, Johnson, and Alpert.  Defendants' suggestion also ignores the proximity to the Monuments and parklands that these

bicycle lanes provide to WABA members who use them for recreation and enjoyment; without these lanes, WABA members would suffer recreational and aesthetic injury. Defendants' reliance on *Safari Club International v. Salazar*, 852 F. Supp. 2d 102, 123 (D.D.C. 2012), is misplaced. *See* Resp. at 18. In that case, the court concluded that the plaintiffs had demonstrated "an injury in fact" sufficient for Article III standing. *See id.* at 111 n.7. Defendants' contention that WABA and its members' injuries "do not even suffice to establish Article III standing" is incorrect.

## IV.    The Balance of Equities and the Public Interest Favor WABA.

WABA requests that the Court permanently enjoin Defendants from initiating the Removal Project. *Nat'l Min. Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1408 (D.C. Cir. 1998) ("District courts enjoy broad discretion in awarding injunctive relief."). A plaintiff seeking a permanent injunction must demonstrate that "considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and … the public interest would not be disserved by a permanent injunction." *Am. Fed'n of Gov't Emps. v. U.S. Dep't of Educ.*, __F. Supp. 3d__, 2025 WL 3123707, *18 (D.D.C. Nov. 7, 2025) (*quoting eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)). The "third and fourth factors merge when the government is the opposing party," *id.* (quotation marks omitted), and are easily satisfied here.

**Balance of Hardships.** The burden on the Government to maintain the bike lanes is minimal—indeed, WABA seeks only to stop the Government from acting and to keep the lanes in place as they currently exist while it complies with its procedural obligations. And to the extent Defendants are concerned about traffic congestion in the coming months, there are obvious, reasonable alternatives available that Defendants have not even considered. *See supra* Part II.B. Defendants nowhere in their brief dispute that the balance of hardships favors WABA and its members.

44

**Public Interest.**    Defendants also do not argue that maintaining the bike lanes would disserve the public interest, nor could they. The bike lanes allow residents, commuters, and tourists to travel safely, and they have co-existed successfully with a range of highly-attended events, such as the Cherry Blossom Festival.   These lanes provide an economical way to recreate, commute, and enjoy the landscape's beauty and historic and cultural resources.  By contrast, the public interest is disserved by the Government's rush job to demolish the bike lanes.

Defendants' conduct in this litigation underscores why the public interest favors an injunction.  Relief short of an injunction would permit Defendants to attempt the same maneuver they seek to pull off here—or worse. The Government could simply make another "new decision" with a slightly adjusted implementation date but deficient in all the same ways.  Worse, nothing would prevent Defendants from acting on the decision even more quickly and secretly next time. Defendants could issue the decision and, minutes later, start demolition, all before WABA or others have a chance to challenge the action.  A permanent injunction is necessary in order to prevent such antics and preserve this Court's ability to engage in meaningful judicial review.[20]

## CONCLUSION

For the reasons set forth herein, this Court should grant summary judgment for WABA and issue a permanent injunction.

---

[20] A permanent injunction because it would "have a meaningful practical effect independent of … vacatur" by prohibiting Defendants from pursuing the removal using yet another set of "new" decision documents. *Ass'n of Am. Univs. v. Dep't of Def.*, 806 F. Supp. 3d 79, 124 (D. Mass. 2025) (citing *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010)).  However, even if this Court did not grant injunctive relief, vacatur would still bar Defendants from proceeding with removal, and the Court should make that clear. *See, e.g.*, *Refugee & Immigrant Ctr. for Educ. & Legal Servs. v. Noem*, 793 F. Supp. 3d 19, 63 (D.D.C. 2025) (both vacatur and an injunction "refer to a court order that bars the party that is the subject of the order from taking a future action, on pain of contempt").

April 7, 2026

Respectfully submitted,

By:  */s/ Thomas Brugato*

Thomas Brugato (D.C. Bar No. 1013523)
Gary S. Guzy (D.C. Bar No. 375977)
Daniel G. Randolph (D.C. Bar 230150)
Christina Coleburn (*pro hac vice*)
Kristin Oakley (*pro hac vice*)
Benjamin Rolsma (*pro hac vice*)

COVINGTON & BURLING LLP
850 Tenth Street, NW
Washington, D.C. 20001-4956
(202) 662-5515
tbrugato@cov.com
gguzy@cov.com
drandolph@cov.com
ccoleburn@cov.com
koakley@cov.com
brolsma@cov.com

*Attorneys for Plaintiff Washington Area Bicyclist Association, Inc.*