**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| WASHINGTON AREA BICYCLIST ASSOCIATION, INC., | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No. 26-0988 (ABJ) |
| DOUGLAS BURGUM, Secretary of the Interior, *et al.*, | ) ) ) ) | |
| Defendants. | ) ) | |

**MEMORANDUM OPINION**

On March 23, 2026, plaintiff Washington Area Bicyclist Association, Inc. ("WABA") filed this action against the Department of Interior; Douglas Burgum, in his official capacity as Secretary of the Interior; the National Park Service ("NPS"); Jessica Bowron, in her official capacity as Acting Director of the National Park Service; the Department of Transportation; Sean Duffy, in his official capacity as Secretary of Transportation; the Federal Highway Administration ("FHWA"); and Sean McMaster, in his official capacity as Administrator of the Federal Highway Administration.  Compl. [Dkt. # 1] ¶¶ 10–17.  Plaintiff sought declaratory and injunctive relief barring the planned removal of the 15th Street Cycle Track, a set of dedicated bicycle lanes close to the National Mall in the District of Columbia.  Compl. ¶¶ 2–4.

A few days later, plaintiff filed a motion for a preliminary injunction, or in the alternative, a stay of the removal of the bicycle lanes pursuant to 5 U.S.C § 705.  Pl.'s Mot. for Prelim. Inj. [Dkt. # 9] ("Pl.'s Mot.").  The Court decided to advance the consideration of the merits and consolidate it with the hearing on the motion for the preliminary injunction pursuant to Federal Rule of Civil Procedure 65(a)(2), deeming plaintiff's motion to be a motion for summary

judgment.  Min. Order (Apr. 2, 2026).  Defendants opposed the motion and filed a cross-motion for summary judgment on April 3, 2026.  Defs.' Opp. to Pl.'s Mot. & Cross-Mot. for Summ. J. [Dkt. ## 21–22] ("Defs' Cross-Opp.").  Both motions are fully briefed,[1] and the Court heard argument at a lengthy hearing conducted on April 9, 2026.  *See* Min. Entry (Apr. 9, 2026).

In the meantime, on April 7, 2026, plaintiff filed an amended four-count complaint against all defendants, which is now the operative complaint in the case.  Am. Compl. [Dkt. # 23]. Pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.*, plaintiff challenges the decision to remove the bike lanes under section 706(2)(A) as arbitrary and capricious and on the grounds that it was not made in accordance with the National Capital Planning Act ("NCPA"), 40 U.S.C. § 8722, the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4332, and the Park Service Organic Act, 54 U.S.C. § 100101.  Am. Compl. ¶¶ 53–107.

The Court will grant summary judgment in favor of plaintiff on Counts Two and Three, given the absence of reasoned decisionmaking underlying both the decision to proceed with the Removal Project and the defendants' application of NEPA.  Given those findings, pursuant to section 706(2)(A) of the APA, the Court will vacate and remand the decision, and the motion for interim injunctive relief will be denied as moot.

---

1    Plaintiff filed a combined opposition to defendants' cross-motion and reply in support of its motion for summary judgment.  Pl.'s Opp. to Defs.' Cross-Mot. & Reply in Further Supp. of Pl.'s Mot. [Dkt. ## 24–25] ("Pl.'s Cross-Opp.").  And on April 8, 2026, defendants filed their reply in support of their cross-motion.  Defs.' Reply Mem. in Supp. of Cross-Mot. [Dkt. # 28] ("Defs.' Cross-Reply").  On April 16, 2026, defendants filed a supplemental memorandum regarding the appropriate remedy in the event the Court concluded that the removal of the bike lane was arbitrary and capricious.  Defs.' Suppl. Mem. in Supp. of Cross-Mot. [Dkt. # 31] ("Defs.' Suppl. Mem.").  And on April 18, 2026, plaintiff filed its supplemental memorandum on the issue of remedy.  Pl.'s Suppl. Mem. in Supp. of Pl.'s Mot. [Dkt. # 32] ("Pl.'s Suppl. Mem.").

**FACTUAL AND PROCEDURAL BACKGROUND**

The National Mall is the "premier civic and symbolic state in our nation," located in the middle of Washington, D.C.  Admin. Rec. for the Nat'l Park Serv. [Dkt. # 17] ("NPS A.R.") 225.[2] The National Mall stretches west from the U.S. Capitol to the Potomac River, and north from the Thomas Jefferson Memorial to Constitution Avenue.  NPS A.R. 227.  Areas surrounding the National Mall serve as "a major vehicular gateway" to Washington, D.C.  NPS A.R. 247.

While much of the Mall is designed for pedestrian traffic and serves as a public park for the nation, the Mall is also crisscrossed by streets and paths that are essential for traversing the District.  *See* NPS A.R. 1228 (showing a map of the streets that cross the Mall).  NPS has authority over those roadways, sharing a role in managing the streets with the District of Columbia Department of Transportation ("DDOT").  NPS A.R. 1229.  For years, NPS and DDOT worked cooperatively to manage 15th Street and the Tidal Basin segment in keeping with NPS's goal to "[i]mprove circulation and amenities for pedestrians, bicyclists, and other visitors" to the Mall. NPS A.R. 234.

### A.  The 15th Street Cycle Track Installation

Until late 2021, the western-most lane of traffic on 15th Street traversing the National Mall was a lane for vehicular traffic.  NPS A.R. 842, 844.  In October 2020, NPS and DDOT initiated a project to replace this vehicular lane with a "two-way protected bicycle facility" or "cycletrack." NPS A.R. 543, 819.  The "primary goal" of the project was to "improve safety for all users in the corridor" and "[c]reate a safe right-of-way for people, regardless of walking, biking, or driving." NPS A.R. 842, 955.  The project was "part of an effort to install twenty miles of protected bike

---

2       The Court's citations to the Administrative Record match the numeric portion of the Bates numbers located at the bottom of each page.  For example, the citation to page 225 correlates to page NPS-AR-000225 of the Administrative Record.

lanes by 2022 with the priority of improving high injury and crash locations." NPS A.R. 844. The cycle track was to be completed in two phases: the first phase included "temporary vertical physical cycle track barriers such as concrete curbs and plastic bollards," and phase two replaced "the temporary elements with permanent granite curb style barriers and K71 bollards as needed." NPS A.R. 842–43.

As NPS and DDOT planned the project, they conducted a traffic analysis and reviewed crash data. DDOT found that between 2015 and 2020, more than 200 crashes had occurred on the 15th Street corridor. NPS A.R. 791. At the same time, NPS and DDOT "utilized an extensive online public engagement campaign to both publicize the proposed project and gather feedback." NPS A.R. 845. This included DDOT convening two public meetings on February 18, 2021 and May 12, 2021, and meeting with various stakeholders. NPS A.R. 781. There were over 140 attendees at the first public meeting, which received 130 public comments from people who said that they biked walked, drove, or rode the segment and provided their point of view. NPS A.R. 817. In total, the meetings generated over 150 comments from the public. NPS A.R. 845.

As part of its compliance with NEPA, NPS completed a "Categorical Exclusion Documentation Form" for the project. NPS A.R. 543–45. The Form described the project as "part of an effort to install twenty miles of protected bike lanes by 2022, prioritizing improvements at locations with high injuries and crashes and supports Mayor Browser's Vision Zero strategy to eliminate traffic fatalities and serious injuries." NPS A.R. 543. The agency concluded that the cycle track installation did not significantly affect the environment, and that it fell within a categorical exclusion that relieved it of the obligation to prepare an environmental impact statement or other environmental assessment. NPS A.R. 544–45. It invoked categorical exclusion C.18, which applies to the "[c]onstruction of minor structures, including small, improved parking

lots, in previously disturbed areas or developed areas." NPS A.R. 544, 845; *see* Existing Categorical Exclusions, U.S. Dep't of the Interior, NPS § 12.5(C)(17), Dec. 21, 2020, https://perma.cc/5VH7-ZWL8.

NPS also consulted with the National Capital Planning Commission ("Planning Commission") before preparing its construction plans, pursuant to 40 U.S.C. § 8722(b)(1). NPS A.R. 842, 845. The Planning Commission designated NPS as the lead agency under NEPA section 106 for approval actions regarding the project. NPS A.R. 845. And to meet its own NEPA obligations, Planning Commission staff applied categorical exclusion 1 C.F.R. § 601.12(a)(2) for the proposed project, which allows for "approval of the installation or restoration of minor site elements, such as but not limited to identification signs, sidewalks, patios, fences, curbs, retaining walls, landscaping, and trail or stream improvements." NPS A.R. 845.

NPS further evaluated the project's potential effects on historic resources under the National Historic Preservation Act ("NHPA"), 54 U.S.C. § 300101 *et seq.*[3] NPS A.R. 845. According to NPS, NHPA review of the project was "streamlined in accordance with a nationwide programmatic agreement." NPS A.R. 845. That agreement, confirmed by the D.C. State Historic Preservation Office, "allow[ed] the NPS to streamline many maintenance, repair, rehabilitation, or other activities that [were] not anticipated to have impacts on historic properties and [were] completed in accordance with a treatment plan." NPS A.R. 845.

---

3    In 1966, Congress passed the National Historic Preservation Act to develop the federal government's historic preservation program and "to assist State and local governments, Indian tribes and Native Hawaiian organizations . . . to expand and accelerate their historic preservation programs and activities." 54 U.S.C. § 300101. The NHPA established the Advisory Council, an independent agency, that strives to ensure federal agencies implement their work in harmony with the Act. 54 U.S.C. § 304101(a). Section 106 of the Act requires that each federal agency identify and assess the effects its actions may have on historic buildings and properties. 54 U.S.C. § 306101.

On June 3, 2021, the National Capital Planning Commission approved the project at a public meeting, noting that it "[s]upports the intended goal of improving safety for all users and reducing vehicle, pedestrian, and bicycle conflicts in the heavily traveled corridor."  NPS A.R. 823, 1295.  DDOT completed construction of the 15th Street bike lanes in the fall of 2021.  NPS A.R. 1369.

### B.  Safety Along 15th Street Improves After the Installation of the Bike Lanes

In 2026, after the installation of the bike lanes, DDOT conducted an analysis of the 15th Street corridor and produced a report to provide a snapshot of roadway conditions before and after the installation of the bike lane.  *See* NPS A.R. 955–60 (report titled "15th St NW/SW Protected Bike Lane Post-Implementation Analysis").  DDOT analyzed verified crash reports generated by the Metropolitan Police Department, a large dataset of vehicular speeds and travel times, bus speeds, and travel time provided by the Washington Metropolitan Area Transit Authority, and turning movement counts, which are collected at every signalized intersection on a regular basis. NPS A.R. 955–60, 1309–11.

DDOT's evaluation concluded that the 15th Street bike lane reduced all roadway crashes by 46 percent and bicycle injury crashes by 91 percent.  NPS A.R. 956.  The evaluation also showed that the protected lanes resulted in a 3 percent increase in bicycle traffic along the corridor. NPS A.R. 955.  Finally, the report showed that speeds increased by 17 percent, and peak hour northbound travel time decreased by thirty-six seconds, while southbound travel time decreased by forty seconds.  NPS A.R. 955.

### C.  The Project to Remove the 15th Street Cycle Track

This year, NPS and FHWA began preparations to remove the cycle track and restore the original lane configuration on the affected roadways as part of what they called the 15th Street Cycle Track Removal and Road Repaving Project ("Removal Project").  NPS A.R. 1145.  In

6

documents dated in late February, but publicly released on March 25, NPS and FHWA described the Removal Project's precise scope, and identified their grounds for declining to analyze its environmental impacts.  On February 23, 2026, NPS executed a NEPA Categorical Exclusion Form ("NPS February 23 Categorical Exclusion Form") and a National Historic Preservation Act Assessment document.  NPS A.R. 1150–60.  Four days later, FHWA completed a Categorical Exclusion Form ("FHWA February 27 Categorical Exclusion Form") for its participation in the project.  Admin. Rec. for the Fed. Highway Admin. ("FHWA A.R.") 1.

According to the NPS February 23 Categorical Exclusion Form, the project would entail the complete removal of both the 15th Street dedicated bike lanes in the National Mall and the Tidal Basin bike lanes:

> The work consists of removing existing cycle-track and bicycle-related traffic control features and restoring the roadway to a conventional lane configuration within the existing curb lines along three segments – 15th St NW / Raoul Wallenberg Pl SW (Constitution Ave NW to Maine Ave SW), Maine Ave SW (15th St NW to Ohio Dr SW/East Basin Dr SW – southbound), and Ohio Dr SW/East Basin Dr SW (Maine Ave SW to the Jefferson Memorial Food Kiosk – southbound) – including removal of cycle track barriers/delineator posts and anchor bolts with restoration of resulting voids; milling and overlaying asphalt within curb faces to a maximum treatment depth of $\leq$ 4 inches; grinding/removing existing pavement markings within concrete bus laybys; removing bicycle signal faces and retiming/rephasing traffic signals as needed; removing bicycle route signage and installing new signage (and striping transitions) at the north and south project limits to safely transition bicyclists; and restriping the corridor to a typical cross-section of two northbound lanes and two southbound lanes (plus turn lanes where feasible), with crosswalk markings replaced in-kind on asphalt and new stop bars and lane-use arrows installed at intersection approaches as warranted.

NPS A.R. 1156.  The work was supposed to take place in connection with the then-upcoming National Cherry Blossom Festival, which was to begin on March 20, 2026 and run through April 12, 2026, NPS A.R. 1364, but the Categorical Exclusion Form did not specify a start date.

The NPS February 23 Categorical Exclusion Form stated that the Removal Project "supports implementation of Executive Order 14252, 'Making the District of Columbia Safe and Beautiful' by advancing coordinated stewardship and improved visual quality of prominent federal public spaces through removal of roadway appurtenances and restoration of a standardized, maintainable corridor configuration within the existing roadway prism."  NPS A.R. 1156.  It described the Removal Project as a "priority" for the "upcoming National Cherry Blossom Festival and preparations underway for America's 250th anniversary."  NPS A.R. 1156.  NPS found the project to be covered by categorical exclusion 12.6(13) – "[m]odernization of a highway by resurfacing, restoration, rehabilitation, reconstruction, adding shoulders, or adding auxiliary lanes (including parking, weaving, turning, and climbing lanes)," if the actions do not involve any of six enumerated constraints.  NPS A.R. 1156, citing Department of Interior ("DOI") Handbook of NEPA Procedures, Appendix 2.  It also justified the invocation of a categorical exclusion with the statement that "[b]ased on the limited scope, confined limits of disturbance, and use of standard resurfacing and traffic-control methods, the action fits under NPS [categorical exclusion] 12.6(13)."  NPS A.R. 1157.

Finally, the NPS form contained a chart setting forth each of the "extraordinary circumstances" listed in the DOI Handbook of NEPA Procedures that would prohibit the use of a categorical exclusion and supplying an explanation as to why each did not apply.  NPS A.R. 1147–49.  The agency concluded with the statement that because the Removal Project is "confined to [an] existing roadway prism and consists of resurfacing/rehabilitation and traffic-control changes . . . without expanding the transportation footprint or inducing land use change," no further NEPA analysis was required, nor did any "extraordinary circumstances apply."  NPS A.R. 1147–49.

The February 20, 2026 National Historic Preservation Act Assessment identified several historic properties that the Removal Project would affect, including the Washington Monument Grounds, National Mall, Tidal Basin, and West Potomac Park. NPS A.R. 1150–51. NPS asserted, though, that the "removal of the [cycle track] [would] return 15th Street back to a design that is in keeping with the historic character of the circulation route." NPS A.R. 1151. NPS further found that because the Removal Project would have "no adverse effect," it was entitled to a "streamlined review under Section III of the 2008 [s]ervicewide [programmatic agreement] for Section 106" NHPA compliance. NPS A.R. 1153.

In its February 27 Categorical Exclusion Form, FHWA repeated the project description utilized by NPS, including the stated objective to implement Executive Order 14252, "Making the District of Columbia Safe and Beautiful." FHWA A.R. 1. FHWA found that the Removal Project met the standard for a categorial exclusion under its own agency regulation, 23 CFR § 771.117(c)(26). FHWA A.R. 1. Subsection (c)(26), the model for the NPS exclusion, also allows for the "[m]odernization of a highway by resurfacing, restoration, rehabilitation, reconstruction, adding shoulders, or adding auxiliary lanes (including parking, weaving, turning, and climbing lanes) . . . ." 23 CFR § 771.117(c)(26).

### D.  Plaintiff Learns About the Removal Project

While the categorical exclusion forms and National Historic Preservation Act assessment document are dated in February, they were not made public until counsel for the defendants advised the Court and the parties of their existence at the March 25 scheduling conference and they were posted on the NPS website. *See* Mar. 25, 2026 Hr'g Tr. [Dkt. # 11] ("Mar. 25 Tr.") at 9:9–15. Beginning in February, though, WABA heard from contacts at the Department of Interior and DDOT that the government was considering removing the 15th Street bike lanes. NPS A.R.

9

1202–03, Decl. of Elizabeth Kiker, Executive Director of WABA ("Kiker Decl.") ¶ 22. WABA sent a letter to NPS on March 13, 2026 expressing concerns about any bike lane removal and urging NPS to comply with its legal obligations. NPS A.R. 1202–03, Kiker Decl. ¶ 22. It received no response. NPS A.R. 1202–03, Kiker Decl. ¶ 22. Then, on March 19, signs announcing imminent road closures and detours appeared on and around the part of 15th Street that crosses the National Mall. NPS A.R. 1203, Kiker Decl. ¶ 23. WABA also learned from its contact that NPS would move forward with removing bike lanes from the section of 15th Street that crosses the National Mall on March 23. NPS A.R. 1203, Kiker Decl. ¶ 24.

On March 20, in a statement provided to press outlets, NPS revealed its plans for the bike lanes, saying that "[w]ith the upcoming National Cherry Blossom Festival and preparation underway for America's 250th anniversary, ensuring safe access for residents, commuters, visitors, and emergency services is a shared priority." NPS A.R. 1322, 1327. That language was identical to the text of the not-yet-public NEPA documents, including the February Categorical Exclusion Form and the National Historic Preservation Act Assessment. The agency added, "[t]hese nationally significant events draw substantial visitation and require coordinated infrastructure planning to support mobility, security, and a positive experience for all." NPS A.R. 1322, 1327.

In response to news of the Park Service's plans, eleven members of Congress wrote to NPS on March 20, urging it to "immediately reverse course and stop the removal of the bike lane." NPS A.R. 1175–76. Mayor Muriel Bowser also called for the retention of the bike lanes and criticized NPS for increasing "conflicts between pedestrians, cyclists, and vehicles, especially at one of the busiest times of the year." NPS A.R. 1323. News outlets then reported that lane removal was scheduled for March 23. NPS A.R. 1321, 1326.

On the afternoon of March 22, after WABA's counsel informed the government of its intention to file this case, the Department of Justice assured WABA that no work would be done on the bike lanes until March 30, at the earliest.  NPS A.R. 1204, Kiker Decl. ¶ 29.  According to plaintiff, the government then revealed for the first time that in addition to the 15th Street bike lanes, the Tidal Basin lanes were also slated for removal.  NPS A.R. 1204, Kiker Decl. ¶ 30.

### E.  Plaintiff Files the Instant Case

On March 23, 2026, plaintiff filed this action seeking a declaratory judgment and interim and permanent injunctive relief barring the removal of the 15th Street and Tidal Basin bike lanes.  Compl. at 20.  The complaint consisted of four counts, alleging that the decision to remove the 15th Street Cycle Track should be declared unlawful and enjoined under the APA because: (1) NPS failed to comply with a legal obligation to consult with the National Capital Planning Commission; (2) the sudden and unexplained decision to depart from NPS's previous position was arbitrary and capricious; (3) the defendants failed to undertake the environmental assessment required under NEPA; and (4) the decision contravened the Park Service Organic Act.  Compl. ¶¶ 42–85.  Notwithstanding the fact that the construction start date was looming and the complaint's request for emergency injunctive relief, a motion for a temporary restraining order or preliminary injunction was not filed at that time.

On March 24, 2026, the parties filed a joint status report stating that counsel had conferred, and that defendants' counsel "provided assurance that no construction work will begin in connection with the removal of the bike lanes . . . until, at the earliest, April 23, 2026." Joint Status Report & Proposed Schedule [Dkt. # 7] at 1–2.  Given that development, the parties proposed a schedule for the filing and briefing of a motion for preliminary injunction.  *Id.* at 2.

11

The Court held a scheduling conference with the parties on March 25.  Min. Entry (Mar. 25, 2026).  In order to craft an appropriate schedule for the hearing, the Court questioned counsel for the government about the timeline for the removal of the bike lanes.  During the course of the conference, counsel represented that the agencies had in fact complied with NEPA and executed exclusion documents, and there was some discussion about when they would be provided to the plaintiff and made public.  *See* Mar. 25 Tr. at 9:5–12.  Counsel was also asked whether the defendants would agree to stand down pending the resolution of the anticipated preliminary injunction motion, and or the merits, and the Court adjourned the proceedings to permit counsel to confer with the agencies involved.  *See* Mar. 25 Tr. at 16:5–12.

Later that day, defendants supplied plaintiff and the Court with copies of the NPS and FHWA February 2026 Categorical Exclusion Forms and also posted them publicly on the National Park Service website.  *15th Street Cycle Track Removal and Road Repaving*, NPS, https://perma.cc/Y7VY-EUYB.  Ultimately, the Court was informed that the defendants would not agree to defer the start of construction beyond April 23, and the schedule was set accordingly.  *See* Mar. 26, 2026 Hr'g Tr. [Dkt. # 10] at 6:13–25.  On March 26, plaintiff filed its motion for a preliminary injunction.  *See* Pl.'s Mot.

### F.  March 31 Decision Documents

Five days after WABA filed the motion for preliminary injunction, defendants published a new set of materials concerning the decision.  On March 31, 2026, NPS issued a document entitled, Decision Memorandum: 15th Street Cycle Track Removal and Road Repaving Project, National Mall and Memorial Parks ("Decision Memorandum"), NPS A.R. 1369–72, and a new Categorical

12

Exclusion Documentation Form ("NPS March 31 Categorical Exclusion Form") for the project. NPS A.R. 1364–68.[4]

On the same day, FHWA issued what it called a "Re-Evaluation" of its February 27 Categorical Exclusion Form ("FHWA March 31 Categorical Exclusion Form"), which noted that its re-evaluation considered NPS's updated March 31 Categorical Exclusion Form. FHWA A.R. 36–42. Both forms, which will be discussed in detail in the Analysis section of this opinion, announced that the removal work would begin on April 23, 2026.

On April 7, 2026, plaintiff filed a four-count amended complaint that included allegations about the insufficiency of the March 31 decision documents:

- **Count One** alleges that the decision to proceed with the Removal Project was not in accordance with law for purposes of section 706(2)(A) of the APA because defendants failed to consult with the National Capital Planning Commission as required by the National Capital Planning Act, 40 U.S.C. § 8722. Am. Compl. ¶¶ 53–68.

- **Count Two** alleges that defendants' decision to remove the 15th Street Cycle Track is arbitrary and capricious and should be set aside in accordance with section § 706(2)(A) of the APA. Am. Compl. ¶¶ 69–91.

- **Count Three** alleges that the decision to proceed with the Removal Project was not reached in accordance with the National Environmental Policy Act, 42 U.S.C. § 4332, because the Categorical Exclusions cited by the defendants do not apply to the removal of bike lanes, and the project involved the "extraordinary circumstance" of a "significant impact on health and safety" that precluded reliance on an exclusion. Am. Compl. ¶¶ 92–101.

- **Count Four** alleges that the decision to remove the bike lanes was not made in accordance with the Park Service Organic Act, 54 U.S.C. § 100101, because it does not protect park resources and was not undertaken with attention to safety. Am. Compl. ¶¶ 102–07.

---

4       The Decision Memorandum made reference to a FHWA internal review of the DDOT Post-Implementation Analysis, which was later included in the Administrative Record at NPS A.R. 1358–61.

**STANDARD OF REVIEW**

Summary judgment is appropriate when the pleadings and evidence show that "there is no genuine dispute as to any material fact and [that] the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). However, in cases involving review of agency action under the APA, Rule 56 does not apply due to the limited role of a court in reviewing the administrative record. *Select Specialty Hosp.-Akron, LLC v. Sebelius*, 820 F. Supp. 2d 13, 21 (D.D.C. 2011). Under the APA, the agency's role is to resolve factual issues and arrive at a decision that is supported by the administrative record, and the court's role is to "determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Occidental Eng'g Co. v. INS*, 753 F.2d 766, 769–70 (9th Cir. 1985), citing *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971); *see also Richards v. INS*, 554 F.2d 1173, 1177 & n.28 (D.C. Cir. 1977).

The "agency must cogently explain why it has exercised its discretion in a given manner . . . and that explanation must be sufficient to enable [a court] to conclude that the agency's action was the product of reasoned decisionmaking." *Alpharma, Inc. v. Leavitt*, 460 F.3d 1, 6 (D.C. Cir. 2006), quoting *Motor Vehicle Mfr's Ass'n. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 48, 52 (1983) (internal quotation marks omitted).

**ANALYSIS**

**I.    The Court Has Subject Matter Jurisdiction to Hear This Case.**

"Federal courts are courts of limited jurisdiction" and the law presumes that "a cause lies outside this limited jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994); *see also Gen. Motors Corp. v. EPA*, 363 F.3d 442, 448 (D.C. Cir. 2004) ("As a court of limited jurisdiction, we begin, and end, with an examination of our jurisdiction."). Subject matter

jurisdiction may not be waived, and courts may raise the issue *sua sponte*.  *NetworkIP, LLC v. FCC*, 548 F.3d 116, 120 (D.C. Cir. 2008).  The Court is "forbidden . . . from acting beyond [its] authority, and 'no action of the parties can confer subject-matter jurisdiction upon a federal court.'"  *Id.*, quoting *Akinseye v. Dist. of Columbia*, 339 F.3d 970, 971 (D.C. Cir. 2003).

"[T]o give meaning to Article III's case-or-controversy requirement, the courts have developed a series of principles termed 'justiciability doctrines,'" which include standing, ripeness, mootness, and the political question doctrine.  *Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1427 (D.C. Cir. 1996), citing *Allen v. Wright*, 468 U.S. 737, 750 (1984); *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 663 (D.C. Cir. 1996) (standing is a necessary "predicate to any exercise of our jurisdiction").  To establish standing, a plaintiff must show that it has "suffered an injury in fact" that "is fairly traceable to the challenged action of the defendant," and it must be "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."  *Friends of the Earth v. Laidlaw Env't Servs., Inc.*, 528 U.S. 167, 180–81 (2000), quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–561 (1992) (internal quotation marks omitted).  The party invoking federal jurisdiction bears the burden of establishing standing.  *Lujan*, 504 U.S. at 561.

To allege the first element of standing, injury-in-fact, a plaintiff must demonstrate that he has "suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'"  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339, quoting *Lujan*, 504 U.S. at 560.  To be "concrete," the injury "must actually exist," meaning that it is real, and not abstract, although concreteness is "not . . . necessarily synonymous with 'tangible.'"  *Id.* at 340–41.  And to be "particularized," the injury must affect a plaintiff "in a personal and individual way."  *Id.* at 340, quoting *Lujan*, 504 U.S. at 560 n.1.  This means that a

15

"plaintiff raising only a generally available grievance about government – claiming only harm to his and every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large – does not state an Article III case or controversy." *Lujan*, 504 U.S. at 573–74.

### A.    Defendants' Jurisdictional Challenges

Plaintiff's initial complaint challenged the decision to remove the bike lanes that was made and scheduled to be implemented without the publication of the then-existing decision documents, that is, the February 23 NPS and February 27 FHWA Categorical Exclusion Forms.  After those documents were made public, and plaintiff moved for a preliminary injunction, the Court deemed the motion to be a motion for summary judgment as well and consolidated the hearing on the motion with consideration of the merits.  Defendants opposed the motion and filed a cross-motion for summary judgment of their own.  Their motion was based in part on the theory that the February 2026 decision to proceed with the Removal Project, which was challenged in the initial complaint, had been superseded by a March 31 decision to proceed with the project on a different timetable, and that therefore, the claims in the original complaint failed because they were not based on a final agency action under the APA, and/or they were moot.  Defs.' Cross-Opp. at 11–15. Defendants also moved for summary judgment on the jurisdictional ground that WABA lacked standing because the organization and its members were merely voicing a generalized grievance.

With the filing of the amended complaint, both of those alleged deficiencies have been alleviated.  While it remains the responsibility of the Court to ensure that it has the authority to act, and subject matter jurisdiction cannot be created by agreement of the parties, it is notable that defendants are preserving their objections but no longer actively pursuing these arguments as a basis for the entry of judgment in their favor.  *See* Apr. 9, 2026 Hr'g Tr. [Dkt. # 29] ("Apr. 9 Tr.")

16

at 37:16–19 (Counsel for defendants: "I think the one paragraph in their amended complaint that brings the March 31st document into this does cure insofar as we agree the March 31st documentation represents final agency action."); *id.* at and 36:12–25 ("Your Honor, our standing argument in our opening brief was based on their complaint at that time, before amendment, and the materials that they provided in their initial preliminary injunction motion.  Of course they have amended the complaint substantially on the issue of standing. . . . [T]hey have bolstered their own case between the time this case started and today. . . . I think we would still preserve an objection that these are generalized grievances.  However, they have substantially amended and . . . on summary judgment, . . . their obligation is to flesh all of that out in declarations . . . .").

Nonetheless, the Court has considered the question, and it finds that it has jurisdiction to hear the case.

### B.    The Case Is Not Moot

A review of the entire record reflects that while the March 31 documents expand the explanations offered in February to some extent, they do not embody a new "decision."  Even as defendants describe it, the Removal Project had a new date but otherwise remained the same.  *See, e.g.*, Defs.' Cross-Opp. at 1 ("[T]he agencies revisited that earlier decision, and after reconsideration, chose instead to proceed on April 23, a decision NPS memorialized on March 31, 2026."); *id.* at 5 ("On March 31, NPS decided to proceed with the project on a new timeline: it will begin the removal work on April 23.").

The FHWA's March 31 Categorical Exclusion Form makes it perfectly clear that that there is only one decision and only one project that was approved:

> The February CE Form was issued on the assumption that the project would start on or around that date.  Since the form was signed, the project was delayed. . . .  FHWA has reanalyzed the impacts of the project given the revised work window and has determined that continuing to rely on 23 CFR

771.117(c)(26) is appropriate. **The project scope has not changed**; the work still consists of removing existing cycle-track and bicycle-related traffic control features and restoring the roadway to a conventional lane configuration within the existing curb lines along three segments—15th St NW / Raoul Wallenberg Pl SW (Constitution Ave NW to Maine Ave SW), Maine Ave SW (15th St NW to Ohio Dr SW/East Basin Dr SW—southbound), and Ohio Dr SW/East Basin Dr SW (Maine Ave SW to the Jefferson Memorial Food Kiosk— southbound).

FHWA A.R. 36–37 (emphasis added); *see also* Apr. 9 Tr. at 40:2–4 (The Court: "Did anything else get decided on March 31st, besides the start date?  Is what's being removed the same?" Counsel: "Yes.").[5]  Therefore, the Court has a live controversy before it to decide.

---

5      The defendants' position prompts the question: if the documents signed on March 31 are supposed to represent a new decision, based on reconsideration of the Removal Project, why are there no documents in either Administrative Record that reflect any analysis or review by NPS between the first set of Categorical Exclusions and the March 31?

The entire FHWA record is comprised of 42 pages: the first 17 are the original FHWA NEPA Categorical Exclusion from February 27, 2026 and copies of the February 23 National Park Service Historic Properties Assessment and NEPA Categorial Exclusion.  The next 18 pages are a series of emails with attachments dating back to February 19 and 20, 2026 concerning the road closures that would be involved in completing the work, and the signing of the Categorical Exclusion Form.  FHWA A.R. 18–35.  There is one email in the chain from March 4 in which an employee of the Department of Transportation asks about the "status of FHWA's NEPA."  FHWA A.R. 30.  The next series of documents begin on page 36, and they consist solely of the March 31, 2026 FHWA "Re-Evaluation" and a copy of the NPS March 31 Categorical Exclusion Form – nothing between the February decision and the decision made in March.  FHWA A.R. 36–42.

The NPS Administrative Record takes up 1372 pages, but again, no records of NPS actions or analysis undertaken during the time period between the decision made on February 23 and March 31.  865 pages (or more than 60% of them) relate to general Park Service polices or management, and are dated before or relate to the 2021 installation of the bike lanes.  NPS A.R. 1–865.  There are 161 pages of materials from 2024 through early 2025, NPS A.R. 866–972, followed by NPS Policy Guidance, the April 4, 2025 Secretary's Order, and copies of the June 30, 2025 Department of Interior ("DOI") Handbook of NEPA Procedures, Appendix 3, and February 2026 DOI Handbook of NEPA Procedures.  NPS A.R. 973–1002, 1006–1138.  Pages 1003 through 1005 are unexplained maps identified as 2026-02 15th Street Northbound and Southbound Detour.  The documents created in connection with the February decision to proceed with the removal of the cycle track take up 28 pages: NPS A.R. 1139–67.

What happens after that?  The record contains 188 pages of material transmitted to the agency by the plaintiff, including declarations from WABA members and an engineering expert, between March 13 and March 26.  NPS A.R. 1168–1356.  And the remainder of the record are the documents dated March 31 concerning the Removal Project: the FHWA Memorandum critiquing the 2026 DDOT Post-Implementation Analysis of crash statistics, the FHWA Categorical Exclusion Re-evaluation, the NPS Categorical Exclusion Form, and the NPS Decision Memorandum.  NPS A.R. 1358–72.  Other than the DOT evaluation of the DDOT study, there is not one piece of paper that explains or precedes the conclusions expressed in the March 31 documents other than the decision documents themselves.

The legal question of whether the March materials should be disregarded under the so-called "*post hoc* rationalization" rule is more complicated.  The law is clear that a court may not accept *post hoc* rationalizations for agency action.  *State Farm*, 463 U.S. at 50, citing *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962); *see SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947).  Defendants insist that those precedents do not apply, repeatedly pointing the Court to its own order in *American Wild Horse Preservation Campaign v. Salazar*, 800 F. Supp. 2d 270 (D.D.C).  Not only did the Court dismiss the action as moot, but the case is not at all comparable.  In the wild horse matter, after the lawsuit was filed, the government decided not to undertake the particular action being challenged, *Am. Wild Horse*, 800 F. Supp. 2d at 271–72, while here, they merely delayed it for a month.  Nor can the case be likened to the *Alpharma* opinion cited by defendants, where the appellate court found it appropriate to consider a new letter included in the record explaining an earlier decision.  460 F.3d at 6.  In *Alpharma*, the Court of Appeals had ruled once already and remanded the case specifically calling for further explanation from the agency.  *Id.* at 6–7.

However, the *Alpharma* court went on to describe the rule against *post hoc* rationalizations as follows:

> It is a rule directed at reviewing courts which forbids judges to uphold agency action on the basis of rationales offered by anyone other than the proper decisionmakers.  Thus the rule applies to rationalizations offered for the first time in litigation affidavits and arguments of counsel.  The policy of the *post hoc* rationalization rule does not prohibit [an agency] from submitting an amplified articulation of the distinctions it sees. . . . Moreover, the logic of the rule requires it.  If a reviewing court finds the record inadequate to support a finding of reasoned analysis by an agency and the court is barred from considering rationales urged by others, only the agency itself can provide the required clarification.

*Id.*, quoting *Local 814, Int'l Brotherhood of Teamsters, Chauffeurs, Warehousemen v. NLRB*, 546 F.2d 989, 992 (D.C. Cir. 1976) (alterations in original).

More recently, the Supreme Court provided additional clarification in *Department of Homeland Security v. Regents of the University of California*, which, like *Alpharma*, was dealing with the assessment of agency action in the wake of a remand calling for more explanation:

> It is a foundational principle of administrative law that judicial review of agency action is limited to the grounds that the agency invoked when it took the action. . . . If those grounds are inadequate, a court may remand for the agency to do one of two things: First, the agency can offer a fuller explanation of the agency's reasoning *at the time of the agency action*. . . . This route has important limitations. When an agency's initial explanation indicate[s] the determinative reason for the final action taken, the agency may elaborate later on that reason (or reasons) but may not provide new ones. . . . Alternatively, the agency can deal with the problem afresh by taking *new* agency action. . . . An agency taking this route is not limited to its prior reasons but must comply with the procedural requirements for new agency action.

591 U.S. 1, 20–21 (2020) (emphasis in original) (internal citations and quotation marks omitted).

We are at a very different procedural juncture. But even if these precedents apply, the Court need not thread the needle to determine whether the second round of documents simply "amplify" a prior decision that was only summarily explained or whether they are to be disregarded as *post-hoc* rationalizations justifying the February decision on new grounds. The parties are agreed that plaintiff's amended complaint challenges both the February decision that was kept under wraps and the March 31 "reconsidered" agency action setting a new timetable and offering a somewhat more elaborate justification for the project.

Given those amendments, defendants' reply in support of its cross-motion for summary judgment does not concede but no longer argues the absence of jurisdiction on mootness grounds. *See generally* Defs.' Cross-Reply; *see also* Apr. 9 Tr. at 43–44 ("The argument in our brief is that because there was a March 31st decision to go with the project, any challenge to the February CE in their original complaint was moot. Now that objection is arguably moot because they have challenged the March 31st CE.").

Therefore, and in the interests of judicial economy, the Court will assess plaintiff's amended claims under the assumption that the March 31 decision documents are the operative agency explanations of the decision to proceed with the removal of the bike lanes and the operative Categorical Exclusion Forms for NEPA purposes, and it will conduct its review of the decision based on the entire Administrative Records docketed and certified by NPS and FHWA, *see* [Dkt. # 16] and [Dkt. # 17].

### C.    Plaintiff Has Standing to Bring the Case

While this is no longer contested either, the submissions in support of plaintiff's motion and the amended complaint contain ample evidence to support a finding at summary judgment that plaintiff has established standing with a showing that its members will suffer a concrete and particularized injury-in-fact, that is actual and imminent and not merely conjectural injury, if the agencies proceed with the Removal Project.

Elizabeth Kiker, Executive Director of the Washington Area Bicyclists' Association, averred in her declaration that plaintiff is a nonprofit organization, founded in 1972.

> WABA has been working for more than 50 years to improve the safety of our streets and achieve better bicycling across the metropolitan D.C. region. We have about 5,000 members and nearly 23,000 regional advocacy supporters. Our mission is to empower people to ride bicycles, strengthen community connections, and reshape places. We are working to build a just and sustainable transportation system where walking, biking, and public transit are the easiest and best ways to travel in the metropolitan D.C. area.
>
> ***
>
> WABA advocates on behalf of metropolitan D.C. residents who ride bicycles on bicycle lanes in the region. The public safety, health, and quality of life of regional residents are primary concerns to WABA.

NPS A.R. 1200, Kiker Decl. ¶¶ 3, 5.

An organization can assert organizational standing on its own behalf, associational standing on behalf of its members, or both. *Equal Rts. Ctr. v. Post Props., Inc.*, 633 F.3d 1136, 1138 (D.C. Cir. 2011), citing *Abigail All. for Better Access to Develop. Drugs v. Eschenbach*, 469 F.3d 129, 132 (D.C. Cir. 2006). Here, WABA asserts that it has associational standing based on the standing of its members, which requires a showing that "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Int'l Brotherhood of Teamsters v. Transp. Sec. Admin.*, 429 F.3d 1130, 1135 (D.C. Cir. 2005), quoting *United Food & Comm. Workers Union Loc. 751 v. Brown Grp., Inc.*, 517 U.S. 544, 553 (1996) (internal quotation marks omitted).

WABA's Executive Director estimates that "900 of [WABA's] members travel on the 15th Street bike lanes every day." NPS A.R. 1202, Kiker Decl. ¶ 16. WABA member Nicholas Johnson reports that he "use[s] the 15th Street bicycle lanes nearly every day," and "regularly use[s]" the Tidal Basin lanes. NPS A.R. 1337–38, Decl. of Nicholas Johnson ¶¶ 4, 11. WABA member Allison Foster lives in Arlington, Virginia, and uses the 15th Street lanes, as well as lanes along Ohio Drive, SW and East Basin Drive, to travel between Arlington and D.C for personal and business tripes, and will continue to do so if they remain. NPS A.R. 1334–35, Decl. of Allison Foster ¶¶ 2–4, 7.

Many WABA members have expressed concerns for their safety if the lanes are removed. NPS A.R. 1340–41, Decl. of David Wacker ¶ 9 (stating that the removal of the lanes "would significantly degrade the safety and reliability of [his] commute" and would "force [him], and others, back into shared spaces with pedestrians or motor vehicles, increasing the likelihood of conflict, delay, and injury"); NPS A.R. 1343–44, Decl. of Steven R. Bouchard ¶¶ 10, 12 (stating

that he had "been nearly struck" at some of the 15th Street intersections in the years prior to the installation of the bike lanes and that "removing these lanes would make cycling less safe, driving less safe, and will not make the vehicle traffic any quicker"); NPS A.R. 1346–47, Decl. of David Alpert ¶¶ 7, 10 (stating "[b]efore the construction of the 15th Street Bike Lane Route, [he] did not feel safe traveling by bicycle along [the] route" and that route will not be as safe if the lanes are gone); NPS A.R. 1349, Decl. of Ashwin Jagannathan ¶¶ 6, 8 (stating the lanes keep him safe because "having physical separation from cars . . . takes the human error out of the equation and actively prevents crashes from happening" and that their "removal would subject [him] to greater risk of bodily harm while cycling").

Based on all of these attestations, the Court finds that there is no genuine dispute of fact that would preclude a finding as a matter of law that WABA has demonstrated its standing to challenge the decision to proceed with the Removal Project: more than one its individual members has shown that they face an actual and imminent risk of an injury-in-fact that is concrete and particularized such that they have standing in their own right; the lawsuit seeks to protect interests that are central to the organization's mission; and neither the claims nor the requested relief requires WABA's members to participate in the action personally.

II.    **The Court Will Enter Judgment in Favor of Plaintiff on Count 2: The Decision to Remove the Bike Lanes Is Arbitrary and Capricious and Not the Result of Reasoned Decisionmaking.**

Count Two of the amended complaint alleges that the decision to remove the dedicated bike lanes is arbitrary and capricious for a number of overlapping reasons, including that the defendants have not provided a reasonable explanation for their action, the decision represents an unexplained change in position, the record does not reflect that defendants gave sufficient

consideration to available safety and traffic data, and the defendants have not considered the reliance interests of WABA members.  Am. Compl. ¶¶ 69–91.

Section 706(2)(A) of the Administrative Procedure Act provides that a reviewing court "shall . . . hold unlawful and set aside agency action . . . found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  As the Supreme Court explained:

> The scope of review under the "arbitrary and capricious" standard is narrow and a court is not to substitute its judgment for that of the agency. Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made.

*State Farm*, 463 U.S. at 43, citing *Burlington Truck Lines*, 371 U.S. at 168 (internal quotation marks omitted).  The parties are in agreement that this longstanding precedent sets forth the test to be applied to this count.

The D.C. Circuit has reiterated that agency action will be upheld if the agency "has considered the relevant factors and articulated a 'rational connection between the facts found and the choice made.'"  *Nat'l Ass'n of Clean Air Agencies v. EPA*, 489 F.3d 1221, 1228 (D.C. Cir. 2007), quoting *Allied Loc. & Reg'l Mfrs. Caucus v. EPA*, 215 F.3d 61, 68 (D.C. Cir. 2000).  In the ordinary APA context, this review is "[h]ighly deferential" and "presumes the validity of agency action."  *Id.*, citing *AT&T Corp. v. FCC*, 349 F.3d 692, 698 (D.C. Cir. 2003) (alteration in original). But this is not to say that courts are expected to rubber stamp agency decisions.  *Nat. Res. Def. Council, Inc. v. Daley*, 209 F.3d 747, 755 (D.C. Cir. 2000).  They need not defer to "conclusory or unsupported suppositions."  *United Techs. Corp., Pratt & Whitney Div. v. U.S. Dep't of Def.*, 601 F.3d 557, 562 (D.C. Cir. 2010), quoting *McDonnell Douglas Corp. v. U.S. Dep't of the Air Force*, 375 F.3d 1182, 1187 (D.C. Cir. 2004).  As the Court of Appeals put it when applying *State*

*Farm*, "[t]he agency must cogently explain why it has exercised its discretion in a given manner, . . . and that explanation must be sufficient to enable us to conclude that the agency's action was the product of reasoned decisionmaking." *Alpharma*, 460 F.3d at 6 (internal citation and quotation marks omitted).

In short, the Court's job is "to evaluate the rationality of [the agency's] decision." *Mississippi v. EPA*, 744 F.3d 1334, 1348 (D.C. Cir. 2013). And when an agency "has failed to provide a reasoned explanation, or where the record belies the agency's conclusion, [the court] must undo its action.'" *Cnty. of Los Angeles v. Shalala*, 192 F.3d 1005, 1021 (D.C. Cir. 1999), quoting *BellSouth Corp. v. FCC*, 162 F.3d 1215, 1222 (D.C. Cir. 1999).

The Court's review of the record reveals the absence of a reasoned explanation. The proffered justifications for the action are vague, and not just the first, but the second set of decision documents are rife with conclusory suppositions that do not warrant deference. To the extent the decision documents appear to be proposing a solution, they do not identify what the problem might be. And critically, the factor at the heart of the issue – human safety – is addressed only superficially to the extent it is addressed at all. This is all particularly problematical since the decision reverses an action taken in the name of safety after considerable study and public comment just five years ago, but no change in circumstance is identified. The agencies accord a study undertaken after the bike lanes were installed only "limited weight," but they point to no studies or data of their own.

To be clear, this case does not simply present a failure by an agency to *explain* its analysis; the agency has now had two bites at that apple. The problem is the absence of record support for the fact that there *was* an analysis – that *facts* related to any of the considerations that supposedly underlie the decision were gathered or assessed or weighed against competing considerations.

Moreover, while the project is described as a means "to facilitate the substantial visitation expected" for a series of events scheduled between late May and August 2026, NPS A.R. 1370, the decision documents do not identify any problems or unusual traffic congestion caused by the existence of the bike lanes during similar events with similar levels of substantial visitation, in 2025 or even during the Cherry Blossom Festival that was already in progress when the supposed reconsideration took place this year. And there appears to have been no consideration given to the possibility of opening the bike lanes to traffic temporarily and then returning them to their current state when the crowds that the agencies claim to be seeking to accommodate with this action are gone.

Putting aside the fact that NPS first memorialized its "Basis for Decision" in a memorandum more than a month after the decision to remove the bike lanes had been made,[6] the March 31, 2026 Decision Memorandum for the 15th Street Cycle Track Removal and Road Paving Project, NPS A.R. 1369–72, does not stand up to scrutiny under the APA. While the February decision emphasized the upcoming National Cherry Blossom Festival, the March Decision Memorandum omits that concern and summarizes the reasons for the decision as follows:

> July 4, 2026 is America's 250th birthday. The National Mall will be central to a months-long series of planned events celebrating the

---

6       *See* NPS A.R. 1150–55 (document entitled "Assessment of Actions Having an Effect on Historic Properties" dated February 20, 2026); NPS A.R. 1161–66 and FHWA A.R. 1–6 (documents titled "Eastern Federal Lands Highway Division, NEPA Categorical Exclusion Form" dated February 27, 2026); NPS A.R. 1156–60 (NPS's Categorical Exclusion Documentation Form dated February 23, 2026, stating, "This project supports implementation of Executive Order 14252, 'Making the District of Columbia Safe and Beautiful' by advancing coordinated stewardship and improved visual quality of prominent federal public spaces through removal of roadway appurtenances and restoration of a standardized, maintainable corridor configuration within the existing roadway prism. With the upcoming National Cherry Blossom Festival and preparations underway for America's 250th anniversary, ensuring safe access for residents, commuters, visitors, and emergency services is a shared priority. These nationally significant events draw substantial visitation and require coordinated infrastructure planning to support mobility, security, and a positive experience for all.").

27

Semiquincentennial.  These events will substantially increase visitation to the National Mall.  Removal of the Cycle Track will open an additional lane on 15th Street from Pennsylvania Avenue to Maine Avenue to vehicular traffic, increasing carrying capacity of that road in advance of the upcoming America 250 events.

Removal of the Cycle Track supports implementation of Executive Order 14252, 'Making the District of Columbia Safe and Beautiful,' which calls for the Nation's Capital to 'showcase beautiful, clean, and safe public spaces,' and for the city's 'highways, boulevards, and parks' to be 'clean, well-kept, and pleasant.'  It also supports implementation of Secretary's Order 3428 of the same name.  The proposed project will improve the visual quality of these prominent federal public spaces through removal of roadway appurtenances and restoration of a standardized, maintainable corridor configuration, and will help the public enjoy those events by relieving vehicular traffic congestion and allowing existing roads to bring more people to the National Mall and through the National Mall.  The Project will be coordinated with infrastructure planning to support mobility, security, and a positive visitor experience.  Improvements made in anticipation of events planned for this Summer will benefit visitors to the National Mall and surrounding System lands for years to come.

NPS A.R. 1370 (citations omitted).  This uses more words than were contained in the February Categorical Exclusion documents but much of it is fluff.

A recurring theme in the "Basis for Decision" is aesthetics: the Removal Project is said to implement the Executive Order which exhorts the District of Columbia to "showcase beautiful, clean, and safe public spaces" and calls for the city's roadways and parks to be "clean, well-kept, and pleasant," and to "improve the visual quality of these prominent federal public spaces."  NPS A.R. 1370.  But beyond those broad generalities, what does it mean?  Beauty is in the eye of the beholder, and it is not up to the Court to quibble with the federal government about whether helmeted cyclists in spandex or automobiles fitted with exhaust pipes are more pleasing to look at.  But nowhere does the National Park Service explain how the removal of the lanes advances these stated objectives, even if one assumes that they are legitimate policy choices.

28

The suggestion that the project will be part of an effort "to support mobility, security, and a positive visitor experience," is similarly ephemeral and unexplained; improving the subjective experience for both area residents and tourists is a valid goal, but where is the logical, factual connection between the choice made and that desired outcome?  What does this have to do with security?  How does it support mobility for visitors with disabilities?  Also, while the defendants tout the benefits of opening an additional lane of traffic in the street, there is no discussion whatsoever of whether or how this change will affect mobility, security, or the visitor experience on the other main thoroughfares that traverse the National Mall: the sidewalks.

The other core consideration identified as underlying the decision is the desire to relieve anticipated traffic congestion associated with special events by making an additional lane on 15th Street available to cars and buses: to "help the public enjoy those events by relieving vehicular traffic congestion and allowing existing roads to bring more people to the National Mall and through the National Mall."  NPS A.R. 1370.  As government counsel summed it up at the argument, it's "common sense" that adding a lane "gives you more cars."  Apr. 9 Tr. at 62:15–22.  Maybe what seems obvious to counsel is statistically correct, but where is the explanation about why that is a good idea, why the space is needed, or why the agency exercised its discretion in that manner?

Even if one assumes that making room for more cars is a policy choice outside of the Court's purview, where is the factual or statistical underpinning for the conclusion that traffic will flow more smoothly if the lanes are restored?  That it makes sense to cut off the critical link that enables commuters, recreational cyclists, and tourists alike to make the entire journey into the city *without* cars, even though the Park Service specifically encouraged them to do so *this year* in its pre-festival promotional materials?  *See* NPS A.R. 1331–32 ("The National Cherry Blossom

Festival invites you to celebrate cherry blossom season in the District.  Find your Bloom and embrace the blossom magic by leaving your car behind and trying transit to get to festival events.").  NPS's own brochure touts "[t]ransit options" that include not only Metrorail and Metrobus, but also Capital Bikeshare, and scooters and dockless bicycles for rent.  NPS A.R. 1331.

The Decision Memorandum wraps up with the statement: "[a]fter weighing competing interests, the NPS concludes that this roadway space would be best used as an additional lane for vehicular traffic."  NPS A.R. 1371.  But beyond that conclusion, there is no description of the factors that went into the calculation.

In its March 31 Categorical Exclusion Form, the agency brushed aside the notion that the removal of the dedicated bike lanes would have a significant impact on public health or safety:

> Removal of the separated bicycle facility will have an operational effect on bicyclists, including a change in facility type and user experience on a corridor that has been documented as carrying more than 2,000 bicycle users per day.  However, this change will not result in significant impacts on public health or safety because cyclists will continue to have the choice to ride on either the roadway or the adjacent sidewalks, consistent with Section 3(i)(i)(A) of the National Mall and Memorial Parks Superintendent's Compendium . . . .  As a result, cyclists will continue to have a route to travel through the project area outside the motor vehicle roadway.  Cyclists who prefer to ride in the roadway instead of on the sidewalk will be able to do so.

NPS A.R. 1366; *see also* NPS A.R. 1371 ("The NPS has considered impacts to pedestrians and cyclists as a result of this project.  Pedestrians and cyclists will continue to have access to the National Mall.  The project will not change existing pedestrian walkways.  Bicycle use will continue to be allowed on sidewalks adjacent to roadways, consistent with Section 3(i)(i)(A) of the National Mall and Memorial Parks Superintendent's Compendium . . . . Cyclists who prefer to ride in the roadway instead of on the sidewalk will be able to do so.").  But the record is devoid of any examination of whether either is a satisfactory option or what the potential consequences might

be. Will either outcome advance the agencies' stated objectives? How? If the cyclists return to the roads, will the presence of the bikes in the lanes alongside or in front of the cars slow things down and add more congestion than they eliminate? If they choose the sidewalks, along with pedestrians, visitors with children or strollers, visitors in wheelchairs, and visitors on scooters, how will that support mobility and a positive visitor experience? Has there been any consideration to whether – given the dangers of riding in the road – that the cyclists may switch to cars and add to the volume themselves? Does either option decrease or increase the risk of collisions?

Counsel asserted, "I think the decision that's reflected here is that removing the protected bike lanes, the dividers on this stretch of road, would not have safety impacts that outweigh what they want to accomplish here, which is restoring the lane of traffic that was there for decades before." Apr. 9 Tr. at 61:5–10. But there is no indication in the record that NPS undertook a cost-benefit analysis at any point in the process.

The Decision Memorandum emphasizes that the removal of the cycle track is also meant to implement Executive Order 14189, Celebrating America's 250th Birthday, "which set[s] the policy of the United States 'to provide a grand celebration' on July 4, 2026 . . . ."

> The upcoming events celebrating America's 250th Birthday will bring large numbers of visitors to the National Mall and surrounding National Park System lands. The project will facilitate the substantial visitation expected for these events.

NPS A.R. 1370.

The defendants would have the Court accept that as the beginning and end of the discussion: "I would say, Your Honor, that that's the policy decision of the agency and the stated rational here includes the fact that they want these roads open for the American 250 celebration. I mean, these are massive, massive events, hundreds of thousands of people, and they decided, in

31

their discretion, as the land management authority that this lane needed to be open for that."  Apr. 9 Tr. at 57:21–58:2.

The Decision Memorandum tries to make that point by listing a number of special events scheduled to occur in the District between May and August of 2026, which other than the celebration of America's 250th anniversary, were not mentioned in the original materials.  NPS A.R. 1370–71.  The Memorandum ticks them off without explaining how the events, some of which are not scheduled to take place on the National Mall, relate to the cycle track removal: the Rededicate 250/Interfaith Day of Prayer on the Mall, occurring on the same weekend as such annual events as the George Washington University commencement on the Washington Monument grounds and the National Peace Officers' Memorial Service on Capitol grounds; the UFC Event scheduled to take place on the South Grounds of the White House; the Great American State Fair which will have pavilions on the National Mall; the Nation's 250th Birthday Fireworks Celebration; and an Indy Car Race, which will require its own track, *see* NPS A.R. 1370–71, and according to counsel, will not be happening on 15th Street at all.  *See* Apr. 9 Tr. at 63:13.

The problem with the crowd size justification is that it's based on assumptions and generalizations even though there were real numbers available for comparison.  In the Decision Memorandum, NPS predicts that the Nation's 250th Birthday Fireworks Celebration "will be substantially larger than prior July 4th celebrations," noting that "[s]everal hundred thousand visitors are expected to attend."  NPS A.R. 1371.  But this is hardly the first "massive event" in recent history.  Just last year, the administration celebrated the 250th anniversary of the U.S. Army, which coincided with the President's birthday and for which the Park Service was asked to approve a permit for 200,000 visitors to the grand parade featuring armored tanks, helicopters, and other military vehicles, along with thousands of soldiers.  Abigail Constantino, *Military Might on*

*Display During Army's 250th Birthday Parade in DC*, WTOP News (June 14, 2025), https://perma.cc/TF9M-U3HN.  The numbers anticipated to converge on D.C. for the nation's 250th birthday are similar, but there is not even any anecdotal evidence about traffic congestion experienced in connection with last year's event or the role the bike lanes played, if any, in exacerbating it.  And there appears to have been no consideration given to whether the availability of the bike lanes facilitated the arrival of some number of attendees without adding to traffic congestion.

The March 20 to April 12, 2026 Cherry Blossom Festival was also described in the original NPS Categorical Exclusion Form as one of the upcoming "nationally significant events" that would "draw substantial visitation and require coordinated infrastructure planning[.]"  NPS A.R. 1145.  Yet the agencies did not point to any problems or successes they had been experiencing during the Festival when they "reconsidered" the decision to remove the bike lanes while it was underway and the defendants could assess the experience and gather data in real time.

Furthermore, even if the agencies have some as-yet-unstated grounds to support a decision that removing the lanes is a necessary or beneficial step for this year's Semiquincentennial events, why it is advisable to remove the lanes permanently?  How will these "improvements" benefit visitors for years to come?

This opinion is not meant to suggest that the Court has reached a decision or should be the one to decide what the correct answers to any of these questions should be.  But the fact that the agencies' thoughts about them – or whether they even considered them at all – cannot be found in the record means that the record cannot support a conclusion that the decision to implement the Removal Project was the product of reasoned decisionmaking.

The most significant defect in the Decision Memorandum is that while it predicates the decision on Executive Order 14252, entitled "Making the District of Columbia *Safe* and Beautiful," and the Order's call for "*safe* public spaces," *see* NPS A.R. 1370 (emphasis added), there is not one sentence in the document that explains how this reversal of the 2025 decision to install the dedicated lanes advances that goal and makes the Mall safe. Did the lanes have a negative impact on anyone's safety? What was it? How will this change improve safety?

Plaintiff's initial complaint and motion for preliminary injunction relied heavily on a post-installation study undertaken by the D.C. Department of Transportation that saw a significant reduction in collisions in the months immediately after the bike lanes were put in place. The figures are dramatic: the bike lane project "reduced all roadway crashes by 46% and bicycle injury crashes by 91%" and that there was a "3% increase in bicycle traffic along the corridor. NPS A.R. 955, 1300. The study further found that speeds along the corridor increased by 17%, "[p]eak hour northbound travel time decreased by 36 seconds," and "southbound travel time decreased by 40 seconds." NPS A.R. 955, 1300. The original FHWA and NPS decision documents made no reference to this analysis at all, but the March 31st Decision Memorandum takes issue with its methodology:

> The NPS is aware of a Post-Implementation Analysis prepared by the D.C. Department of Transportation ('DDOT') on the 15th Street NW/SW Protected Bike Lane. This analysis has been reviewed by the Federal Highway Administration in an internal review that identified 'significant methodological flaws' in the DDOT analysis and found that the 'report's claim of a '46% reduction in all crashes' is mathematically unsupported.' The Federal Highway Administration also noted that the report 'fails to account for city-wide post-pandemic traffic reductions, ignores potential traffic diversion to adjacent routes, and entirely omits the necessary multi-modal exposure rates required to evaluate a bicycle facility.' Given that the Federal Highway Administration found the 'DDOT study's methodology is significantly compromised by its failure to use standard corridor exposure metrics (VMT) and multimodal trip rates,' the NPS gave limited weight to DDOT's study.

NPS A.R. 1371.  The FHWA internal review can be found in the NPS Administrative Record at NPS A.R. 1358; it is dated March 31, 2026, well after the defendants had already decided to remove the lanes, and it is not found in the FHWA Administrative Record at all.

Among other things, the FHWA recent analysis of the DDOT study complains that the "before-after" design of the study, comparing crash data from 2017–2019 to 2022–2025, suffers from a "failure to account for the impact of the pandemic on transportation."  NPS A.R. 1358. While no numbers are provided, the memorandum observes, "[b]ecause DC experienced a massive shift toward telework during this timeframe, there were simply fewer cars on the road."  NPS A.R. 1358.  But how does that bear on 2026?

Counsel argued at the hearing that any relevant data would have to take the President's 2025 order that federal employees to return to work into account.  *See* Defs.' Cross-Opp. at 4; Apr. 9 Tr. at 66:5–19 ("You can't look at a period when, you know, most of the federal government is out on telework and say look at all the wonderful things that happened, there were no cars, everyone is traveling faster, no one is getting hurt.  And then January 20th, 2025 there's an executive order that ends telework, it is implemented over a series of months, and now – this is not in the record – but as we all know, there's a lot more traffic in the District of Columbia.  So to use statistics that are based on a period that DDOT and . . . plaintiff[] know[s] has sort of artificially suppressed the number of cars in the District just doesn't give the Court anything to work with . . . as an evidentiary matter to conclude that there would be safety impacts . . . .").  If that should be part of the calculus that bears on whether an extra lane is needed, where are the numbers to support it?  What do we know about whether employees at the many private companies in the District – law firms, trade associations, educational institutions, etc. – are still teleworking or not? What about employees of commercial establishments that never recovered after the pandemic?

And wouldn't one also have to ascertain what percentage of the federal workforce that was in place in early 2025 has since been fired or accepted early retirement offers, thereby reducing the total number of commuters again?  In sum, do the decisionmakers have any idea whether there are more people or fewer people making the commute than there were in from 2022 to 2025, and what modes of transportation they use for that purpose?  On this as with all other aspects of the problem, what defendants surmise might be going on with traffic in DC is entirely speculative as neither NPS or FHWA tried to figure out.[7]

Plaintiff has responded to each of the claimed flaws with the study in considerable detail. Pl.'s Cross-Opp. at 28–30; *see* Apr. 9 Tr. at 20:19–22:23, and it has gathered more information

---

[7]    Also, how much does it matter if, as defendants complain in their reply, the statistics for the 2015–2020 "before" crashes reported in the DDOT study included crashes that occurred north of Constitution Avenue as well as on the lower portion of the 15th Street where the track would be removed.  *See* Defs.' Cross-Reply at 10.  The overall numbers may not show exactly how many more collisions are likely to occur or to be prevented in the specific segment involved in the removal, but do they say something about the difference in safety between when cyclists are separated from automobiles and when they aren't.  The exhibit defendants referenced in their reply, NPS A.R. 791, shows that it was the streets near the Mall that had the highest volume of daily traffic between 2015 and 2020, as well as multiple vehicle-bicycle crashes, on top of the many on Constitution Avenue itself.  So why are those the roads where it makes sense to introduce both more cars and displaced cyclists at the same time?

from DDOT that addresses the FHWA critique directly.[8]  Counsel's reminder that there are inherent limitations in the types of data available, and that one cannot design a laboratory-controlled trial to assess the kinds of real-world impacts at issue here, Apr. 9 Tr. at 20:25–21:5, had a lot of force, as did his suggestion that the FHWA's criticism of the size of the sample was misplaced.  Apr. 9 Tr. at 22:2–11.  But this case does not turn on whether one can accept every aspect of the original DDOT study as gospel, or to what extent the Court, who is not the decisionmaker, accepts its statistics and conclusions.

The bottom line is – whatever the deficiencies of the only study in the record – the government does not dispute, and it did not submit any data that would contradict. plaintiff's contention that the dedicated lanes reduce collisions.  As counsel for defendants acknowledged at the motions hearing, "[t]here is information in the record that says as a general principle, protected bike lanes prevent collisions."  Apr. 9 Tr. at 65:25–66:1.  No decision document addresses that

---

8      Plaintiff appended an updated DDOT study, dated April 6, 2026, to its amended complaint. *See* Ex. B to Am. Compl. [Dkt. # 23-2] (entitled, "Memorandum from the Office of the Director, District Department of Transportation to Elizabeth Kiker, WABA") ("DDOT Director Mem.").  It answered questions about the goals, limitations, and meaning of the original 15th St. NW/SW Multimodal Before/After Analysis, and engaged in further analysis, concluding:

> Additional analysis and normalization for exposure shows that after the 15th Street NW/SW Corridor Project was installed the corridor saw a decrease in crashes and no effect on vehicle congestion. Depending on the method for normalizing, crash reductions ranged from 16% to 24% for all roadway crashes and 93% reduction in bicycle-related crashes.  Compared to city-wide crash trends, 15th Street NW/SW outpaced the city in crash reductions by 39% for all crashes and 20% by bicycle crashes.

DDOT Director Mem. at 6.  While this is precisely the sort of information that should factor into any consideration of the bike lanes' fate, the Court agrees with the government that this document, is not part of the administrative record underlying the March 31 decision, and it does not factor into the Court's conclusion that neither the defendants' original explanations nor their reconsidered explanations for the Removal Project pass muster under the APA.

37

inarguable fact, but the defendants insist that it has been considered. Indeed, the defendants would have the Court believe that its view has not changed since 2021. Apr. 9 Tr. at 49:22–25 ("[T]he Park service . . . has not changed the position on the value and opportunities in safety that bike lanes afford."). That's certainly not apparent from the materials provided.

While the defendants' Decision Memorandum voices objections to conclusions in the original DDOT study they deem to be overstated, they make no effort to quantify what the actual risks might be or to assess whether the benefits of eliminating the lanes outweigh those risks. *See* NPS A.R. 1369–72. Among other things, the defendants have not considered whether the numbers of collisions in the streets or on the sidewalks are likely to go up or down, what costs are likely to be associated with police and emergency personnel responding to collisions, or what if any backups and congestion associated with the predictable collisions might be.

Another problem with the decision is that there are other materials that bear on these issues in the record that precede the issuance of the March 31 decision documents that do not rest entirely on the DDOT study, but there is no indication that the agencies considered those either. The administrative record includes:

A letter signed by eleven Members of Congress, including the sole representative of the District of Columbia and members representing Virginia and Maryland, dated March 20, 2026, calling on NPS to "immediately reverse course and stop the removal of the bike lane."

> The bike lanes are part of a broader safe cycling corridor along 15th Street. Those lanes are an essential travel route for commuters from Virginia, D.C., Maryland, and visitors across the country, who rely on them to access jobs, NPS sites along the National Mall, and the Capitol complex. Allowing or actively working to remove these lanes will reverse a decade of improved bike access to those sites and intentionally cut off public access to their elected representatives and public lands.
>
> Many of those commuters and visitors would continue to need access to this corridor. By removing the bike lanes, NPS would also force remaining

38

> bicyclists to share walkway space with pedestrians or roads with cars, creating danger for pedestrians, bikers, and cars alike.

NPS A.R. 1175.

> A March 20, 2026 letter from the D.C. Ward 4 Councilmember:

> The removal of the protected bike lane will disrupt traffic and add to congestion in this high-traffic area.

> ***

> Protected bike lane is a common-sense strategy to ensure safety and efficiency along this highly trafficked corridor.  But it's not just District residents who will be negatively impacted if this bike lane is removed – it is heavily utilized by tourists from all 50 states. Small businesses that provide rentals and tours have reported that thousands of visitors utilize the lane each week and would be less safe as they navigate the road alongside 2 or 3-ton vehicles.

NPS A.R. 1177.[9]

Finally, in support of their motion, plaintiff submitted a declaration from William Schultheiss, PE, the Director of Engineering at a transportation planning, design and engineering firm, which can be found in the Administrative Record.  NPS A.R. 1351–56.  While he cited statistics from the DDOT study, he included a number of additional observations based on his personal expertise and experience, including:

> The affected corridor traverses one of the most heavily visited pedestrian environments in the United States.  The National Mall and Memorial Parks ('National Mall') unit receives approximately 24 million visitors annually.  The corridor passes directly through or adjacent to destinations including the Washington Monument, the World War II Memorial, the Korean War

---

9      A Washington Post article included in the Administrative Record, *see* NPS A.R. 1326 reports that Mayor Muriel Bowser made a statement opposing the removal of the lanes on the grounds that the action "would likely increase conflicts between pedestrians, cyclists, and vehicles, especially at one of the busiest times of year[,]" adding that removing the lanes "would push cyclists into traffic or onto crowded sidewalks, creating new safety risks for everyone."  NPS A.R. 1327.  The statement itself, *see* Mayor Muriel Bowser (@MayorBowser), X, (Mar. 20, 2026, at 4:51 ET), https://perma.cc/GH23-FUSN, however, is not otherwise included in the Administrative Record.

Veterans Memorial, the Martin Luther King Jr. Memorial, the Holocaust Museum, multiple Smithsonian Institution museums, the Jefferson Memorial, and the Tidal Basin. The National Mall also serves as a critical destination for outdoor recreation, functioning as D.C.'s central public park and green space for residents and visitors.

This visitor population includes a significant number of users with mobility considerations, including veterans who travel to these memorials in wheelchairs and with mobility aids to honor their own service and that of fallen comrades. The visitor population also includes families with young children, elderly visitors, and international tourists who are unfamiliar with local traffic patterns. The corridor also serves as a recreational and commuter route for cyclists and pedestrians of all abilities, including disabled cyclists and veterans who rely on adaptive cycles. This pedestrian and mobility context is not incidental to the safety analysis—it is central to it.

\*\*\*

The corridor between Maine Avenue and the 14th Street Bridge carried three southbound lanes pre-construction, which the installation of the protected bicycle facility reduced two lanes. The corridor between Pennsylvania Avenue and Maine Avenue carried two southbound through lanes pre-construction, which the installation reduced to one through lane. In both segments, the remaining through lanes converge to a single lane at the same I-395 highway entrance, compounding the fixed capacity constraint shared across all approach corridors. This severe geometric constraint is a well-documented source of aggressive pre-merge behavior. Drivers anticipating the bottleneck accelerate and execute repeated lateral lane changes in the approach blocks, competing for positions before capacity is eliminated. Critically, this behavior produces no benefit to overall throughput. The number of vehicles that can enter I-395 is fixed by the single-lane constraint regardless of approach speed or lane position.

The pre-installation crash record on this corridor reflects the predictable consequence of that dynamic—elevated rates of sideswipe, rear-end, and turn conflicts generated by vehicles operating at speed differentials in a constrained approach zone. The lane reductions directly diminished the volume of lateral lane-change maneuvers in the pre-merge zone on both segments. The corridor became more orderly and efficient for motor vehicles precisely because the incentive and opportunity for unproductive pre-merge competition was reduced.

\*\*\*

The motor vehicle capacity argument for removal is further undermined by the geometry of the broader corridor. 14th Street, SW runs parallel to 15th Street and Raoul Wallenberg Place, and all motor vehicle traffic on both roads is destined for the same I-395 entrance. 14th Street currently operates

40

as a motor vehicle priority corridor with three through southbound lanes and three through northbound lanes, constituting six lanes of capacity serving the identical destination. In my professional opinion, restoring one travel lane on 15th Street and Raoul Wallenberg Place would provide no meaningful increase in motor vehicle access to I-395 because the constraint is the highway entrance itself, which is shared across both parallel approach corridors. The pre-merge competition that produced elevated crash rates on the project corridor occurs in the context of this existing parallel capacity—further evidence that the lane reductions on 15th Street and Raoul Wallenberg Place improved operations by reducing unproductive conflict rather than restricting throughput.

***

The sidewalks along the corridor are heavily used throughout the day by visitors moving between memorials, museums, transit stops, and parking areas.

By providing cyclists with dedicated and physically separated infrastructure, the lane removed cyclists from the sidewalk environment and eliminated a significant source of pedestrian conflict along the full corridor. Removal of the facility would displace cyclists back onto those sidewalks, directly reversing the safety gains documented above.

The consequences of removing the protected bike lane would be particularly challenging on the segment between Independence Avenue, SW and the 14th Street Bridge, where visitor access to the Tidal Basin memorials generates persistently high pedestrian densities. The existing sidewalks along this stretch are of insufficient width to safely accommodate the current volume and mix of users, which includes a significant population of wheelchair users and individuals using mobility aids—among them disabled veterans visiting the memorials that honor their service and that of fallen soldiers. Introducing cyclists displaced from the roadway would further reduce the effective clearance available to these users, creating foreseeable conflicts and increasing the risks of falls and injuries for a population that is disproportionately vulnerable to serious harm from such incidents. A similar challenge exists between Pennsylvania Avenue, NW and Independence Avenue, SW, where high pedestrian volumes generated by the museums, monuments, and federal buildings along that segment create comparable conditions.

The removal of the protected bike lane within the segment between Independence Avenue, SW and the 14th Street Bridge presents elevated motor vehicle conflict risks, as described above in paragraphs eight through 11. The protected lane provides a physical buffer between the high-speed pre-merge vehicle activity and the sidewalk environment. Its removal would eliminate that buffer, reducing the margin of safety for pedestrians,

41

including disabled users, near the most active motor vehicle conflict zone on the corridor. Bicyclists who remain in the roadway rather than the sidewalk would face comparable risks. This segment attracts a significant number of recreational and tourist cyclists, including Capital Bikeshare users accessing the memorials and Tidal Basin, many of whom are likely less experienced with bicycling in urban conditions. Without the protected lane, these users would be exposed to the high-speed merge dynamics described above in paragraphs eight through 11, increasing the likelihood of bicycle-vehicle conflicts for an inexperienced riding population.

***

It is my professional opinion that the removal of the protected lanes would most likely result in crash rates returning to or exceeding the pre-installation levels across all modes. The above findings are not independent: the protected lane simultaneously improved motor vehicle operations, cleared the sidewalk environment for pedestrians throughout the corridor, and separated cyclists from traffic. Removal would reverse all three effects at once.

Specifically: the corridor would return to pre-installation approach geometry on both segments, restoring the conditions for unproductive pre-merge speed and lateral conflict. Cyclists would be displaced onto sidewalks that already operate beyond a safe capacity for their existing users, including disabled veterans and mobility-impaired visitors. The physical buffer between high-speed merge activity and the pedestrian zone would be eliminated.

The stated justification for the removal, improving motor vehicle operations, directly contradicts the data. It is further unde1mined by the existence of 14th Street, SW as a parallel six-lane motor vehicle priority corridor serving the identical I-395 destination. In my professional opinion, removing the facility—particularly without a safety analysis, an alternatives assessment, or a public process—would foreseeably degrade motor vehicle operations and increase the collision risks for pedestrians and cyclists, including disabled veterans and mobility-impaired users.

NPS A.R. 1352–56.

Again, the Court is not assessing credibility or making factual findings as to the validity of Schultheiss's opinion; the declaration is relevant because it identifies a host of issues that should be analyzed and considered before a reasoned decision can be made, and it exemplifies the level of detail that can be mustered to understand the potential consequences of the Removal Project in

a manner that sharply contrasts with the defendants' failure to grapple with the issues.[10]  Visitors with disabilities do not receive even a whisper in the decision documents.

For all of these reasons, the Court finds the decision to proceed with the Removal Project to be arbitrary and capricious under the *State Farm* test.  The same set of record excerpts and questions underlie plaintiff's allegations that the decision is arbitrary and capricious because it departs from prior practice without explanation, and because it fails to take the cyclists' reliance on the lanes – particularly the unique link connecting the District with Virginia – for their daily commuting, recreation, and tourism.[11]  Those concerns add force to the Court's determination that the decision must be vacated pursuant to section 706(2)(A).

---

10    Plaintiff submitted a supplemental declaration from this engineer as an exhibit to their amended complaint.  *See* Suppl. Decl. of William Schultheiss, Ex. 1 to Am. Compl. [Dkt. # 23-1]. While it may bear on the safety of the project or the merits of any future NEPA analysis, it cannot be said that the April 7, 2026 declaration is part of the record underlying the March 31 decision before the Court at this time, and therefore, the Court will not consider it in connection with the instant ruling.

11    The 2026 reversal of a plan implemented in 2021 here can be differentiated from the precedents cited involving changes in "longstanding" policy and the types of reliance interests found to be significant.  *See, e.g.*, *Regents*, 591 U.S. at 30, involving the rescission of the Department of Homeland Security's immigration program known as Deferred Action for Childhood Arrivals ("When an agency changes course . . . it must be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account.").  Given its ruling, the Court need not decide whether the failure to consider reliance interests here fits that paradigm and provides an additional basis to find the decision to be arbitrary and capricious.  But the Court agrees with the plaintiff that a decision to reverse the carefully considered decision to install the bike lanes requires some consideration of who had come to rely on them and for what purposes; the casual statement in the Categorical Exclusion Forms that cyclists would still have the option of using the street or the sidewalk does not engage with the WABA members' concerns – or the absence of sidewalks at key junctures – in a substantive way.

**III.    The Court Will Enter Judgment in Favor of Plaintiff on Count Three: Defendants Based Their Failure to Undertake a NEPA Assessment on a Categorical Exclusion When the Project's Significant Impact on Public Safety Precluded the Use of an Exclusion, and Defendants Failed to Analyze or Explain Their Rejection of the Exception.**

The National Environmental Policy Act "'declares a broad national commitment to protecting and promoting environmental quality,' and brings that commitment to bear on the operations of the federal government." *Sierra Club v. FERC*, 867 F.3d 1357, 1367 (D.C. Cir. 2017), quoting *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 348 (1989). The statute begins with a congressional declaration of its purpose, which includes, "[t]o declare a national policy which will encourage productive and enjoyable harmony between man and his environment; [and] to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man[.]" 42 U.S.C. § 4321. To that end, NEPA requires federal agencies to prepare "a detailed statement" assessing the environmental impacts of all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). This provision directs federal agencies "look hard at the environmental effects" of their projects before taking action. *Minisink Residents for Env't Pres. & Safety v. FERC*, 762 F.3d 97, 102 (D.C. Cir. 2014) (internal citation and quotation marks omitted).

The Supreme Court has emphasized that "'NEPA itself does not mandate particular results' in order to accomplish these ends. Rather, NEPA imposes only procedural requirements on federal agencies with a particular focus on requiring agencies to undertake analyses of the environmental impact of their proposals and actions." *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 756–57 (2004), quoting *Methow Valley*, 490 U.S. at 350.

The detailed environmental impact statement ("EIS") described in the statute must analyze the "environmental effects of the proposed agency action," any unavoidable "adverse environmental effects" of the action, and potential alternatives to the action.  42 U.S.C. § 4332(2)(C).   Until they were recently repealed, the regulations implementing NEPA promulgated by the Council on Environmental Quality within the Executive Office of the President specified that an agency was not required to prepare an EIS if it made a determination in a more limited document, known as an environmental assessment ("EA"), that the proposed action would not have a significant impact on the environment.  40 C.F.R. §§ 1501.4, 1508.13 (repealed 2025).[12] And citing those regulations, the EA was described by the Supreme Court as a "concise public document that [b]riefly provide[s] sufficient evidence and analysis for determining whether to prepare an [EIS]." *Pub. Citizen*, 541 U.S. at 757, quoting 40 C.F.R. § 1508.9(a) (internal quotation marks omitted) (repealed 2025).  Courts have also explained that an agency may forgo preparing an environmental impact statement or an environmental assessment altogether if the proposed action is "categorically excluded" from NEPA's usual requirements because it "[n]ormally does not have significant effects" on the environment.  *Marin Audubon Soc'y v. Fed. Aviation Admin.*, 121 F.4th 902, 907 (D.C. Cir. 2024), quoting 40 C.F.R. § 1501.3(a)(1) (2020) (repealed 2025).

Many federal agencies, including the two involved here, prepared their own lists of categorical exclusions to be applied unless "extraordinary circumstances" enumerated in other regulations pertained.  *See, e.g.*, Dep't of Interior Listing of Dep't Categorical Exclusions, 43 CFR § 46.210 ("The following actions are categorically excluded under § 46.205(b) unless any of the

---

12    On February 25, 2025, the Council on Environmental Quality rescinded its regulations implementing NEPA, so this Court cannot look to 40 C.F.R. §§ 1500–08 for guidance as to what "significant effects" might be or how the statute is to be carried out.  *See Removal of Nat'l Env't Policy Act Implementing Reguls.*, 90 Fed. Reg. 10,610 (Feb. 25, 2025).  But that change in the regulatory environment does not change the task before the Court.

extraordinary circumstances in § 46.215 apply."). One of the extraordinary circumstances that would preclude reliance on a categorical exclusion is if the proposed action would "[h]ave significant impacts on public health or safety." 43 C.F.R. § 46.215(a).

The defendants in this case have both invoked categorical exclusions as a justification for failing to undertake an environmental assessment, and they maintain that the proposal would not have a significant impact on safety that would make a categorical exclusion unavailable. The decision to invoke a categorical exclusion under NEPA is reviewed under the arbitrary and capricious standard. *Nat'l Trust for Hist. Pres. in U.S. v. Dole*, 828 F.2d 776, 781 (D.C. Cir. 1987).

Defendants insist that the Supreme Court's recent decision in *Seven County Infrastructure Coalition v. Eagle County, Colorado*, 605 U.S. 168 (2025) requires the Court to accord an agency's implementation of NEPA and the application of categorical exclusions "substantial deference," and that the Court should stand down from disturbing their policy choice. *See, e.g.*, Defs.' Cross-Opp. at 25 ("When reviewing an agency's decision to classify a proposed action as falling within a particular categorical exclusion, '[c]ourts should afford substantial deference and should not micromanage those agency choices so long as they fall within a broad zone of reasonableness.'") (alteration in original), quoting *Seven Cnty.*, 605 U.S. at 183; Defs.' Cross-Reply at 1 ("NPS is entitled to 'substantial deference' in its determination that restoring the pre-2021 lane configuration would not cause significant impacts or impairment."), quoting *Seven Cnty.*, 605 U.S. at 180. *See also* Apr. 9 Tr. at 59:1–3 ("[T]his is exactly the type of policymaking question *Seven Count*[*y*] says is inappropriate for this action. They made a policy decision.").

As plaintiff has pointed out, though, *Seven County* does not sweep quite so broadly; the decision was only concerned with Environmental Impact Statements:

> When a party argues that an agency action was arbitrary and capricious due
> to a deficiency in an EIS, the reviewing court must account for the fact that

> NEPA is a *purely procedural statute.* . . . NEPA imposes no *substantive* constraints on the agency's ultimate decision to build, fund, or approve a proposed project. So when reviewing an agency's EIS, the only role for a court is to confirm that the agency has addressed environmental consequences and feasible alternatives as to the relevant project.

605 U.S. at 180 (emphasis in original) (internal citations and quotation marks omitted). *See also id.* ("[W]hen determining whether an agency's EIS complied with NEPA, a court should afford substantial deference to the agency."). An in-depth analysis of environmental impacts conducted by agency experts can hardly be compared to the NPS's short statement announcing an absence of safety concerns that cites no data whatsoever. However, to the extent the *Seven County* opinion addresses NEPA compliance generally, the case does not stand for the proposition that the Court has no role to play; it simply reiterates that in this instance, the Court is engaged in traditional APA analysis. *See id.* ("Because an EIS is only one input into an agency's decision and does not itself require any particular substantive outcome, the adequacy of an EIS is relevant only to the question of whether an agency's final decision . . . was reasonably explained.").

Here the APA review consists of two questions: do the decision documents reasonably explain and support the finding that the project falls within a categorical exclusion? And, is there a reasoned explanation for why use of a categorial exclusion is not precluded by the presence of an enumerated extraordinary circumstance?

The National Park Service, which is a bureau of the Department of Interior, can look to the Department's regulations when applying categorical exclusions, and it relies upon the DOI Handbook of NEPA Procedures, Appendix 2, as the source for the exclusion cited in its February 23 Categorical Exclusion Documentation Form: NPS § 12.6(13). NPS A.R. 1156. Section 12.6(13) permits a categorial exclusion for the "[m]odernization of a highway by resurfacing, restoration, rehabilitation, reconstruction, adding shoulders, or adding auxiliary lanes (including

47

parking, weaving, turning, and climbing lanes),” if the actions do not involve any of six enumerated constraints.[13] NPS A.R. 1122, citing DOI Handbook of NEPA Procedures, Appendix 2. The National Park Service adopted this exclusion, and the list of constraints, verbatim, from the Federal Highway Administration's NEPA regulations, specifically 23 C.F.R. § 771.117(c)(26). The Eastern Federal Lands Highway Division of the FHWA invoked that exclusion, with little elaboration, in its February 27 Categorical Exclusion Form.

---

13    Actions may not be processed as categorical exclusions under these provisions if they involve:

(1)    An acquisition of more than a minor amount of right-of-way or that would result in any residential or non-residential displacements;

(2)    An action that needs a bridge permit from the U.S. Coast Guard, or an action that does not meet the terms and conditions of a U.S. Army Corps of Engineers nationwide or general permit under section 404 of the Clean Water Act and/or section 10 of the Rivers and Harbors Act of 1899;

(3)    A finding of “adverse effect” to historic properties under the National Historic Preservation Act, the use of a resource protected under 23 U.S.C. 138 or 49 U.S.C. 303 (section 4(f)) except for actions resulting in *de minimis* impacts, or a finding of “may affect, likely to adversely affect” threatened or endangered species or critical habitat under the Endangered Species Act; *de minimis* impacts, or a finding of “may affect, likely to adversely affect” threatened or endangered species or critical habitat under the Endangered Species Act;

(4)    Construction of temporary access or the closure of existing road, bridge, or ramps that would result in major traffic disruptions;

(5)    Changes in access control;

(6)    A floodplain encroachment other than functionally dependent uses (e.g., bridges, wetlands) or actions that facilitate open space use (e.g., recreational trails, bicycle and pedestrian paths); or construction activities in, across or adjacent to a river component designated or proposed for inclusion in the National System of Wild and Scenic Rivers.

NPS A.R. 1122 (document entitled “DOI Handbook of NEPA Procedures, Appendix 2”); *see also* 23 C.F.R. § 771.117(c)(26). Plaintiff is not arguing that any of these constraints apply in this case.

In the NPS February 23 Categorical Exclusion Form, the agency provided this concise explanation for its use of the exclusion: "[b]ased on the limited scope, confined limits of disturbance, and use of standard resurfacing and traffic-control methods, the action fits under NPS 12.6(13)." NPS A.R. 1157.

Both defendants relied on the same exclusion again on March 31. NPS A.R. 1364; FHWA A.R. 36.[14] The NPS March 31 Categorical Exclusion Form cites NPS 16.1(G)(5), which is how 12.6(13) was renumbered in 2026. NPS A.R. 1365. The March 31 FHWA Categorical Exclusion Form invokes section 771.117(c)(26) again. FHWA A.R. 36. The document addresses the "revised window for work," and it includes the statement that FHWA believes that the "phased work can be completed from April 23-May 14, 2026, and will work with NPS to mitigate any impacts in light of increased traffic due to the time of year." FHWA A.R. 36–37.

Plaintiff maintains that the plain text of the highway modernization exclusion does not apply, and that reliance on the exclusion is precluded by the "extraordinary circumstance" that the removal of the dedicated bike lanes will have a significant impact on safety. Pl.'s Cross-Opp. at 32–35.[15]

As for the invocation of the exclusion, the agencies themselves have provided some guidance as to how they are to be applied. According to the FHWA, categorical exclusions "are

---

14     Defendants have not argued that the rescission of the CEQ regulations casts doubt on the continuing validity of the Department of Interior, NPS, or FHWA regulations or their applicability here. Therefore, the Court will review the reasons cited by the agencies for why the Removal Project was categorically excluded from NEPA compliance under their own regulations under the arbitrary and capricious standard.

15     Plaintiff raises other objections to the defendants' application of NEPA. It contends that the categorical exclusions are improper because the removal will "have significant impacts on travel patterns" in accordance with 23 C.F.R. § 71.117(a) and entails "[s]ubstantial controversy on environmental grounds" pursuant to 23 C.F.R. § 771.117(b)(2). Pl.'s Cross-Opp. at 29–30, 33–34.

actions that, based on FHWA's past experience with similar actions, normally do not involve significant environmental impacts. They are actions that: . . . do not have a significant impact on any natural, cultural, recreational, historic or other resource; do not have significant impacts on travel patterns; or do not otherwise have any significant environmental impacts. 23 C.F.R. § 771.117(a).

The NPS NEPA Handbook encourages agency officials to use categorical exclusions when applicable, but it cautions:

> In order to use a CE, you must ensure a proposed action fits within the category of actions described in a specific CE. A proposed action is "the bureau activity under consideration" (46.30). The proposed action does not have to be specifically mentioned in the text of a CE, but should easily fit into the category of actions described by the CE.

NPS A.R. 303 (document entitled "NPS NEPA Handbook § 3.1").

It is not at all clear that the plain text of the exclusion fits the circumstance of the destruction, as opposed to the creation, of the bike lanes. The nouns and gerunds in the exclusion – "modernization . . . [,] resurfacing, restoration, rehabilitation, reconstruction, adding shoulders, or adding auxiliary lanes" – are all commonly understood terms that relate to improving, repairing, or adding to existing roadways, not ripping them out. This is not an every-day rehabilitation of worn-out surfaces or the mere refreshing of road stripes, and there is no indication in the record that either agency has done anything "similar" in the past. The ill-fitting nature of the exclusion is further demonstrated by the existence of a separate FHWA exclusion that specifically carves the construction of bike lanes out of the environmental assessment requirement but does not exclude their removal. *See* 23 C.F.R. § 771.117(c)(3). The omission is telling.

Furthermore, as noted above, FHWA's regulations provide that categorical exclusions are inappropriate for actions that "have significant impacts on travel patterns." 23 C.F.R.

§ 771.117(a). Yet a central reason advanced for the Removal Project is to have an impact on traffic patterns. *See* NPS A.R. 1370 ("Removal of the Cycle Track will open an additional lane on 15th Street from Pennsylvania Avenue to Maine Avenue to vehicular traffic, increasing carrying capacity of that road in advance of the upcoming America 250 events."); *id.* ("The proposed project . . . will help the public enjoy these events by relieving vehicular traffic congestion and allowing existing roads to bring more people to the National Mall and through the National Mall."). This internal inconsistency cuts against a finding that the decision is reasoned and reasonable.

Finally, according the agency's implementation of its own regulations the presumption of regularity is complicated here by the agency's decision to undertake the project without involving or even informing the public, and its insistence on moving full speed ahead even after being notified of objections on the part of D.C. and federal officials and an organization of avid cyclists.

Even if one accepts the defendants' strained interpretation of the highway modernization categorical exclusion as worth of deference, their assertion that no extraordinary circumstance applies remains to be reviewed. One cannot say that the defendants failed to offer *any* explanation of their position that the Removal Project would not have significant impacts on public safety; the NPS March 31 Categorical Exclusion Form includes a chart listing all of the potentially applicable extraordinary circumstances, and the box for impacts on public health and safety is filled out. NPS A.R. 1366–68. But the Court agrees with the observation of another court in this district that "where there is substantial evidence in the record that an extraordinary circumstance might apply, an agency may act arbitrarily and capriciously by failing to explain its determination that a categorical exclusion is applicable." *Reed v. Salazar,* 744 F. Supp. 2d 98, 116 (D.D.C. 2010).

Here, while an explanation appears, it does not reveal that the agency undertook any sort of evaluation of the safety issue. *See* 42 C.F.R. § 46.205(c)(1) ("Any action that is normally

51

categorically excluded must be evaluated to determine whether it meets any of the extraordinary circumstances in § 46.215; if it does, further analysis and environmental documents must be prepared for the action.").

As plaintiff emphasizes, one concern is that defendants have abandoned their own conclusions regarding the safety, connectivity, and importance of the bike lanes without explanation. The NPS 2016 Paved Trails Study emphasized that "[p]edestrian and bicycle safety is of primary importance," and it identified the 15th Street bike lane as a "much-needed connection." NPS A.R. 375, 432, 497. Similarly, the National Mall Plan set goals to "provide separate bicycle lanes or trails," NPS A.R. 234, and NPS's own management policies prioritize alternative, nonmotorized transportation where appropriate. NPS A.R. 155–56; *see also* NPS A.R. 245 ("A stronger connection with the National Mall and a sense of arrival at the Tidal Basin will be achieved by redesigning and separating pedestrian, bicycle, and vehicular circulation."). The March 31 Categorial Exclusion forms and Decision Memorandum fail to address prior studies showing that the bike lanes would improve access, maintain safety, and not significantly alter traffic patterns for pedestrians, cyclists, drivers, or tourists. NPS A.R. 786–88, 815. They also ignore the Planning Commission's previous determination that the cycle track "maintains important viewsheds on the Mall." NPS A.R. 843. The decision documents offer no explanation for reversing or ignoring these determinations, leaving the March 31 decision untethered from the

agencies' own full-throated endorsement of the safety and environmental benefits of dedicated bike lanes.[16]

What does appear as the reason the proposal would not have significant impacts on public health or safety does not actually address or answer the question:

> Removal of the separated bicycle facility will have an operational effect on bicyclists, including a change in facility type and user experience on a corridor that has been documented as carrying more than 2,000 bicycle users per day. However, this change will not result in significant impacts on public health or safety because cyclists will continue to have the choice to ride on either the roadway or the adjacent sidewalks . . . . As a result, cyclists will continue to have a route to travel through the project area outside the motor vehicle roadway. Cyclists who prefer to ride in the roadway instead of on the sidewalk will be able to do so.

> The proposed project will not have other significant impacts on public health or safety because it is confined to the existing roadway prism and consists of resurfacing/rehabilitation and traffic-control changes (striping, signing, and signal adjustments) without expanding the transportation footprint or inducing land use change. The project includes traffic-control measures, clear transition signing/markings at the project termini, and coordination with the local transportation agency to maintain bicycle accommodation and manage operational transitions. With these measures, the action is not expected to cause significant environmental impacts or constitute an extraordinary circumstance.

> The project does not eliminate bicycle travel in the corridor; it changes the facility type. NPS will implement transition signing/markings and will monitor operations after implementation and adjust striping/signals as warranted to address observed operational issues.

---

16    As noted in section II, blanket statements such as the claim that removal of the cycle track supports implementation of Executive Order 14252, "Making the District of Columbia Safe and Beautiful," because it "will improve the visual quality of these prominent federal public spaces through removal of roadway appurtenances and restoration of a standardized, maintainable corridor configuration, and will help the public enjoy those events by relieving vehicular traffic congestion and allowing existing roads to bring more people to the National Mall and through the National Mall," Decision Memorandum, NPS A.R. 1370, merely pay lip service to safety. The material in the record fails to address how adding vehicle lanes – which are designed to increase the number of cars and therefore likely to increase pollution and safety risks – advances these goals. There is no assessment of the long-term impact on the District, its residents, or tourists who rely on alternative transportation, or the comparative safety of alternative transportation modes such as bikes and e-scooters. NPS A.R. 1370.

NPS A.R. 1366–67.

This rejection of the extraordinary circumstance is superficial, and highly conclusory. While acknowledging that removing the separated bicycle facility will change the "user experience" for over 2,000 daily cyclists, that outcome is treated as simply an "operational" matter or "change in facility type." The explanation devotes a paragraph to assuring the public that the new traffic pattern will be well-marked and clear, but whatever safety risks there might be – and they were well-known to both agencies – are not even mentioned, much less quantified or weighed in the balance. They are brushed aside with the assurance that cyclists may continue to ride on the roadway or adjacent sidewalks, without any discussion of what the safety implications of increased interactions between vehicles and cyclists might be, what problems are likely to arise on the sidewalks, or why the cited benefits now outweigh NPS's own thoroughly researched and documented determinations about cyclist and pedestrian safety, mobility, and connectivity. NPS A.R. 375, 497; 786–88. Checking a box, and even pasting something in the box, is not the same thing as meaningfully engaging with the issue.

For all of these reasons, the Court finds that the decision that the Removal Project was covered by a categorical exclusion, and that the project would not have significant impacts on public health or safety, was not the product of reasoned decisionmaking, and was arbitrary and capricious and not in accordance with law.

## IV. The Court Need Not Resolve the Remaining Counts.

The remaining two counts are APA claims alleging that defendants' decision to remove the 15th Street Cycle Track was not in accordance with law. Count One alleges that the decision was not in accordance with the National Capital Planning Act because defendants failed to consult with the National Capital Planning Commission. Am. Compl. ¶¶ 53–68. Count Four alleges that the

decision was not in accordance with the Park Service Organic Act ("Organic Act").  Am. Compl. ¶¶ 102–07.

Both the NCPA and Organic Act are procedural statutes.  The NCPA defines the review process and planning responsibilities of the Planning Commission, 40 U.S.C. § 8701(b)(1), while the Organic Act establishes the fundamental purpose of the NPS to conserve natural and historical resources and provide for public enjoyment.  54 U.S.C. § 100101.

Since the Court has already determined that the decision itself and the defendants' use of a categorical exclusion to bypass any further NEPA assessment were arbitrary and capricious, and that the decision should be set aside under section 706(2)(A) of the APA, it need not rule on these additional APA claims based on statutes that leave a lot of room for discretion and for which there is little binding authority.  Furthermore, it is not clear that plaintiffs have the same standing to complain about a federal agency's sidestepping a Commission charged with planning and coordinating the development of the capital that they have to bring claims based upon the decision to proceed with the Removal Project and steps taken under NEPA related to that project that directly affect their personal health safety.

### A.  The National Capital Planning Act

The National Capital Planning Act, or NCPA empowers the National Capital Planning Commission ("Planning Commission") to "secure comprehensive planning for the physical development of the National Capital and its environs."  40 U.S.C. § 8701(b)(1)(A).

As part of that endeavor, section 8721 of the NCPA directs the Commission to "prepare and adopt a comprehensive, consistent, and coordinated plan for the National Capital."  *Id.* § 8721(a).  Section 8722(a) of the National Capital Planning Act contains mandatory language with respect to the role to be played by the federal government:

> Agencies of the Federal Government responsible for public developments and projects shall cooperate and correlate their efforts by using the National Capital Planning Commission as the central planning agency for federal activities in the National Capital region.

*Id.* § 8722(a).  The provision goes on:

> To aid the Commission in carrying out this function, federal and District of Columbia governmental agencies on request of the Commission shall furnish plans, data, and records the Commission requires.

*Id.*  So while a federal agency is required to cooperate, section 8722(a) suggests that it is up to the Commission whether plans need to be submitted or not.

More mandatory language appears in section 8722(b), entitled, "Consultation between agencies and the Commission," but it is specifically related to "construction plans:"

> To ensure the comprehensive planning and orderly development of the National Capital, a federal or District of Columbia agency, before preparing construction plans the agency originates for proposed developments and projects . . . shall advise and consult with the Commission as the agency prepares plans and programs in preliminary and successive stages that affect the plan and development of the National Capital.

*Id.* § 8722(b)(1).

As to whether consultation was required, defendants point to a one sentence email from an individual identified as Director, Urban Design and Plan Review at the Commission, to an Associate Regional Director, Lands and Planning at NPS, saying, "I'm confirming that NCPC would not review the removal of bike lanes."  NPS A.R. 1197.  This email was sent on March 23, 2026, a month after the Park Service had already made its decision, and after the plan was made public and the original date was set for the work to commence.  There is no other material that explains whether the email was solicited or why it was sent at that time.  So if consultation was legally required, the belated, informal communication does not have an air of regularity, and it does not amount to record support for much. The parties dispute, though, whether "construction" was involved that would give rise to any obligation under section 8722(b)(1).  *See* Defs.' Cross-

56

Reply at 7.  The term "construction" is not defined in the statute.  The common primary meaning of "construct" is to build, *see Construct*, Merriam Webster Dictionary, https://perma.cc/6Y8L-APEW, ("[T]o make or form by combining or arranging parts or elements: build"), and "construction" is defined as "the process, art, or manner of constructing something," https://perma.cc/B8FU-7ZVF; *see also Construction*, Oxford English Dictionary, https://perma.cc/9AFE-2XE4, II.5.a. ("The action or process of constructing, building, assembling, or making something, or of causing something to be constructed or made; an instance of this.").  However, the term can also have a broader meaning that does not rule out the concept of renovating or restructuring.  *See id.* II.5.c. ("The discipline, skill, or work of constructing, esp. with reference to the erection of buildings and other large complex structures. Now also: *spec.* the field of activity associated with designing, engineering, and constructing houses, bridges, roads, etc.; the building industry as a whole."); *Construction*, Meriam Webster Dictionary, https://perma.cc/B8FU-7ZVF, 2(b) ("the construction industry").  Given the breadth of the term and the ambiguity created by the existing documents, any record created on remand should provide more clarity about NPS's consideration and resolution of this question.

### B.  The National Park Service Organic Act

The National Park Service was created by the Organic Act of 1916 and charged with the duty to:

> promote and regulate the use of the National Park System by means and measures that conform to the fundamental purpose of the System units, which purpose is to conserve the scenery, natural and historic objects, and wild life in the System units and to provide for the enjoyment of the scenery, natural and historic objects, and wild life in such manner and by such means as will leave them unimpaired for the enjoyment of future generations.

54 U.S.C. § 100101.  Congress supplemented and clarified these provisions through the General Authorities Act in 1970, and again through enactment of the 1978 amendment known as the

"Redwood Amendment." *See* Act of Mar. 27, 1978, Pub. L. No. 95-250, sec. 101(b), 92 Stat. 163, 166, codified at 54 U.S.C. § 100101(b)(2).   The Redwood Amendment provides that the "management" and "administration" of NPS units "shall not be exercised in derogation of the values and purposes for which the System units have been established, except as directly and specifically provided by Congress."  54 U.S.C. § 100101(b)(2).

Plaintiff submits that the removal of the bike lanes contravenes the statute's requirement that NPS regulate usage of the "[National] Mall in a manner that conserves park resources and values while providing for visitor enjoyment 'as will leave them unimpaired for the enjoyment of future generations.'"  *See* Pls.' Cross-Opp. at 35–36, quoting 54 U.S.C. § 10010.  But the broadly worded Act does not mandate the use of a cycle track.  And the impact of its removal on visitor safety, access, and enjoyment appears to relate more directly to the claim alleging arbitrary and capricious decisionmaking than the conservation of resources.  The Organic Act may or may not turn out to be germane to the review of a future decision, if any, and therefore the Court will decline to reach the Organic Act at this time.

## V.    The Appropriate Remedy Is to Vacate and Remand.

The Administrative Procedure Act is clear: "[t]he reviewing court shall . . . hold unlawful *and set aside* agency action . . . found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.  5 U.S.C. § 706(a)(2) (emphasis added).

Defendants submit that the proper remedy in this case would be a remand without vacatur in accordance with *Allied-Signal, Inc., v. U.S. Nuclear Regulatory Commission*, 988 F.2d 146 (D.C. Cir. 1991).  Defs.' Cross-Reply at 11–12; *see also* Defs.' Suppl. Mem. at 2–5.  That opinion did observe that "[a]n inadequately supported rule . . . need not be vacated."  *Allied-Signal*, 988

F.2d at 150.  But this case is not about a rule.  And more importantly, the Court of Appeals went on to provide guidance on the factors to be considered when considering what remedy to impose:

> The decision whether to vacate depends on the seriousness of the order's deficiencies (and thus the extent of doubt whether the agency chose correctly) and the disruptive consequences of an interim change that may itself be changed.

*Id.* at 150–51, quoting *Int'l Union, United Mine Workers of Am. v. FMSHA*, 920 F. 2d 960, 967 (D.C. Cir. 1990) (internal quotation marks omitted).  Here the failure to address safety concerns gives rise to considerable doubt about whether the agency chose the correct course.  And remand without vacatur is inappropriate given the immediate safety risks posed by the Removal Project and defendants' emphatic unwillingness to delay demolition beyond April 22.  Even if the vacatur is later overturned, that change will not have any appreciable disruptive impact on the interests cited by the defendants in favor of the project; the order does not involve tearing anything down that would then have to be rebuilt – it is the precisely the opposite.

The massive celebration of the 250th anniversary of the United States Army, the 2026 Cherry Blossom Festival, multiple July 4th fireworks displays, and many other gatherings on the National Mall have proceeded unimpeded since the installation of the bike lanes five years ago, and defendants have not suggested that the events planned for the rest of the summer will be negatively affected if they proceed pending the analysis that should have been undertaken in the first place.  Moreover, the failure to address the undisputed relationship between dedicated bike lanes and safety is the sort of serious deficiency that weighs in favor of vacatur.

However, the Court will decline plaintiff's invitation to step outside the boundaries of ordinary practice in an APA case and enter a permanent injunction.  The cases cited by WABA at the hearing and in its papers as examples to be followed involved violations of the First Amendment, and not the review of agency action under the APA.  *Nat'l Pub. Radio, Inc. v. Trump*,

59

2026 WL 877434, at *1 (D.D.C. Mar. 31, 2026); *see also Am. Fed'n of Gov't Emps. v. U.S. Dep't of Educ.*, 2025 WL 3123707, at *1 (D.D.C. Nov. 7, 2025). The ruling in *League of United Latin American Citizens v. Executive Office of the President*, 2026 WL 252420 (D.D.C. Jan. 30, 2026), which included a permanent injunction, was also predicated on a finding that the challenged Executive Order directing heads of federal agencies to assess citizenship before providing voter registration forms to enrollees in public assistance programs violated the Constitution. *Id.* at *1– 4. All of those are easily distinguished from the APA case before the Court.

## CONCLUSION

The Court finds the decision to proceed with the 15th Street Cycle Track Removal to be arbitrary and capricious because the record does not reflect that the defendants examined the relevant data and articulated a rational connection between the facts found and the choice made. It further finds that the defendants' invocation of the highway modernization categorical exclusion, and their conclusion that the Removal Project would not have a significant impact on public health and safety, to be arbitrary and capricious as well. Therefore, the decision to proceed with the Removal Project as described in the March 31, 2026 NPS Decision Memorandum and the March 31, 2026 NPS and FHWA Categorial Exclusion documents, as well as in the February 23 NPS and February 27 FHWA Categorical Exclusion documents to the extent they were not rescinded or nullified but only elaborated upon on March 31, is hereby **VACATED** and **REMANDED** to the National Park Service and the Federal Highway Administration. This means, as counsel for the defendants acknowledged on the record at the hearing, that the decision is null and void, and the Removal Project may not and will not proceed on April 23, 2026. Given the ruling in plaintiff's favor on the merits, plaintiff's request for interim relief is denied as **MOOT**.

A separate order will issue.

AMY BERMAN JACKSON
United States District Judge

DATE:  April 21, 2026